No. 25-1677

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

———————————

AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, et al.,

Plaintiffs-Appellees,

v.

UNITED STATES OFFICE OF PERSONNEL MANAGEMENT, et al.,

Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the Northern District of California

———————————

## EMERGENCY MOTION UNDER CIRCUIT RULE 27-3 FOR A STAY
## PENDING APPEAL AND FOR AN IMMEDIATE ADMINISTRATIVE
## STAY PENDING DISPOSITION OF THE STAY MOTION

———————————

YAAKOV M. ROTH
   *Acting Assistant Attorney General*

PATRICK D. ROBBINS
   *Acting United States Attorney*

MARK R. FREEMAN
COURTNEY L. DIXON
CASEN B. ROSS
JOSHUA M. KOPPEL
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7270*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, DC 20530*
   *(202) 514-1923*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................1

STATEMENT .......................................................................................3

    A.    Statutory And Regulatory Background........................................3

    B.    Factual Background ...................................................................5

    C.    Prior Proceedings......................................................................7

ARGUMENT ..................................................................................... 11

I.    THE GOVERNMENT IS LIKELY TO PREVAIL ON THE MERITS ........................... 11

    A.    The District Court Lacked Jurisdiction To Enter The Extraordinary Relief Ordered .......................................................11

    B.    In All Events, The Reinstatement Order Is Baseless................................18

II.    The Equitable Factors Favor an Immediate Stay ................................. 20

CONCLUSION ................................................................................ 24

CERTIFICATE OF COMPLIANCE

## INTRODUCTION

The district court (Alsup, J.) issued an unprecedented preliminary injunction directing six federal departments and agencies (with more likely to follow) to immediately offer reinstatement to thousands of probationary employees who were terminated in February 2025. The district court expressly invited the government to appeal, which the government did the same day. This Court should now stay the court's extraordinary order pending appeal, and grant an immediate administrative stay while the Court considers this motion. Chaos will ensue absent a stay, as employees who were lawfully terminated must be offered (and may well accept) reinstatement, only to potentially lose their jobs again if the district court's order is vacated.

And vacatur is inevitable, given the district court's series of jurisdictional and factual errors. The court acted on claims by a set of non-profit organizations whose members use government services and who allege that the terminations will cause a reduction in those services, thereby harming plaintiffs' members or organizational missions. That theory of downstream harm rests on a highly attenuated chain of inferences that cannot establish an Article III injury-in-fact, nor can plaintiffs link their theory of illegality (a lack of OPM authority) to the injury they assert, failing to establish both traceability and redressability. Moreover, Congress has channeled all federal employment disputes into an administrative process with judicial review in the U.S. Court of Appeals for the Federal Circuit. Allowing strangers to that federal-

employment relationship to circumvent that process would upend a reticulated statutory scheme and contravene Supreme Court precedent. Were plaintiffs' theory correct, downstream users of government services could always go directly to court to raise challenges that Congress has required the employees themselves to first pursue administratively.

Beyond that, the district court's injunction does not follow from the legal problem the court identified. Plaintiffs argued, and the court found, that the termination decisions had been directed by the Office of Personnel Management (OPM), without statutory authority. But *all agree* that OPM lacks statutory authority to direct agencies to terminate probationary employees, and OPM issued a memorandum *expressly clarifying* that "OPM is not directing agencies to take any specific performance-based actions regarding probationary employees" and that "[a]gencies have ultimate decisionmaking authority." Dkt. 64-1, at 2. That should have solved the court's concern. Insofar as the agencies stood by their employment decisions, it is now clear they did so of their own volition, rather than under the ostensible thumb of OPM. Yet the district court, without evidence, decried the clarifying memorandum as a "sham" and required agencies to offer to reinstate probationary employees—thereby usurping the very agency power it was supposedly protecting.

In addition to the district court's extraordinary remedy of reinstatement, the court also apparently prohibited OPM from giving certain guidance to other agencies

regarding probationary employees, despite express statutory authority to do so, 5 U.S.C. § 1103; *see also* 5 C.F.R. §§ 315.801-806. The court also purported to prohibit agencies from using OPM-provided template letters, and it authorized open-ended discovery in a case brought under the Administrative Procedure Act (APA), without considering the applicable legal framework.

To correct these errors and stem the unnecessary chaos they will cause, the Court should grant an immediate administrative stay and a stay pending appeal.

## STATEMENT

### A.    Statutory And Regulatory Background

**1.** The Office of Personnel Management is tasked with assisting the President in overseeing the federal workforce. Congress has instructed OPM to, among other things, "aid[] the President … in preparing such civil service rules as the President prescribes, and otherwise advis[e] the President on actions which may be taken to promote an efficient civil service …, including recommending policies relating to the selection, … tenure, and separation of employees." 5 U.S.C. § 1103(a)(7).

Federal law provides that "[t]he President may … provide … for a period of probation" for federal employees "before an appointment in the competitive service becomes final." 5 U.S.C. § 3321(a)(1); *see id.* § 7511(a)(1). Exercising this authority, OPM has issued rules defining the probationary term and specifying that agencies "shall utilize the probationary period as fully as possible to determine the fitness of the employee and shall terminate his or her services during this period if he fails to

3

demonstrate fully his or her qualifications for continued employment." 5 C.F.R.
§§ 315.801, 315.802, 315.803(a).

**2.**  The Civil Service Reform Act (CSRA) "establishe[s] a comprehensive
system for reviewing personnel action taken against federal employees." *United States
v. Fausto*, 484 U.S. 439, 455 (1988).  Through that statute, Congress created an
"integrated scheme of administrative and judicial review, designed to balance the
legitimate interests of the various categories of federal employees with the needs of
sound and efficient administration." *Id.* at 443.  Under the CSRA, most civilian
employees of the federal government can appeal a major adverse personnel action—
including a removal, suspension for more than 14 days, or furlough of 30 days or
less—to the Merit Systems Protection Board (MSPB).  5 U.S.C. §§ 7512, 7513(d),
7701.  The MSPB can order relief to prevailing employees, including reinstatement.
*Id.* § 1204(a)(2), 7701(g).  An employee aggrieved by a final decision of the MSPB may
obtain judicial review of that decision.  *Id.* § 7703(a)(1).

Federal employees in their probationary period generally do not have a right to
appeal to the MSPB, as they are not considered "employee[s]" for such purposes.
5 U.S.C. § 7511(a)(1); *see also* 5 C.F.R. § 315.806 (permitting probationary employees
to appeal to the MSPB only on specific issues).  But probationary employees may in
appropriate circumstances pursue relief by filing complaints alleging certain prohibited
personnel practices with the Office of Special Counsel, which may in turn pursue
administrative relief before the MSPB.  *See* 5 U.S.C. §§ 1212, 1214.

In addition, the Federal Service Labor–Management Relations Statute (FSLMRS) governs labor relations between the Executive Branch and its employees. *See* 5 U.S.C. §§ 7101-7135; *American Fed'n of Gov't Emps. v. Trump* (*AFGE*), 929 F.3d 748, 752 (D.C. Cir. 2019). The Federal Labor Relations Authority (FLRA) is charged with adjudicating federal labor disputes. 5 U.S.C. § 7105(a)(2). Direct review of the FLRA's decisions is available in the courts of appeal. *Id.* § 7123(a).

### B.  Factual Background

**1.a.**  On January 20, 2025, President Trump immediately took steps to optimize the size of the federal workforce and limit hiring to mission-critical positions. To that end, the President issued a memorandum instituting a hiring freeze of federal civilian employees, and ordering agencies to identify ways to reduce the size of the federal government. Dkt. 111-6, at 1-2; *see also* Exec. Order No. 14,210, 90 Fed. Reg. 9669 (Feb. 14, 2025) (clarifying terms of the hiring freeze).

The same day, OPM Acting Director Charles Ezell transmitted to Executive Branch agencies a memorandum "providing … guidance … regarding critical potential personnel actions." Dkt. 111-1, at 1. The memorandum explained that "[p]robationary periods are an essential tool for agencies to assess employee performance and manage staffing levels." *Id.* Ezell instructed agencies to "identify all employees on probationary periods" and to "promptly determine whether those employees should be retained at the agenc[ies]." *Id.*

5

On February 12, OPM sent agency Chiefs of Staff an email titled "Probationary Employee Actions." Dkt. 111-5, at 1. The email instructed the agency Chiefs of Staff to "partner with your [agency Chief Human Capital Officer (CHCO)] to action those you know you wish to separate … using the attached template letter." *Id.* Agencies were directed to report to OPM "[w]hich probationary employees have been terminated and which [the agencies] plan to keep." *Id.*

On February 14, OPM provided additional guidance to agencies through an email to the CHCO Council, an interagency forum to coordinate on federal human-resources matters. Dkt. 111-2. OPM explained that "'[a]n appointment is not final until the probationary period is over,'" and that "'[u]ntil the probationary period has been completed,' a probationer has 'the burden to demonstrate why it is in the public interest for the Government to finalize [his] appointment to the civil service.'" *Id.* OPM advised that "[a]n employee's performance must be measured in light of the existing needs and interests of government," and that employees would have the requisite "qualifications for continued employment" only if they are "high-performing … in mission critical areas." *Id.* at 1-2.

On February 24, OPM again emailed the CHCO Council, noting that "[a]s agencies continue to make decisions on whether to retain probationary employees, OPM has received numerous questions." Dkt. 111-4. OPM provided a frequently-asked-questions document "[t]o assist agencies in carrying out their decisions." *Id.*

6

OPM did not direct agencies to terminate any particular probationary employees; rather, OPM instructed agencies to engage in a review of probationers based on how their performance was advancing the agencies' mission. *See, e.g.*, Dkt. 111-3, at 1 (posing the question: "How should agencies evaluate the performance of an employee serving a probationary or trial period?").

**b.** Beginning on February 13, federal agencies terminated a number of federal employees serving in their probationary periods. The Department of Veterans Affairs, for example, dismissed "more than 1,000 employees," consistent with "a government-wide Trump Administration effort to make agencies more efficient, effective and responsive to the American People." Dkt. 11-9, at 1-2. The Department of Agriculture announced that it "is pursuing an aggressive plan to optimize its workforce," including "by eliminating positions that are no longer necessary." Dkt. 111-10, at 2. And the Department of Defense announced that it "is re-evaluating [its] probationary workforce, consistent with the President's initiative to reform the Federal workforce to maximize efficiency and productivity," noting that its "leaders are carrying out that [re-evaluation] carefully and smartly" "to produce efficiencies and refocus the Department on the President's priorities and restoring readiness in the force." Dkt. 111-11, at 1.

### C. Prior Proceedings

**1.a.** Four labor unions filed this action on February 19, 2025. Dkt. 1. On February 23, plaintiffs filed an amended complaint adding as plaintiffs five additional

organizations: Main Street Alliance, a network of small businesses; Coalition to

Protect America's National Parks, a non-profit organization comprised of individuals

associated with the National Park Service; Western Watersheds Project, an

environmental conservation group; and Vote Vets Action Fund Inc. (VoteVets) and

Common Defense Civic Engagement (Common Defense), organizations that work

on behalf of veterans. Dkt. 17, at 5-7. The action was brought against OPM and

Acting OPM Director Ezell. *Id.* at 1. Plaintiffs alleged, *inter alia*, that OPM acted in

excess of its statutory authority, and in contravention of agencies' own statutory

authority to hire and manage their workers, by "order[ing] federal agencies" to

terminate employees. *Id.* at 1-2, 24-28.

Plaintiffs also filed an *ex parte* motion for a temporary restraining order. Dkt.

18. They argued that the organizational (*i.e.*, non-union) plaintiffs were injured by

OPM's challenged conduct because the termination of probationary employees would

affect the federal government's ability to provide certain services. Dkt. 18-1, at 32-33.

**b.** On February 27, the district court issued a temporary restraining order from

the bench. Dkt. 41. In a written order the next day, the court reasoned that it "likely

… lacks jurisdiction to hear the union plaintiffs' claims" because Congress has

channeled claims arising out of federal employment actions and labor disputes to the

MSPB and FLRA. Dkt. 45, at 11-12. But the court determined that it likely does

have jurisdiction over the claims of the organizational plaintiffs because they are not

federal employees or their union representatives, and their claims are "ill-suited to

adjudication by a *labor* board." *Id.* at 13. The court further reasoned that these plaintiffs have standing because terminating federal employees may, in turn, harm the plaintiffs' organizational missions or affect the government services provided to plaintiffs' members. *Id.* at 14-22.

On the merits, the district court noted that OPM had "concede[d] that it lacks the authority to direct firings outside of its own walls." Dkt. 45, at 8. The court failed to credit the plain language of the guidance that OPM sent to agencies directing that they conduct their own review of probationary employees, and instead found that the agencies likely terminated employees at the direction of OPM. *Id.*

As to the equities, the district court stated that the Coalition to Protect America's National Parks and Western Watersheds Project are likely to suffer "loss of access to national recreational areas," that other plaintiffs' members would suffer from diminished services at the Department of Veterans Affairs or Small Business Administration, and that plaintiffs had diverted significant resources to responding to the hardships created by the termination of probationary employees. Dkt. 45, at 22-23. The court therefore issued a temporary restraining order invalidating OPM's January 20 memorandum and February 14 email and requiring OPM to provide written notice of the order to six agencies. *Id.* at 24.

**c.** OPM promptly complied with the court's temporary restraining order—rescinding the relevant communications and notifying the specified agencies. Dkt. 75, at 3; Dkt. 76, at 1 ¶ 4. Moreover, on March 4, OPM revised its earlier guidance to

clarify: "OPM is not directing agencies to take any specific performance-based actions regarding probationary employees." Dkt. 64-1, at 2. OPM emphasized that "[a]gencies have ultimate decision-making authority over, and responsibility for, such personnel actions. *Id.*; *see also* Dkt. 78 (revised OPM guidance).

On March 11, plaintiffs filed a second amended complaint adding additional plaintiffs and naming 22 additional federal agencies as defendants "for relief purposes only." Dkt. 90, at 5-17.

**2.** On March 13, the district court held an evidentiary hearing, at the conclusion of which it issued a preliminary injunction—even though plaintiffs had never filed a motion for that relief and defendants never had an opportunity to respond to such a motion. Dkt. 115; 3/13/25 Tr. 56:25-57:1.

The court ordered the Departments of Veterans Affairs, Agriculture, Defense, Energy, Interior, and Treasury to "immediately"—without waiting for a written order—"offer reinstatement to any and all probationary employees terminated on or about February 13th and 14th 2025"; "cease any termination of probationary employees at the direction of … OPM"; cease using a template termination notice provided by OPM; and submit, within seven days, a list of all probationary employees who were terminated, explaining "as to each of what has been done to comply with" the court's order. 3/13/25 Tr. 52:7-24, 53:13-25, 54:5-9. The court further stated it may "extend[] the relief … to other agencies." *Id.* at 54:1-4. The court also opened

discovery and ordered deposing an OPM official, *id.* at 54:10-14, and court invited the government to appeal, *id.* at 56:12-13, 56:24-25.

**3.** On March 14, the government sought a stay pending appeal. Dkt. 127. The district court has not acted on that motion.

## ARGUMENT

In considering a stay pending appeal, this Court examines "(1) whether the stay applicant … is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties …; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 426 (2009). These factors overwhelmingly favor a stay.

## I. THE GOVERNMENT IS LIKELY TO PREVAIL ON THE MERITS

### A. The District Court Lacked Jurisdiction To Enter The Extraordinary Relief Ordered

**1. Article III Standing.** Plaintiffs are non-profit organizations who contend that OPM's alleged unlawful direction to agencies to terminate probationary employees will cause downstream harms to their members' access to certain government services and their organizational missions. Like any litigant, "organizations must fully satisfy the traditional requirements of Article III standing." *See Arizona Alliance for Retired Americans v. Mayes*, 117 F.4th 1165, 1170 (9th Cir. 2024). Plaintiffs must show that their members have an injury-in-fact that is "fairly traceable to the challenged conduct of the defendant" and "likely to be redressed by a favorable

decision." *Spokeo, Inc. v. Robbins*, 578 U.S. 330, 338 (2016). Plaintiffs have shown neither a cognizable injury nor redressability.

**a.** Plaintiffs' attenuated theory of harms does not establish an injury-in-fact. Plaintiffs allege indirect harms from agencies' termination of probationary employees, which they assert will cause various delays or disruptions in government services. But plaintiffs merely speculate that the terminations will impair or delay specific government services. *See, e.g.*, Dkt. 18-16, at 3-4 ¶¶ 8-9 (asserting that terminated employees at the Small Business Administration "will make access to [certain] financial assistance slower and less reliable," which will "likely to have ripple effects" across the economy); Dkt. 18-15, at 2 ¶ 5 (alleging that Yosemite National Park "will likely have to stop specific functions and close park areas" because "[w]hen there was a partial government shutdown in 2018, visitors trashed scenic view points" and "trampled sensitive ecological areas"); Dkt. 45, at 17-18 (asserting that the Bureau of Land Management may be unable to provide timely "land health assessments" and that the Fish and Wildlife Service may be unable to meet deadlines in separate litigation).

Plaintiffs cite only a handful of instances of alleged delays. And even as to those examples—far too scant to justify the sweeping relief against multiple agencies—plaintiffs only speculate that the delays are related to terminated probationary employees, rather than other agency decisions. *See, e.g.*, Dkt. 18-13, at 3 ¶ 8 (asserting without further information that a staff member at the Bureau of Land

12

Management identified "staffing issues" in not responding to a request); Dkt. 39-3, at 1 ¶ 4 (alleging that a bathroom facility in Joshua Tree National Park, "remained closed well after its scheduled opening time" during one organizational members' visit). On plaintiffs' sweeping view of standing, end users of government services could use the courts to second-guess agencies' personnel decisions—whether that be hiring or firing, opening an office in a different location, or shifting employees between offices; but those actions would traditionally be challenged, if at all, by affected employees. *Cf. Perry v. Newsom*, 18 F.4th 622, 634 (9th Cir. 2021) (asserting a "generalized grievance" that is "undifferentiated and common to all members of the public" cannot establish an injury-in-fact (quotations omitted)).

The district court also concluded that plaintiffs VoteVets and Common Defense had established an Article III injury from having to "divert" organizational resources to respond to questions from their members and supporters about potential actions by the Department of Veterans Affairs. *See* Dkt. 45, at 20-21; *see also* Dkt. 18-7, at 3 ¶ 11; Dkt. 18-3, at 2-3 ¶ 6. That standing theory is squarely foreclosed by *FDA v. Alliance for Hippocratic Medicine*, which makes clear that "divert[ing] [organizational] resources in response to a defendant's actions" is not an Article III injury-in-fact. 602 U.S. 367, 395 (2024); *see also Mayes*, 117 F.4th at 1175 (recognizing that this Court's standing decisions "erred to the extent that [they] suggested that the mere diversion of resources in response to a policy can provide standing").

13

**b.** In any event, plaintiffs' alleged downstream harms do not support the injunctive relief ultimately ordered. Plaintiffs' central claim in this case is that OPM unlawfully directed other agencies to fire probationary employees without statutory authority to do so. But, in the course of this litigation, OPM has already issued revised guidance to all agencies on March 4 clarifying that "OPM is not directing agencies to take any specific performance-based actions regarding probationary employees," and that "[a]gencies have ultimate decision-making authority over, and responsibility for, such personnel actions." Dkt. 78; *see also* Dkt. 75, at 3. That made pellucid that an agency exercised its own judgment in hiring and firing decisions. At least one agency did rescind some probationary employees' terminations. *See* 3/13/25 Tr. 15. Most did not. *See, e.g.*, Dkt. 111-11.

For that reason, any alleged harms experienced by the plaintiffs from the downstream effects of the terminations of probationary employees are not plausibly traceable to any extant "order" by OPM; rather, they are traceable, at most, to each agency's independent decision to adhere to prior terminations. Relatedly, those harms are not redressable by relief the district court could properly order on plaintiffs' claims: vacating the original OPM guidance will not restore the jobs and lead to the provision of services that plaintiffs seek to use, especially when that guidance has already been withdrawn. *See* Dkt. 75, at 3. That should have been the end of this case.

14

**2. CSRA Channeling.** Even if plaintiffs have Article III standing, the government is likely to succeed on appeal because the district court lacks subject-matter jurisdiction over plaintiffs' claims. Plaintiffs' claims seek to litigate personnel actions by federal agencies. But Congress has "established a comprehensive system" that provides the "exclusive means" for reviewing such matters. *Elgin v. Department of Treasury*, 567 U.S. 1, 5, 8 (2012).

The CSRA, together with the FLSMRS for federal labor-management relations, "creates an integrated scheme of administrative and judicial review, wherein Congress intentionally provided—and intentionally chose not to provide—particular forums and procedures for particular kinds of claims." *AFGE v. Secretary of Air Force*, 716 F.3d 633, 636 (D.C. Cir. 2023) (quotations and citations omitted). Congress allowed certain individual federal employees who are affected by agency personnel decisions to challenge those decisions "by litigating their claims through the statutory scheme in the context of [a] concrete" dispute, with the claims and remedies provided by Congress. *See AFGE, AFL-CIO v. Trump*, 929 F.3d 748, 757 (D.C. Cir. 2019). But Congress did not permit all federal employees to challenge all employment actions. With respect to probationary employees in particular, an employee can seek MSPB review only of "a termination not required by statute which [the employee] alleges was based on partisan political reasons or marital status" or that "was not effected in accordance" of specified procedural requirements. 5 C.F.R. § 315.806. Probationary

employees can also lodge complaints with the Office of the Special Counsel, which can investigate prohibited personnel practices. 5 U.S.C. §§ 1212, 1214.

The district court acknowledged this comprehensive scheme, *see* Dkt. 45, at 11, but misunderstood the scope of Congress's choice to preclude district-court jurisdiction. Although the court recognized that individual employees and labor unions would have to channel their claims, it reasoned that non-profits may bring their claims outside those schemes because they allege that agency terminations will reduce certain government services that will affect their members and organizational missions. Dkt. 45, at 13. That is incorrect. "Congress designed the CSRA's remedial scheme with care, 'intentionally providing—and intentionally not providing— particular forums and procedures for particular kinds of claims" at the behest of particular types of plaintiffs. *Grosdidier v. Chairman, Broad. Bd. of Governors*, 560 F.3d 495, 497 (D.C. Cir. 2009); *see United States v. Fausto*, 484 U.S. 439, 455 (1988) (explaining that Congress's "deliberate exclusion of employees in respondent's service category" from the CSRA's comprehensive scheme "for [challenged] personnel actions" "prevents respondent from seeking review" through other channels). Congress's exclusion of non-profits alleging downstream effects from agency terminations from the CSRA's comprehensive review scheme indicates that plaintiffs cannot bring these claims *at all*; they cannot "circumvent the [CSRA's] requirements and limitations by" filing an APA action in district court. *Grosdidier*, 560 F.3d at 497.

16

The district court further reasoned, at least in granting a temporary restraining order, that plaintiffs' claims do not have to be channeled because plaintiffs sued OPM rather than the individual employing agencies. Dkt. 45, at 13. But plaintiffs' claims are squarely directed to agency termination decisions, *e.g.*, Dkt. 17, at 10-11; and regardless, whatever may have been true of the nature of plaintiffs' claims at the time of the district court's temporary restraining order—when OPM was the only agency defendant—plaintiffs have now amended their complaint to bring claims directly against the employing agencies, *see* Dkt. 90. Indeed, it was only because of that amendment that the court (erroneously) thought it had authority to issue a broad injunction ordering reinstatement.

It would be odd, to say the least, if claims that cannot be raised in district court by the federal employees directly affected by the challenged actions (or by the unions who represent those employees) could instead be raised by organizational plaintiffs that assert injuries several steps removed. Indeed, under plaintiff's theory, district courts would presumably be permitted to review nearly *any* agency employment decision at the behest of organizational plaintiffs, so long as those employment decisions have any plausible downstream effect on federal government services. *See supra* p. 14. Congress did not intend district courts to superintend federal employment decisions in this posture. The district court erred in holding otherwise.

17

### B.    In All Events, The Reinstatement Order Is Baseless

Even assuming the non-union plaintiffs have standing and were not required to channel their claims to the MSPB or the FLRA, the district court had no grounds to order reinstatement.  As discussed, plaintiffs' central claim asserts that OPM lacks statutory authority to direct other agencies to terminate probationary employees.  No one disputes that as a legal matter.  OPM's role is to provide support, guidance, and coordination with respect to federal human-resources policy, consistent with its statutory and regulatory responsibilities.  5 U.S.C. § 1103.  It does not—and cannot—make personnel decisions for other agencies.

Thus, when the district court granted plaintiffs a temporary restraining order that directed OPM to rescind certain communications to agencies and notify agencies of the court's decisions, OPM complied with the court's order and, further, issued clarifying guidance.  *See supra* pp. 9-10, 14.  OPM has now made clear that "[a]gencies have ultimate decision-making authority over, and responsibility for," performance-based personnel actions against probationary employees.  Dkt. 64-1, at 2.  That should have been the end of this case—any confusion was cleared up, and no agency could shift accountability to OPM.  As discussed above, at least one agency rescinded terminations, but most did not.  That result is unsurprising—the President directed agencies to optimize the federal workforce, and agencies may make employment decisions against the backdrop of that policy choice.  *See* Exec. Order No. 14,210 § 3.

18

Plaintiffs have provided no evidence to doubt that OPM's March 4 memorandum resolved any confusion and ensured proper political accountability for all of the agencies' terminations. And plaintiffs have not questioned the agencies' authority to terminate probationary employees, nor provided any reason to suggest those terminations are unlawful, apart from OPM's supposed "order." Nonetheless, the district court—without any preliminary injunction briefing—derided OPM's clarification as a "sham" and granted plaintiffs the extraordinary relief of directing reinstatement at specific agencies, remarking that "maybe" an injunction is needed to "tell[] [agencies] to rehire [probationary employees]," 3/13/25 Tr. 15-16.

Consequently, while the plaintiffs purported to vindicate agencies' right to make their own personnel choices, this case became a vehicle for a single district court to usurp that authority by ordering agencies to broadly reinstate employees who had been intentionally let go. Indeed, it is unclear from the court's order how an agency could prove that it exercised its own authority in making personnel decisions. The court's bench-issued injunction suggests that the court wants to hear live testimony from officials at each agency, so the court can assess whether those officials credibly engaged in decision-making independent from OPM. 3/13/25 Tr. 16. But APA review ordinarily "should not involve probing the 'mental processes' of administrative decisionmakers"; it is typically "limited to the administrative record," *In re U.S. Dep't of Educ.*, 25 F.4th 692, 701 (9th Cir. 2022), which has yet to be compiled here.

It is one thing to enjoin an unlawful act. It is quite another entirely to enjoin a lawful act on the theory that the actor may have been confused, even as the actor stands by and insists there is no confusion.

## II. The Equitable Factors Favor an Immediate Stay

The equitable factors all strongly favor a stay. Allowing the injunction to take effect threatens irreparable injuries to the government and the public, whose interests "merge" here. *Nken*, 556 U.S. at 435. And even assuming plaintiffs established irreparable injury, any such injury is "plainly outweigh[ed]" by the public interest and the President's interest in effective and efficient management of the Executive Branch. *Winter v. NRDC, Inc.*, 555 U.S. 7, 26 (2008).

**A.** The harms to the government from the district court's order are manifest. It requires agencies to offer reinstated employment to more than 16,000 employees at six federal agencies. 3/13/25 Tr. 53; Dkt. 127-1, at 1 ¶ 8; Dkt. 127-2, at 1 ¶ 7; Dkt. 127-3, at ¶; Dkt. 127-3, at 2 ¶ 9; Dkt. 127-4, at 1 ¶ 4; Dkt. 127-5, at 1 ¶ 7; Dkt. 127-6, at 1 ¶ 4. It also prohibited OPM from providing guidance to federal agencies on personnel matters, which precludes OPM from exercising its statutorily assigned role, with no stated reason. *See* 5 U.S.C. § 1103; 3/13/25 Tr. 52-53.

Implementing the preliminary injunction will be extraordinarily burdensome for the affected agencies, current agency employees, and the probationary employees themselves. *See, e.g.*, Dkt. 127-3, at 2-3 ¶¶ 10-14; Dkt. 127-6, at 1 ¶ 5. At the outset, the injunction requires the impacted agencies to contact thousands of terminated

employees and offer them reinstated employment—itself a substantial administrative burden, *e.g.* Dkt. 127-2, at 2 ¶ 9—and then onboard employees who accept. That onboarding process is an extensive one, and includes assigning workspace, issuing appropriate credentials, enrolling in benefits programs, and completing required training. *E.g.*, Dkt. 127-5, at 2 ¶ 9. And it is particularly odd to require these steps in response to a suit by these plaintiffs, who are users of government services.

The injunction also imposes substantial costs on probationary employees who accept reinstatement. Even after reinstatement, those employees would still be probationary. *E.g.*, Dkt. 127-4, at 1 ¶ 7. And they would still be subject to their agencies' independent decision-making about whether to retain their employment and what tasks to assign to them—which plaintiffs have not challenged here—plus the uncertainty of being reinstated while the district court's order is on appeal and is likely to be reversed. That uncertainty would perpetuate chaos and confusion. *E.g.*, Dkt. 127-2, at ¶ 10.

**B.** On the other side of the ledger, the organizational plaintiffs have not established any irreparable injury warranting the district court's sweeping relief.

As discussed above, plaintiffs' allegations of reduced access to certain government services as a downstream effect of agencies' terminations of probationary employees do not establish an Article III injury-in-fact, let alone irreparable harm warranting the extraordinary relief of immediate reinstatement of terminated employees. Plaintiffs largely assert, for example, injuries associated with a delay in

discrete government services. *E.g.*, Dkt. 18-13, at 1-2 ¶ 7 (request for records under the Freedom of Information Act); Dkt. 18-16, at 2-3 ¶¶ 7-8 (application for financial assistance from the Small Business Association); Dkt. 39-2, at 1-2 ¶¶ 3-4 (activities involving endangered species). Even if such delays could establish an Article III harm, any such "delay-related hardship[s]" do not suffice to establish *irreparable* injury, and plaintiffs' declarations provide nothing to suggest to the contrary. *See Odell v. U.S. Dep't of Health & Hum. Servs.*, 995 F.3d 718, 724 (9th Cir. 2021) (quotations omitted) (vacating preliminary injunction). The district court further concluded that plaintiffs had established irreparable harm from the "degradation" of wildlife and national parks. *See* Dkt. 45, at 22 (speculating that the "Artic grayling, if it goes, is not coming back."). But plaintiffs' declarations do not establish that any such degradation is likely or imminent, and the mere "possibility" of harm is insufficient. *See Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 996 (9th Cir. 2011) (quoting *Winter*, 555 U.S. at 22).

For similar reasons, plaintiffs' other allegations of a "[l]oss of access" to critical government services credited by the district court, Dkt. 45, at 22-23, do not establish any imminent irreparable injury. Plaintiffs provided only speculation that one national park would "likely have to stop specific functions and close park areas," Dkt. 18-15, at 1-2 ¶ 5, and an isolated allegation of a delayed "opening time" of facilities at one other park, Dkt. 39-3, at 1 ¶ 4. And while plaintiffs also broadly suggested that "support staff" recruitment has been hindered for "trainers and quality assurance personnel"

22

for the Veterans Crisis Line—which provides emergency mental health care for veterans and their families—they failed to provide any concrete specifics about how that crisis hotline's operations have been impacted. Dkt. 18-7, at 2 ¶ 9.

At a minimum, plaintiffs' assertions of irreparable harm are insufficient to warrant relief with respect to all six of the federal agencies subject to the injunction. 3/13/25 Tr. 53 (applying injunction to the Departments of Veterans Affairs, Agriculture, Defense, Energy, Interior, and Treasury). The district court made no findings of any harms with respect to the Departments of Agriculture, Defense, Energy, or Treasury—nor were those agencies afforded the opportunity to oppose any preliminary injunction motion against them, since plaintiffs filed no such motion. *See* Dkt. No. 22-23. This Court has previously reversed broad injunctions that lacked record support, *see, e.g., City & County of San Francisco v. Trump*, 897 F.3d 1225, 1244-45 (9th Cir. 2018); *California v. Azar*, 911 F.3d 558, 584 (9th Cir. 2018), and it should do so here.

**C.** The district court's preliminary injunction is particularly unsupported given that it does not plausibly remedy plaintiffs' alleged irreparable harms. Even crediting plaintiffs' allegations of an imminent diversion of certain government resources, that could be remedied by the district court's injunction only if terminated probationary employees are restored to those specific tasks—relief the district court did not (and could not properly) order. The district court's order is therefore maximally disruptive

23

to government services, while providing minimal if any relief to plaintiffs' asserted downstream harms.

Respectfully, the balance of equities in this case is not close. An immediate stay is necessary.

## CONCLUSION

The Court should stay the preliminary injunction pending appeal and enter an immediate administrative stay pending consideration of this motion.

Respectfully submitted,

YAAKOV M. ROTH
*Acting Assistant Attorney General*

PATRICK D. ROBBINS
*United States Attorney*

MARK R. FREEMAN
COURTNEY L. DIXON

*s/ Casen B. Ross*

CASEN B. ROSS
JOSHUA M. KOPPEL
*Attorneys, Appellate Staff*
*Civil Division, Room 7270*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-1923*
*casen.ross@usdoj.gov*

March 2025

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I hereby certify that this motion complies with Federal Rule of Appellate Procedure 27(d)(1)(E) because it has been prepared using in 14-point Garamond, a proportionally spaced typeface, and that it complies with the type-volume limitation of Circuit Rule 27-1(1)(d) and 32-3(2) because it contains 5,599 words, according to Microsoft Word.

*s/ Casen B. Ross*
Casen B. Ross