No. 25-1677

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

American Federation of Government Employees (AFGE), et al
*Plaintiff -Appellees*,
v.

The Office of Personnel Management et al
*Defendant -Appellants*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTICT OF CALIFORNIA
No. 3:25-cv-01780-WHA
The Honorable Judge William Alsup

_____

## PLAINTIFF-APPELLEES' OPPOSITION TO
## MOTION FOR ADMINISTRATIVE STAY

_____

Scott A. Kronland
Stacey M. Leyton
Eileen B. Goldsmith
Danielle E. Leonard
Robin S. Tholin
James Baltzer
ALTSHULER BERZON LLP
177 Post St., Suite 300
San Francisco, CA 94108
Tel.: (415) 421-7151
dleonard@altber.com

*Attorneys for Plaintiff-Appellee Organizations\**
*[additional counsel on following page]*

Norman L. Eisen
Pooja Chaudhuri
STATE DEMOCRACY DEFENDERS
FUND
600 Pennsylvania Avenue SE #15180
Washington, DC 20003
Tel: (202) 594-9958
Norman@statedemocracydefenders.org
Pooja@statedemocracydefenders.org

*Attorneys for Plaintiff Organizations\**

Teague Paterson
Matthew Blumin
AMERICAN FEDERATION OF
STATE, COUNTY, AND MUNICIPAL
EMPLOYEES
1625 L Street, N.W.
Washington, D.C. 20036
Tel: (202) 775-5900
TPaterson@afscme.org
MBlumin@afscme.org

*Attorneys for Plaintiff American
Federation of State County and
Municipal Employees (AFSCME)*

Rushab Sanghvi
AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES
80 F Street, NW
Washington, DC 20001
Tel: (202) 639-6426
Sanghr@afge.org

*Attorneys for Plaintiff American
Federation of Government Employees
(AFGE)*

Tera M. Heintz
Cristina Sepe
Cynthia Alexander
Deputy Solicitors General
OFFICE OF THE WASHINGTON
STATE ATTORNEY GENERAL
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744
tera.heintz@atg.wa.gov
cristina.sepe@atg.wa.gov
cynthia.alexander@atg.wa.gov

*Attorneys for Plaintiff State of
Washington*

*Plaintiff-Appellee Organizations are the American Federation of Government Employees, AFL-CIO, American Federation of State County and Municipal Employees, AFL-CIO, AFGE Local 2110, American Federation of Government Employees Local 1216, United Nurses Associations of California/Union of Health Care Professionals, AFSCME, AFL-CIO, American Public Health Association, Association of Flight Attendants-CWA, AFL-CIO, American Geophysical Union, Point Blue Conservation Science, Climate Resilient Communities, Main Street Alliance, Common Defense Civic Engagement, Coalition to Protect Americas National Parks, Western Watersheds Project, Vote Vets Action Fund Inc..

## PLAINTIFF-APPELLEES' OPPOSITION TO
## MOTION FOR ADMINISTRATIVE STAY

Plaintiff-Appellees, a coalition of veterans, small business, labor, and conservation organizations along with the State of Washington (hereinafter "Plaintiffs"), file this opposition to the motion for an administrative stay by Defendant-Appellants U.S. Office of Personnel Management ("OPM") et al. (hereinafter "Defendants"), to explain why an administrative stay should not issue.

Plaintiffs are prepared to file a brief opposing the motion for an emergency stay no later than **Monday, March 17, at 12 noon** (or any deadline set by this Court, if a briefing schedule is issued), which will allow the Court sufficient time to act on the emergency motion before Defendants are required to make any compliance report to the District Court. Plaintiffs file this short response to explain why an administrative stay should not issue in the meantime.

A.    **No urgency requires immediate issuance of an administrative stay, particularly when the District Court has not yet ruled.**

No urgent circumstances require an "immediate" ruling on an administrative stay. Defendants challenge a preliminary injunction requiring Defendants to report their compliance by filing lists of reinstated terminated probationary employees "with an explanation as to each of what has been done to comply with this order" within *seven calendar days*. D. Ct. Dkt. 120 (PI Hearing Transcript) at 53:13-16 (attached as Exhibit B). Thus, Defendants need not report their compliance to the District Court until Thursday, March 20. In fact, Defendants' six declarations, filed in the District Court this afternoon in support of a still-pending stay request to that Court, make clear that they have taken no steps to reinstate federal employees thus

-1-

far and do not intend to take any such steps over the weekend. *See* D. Ct. Dkt. 127-1, 127-2, 127-3, 127-4, 127-5, 127-6. There is no reason, even on Defendants' presentation, for the Court to act precipitously.[1]

Moreover, this Court should await the District Court's ruling on Defendants' motion for a stay pending appeal. The Federal Rules of Appellate Procedure require movants to file a stay motion in the District Court before moving for a stay in the Court of Appeal. Fed. R. App. P. 8(a)(1)(A). And they require the motion either to "(i) show that moving first in the district court would be impracticable; or (ii) state that, a motion having been made, *the district court denied the motion or failed to afford the relief requested* and state any reasons given by the district court for its action." Fed. R. App. P. 8(a)(2)(A) (emphasis added).

In this case, the District Court issued its oral preliminary injunction ruling before 9:30 a.m. on Thursday, March 13. D. Ct. Dkt. 115. At that hearing, *Defendants did not request a stay*, despite ample opportunity to do so. *See* D. Ct. Dkt. 120 (PI Hearing Transcript) at 59:12-13 ("Court: Anything on your side? Mr. Helland: No. Thank you, Your Honor.") (attached as Exhibit B). Instead, Defendants waited until 12:48 p.m. today to file a motion for a stay pending appeal in the District Court. D. Ct. Dkt. 127. Within 90 minutes, the District Court ordered Plaintiffs to respond by this evening. D. Ct. Dkt. 128. Plaintiffs filed that

---

[1] It is notable that Defendants filed declarations from federal agency officials for the first time only *after* the District Court issued a preliminary injunction, despite numerous opportunities to do so in connection with the TRO and preliminary injunction proceedings. *See infra.*

-2-

response by 5:31 p.m. today.  Dkt. 129.  By that time, however, Defendants has already filed their motion in this Court—at 3:56 p.m.  9th Cir. ECF 7.1.

But there is good reason for the rule requiring a movant seeking an emergency stay in the Court of Appeals to first seek and obtain a ruling in the District Court.  As this Court is aware, the District Court's findings of fact are entitled to deference on appeal, and the District Court is closest to both the legal and factual issues.  *See*, *e.g.*, *Ruckelhaus v. Monsanto Co.*, 463 U.S. 1315,  1316 (1983) ("[A] district court's conclusion that a stay is unwarranted is entitled to considerable deference.") (citations omitted).  A stay pending appeal is an "extraordinary request." *East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 661 (9th Cir. 2021) (citations omitted).  It is "'an exercise of judicial discretion,' and 'the propriety of its issue is dependent upon the circumstances of the particular case.'"  *Al Otro Lado v. Wolf*, 952 F.3d 999, 1006 (9th Cir. 2020) (quoting *Nken v. Holder*, 556 U.S. 418, 433 (2009)).  The District Court should have the opportunity to weigh in before this Court acts.  *See also Nken*, 556 U.S. at 433 (stay "is not a matter of right, even if irreparable injury might otherwise result").

Defendants are wrong to treat Rule 8 as imposing pro forma requirements.  Rather than issuing an administrative stay, the Court should wait until the District Court rules and until Plaintiffs have the opportunity file a response to the equities and merits arguments that Defendants advance in their motion for an emergency stay pending appeal.  As stated, if this Court has not acted on the administrative stay motion, Plaintiffs will file a response to the emergency stay motion by Monday, March 17, at 12 noon (or any other deadline if set by the Court).

-3-

**B.     A stay would disrupt rather than preserve the status quo.**

An "administrative" or "temporary stay … is only intended to preserve the status quo until the substantive motion for a stay pending appeal can be considered on the merits." *Doe #1 v. Trump*, 944 F.3d 1222, 1223 (9th Cir. 2019); *accord Nat'l Urban League v. Ross*, 977 F.3d 698, 700 (9th Cir. 2020) (denying administrative stay).

Here, however, it is the actions of Defendants that disrupted the status quo. The status quo is "the legally relevant relationship between the parties before the controversy arose." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 684-85 (9th Cir. 2023) (en banc) (status quo was group's status as official student club before implementation of new policy and revocation of club recognition that gave rise to plaintiff's claims) (quotations omitted); *see also Goto.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000) ("status quo ante litem refers not simply to any situation before the filing of a lawsuit, but instead to the last uncontested status which preceded the pending controversy") (quotations omitted).  The last "uncontested status" before the "pending controversy"—that is, OPM's contested (and, Plaintiffs contend, unlawful) directive that all federal agencies terminate their probationary employees en masse—was that the probationary employees were in their positions and providing the government services on which Plaintiffs rely.  It is OPM's actions that disrupted the status quo, and the preliminary injunction that would restore it.

**C.     As Plaintiffs' opposition to an emergency stay will explain in greater detail, the District Court's order was fully supported by the record and is correct on the merits.**

An administrative stay is also unwarranted because the record evidence and law overwhelmingly support Plaintiffs' claims that OPM directed federal agencies to terminate all their probationary employees (except those deemed "mission critical"), to do so using a fraudulent form claiming that employees were all fired for performance (when no agency could conduct thousands performance reviews in mere days), and that OPM's actions exceed its own statutory authority and violated myriad other statutes including multiple provisions of the APA. D. Ct. Dkt. 45 (TRO Memorandum Opinion) (attached as Exhibit A) at 1-10; D. Ct. Dkt. 120 (PI Hearing Transcript) (attached as Exhibit B) at 47-57.

**1.     The District Court's conclusion that Defendants acted unlawfully is not likely to be overturned on appeal.**

Initially, Defendants barely attempt to contest the District Court's conclusion that they acted unlawfully. As the District Court found, "[P]laintiffs … assembled a mountain of evidence supporting their more concise causal chain: OPM directed mass firings and plaintiffs each likely will be (or have been) injured as a result." D.Ct. Dkt. 21. That evidence included multiple admissions by agency officials (ignored here by Defendants in presenting this stay request to this Court) that OPM directed agencies to act and that the federal agencies did not act independently decide to fire all of their probationary employees: "We were directed last Friday [February 14] by OPM to terminate all probationers except for a minimal number

of mission critical probationers." D. Ct. Dkt. 45 at 3.[2] As the Court recognized, even the few documents provided to the Court *by Defendants* revealed that OPM directed agencies to "separate probationary employees that you have not identified as mission-critical" and provided the mass termination template falsely citing performance. *Id*. at 3 (quoting February 14 email from OPM to all agency Chief Human Capital Officers, or "CHCOs"). Federal CHCOs made clear, in testimony to Congress and statements to their own employees: OPM directed this and OPM wrote the template, uniform termination letter purporting to terminate employees for performance reasons.

The record was also replete with examples of stellar federal employees whose performance reviews put truth to the across-the-board lie in OPM's required termination notice template that "[t]he Agency finds, based on your performance, that you have not demonstrated that your further employment at the Agency would be in the public interest." D. Ct. Dkt. 45 at 3. Again, agency officer admissions

---

[2] As the District Court quoted from a Forest Service memorandum to managers: "'All' -- that's spelled A-L-L -- " All federal agencies, including the Department of Agriculture, were **notified on February 12th, 2025, by the Office of Personnel Management to terminate all employees** who have not completed their probationary or trial period." D.Ct. Dkt. 120 at 48. The head of human resources at the IRS told employees: "Regarding the removal of the probationary employees, again, **that was something that was directed from OPM**. And even the letters that your colleagues received yesterday were letters that written by OPM, put forth through Treasury, and given to us . . . . I cannot explain to you why this has happened. I've never seen OPM direct people at any agency to terminate." *Id*. at 4. The head of human resources at the VA, under questioning from Congress, similarly admitted: "**There was direction from the Office of Personnel Management**." D.Ct. Dkt. 45 at 4. The Department of Defense internal memorandum stated "**In accordance with direction from OPM**, beginning February 28, 2025, all DOD Components must terminate the employment of all individuals who are currently serving a probationary or trial period…" *Id*. There was more, from every corner of the government.

were uniform: "The cause comes from boilerplate we received from OPM. The cause says that the agency finds based on your performance that you have not demonstrated that your further employment at the agency would be in the public interest." D. Ct. Dkt. 18-9 (Frassetto Dec., Ex. B at 21).

As against this evidence, Defendants spent the three weeks after the Complaint was filed (and 2.5 weeks after the TRO motion) declining to present *any* evidence directly from federal agencies or officials (other than a few press releases),[3] and attempting to present declarations from OPM officials who were unwilling to submit to cross-examination in an evidentiary hearing as ordered by the District Court. Defendants initially submitted just one declaration (from acting OPM head Charles Ezell), and after the District Court concluded that his declaration was not credible in light of the "mountain" of Plaintiffs' contrary evidence and ordered the declarant to appear for cross-examination (which Defendants initially welcomed), Defendants instead *withdrew the declaration*. D. Ct. Dkts. 34, 97. Defendants then defended the preliminary injunction based on a few submitted documents and no testimony (in declaration or any other form) at all.

Thus, the factual record, as found by the District Court, is far from what Defendants portray to this Court. But Defendants, like everyone else, are bound by

---

[3] The few agency declarations Defendants now rely on to support their stay motion were *not* submitted in opposition to the preliminary injunction or before the preliminary injunction hearing. Rather, they were submitted today.

the record or lack thereof that they created, and the facts found by the Court below.[4]

Next, the District Court also correctly held that "[n]o statute—anywhere, ever—has granted OPM the authority to direct the termination of employees in other agencies," D. Ct. Dkt. 45 at 7—as Defendants *now concede*, Mot. for Stay at 2.[5]  And Congress certainly never authorized OPM or the agencies to lie about the basis, claiming performance for mass terminations, which is profoundly arbitrary and capricious OPM action.  D. Ct. Dkt. 45 at 9.  And, as former a OPM Director and former National Park Service Director attested for Plaintiffs, any such terminations could never have been performance-based in the time frame of the 'Valentine's Day massacre,' as OPMs orders have now been called.  D. Ct. Dkt. 18-4 (Archuleta Decl. ¶ 13).

Finally, there is no real dispute that when OPM creates government-wide rules (such as ordering agencies to redefine probationary employee "performance" to mean "only employees who are mission-critical"), Congress required OPM to comply with notice-and-comment rulemaking (*see* 5 U.S.C. §§1103(b), 1105).  The District Court was correct to conclude OPM's actions were both ultra vires and violated the APA.  D. Ct. Dkt. at 7-10.

---

[5] Congress never authorized OPM to direct the hiring and firing of agency employees.  *Id*. at 8; 5 U.S.C. §1103.  Rather, Congress authorized each federal agency, via literally hundreds of specific agency authorizing statutes and a general grant of authority, to hire and fire the employees of that agency.  D. Ct. Dkt. 45 at 8; 5 U.S.C. §3101.

**2. The District Court's conclusions that Plaintiffs have standing and suffered irreparable injury are not likely to be overturned on appeal.**

The evidence also conclusively established that the effect of these terminations was widespread and devastating to the services provided by these federal agencies and those who benefit from and rely on those services. D. Ct. Dkt. 45 at 13-23. The Plaintiff organizations' showing of injury for both standing and irreparable harm purposes was substantial and well-supported, not the tenuous and truncated record the government depicts here to the Court.[6] Apparently conceding that Washington State has standing, Defendants object only that the claimed injuries to the other organizational Plaintiffs are unduly speculative. Mot. at 11-14. But Defendants are wrong. Plaintiffs "need only establish a risk or threat of injury to satisfy the actual injury requirement." *City & Cnty. of San Francisco v.*

---

[6] *E.g.*, Dkt. 18-7, ¶¶7-8 (Vote Vets; loss of staffing in critical services for veterans, including "mental health research, cancer treatment, addiction recovery, prosthetics, and burn pit exposure studies"); *id.* ¶¶14-15 (veteran lost transportation service to his medical appointments); Dkt. 18-3, ¶¶8-10 (Common Defense; loss of access to VA services); Dkt. 70-13, ¶¶4-7 (Association of Flight Attendants; staffing reductions at FAA undermine efficacy of agency with predictable impact on safety of flight crews); Dkt. 70-4, ¶¶4-8, 10 (Climate Resilient Communities; termination of probationary EPA program officer leaves CRC unable to navigate its grant requirements); Dkt. 18-16, ¶¶7-8 (Main Street Alliance; likely impairment of access to SBA services including disaster relief); Dkt. 18-13, ¶7 (Western Watersheds Project; reduced staffing has prevented Bureau of Land Management from responding to FOIA request); Dkt. 70-18 ¶¶7-8 (imminent harm to riparian habitat managed by WWP because of probationary terminations at Bureau of Land Management); Dkt. 39-3 ¶4 (Coalition to Protect America's National Parks; closed visitor center at Joshua Tree National Park); Dkt. 70-19 ¶3 (CPANP; likely degradation to habitat in NOAA marine sanctuaries); Dkt. 70-3 ¶21 (American Public Health Association; loss of members' access to their grant officers in federal science agencies, disrupting current and planned research); Dkt. 70-16 ¶6 (American Geophysical Union; same).

*U.S. Citizenship & Immigr. Servs*., 944 F.3d 773, 786–87 (9th Cir. 2019) (citations omitted); *see also Harris v. Bd. of Supervisors*, 366 F.3d 754, 762 (9th Cir. 2004) (holding that where plaintiffs challenged cuts to county hospital services, it was "not speculative to anticipate that reducing the resources available will further impede the County's ability to deliver medical treatment to plaintiffs in their times of need.") (affirming preliminary injunction).  The Plaintiff organizations (and Washington State) have presented extensive evidence of the type of threatened harms to services that supported standing in *Harris*, as well as actual harms that have already occurred.

Moreover, it is "predictable, likely, and imminent" that services relied on by the organizational Plaintiffs will suffer as a result of the termination of tens of thousands of probationary federal employees. *City & Cnty. of San Francisco*, 944 F.3d at 787; *Harris*, 366 F.3d at 762.  For example, the former National Park Service Director and Yosemite National Park Superintendent both predicted, based on their long experience as park managers, that services, environmental quality, and public safety will suffer in the national parks as a result of the mass probationary terminations.  Dkt. 18-11, ¶¶4-15; Dkt. 18-17, ¶5.  That the speed and efficacy of hotline services provided to troubled veterans by the VA's Veterans Crisis Line will suffer as a result of terminations there (Dkt. 18-7, ¶¶7-8) requires no fanciful leaps of logic.

Finally, each of the organizational Plaintiffs and the State of Washington documented their injury and harm caused by the immediate cessation of services in extensive declarations.

-10-

**3. The District Court's conclusion that administrative channeling did not preclude its subject matter jurisdiction over Plaintiffs' claims will likely be affirmed on appeal.**

The District Court also correctly rejected Defendants' attempt to use an administrative channeling doctrine to remove the court's subject matter jurisdiction over claims by these Plaintiff organizations and the State of Washington—which are *not* employees and *not* labor unions—and who bring claims that OPM acted without statutory authority and so its acts were *ultra vires*, and also violated the APA.  D. Ct. Dkt. 45 at 10-13.

Defendants argued that Congress implicitly intended for any claim that involves federal employees—regardless of the party or nature of the claim—must be sent to the Merit Systems Protection Board ("MSPB") or Federal Labor Relations Authority ("FLRA")—agencies set up by Congress to resolve disputes among employees, their representatives, and their employing agencies.

In arguing that non-employee and non-union Plaintiffs therefore may not bring claims in federal court, Defendants stretch administrative channeling doctrine here so far beyond its moorings in Congressional intent to be nonsensical: Congress never meant to send the State of Washington to the MSPB (indeed, it cannot appear there).  Congress never intended the environmental groups, or veterans organizations to be appear before the FLRA (indeed, they cannot). Neither the U.S. Supreme Court nor this Court nor *any other* Circuit has ever extended this doctrine so far afield as to say that third parties who are not

-11-

employees, employers, or their representatives cannot bring an APA claim in court, or cannot sue over government-wide rules.[7]

When Plaintiffs fully brief this issue in response to Defendants' stay motion, the Court will see that there is no reason to expand this doctrine or to go where no court in this country has *ever* gone before, and "channel" these non-employee, non-union claims challenging unlawful government action into administrative agencies that cannot hear their claims.

## CONCLUSION

The Court should deny Defendants' motion for an administrative stay pending appeal.

---

[7] Defendants never explained to the Court below why or how Congress could have intended third party claims to be "channeled" when no agency could ever hear such a claim, and when doing so would violate the "command" of judicial review in the APA recognized recently by the Supreme Court (*Dep't of Commerce v. New York*, 588 U.S. 752, 772 (2019). This Court has always looked to whether the particular statutes at issue evince intent to challenge the specific claims brought by the particular parties in a case. *See Kerr v. Jewell*, 836 F.3d 1048, 1052-53 (9th Cir. 2016) (channeling some claims but not others by the same plaintiff).

-12-

DATED:  March 14, 2025          Respectfully submitted,

Scott A. Kronland
Stacey M. Leyton
Eileen B. Goldsmith
Danielle E. Leonard
Robin S. Tholin
James Baltzer
ALTSHULER BERZON LLP
177 Post St., Suite 300
San Francisco, CA 94108
Tel: (415) 421-7151


By: */s/ Stacey Leyton*

*Attorneys for Plaintiff Organizations*


Norman L. Eisen
Pooja Chaudhuri
STATE DEMOCRACY DEFENDERS
FUND
600 Pennsylvania Avenue SE #15180
Washington, DC 20003
Tel: (202) 594-9958
Norman@statedemocracydefenders.org
Pooja@statedemocracydefenders.org

By: */s/ Norman L. Eisen*

*Attorneys for Plaintiff Organizations*

Rushab Sanghvi
AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES
80 F Street, NW
Washington, DC 20001
Tel: (202) 639-6426
Sanghr@afge.org

-13-

By: */s/ Rushab Sanghvi* _____

*Attorneys for Plaintiff American Federation of Government Employees (AFGE)*

Teague Paterson
Matthew Blumin
AMERICAN FEDERATION OF STATE, COUNTY, AND MUNICIPAL EMPLOYEES
1625 L Street, N.W.
Washington, D.C.  20036
Tel: (202) 775-5900
TPaterson@afscme.org
MBlumin@afscme.org

By: */s/Teague Paterson* _____

*Attorneys for Plaintiff American Federation of State County and Municipal Employees (AFSCME)*

Tera M. Heintz
Cristina Sepe
Cynthia Alexander
Deputy Solicitors General
OFFICE OF THE WASHINGTON STATE ATTORNEY GENERAL
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744
tera.heintz@atg.wa.gov
cristina.sepe@atg.wa.gov
cynthia.alexander@atg.wa.gov

By: */s/ Tera M. Heintz* _____

*Attorneys for Plaintiff State of Washington*

-14-

Exhibit A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES, AFL-CIO,
et al.,

No.  C 25-01780 WHA

Plaintiffs,

v.

**MEMORANDUM OPINION AND
ORDER AMENDING TRO**

UNITED STATES OFFICE OF
PERSONNEL MANAGEMENT, et al.,

Defendants.

**STATEMENT**

On January 20, 2025, Acting Director of the Office of Personnel Management Charles
Ezell, defendant, issued a memo to department and agency heads directing them to identify all
employees serving probationary periods by January 24, and to "promptly determine whether
those employees should be retained at the agency."  Probationary employees are those who
have served less than one year in the competitive service or less than two in the excepted
service.

On February 13 OPM communicated with the heads of several federal agencies in a
private conference call.  Neither the participants nor the contents of that call are directly in the
record.

The next day, OPM sent an email to federal agencies' chief human capital officers (and their deputies) stating:

> Over the past several days, agencies have worked to review, clean up, and finalize their lists of probationary employees they wish to keep, and wish to terminate, and begin taking action.
>
> We have asked that you separate probationary employees that you have not identified as mission-critical no later than end of the day Monday, 2/17. We have attached a template letter. The separation date should be as soon as possible that is consistent with applicable agency policies (including those in CBAs).

(Dkt. No. 37-1).

The large-scale termination of probationary employees from myriad federal agencies followed. Plaintiffs contend that those employees were terminated at the direction of OPM.

Dr. Andrew Frassetto, for example, was hired as a program director at the National Science Foundation on September 9, 2024 (Frassetto Decl. ¶3). Dr. Frassetto and over 100 other NSF employees were terminated *en masse* during a Zoom meeting on February 18 (*id.* ¶ 10; Evans Decl. ¶28). A time-stamped transcript of that meeting, generated by an automated closed captioning system, is attached to Dr. Frassetto's declaration (Exh. B). In response to inquiries by the terminated employees, NSF's chief management officer, Micah Cheatham, stated that "[w]e were directed last Friday [February 14] by OPM to terminate all probationers except for a minimal number of mission critical probationers" (*id.* at 18). Asked if NSF had attempted to negotiate with the administration to minimize the number of terminations, Cheatham responded: "There's no negotiation" (*id.* at 25).

In fact, when the NSF officials orchestrating the firings were confronted by the terminated probationers, they stated that "[u]p until Friday [February 14]. Yes. We were told by OPM it was the agency's discretion whether to remove probations or not. *We chose to retain them all*" (*id.* at 17). But "late Friday night," "[t]hey told us that they directed us to remove probationers" (*ibid.*). "[T]here was no limited discretion. *This is not a decision the agency made. This is a direction we received*" (*id.* at 12) (emphasis added).

United States District Court
Northern District of California

2

Plaintiffs further allege that OPM ordered agencies to use template notices — supplied by OPM — to implement the ordered terminations, and that those templates falsely premised the *en masse* terminations on individual performance. The Department of Agriculture, National Science Foundation, Federal Aviation Administration, Department of Veterans Affairs, and Department of Health and Human Services each issued substantially similar letters (Bachelder Decl., Exh. 1; Evans Decl., Exh. B; Ronneberg Decl., Exh. 1; Schwarz Decl., Exh. A). Each stated that the recipient was fired because "[t]he Agency finds, *based on your performance*, that you have not demonstrated that your further employment at the Agency would be in the public interest" (*ibid*. (emphasis added)). The empty template provided to DOD by OPM likewise declares — despite empty "[NAME]" "[TITLE]" and "[ORGANIZATION]" fields — that "the Agency finds, based on your performance, that you have not demonstrated that your further employment at the agency would be in the public interest" (Schwarz Decl., Exh. D).

Dr. Frassetto is again illustrative. In a February 13 performance review — *five days* before he was terminated "based on [his] performance" — Dr. Frassetto's supervisor reported:

> [H]is role [is] mission critical. Dr. Frassetto has been an outstanding program director, and he has taken the lead role in overseeing this important and complicated portfolio for the division. Dr. Frassetto came to NSF with a unique skill set in interdisciplinary scientific research . . . . He has already demonstrated an outstanding ability to balance the various aspects of his job responsibilities and is highly effective at organizing and completing all his work in an accurate and timely manner.
>
> . . .
>
> Dr. Frassetto's work on this portfolio has been outstanding and he has brought important experience to the role and has demonstrated highly competent project management and oversight. He is a program director who has needed minimal supervision and eagerly seeks special assignments at higher levels of difficulty. He has been an outstanding contributor to the division, directorate, and agency.

(Frassetto Decl., Exh. A).

The NSF officials who fired Dr. Frassetto (and over 100 of his peers) via Zoom on February 18 stated: "The cause comes from boilerplate we received from OPM. The cause

*United States District Court*
*Northern District of California*

3

United States District Court
Northern District of California

1   says that the agency finds based on your performance that you have not demonstrated that your

2   further employment at the agency would be in the public interest" (Frassetto Decl., Exh. B at

3   21).

4       On February 26, 2025, Civilian Personnel Policy Council members at the Department of

5   Defense (DOD) stated by email: "In accordance with direction from OPM, beginning

6   February 28, 2025, all DOD Components must terminate the employment of all individuals

7   who are currently serving a probationary or trial period" (Schwarz Decl., Exh. C at 1).

8       Tracey Therit, chief human capital officer for the VA, testified under oath at a

9   congressional hearing before the House Committee on Veterans Affairs on February 25:

> **RANKING MEMBER TAKANO**:  So nobody ordered you to carry out these terminations?·
>
> You did it on your own?
>
> **MS. THERIT**:  There was direction from the Office of Personnel Management.

(Walls Decl. (Reply), Exh. A at 8).

On February 14, a probationer terminated by the Foreign Agricultural Service asked USDA's deputy chief human capital officer by email about the "specific details of my performance that were evaluated and found to be insufficient" (Blake Suppl. Decl., Exh. A at 1).  The response:  "[A]gencies were directed to begin providing termination notices . . . and directed [*sic*] the use of a specific template and language for the notice beginning immediately upon OPM notification" (*id*. at 2).

In a "town hall" for IRS employees on February 21, the IRS's chief human capital officer (CHCO) stated:

> I'm not sure why it's happening . . . .  Regarding the removal of the probationary employees, again, that was something that was directed from OPM.  And even the letters that your colleagues received yesterday that written by OPM, put forth through Treasury, and given to us . . . .  I cannot explain to you why this has happened.  I've never seen OPM direct people at any agency to terminate.

4

1   (Lezra Decl., Exh. A at 4–5).

2       The IRS had to "get permission" to make even minor alterations to the template OPM

3   termination letter:

4           There was a modification because we created our own email box
            for employees to send questions to HR directly after they separate.
5           We felt it was important to have an avenue of communication open
            for them if they had questions about their final paycheck, or
6           benefits, or leave payouts.  So we did get permission to add that
            email in there.
7

8   (*id*. at 4–5).  The IRS CHCO continued:

9           And our actions are being watched by OPM.  So that's, again,
            something else that's unprecedented. . . . Everything we do is
10          scrutinized.  Everything is being looked at twice.  Any changes
            that are made in our system that show any type of action that has
11          been deemed impermissible, we have to respond to why it
            happened.
12

13  (*id*. at 3–4).

14      A termination letter received by a probationer at the Bonneville Power Administration

15  (within the Department of Energy) stated:  "*Per OPM instructions*, DOE finds that your further

16  employment would not be in the public interest.  For this reason, you are being removed from

17  your position with DOE and the federal civil service effective today" (Schwarz Decl., Exh. B

18  at 10 (emphasis added)).

19      As many as 200,000 probationary federal employees are at risk of termination (Br. at 19).

20  Those already terminated rank somewhere in the tens of thousands (*ibid*.).  OPM and the

21  federal agencies involved have not disclosed the number or identity of those terminated (even

22  to their unions) (*ibid*.).

23      The ongoing, *en masse* termination of probationary employees across the federal

24  government's agencies has sown significant chaos.  By way of example, Major General (Ret.)

25  Paul Eaton states that the termination of over 1,000 employees across the VA has crippled the

26  agency's administration of the Veterans Crisis Line (Eaton Decl. ¶¶ 8–9).  When functioning

27  as intended, the VCL offers our veterans, who suffer from high rates of post-traumatic stress

28  disorder and suicide, 24/7 mental health care in moments of crisis (*ibid*).  Don Neubacher,

5

1    formerly the Superintendent at Yosemite National Park, states that the ongoing firing of

2    National Park System probationers will inflict immediate, foreseeable harm onto our national

3    parks and the habitats and animals therein (Neubacher Decl.).  The Western Watershed Project,

4    meanwhile, has already had its ecological mission frustrated, as terminations at BLM have

5    rendered that agency unable to respond to the Project's FOIA requests (Molvar Decl. ¶ 7).

6                            *              *              *

7           Plaintiffs in this action fall into two groups.  *First*, the union plaintiffs:  American

8    Federation of Government Employees, AFL-CIO (AFGE); American Federation of

9    Government Employees Local 1216; American Federation of Government Employees Local

10   2110; American Federation of State County and Municipal Employees, AFL-CIO; and United

11   Nurses Associations of California/Union of Health Care Professionals, AFSCME, AFL-CIO.

12   *Second*, the organizational plaintiffs:  Main Street Alliance, Coalition to Protect America's

13   National Parks, Western Watersheds Project, Vote Vets Action Fund Inc., and Common

14   Defense Civic Engagement.

15          Plaintiffs filed a complaint for declaratory and injunctive relief on February 19, 2025

16   (Dkt. No. 1).  Four days later, on February 23, they filed an amended complaint and moved for

17   a temporary restraining order (Dkt. Nos. 17, 18).

18          *First*, plaintiffs argue that OPM directed federal agencies to fire probationary employees,

19   and that the action was an *ultra vires* act because it exceeded the scope of OPM's statutory

20   authority, intruded upon the statutory authority of the individual federal agencies and their

21   heads, violated the Civil Service Reform Act's (CSRA) provisions governing agency

22   terminations based on performance and reductions in force (RIFs), and violated the General

23   Authority to Employ enacted by Congress (Dkt. No. 17 at 25–26).  *Second*, plaintiffs argue that

24   the OPM directive to terminate probationary employees constituted a final agency action that

25   violated the APA because it exceeded the agency's statutory or constitutional authority, was

26   otherwise unlawful, was arbitrary and capricious, and did not undergo the necessary notice and

27   comment process (*id*. at 26–30).

28

United States District Court
Northern District of California

1    Plaintiffs' motion for a TRO seeks an order enjoining defendants from taking any actions

2    to effectuate OPM's probationary employee termination directive.

3

4    **ANALYSIS**

5    The standard for a temporary restraining order is the same as that for a preliminary

6    injunction. *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir.

7    2001). "A plaintiff seeking a preliminary injunction must establish that [1] he is likely to

8    succeed on the merits, that [2] he is likely to suffer irreparable harm in the absence of

9    preliminary relief, that [3] the balance of equities tips in his favor, and [4] that an injunction is

10    in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

11    1.    LIKELIHOOD OF SUCCESS ON THE MERITS.

12    A.    PLAINTIFFS' ULTRA VIRES CLAIM.

13    Plaintiffs argue that OPM's termination directive constituted an *ultra vires* act that

14    violated, and — unless recalled — continues to violate the scope of its and all impacted

15    agencies' statutory authority as established by Congress.

16    "The ability to sue to enjoin unconstitutional actions by state and federal officers is the

17    creation of courts of equity, and reflects a long history of judicial review of illegal executive

18    action, tracing back to England." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327

19    (2015). "Equitable actions to enjoin *ultra vires* official conduct do not depend upon the

20    availability of a statutory cause of action; instead, they seek a 'judge-made remedy' for injuries

21    stemming from unauthorized government conduct, and they rest on the historic availability of

22    equitable review." *Sierra Club v. Trump*, 963 F.3d 874, 890–91 (9th Cir. 2020) (citing

23    *Armstrong*, 575 U.S. at 327), *vacated and remanded on other grounds (mootness)*, 142 S. Ct.

24    46 (2021).

25    Plaintiffs are likely to succeed on their *ultra vires* claim. No statute — anywhere, ever —

26    has granted OPM the authority to direct the termination of employees in other agencies.

27    "Administrative agencies [like OPM] are creatures of statute. They accordingly possess only

28    the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*, 595

United States District Court
Northern District of California

7

1    U.S. 109, 117 (2022). Congress's statutory scheme grants to each agency head the authority to

2    manage their own affairs, including the hiring and firing of employees. 5 U.S.C. § 3101

3    ("Each Executive agency, military department, and the government of the District of Columbia

4    may employ such number of employees of the various classes recognized by chapter 51 of this

5    title as Congress may appropriate for from year to year."); 5 U.S.C. § 301 ("The head of an

6    Executive department or military department may prescribe regulations for the government of

7    his department, the conduct of its employees . . . ."); *see also, e.g.,* 38 U.S.C. §§ 303, 510

8    (VA); 10 U.S.C. § 113 (DOD).

9        The same is true of OPM. Congress has vested its director with the authority to "secur[e]

10   accuracy, uniformity, and justice in the functions of the Office," "appoint[] individuals to be

11   employed by the Office, and "direct[] and supervis[e] employees of the Office." 5 U.S.C. §

12   1103(a)(1)–(3). But that's it. OPM did not have the authority to direct the firing of employees,

13   probationary or otherwise, in any *other* federal agency.

14       OPM concedes that it lacks the authority to direct firings outside of its own walls and

15   argues, instead, that it "did not direct agencies to terminate any particular probationary

16   employees based on performance or misconduct, and did not create a 'mass termination

17   program'" — it merely "asked agencies to engage in a focused review of probationers based on

18   how their performance was advancing the agencies' mission, and allowed them at all times to

19   exclude whomever they wanted" (Ezell Decl. ¶ 7). OPM's factual contention rests entirely on

20   the Ezell Declaration.

21       Plaintiffs, meanwhile, have mustered a mountain of evidence that points in the other

22   direction, from a broad range of federal agencies: "In accordance with *direction* from OPM . .

23   . all DOD Components must terminate the employment of all individuals who are currently

24   serving a probationary or trial period" (DOD), "[t]here was *direction* from the Office of

25   Personnel Management" (VA), "agencies were *directed* to begin providing termination notices

26   . . . immediately upon OPM notification" (USDA), "that was something that was *directed* from

27   OPM" (IRS), "[w]e were *directed* last Friday by OPM" (NSF), "[t]hey told us that they

28   *directed* us to remove probationers" (NSF) (emphases added). A full accounting is above. The

United States District Court
Northern District of California

8

1  weight of the evidence supports plaintiffs' contention that OPM exceeded the bounds of its

2  authority by unlawfully directing the mass termination of probationary employees across a

3  wide range of federal agencies.

4  OPM's Article II argument likewise rests on the factual contention that OPM's actions

5  constituted mere "guidance," and is rejected on the facts (Opp. at 26). Article II, moreover, is

6  irrelevant here. Congress's statutory scheme *created* the agency, *vested the agency with*

7  *authority*, and *defined the bounds of that authority*. It is an OPM action that is being

8  challenged and, as explained above, the evidence supports the contention that OPM's direction

9  to other agencies fell outside its limited statutory authority.

10          **B.  PLAINTIFFS' APA CLAIMS.**

11  Plaintiffs have also shown that their APA claims are likely to succeed.

12  Under the APA, only "final agency action[s]" — those that "mark the consummation of

13  the agency's decisionmaking process" and determine "rights or obligations . . . from which

14  legal consequences will flow" are subject to judicial review. *Bennett v. Spear*, 520 U.S. 154,

15  177–78 (1997) (cleaned up) (citing 5 U.S.C. § 704). OPM's direction to the other agencies

16  constituted a final agency action for the purposes of the APA. Plaintiffs have marshalled

17  significant evidence from numerous agencies stating that they were acting at the direction of

18  OPM.

19  As explained above, OPM's direction to other agencies was not supported by any

20  statutory authority. Plaintiffs are therefore likely to show that OPM's directive constituted an

21  agency action that was "in excess of statutory jurisdiction, authority, or limitations, or short of

22  statutory right" that must be "[held] unlawful and set aside." 5 U.S.C. § 706(2)(C).

23  Plaintiffs are also likely to show that the OPM directive was an arbitrary and capricious

24  action. *Id*. § 706(2)(A). "The scope of review under the 'arbitrary and capricious' standard is

25  narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle*

26  *Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

27  "Nevertheless, the agency must examine the relevant data and articulate a satisfactory

28  explanation for its action including a 'rational connection between the facts found and the

United States District Court
Northern District of California

9

United States District Court
Northern District of California

choice made.'" *Ibid.* (quoting *Burlington Truck Lines v. United States,* 371 U.S. 156, 168 (1962)). The key fact here is that the template letters sent from OPM to the directed agencies stated: "[T]he Agency finds, *based on your performance*, that you have not demonstrated that your further employment at the Agency would be in the public interest" (Schwarz Decl., Exh. D). *First,* it is unlikely, if not impossible, that the agencies themselves had the time to conduct *actual* performance reviews of the thousands terminated in such a short span of time (Archuleta Decl. ¶ 14). It is even less plausible that *OPM alone* managed to do so. In at least one instance, a terminated scientist had received a glowing review — "[h]e has been an outstanding contributor to the division, directorate, and agency" — five days before he was terminated "for [his] performance" (Frassetto Decl., Exh. A at 1; Exh. C at 1). "Reliance on facts that an agency knows are false at the time it relies on them is the essence of arbitrary and capricious decisionmaking." *Missouri Serv. Comm'n v. Fed. Energy Regul. Comm'n*, 337 F.3d 1066, 1075 (D.C. Cir. 2003).

Lastly, plaintiffs are likely to show that OPM failed to comply with notice and comment rulemaking. "'Rule' means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency . . . ." 5 U.S.C. § 551(4). Rules are subject to the notice and comment process prior to enactment. 5 U.S.C. § 553. OPM's January 20 memo and February 14 email are likely to constitute a "rule" under the APA (*see, e.g.,* Dkt. No. 37-1 at 2) ("OPM believes 'qualifications for continued employment' in the current context means that only the highest-performing probationers in mission-critical areas should be retained."). It is beyond cavil that they did not go through notice and comment rulemaking.

OPM's counters on this point rely on the jurisdictional "channeling" of the organizational plaintiffs or the factual contention that OPM did not issue a directive and are rejected on those grounds.

United States District Court
Northern District of California

### C.   SUBJECT-MATTER JURISDICTION.

*First*, it is likely that the undersigned lacks jurisdiction to hear the union plaintiffs' claims for the reasons stated in recent denials of similar claims made by unions representing federal employees. *See, e.g.*, *Nat'l Treasury Emps. Union v. Trump*, No. 25-CV-420 (CRC), 2025 WL 561080, at *5–8 (D.D.C. Feb. 20, 2025) (Judge Christopher Cooper) (denying TRO); *Am. Foreign Serv. Ass'n, Inc. v. Donald Trump*, No. 1:25-CV-352 (CJN), 2025 WL 573762, at *8–11 (D.D.C. Feb. 21, 2025) (Judge Carl Nichols) (dissolving TRO); *Am. Fed'n of Gov't Emps. v. Ezell*, No. CV 25-10276-GAO, 2025 WL 470459, at *2 (D. Mass. Feb. 12, 2025) (Judge George O'Toole, Jr.) (dissolving TRO).

"Congress may preclude district court jurisdiction by establishing an alternative statutory scheme for administrative and judicial review." *Am. Fed'n of Gov't Emps. v. Trump*, 929 F.3d 748, 755 (D.C. Cir. 2019). Congress set forth such statutory schemes by way of the Federal Service Labor-Management Relations Statute (FSLMRS) and the CSRA. The relevant statutory background has been summarized in *National Treasury*:

> The Federal Service Labor-Management Relations Statute ("the Statute" or "FSLMRS"), set forth in Title VII of the Civil Service Reform Act ("CSRA"), governs labor relations between the executive branch and its employees. It grants federal employees the right to organize and bargain collectively, and it requires that unions and federal agencies negotiate in good faith over certain matters. The Statute further establishes a scheme of administrative and judicial review. Under that scheme, the Federal Labor Relations Authority ("FLRA"), a three-member agency charged with adjudicating federal labor disputes, reviews matters including negotiability and unfair labor practice disputes. When reviewing unfair labor practice complaints, the FLRA resolves whether an agency must bargain over a subject, violated the duty to bargain in good faith, or otherwise failed to comply with the Statute.
>
> Direct review of the FLRA's decisions is available in the courts of appeals. 5 U.S.C. § 7123(a).
>
> . . .
>
> Separately, the CSRA also established a comprehensive system for reviewing personnel action taken against federal employees. If an agency takes a final adverse action against an employee — removal, suspension for more than 14 days, reduction in grade or pay, or furlough for 30 days or less — the employee may appeal to the Merit Systems Protection Board ("MSPB"). The MSPB may order relief to prevailing employees, including reinstatement,

11

> backpay, and attorney's fees. Probationary employees, however, generally do not enjoy a right to appeal to the MSPB. Employees may appeal final MSPB decisions to the Federal Circuit, which has exclusive jurisdiction over such appeals. This statutory review scheme, too, is exclusive, even for employees who bring constitutional challenges to federal statutes.

*Nat'l Treasury*, 2025 WL 561080, at *4–5 (cleaned up).

Under *Thunder Basin Coal Co. v. Reich*, a claim may fall outside of the scope of a special statutory scheme where "a finding of preclusion could foreclose all meaningful judicial review," the claims considered are "wholly 'collateral'" to a statute's review provisions, or the claims are "outside the agency's expertise." 510 U.S. 200, 212–13 (1994). "These considerations do not form three distinct inputs into a strict mathematical formula. Rather, they serve as general guideposts useful for channeling the inquiry into whether the particular claims at issue fall outside an overarching congressional design." *Trump*, 929 F.3d at 755 (cleaned up).

The union plaintiffs' attempts to distinguish their instant claims from those channeled to the FLRA and MSPB in *National Treasury*, *American Foreign Service*, and *Ezell* are unconvincing, and the analysis laid out in those decisions applies with equal force here: The union plaintiffs and their members must adjudicate their claims through the FLRA and MSPB. The union plaintiffs' claims "are the vehicle by which they seek to reverse the removal decisions, to return [members] to federal employment, and to [collect] the compensation they would have earned but for the adverse employment action." *Elgin v. Dep't of Treasury*, 567 U.S. 1, 22 (2012); *Heckler v. Ringer*, 466 U.S. 602, 614 (1984). That the FLRA or MSPB may lack the authority to adjudicate the union plaintiffs' constitutional and APA claims does not constitute a foreclosure on all meaningful judicial review: Those issues can be "'meaningfully addressed in the Court of Appeals' that Congress [has] authorized to conduct judicial review." *Elgin*, 567 U.S. at 17 (quoting *Thunder Basin*, 510 U.S. at 215). Both schemes "provide[] review in . . . an Article III court fully competent to adjudicate [plaintiffs'] claims." *Ibid*.

*Second*, OPM argues that the CSRA and FSLMRS intended to channel *all* disputes that touch on a federal employment relationship to administrative review, *no matter the party*

12

*bringing such a dispute*. But a claim brought by Western Watersheds Project (WWP), for example, against OPM, alleging that the latter issued an unlawful, arbitrary and capricious rule that undermined the BLM's ability to respond to WWP's FOIA requests, does not feature a federal employee, their union representative, or their federal employer (in this example BLM). The plaintiff's injury — frustration of its ecological mission — is equally ill-suited to adjudication by a *labor* board. True, the termination of a federal employee remains embedded within the dispute: WWP's injury, it argues, occurred *because* OPM demanded, unlawfully, that the probationary employees at BLM be terminated. That, standing alone, is not enough to bring a claim within the scope of the statutory schemes created for the resolution of bargaining disputes and employee claims. Asked to provide a single example of a claim brought by a third party, against a third party, that had been administratively channeled via *Thunder Basin*, OPM could not. Such a rule would stretch that doctrine too far.

In sum, it is unlikely that this Court has jurisdiction over the union plaintiffs, but it likely does have jurisdiction to hear the claims of the organizational plaintiffs. This order moves to consider whether the latter group has standing.

### D. STANDING.

The Supreme Court has set the bar for standing as follows:

> [T]he irreducible constitutional minimum of standing contains three elements. *First*, the plaintiff must have suffered an injury in fact — an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. *Second*, there must be a causal connection between the injury and the conduct complained of — the injury has to be fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court. *Third*, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (cleaned up; emphases added). Where plaintiff seeks prospective injunctive relief, he "must demonstrate that he has suffered or is threatened with a concrete and particularized legal harm, coupled with a sufficient likelihood that he will again be wronged in a similar way." *Fellowship of Christian Athletes v. San Jose*

1  *Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 680–81 (9th Cir. 2023) (en banc) (quoting *Bates*

2  *v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007) (en banc)).  "[I]n an injunctive

3  case this court need not address standing of each plaintiff if it concludes that one plaintiff has

4  standing."  *Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown*, 567 F.3d 521,

5  523 (9th Cir. 2009).  Given the nature of this action and the injunction requested, however, it is

6  necessary that standing be evaluated as to each organizational plaintiff.

7  　　　　"An organization has standing to bring suit on behalf of its members ["representational

8  standing"] if '(1) at least one of its members would have standing to sue in his own right, (2)

9  the interests the suit seeks to vindicate are germane to the organization's purpose, and (3)

10  neither the claim asserted nor the relief requested requires the participation of individual

11  members in the lawsuit.'"  *Fellowship of Christian Athletes*, 82 F.4th at 681 (quoting *Fleck &*

12  *Assocs., Inc. v. City of Phoenix*, 471 F.3d 1100, 1105–06 (9th Cir. 2006)).

13  　　　　An organization has direct organizational standing, meanwhile, "where it establishes that

14  the defendant's behavior has frustrated its mission and caused it to divert resources in response

15  to that frustration of purpose."  *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 663 (9th

16  Cir. 2021).  "Of course, organizations cannot manufacture the injury by incurring litigation

17  costs or simply choosing to spend money fixing a problem that otherwise would not affect the

18  organization at all, but they can show they would have suffered some other injury had they not

19  diverted resources to counteracting the problem."  *Ibid.*  (internal quotation marks omitted); *see*

20  *also FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 384–86 (2024).  At bottom, the test is

21  whether an organization's ability to perform the services they were formed to provide has been

22  "perceptibly impaired" by the challenged action.  *E. Bay Sanctuary Covenant v. Trump*, 932

23  F.3d 742, 765 (9th Cir. 2018) (cleaned up).

### (i) The Coalition to Protect America's National Parks (The Coalition) and Main Street Alliance (MSA).

25  　　　　"Aesthetic and environmental well-being, like economic well-being, are important

26  ingredients of the quality of life in our society, and the fact that particular environmental

27  interests are shared by the many rather than the few does not make them less deserving of legal

United States District Court
Northern District of California

14

United States District Court
Northern District of California

protection through the judicial process." *Sierra Club v. Morton*, 405 U.S. 727, 734 (1972). In *Desert Citizens Against Pollution v. Bisson*, for example, BLM sought to exchange 1,745 acres of federal land in Imperial County for a 2,642-acre parcel in the Santa Rosa and Little Chuckwalla Mountains owned by Gold Fields, a mining company. 231 F.3d 1172, 1175 (9th Cir. 2000). Gold Fields aimed to turn the Imperial County tract into a landfill; the members of Desert Citizens aimed to save it from that grim fate via an APA action. *Ibid.* Our court of appeals held that the members' continued use of the federal lands established an injury in fact: "The recreational or aesthetic enjoyment of federal lands is a legally protected interest whose impairment constitutes an actual, particularized harm sufficient to create an injury in fact for purposes of standing." *Id.* at 1176 (citing *Sierra Club*, 405 U.S. at 734).

The National Park Service has terminated close to 1,000 newly hired employees (Neubacher Decl., Exh. A). Coalition board member Don Neubacher, the former Superintendent at Yosemite National Park (2010–2016) and Point Reyes National Seashore (1995–2010) submitted a declaration stating:

> The Coalition to Protect America's National Parks ("Coalition") is a non-profit organization made up of over 3,400 members, all of whom are current, former, and retired employees and volunteers of the National Park Service. Together, they have accumulated over 50,000 years of experience caring for America's most valuable natural and cultural resources. . . . *Our members and their families are regular and avid users of the National Park System who would be adversely affected by any degradation of the parks or the programs of the NPS to preserve and protect the parks and make them available to visitors. Based on my experience as a park Superintendent, the termination of so many NPS employees at once will have an immediate adverse impact on the parks and park visitors.* For example, at Yosemite, the park will likely have to stop specific functions and close park areas. There is no way to accommodate current visitation levels without additional staff support during the upcoming peak season. When there was a partial government shutdown in 2018, visitors trashed scenic viewpoints, defecated outside locked restrooms and trampled sensitive ecological areas with their vehicles and dogs. The park receives annual visitation of over 4 million people.

(Neubacher Decl. ¶¶ 2–5 (emphasis added)). In a separate declaration, Jonathan B. Jarvis, the former Director of the National Parks Service, underscores the immediacy and scope of the harm to park operations, environmental protection, and natural resource monitoring (Dkt. No.

1    18-11). Some of the likely, imminent harms laid out above have already come to pass. A

2    member of the Coalition reported this week that they and their party were forced to abandon a

3    trip to Joshua Tree National Park because the Black Rock Nature Center, which ordinarily

4    provides shelter and commodes to the public, remained unstaffed and closed well after its

5    scheduled opening time (Neubacher Suppl. Decl. ¶ 4).

6         The Coalition has standing. Its members' continued use and enjoyment of our national

7    parks will likely be, and in at least one case already has been, injured by the terminations that

8    have taken place at the National Parks Service.

9         Main Street Alliance likewise has representational standing. MSA is a "national network

10   of small businesses, with approximately 30,000 members throughout the United States. MSA

11   helps small business owners realize their full potential as leaders . . . with the aim of creating

12   an economy where all small business owners have an equal opportunity to succeed"

13   (Phetteplace Decl. ¶¶ 2–3). "MSA's small business members rely on the U.S. Small Business

14   Administration ('SBA') for a variety of valuable services that help small businesses succeed.

15   These services include loans, loan guarantees, and grants; disaster relief; assistance in

16   connecting small businesses with government contracting opportunities; and a national

17   network of some 1,000 Small Business Development centers that provide counseling and

18   training to help entrepreneurs start their own businesses" (*id*. ¶ 4). A February 20 letter from

19   the Ranking Member of the Senate Committee on Small Business and Entrepreneurship to the

20   Administrator of the SBA cited reporting that hundreds of probationary SBA employees had

21   been terminated across the country and stated that "through our own investigation and public

22   reporting, we have learned that the fired employees included those supporting disaster

23   assistance and oversight of loan programs" (*id*. Exh. A). MSA asserts that the mass

24   terminations at the SBA are likely to impair disaster relief, the provision of loan guarantees,

25   and other services necessary for MSA's members to open a business or stay float (*id*. ¶ 9).

26   Some members who already have entered into contracts with the expectation of obtaining

27   timely loan guarantees "are likely to be on the hook for expenses owed to contractors and

28   suppliers without the ability to pay amounts owed" (*id*. ¶ 8).

United States District Court
Northern District of California

16

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### (ii)    The Western Watersheds Project (the Project).

In *Havens Realty Corp. v. Coleman*, an organization "whose purpose was to make equal opportunity in housing a reality in the Richmond Metropolitan Area," HOME, brought a Fair Housing Act claim against Havens Realty, which owned and operated apartment complexes in Richmond.  455 U.S. 363, 368 (1982) (internal quotation marks omitted).  HOME asserted that Havens Realty's unlawful "racial steering" — providing false information regarding the availability of housing to black individuals to maintain a segregated property — had frustrated its mission and, critically, its housing counseling service.  *Id.* at 367, 369.  The Supreme Court rejected Haven Realty's standing challenge, holding:

> If, as broadly alleged, petitioners' steering practices have perceptibly impaired HOME's ability to provide counseling and referral services for low-and moderate-income homeseekers, there can be no question that the organization has suffered injury in fact. Such concrete and demonstrable injury to the organization's activities — with the consequent drain on the organization's resources — constitutes far more than simply a setback to the organization's abstract social interests.

*Id.* at 379 (citing *Sierra Club*, 405 U.S. at 739).

The Project has standing to challenge OPM's directive to fire probationary employees at BLM and the U.S. Fish and Wildlife Service.  Erik Molvar, a wildlife biologist formerly employed by the U.S. Forest Service and Army Corps of Engineers, and now the Project's Executive Director, states that it "is a non-profit environmental conservation group that works to influence and improve public lands management" (Molvar Decl. ¶¶ 3–4).  Founded in 1993, the group has some 14,000 members, with field offices in Idaho, Montana, Wyoming, Arizona, Nevada, and Oregon.  The group is primarily focused on "the negative impacts of livestock grazing" (*ibid.*).  The group is also an active litigant in the federal courts, where it advocates against commercial grazing on public lands.  *See, e.g., W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472 (9th Cir. 2011); *W. Watersheds Project v. Abbey*, 719 F.3d 1035 (9th Cir. 2013); *W. Watersheds Project v. Interior Bd. of Land Appeals*, 62 F.4th 1293 (10th Cir. 2023); *W. Watersheds Project v. U.S. Forest Serv.*, 603 F. App'x 612 (9th Cir. 2015) (mem.).

17

*First*, the Project has shown *actual* harm, namely that its ecological mission has been perceptibly impaired by the termination of employees at the BLM:

> This mass termination of employees will have an immediate adverse effect on the ability of the [Project] to accomplish its mission.
>
> For example, I was told by a federal employee on February 20, 2025, that because of staffing issues the Bureau of Land Management is unable to respond to a Freedom of Information Act request submitted by the [Project]. Our work depends on timely access to public records.

(Molvar Decl. ¶¶ 7–8). The termination of range managers and biologists, meanwhile, will diminish BLM's ability to provide timely "land health assessments to monitor the impact of cattle and sheep grazing on public lands," further undercutting the Project's ability to pursue its stated goals (*id.* ¶ 8).

*Second,* the Project has shown harm to both its members' protected interests in and its own efforts to advocate on behalf of endangered species. The Project is a party in an ongoing litigation in the District of Montana (Molvar Suppl. Decl. ¶ 3). *Ctr. for Biological Diversity v. Haaland,* No. 23-cv-02-BU-DLC (D. Mont.) (Judge Dana Christensen). There, the Project (and its co-plaintiffs) challenged a 2020 finding from the FWS concerning the Missouri River Distinct Population Segment of Arctic grayling, a freshwater fish with precious little habitat left, under the Endangered Species Act (Molvar Suppl. Decl. ¶ 3). Following a partial grant of summary judgment in the plaintiffs' favor, Judge Christensen ordered FWS to make a new finding regarding the status of the upper Missouri River Basin Distinct Population Segment of Arctic grayling by August 2025. *Haaland*, No. 23-cv-02-BU-DLC, Dkt. No. 52 at 53. On February 12 the FWS sought and received an extension of that deadline to February 2027 (Molvar Suppl. Decl. at ¶ 3). In a declaration to Judge Christensen, the FWS conditioned their ability to meet that new deadline on the "assumption[]" that "the Service will continue to have the authority to hire and retain sufficient listing program staff to be able to carry out the specified commitments." *Haaland*, No. 23-cv-02-BU-DLC, Dkt. No. 63-1 ¶ 15. The Project

18

United States District Court
Northern District of California

1  represents that, as of February 26, some 400 FWS employees have been terminated (Molvar

2  Suppl. Decl. ¶ 3).

3      Executive Director Molvar, himself a member of the Project, frequently fishes for Arctic

4  grayling in the lakes of the Sapphire Mountains, in Glacier National Park, and in Alaska (*id*. at

5  ¶ 9).  He plans to do so again during a planned July 2025 trip to Alaska (*ibid.*).  Under *Sierra*

6  *Club* and its progeny, therefore, the Project has standing to vindicate its members' legally

7  protected interest in the recreational enjoyment of federal lands and the flora and fauna therein.

8          (iii)    **Vote Vets Action Fund Inc. (VoteVets) and**
               **Common Defense Civic Engagement (Common**
9               **Defense).**

10      In *Fellowship of Christian Athletes*, an international student ministry challenged the

11  defendant school district's decision to bar its local chapter from formal "recognition" as a

12  student-run organization by the Associated Student Body (ASB).  82 F.4th at 681.  The FCA

13  stated it was an international "ministry group formed for student athletes to engage in various

14  activities through their shared Christian faith" that operates through more than 7,000 local

15  chapters.  *Id*. at 671–72.  Their stated mission was to equip "student athletes from all

16  backgrounds for fellowship, spiritual growth, and service on their campuses."  *Ibid.*  FCA

17  required that students serving in a leadership capacity affirm certain religious beliefs through a

18  "Statement of Faith" (stating, among other things, that "marriage is exclusively the union of

19  one man and one woman") and a "Sexual Purity Statement."  *Id*. at 672–73.  The defendant

20  school district, citing the "discriminatory nature" of both statements, first stripped the club of

21  its recognition as an official student club, and then imposed new "non-discriminatory criteria"

22  for all student clubs, under which the local FCA chapter would be denied recognition in future

23  years.  *Id*. at 675, 678–79.  While FCA's local chapter remained on campus, it lost out on

24  certain campus privileges.  *See id*. at 673.

25      Our court of appeals, sitting en banc, held that the FCA's national office had direct

26  organizational standing because the local chapter's exclusion from the benefits associated with

27  ASB recognition — access to fundraisers, the student yearbook, priority access to meeting

28  spaces, and so on — "undoubtedly hampered," *id*. at 683, the FCA's mission "to lead every

19

coach and athlete into a growing relationship with Jesus Christ and His church," *id.* at 672. The FCA's national office moreover, "had to 'divert[] resources' in 'counteracting the problem' posed by the derecognition," including "a huge amount of staff time, energy, effort, and prayer that would normally have been devoted to preparing for school or ministry." *Ibid.*

Plaintiff VoteVets has standing. VoteVets is a "non-partisan, non-profit organization" that has "nearly 2 million supporters . . . with whom it regularly communicates about issues affecting veterans, including the operations, programs, and services available through the U.S. Department of Veterans Affairs" (Eaton Decl. ¶3). The VA has "dismissed over 1,000 probationary employees," "rais[ing] concerns about potential staffing shortages and the quality of care provided to veterans" (*id.* ¶ 8). For example, "the layoffs have hindered the recruitment of essential support staff for VCL positions such as trainers and quality assurance personnel" (*id.* ¶ 9). This shortage "has overwhelmed existing supervisors and affected the VCL's ability to provide timely assistance to veterans in crisis." Major General Eaton attests that:

> The February 2025 probationary terminations have had a significant impact on the organizational activities of VoteVets. The time of VoteVets' staff and consultants has been diverted from VoteVets' regular activities to field and respond to inquiries from veterans and their families and to connect them with case workers in congressional offices. This has taken almost all of our resources since the probationary terminations began, and has prevented us from performing our regular activities to meet the needs of veterans and their families.

(*id.* ¶ 11). VoteVets' members' access to services critical to the organization's mission has been hampered, and VoteVets itself has been forced to divert "almost all of [their] resources" in "counteracting the problem," depriving the organization of its ability to continue to provide services to its members (*ibid.*).

Plaintiff Common Defense likewise has standing. Common Defense is a "grassroots membership organization of progressive veterans, military families, and civilian supporters" (Arbulu Decl. ¶ 2). With approximately 33,187 members in California (about 2,000 of them veterans), Common Defense "mobilize[s] veterans to support and advocate for policies that help veterans, military families, and all working families," offers training and helps members

United States District Court
Northern District of California

20

1    begin issue campaigns, and otherwise engages in legislative and political advocacy (*id*. ¶¶ 3–5,

2    11). Military veterans compose a large percentage of federal employees, and widespread

3    termination — particularly at the VA and DOD — have had a disproportionate impact on

4    persons whom Common Defense typically serves:

> As a result of these developments, Common Defense has had to
> devote considerable resources to responding to requests from our
> members and providing guidance about the mass probationary
> terminations. Many members believe that the termination of their
> employment may be imminent, and understandably have asked
> questions — by email, by phone, and on our members' slack
> channel — about what the letter means for their rights as
> employees Responding to members questions, and working to
> determine what answers we can give to those members, diverts
> resources from Common Defense's advocacy mission and core
> priorities, including working to expand ballot access at the state
> level, advancing initiatives to address climate change, and training
> and educating members.

(*id*. ¶ 6). Common Defense, like VoteVets, has diverted considerable resources otherwise

intended for the pursuit of its advocacy mission to the problems presented to its members, and

its mission, by mass terminations, particularly at the VA and DOD.

                        *          *          *

   *First*, OPM counters that plaintiffs fail on causation: There was no direction, merely a

request; that request was carried out by some agencies; it was those agencies' independent,

intervening actions that are the proximate cause of plaintiffs' alleged harm. This argument

rests on OPM's broader factual position that its memos and other communications to agencies

regarding probationary employees constituted mere guidance, not direction. But plaintiffs

have assembled a mountain of evidence supporting their more concise causal chain: OPM

directed mass firings and plaintiffs each likely will be (or have been) injured as a result.

Plaintiffs have each established a sufficient causal link between the mass termination of

employees at the implicated agencies, and the imminent, foreseeable, and in some cases actual

injuries that they face.

United States District Court
Northern District of California

21

Next, OPM argues redressability:

> They ask the Court to order agencies to rescind probationary
> removals and reinstate removed employees. But, apart from OPM,
> no other federal agency is a party here, leaving the Court without
> the power to order those agencies to take any action. Thus,
> Plaintiffs cannot show that an order of this Court would likely
> grant their requested relief, rendering their claimed injuries non-
> redressable here.

(Dkt. No. 33 at 13). Plaintiffs fairly allege that they have been harmed by OPM's *direction* to other agencies to fire their probationary employees. Declaratory and injunctive relief enjoining OPM from issuing such a directive — one request among many made by plaintiffs — will likely redress their alleged injuries.

### 2.   IRREPARABLE HARM.

"[P]laintiffs may not obtain a preliminary injunction unless they can show that irreparable harm is likely to result in the absence of the injunction." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). They have done so here.

"[T]he Supreme Court has instructed us that '[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.,* irreparable.'" *Ibid*. (alterations in original) (quoting *The Lands Council v. McNair*, 537 F.3d 981, 1004 (9th Cir. 2008) (en banc)). Relatedly, "deprivation of a source of personal satisfaction and tremendous joy can constitute an irreparable injury." *Ft. Funston Dog Walkers v. Babbitt*, 96 F. Supp. 2d 1021, 1039 (N.D. Cal. 2000) (citing *Chalk v. U.S. Dist. Ct.*, 840 F.2d 701, 709 (9th Cir. 1988)). That is true as to loss of access to national recreational areas. *Ibid*. The partial closure and degradation of national parks constitutes likely, irreparable harm due to both environmental injury and loss of access (*see* Neubacher Decl. ¶¶ 2–5). In at least one instance, a closure at Joshua Tree has resulted in actual harm (*see* Neubacher Suppl. Decl. ¶ 4). And the Arctic grayling, if it goes, is not coming back (*see* Molvar Suppl. Decl. ¶ 3–9). The Coalition and the Project have established irreparable harm.

Loss of access to essential government services also constitutes likely, and in some cases actual, irreparable harm. For example, the Veterans Crisis Line — an indispensable resource for our veterans in times of crisis — has been "overwhelmed" and its ability to provide care

United States District Court
Northern District of California

1    diminished for lack of staff (Eaton Decl. ¶ 9).  Loss of access to that critical resource, standing

2    alone, constitutes irreparable harm to VoteVets' members.  Its failure to meet the needs of our

3    veterans presents the further likelihood of tragic results.  MSA's members' access to crucial

4    SBA services, including the provision of loan guarantees, is likely to be diminished

5    (Phetteplace Decl. ¶¶ 5–9), and the Western Watersheds Project's access to FOIA production

6    already has been impacted (Molvar Decl. ¶¶ 7–8).

7    Finally, plaintiffs face irreparable harm because they have diverted significant or even all

8    present resources to responding to the hardships created by the mass termination of

9    probationary employees (*see, e.g.*, Arbulu Decl. ¶ 6; Eaton Decl. ¶ 11).

10    MSA, the Coalition, the Project, VoteVets, and Common Defense have each established

11    irreparable injury.

12    OPM's rebuttals, tailored largely to the union plaintiffs, are moot (Dkt. No. 33 at 10).

13    OPM's assertion, meanwhile, that "[p]laintiffs have produced no credible evidence that

14    terminations of federal employees have caused a disruption in critical government services"

15    (*ibid.*) is refuted by the record, discussed at length in this memorandum's consideration of

16    standing.

17    **3.    THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST.**

18    Because OPM is a party in this action, the balance of the equities and the public interest

19    merge.  *See Nken v. Holder,* 556 U.S. 418, 435 (2009).  Here, they strongly favor plaintiff.

20    "The preservation of the rights in the Constitution and the legality of the process by which

21    government agencies function certainly weighs heavily in the public interest."  *Nat'l Treasury*

22    *Emps. Union v. U.S. Dep't of Treasury*, 838 F. Supp. 631, 640 (D.D.C. 1993) (Judge Harold

23    Greene).  Plaintiffs have presented real harms, detailed above, to their organizations, their

24    members, and their missions, while OPM has not provided a substantive opposition (Dkt. No.

25    33 at 22–23).

26    In sum, each *Winter* factor favors granting a limited injunction.

27

28

United States District Court
Northern District of California

23

**CONCLUSION**

Based on the foregoing, the Court granted the following relief at the close of the February 27 argument:

> That OPM's January 20 memo, February 14 email, and all other efforts to direct the termination of employees at NPS, BLM, VA, DOD, SBA, and NSF are illegal, invalid and must be stopped and rescinded. That OPM must communicate that decision to those agencies by the next day, February 27.

(Dkt. No. 41).

This memorandum amends the bench order to address two errors (the inclusion of the NSF, and the exclusion of FWS). The Court's TRO is accordingly **AMENDED** to the following:

It is **ORDERED** that:

> OPM's January 20 memo, February 14 email, and all other efforts by OPM to direct the termination of employees at NPS, BLM, VA, DOD, SBA, and FWS are unlawful, invalid, and must be stopped and rescinded.
>
> OPM shall provide written notice of this order to NPS, BLM, VA, DOD, SBA, and FWS.

The evidentiary hearing described at the February 27 motion hearing shall occur on **MARCH 13, 2025, AT 8 AM**. The hearing will be in person in Courtroom 12.

Dated: February 28, 2025.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

Exhibit B

Pages 1 - 59

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William Alsup, Judge

```
AMERICAN FEDERATION OF            )
GOVERNMENT EMPLOYEES, AFL-CIO,    )
et al.,                           )
                                  )
            Plaintiffs,           )
                                  )
   VS.                            )    NO. 25-cv-01780-WHA
                                  )
UNITED STATES OFFICE OF           )
PERSONNEL MANAGEMENT, et al.,     )
                                  )
            Defendants.           )
_____)
```

San Francisco, California
Thursday, March 13, 2025

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiffs:

> ALTSHULER BERZON LLP
> 177 Post Street, Suite 300
> San Francisco, CA  94108
> BY:  DANIELLE EVELYN LEONARD, ATTORNEY AT LAW
>      STACEY M. LEYTON, ATTORNEY AT LAW
>      EILEEN B. GOLDSMITH, ATTORNEY AT LAW

> STATE DEMOCRACY DEFENDERS ACTION
> 2022 Columbia Road, NW, Suite 214
> Washington, DC 20009-1309
> BY:  NORMAN L. EISEN, ATTORNEY AT LAW

(APPEARANCES CONTINUED ON THE NEXT PAGE.)

REPORTED REMOTELY BY:  Kendra A. Steppler, RPR, CRR
                       Official United States Reporter

<u>APPEARANCES:</u> (Continued)

```
                        STATE OF WASHINGTON ATTORNEY GENERAL
                        1125 Washington Street SE
                        Olympia, WA 98501-2283
              BY:   TERA M. HEINTZ, ATTORNEY AT LAW

For Defendants:

                        UNITED STATES ATTORNEY'S OFFICE
                        450 Golden Gate Avenue, Box 36055
                        San Francisco, CA 94102
              BY:   KELSEY J. HELLAND, ASST. U.S. ATTORNEY
```

```
 1  Thursday - March 13, 2025                              8:01 a.m.

 2                      P R O C E E D I N G S

 3                          ---o0o---

 4          THE COURTROOM DEPUTY:  All rise.  Court is now in

 5  session.  The Honorable William Alsup is presiding.

 6          THE COURT:  Good morning, everyone.

 7          ALL:  Good morning, Your Honor.

 8          THE COURT:  Please be seated.

 9          THE COURTROOM DEPUTY:  Calling Civil Action 25-1780,

10  American Federation of Government Employees, et al. v. U.S.

11  Office of Personnel Management, et al.

12      This hearing -- people on the Zoom -- attendees -- no

13  recording, whether by audio or video or screenshot, is allowed.

14  It's prohibited -- it's prohibited.

15          THE COURT:  That was unclear.  You said "allowed."

16          THE COURTROOM DEPUTY:  No.  No recording.

17          THE COURT:  You said "prohibited."  Which is it?

18          THE COURTROOM DEPUTY:  No recording, audio or

19  screenshots, are allowed.

20      Counsel, please approach the podium and state your

21  appearances for the record, beginning with counsel for

22  plaintiffs.

23          MS. LEONARD:  Good morning, Your Honor.  Danielle

24  Leonard, Altshuler Berzon, for the plaintiffs.  With me at

25  counsel table are Stacey Leyton and Eileen Goldsmith from
```

(46 of 102), Page 46 of 102 Case: 25-1677, 03/14/2025, DktEntry: 9.1, Page 46 of 102
Case 3.25-cv-01780-WHA    Document 120    Filed 03/13/25    Page 4 of 60

4

1    Altshuler Berzon, Norm Eisen from the State Democracy Defenders

2    Fund, and Tera Heintz from the Attorney General's Office of the

3    State of Washington.

4         THE COURT:  Welcome.

5         MR. HELLAND:  And good morning, Your Honor.  Assistant

6    United States Attorney Kelsey Helland for the Government.

7         THE COURT:  Thank you.  Welcome.

8    All right.  We're here on a motion for preliminary

9    injunction, and we'll hear some argument.

10   Are there any other items that we need to address?  Let's

11   hear first from plaintiffs.

12        MS. LEONARD:  Thank you, Your Honor.

13   I'm happy to provide argument on the preliminary

14   injunction.  I do think that there are some additional items to

15   address that we can --

16        THE COURT:  Well, just --

17        MS. LEONARD:  -- get to after we --

18        THE COURT:  -- let me hear what -- let's make a list

19   of whatever it is you have in mind.  I don't want to hear the

20   arguments on them yet, but let's -- tell me what needs to be

21   decided.

22        MS. LEONARD:  We have a pending request that a certain

23   additional declaration be struck from the record that was filed

24   yesterday.

25   We also --

```
1          THE COURT:  Is that Noah Peters?

2          MS. LEONARD:  Yes, Your Honor.

3          THE COURT:  All right.  So let's -- what else?

4          MS. LEONARD:  There is also the issue of Mr. Ezell's

5   failure to appear in response to your court order that he

6   appear on Monday.

7          THE COURT:  What else?  There was some --

8          MS. LEONARD:  That's --

9          THE COURT:  -- somebody from the IRS wanted to come

10  and testify but wanted immunization, which I can't give.  So

11  I -- is that person here and wants to testify or is that moot?

12         MS. LEONARD:  So it's not moot, Your Honor.  But just

13  for clarification, it wasn't necessarily immunization.  It was

14  just a court order enforcing the subpoena to provide --

15         THE COURT:  No, you don't need a court order to

16  enforce a subpoena.  That's what the subpoena itself is.

17         MS. LEONARD:  Your Honor, there's --

18         THE COURT:  No.  I'm not going to do that.

19         MS. LEONARD:  Okay.

20         THE COURT:  I know what's going on there.  Some lawyer

21  wants to be able to say that Judge Alsup has immunized her and

22  given her a blank check to say whatever she wants and not be

23  punished for it.  No.  If she wants to come and testify, I will

24  hear what she has to say.  But, no, you don't need a court

25  order.  I'm not going to do that.
```

```
 1          MS. LEONARD:  Okay.  I very much appreciate that
 2   clarification, Your Honor, but I also for -- just to clarify,
 3   that the person wanted protection against retaliation.
 4          THE COURT:  I can't give her that in advance.
 5          MS. LEONARD:  Okay.
 6          THE COURT:  Do you understand that?
 7          MS. LEONARD:  I --
 8          THE COURT:  This is a sideshow.  Why are you going of
 9   into a sideshow?
10          MS. LEONARD:  Because we --
11          THE COURT:  All right.  Is she here and does she want
12   to testify?
13          MS. LEONARD:  She's not here today.
14          THE COURT:  Okay, then it's moot.  All right.  Let's
15   move on.
16       What else is on your list?
17          MS. LEONARD:  I think that's it, Your Honor.
18          THE COURT:  All right.  We will deal with Noah Peters
19   and Ezell's failure to appear in the course of general
20   argument.  You get to go first.
21          MS. LEONARD:  Thank you, Your Honor.
22       Your Honor, many of the issues that are raised by our
23   request for a preliminary injunction have already been
24   addressed in your Court's -- in the orders thus far in the
25   case, including the order resolving the TRO and the recent --
```

1    more recent order on granting leave to amend.

2        And so those legal issues I'm happy to address further if

3    there is a need, but I'm going to try to keep this focused on

4    the issues that are still in play.

5        And what we have before the Court is record evidence that

6    conclusively establishes that OPM directed the terminations at

7    issue.  We have a very unusual circumstance where the

8    Government has not mounted -- has attempted to say they

9    factually dispute that.  But as Your Honor is very familiar

10   with the course of events here, have actually withdrawn the

11   declaration by which they were attempting to dispute that.  And

12   there is no record evidence on the other side by which they've

13   disputed this fact and the mountain of evidence that Your Honor

14   recognized at the TRO stage.

15        THE COURT:  Well, but then they substituted Noah

16   Peters.  So what is the -- your opinion on that and what is the

17   law that backs it up?

18        MS. LEONARD:  So they have not substituted Mr. Peters'

19   declaration, Your Honor, because he -- that testimony was not

20   presented for cross-examination and should not be considered by

21   the Court.  It was presented with an *ex parte* motion to stop

22   this hearing today, Your Honor.  That is the purpose for which

23   they presented that declaration, to slide it into the record.

24        Out of an abundance of caution, we asked them to withdraw

25   that declaration because they are not making Mr. Peters

1    available to be cross-examined, just like all of the other

2    Government witnesses that we tried to present to the Court to

3    have the truth of what has happened come out and that they have

4    refused and blocked from appearing here.  They have not

5    presented --

6              THE COURT:  I tend to agree with you on that.  And the

7    Government, I believe, has tried to frustrate the Judge's

8    ability to get at the truth of what happened here and then set

9    forth sham declarations to -- a sham declaration -- they

10   withdrew it, then substitutes another.  That's not the way it

11   works in the U.S. District Court.  I'm going to talk to the

12   Government about that in a minute.

13       I had expected to have an evidentiary hearing today in

14   which these people would testify.  And if they wanted to get

15   your people on the stand, I was going to make that happen too.

16   It would be fair.  But, instead, we've been frustrated in that.

17       But I still -- we're here on a preliminary injunction.

18   And if you want me to just wait until months go by, until we

19   ever get the evidentiary hearing, I will do that.  But we do

20   have a record here, and I'd like to hear your views on what

21   relief should be issued today -- T-O-D-A-Y -- today.

22             MS. LEONARD:  Thank you, Your Honor.

23       We are aligned in wanting that to happen, as well, and

24   believing that these issues are a distracting sideshow, however

25   important the truth is.

1    The record before Your Honor absolutely supports the

2    issuance of a preliminary injunction today.  And the reason is,

3    even if the Peters' declaration's considered, which it

4    shouldn't be for all those reasons, it's not credible.  There's

5    a mountain of evidence before the Court that OPM directed it.

6    OPM's actions were unlawful.  The plaintiffs have standing.

7    And there is irreparable harm that is occurring every minute.

8    And it is snowballing.

9    So the real question here, Your Honor, is remedy.  And we

10   are happy to go straight to that point rather than repeating

11   some --

12            THE COURT:  All right.  Tell me what remedy you want.

13            MS. LEONARD:  Okay.  So my colleague, Ms. Leyton, is

14   actually going to address the remedy issues, so I'm going to

15   turn it over to her.

16            THE COURT:  Okay.

17            MS. LEYTON:  Thank you, Your Honor.

18   As a remedy, we would request vacatur of the OPM action,

19   rescission of the directive to the agencies, and rescission of

20   the terminations that were carried out pursuant to that

21   directive.

22   OPM issued the directive.  Our belief is that the evidence

23   in the record establishes that.  There is no credible contrary

24   evidence that it's caused the widespread loss and deterioration

25   of Federal Government services, including, as documented by the

1   declarations, habitat and conservation harms, national parks

2   harms, veterans' services, a variety of harms that are

3   illustrated by the tens of declarations that we have submitted.

4   And it's causing injury to a variety of plaintiffs.

5       So the only appropriate relief is to order both OPM to

6   rescind its directives and the agencies to rescind the actions

7   that they took pursuant to the unlawful directive in

8   implementation of that directive.

9       The voluntary cessation cases, which we cited in our reply

10  brief, provide some guidance.  There, the question there is

11  whether the Government has done enough that the Court should

12  no -- no longer need act in order to remedy the relevant

13  injuries.

14      The first prong of the voluntary cessation injury is about

15  a different subject.  It's about whether we can be assured --

16              THE COURT:  All right.  Well, let me ask you --

17              MS. LEYTON:  Yes.

18              THE COURT:  -- this.

19      Are there -- I've read through some of the papers

20  submitted to me that some of the people who were terminated

21  were rehired; is that true?

22              MS. LEYTON:  Yes, Your Honor.  After this Court issued

23  an order, some were rehired pursuant to that, and then there

24  has been some public outcry over things like the loss of the

25  nuclear safety people.

1          THE COURT:  All right.  But have there been others who

2     were terminated who have not yet been rehired?

3          MS. LEYTON:  Most have not been rehired, Your Honor.

4          THE COURT:  Can you give me some examples?

5          MS. LEYTON:  The examples where they were rehired

6     included the Department of Labor rescinded the terminations

7     that had not taken effect.  All of the other agencies that we

8     have documented -- the Forest Service, the Department of

9     Agriculture, the Department of Education, the Department of

10    Labor -- most of the agencies have not rehired people.

11         The ones where we are aware, where the probationary

12    employees were rehired, were the National Science Foundation,

13    which occurred fairly quickly after this Court's order; the CDC

14    rescinded some of the terminations; the Department of Labor

15    rescinded terminations that had not yet happened; the

16    Department of Agriculture has taken steps but has not yet

17    rescinded the -- has not yet brought people back to work, is

18    our understanding.  And that was addressed in some of the

19    declarations that we submitted earlier this week.

20         THE COURT:  All right.  Where does it stand with

21    relief being sought from the Merit Systems Protection Board by

22    terminated employees?

23         MS. LEYTON:  The Merit Systems Protection Board

24    initially addressed six individual employees and ordered those

25    employees back to work.  Then there was a class of Department

1   of Agriculture employees -- 6,000 Department of Agriculture

2   employees -- who were ordered back to work.  That's what our

3   most recently submitted declarations address.

4       Our understanding is that those people are not yet back to

5   work.  The Office of Special Counsel, Hampton Dellinger, was

6   terminated after that order issued, after he sought that class

7   relief, and so we are not aware that those individuals have

8   actually been brought back to work to restore the services that

9   they were providing, which is the injury that this Court is

10  seeking to redress.

11          THE COURT:  I'm going to have some more questions

12  later about that whole process, but I want to hold up for a

13  moment and stick with the main things.

14      Okay.  What else by way of relief are you seeking today?

15          MS. LEYTON:  That is the key relief.

16      We would also ask that there be a compliance report from

17  the Federal Government.  Our understanding, as this Court noted

18  in its order, is that OPM should have a list of all of the

19  probationary employees who were terminated.  And so we would

20  like confidential reports from OPM as to which probationary

21  employees have been brought back to their job so that those

22  Government services can be restored.  We would ask for a

23  timeline and for reports to this Court.

24      Under either our *ultra vires* claim or the APA claim, the

25  appropriate remedy is to restore the status quo.  Vacatur is

1    supposed to unwind the unlawful agency action, and injunctive

2    relief is available under both the APA and our *ultra vires*

3    claim in order to redress the injuries that have occurred.

4        And in order to do that, this Court needs to be assured

5    that those actions that were taken pursuant to the unlawful

6    order have been fully unwound, meaning that people have been

7    brought back to work so that the services can be restored.

8             THE COURT:  All right.  Thank you.

9        Let's hear from the Government.

10            MS. LEYTON:  Thank you, Your Honor.

11            MR. HELLAND:  Thank you, Your Honor.

12       I didn't hear counsel address any of the evidence that we

13   submitted yesterday, including contemporaneous statements from

14   agency heads saying that they were the ones who made the

15   decision to terminate probationary employees.

16       We submitted, yesterday, press releases from the VA, from

17   the Department of Defense, from the USDA, including statements

18   from the Senate-confirmed officials or high-ranking career

19   officials in those departments saying these were tough

20   decisions, but ultimately it's the right thing to do.  Or the

21   USDA press release.  USDA is pursuing an aggressive workforce

22   optimization plan.

23       This is set against the backdrop of the

24   February 11th Executive Order, where the President directed

25   agencies to dramatically improve workforce efficiency to shrink

 1    the size of the Federal Government, and the White House fact

 2    sheet from that same date, February 11th, that said that

 3    shrinking the size of the federal workforce is one of the

 4    Administration's top priorities.

 5        At the TRO hearing, Your Honor was, I think, looking for a

 6    reason, other than OPM's mandate, that all of these agencies

 7    would be taking this same action at the same time.  I submit

 8    that this backdrop, including the evidence that we submitted

 9    yesterday, shows the obvious alternative explanation.

10        This was a priority for the Administration.  The political

11    leadership of these agencies were taking this action

12    themselves.  In fact, we previously pointed out to Your Honor

13    that on February 7th, before the OPM communications that

14    plaintiffs have put at the center of this case, the SBA had

15    already started terminating probationary employees.  That was

16    reported in the media.

17        I don't think plaintiffs have yet acknowledged this

18    evidence that these were the actions of the political

19    leadership of these agencies in response to a priority -- a

20    clearly communicated public priority -- of the Administration

21    rather than an order from OPM.

22        That's first, Your Honor.  Your Honor, has -- may I speak

23    to a couple of questions that Your Honor had?

24            THE COURT:  Go ahead.

25            MR. HELLAND:  So, first, Your Honor, with respect to

 1   the MSPB actions, it's my understanding that there's not just

 2   one class petition pending, but there are several from

 3   almost -- I don't know if it's almost all, but many of the

 4   agencies that are here.  There's a website, in fact, that lists

 5   the class petitions by agency.  So many of the agencies

 6   involved here are covered by those.

 7        As far as I know, Your Honor, the MSPB has not yet decided

 8   whether to accept those as class actions, but those requests

 9   are pending.  There's still time for that to play out.

10        And then going to the probationary employees who were

11   reinstated, Your Honor, I think NSF here is the exception that

12   proves the rule.  All of these other agencies -- after

13   receiving Your Honor's order, after OPM amended its guidance on

14   March 4th to clarify that it hadn't been and still was not

15   directing terminations -- virtually all of them decided not to

16   bring back the probationary employees that their leadership had

17   decided to terminate.  NSF did bring them back.  That was

18   within its prerogative do so.  But virtually no other agency

19   did.  Maybe a couple others.  So I think that that actually

20   shows that --

21        THE COURT:  Well, maybe that's why we need an

22   injunction that tells them to rehire them.  You will not bring

23   the people in here to be cross-examined.  You're afraid to do

24   so because you know cross-examination would reveal the truth.

25        MR. HELLAND:  Respectfully --

```
 1          THE COURT:  This is the U.S. District Court.  Whenever
 2   you submit declarations, those people should be submitted to
 3   cross-examination, just like the plaintiffs' side should be.
 4   And we -- then we get at the truth of whether that's what --
 5   your story is actually true.  I tend to doubt it.  I tend to
 6   doubt that you're telling me the truth whenever we hear all the
 7   evidence eventually.
 8       Why can't you bring your people in to be cross-examined or
 9   to be deposed at their convenience?  I said two hours for
10   Mr. Ezell, a deposition, at his convenience.  And you withdrew
11   his declaration rather than do that?  Come on.  That's a sham.
12       Go ahead.  I'm -- it upsets me.  I want you to know that.
13   I've been practicing or serving in this court for over
14   50 years, and I know how we get at the truth.  And you're not
15   helping me get at the truth.  You're giving me press releases,
16   sham documents.
17       All right.  I'm getting mad at you and I shouldn't.
18   You're trying to do your best, and I apologize.
19       All right.  Go ahead.  I do have a question, though.  I
20   want you to answer on the --
21          MR. HELLAND:  Thank you, Your Honor.
22          THE COURT:  Just a minute.  I'm going to let you
23   respond.
24       But all of those -- see, they give me so much stuff, I
25   can't find the thing that I wanted now.  But the letter that --
```

```
 1    that template letter, which I don't have here anymore -- the
 2    template letter said to the employees that got terminated that
 3    "You may" -- it didn't say "you do," it said, "You may have
 4    rights to appeal to the MSP." "You may have" -- I'll quote it
 5    now. I have it here. Quote, "You may have a right to file an
 6    appeal with the Merit Systems Protection Board" -- may have --
 7    "on the limited" -- limited -- "grounds set forth in 5 C.F.R.
 8    315806."
 9         Well, I looked at that to see what that was, and it is
10    limited to circumstances that existed prior to their
11    employment. Did you realize that when you told me that they
12    had the right to go to the MSPB?
13         MR. HELLAND: Well, Your Honor, these probationary
14    employees -- many of them -- are going to the MSPB, including
15    on grounds that --
16         THE COURT: Yes, but the letter -- your own letter
17    says that they have only a right to do so on grounds that
18    things that existed prior -- if the termination was based on
19    something prior to their employment.
20         MR. HELLAND: I cannot speak to whether the letter
21    that you're referring to is limited in advising these --
22         THE COURT: Here. I'll let you look at it. It is
23    limited. Take a look at it. The appeal rights that were
24    referred to there just call out that one thing. And when you
25    actually look at the regulation, it has nothing to do with this
```

1    case.  It's a sham, in my opinion.

2         Now, it could be that some employees are trying -- it is

3    true that some employees have tried to go to the MSPB.  That is

4    true.  And some relief -- and, by the way, the President fired

5    the special counsel; true?

6              MR. HELLAND:  I believe that's true.

7              THE COURT:  Yeah, he fired him.  So there is no

8    special counsel anymore for the MSPB.  And then one of the --

9    one of the members was either fired or retired.

10        In the prior Administration in 2017 to 2022 -- or 2020 --

11   there was not a quorum of the MSPB.  Do you remember that?  So

12   there was no way to get relief from the MSPB during that

13   four-year period.  I have a feeling that's where it's headed

14   now, is to decimate the MSPB, get rid of the special counsel,

15   and these employees will have no recourse even under that

16   limited sentence.

17        That troubles me.  It makes me wonder whether I got misled

18   on saying there was no jurisdiction because I relied on you.

19   You said there was a remedy at the MSPB; and, therefore, I said

20   the unions didn't have subject-matter jurisdiction.  I question

21   that.  I'm going to ask for briefing on that after today,

22   because I believe I got misled by the U.S. Government on the

23   efficacy of the MSPB.

24        Yes, in statute theory, it may be.  But based on that

25   regulation and based on that letter and based on the

```
 1   cannibalization of the Office of Special Counsel and the MSPB

 2   today, I -- there's not much of a remedy there.  Possibly I'm

 3   wrong, but I'm going to ask for briefing on it.

 4         But I'll let you give me your response to that concern.

 5   Please go ahead.

 6              MR. HELLAND:  Thank you, Your Honor.

 7         I am aware that employees have been reinstated pursuant to

 8   MSPB orders.  I believe there was a widespread stay issued as

 9   against the Department of Agriculture that affected a large

10   number of probationary employees at that agency.  So I do not

11   think it is the case that the MSPB is without ability to grant

12   relief to affected probationary employees.  I think that's

13   happening.

14         I do not know what's going to happen down the road.  And

15   that may well be an appropriate subject for further briefing or

16   reconsideration.  But as it stands now, Your Honor, I think the

17   MSPB is capable of granting this relief.

18         I --

19              THE COURT:  Just a minute.  Just a second.

20         The Administration has -- the member of the -- on

21   March 5th, 2025, board member, Cathy Harris, granted a second

22   45-day stay request on probationary employees at USDA.  So

23   you're correct about that; however, the President has attempted

24   to fire her, but Judge Rudolph Contreras granted summary

25   judgment in her favor and held that the removal by the
```

1    Administration was unlawful.  Is that correct?

2              MR. HELLAND:  I have no reason to doubt that.

3              THE COURT:  Well, we won't decide the efficacy of the

4    MSPB today, but we're going to have to look at that again.  And

5    maybe we do have subject-matter jurisdictions after these

6    unions if there's -- if the channel through which Congress

7    sought to move those grievances by employees has been

8    decimated.

9              MR. HELLAND:  Your Honor, briefly.

10             THE COURT:  Yes.

11             MR. HELLAND:  The unions, of course, would go through

12    the FLRA, not the MSPB, so --

13             THE COURT:  Not the unions, yes, but the employees --

14             MR. HELLAND:  Sure.

15             THE COURT:  -- the employees who they represent.

16    Okay.

17             MR. HELLAND:  May I respond to Your Honor's concerns

18    about the declarations and --

19             THE COURT:  Please, yes.  I'd like to hear it.

20             MR. HELLAND:  Thank you.

21    Your Honor, I respectfully disagree that we have submitted

22    false evidence or have withdrawn evidence in an attempt to

23    frustrate Your Honor's efforts to find the truth.

24             We prepared the Ezell declaration within the two days that

25    we had to respond to the TRO thinking that that would be an

1    authoritative statement of the agency's position of what

2    happened.

3         If you review that declaration again -- I understand that

4    it's stricken.  I'm not relying on it for its truth.  But if

5    you review that declaration again, he says, in the opening

6    paragraph, that the materials reflected therein were based on

7    his personal knowledge as well information provided to him.  We

8    were presenting it in his capacity as the acting director of

9    that agency.

10        The paragraphs in that declaration talking about the

11   February communications do not say that Mr. Ezell personally

12   said anything or took any action.  Those paragraphs are framed

13   as coming from OPM.  That's in contrast to the January 20th

14   memo that he did personally author and send out.  So, again, we

15   put that forward in the TRO context on expedited briefing.

16        We understood coming out of the TRO hearing that

17   Your Honor wasn't interested in the agency's summary of what

18   happened.  Your Honor wanted to know what was actually

19   communicated on the February 13th call or February 14th call.

20        Well, Mr. Ezell was not on those calls.  He was not on the

21   February 13th call at all.  And from what we understand, he was

22   at the beginning of the February 14th call and then left.  So

23   he is not the person with firsthand knowledge of those events.

24   Others are, and we -- I -- I expect Your Honor will be

25   frustrated to hear this, but we continue to look forward to

1    presenting our case in terms of what was actually communicated

2    on those calls.

3        But this is an APA case, Your Honor.  There's a procedure

4    for generating an administrative record, which we are working

5    on and have started to submit to Your Honor, including the

6    February 12th email, which I understand was basically read as a

7    script on the February 13th call.

8        THE COURT:  You know, your Noah Peters declaration --

9    nowhere does he -- does he ever say he was personally present

10    during the call?

11        MR. HELLAND:  Noah Peters is on the list of

12    participants of the February 13th call that we shared with

13    plaintiffs' counsel.

14        THE COURT:  That's not the same thing.  Does he say

15    under oath that he was on the call?  No.

16        MR. HELLAND:  Honestly, Your Honor, I thought that he

17    did.  And it may not be in that declaration.

18        THE COURT:  Oh, maybe I read it too quickly.

19        MR. HELLAND:  So, Your Honor, we are in the process of

20    compiling the administrative record.  The procedure in APA

21    cases is for the agency to prepare a record, for gaps in that

22    record to be litigated, to be supplemented by oral testimony if

23    necessary.  The Government believes that that's the procedure

24    to follow here.

25        We're not trying to frustrate the ability to find the

```
 1    truth.  We think that this is an APA case.  And the way the

 2    record is developed in APA cases is through the process that I

 3    just described.

 4         THE COURT:  Yes, but you haven't given me any

 5    administrative record, and I -- so I have to go based -- they

 6    need emergency relief.

 7         And I have a few words to say about administrative

 8    records.  Would you like to hear those?

 9         MR. HELLAND:  I will just submit, Your Honor, that we

10    have said the things that we filed yesterday as documentary

11    evidence will be in the administrative record, including the

12    February 12th email, the February 14th email, the FAQs that

13    followed those.  This is the essence of the administrative

14    record that is being compiled.

15         THE COURT:  I'm going to tell you, I think this is a

16    good point because this is a recurring problem in APA cases --

17    about the administrative record.  The rest of -- I see people

18    in the gallery -- their eyes are glazing over because they hear

19    something called "administrative record" and it just puts them

20    to sleep.  Well, it's exceedingly important.

21         It is generally true that under the Administrative

22    Procedure Act, if you sue to set aside agency action, the

23    agency provides the record on which the decision was made, and

24    then the Court looks at that and decides -- rules according to

25    the law based on that record.  And there -- that is the normal
```

 1   rule.  And sometimes you get to go outside that and take

 2   additional discovery, but most cases are decided on the

 3   administrative record.

 4        Now, back when I was in the Justice Department -- this was

 5   in '78, '79, and '80, in the Stone Age -- I was in the

 6   Solicitor General's Office.  I reviewed a lot of administrative

 7   records.  And then, in those days, everything that was before

 8   the agency or at least those people -- not just the

 9   decision-maker but the people reporting to the

10   decision-maker -- even the bad memos -- those -- or

11   deliberative memos -- those were all included.  Now, as time

12   goes on, though, that became inconvenient to very -- in future

13   years.

14        And to fast-forward, in recent years, sometimes the

15   Government lawyers present a sanitized record.  It only has the

16   good stuff that supports the agency action.  It omits all of

17   the bad stuff.

18        You think I'm making this up.  It's absolutely true.

19        Now, whenever President Obama was President, I had a case.

20   And it just -- and there was a question about the adequacy of

21   the record.  And it turned out that your department, the

22   Justice Department, had actually put out a good memo that

23   required the agencies to include much more than just the stuff

24   that the decision-maker saw.  I don't know, that's probably

25   been deep-sixed by now.  But that was the rule back around

```
 1    2008.  And so that gave a little bit of sunshine into what had

 2    actually happened in the agency.

 3         But after that, we went back to the Dark Ages, and there's

 4    nothing -- these agency records are just sanitized to allow the

 5    decision to be upheld with only the documents that support it

 6    and none of the other material that would undercut the agency

 7    action that was in play in the agency at the time the thing was

 8    being decided.

 9         So I say to you, I have -- I want you -- if you're going

10    to give me an administrative record, let's do an honest one and

11    a complete one and not one that is sanitized.  That's my advice

12    to the Government.

13         And that history, I believe you'll find, is actually

14    100 percent true as I have -- so I have some frustration with

15    administrative records.  And I'm skeptical of them, because I

16    think they go to some trouble to sanitize and not give me the

17    true administrative record.

18         Okay.  But right now, even if you gave me a perfect

19    administrative record, you have it.  And these people over here

20    want immediate relief.  And they are entitled to get a ruling

21    on the record that I do have.  So that's the answer on that

22    part.

23              MR. HELLAND:  May I speak to that briefly, Your Honor?

24              THE COURT:  Yes, you may.  Please go ahead.

25              MR. HELLAND:  We, as you know, have offered to
```

1  stipulate to continue the TRO pending further development of

2  the factual record.

3      So, furthermore, our position being that OPM didn't and

4  hasn't been, since the TRO, direct these terminations.  We

5  don't see the urgency demanding relief that plaintiffs are

6  putting forward.  We think that the Court's order from the TRO

7  is clear, that agencies have been complying with it, and that

8  provides time for further factual development.

9      THE COURT:  Well, that's not quite true.  I don't

10 quite agree with what you just said.

11     All right.  What else would you like to say?

12     MR. HELLAND:  I want to pause just for one more moment

13 on Acting Director Ezell, just because I think the agency's

14 reasons for not wanting him to submit to a deposition are

15 broader than just the limited facts of the TRO that we put

16 forward.

17     Every Presidential Administration in modern history has

18 jealously guarded their agency heads against being forced to

19 give testimony.  That's since the *Morgan* case about 80 years

20 ago now.  So that is not something unique to this

21 Administration.  It is not something about Secretary Ezell's

22 testimony.  That is just an Executive Branch prerogative to --

23     THE COURT:  Is he a secretary?

24     MR. HELLAND:  He's an acting director.

25     THE COURT:  Director -- acting director -- but he's

```
 1    not a secretary of the Department?

 2              MR. HELLAND:  No, correct.

 3              THE COURT:  Okay.

 4              MR. HELLAND:  But I think he is the highest-level

 5    official at that Department.

 6              THE COURT:  At that agency?

 7              MR. HELLAND:  At that agency.

 8              THE COURT:  Yes, okay.  All right.

 9              MR. HELLAND:  The only other thing, then, I --

10              THE COURT:  Yes, but you chose to submit his

11    declaration.

12              MR. HELLAND:  Yes, in the context of the TRO.

13              THE COURT:  And then you said, "No, but he can't be

14    cross-examined."  So you must submit -- you can't just give

15    me -- you can't just say, "Here's the declaration.  You have to

16    accept it without question whenever there is a question."

17              MR. HELLAND:  Absolutely, Your Honor.  And so the --

18    as you know, the purpose of a TRO is an expedited process.

19    Both sides put together what evidence they can in a very short

20    time frame.  And then the period between the issuance of the

21    TRO and the further preliminary injunction is supposed to flesh

22    out the facts.

23         So that is the stage that we are in now.  We're compiling

24    the administrative record.  We've publicly filed several of the

25    documents that would go into that administrative record.
```

1          Our purpose, again, for submitting the declaration for the

2     TRO was to submit an authoritative statement from the agency in

3     very expedited circumstances.  But it is not supposed to shield

4     the agency from review of its actions.  It's to articulate and

5     provide some evidence for a TRO decision on a couple days'

6     notice.

7          I note my opposing counsel discussed relief very briefly,

8     Your Honor, and I want to speak to that.

9               THE COURT:  I want to hear your argument.  Please go

10    ahead.

11              MR. HELLAND:  Thank you.

12         Well, so, first of all, again, we have stipulated that the

13    TRO can continue as a preliminary injunction as is.  So we

14    agree already, to that extent, of further relief.

15         I don't think that ordering the rescissions of the

16    terminations is an appropriate thing either on this record or

17    for Your Honor to be granting.  Again, the MSPB, the FLRA --

18    those administrative agencies have the authority to stay

19    terminations, to order reinstatements, to issue that form of

20    relief.  I don't think that that's appropriate there.  I

21    certainly don't think it's appropriate when the agencies that

22    were added as parties two days ago have not had the chance to

23    file any briefing or to -- plaintiffs have not even moved for

24    relief against those new defendants.  They moved against OPM

25    two weeks ago.

1    So I think there's a further process that would have to

2    happen, which would include briefing on the authority for

3    Your Honor to even issue that relief.

4    To the extent any further relief beyond the TRO is

5    appropriate in the near term, we would submit that it should be

6    limited to something like each agency performing an independent

7    review of the decisions previously made, reaffirming that they

8    were done under the agency's authorities, not OPM's direction.

9    I think that's more appropriate and consistent with

10   Your Honor's authority and jurisdiction as well as the factual

11   record here.

12        THE COURT:  Okay.

13   Response?

14        MS. LEONARD:  The terminations were not done at the

15   agency's discretion, and they were not done properly in

16   accordance with the law on the basis of performance,

17   Your Honor.

18   The suggestion that opposing counsel just made, that

19   somehow the agency should be able to rereview the decision to

20   fire probationary employees on mass at the direction of OPM is

21   somehow an appropriate remedy is divorced from reality and the

22   record that's before this Court.

23   But to address some specific -- to pointedly address some

24   of the specific points that -- and quickly -- that opposing

25   counsel made, there was an exchange about appeal rights to the

```
 1    MSPB.  And I think this is incredibly important, Your Honor,
 2    because from the very first moment -- on the first day of this
 3    Administration -- that OPM started directing agencies through
 4    the January 20th memorandum to collect and list -- something
 5    that had never happened before in the history of this
 6    country -- compile and submit to OPM a list of all your
 7    probationary employees so you can get ready to fire them.  They
 8    told them they don't have appeal rights.  "We are firing them
 9    because they don't have appeal rights."  That's how insidious
10    this action was.
11         THE COURT:  Read that -- where do you get that?  I'm
12    trying to remember where I saw that before.  Read that to me
13    again.
14         MS. LEONARD:  Yes.  That's in the January 20th memo,
15    which was originally attached, Your Honor, as an attachment to
16    the now withdrawn Ezell declaration.  But they've just
17    resubmitted all the documents that he submitted without a
18    declaration.  But we don't contest that that's actually what --
19         THE COURT:  Read to me the sentence you're talking
20    about.
21         MS. LEONARD:  [As read]:
22              "Probationary periods are an essential tool for
23         agencies to assess performance.  Employees on
24         probationary periods can be terminated during that
25         period without triggering appeal rights to the Merit
```

1    Systems Protection Board."

2    That is Mr. Ezell --

3         THE COURT:  Is that an exact quote?

4         MS. LEONARD:  That is an exact quote.

5         THE COURT:  From the January 20 memo by who?

6         MS. LEONARD:  By Mr. Ezell, OPM, to the agencies.

7    This has been the plan from the very beginning:  Fire them all

8    because they can't appeal, Your Honor.  That is what OPM has

9    consistently said to the agencies in every single communication

10   that's before this Court.

11        It was not just a February 13th phone call and a

12   February 14th CHCO meeting.  And they say, "Oh, but Mr. Ezell

13   was not on that."  We don't know if that's true or not,

14   Your Honor.  We would like to get to the truth.  But what's in

15   front of this Court is every single communication, including

16   the ones that they have now belatedly tried to say are the

17   administrative record.

18        They have said:  Terminate everyone who's not mission

19   critical because they cannot appeal.  That's the plan.  That's

20   what OPM has done here, and that is profoundly --

21        THE COURT:  How many employees -- probationary

22   employees -- were terminated on or about February 14th?

23        MS. LEONARD:  We don't know, Your Honor.  We

24   believe --

25        THE COURT:  Give me an estimate.

1        MS. LEONARD:  I believe it is far higher than 10,000

2   employees, Your Honor.  We know that at least by February 14th,

3   more than five agencies had terminated.  On February 13th, the

4   VA terminated.

5        And the press releases that they have cited -- they were

6   in our complaint, Your Honor.  He said we are not addressing

7   them?  They were in our complaint, Your Honor, because they

8   actually show that this was a centralized effort.

9        The VA press release that they're saying shows agency

10  discretion says, I quote [as read]:

11            "The dismissals announced today are part of a

12        government-wide Trump Administration effort to make

13        agencies more efficient, effective, and responsive to

14        the American people."

15       OPM told them to do this, Your Honor.  And we have proven

16  it on the record.  They have not put anything in, in response

17  to that, other than press releases that actually support

18  plaintiffs.  It's profoundly unlawful, Your Honor.

19       And with respect to the representations regarding the --

20  that's the importance of the appeal rights.  It's twofold.

21  It's both a factual matter to show how centralized this was and

22  the reasons for it, which are incredibly disturbing, frankly,

23  for the U.S. Government to be terminating these employees

24  because they have no appeal rights.

25       But also it goes straight to the point that Your Honor is

 1   raising about channeling.  And we welcome -- and I was prepared

 2   here to try to -- try to -- try to beg for one more chance,

 3   Your Honor, to address this issue, because I think it is

 4   absolutely right -- what Your Honor raised at the TRO

 5   hearing -- the question about these mass actions with respect

 6   to so many employees.

 7        Is that really what Congress intended when it set up these

 8   agencies?  And now that it is, these agencies are being

 9   dismantled.  And, by the way, the President has fired the

10   members of the FLRA too.  They say, "Oh, the unions can go to

11   the FLRA."  The President fired them too.

12        THE COURT:  How many members -- I didn't know about

13   that part.

14        MS. LEONARD:  It's --

15        THE COURT:  How many members are there on the FLSB or

16   whatever it is?

17        MS. LEONARD:  So the MSPB I believe the President

18   removed one so that there is not a majority -- so it's a

19   one-one split.  And that --

20        THE COURT:  Well, that person --

21        MS. LEONARD:  Got put back.

22        THE COURT:  -- demoted them but did not remove them.

23   Demoted them from vice chair; right?

24        MS. LEONARD:  But one was removed.  That's now tied

25   up.  And the Government is fighting in the D.C. Circuit to off

1    them.

2        And then the FLRA, I believe it's also one additional

3    member has been -- has been --

4        THE COURT:  And one --

5        MS. LEONARD:  I'm looking at my cocounsel, Mr. Eisen,

6    who might have better facts than I do on this.

7        But one member has been removed by the President to stymie

8    that agency from actually doing anything, Your Honor.  And

9    they're fighting that in the D.C. Circuit.  They're opposing

10   the orders that have -- that is an unlawful order.  They're

11   fighting those orders to put those people back.  The OSC is

12   gone.

13       THE COURT:  All right.  One out of three?  One out of

14   five?  How many -- how many?

15       MS. LEONARD:  Three.  One out of three removed.

16       THE COURT:  All right.  And this is the FL --

17       MS. LEONARD:  RA.  The Federal Labor -- the Federal

18   Labor Relations Authority, Your Honor, which is the board set

19   up by the FSLMRS, which is the labor relations statute for

20   federal employees.  So they removed them.

21       The OSC is gone.  The pattern is very clear.  This is all

22   centralized action, of course, from this Administration.  The

23   pattern is clear to -- there is no channel, Your Honor.  There

24   is no channel.

25       THE COURT:  All right.  But let me ask you, Congress

 1  did pass the Reduction in Force Act, which, by definition,

 2  contemplates that there can be a reduction in force within an

 3  agency; isn't that true?

 4          MS. LEONARD:  That's part of this -- there are

 5  reduction in force statutes as part of the CSRA, absolutely.

 6  But they're ignoring them and eviscerating them, Your Honor.

 7          THE COURT:  Well, I know you say they have not been

 8  followed.  And possibly that's true.  But I wouldn't want

 9  anyone listening to this call on the Zoom to think that this

10  case is about stopping the termination of anybody from the

11  Government, even when it's in the hundreds, because there is a

12  statute that allows that, called the Reduction in Force Act, if

13  the steps that are required by statute are followed.

14          MS. LEONARD:  Absolutely, Your Honor.

15          THE COURT:  That's true; isn't it?

16          MS. LEONARD:  It is for agencies to decide to do

17  reduction in force.  And what we have here absolutely,

18  Your Honor, on the record before the Court, is not agencies'

19  decisions to terminate anything.  It's OPM's.  And that's a

20  question for another day, whether OPM can order RIFs.  That's a

21  question for another day, Your Honor.  And maybe that day is

22  coming very soon.  OPM cannot order those either.  But agencies

23  can make those decisions.  But OPM here ordered this.

24          THE COURT:  All right.  Maybe.  But if it's done

25  right, there can be a reduction in force within an agency.

1    That has to be true.

2         MS. LEONARD:  There's -- absolutely.  There's a

3    statute that allows it and regs that set up the many steps,

4    including notice and notice to states and local governments who

5    are affected.  There are many steps.  And it requires -- it

6    takes years of planning, actually, Your Honor.  It can't be

7    done in a day.

8         THE COURT:  It can't be done in one day, but there's a

9    lot of ground between one day and years.  So I -- okay.  But

10   that, as you say, is for another day.

11       But Congress itself has said you can have -- an agency can

12   do a reduction in force if it's done correctly under the law.

13   So I -- I want everyone to be aware of that.

14       Your lawsuit is not challenging that proposition.  Your

15   lawsuit is saying these terminations were in violation of other

16   laws and *ultra vires*, and that's a separate point.

17       All right.

18         MS. LEONARD:  That is right.

19         THE COURT:  What else would you like to say?

20         MS. LEONARD:  Just one second to make sure I'm

21   covering all the -- I did want to clarify one other factual

22   point that I feel like we, in our TRO papers, perhaps didn't

23   present as clearly as we could have to the Court.  And I think

24   it's incredibly important and don't want it to be lost.

25       It's not just employees who were hired right out of

1    college or at the outset of their careers who were affected by

2    these unlawful terminations.  Anyone who received a promotion

3    is a probationary employee.  Directors of entire departments

4    were gone in a day, Your Honor.

5         This action by OPM made swiss cheese of the federal

6    agencies at every level.  That is why that is directly

7    connected to the level of harm that this is causing.  Because

8    it's not just new folks -- they can go find a career somewhere

9    else -- it is -- they're the future of the American workforce,

10   and I don't mean to undermine their importance.  But it is

11   people with decades of federal service.  The most experienced

12   people.  If they have been promoted from acting director to

13   director of their particular division, they were gone.  That

14   is --

15             THE COURT:  All right.  You mean --

16             MS. LEONARD:  -- the problem here.

17             THE COURT:  -- they don't go back to their original

18   position?  They're just terminated?

19             MS. LEONARD:  They're gone, Your Honor, within hours.

20             THE COURT:  How long were they terminated?

21             MS. LEONARD:  Turn in your keys.

22             THE COURT:  Even though they worked for 30 years?

23             MS. LEONARD:  Even though they worked for 30 years,

24   Your Honor.  That is why the harm is so widespread and so

25   profound.  It is -- this action was intended to cripple these

1    agencies, and that is what it has done.  And it is profoundly

2    problematic.

3        And we didn't want that to be lost on the Court, because I

4    think, in our TRO papers, we didn't -- we didn't make that as

5    prominent as we, perhaps, should have.  And that is absolutely

6    established in the record here.

7        "Probationary" means -- and the formal director of OPM,

8    who submitted a declaration in support of this preliminary

9    injunction -- it's in that dec., as well, and other

10   declarations we've submitted in support -- it's anyone who was

11   new to their position, Your Honor, not just to the Federal

12   Government.

13           THE COURT:  I did not appreciate that point.  Thank

14   you.

15       What else would you like to say?

16           MS. LEONARD:  One more point of clarification about

17   the OSC because I think there's been a further implication,

18   perhaps, from something that opposing counsel said.  Only the

19   OSC, who isn't there anymore --

20           THE COURT:  OSC?

21           MS. LEONARD:  Office of Special Counsel.

22           THE COURT:  Oh, all right.

23           MS. LEONARD:  -- can initiate a stay request with the

24   MSPB.  Only the OSC can do that.  The only class stay

25   request -- "stay" meaning reinstate the employees pending

1    resolution -- the only class one that was actually initiated by

2    Hampton Dellinger before he was fired was U.S. -- well, during

3    his period of reinstatement before he was then fired again by

4    the D.C. Circuit -- was with respect to USDA.

5        He did not -- the other six -- the other five agencies of

6    the original six employees -- there were not class requests

7    that had been filed yet.  So the idea that those are pending

8    before the MSPB is not correct, Your Honor.  There were no

9    class stay requests.

10       And with respect to the USDA, I want the record to be very

11   clear about what's happened.  They are not complying with the

12   MSPB's order to reinstate.  What they did was they put people

13   back on pay -- they just announced this, I believe, yesterday,

14   in a press release, a week after the reinstatement order --

15   they put people back on pay, but they haven't put them back in

16   their position.

17       So what they've done is they're waiting out the 45 days.

18   It's a temporary stay.  It's going to expire.  There's no OSC

19   to ask for it to be extended.

20       This is the announcement.  This is the Forest Service

21   directly to the union:  On March 5th, the MSPB issued a 45-day

22   stay of the termination of U.S. Department of Agriculture

23   probationary employees.

24       By Wednesday, March 12th, the Department will place all

25   terminated probationary employees in pay status and provide

```
 1    them with backpay.

 2         That's great.  Happy about that.

 3         The Department will quickly develop a phased plan for the

 4    return to duty.  And while those plans materialize, all

 5    probationary employees will be paid.

 6         We do not believe that they are going to return any of

 7    these employees to actual service, Your Honor.  They certainly

 8    haven't yet.  This is the record before the Court.  They

 9    haven't restored the services, Your Honor, when they were

10    directly ordered by the MSPB to reinstate those employees to

11    service.

12              THE COURT:  In the Office of Special Counsel, are --

13    they got rid of Dellinger; right?

14              MS. LEONARD:  Yes.

15              THE COURT:  But are there other acting special

16    counsels that are --

17              MS. LEONARD:  There's been one appointed, Your Honor,

18    and he is the head of the VA.  The head of an agency is the new

19    whistleblower protector.

20              THE COURT:  The head of the what?

21              MS. LEONARD:  The Veterans Administration.

22              THE COURT:  Has been moved over to be -- and is no

23    longer the head of the VA?

24              MS. LEONARD:  No.  He's also still the head of the VA.

25              THE COURT:  All right.
```

```
 1              MS. LEONARD:  I don't understand how it could possibly
 2    be that the head of the defendant agency is the person who is
 3    supposed to protect the whistleblowers, Your Honor.  But that
 4    is what this Administration has done.
 5              THE COURT:  Are there subordinate lawyers in that
 6    unit?
 7              MS. LEONARD:  In the OSC?
 8              THE COURT:  Yeah.
 9              MS. LEONARD:  I am sure that there are.  He -- I'm
10    sure the OSC has people who work for him.  They've probably
11    actually had all of their probationary employees fired too,
12    just like the FLRA did and the MSPB did.
13         But setting that aside, Your Honor -- that's true --
14              THE COURT:  You don't know that --
15              MS. LEONARD:  I --
16              THE COURT:  You're just guessing at that.
17              MS. LEONARD:  They're on the list.  They're on the
18    list of people who had probationary employees, but -- and
19    they're on the CHCO directive from February 14th.  There's a
20    representative of the small agency counsel -- the FLRA, MSPB,
21    OSC -- they're all part of that.
22              THE COURT:  Well, are they -- were there -- were there
23    lawyers who were non-probationary working in the unit?
24              MS. LEONARD:  I am sure that there are, Your Honor.
25              THE COURT:  All right.
```

1              MS. LEONARD:  I'm sure that there are.  But they don't

2      have the authority to move for a stay.  Only the OSC has that.

3              THE COURT:  So you're telling me that a probationary

4      employee in some random agency cannot directly go to the MSPB?

5      Is that true?

6              MS. LEONARD:  They can.  They can file their

7      individual -- they can file their individual action against

8      their employer agency at the MSPB.  Some of them can.  Some of

9      the probationary employees -- this is very complicated.

10     It's -- who has the appeal rights where is exceptionally

11     complicated, depending on the category of service.  Some of

12     them can only go to the OSC.  A big portion of them can only go

13     to the OSC.

14             THE COURT:  Well, what's the difference between those

15     that can only go to the OSC versus those that can go straight

16     to the Merit Systems Protection Board?

17             MS. LEONARD:  It depends on the category of service,

18     Your Honor, and the reason that they're invoking.  And the

19     best -- the best place that I have seen summarizing this --

20     people have been writing a lot of material about -- to try to

21     explain this.  The best place is the OSC intake -- it's like --

22     as a union lawyer, I'm very familiar with the unfair labor

23     practice form at the NLRB where you check the boxes.  The OSC

24     has the same thing.

25         And so the OSC has an intake form where -- it's like

1    three pages long -- where you have to identify all the sort of
2    ins and outs whether you qualify to go to the OSC or not.  So I
3    cannot recite that here today, Your Honor, full candor.  It
4    depends on whether you're in competitive service or in what
5    category and what you're basing your allegations on, if it's
6    discrimination or not.  It's an incredibly complicated sort of
7    if then, who gets to go there or not.  Some -- at a highest
8    level, some can go to the OSC, and that's their only avenue,
9    and now that avenue is gone.

10    We are very happy to brief this further if Your Honor
11    would like further briefing on -- particularly as you've
12    invited on the channeling issues, whether it's at this point.
13    We obviously do not want to delay any injunction.  And what I
14    would -- we would propose is there is no need, Your Honor, for
15    purposes of this preliminary injunction, to reach the
16    channeling issue, even with respect to the unions.

17    We would invite and ask for another chance to convince
18    Your Honor that the channeling argument that was presented by
19    the Government and the representations were not correct.  And
20    that the claims against OPM are not channeled, Your Honor, even
21    for my union clients.  And we would invite another chance to
22    convince Your Honor of that.

23    But for purposes of the PI today, the other organizations
24    and the State of Washington have standing -- irreparable
25    harm -- more than enough to issue that PI without reaching and

1    making further law with respect to the channeling.

2         I would -- one further point about that, Your Honor.  I do

3    believe that your TRO order actually extends the law further

4    than it has been in the Ninth Circuit.  Not just applying it,

5    but extends it.  No case has ever channeled a claim against OPM

6    over a Government-wide rule in the Ninth Circuit.  No case has

7    ever channeled a procedural APA claim in the Ninth Circuit.

8    Your TRO order was the first, and we would respectfully welcome

9    another chance.

10        And we don't want that TRO decision to take on a life of

11   its own, Your Honor, and we would welcome another chance to try

12   to convince you that these claims are not channeled.  Because,

13   as Your Honor has indicated here today, the channel's gone,

14   Your Honor.

15            THE COURT:  Let me give the defendants a chance to

16   respond.  You had a long talk there.

17        Go ahead.  Please, let's hear from the defense.

18            MR. HELLAND:  Thank you, Your Honor.

19        Taking the very last point first, I think the "in the

20   Ninth Circuit" caveat there is doing a lot of work.  There's of

21   course many decisions from outside the Ninth Circuit, including

22   the D.C. Circuit, the Federal Circuit, the First Circuit.

23   These have been, you know, addressed in the papers on the TRO

24   briefing.

25        To the extent Your Honor is reconsidering its initial

```
 1   channeling decision, we agree further briefing would be
 2   appropriate.
 3          THE COURT:  Yeah, that's -- I'm not going to do it
 4   today, but I want to raise the issue and ask for briefing.  So
 5   I agree with you on that.
 6          Go ahead.
 7          MR. HELLAND:  Thank you.
 8       I come back to a point I made at the outset.  The press
 9   releases that we've submitted show that the independent
10   political appointment -- the political leadership of these
11   agencies were taking credit publicly for the decisions.
12       We do not deny that OPM had a role in coordinating these
13   efforts.  I think the documents that we've put forward are very
14   clear about that.
15       But plaintiffs' theory of this case isn't just that OPM
16   coordinated this; it's that OPM ordered it.  That the agencies
17   didn't think that they had the authority not to do it.  Well,
18   if that's the case, why would the leaders of these agencies be
19   issuing press releases the same day or shortly after these
20   decisions were made?  They wouldn't.  The reason --
21          THE COURT:  Well, I would like to see some depositions
22   taken on that, but you stonewalled me on it.  I would like to
23   know -- maybe -- maybe the press release was an orchestrated
24   thing.  It wouldn't be the first time.
25          MR. HELLAND:  It starts to sound a bit
```

```
 1   conspiratorial --

 2         THE COURT:  Yeah.

 3         MR. HELLAND:  -- to think that these press releases

 4   coming out of multiple agencies when, again, the Administration

 5   has just put out Executive Orders and fact sheets making clear

 6   that this is an agenda priority for the Administration.

 7       I think the pretty obvious alternative explanation is

 8   everybody knew the new Administration was prioritizing this.

 9   And the political appointments wanted to comply with that

10   Administration priority.

11         THE COURT:  Okay.

12         MR. HELLAND:  Finally, Your Honor, the additional

13   documents that we put forward, which, again, will be part of

14   the administrative record in this case, including specifically

15   the February 12th email, I invite you to look closely at the

16   language of that.  I think you'll see it is not an OPM order.

17   The language of that reflects that OPM had asked agencies to

18   prepare lists and asked them, with a please, "Separate those

19   that you know you want to separate by a date certain."  Right?

20   It put it to the agencies, "those that you know you want to

21   separate."

22       This was not an order from OPM.  The Administration record

23   will show, and it does show on the record that we've put before

24   Your Honor, that OPM was coordinating this, was asking for

25   information, was asking that action be taken by certain times,
```

1    but the decisions on these employment actions were made by the

2    agencies and were fully endorsed by their political leadership.

3        Thank you, Your Honor.

4        THE COURT:  Okay.  Give me a moment.

5        The Court is going to grant some additional relief by way

6    of preliminary injunction.  I want to give some background.

7        Congress, in the Reduction in Force Act, makes it clear

8    that an agency can engage in a reduction in force.  So I want

9    everyone to be completely aware that if an agency decides to do

10    a reduction in force, it can do so, so long as it complies with

11    the several requirements of the Reduction in Force Act.

12        So this should not -- the words that I give you today

13    should not be taken as some kind of criticism that a wild and

14    crazy judge in San Francisco has said that the Administration

15    cannot engage in a reduction in force.  I'm not saying that at

16    all.  Of course, if it does, it has to comply with the

17    statutory requirements, the Reduction in Force Act, the Civil

18    Service Act, the Constitution, maybe other statutes.  But it

19    can be done if it's done in accordance with the law.

20        This case is not about that.  What this case is about is

21    really an attempt to do a reduction in force, but to force it

22    through the OPM, Office of Personnel Management, to have the

23    OPM direct agencies to terminate probationary employees as an

24    easy way to get a reduction in force underway.

25        Because, as counsel pointed out, its own memo says they

1    don't have appeal rights -- probationary employees don't have

2    appeal rights -- and so let's get started with the process by

3    just terminating all probationary employees except those that

4    are mission critical.

5        Now, I went through the evidence last time.  I'm not going

6    to go through it quite as extensively, but I am going to touch

7    on some of the points.  Something new came in by the -- from

8    the plaintiffs.  It involved the Forest Service.

9        On February 13th, 2025, a Forest Service briefing paper

10   from Human Resources Management at the Forest Service says

11   this -- or said this -- quote [as read]:

12           "All" -- that's spelled A-L-L -- "All federal

13           agencies, including the Department of Agriculture,

14           were notified on February 12th, 2025, by the Office

15           of Personnel Management to terminate all employees

16           who have not completed their probationary or trial

17           period."

18       That then led to the termination of a lot of people, but

19   one in particular I'll give as an example.  Leandra Bailey was

20   a physical science info specialist in Albuquerque.  In

21   September of last year, she had received a performance review

22   in which she was, quote, "fully successful," closed quote, in

23   every category.  Not just some; every category.  On

24   February 13th, she was terminated using the OPM template

25   letter.

1      In addition to directing these terminations, OPM gave a

2    proposed letter.  The letter said -- I'm reading from it --

3    Memorandum for Leandra Bailey, February 13, from Deedra Fogle,

4    Director Human Source Management, U.S. Forest Service.  This is

5    just one sentence, quote [as read]:

6          "The agency finds, based on your performance,

7       that you have not demonstrated that your further

8       employment at the agency would be in the public

9       interest," closed quote.

10     This despite the fact that her most recent review was

11   fully successful in every category.

12     Now, how could it be, you might ask, that the agency could

13   find that based on her performance when her performance had

14   been stellar?  The reason that OPM wanted to put this based on

15   performance was, at least in part, in my judgment, a gimmick to

16   avoid the Reduction in Force Act.  Because the law always

17   allows you to fire somebody for performance.

18     So OPM was thinking:  Okay, if we tell them to use this

19   template letter, then that will give us an argument against the

20   Reduction in Force Act or maybe some other act -- Civil Service

21   Reform Act.

22     Now, this -- what I'm about to say is not the legal basis

23   for what I'm going to order today, but I just want to say, it

24   is sad -- a sad day -- when our Government would fire some good

25   employee and say it was based on performance when they know

(92 of 102), Page 92 of 102 Case: 25-1677, 03/14/2025, DktEntry: 9.1, Page 92 of 102
Case 3:25-cv-01780-WHA    Document 120    Filed 03/13/25    Page 50 of 60

50

1    good and well that's a lie.

2        Excellent in all -- fully -- what was the phrase?  I don't

3    want to misstate it.  "Fully successful in every category," yet

4    they terminate her based on performance.  That should not have

5    been done in our country.  It was a sham in order to try to

6    avoid statutory requirements.

7        It also happens to be that whenever you fire somebody

8    based on performance, then they can't get unemployment

9    insurance.  So that makes it even worse, doesn't it?

10        And then it makes it even worse because the next employer

11    is going to say, "Well, have you ever been terminated based on

12    performance?"  They're going to have to say, "Yes," to

13    thousands of people.

14        Now, the reason this is not a basis for the ruling today

15    is that the -- that is a grievance that goes to the employee,

16    and the -- and we still haven't decided -- I mean, I have

17    decided but I'm going to take another look at it, as to whether

18    they're channeled -- that grievance has to be channeled through

19    the Merit Systems Protection Board.

20        But it is illustrative of the manipulation that was going

21    on by OPM to try to orchestrate this Government-wide

22    termination of probationary employees.

23        I'm going to go back to what I read [as read]:

24            "All" -- this is from the Forest Service -- "All

25            federal agencies, including the Department of

1    Agriculture, were notified on February 12th by the

2    Office of Personnel Management to terminate all

3    employees who have not completed their probationary

4    or trial period."

5    Now, there's more evidence than that.  Some of that I went

6  over last time.

7    Department of Energy sent a termination letter saying [as

8  read]:

9        "Per OPM instructions, Department of Energy

10        finds your further employment would not be in the

11        public interest."

12    Another termination letter from the Bonneville Power

13  Administration per OPM instructions, Civilian Personnel Policy

14  Counsel, Department of Defense in accordance with direction

15  from OPM and before Congress, Chief Human Capital Officer for

16  the Veterans Administration testified under oath recently,

17  February 25th [as read]:

18    "QUESTION:  So nobody ordered you to carry out these

19        terminations?  You did it on your own?

20    "WITNESS:  There was direction from the Office of

21  Personnel Management, the USDA."

22    Quote, [as read]:

23        "Agencies were directed to begin providing

24        termination notices."

25    So the Court finds that OPM did direct all the agencies to

1   terminate probationary employees with the exception of

2   mission-critical employees.  The Court rejects the Government's

3   attempt to use these press releases and to read between the

4   lines to say that the agency heads made their own decision with

5   no direction from OPM.

6        The relief that's going to be granted as is follows:

7        The temporary restraining order well be extended.  In

8   addition, relief defendant Veterans Administration shall

9   immediately offer reinstatement to any and all probationary

10  employees terminated on or about February 13th and 14th, 2025.

11       This order finds that all such terminations were directed

12  by defendants' OPM and Acting Director Ezell and were unlawful

13  because OPM and Ezell had no authority to do so.

14       Further, relief defendant Veterans Administration shall

15  cease any and all use of the template termination notice

16  provided by defendant OPM and/or Acting Director Ezell to the

17  VA and to other agencies on or about February 13th and 14th and

18  shall immediately advise all probationary employees terminated

19  on or about February 13 and 14 that the notice and termination

20  have been found to be unlawful by the United States District

21  Court for the Northern District of California.

22       Relief defendant Veterans Administration shall cease any

23  termination of probationary employees at the direction of

24  defendants OPM and Acting Director Ezell.

25       To repeat, this order holds that OPM and Acting

1    Director Ezell have no authority whatsoever to direct, order,

2    or require in any way that any agency fire any employee.

3         Now, given the arguments and the facts in this case,

4    namely, that defendants have attempted to recast these

5    directives as mere guidance, this order further prohibits

6    defendants from giving guidance as to whether any employee

7    should be terminated.

8         Any terminations of agencies' employees must be made by

9    the agencies themselves, if made at all, and must be made in

10   conformity with the Civil Service Reform Act and the Reduction

11   in Force Act and any other Constitutional or statutory

12   requirement.

13        In seven calendar days, relief defendant VA shall submit a

14   list of all probationary employees terminated on or about

15   February 13th and 14th with an explanation as to each of what

16   has been done to comply with this order.

17        Now, this order so far has only mentioned the Veterans

18   Administration, but the same relief is extended -- and I'm not

19   going to repeat it, but I rely on the good faith of the

20   Government -- I'm extending the same relief to the Department

21   of Agriculture, Department of Defense, Department of Energy,

22   Department of the Interior, Department of Treasury.  And those

23   are the ones where I believe the record is the strongest that

24   relief is necessary.  And so it's the VA plus those other

25   agencies.

1      And this is without prejudice to extending the relief

2   later in the future to other agencies and it's without

3   prejudice to shrinking the relief in the future upon a proper

4   showing.

5      Okay.  I will try to get out a short memorandum opinion

6   that elaborates on this order, but this is the order and it

7   counts effective immediately.  Please don't say, "Oh, I'm

8   waiting for the written order."  This is the order from the

9   bench.

10      Okay.  I want -- I'm giving the plaintiffs authority

11   promptly to depose, in Washington, Noah Peters, who submitted

12   this other declaration.  I am -- discovery is now open.  And,

13   within reason, you can, on both sides, take depositions and ask

14   for documents, but be reasonable.

15      The easiest mistake you plaintiffs can make is to be

16   unreasonably broad in your discovery.  I promise you, I won't

17   allow that.  But narrowly directed, reasonable discovery is in

18   order in this case to get at the truth because the Government

19   is saying one thing and you're saying another.

20      Right now your record is the strongest, and I think that

21   your position is correct on the facts.  But it deserves to be

22   tested by discovery.

23      Finally, I believe that the channeling argument -- I

24   believe that the channeling argument that I relied on that says

25   that all employee grievances should be channeled through the

1    MSPB might have been in error because -- I'm not making a

2    ruling now -- I'm going to invite briefing -- because the whole

3    point of the January 20 memorandum was to say the probationary

4    employees have no appeal rights.  And the letter that was

5    sent -- the template letter -- said, "You may have a right to

6    file an appeal with the Merit Systems Protection Board on the

7    limited grounds set forth in 5 C.F.R. 315806," which I looked

8    up, and that has nothing to do with this case.  It gives you a

9    right to appeal if you get terminated based on something that

10   happened before your employment.  Let's say that you were a

11   convicted felon and didn't disclose that.  Well, that's not

12   this case.

13        So if there is no ability to appeal and get not just some

14   limited -- I mean, a real effective way to undo the harm to

15   these individual employees, I don't see how this could be

16   channeled.  So the -- to the extent that the unions here were

17   seeking to vindicate the rights of their employees, you know,

18   like I thought you were, I may have made an error.

19        Now, I did rely upon the Government's representations that

20   the MSPB was an effective remedy.  I thought it was.  And I'm

21   not yet ready to say it wasn't.  But I didn't know all this at

22   the time I made that ruling.

23        So I would like to give you each an opportunity to brief

24   this.  I'll give you, say, one week to brief this.  I'll give

25   you until the end of next week, to Friday at noon, to brief

1    whether or not the unions have standing based upon the fact

2    that the channel has been destroyed.  So no channeling because

3    no channel -- no effective channel.

4        Now, this -- and then if you want to make the same

5    argument for the Federal Labor Relations Board -- or

6    Authority --

7              MS. LEONARD:  Authority.

8              THE COURT:  -- whatever it is, you can brief that too,

9    all within the 10 pages.

10       I'm ordering the Government to make this guy, Noah,

11   available soon, within the next two weeks.

12       If you want to appeal to the Court of Appeals, God bless

13   you.  I want you to because I'm tired of seeing you stonewall

14   on trying to get at the truth.  Instead of giving me snippets,

15   I want somebody to go under oath and tell us what happened in

16   these phone calls and at other times was it really an agency --

17   so you can depose some people in the agencies if they really

18   are claiming they did it on their own and was not influenced by

19   OPM.  We should get it, but be reasonable in the discovery.

20       The only one I'm ordering for sure is Noah Peters within

21   the next two weeks.  You've got to go to Washington to take his

22   deposition.  And it can be two hours.  All right?

23       So, see, the way the Government does it, they want to come

24   in with an *ex parte* and just stall, stall, stall.  Just go

25   ahead and take your appeal.  We've got a preliminary injunction

1  now.  I've ordered some discovery.  Just go ahead and put it up

2  there on appeal and see if the Court of Appeals feels that what

3  I have done here today by way of relief is unjustified.  I'm --

4  that's fine.

5      I'm doing the best I can with the record I got, and this

6  is a quick-moving time frame.  These people have been

7  terminated.  I want to make it clear that, right now, I'm just

8  ruling based on services -- these organizational plaintiffs --

9  and I'm not considering the State of Washington.

10     The organizational plaintiffs that got the TRO are

11  complaining about the deprivation of services by these agencies

12  and resources that they count on, and that is still the basis

13  for their standing and the basis for the subject-matter

14  jurisdiction.  But I am raising the question whether or not the

15  additional subject-matter jurisdiction exists because the

16  channel that Congress wanted to be effective has been ruined.

17     All right.  Anything further today?

18     MS. LEONARD:  Yes, Your Honor.  Two points of

19  clarification.

20     First of all, I believe Mr. Peters is a lawyer, and I

21  would ask for three hours, Your Honor.  We all know how hard it

22  is to depose lawyers.

23     THE COURT:  Three hours.

24     MS. LEONARD:  Thank you.

25     THE COURT:  Okay.  But the three hours of airtime, all

```
 1   right?

 2          MS. LEONARD:  Thank you.  For our questioning?

 3          THE COURT:  For your questioning.

 4          MS. LEONARD:  Thank you, Your Honor.

 5      But more seriously, actually, not that that's not a

 6   serious issue, to clarify, the evidence that plaintiffs have

 7   presented with respect to other agencies and the harm -- and I

 8   know Your Honor's very familiar with the record -- I just want

 9   to clarify because there is extensive irreparable harm with

10   respect to NOAA, NIH, FAA that is incredibly urgent.  How do we

11   get in front of you the -- I have a list that we have prepared.

12   I'm happy to give to the Government a copy of every agency and

13   every plaintiff that they're connected with.  And we're happy

14   to give you the declarations --

15          THE COURT:  Can I see what you're talking about?

16          MS. LEONARD:  Sure.  It's every agency and every

17   plaintiff that has shown harm through the declarations with

18   respect to that agency.

19      And we're happy to submit this by later today with the

20   declaration cites.  I believe we already have that prepared as

21   well.  This was just my cheat sheet, Your Honor, if that would

22   assist you.

23          THE COURT:  Well, does counsel object if I keep this

24   cheat sheet?

25          MR. HELLAND:  No.
```

```
 1           THE COURT:  Thank you.

 2      I -- this is not good enough for -- I mean, you'd have to

 3  connect the dots better than this, but I see where you're

 4  going.

 5      You can submit more, but I am not promising -- I'm basing

 6  it based on my understanding of the present record of who has

 7  standing and who is suffering irreparable harm, so -- but I

 8  could be wrong on one or two.  I was wrong last time on one

 9  issue, so I -- you can submit something more and we'll consider

10  it.

11           MS. LEONARD:  Thank you very much, Your Honor.

12           THE COURT:  Anything on your side?

13           MR. HELLAND:  No.  Thank you, Your Honor.

14           THE COURT:  All right.

15      All right.  I want to make it clear that I don't think

16  counsel for the Government has done anything dishonorable.

17  I've given him a hard time.  He's doing the best he can with

18  the case he's got.  And thank you for your service in the

19  Justice Department.

20      Okay.  I think we're done for today.

21           THE COURTROOM DEPUTY:  Court is adjourned.

22               (Proceedings adjourned at 9:30 a.m.)

23                       ---oOo---

24

25
```

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:    Thursday, March 13, 2025

_Kendra Steppler_
_____

Kendra A. Steppler, RPR, CRR

Official Reporter, U.S. District Court