No. 25-1677

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

American Federation of Government Employees (AFGE), et al
*Plaintiff -Appellees*,
v.

The Office of Personnel Management et al
*Defendant -Appellants*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTICT OF CALIFORNIA
No. 3:25-cv-01780-WHA
The Honorable Judge William Alsup

_____

## APPENDIX

_____

Scott A. Kronland (SBN 171693)
Stacey M. Leyton (SBN 203827)
Eileen B. Goldsmith (SBN 218029)
Danielle E. Leonard (SBN 218201)
Robin S. Tholin (SBN 344845)
James Baltzer (SBN 332232)
ALTSHULER BERZON LLP
177 Post St., Suite 300
San Francisco, CA 94108
Tel.: (415) 421-7151
dleonard@altber.com

*Attorneys for Plaintiff-Appellee Organizations\**
*[additional counsel on following page]*

Norman L. Eisen (*pro hac vice*)
Pooja Chaudhuri (SBN 314847)
STATE DEMOCRACY DEFENDERS
FUND
600 Pennsylvania Avenue SE #15180
Washington, DC 20003
Tel: (202) 594-9958
Norman@statedemocracydefenders.org
Pooja@statedemocracydefenders.org

*Attorneys for Plaintiff Organizations\**

Rushab Sanghvi (SBN 302809)
AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES
80 F Street, NW
Washington, DC 20001
Tel: (202) 639-6426
Sanghr@afge.org

*Attorneys for Plaintiff American
Federation of Government Employees
(AFGE)*

Teague Paterson (SBN 226659)
Matthew Blumin  (*pro hac vice*)
AMERICAN FEDERATION OF
STATE, COUNTY, AND MUNICIPAL
EMPLOYEES
1625 L Street, N.W.
Washington, D.C.  20036
Tel: (202) 775-5900
TPaterson@afscme.org
MBlumin@afscme.org

*Attorneys for Plaintiff American
Federation of State County and
Municipal Employees (AFSCME)*

Tera M. Heintz (SBN 241414)
Cristina Sepe (SBN 308023)
Cynthia Alexander, WA Bar No.
46019 (*pro hac vice pending*)
Deputy Solicitors General
OFFICE OF THE WASHINGTON
STATE ATTORNEY GENERAL
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744
tera.heintz@atg.wa.gov
cristina.sepe@atg.wa.gov
cynthia.alexander@atg.wa.gov

*Attorneys for Plaintiff State of
Washington*

*Plaintiff-Appellee Organizations are the American Federation of Government Employees, AFL-CIO, American Federation of State County and Municipal Employees, AFL-CIO, AFGE Local 2110, American Federation of Government Employees Local 1216, United Nurses Associations of California/Union of Health Care Professionals, AFSCME, AFL-CIO, American Public Health Association, Association of Flight Attendants-CWA, AFL-CIO, American Geophysical Union, Point Blue Conservation Science, Climate Resilient Communities, Main Street Alliance, Common Defense Civic Engagement, Coalition to Protect Americas National Parks, Western Watersheds Project, Vote Vets Action Fund Inc..

## INDEX TO APPENDIX

| Doc. | Description | Date | Page |
|---|---|---|---|
| 1 | ECF 45- Memorandum Opinion and Order Amending TRO | 2/28/25 | 2 |
| 2 | ECF 88- Order on Motion for Leave to Amend | 3/10/25 | 26 |
| 3 | ECF 89- Order on Ex Parte Application by Defendants | 3/10/25 | 33 |
| 4 | ECF 132- Memorandum (granting preliminary injunction) | 3/14/25 | 35 |
| 5 | ECF 133- Order Denying Ex Parte Motion to Stay Preliminary Injunction Pending Appeal | 3/15/25 | 49 |
| 6 | ECF 44- Hearing Transcript from February 27, 2025 (TRO hearing) | 2/28/25 | 54 |
| 7 | ECF 65- Hearing Transcript from March 6, 2025 (status conference) | 3/7/25 | 128 |
| 8 | ECF 120- Hearing Transcript from March 13, 2025 (preliminary injunction hearing) | 3/13/25 | 155 |

1

2

3

4

5

6    UNITED STATES DISTRICT COURT

7
     NORTHERN DISTRICT OF CALIFORNIA
8

9

10   AMERICAN FEDERATION OF
     GOVERNMENT EMPLOYEES, AFL-CIO,
11   et al.,                                        No.  C 25-01780 WHA

12              Plaintiffs,

13         v.
                                                    **MEMORANDUM OPINION AND**
14   UNITED STATES OFFICE OF                        **ORDER AMENDING TRO**
     PERSONNEL MANAGEMENT, et al.,
15
                Defendants.
16

17   ──────────────────────────────

18                                    **STATEMENT**

19         On January 20, 2025, Acting Director of the Office of Personnel Management Charles

20   Ezell, defendant, issued a memo to department and agency heads directing them to identify all

21   employees serving probationary periods by January 24, and to "promptly determine whether

22   those employees should be retained at the agency."  Probationary employees are those who

23   have served less than one year in the competitive service or less than two in the excepted

24   service.

25         On February 13 OPM communicated with the heads of several federal agencies in a

26   private conference call.  Neither the participants nor the contents of that call are directly in the

27   record.

28

United States District Court
Northern District of California

The next day, OPM sent an email to federal agencies' chief human capital officers (and their deputies) stating:

> Over the past several days, agencies have worked to review, clean up, and finalize their lists of probationary employees they wish to keep, and wish to terminate, and begin taking action.
>
> We have asked that you separate probationary employees that you have not identified as mission-critical no later than end of the day Monday, 2/17. We have attached a template letter. The separation date should be as soon as possible that is consistent with applicable agency policies (including those in CBAs).

(Dkt. No. 37-1).

The large-scale termination of probationary employees from myriad federal agencies followed. Plaintiffs contend that those employees were terminated at the direction of OPM.

Dr. Andrew Frassetto, for example, was hired as a program director at the National Science Foundation on September 9, 2024 (Frassetto Decl. ¶3). Dr. Frassetto and over 100 other NSF employees were terminated *en masse* during a Zoom meeting on February 18 (*id.* ¶ 10; Evans Decl. ¶28). A time-stamped transcript of that meeting, generated by an automated closed captioning system, is attached to Dr. Frassetto's declaration (Exh. B). In response to inquiries by the terminated employees, NSF's chief management officer, Micah Cheatham, stated that "[w]e were directed last Friday [February 14] by OPM to terminate all probationers except for a minimal number of mission critical probationers" (*id*. at 18). Asked if NSF had attempted to negotiate with the administration to minimize the number of terminations, Cheatham responded: "There's no negotiation" (*id*. at 25).

In fact, when the NSF officials orchestrating the firings were confronted by the terminated probationers, they stated that "[u]p until Friday [February 14]. Yes. We were told by OPM it was the agency's discretion whether to remove probations or not. *We chose to retain them all*" (*id*. at 17). But "late Friday night," "[t]hey told us that they directed us to remove probationers" (*ibid.*). "[T]here was no limited discretion. *This is not a decision the agency made. This is a direction we received*" (*id*. at 12) (emphasis added).

**App.003**

United States District Court
Northern District of California

Plaintiffs further allege that OPM ordered agencies to use template notices — supplied by OPM — to implement the ordered terminations, and that those templates falsely premised the *en masse* terminations on individual performance. The Department of Agriculture, National Science Foundation, Federal Aviation Administration, Department of Veterans Affairs, and Department of Health and Human Services each issued substantially similar letters (Bachelder Decl., Exh. 1; Evans Decl., Exh. B; Ronneberg Decl., Exh. 1; Schwarz Decl., Exh. A). Each stated that the recipient was fired because "[t]he Agency finds, *based on your performance*, that you have not demonstrated that your further employment at the Agency would be in the public interest" (*ibid.* (emphasis added)). The empty template provided to DOD by OPM likewise declares — despite empty "[NAME]" "[TITLE]" and "[ORGANIZATION]" fields — that "the Agency finds, based on your performance, that you have not demonstrated that your further employment at the agency would be in the public interest" (Schwarz Decl., Exh. D).

Dr. Frassetto is again illustrative. In a February 13 performance review — *five days* before he was terminated "based on [his] performance" — Dr. Frassetto's supervisor reported:

> [H]is role [is] mission critical. Dr. Frassetto has been an outstanding program director, and he has taken the lead role in overseeing this important and complicated portfolio for the division. Dr. Frassetto came to NSF with a unique skill set in interdisciplinary scientific research . . . . He has already demonstrated an outstanding ability to balance the various aspects of his job responsibilities and is highly effective at organizing and completing all his work in an accurate and timely manner.
>
> . . .
>
> Dr. Frassetto's work on this portfolio has been outstanding and he has brought important experience to the role and has demonstrated highly competent project management and oversight. He is a program director who has needed minimal supervision and eagerly seeks special assignments at higher levels of difficulty. He has been an outstanding contributor to the division, directorate, and agency.

(Frassetto Decl., Exh. A).

The NSF officials who fired Dr. Frassetto (and over 100 of his peers) via Zoom on February 18 stated: "The cause comes from boilerplate we received from OPM. The cause

United States District Court
Northern District of California

3

**App.004**

says that the agency finds based on your performance that you have not demonstrated that your further employment at the agency would be in the public interest" (Frassetto Decl., Exh. B at 21).

On February 26, 2025, Civilian Personnel Policy Council members at the Department of Defense (DOD) stated by email: "In accordance with direction from OPM, beginning February 28, 2025, all DOD Components must terminate the employment of all individuals who are currently serving a probationary or trial period" (Schwarz Decl., Exh. C at 1).

Tracey Therit, chief human capital officer for the VA, testified under oath at a congressional hearing before the House Committee on Veterans Affairs on February 25:

> **RANKING MEMBER TAKANO**: So nobody ordered you to carry out these terminations?·
>
> You did it on your own?
>
> **MS. THERIT**: There was direction from the Office of Personnel Management.

(Walls Decl. (Reply), Exh. A at 8).

On February 14, a probationer terminated by the Foreign Agricultural Service asked USDA's deputy chief human capital officer by email about the "specific details of my performance that were evaluated and found to be insufficient" (Blake Suppl. Decl., Exh. A at 1). The response: "[A]gencies were directed to begin providing termination notices . . . and directed [*sic*] the use of a specific template and language for the notice beginning immediately upon OPM notification" (*id*. at 2).

In a "town hall" for IRS employees on February 21, the IRS's chief human capital officer (CHCO) stated:

> I'm not sure why it's happening . . . . Regarding the removal of the probationary employees, again, that was something that was directed from OPM. And even the letters that your colleagues received yesterday that written by OPM, put forth through Treasury, and given to us . . . . I cannot explain to you why this has happened. I've never seen OPM direct people at any agency to terminate.

4

United States District Court
Northern District of California

1   (Lezra Decl., Exh. A at 4–5).

2       The IRS had to "get permission" to make even minor alterations to the template OPM

3   termination letter:

4           There was a modification because we created our own email box
            for employees to send questions to HR directly after they separate.
5           We felt it was important to have an avenue of communication open
            for them if they had questions about their final paycheck, or
6           benefits, or leave payouts.  So we did get permission to add that
            email in there.

7

8   (*id*. at 4–5).  The IRS CHCO continued:

9           And our actions are being watched by OPM.  So that's, again,
            something else that's unprecedented. . . . Everything we do is
10          scrutinized.  Everything is being looked at twice.  Any changes
            that are made in our system that show any type of action that has
11          been deemed impermissible, we have to respond to why it
            happened.
12

13  (*id*. at 3–4).

14      A termination letter received by a probationer at the Bonneville Power Administration

15  (within the Department of Energy) stated:  "*Per OPM instructions*, DOE finds that your further

16  employment would not be in the public interest.  For this reason, you are being removed from

17  your position with DOE and the federal civil service effective today" (Schwarz Decl., Exh. B

18  at 10 (emphasis added)).

19      As many as 200,000 probationary federal employees are at risk of termination (Br. at 19).

20  Those already terminated rank somewhere in the tens of thousands (*ibid*.).  OPM and the

21  federal agencies involved have not disclosed the number or identity of those terminated (even

22  to their unions) (*ibid*.).

23      The ongoing, *en masse* termination of probationary employees across the federal

24  government's agencies has sown significant chaos.  By way of example, Major General (Ret.)

25  Paul Eaton states that the termination of over 1,000 employees across the VA has crippled the

26  agency's administration of the Veterans Crisis Line (Eaton Decl. ¶¶ 8–9).  When functioning

27  as intended, the VCL offers our veterans, who suffer from high rates of post-traumatic stress

28  disorder and suicide, 24/7 mental health care in moments of crisis (*ibid*).  Don Neubacher,

5

**App.006**

formerly the Superintendent at Yosemite National Park, states that the ongoing firing of

National Park System probationers will inflict immediate, foreseeable harm onto our national

parks and the habitats and animals therein (Neubacher Decl.).  The Western Watershed Project,

meanwhile, has already had its ecological mission frustrated, as terminations at BLM have

rendered that agency unable to respond to the Project's FOIA requests (Molvar Decl. ¶ 7).

*   *   *

Plaintiffs in this action fall into two groups.  *First*, the union plaintiffs:  American

Federation of Government Employees, AFL-CIO (AFGE); American Federation of

Government Employees Local 1216; American Federation of Government Employees Local

2110; American Federation of State County and Municipal Employees, AFL-CIO; and United

Nurses Associations of California/Union of Health Care Professionals, AFSCME, AFL-CIO.

*Second*, the organizational plaintiffs:  Main Street Alliance, Coalition to Protect America's

National Parks, Western Watersheds Project, Vote Vets Action Fund Inc., and Common

Defense Civic Engagement.

Plaintiffs filed a complaint for declaratory and injunctive relief on February 19, 2025

(Dkt. No. 1).  Four days later, on February 23, they filed an amended complaint and moved for

a temporary restraining order (Dkt. Nos. 17, 18).

*First*, plaintiffs argue that OPM directed federal agencies to fire probationary employees,

and that the action was an *ultra vires* act because it exceeded the scope of OPM's statutory

authority, intruded upon the statutory authority of the individual federal agencies and their

heads, violated the Civil Service Reform Act's (CSRA) provisions governing agency

terminations based on performance and reductions in force (RIFs), and violated the General

Authority to Employ enacted by Congress (Dkt. No. 17 at 25–26).  *Second*, plaintiffs argue that

the OPM directive to terminate probationary employees constituted a final agency action that

violated the APA because it exceeded the agency's statutory or constitutional authority, was

otherwise unlawful, was arbitrary and capricious, and did not undergo the necessary notice and

comment process (*id*. at 26–30).

United States District Court
Northern District of California

Plaintiffs' motion for a TRO seeks an order enjoining defendants from taking any actions to effectuate OPM's probationary employee termination directive.

## ANALYSIS

The standard for a temporary restraining order is the same as that for a preliminary injunction. *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). "A plaintiff seeking a preliminary injunction must establish that [1] he is likely to succeed on the merits, that [2] he is likely to suffer irreparable harm in the absence of preliminary relief, that [3] the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

### 1.     LIKELIHOOD OF SUCCESS ON THE MERITS.

#### A.     PLAINTIFFS' ULTRA VIRES CLAIM.

Plaintiffs argue that OPM's termination directive constituted an *ultra vires* act that violated, and — unless recalled — continues to violate the scope of its and all impacted agencies' statutory authority as established by Congress.

"The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). "Equitable actions to enjoin *ultra vires* official conduct do not depend upon the availability of a statutory cause of action; instead, they seek a 'judge-made remedy' for injuries stemming from unauthorized government conduct, and they rest on the historic availability of equitable review." *Sierra Club v. Trump*, 963 F.3d 874, 890–91 (9th Cir. 2020) (citing *Armstrong*, 575 U.S. at 327), *vacated and remanded on other grounds (mootness)*, 142 S. Ct. 46 (2021).

Plaintiffs are likely to succeed on their *ultra vires* claim. No statute — anywhere, ever — has granted OPM the authority to direct the termination of employees in other agencies. "Administrative agencies [like OPM] are creatures of statute. They accordingly possess only the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*, 595

United States District Court
Northern District of California

7

**App.008**

U.S. 109, 117 (2022).  Congress's statutory scheme grants to each agency head the authority to manage their own affairs, including the hiring and firing of employees.  5 U.S.C. § 3101 ("Each Executive agency, military department, and the government of the District of Columbia may employ such number of employees of the various classes recognized by chapter 51 of this title as Congress may appropriate for from year to year."); 5 U.S.C. § 301 ("The head of an Executive department or military department may prescribe regulations for the government of his department, the conduct of its employees . . . ."); *see also, e.g.,* 38 U.S.C. §§ 303, 510 (VA); 10 U.S.C. § 113 (DOD).

The same is true of OPM.  Congress has vested its director with the authority to "secur[e] accuracy, uniformity, and justice in the functions of the Office," "appoint[] individuals to be employed by the Office, and "direct[] and supervis[e] employees of the Office."  5 U.S.C. § 1103(a)(1)–(3).  But that's it.  OPM did not have the authority to direct the firing of employees, probationary or otherwise, in any *other* federal agency.

OPM concedes that it lacks the authority to direct firings outside of its own walls and argues, instead, that it "did not direct agencies to terminate any particular probationary employees based on performance or misconduct, and did not create a 'mass termination program'" — it merely "asked agencies to engage in a focused review of probationers based on how their performance was advancing the agencies' mission, and allowed them at all times to exclude whomever they wanted" (Ezell Decl. ¶ 7).  OPM's factual contention rests entirely on the Ezell Declaration.

Plaintiffs, meanwhile, have mustered a mountain of evidence that points in the other direction, from a broad range of federal agencies:  "In accordance with *direction* from OPM . . . all DOD Components must terminate the employment of all individuals who are currently serving a probationary or trial period" (DOD), "[t]here was *direction* from the Office of Personnel Management" (VA), "agencies were *directed* to begin providing termination notices . . . immediately upon OPM notification" (USDA), "that was something that was *directed* from OPM" (IRS), "[w]e were *directed* last Friday by OPM" (NSF), "[t]hey told us that they *directed* us to remove probationers" (NSF) (emphases added).  A full accounting is above.  The

8

weight of the evidence supports plaintiffs' contention that OPM exceeded the bounds of its authority by unlawfully directing the mass termination of probationary employees across a wide range of federal agencies.

OPM's Article II argument likewise rests on the factual contention that OPM's actions constituted mere "guidance," and is rejected on the facts (Opp. at 26). Article II, moreover, is irrelevant here. Congress's statutory scheme *created* the agency, *vested the agency with authority*, and *defined the bounds of that authority*. It is an OPM action that is being challenged and, as explained above, the evidence supports the contention that OPM's direction to other agencies fell outside its limited statutory authority.

### B.    PLAINTIFFS' APA CLAIMS.

Plaintiffs have also shown that their APA claims are likely to succeed.

Under the APA, only "final agency action[s]" — those that "mark the consummation of the agency's decisionmaking process" and determine "rights or obligations . . . from which legal consequences will flow" are subject to judicial review. *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up) (citing 5 U.S.C. § 704). OPM's direction to the other agencies constituted a final agency action for the purposes of the APA. Plaintiffs have marshalled significant evidence from numerous agencies stating that they were acting at the direction of OPM.

As explained above, OPM's direction to other agencies was not supported by any statutory authority. Plaintiffs are therefore likely to show that OPM's directive constituted an agency action that was "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" that must be "[held] unlawful and set aside." 5 U.S.C. § 706(2)(C).

Plaintiffs are also likely to show that the OPM directive was an arbitrary and capricious action. *Id*. § 706(2)(A). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the

United States District Court
Northern District of California

9

1   choice made.'" *Ibid*. (quoting *Burlington Truck Lines v. United States,* 371 U.S. 156, 168

2   (1962)). The key fact here is that the template letters sent from OPM to the directed agencies

3   stated: "[T]he Agency finds, *based on your performance*, that you have not demonstrated that

4   your further employment at the Agency would be in the public interest" (Schwarz Decl., Exh.

5   D). *First*, it is unlikely, if not impossible, that the agencies themselves had the time to conduct

6   *actual* performance reviews of the thousands terminated in such a short span of time

7   (Archuleta Decl. ¶ 14). It is even less plausible that *OPM alone* managed to do so. In at least

8   one instance, a terminated scientist had received a glowing review — "[h]e has been an

9   outstanding contributor to the division, directorate, and agency" — five days before he was

10  terminated "for [his] performance" (Frassetto Decl., Exh. A at 1; Exh. C at 1). "Reliance on

11  facts that an agency knows are false at the time it relies on them is the essence of arbitrary and

12  capricious decisionmaking." *Missouri Serv. Comm'n v. Fed. Energy Regul. Comm'n*, 337 F.3d

13  1066, 1075 (D.C. Cir. 2003).

14          Lastly, plaintiffs are likely to show that OPM failed to comply with notice and comment

15  rulemaking. "'Rule' means the whole or a part of an agency statement of general or particular

16  applicability and future effect designed to implement, interpret, or prescribe law or policy or

17  describing the organization, procedure, or practice requirements of an agency . . . ." 5 U.S.C. §

18  551(4). Rules are subject to the notice and comment process prior to enactment. 5 U.S.C. §

19  553. OPM's January 20 memo and February 14 email are likely to constitute a "rule" under

20  the APA (*see, e.g.,* Dkt. No. 37-1 at 2) ("OPM believes 'qualifications for continued

21  employment' in the current context means that only the highest-performing probationers in

22  mission-critical areas should be retained."). It is beyond cavil that they did not go through

23  notice and comment rulemaking.

24          OPM's counters on this point rely on the jurisdictional "channeling" of the organizational

25  plaintiffs or the factual contention that OPM did not issue a directive and are rejected on those

26  grounds.

27

28

United States District Court
Northern District of California

10

**App.011**

### C.    SUBJECT-MATTER JURISDICTION.

*First*, it is likely that the undersigned lacks jurisdiction to hear the union plaintiffs' claims

for the reasons stated in recent denials of similar claims made by unions representing federal

employees. *See, e.g.*, *Nat'l Treasury Emps. Union v. Trump*, No. 25-CV-420 (CRC), 2025 WL

561080, at *5–8 (D.D.C. Feb. 20, 2025) (Judge Christopher Cooper) (denying TRO); *Am.*

*Foreign Serv. Ass'n, Inc. v. Donald Trump*, No. 1:25-CV-352 (CJN), 2025 WL 573762, at *8–

11 (D.D.C. Feb. 21, 2025) (Judge Carl Nichols) (dissolving TRO); *Am. Fed'n of Gov't Emps.*

*v. Ezell*, No. CV 25-10276-GAO, 2025 WL 470459, at *2 (D. Mass. Feb. 12, 2025) (Judge

George O'Toole, Jr.) (dissolving TRO).

"Congress may preclude district court jurisdiction by establishing an alternative statutory

scheme for administrative and judicial review." *Am. Fed'n of Gov't Emps. v. Trump*, 929 F.3d

748, 755 (D.C. Cir. 2019). Congress set forth such statutory schemes by way of the Federal

Service Labor-Management Relations Statute (FSLMRS) and the CSRA. The relevant

statutory background has been summarized in *National Treasury*:

> The Federal Service Labor-Management Relations Statute ("the
> Statute" or "FSLMRS"), set forth in Title VII of the Civil Service
> Reform Act ("CSRA"), governs labor relations between the
> executive branch and its employees. It grants federal employees
> the right to organize and bargain collectively, and it requires that
> unions and federal agencies negotiate in good faith over certain
> matters. The Statute further establishes a scheme of administrative
> and judicial review. Under that scheme, the Federal Labor
> Relations Authority ("FLRA"), a three-member agency charged
> with adjudicating federal labor disputes, reviews matters including
> negotiability and unfair labor practice disputes. When reviewing
> unfair labor practice complaints, the FLRA resolves whether an
> agency must bargain over a subject, violated the duty to bargain in
> good faith, or otherwise failed to comply with the Statute.
>
> Direct review of the FLRA's decisions is available in the courts of
> appeals. 5 U.S.C. § 7123(a).
>
> . . .
>
> Separately, the CSRA also established a comprehensive system for
> reviewing personnel action taken against federal employees. If an
> agency takes a final adverse action against an employee —
> removal, suspension for more than 14 days, reduction in grade or
> pay, or furlough for 30 days or less — the employee may appeal to
> the Merit Systems Protection Board ("MSPB"). The MSPB may
> order relief to prevailing employees, including reinstatement,

11

**App.012**

> backpay, and attorney's fees. Probationary employees, however,
> generally do not enjoy a right to appeal to the MSPB. Employees
> may appeal final MSPB decisions to the Federal Circuit, which has
> exclusive jurisdiction over such appeals. This statutory review
> scheme, too, is exclusive, even for employees who bring
> constitutional challenges to federal statutes.

*Nat'l Treasury*, 2025 WL 561080, at *4–5 (cleaned up).

Under *Thunder Basin Coal Co. v. Reich*, a claim may fall outside of the scope of a special statutory scheme where "a finding of preclusion could foreclose all meaningful judicial review," the claims considered are "wholly 'collateral'" to a statute's review provisions, or the claims are "outside the agency's expertise." 510 U.S. 200, 212–13 (1994). "These considerations do not form three distinct inputs into a strict mathematical formula. Rather, they serve as general guideposts useful for channeling the inquiry into whether the particular claims at issue fall outside an overarching congressional design." *Trump*, 929 F.3d at 755 (cleaned up).

The union plaintiffs' attempts to distinguish their instant claims from those channeled to the FLRA and MSPB in *National Treasury*, *American Foreign Service*, and *Ezell* are unconvincing, and the analysis laid out in those decisions applies with equal force here: The union plaintiffs and their members must adjudicate their claims through the FLRA and MSPB. The union plaintiffs' claims "are the vehicle by which they seek to reverse the removal decisions, to return [members] to federal employment, and to [collect] the compensation they would have earned but for the adverse employment action." *Elgin v. Dep't of Treasury*, 567 U.S. 1, 22 (2012); *Heckler v. Ringer*, 466 U.S. 602, 614 (1984). That the FLRA or MSPB may lack the authority to adjudicate the union plaintiffs' constitutional and APA claims does not constitute a foreclosure on all meaningful judicial review: Those issues can be "'meaningfully addressed in the Court of Appeals' that Congress [has] authorized to conduct judicial review." *Elgin*, 567 U.S. at 17 (quoting *Thunder Basin*, 510 U.S. at 215). Both schemes "provide[] review in . . . an Article III court fully competent to adjudicate [plaintiffs'] claims." *Ibid*.

*Second*, OPM argues that the CSRA and FSLMRS intended to channel *all* disputes that touch on a federal employment relationship to administrative review, *no matter the party*

**App.013**

*bringing such a dispute*.  But a claim brought by Western Watersheds Project (WWP), for example, against OPM, alleging that the latter issued an unlawful, arbitrary and capricious rule that undermined the BLM's ability to respond to WWP's FOIA requests, does not feature a federal employee, their union representative, or their federal employer (in this example BLM).  The plaintiff's injury — frustration of its ecological mission — is equally ill-suited to adjudication by a *labor* board.  True, the termination of a federal employee remains embedded within the dispute:  WWP's injury, it argues, occurred *because* OPM demanded, unlawfully, that the probationary employees at BLM be terminated.  That, standing alone, is not enough to bring a claim within the scope of the statutory schemes created for the resolution of bargaining disputes and employee claims.  Asked to provide a single example of a claim brought by a third party, against a third party, that had been administratively channeled via *Thunder Basin*, OPM could not.  Such a rule would stretch that doctrine too far.

In sum, it is unlikely that this Court has jurisdiction over the union plaintiffs, but it likely does have jurisdiction to hear the claims of the organizational plaintiffs.  This order moves to consider whether the latter group has standing.

### D.    STANDING.

The Supreme Court has set the bar for standing as follows:

> [T]he irreducible constitutional minimum of standing contains three elements.  *First*, the plaintiff must have suffered an injury in fact — an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical.  *Second*, there must be a causal connection between the injury and the conduct complained of — the injury has to be fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court.  *Third*, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (cleaned up; emphases added).  Where plaintiff seeks prospective injunctive relief, he "must demonstrate that he has suffered or is threatened with a concrete and particularized legal harm, coupled with a sufficient likelihood that he will again be wronged in a similar way." *Fellowship of Christian Athletes v. San Jose*

United States District Court
Northern District of California

1    *Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 680–81 (9th Cir. 2023) (en banc) (quoting *Bates*

2    *v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007) (en banc)).  "[I]n an injunctive

3    case this court need not address standing of each plaintiff if it concludes that one plaintiff has

4    standing."  *Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown*, 567 F.3d 521,

5    523 (9th Cir. 2009).  Given the nature of this action and the injunction requested, however, it is

6    necessary that standing be evaluated as to each organizational plaintiff.

7        "An organization has standing to bring suit on behalf of its members ["representational

8    standing"] if '(1) at least one of its members would have standing to sue in his own right, (2)

9    the interests the suit seeks to vindicate are germane to the organization's purpose, and (3)

10   neither the claim asserted nor the relief requested requires the participation of individual

11   members in the lawsuit.'"  *Fellowship of Christian Athletes*, 82 F.4th at 681 (quoting *Fleck &*

12   *Assocs., Inc. v. City of Phoenix*, 471 F.3d 1100, 1105–06 (9th Cir. 2006)).

13       An organization has direct organizational standing, meanwhile, "where it establishes that

14   the defendant's behavior has frustrated its mission and caused it to divert resources in response

15   to that frustration of purpose."  *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 663 (9th

16   Cir. 2021).  "Of course, organizations cannot manufacture the injury by incurring litigation

17   costs or simply choosing to spend money fixing a problem that otherwise would not affect the

18   organization at all, but they can show they would have suffered some other injury had they not

19   diverted resources to counteracting the problem."  *Ibid.*  (internal quotation marks omitted); *see*

20   *also FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 384–86 (2024).  At bottom, the test is

21   whether an organization's ability to perform the services they were formed to provide has been

22   "perceptibly impaired" by the challenged action.  *E. Bay Sanctuary Covenant v. Trump*, 932

23   F.3d 742, 765 (9th Cir. 2018) (cleaned up).

                    **(i)    The Coalition to Protect America's National Parks
                             (The Coalition) and Main Street Alliance (MSA).**

25       "Aesthetic and environmental well-being, like economic well-being, are important

26   ingredients of the quality of life in our society, and the fact that particular environmental

27   interests are shared by the many rather than the few does not make them less deserving of legal

United States District Court
Northern District of California

14

**App.015**

protection through the judicial process." *Sierra Club v. Morton*, 405 U.S. 727, 734 (1972). In *Desert Citizens Against Pollution v. Bisson*, for example, BLM sought to exchange 1,745 acres of federal land in Imperial County for a 2,642-acre parcel in the Santa Rosa and Little Chuckwalla Mountains owned by Gold Fields, a mining company. 231 F.3d 1172, 1175 (9th Cir. 2000). Gold Fields aimed to turn the Imperial County tract into a landfill; the members of Desert Citizens aimed to save it from that grim fate via an APA action. *Ibid.* Our court of appeals held that the members' continued use of the federal lands established an injury in fact: "The recreational or aesthetic enjoyment of federal lands is a legally protected interest whose impairment constitutes an actual, particularized harm sufficient to create an injury in fact for purposes of standing." *Id.* at 1176 (citing *Sierra Club*, 405 U.S. at 734).

The National Park Service has terminated close to 1,000 newly hired employees (Neubacher Decl., Exh. A). Coalition board member Don Neubacher, the former Superintendent at Yosemite National Park (2010–2016) and Point Reyes National Seashore (1995–2010) submitted a declaration stating:

> The Coalition to Protect America's National Parks ("Coalition") is a non-profit organization made up of over 3,400 members, all of whom are current, former, and retired employees and volunteers of the National Park Service. Together, they have accumulated over 50,000 years of experience caring for America's most valuable natural and cultural resources. . . . *Our members and their families are regular and avid users of the National Park System who would be adversely affected by any degradation of the parks or the programs of the NPS to preserve and protect the parks and make them available to visitors. Based on my experience as a park Superintendent, the termination of so many NPS employees at once will have an immediate adverse impact on the parks and park visitors.* For example, at Yosemite, the park will likely have to stop specific functions and close park areas. There is no way to accommodate current visitation levels without additional staff support during the upcoming peak season. When there was a partial government shutdown in 2018, visitors trashed scenic viewpoints, defecated outside locked restrooms and trampled sensitive ecological areas with their vehicles and dogs. The park receives annual visitation of over 4 million people.

(Neubacher Decl. ¶¶ 2–5 (emphasis added)). In a separate declaration, Jonathan B. Jarvis, the former Director of the National Parks Service, underscores the immediacy and scope of the harm to park operations, environmental protection, and natural resource monitoring (Dkt. No.

15

**App.016**

18-11).  Some of the likely, imminent harms laid out above have already come to pass.  A member of the Coalition reported this week that they and their party were forced to abandon a trip to Joshua Tree National Park because the Black Rock Nature Center, which ordinarily provides shelter and commodes to the public, remained unstaffed and closed well after its scheduled opening time (Neubacher Suppl. Decl. ¶ 4).

The Coalition has standing.  Its members' continued use and enjoyment of our national parks will likely be, and in at least one case already has been, injured by the terminations that have taken place at the National Parks Service.

Main Street Alliance likewise has representational standing.  MSA is a "national network of small businesses, with approximately 30,000 members throughout the United States.  MSA helps small business owners realize their full potential as leaders . . . with the aim of creating an economy where all small business owners have an equal opportunity to succeed" (Phetteplace Decl. ¶¶  2–3).  "MSA's small business members rely on the U.S. Small Business Administration ('SBA') for a variety of valuable services that help small businesses succeed. These services include loans, loan guarantees, and grants; disaster relief; assistance in connecting small businesses with government contracting opportunities; and a national network of some 1,000 Small Business Development centers that provide counseling and training to help entrepreneurs start their own businesses" (*id*. ¶ 4).  A February 20 letter from the Ranking Member of the Senate Committee on Small Business and Entrepreneurship to the Administrator of the SBA cited reporting that hundreds of probationary SBA employees had been terminated across the country and stated that "through our own investigation and public reporting, we have learned that the fired employees included those supporting disaster assistance and oversight of loan programs"  (*id*. Exh. A).  MSA asserts that the mass terminations at the SBA are likely to impair disaster relief, the provision of loan guarantees, and other services necessary for MSA's members to open a business or stay float (*id*. ¶ 9). Some members who already have entered into contracts with the expectation of obtaining timely loan guarantees "are likely to be on the hook for expenses owed to contractors and suppliers without the ability to pay amounts owed" (*id*. ¶ 8).

16

**App.017**

### (ii)    The Western Watersheds Project (the Project).

In *Havens Realty Corp. v. Coleman*, an organization "whose purpose was to make equal opportunity in housing a reality in the Richmond Metropolitan Area," HOME, brought a Fair Housing Act claim against Havens Realty, which owned and operated apartment complexes in Richmond.  455 U.S. 363, 368 (1982) (internal quotation marks omitted).  HOME asserted that Havens Realty's unlawful "racial steering" — providing false information regarding the availability of housing to black individuals to maintain a segregated property — had frustrated its mission and, critically, its housing counseling service.  *Id*. at 367, 369.  The Supreme Court rejected Haven Realty's standing challenge, holding:

> If, as broadly alleged, petitioners' steering practices have
> perceptibly impaired HOME's ability to provide counseling and
> referral services for low-and moderate-income homeseekers, there
> can be no question that the organization has suffered injury in fact.
> Such concrete and demonstrable injury to the organization's
> activities — with the consequent drain on the organization's
> resources — constitutes far more than simply a setback to the
> organization's abstract social interests.

*Id*. at 379 (citing *Sierra Club*, 405 U.S. at 739).

The Project has standing to challenge OPM's directive to fire probationary employees at BLM and the U.S. Fish and Wildlife Service.  Erik Molvar, a wildlife biologist formerly employed by the U.S. Forest Service and Army Corps of Engineers, and now the Project's Executive Director, states that it "is a non-profit environmental conservation group that works to influence and improve public lands management" (Molvar Decl. ¶¶ 3–4).  Founded in 1993, the group has some 14,000 members, with field offices in Idaho, Montana, Wyoming, Arizona, Nevada, and Oregon.  The group is primarily focused on "the negative impacts of livestock grazing" (*ibid.*).  The group is also an active litigant in the federal courts, where it advocates against commercial grazing on public lands.  *See, e.g., W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472 (9th Cir. 2011); *W. Watersheds Project v. Abbey*, 719 F.3d 1035 (9th Cir. 2013); *W. Watersheds Project v. Interior Bd. of Land Appeals*, 62 F.4th 1293 (10th Cir. 2023); *W. Watersheds Project v. U.S. Forest Serv.*, 603 F. App'x 612 (9th Cir. 2015) (mem.).

**App.018**

*First*, the Project has shown *actual* harm, namely that its ecological mission has been perceptibly impaired by the termination of employees at the BLM:

> This mass termination of employees will have an immediate adverse effect on the ability of the [Project] to accomplish its mission.
>
> For example, I was told by a federal employee on February 20, 2025, that because of staffing issues the Bureau of Land Management is unable to respond to a Freedom of Information Act request submitted by the [Project]. Our work depends on timely access to public records.

(Molvar Decl. ¶¶ 7–8). The termination of range managers and biologists, meanwhile, will diminish BLM's ability to provide timely "land health assessments to monitor the impact of cattle and sheep grazing on public lands," further undercutting the Project's ability to pursue its stated goals (*id*. ¶ 8).

*Second*, the Project has shown harm to both its members' protected interests in and its own efforts to advocate on behalf of endangered species. The Project is a party in an ongoing litigation in the District of Montana (Molvar Suppl. Decl. ¶ 3). *Ctr. for Biological Diversity v. Haaland,* No. 23-cv-02-BU-DLC (D. Mont.) (Judge Dana Christensen). There, the Project (and its co-plaintiffs) challenged a 2020 finding from the FWS concerning the Missouri River Distinct Population Segment of Arctic grayling, a freshwater fish with precious little habitat left, under the Endangered Species Act (Molvar Suppl. Decl. ¶ 3). Following a partial grant of summary judgment in the plaintiffs' favor, Judge Christensen ordered FWS to make a new finding regarding the status of the upper Missouri River Basin Distinct Population Segment of Arctic grayling by August 2025. *Haaland*, No. 23-cv-02-BU-DLC, Dkt. No. 52 at 53. On February 12 the FWS sought and received an extension of that deadline to February 2027 (Molvar Suppl. Decl. at ¶ 3). In a declaration to Judge Christensen, the FWS conditioned their ability to meet that new deadline on the "assumption[]" that "the Service will continue to have the authority to hire and retain sufficient listing program staff to be able to carry out the specified commitments." *Haaland*, No. 23-cv-02-BU-DLC, Dkt. No. 63-1 ¶ 15. The Project

United States District Court
Northern District of California

**App.019**

1    represents that, as of February 26, some 400 FWS employees have been terminated (Molvar

2    Suppl. Decl. ¶ 3).

3        Executive Director Molvar, himself a member of the Project, frequently fishes for Arctic

4    grayling in the lakes of the Sapphire Mountains, in Glacier National Park, and in Alaska (*id*. at

5    ¶ 9).  He plans to do so again during a planned July 2025 trip to Alaska (*ibid.*).  Under *Sierra*

6    *Club* and its progeny, therefore, the Project has standing to vindicate its members' legally

7    protected interest in the recreational enjoyment of federal lands and the flora and fauna therein.

8                    ***(iii)        Vote Vets Action Fund Inc. (VoteVets) and***
                              ***Common Defense Civic Engagement (Common***
9                              ***Defense).***

10       In *Fellowship of Christian Athletes*, an international student ministry challenged the

11    defendant school district's decision to bar its local chapter from formal "recognition" as a

12    student-run organization by the Associated Student Body (ASB).  82 F.4th at 681.  The FCA

13    stated it was an international "ministry group formed for student athletes to engage in various

14    activities through their shared Christian faith" that operates through more than 7,000 local

15    chapters.  *Id*. at 671–72.  Their stated mission was to equip "student athletes from all

16    backgrounds for fellowship, spiritual growth, and service on their campuses."  *Ibid*.  FCA

17    required that students serving in a leadership capacity affirm certain religious beliefs through a

18    "Statement of Faith" (stating, among other things, that "marriage is exclusively the union of

19    one man and one woman") and a "Sexual Purity Statement."  *Id*. at 672–73.  The defendant

20    school district, citing the "discriminatory nature" of both statements, first stripped the club of

21    its recognition as an official student club, and then imposed new "non-discriminatory criteria"

22    for all student clubs, under which the local FCA chapter would be denied recognition in future

23    years.  *Id*. at 675, 678–79.  While FCA's local chapter remained on campus, it lost out on

24    certain campus privileges.  *See id*. at 673.

25       Our court of appeals, sitting en banc, held that the FCA's national office had direct

26    organizational standing because the local chapter's exclusion from the benefits associated with

27    ASB recognition — access to fundraisers, the student yearbook, priority access to meeting

28    spaces, and so on — "undoubtedly hampered," *id*. at 683, the FCA's mission "to lead every

United States District Court
Northern District of California

19

**App.020**

coach and athlete into a growing relationship with Jesus Christ and His church," *id*. at 672. The FCA's national office moreover, "had to 'divert[] resources' in 'counteracting the problem' posed by the derecognition," including "a huge amount of staff time, energy, effort, and prayer that would normally have been devoted to preparing for school or ministry." *Ibid*.

Plaintiff VoteVets has standing. VoteVets is a "non-partisan, non-profit organization" that has "nearly 2 million supporters . . . with whom it regularly communicates about issues affecting veterans, including the operations, programs, and services available through the U.S. Department of Veterans Affairs" (Eaton Decl. ¶3). The VA has "dismissed over 1,000 probationary employees," "rais[ing] concerns about potential staffing shortages and the quality of care provided to veterans" (*id*. ¶ 8). For example, "the layoffs have hindered the recruitment of essential support staff for VCL positions such as trainers and quality assurance personnel" (*id*. ¶ 9). This shortage "has overwhelmed existing supervisors and affected the VCL's ability to provide timely assistance to veterans in crisis." Major General Eaton attests that:

> The February 2025 probationary terminations have had a significant impact on the organizational activities of VoteVets. The time of VoteVets' staff and consultants has been diverted from VoteVets' regular activities to field and respond to inquiries from veterans and their families and to connect them with case workers in congressional offices. This has taken almost all of our resources since the probationary terminations began, and has prevented us from performing our regular activities to meet the needs of veterans and their families.

(*id*. ¶ 11). VoteVets' members' access to services critical to the organization's mission has been hampered, and VoteVets itself has been forced to divert "almost all of [their] resources" in "counteracting the problem," depriving the organization of its ability to continue to provide services to its members (*ibid.*).

Plaintiff Common Defense likewise has standing. Common Defense is a "grassroots membership organization of progressive veterans, military families, and civilian supporters" (Arbulu Decl. ¶ 2). With approximately 33,187 members in California (about 2,000 of them veterans), Common Defense "mobilize[s] veterans to support and advocate for policies that help veterans, military families, and all working families," offers training and helps members

begin issue campaigns, and otherwise engages in legislative and political advocacy (*id.* ¶¶ 3–5, 11). Military veterans compose a large percentage of federal employees, and widespread termination — particularly at the VA and DOD — have had a disproportionate impact on persons whom Common Defense typically serves:

> As a result of these developments, Common Defense has had to devote considerable resources to responding to requests from our members and providing guidance about the mass probationary terminations. Many members believe that the termination of their employment may be imminent, and understandably have asked questions — by email, by phone, and on our members' slack channel — about what the letter means for their rights as employees Responding to members questions, and working to determine what answers we can give to those members, diverts resources from Common Defense's advocacy mission and core priorities, including working to expand ballot access at the state level, advancing initiatives to address climate change, and training and educating members.

(*id.* ¶ 6). Common Defense, like VoteVets, has diverted considerable resources otherwise intended for the pursuit of its advocacy mission to the problems presented to its members, and its mission, by mass terminations, particularly at the VA and DOD.

*       *       *

*First*, OPM counters that plaintiffs fail on causation: There was no direction, merely a request; that request was carried out by some agencies; it was those agencies' independent, intervening actions that are the proximate cause of plaintiffs' alleged harm. This argument rests on OPM's broader factual position that its memos and other communications to agencies regarding probationary employees constituted mere guidance, not direction. But plaintiffs have assembled a mountain of evidence supporting their more concise causal chain: OPM directed mass firings and plaintiffs each likely will be (or have been) injured as a result. Plaintiffs have each established a sufficient causal link between the mass termination of employees at the implicated agencies, and the imminent, foreseeable, and in some cases actual injuries that they face.

United States District Court
Northern District of California

**App.022**

United States District Court
Northern District of California

1    Next, OPM argues redressability:

2        They ask the Court to order agencies to rescind probationary
         removals and reinstate removed employees.  But, apart from OPM,
3        no other federal agency is a party here, leaving the Court without
         the power to order those agencies to take any action.  Thus,
4        Plaintiffs cannot show that an order of this Court would likely
         grant their requested relief, rendering their claimed injuries non-
5        redressable here.

6    (Dkt. No. 33 at 13).  Plaintiffs fairly allege that they have been harmed by OPM's *direction* to

7    other agencies to fire their probationary employees.  Declaratory and injunctive relief enjoining

8    OPM from issuing such a directive — one request among many made by plaintiffs — will

9    likely redress their alleged injuries.

10       **2.    IRREPARABLE HARM.**

11       "[P]laintiffs may not obtain a preliminary injunction unless they can show that irreparable

12   harm is likely to result in the absence of the injunction."  *All. for the Wild Rockies v. Cottrell*,

13   632 F.3d 1127, 1135 (9th Cir. 2011).  They have done so here.

14       "[T]he Supreme Court has instructed us that '[e]nvironmental injury, by its nature, can

15   seldom be adequately remedied by money damages and is often permanent or at least of long

16   duration, *i.e.,* irreparable.'"  *Ibid.* (alterations in original) (quoting *The Lands Council v.*

17   *McNair*, 537 F.3d 981, 1004 (9th Cir. 2008) (en banc)).  Relatedly, "deprivation of a source of

18   personal satisfaction and tremendous joy can constitute an irreparable injury."  *Ft. Funston*

19   *Dog Walkers v. Babbitt*, 96 F. Supp. 2d 1021, 1039 (N.D. Cal. 2000) (citing *Chalk v. U.S. Dist.*

20   *Ct.*, 840 F.2d 701, 709 (9th Cir. 1988)).  That is true as to loss of access to national recreational

21   areas.  *Ibid.*  The partial closure and degradation of national parks constitutes likely, irreparable

22   harm due to both environmental injury and loss of access  (*see* Neubacher Decl. ¶¶ 2–5).   In at

23   least one instance, a closure at Joshua Tree has resulted in actual harm (*see* Neubacher Suppl.

24   Decl. ¶ 4).  And the Arctic grayling, if it goes, is not coming back (*see* Molvar Suppl. Decl. ¶

25   3–9).  The Coalition and the Project have established irreparable harm.

26       Loss of access to essential government services also constitutes likely, and in some cases

27   actual, irreparable harm.  For example, the Veterans Crisis Line — an indispensable resource

28   for our veterans in times of crisis — has been "overwhelmed" and its ability to provide care

22

United States District Court
Northern District of California

1   diminished for lack of staff (Eaton Decl. ¶ 9).  Loss of access to that critical resource, standing

2   alone, constitutes irreparable harm to VoteVets' members.  Its failure to meet the needs of our

3   veterans presents the further likelihood of tragic results.  MSA's members' access to crucial

4   SBA services, including the provision of loan guarantees, is likely to be diminished

5   (Phetteplace Decl. ¶¶ 5–9), and the Western Watersheds Project's access to FOIA production

6   already has been impacted (Molvar Decl. ¶¶ 7–8).

7       Finally, plaintiffs face irreparable harm because they have diverted significant or even all

8   present resources to responding to the hardships created by the mass termination of

9   probationary employees (*see, e.g.*, Arbulu Decl. ¶ 6; Eaton Decl. ¶ 11).

10      MSA, the Coalition, the Project, VoteVets, and Common Defense have each established

11  irreparable injury.

12      OPM's rebuttals, tailored largely to the union plaintiffs, are moot (Dkt. No. 33 at 10).

13  OPM's assertion, meanwhile, that "[p]laintiffs have produced no credible evidence that

14  terminations of federal employees have caused a disruption in critical government services"

15  (*ibid.*) is refuted by the record, discussed at length in this memorandum's consideration of

16  standing.

17      **3.    THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST.**

18      Because OPM is a party in this action, the balance of the equities and the public interest

19  merge.  *See Nken v. Holder,* 556 U.S. 418, 435 (2009).  Here, they strongly favor plaintiff.

20  "The preservation of the rights in the Constitution and the legality of the process by which

21  government agencies function certainly weighs heavily in the public interest."  *Nat'l Treasury*

22  *Emps. Union v. U.S. Dep't of Treasury*, 838 F. Supp. 631, 640 (D.D.C. 1993) (Judge Harold

23  Greene).  Plaintiffs have presented real harms, detailed above, to their organizations, their

24  members, and their missions, while OPM has not provided a substantive opposition (Dkt. No.

25  33 at 22–23).

26      In sum, each *Winter* factor favors granting a limited injunction.

27

28

**App.024**

**CONCLUSION**

Based on the foregoing, the Court granted the following relief at the close of the February

27 argument:

> That OPM's January 20 memo, February 14 email, and all other
> efforts to direct the termination of employees at NPS, BLM, VA,
> DOD, SBA, and NSF are illegal, invalid and must be stopped and
> rescinded.  That OPM must communicate that decision to those
> agencies by the next day, February 27.

(Dkt. No. 41).

This memorandum amends the bench order to address two errors (the inclusion of the

NSF, and the exclusion of FWS).  The Court's TRO is accordingly **AMENDED** to the

following:

It is **ORDERED** that:

> OPM's January 20 memo, February 14 email, and all other efforts
> by OPM to direct the termination of employees at NPS, BLM, VA,
> DOD, SBA, and FWS are unlawful, invalid, and must be stopped
> and rescinded.

> OPM shall provide written notice of this order to NPS, BLM, VA,
> DOD, SBA, and FWS.

The evidentiary hearing described at the February 27 motion hearing shall occur on

**MARCH 13, 2025, AT 8 AM**.  The hearing will be in person in Courtroom 12.

Dated:  February 28, 2025.

_____

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

United States District Court
Northern District of California

24

**App.025**

United States District Court
Northern District of California

1

2

3

4

5

6            UNITED STATES DISTRICT COURT

7

8          NORTHERN DISTRICT OF CALIFORNIA

9

10   AMERICAN FEDERATION OF
     GOVERNMENT EMPLOYEES, AFL-CIO,
11   et al.,                                          No.  C 25-01780 WHA

12              Plaintiffs,

13         v.                                         **ORDER ON MOTION FOR LEAVE
                                                      TO AMEND**
14   UNITED STATES OFFICE OF
     PERSONNEL MANAGEMENT, et al.,
15
                Defendants.
16

17

18                      **INTRODUCTION**

19        In this action for declaratory and injunctive relief against defendant federal agency and

20   its acting director, plaintiff unions and non-governmental organizations move for leave to

21   amend the complaint, join new parties, and file additional declaratory evidence.  Defendants

22   oppose.  For the reasons stated below, plaintiffs' motion is **GRANTED**.

23

24                       **STATEMENT**

25        Plaintiffs filed their original complaint on February 19, 2025 (Dkt. No. 1).  They filed a

26   first amended complaint (FAC) (Dkt. No. 17) and an ex parte request for a temporary

27   restraining order (Dkt. No. 18) four days later, February 23.  The FAC added five non-union

28   plaintiffs and various new factual allegations.

1    The undersigned imposed a temporary restraining order following full briefing and

2    hearing on February 27 (Dkt. No. 44 at 67–74).  A written memorandum opinion and amended

3    TRO issued the next day (Dkt. No. 45).  The undersigned concluded that "OPM's January 20

4    memo, February 14 email, and all other efforts by OPM to direct the termination of employees

5    at NPS, BLM, VA, DOD, SBA, and FSW are unlawful, invalid, and must be stopped and

6    rescinded," and ordered OPM to provide written notice of the memorandum opinion to those

7    agencies (*id*. at 24).

8    On March 4, OPM amended its January 20 memo, adding two sentences:

9          Please note that, by this memorandum, OPM is not directing
10         agencies to take any specific performance-based actions regarding
           probationary employees.  Agencies have ultimate decision-making
11         authority over, and responsibility for, such personnel actions.

12    (Dkt. No. 64-1 at 2).

13    Plaintiffs were permitted to move for leave to amend the FAC at the close of the February

14    27 TRO hearing, and they did so five days later (Dkt. No. 49).  Plaintiffs' proposed second

15    amended complaint (SAC) aligns their factual allegations with information disclosed by

16    defendants or third parties during or after the TRO briefing, adds plaintiffs, and adds federal

17    agency defendants (and their heads) as both true defendants under Rule 20 (as to Claims 1–3)

18    and relief defendants under Rule 19 (as to Claims 1–4) (Dkt. No. 49-1).  Plaintiffs filed a

19    revised second amended complaint (RSAC) alongside their reply in support of the motion for

20    leave (Dkt. No. 69-1).  The RSAC is substantially similar to the SAC except that it seeks to

21    add the new federal agencies and their heads as Rule 19 relief defendants *only* (*id*. at 1) ("[T]he

22    Federal Agency Defendants (listed below) . . . are sued solely for purposes of obtaining

23    complete relief.").  This order considers only the RSAC, which displaced the SAC.

2

# ANALYSIS

### 1.   RULE 15 LEAVE TO AMEND.

Under Rule 15, leave to amend should be "freely give[n] . . . when justice so requires." FRCP 15(a)(2). "This policy is 'to be applied with extreme liberality.'" *Eminence Cap. v. Aspeon*, 316 F.3d 1048, 1051 (9th Cir. 2003) (quoting *Owens v. Kaiser Found. Health Plan*, 244 F.3d 708, 712 (9th Cir. 2001)). The Supreme Court has explained:

> If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason — such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. — the leave sought should, as the rules require, be "freely given." . . . [R]efusal to grant [] leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules.

*Foman v. Davis*, 371 U.S. 178, 182 (1962).

Leave to amend is appropriate.

*First*, plaintiffs do not seek to amend for an improper purpose. Plaintiffs challenge the terminations of thousands (likely tens of thousands) of probationary employees across a wide range of federal agencies. Defendant OPM possesses records of those terminations: OPM has required other federal agencies to report lists of probationers, lists of those fired, lists of those remaining, and so forth. OPM and the terminating agencies have not, however, disclosed the identity or number of terminated probationers — not even to the unions that represent them. Plaintiffs have independently assembled some of that information piecemeal, without the benefit of formal discovery. In other instances, terminations, OPM memos, public reporting, and other developments relevant to the dispute occurred only after plaintiffs' previous filings. Plaintiffs' addition of Rule 19 defendants is also appropriate. Plaintiffs seek, among other things, to secure the provision of government services (and access to federal lands) through the reinstatement of probationary employees that they allege were terminated pursuant to an unlawful OPM directive. As the undersigned explained during the February 27

United States District Court
Northern District of California

3

**App.028**

United States District Court
Northern District of California

1    TRO hearing, that relief will require that the terminating agencies be joined as relief

2    defendants. The RSAC does not otherwise alter the scope of the dispute because it does not

3    seek to join the non-OPM federal agencies as Rule 20 defendants.

4        In sum, the factual landscape is in flux. The RSAC re-aligns plaintiffs' allegations with

5    facts discovered after the FAC was filed (and adds new plaintiffs based on those facts). That is

6    appropriate considering the circumstances under which the parties are litigating.

7        *Second*, plaintiffs' amendment is timely. It comes five days after the TRO hearing, nine

8    days after the FAC, and thirteen days after the filing of the dispute. The parties, moreover,

9    have been engaged in non-stop motion practice during that span. Plaintiffs have moved as

10    quickly as can be expected.

11        Defendants respond that amendment would be futile because "OPM's guidance [the

12    March 4 revision to the January 20 memo] renders the case moot" (Opp. at 3). They fail to

13    persuade.

14        For one thing, defendants' assumption that the addition of two sentences to the January

15    20 memo extinguished the parties' fact dispute regarding ongoing terminations is

16    incorrect. OPM submits no evidence suggesting that federal agencies — some of which have

17    continued to terminate probationers — are now acting at their own discretion. Nor has OPM

18    submitted any evidence suggesting that it has rescinded or revised the other communications

19    imparting its unlawful directive. Defendants' argument on this point simply asks that the

20    undersigned accept OPM's factual contentions — supported only by counsel's say-so — as

21    true. That is not enough. Plaintiffs, meanwhile, contend that those agencies now terminating

22    probationers are still doing so at the direction of OPM (Reply at 2). There is a live controversy

23    concerning past and ongoing terminations of probationary employees.

24        For another thing, assuming that defendants' actions *did* result in the total cessation of

25    unlawful firings, defendants' revision to one of the several communications subject to the TRO

26    is not enough to moot the dispute. Our court of appeals has explained:

27            It is well-established . . . that voluntary cessation of allegedly
              illegal conduct does not deprive the tribunal of power to hear and
28            determine the case unless **[1]** it can be said with assurance that

4

**App.029**

1

2

3

> there is no reasonable expectation that the alleged violation will recur and **[2]** interim relief or events have completely and irrevocably eradicated the effects of the alleged violation. A party asserting mootness has the heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again.

*Fikre v. Fed. Bureau of Investigation*, 904 F.3d 1033, 1037 (9th Cir. 2018) (cleaned

up). Defendants fail on both counts. On factor [1], while "we presume that [the government]

acts in good faith," it "must still demonstrate that the change in its behavior is *entrenched* or

*permanent*." *Ibid*. (emphasis added; quotations omitted). "[T]he form the government action

takes is critical and, sometimes, dispositive." *Id*. at 1038. Defendants' action — a two-

sentence revision to one memo among several held likely to constitute an unlawful directive —

"could be easily abandoned or altered in the future" (via further revision to that memo, for

example) and does not moot the present case. *Ibid*. (quotations omitted). On factor [2],

defendants conflate the scope of the TRO with the scope of relief available to and sought by

plaintiffs. OPM's revision to the January 20 memo has not "*completely* and *irrevocably*

eradicated *the effects of the alleged violation*," even if it does constitute compliance with the

TRO. *Ibid*. (emphasis added). True, one agency reinstated nearly all probationers following

the undersigned's TRO (further suggesting that the terminations were not the product of that

agency's own discretion), but the record suggests that the majority remain terminated, and that

plaintiffs will continue to suffer harms due to the resulting diminishment or cessation of

government services.

Defendants next argue that adding non-OPM agency defendants and their heads would

prejudice them because "[d]efending such a sprawling lawsuit would substantially overburden

[d]efendants while not materially advancing [p]laintiffs' claims" (Opp. at 8). The RSAC

moots the issue: It adds non-OPM agency defendants and their heads as relief defendants

only. Government counsel, moreover, does not point to any actual or potential prejudice

beyond being "overburden[ed]" (*ibid*.).

Finally, defendants assert that the non-union plaintiffs' claims "must be channeled

through the administrative processes" (*id*. at 5). Defendants' attempt to relitigate the

5

**App.030**

United States District Court
Northern District of California

1    channeling argument is not properly raised on a motion for leave to amend and remains denied

2    for the reasons stated in the undersigned's February 28 memorandum opinion.

3         **2.**    **RULE 20 JOINDER.**

4        Defendants also contest the addition of new plaintiffs (*id*. at 10). Our court of appeals

5    has explained that "Rule 20(a)(1) imposes two specific requisites for the joinder of parties: (1)

6    a right to relief must be asserted by, or against, each plaintiff or defendant relating to or arising

7    out of the same transaction or occurrence; and (2) some question of law or fact common to all

8    the parties will arise in the action." *League to Save Lake Tahoe v. Tahoe Reg'l Plan. Agency*,

9    558 F.2d 914, 917 (9th Cir. 1977). "Under the rules, the impulse is toward entertaining the

10    broadest possible scope of action consistent with fairness to the parties; joinder of claims,

11    parties and remedies is strongly encouraged." *United Mine Workers of Am. v. Gibbs*, 383 U.S.

12    715, 724 (1966).

13        Defendants argue that joinder of the new plaintiffs is inappropriate because these

14    plaintiffs' claims present discrete issues of fact and law (Opp. at 10).

15        *First*, defendants misunderstand the rule. Rule 20 requires that "*some* question of law or

16    fact common to all the parties will arise in the action." *League to Save Lake Tahoe*, 558 F.2d

17    at 917; FRCP 20(a)(1) ("All persons may join in one action as plaintiffs if . . . *any* question of

18    law or fact common to all these persons will arise in the action." (emphasis added)). Rule 20

19    does *not* require that *all* questions of law and fact be identical. Varying grounds for standing,

20    for example, do not foreclose on joinder where common questions of law (such as those

21    underpinning plaintiffs' *ultra vires* and APA claims) exist. Defendants' argument that "all [the

22    new organizational plaintiffs] have different priorities, memberships, and purported injuries as

23    to different agencies" fails for the same reason (Opp at 10). *Some* factual disparities do not

24    foreclose joinder where "*any* question of . . . fact common to all these persons will arise in the

25    action." FRCP 20(a)(1) (emphasis added).

26        *Second*, plaintiffs' claims relate to the same transaction or occurrence: OPM's purported

27    directive to other federal agencies to terminate probationary employees. The argument to the

28

**App.031**

contrary again rests on the factual contention that no such directive was given and is rejected for the reasons laid out in the undersigned's February 28 memorandum opinion.

Defendants do not otherwise point to any unfairness or prejudice that would result from the joinder of the new plaintiffs. *See Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1296 (9th Cir. 2000).

**CONCLUSION**

Plaintiffs' motion for leave to amend is **GRANTED.** Plaintiffs shall file the RSAC (Dkt. No. 69-2) by **TUESDAY, MARCH 11, 2025, AT NOON**.

**IT IS SO ORDERED.**

Dated: March 10, 2025.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

App.032

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES, AFL-CIO,
et al.,

          Plaintiffs,

      v.

UNITED STATES OFFICE OF
PERSONNEL MANAGEMENT, et al.,

          Defendants.

No.  C 25-01780 WHA

**ORDER ON EX PARTE
APPLICATION BY DEFENDANTS**

The hearing on a preliminary injunction will proceed as scheduled on Thursday, March 13.

The government argues that "the March 13 evidentiary hearing and any depositions are unnecessary in light of OPM's compliance with the TRO and [their] willingness to convert the Court's TRO into a preliminary injunction" (Dkt. No. 75 at 10) (cleaned up).  The problem is that plaintiffs seek broader relief than was provided by the TRO now in place.  So, even if the Court must rule based solely on the record submitted during the TRO proceeding, it will do so, on or shortly after the March 13 hearing.

Defendants next argue that the testimony of Acting Director Ezell should not be compelled because to do so would "inappropriately intrude on the workings of a coordinate branch of government and pose avoidable and unnecessary separation-of-powers concerns"

**App.033**

1   (Dkt. No. 75 at 12).  The problem here is that Acting Director Ezell submitted a sworn

2   declaration in support of defendants' position, but now refuses to appear to be cross examined,

3   or to be deposed (despite, it should be added, government counsel's embrace of that very idea

4   during the TRO hearing).  *See In re Cheney*, 544 F.3d 311, 313-314 (D.C. Cir. 2008).

5      The Court's order that he appear or be deposed will not be vacated, nor will the hearing

6   on March 13.  If Ezell does not appear in violation of that order, then the Court will have to

7   decide the sanction, including whether or not to strike or limit his sworn declaration.

8      However, with respect to those other government employees who have not submitted

9   declarations, they need not be produced at the March 13 hearing.  We will address the

10   necessity (if any) of their testimony in due course.

11      Plaintiffs remain free to bring those witnesses who will appear voluntarily.

12      Counsel shall advise the Court whether they intend to produce any live witnesses by

13   **MARCH 11, 2025, AT 5 PM**.  If the answer is "no" on all counts, then the hearing will be moved

14   to 1 PM (so the Court need not interrupt an ongoing criminal trial).  If the answer is "yes," and

15   live testimony will be heard, then the hearing will take place as scheduled at 8 AM (and the

16   criminal trial will be interrupted).

18   **IT IS SO ORDERED.**

20   Dated:  March 10, 2025.

23   WILLIAM ALSUP
   UNITED STATES DISTRICT JUDGE

United States District Court
Northern District of California

2

**App.034**

1

2

3

4

5

6              UNITED STATES DISTRICT COURT

7

8              NORTHERN DISTRICT OF CALIFORNIA

9  AMERICAN FEDERATION OF
   GOVERNMENT EMPLOYEES, AFL-CIO,
10  et al.,                                     No.  C 25-01780 WHA

11              Plaintiffs,

12         v.                                   **MEMORANDUM**

13  UNITED STATES OFFICE OF
   PERSONNEL MANAGEMENT, et al.,
14
                Defendants.
15
   ─────────────────────────────────
16

17                        **INTRODUCTION**

18        Each federal agency has the statutory authority to hire and fire its employees, even at

19  scale, subject to certain safeguards.  The Office of Personnel Management has no authority to

20  hire and fire employees in another agency.  Yet that is what happened here — *en masse*.  OPM

21  directed all (or at least most) federal agencies to terminate all probationary employees for

22  "performance."  Because the organizational plaintiffs in this case have shown they will suffer

23  irreparable harm resulting from the immediate impairment of public services (and meet other

24  tests), they are entitled to a preliminary injunction.  The Court granted it from the bench —

25  ordering the reinstatement of probationary employees at the relevant agencies.

26

27

28

United States District Court
Northern District of California

United States District Court
Northern District of California

**STATEMENT**

*First*, OPM directed other agencies to fire their probationary employees.

A "Forest Service Briefing Paper" circulated by its human resource management to "Supervisor[s]/Leader[s]" stated:

> All federal agencies, including the Department of Agriculture, were notified on February 12, 2025, by the Office of Personnel Management (OPM) to terminate all employees who have not completed their probationary or trial period. . . . OPM *directed* agencies to separate Probationary employees starting 2/13/25 . . . . Based on this *direction* it is necessary to start providing notices of separation to employees in probationary and trial period positions starting 2/13/25.

(Dkt. No. 71 at 16 (emphasis added) (February 13, 2025)).

Then, in February 13 and 14 phone calls, OPM discussed probationary employee terminations with leadership from other agencies. Defendants have not provided transcripts of those calls nor declarations from any person who attests to having participated on one.

On February 13, the Department of Energy sent a probationary business cost analyst a termination letter stating: "*Per OPM instructions*, DOE finds that your further employment would not be in the public interest" (Dkt. No. 70-14 at 15 (emphasis added)).

That same day, a probationer at the Bonneville Power Administration (within the DOE) received a termination letter that stated: "*Per OPM instructions*, DOE finds that your further employment would not be in the public interest. For this reason, you are being removed from your position with DOE and the federal civil service effective today" (Dkt. No. 39-4 at 10 (emphasis added)).

On February 14, a probationer terminated by the Foreign Agricultural Service asked the Department of Agriculture's deputy chief human capital officer by email about the "specific details of my performance that were evaluated and found to be insufficient" (Dkt. No. 39-6 at 5–6). The response: "[A]gencies were *directed* to begin providing termination notices . . . beginning immediately upon OPM notification" (*ibid.*).

On February 18, meanwhile, the National Science Foundation fired its probationers *en masse* via Zoom. During that call, NSF officials stated: "We were *directed* last Friday

2

[February 14] by OPM to terminate all probationers except for a minimal number of mission critical probationers" (Dkt. No. 18-9 at 27 (emphasis added)). When confronted by the terminated probationers, the officials continued: "Up until Friday [February 14]. Yes. We were told by OPM it was the agency's discretion whether to remove probations or not. We chose to retain them all" (*id*. at 26). But "late Friday night," "[t]hey told us that they *directed* us to remove probationers" (*ibid.* (emphasis added)). "[T]here was no limited discretion. This is not a decision the agency made. This is a *direction* we received" (*id*. at 21) (emphasis added). Asked if NSF had at least *attempted* to negotiate with OPM to minimize the number of terminations, NSF responded: "There's no negotiation" (*id*. at 34). Defendants concede that on March 3, three days after the undersigned issued a memorandum opinion and amended the temporary restraining order, NSF's director re-hired nearly all the probationers terminated February 18.

In a February 21 Internal Revenue Service "town hall," IRS Chief Human Capital Officer Traci DiMartini stated:

> I'm not sure why it's happening . . . . Regarding the removal of the probationary employees, again, that was something that was *directed* from OPM. And even the letters that your colleagues received yesterday were letters that were written by OPM, put forth through Treasury, and given to us . . . . I cannot explain to you why this has happened. I've never seen OPM *direct* people at any agency to terminate.

(Dkt. No. 39-5 at 8–9 (emphasis added)).

She continued:

> And our actions are being watched by OPM. So that's, again, something else that's unprecedented. . . . Everything we do is scrutinized. Everything is being looked at twice. Any changes that are made in our system that show any type of action that has been deemed impermissible, we have to respond to why it happened.

(*id*. at 7–8).

**App.037**

United States District Court
Northern District of California

On February 25, Tracey Therit, chief human capital officer for the Department of

Veterans Affairs, testified under oath at a congressional hearing before the House Committee

on Veterans Affairs:

> **RANKING MEMBER TAKANO**:  So nobody ordered you to carry out these terminations?
>
> You did it on your own?
>
> **MS. THERIT**:  There was *direction* from the Office of Personnel Management.

(Dkt. No. 39-1 at 13 (emphasis added)).

On February 26, members of the Civilian Personnel Policy Council at the Department of

Defense stated by email:  "In accordance with *direction* from OPM, beginning February 28,

2025, all DOD Components must terminate the employment of all individuals who are

currently serving a probationary or trial period" (Dkt. No. 39-4 at 14 (emphasis added)).

In a March 6 sworn declaration filed in the District of Maryland and introduced into the

record by plaintiffs, meanwhile, IRS CHCO DiMartini stated:

> I attended several virtual meetings with Trevor Norris and other Human Capital Officers at Treasury agencies (which include the Office of the Comptroller of the Currency, the Bureau of Engraving and Printing, and the U.S. Mint) during which we discussed the *directive* to conduct mass terminations of probationary employees.
>
> . . . .
>
> Mr. Norris informed us that Charles Ezell, the Acting Director of OPM, Amanda Scales, Mr. Ezell's Chief of Staff, and Noah Peters, were the individuals spearheading the termination of probationary employees at OPM.
>
> . . . .
>
> Mr. Norris specifically instructed me and the other Human Capital Officers at Treasury that *OPM would not allow us to exempt military veterans from the probationary terminations*.

(Dkt. No. 94-1 at 3–4 (emphasis added)).

4

**App.038**

*Second*, OPM directed agencies to fire those employees under the pretense of "performance."

In early February, OPM disseminated a template termination letter to agency chief human capital officers (Dkt. No. 87-1).  The OPM template was largely generic, with placeholder text to be filled out by each respective agency (its image reproduced here, in two excerpts):

[DATE], 2025

MEMORANDUM FOR [EMPLOYEE], [TITLE], [ORGANIZATION]

| FROM: | [NAME] |
| | [TITLE] |
| SUBJECT: | Notification of Termination During Probationary Period |
| REFERENCES: | 5 U.S.C. § 7511 |
| | [5 U.S.C. § 3321(a)] |
| | [5 C.F.R. §§ 315.803 and 804] |
| | [5 C.F.R. § 316.304] |
| | [INSERT AGENCY POLICY] |

This is to provide notification that the Agency is removing you from your position of [TITLE]  and federal service consistent with the above references.

On [INSERT DATE OF APPOINTMENT], the Agency appointed you to the position of [TITLE]. As documented on your appointment Standard Form 50 (SF-50), you appointment is subject to a probationary/trial period. The agency also informed you of this requirement in the job opportunity announcement for the position.

(*ibid.*).

While it did not account for the specific employee (or even agency), the OPM template *did* articulate a specific reason for termination:

The Agency finds, based on your performance, that you have not demonstrated that your further employment at the Agency would be in the public interest. For this reason, the Agency informs you that the Agency is removing you from your position of [TITLE] with the Agency and the federal civil service effective [insert date and time, if necessary].

(*ibid.* (highlighting added)).

**App.039**

1      From IRS CHCO DiMartini:

2          My colleagues and I asked Mr. Norris what the termination letter
           for affected probationary employees should consist of, and they
3          informed me that OPM had drafted a letter, Treasury made a few
           modifications, and that we were instructed to send this letter out.
4

5   (Dkt. No. 94-1 at 3–4).

6      The IRS did not consider probationer performance:

7          My office did not review or consider the actual job performance or
8          conduct of any IRS probationary employee when issuing the
           termination notices.  I also know that Treasury did not review or
9          consider the actual job performance or conduct of any IRS
           probationary employee when issuing the termination notices.  I
10         know this because this fact was discussed openly in meetings.
           Practically speaking, it would take weeks or months to evaluate the
11         job performance of 6,700 probationary employees.

12  (*id.* at 4).

13      The Department of Agriculture used the OPM template to terminate probationers "based

14  on [their] performance" (Dkt. No. 18-5 at 11 (emphasis added)).  USDA's deputy chief human

15  capital officer stated OPM "*directed* the use of a specific template and language for the notice

16  beginning immediately upon OPM notification" (Dkt. No. 39-6 at 6 (emphasis added)).  The

17  Department of Transportation informed probationers that "based on your performance you

18  have not demonstrated that your further employment at the DOT FAA would be in the public

19  interest" (Dkt. No. 18-17 (emphasis added)).  The Department of Defense circulated the OPM

20  template to its civilian personnel policy council members, "[a]s provided by OPM, and for

21  your convenience" (Dkt. No. 39-4 at 15).

22      On February 13, Leandra Bailey, a Physical Science Information Specialist for the Forest

23  Service, was terminated (Dkt. No. 71).  In her most recent performance review, she received

24  the highest mark possible in every category (*id.* at 11).  The OPM template she received

25  nevertheless stated:  "The Agency finds, based on your performance, that you have not

26  demonstrated that your further employment at the Agency would be in the public interest" (*id.*

27  at 13 (emphasis added)).

28

6

**App.040**

On February 18, Dr. Andrew Frassetto, a probationer terminated by the NSF, received the OPM template (Dkt. No 18-9 at 38).  In a February 13 performance review — *five days* before he was terminated "*based on* [*his*] *performance*" — Dr. Frassetto's supervisor reported in a performance review:

> [H]is role [is] mission critical. Dr. Frassetto has been an outstanding program director, and he has taken the lead role in overseeing this important and complicated portfolio for the division. Dr. Frassetto came to NSF with a unique skill set in interdisciplinary scientific research . . . . He has already demonstrated an outstanding ability to balance the various aspects of his job responsibilities and is highly effective at organizing and completing all his work in an accurate and timely manner.
>
> . . . .
>
> Dr. Frassetto's work on this portfolio has been outstanding and he has brought important experience to the role and has demonstrated highly competent project management and oversight. He is a program director who has needed minimal supervision and eagerly seeks special assignments at higher levels of difficulty. He has been an outstanding contributor to the division, directorate, and agency.

(*id.* at 7–8).

NSF said: "The cause comes from boilerplate we received from OPM.  The cause says that the agency finds based on your performance that you have not demonstrated that your further employment at the agency would be in the public interest" (*id.* at 30 (emphasis added)).

Other agencies made slight tweaks to OPM's language — but maintained the central pretense.  For example, the Department of Health and Human Services reworded the OPM template's "performance" language — "based on your performance, [] you have not demonstrated that your further employment at the Agency would be in the public interest" — to "fitness": "Unfortunately, the Agency finds that *you are not fit for continued employment* because your ability, knowledge, and skills do not fit the Agency's current needs . . . ." (Dkt. No. 18-10 (emphasis added)).  They otherwise stayed true to the OPM template, down to the footnotes (*ibid.*).

OPM directed agencies to fire their probationers under the pretense of "performance" to, at least in part, circumvent statutory and regulatory reduction in force procedures and foreclose

7

**App.041**

United States District Court
Northern District of California

appeal to the Merit Systems Protection Board. In defendant Ezell's words: "Employees on probationary periods can be terminated during that period without triggering appeal rights to the Merit Systems Protection Board (MSPB)" (Dkt. No. 37 at 1).

Virtually all the foregoing facts were uncovered by counsel for plaintiffs. Defendants have provided virtually no transparency.

\*            \*            \*

Plaintiffs filed their complaint on February 19, 2025 (Dkt. No. 1). Four days later, they amended that complaint and moved for a temporary restraining order (Dkt. Nos. 17, 18). The undersigned ordered expedited briefing and held a hearing on February 27, during which a temporary restraining order was granted. A memorandum opinion and an amended TRO followed the next day (Dkt. No. 28). As part of that order, the undersigned required that defendant Ezell, who had volunteered his own declaration in support of defendants' opposition to a TRO, be cross-examined during a forthcoming evidentiary hearing on preliminary injunction. Plaintiffs, meanwhile, subpoenaed several agency employees to testify. Defendants were afforded the opportunity to request the production of any number of plaintiffs' declarants but did not. On March 10, three days before the evidentiary hearing, defendants moved to vacate that hearing, quash all subpoenas, and be relieved from having to produce defendant Ezell and other witnesses for deposition (Dkt. No. 75-1). The Court denied the motion to vacate, granted in part the motion to quash the subpoenas to appear, but denied relief as to defendant Ezell, who uniquely was a party and had volunteered his own testimony (Dkt. No. 89 at 2). Defendants ultimately withdrew Ezell's declaration and he did not appear. Finally, also on March 11, plaintiffs filed a second amended complaint that added several federal agencies (and their heads) as relief defendants, bringing them within this Court's ability to grant relief.

The March 13 hearing went ahead, and the undersigned issued a preliminary injunction from the bench, on the record to date and counsels' argument. As stated at the hearing, the preliminary injunction flows only from claims made by organizational plaintiffs.

8

**App.042**

United States District Court
Northern District of California

**ANALYSIS**

"A plaintiff seeking a preliminary injunction must establish that [1] he is likely to succeed on the merits, that [2] he is likely to suffer irreparable harm in the absence of preliminary relief, that [3] the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

*First*, OPM's directive constituted an *ultra vires* act that violated its and all impacted agencies' statutory authority.

"The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). "Equitable actions to enjoin *ultra vires* official conduct do not depend upon the availability of a statutory cause of action; instead, they seek a 'judge-made remedy' for injuries stemming from unauthorized government conduct, and they rest on the historic availability of equitable review." *Sierra Club v. Trump*, 963 F.3d 874, 890–91 (9th Cir. 2020) (citing *Armstrong*, 575 U.S. at 327), *vacated and remanded on other grounds (mootness)*, 142 S. Ct. 46 (2021).

No statute — anywhere, ever — has granted OPM the authority to direct the termination of employees in other agencies. "Administrative agencies [like OPM] are creatures of statute. They accordingly possess only the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*, 595 U.S. 109, 117 (2022).

Instead, Congress's statutory scheme grants to each agency head the authority to manage its own affairs, including the hiring and firing of employees. 5 U.S.C. § 3101 ("Each Executive agency, military department, and the government of the District of Columbia may employ such number of employees of the various classes recognized by chapter 51 of this title as Congress may appropriate for from year to year."); 5 U.S.C. § 301 ("The head of an Executive department or military department may prescribe regulations for the government of his department, the conduct of its employees . . . ."); *see also, e.g.,* 42 U.S.C. § 7231 (DOE) (re employees); *id.* § 7253 (re reorgs.); 38 U.S.C. §§ 303, 510 (VA); 10 U.S.C. § 113 (DOD).

9

**App.043**

1          The same is true of OPM.  Congress has vested its director with the authority to "secur[e]

2     accuracy, uniformity, and justice in the functions of the Office," "appoint[] individuals to be

3     employed by the Office," and "direct[] and supervis[e] employees of the Office."  5 U.S.C.

4     § 1103(a)(1)–(3).  But that's it.  OPM did not have the authority to direct the firing of

5     employees, probationary or otherwise, in any *other* federal agency.

6          Defendants concede as much.  Their opposition to relief rests instead on the factual

7     contention that OPM did not issue a directive.  The sanitized record provided in support —

8     press releases and a feeble start to a yet-to-come "administrative record" (Dkt. Nos. 110, 111)

9     — is unpersuasive.

10          For example, defendants point to a February 14 OPM memo where OPM "asked" the

11     agencies to select for termination only those probationers they did *not* identif[y] as mission-

12     critical no later than end of the day Monday, 2/17" (Dkt. No. 111-2 at 1 (emphasis

13     added)).  But the balance of the record shows the actual situation was not as this memo would

14     make it seem.  *First*, even the fig leaf of agency discretion allowed for in the letter was

15     illusory.  As the NSF officials implementing the OPM directive stated:  "Up until Friday

16     [February 14]. Yes.  We were told by OPM it was the agency's discretion whether to remove

17     probations or not.  We were told by OPM it was the agency's discretion whether to remove

18     probations or not.  *We chose to retain them all*" (Dkt. No. 18-9 at 26).  But "late, late Friday

19     night," "[t]hey told us that they *directed* us to remove probationers" (*ibid.* (emphasis

20     added)).  "[T]here was no limited discretion.  *This is not a decision the agency made*.  This is a

21     *direction* we received" (*id*. at 21) (emphasis added).  An "ask," followed by a directive, is a

22     directive.  *Second*, even if the agency discretion were real (it wasn't), the February 14 OPM

23     memo directed that discretion towards evaluating who was "mission-critical," not who was

24     high-performing (Dkt. No. 111-2 at 1).  The OPM template letter used to effectuate those

25     terminations — "[t]he Agency finds, *based on your performance*, that you have not

26     demonstrated that your further employment at the Agency would be in the public interest"

27     (Dkt. No. 87-1 at 1 (emphasis added)) — was an obvious pretext intended to obstruct appeal

28

United States District Court
Northern District of California

10

**App.044**

and avoid statutory and regulatory reduction-in-force procedures (for example, the honoring of veteran preferences in the order of retention) (Dkt. No. 94-1 at 3–5).

The declaration of OPM senior advisor Noah Peters fares no better (Dkt. No. 77). *First*, Peters does not claim personal knowledge as to *anything* in his declaration. *Second*, Peters does not state that he participated in *any* of the calls he describes. Defense counsel argued, as to Acting Director Ezell's declaration, that *agency heads* "lack[ ] specific knowledge of disputed issues of fact," and "such declarations are based on information obtained by the official in course of performing his or her official duties and provide background information and summarize agency decision making reflected in other, sometimes lengthy or complex official documents" (Dkt. No. 75 at 8). Peters is not an agency head, he is a "senior advisor" who joined OPM two months ago. Peters' concluding paragraph — "At no point on these calls did OPM direct or require any agencies to terminate probationary employees. At all times, the tone was friendly, cordial, and cooperative." — is hearsay within hearsay (Dkt. No. 77 at 3 (emphasis added)). Defendants concede that *someone* from OPM *was* present on each of the calls described but have refused to provide the Court with declarations from *any* such employee with direct knowledge of the facts. *Finally*, Peters' assertion that there was no directive is cabined to "these calls." Nowhere does he state that OPM did not issue a directive *at all* (*ibid.*).

Plaintiffs have nourished the record with a mountain of countervailing evidence (agency memos, termination letters, congressional testimony, meeting transcripts, emails, and more) including, for example: "In accordance with *direction* from OPM . . . all DOD Components must terminate the employment of all individuals who are currently serving a probationary or trial period" (DOD), "[t]here was *direction* from the Office of Personnel Management" (VA), "agencies were *directed* to begin providing termination notices . . . immediately upon OPM notification" (USDA), "that was something that was *directed* from OPM" (IRS), "[t]hey told us that they *directed* us to remove probationers" (NSF), "OPM *directed* agencies to separate Probationary employees starting 2/13/25" (Forest Service) (emphases added).

11

**App.045**

United States District Court
Northern District of California

1    Also on the merits, plaintiffs' APA claims are likely to succeed for much the same

2    reason. OPM's *ultra vires* directive is likely to constitute an unlawful final agency action that

3    is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in

4    excess of statutory jurisdiction, authority, or limitations, or short of statutory right," and

5    "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), (D).

6    Based on the full record at the time of injunction, some of it excerpted here, defendants'

7    opposition is rejected (except to the extent addressed next on jurisdiction and standing).

8    As to jurisdiction, the conclusions in the February 28 memorandum stand (for now).

9    Facts not before the court during the TRO hearing suggest that the FLRA and MSPB may be

10   alternative channels in theory alone (if at all). The undersigned ordered further briefing on that

11   point and will not yet disturb the prior conclusion, which is incorporated here.

12   Standing was also set out in the February 28 memorandum, with that legal analysis also

13   incorporated here. To be clear, no employees bring claims in this action, and unions' claims

14   on their behalf have not yet been determined to be the sort that can be heard in district court (as

15   above). But the organizational plaintiffs themselves face concrete harms. These flow from the

16   way the unlawfully directed terminations disable the federal agency services on which they or

17   their members depend, or otherwise imperil their organizational mission or membership —

18   such as by requiring the organizations to steal resources from their existing work to solve new

19   problems entirely of OPM's making. For example, Vote Vets Action Fund Inc., has diverted

20   resources from its complementing array of veterans' services to cover primary needs newly

21   unmet by VA services with slashed staffing, like the short-staffed Veterans Crisis Line (*see*

22   Dkt. No. 45 at 20–23). Nearly all the plaintiffs that the TRO found likely to have standing (*id.*

23   at 13–22) have added support to our record since (Coalition to Protect America's National

24   Parks (Dkt. No. 70-19), Common Defense Civic Engagement (Dkt. No. 70-17), Main Street

25   Alliance (Dkt. No. 70-20), and Western Watersheds Project (Dkt. No. 70-18)). Plus, other

26   organizational plaintiffs have shown likely harms at OPM's hand (relevantly, Point Blue

27   Conservation Science (Dkt. No. 70-15), and American Geophysical Union (Dkt. No. 70-16)).

28

**App.046**

*Second*, irreparable harms are imminent for these plaintiffs if not enjoined. Fresh record evidence shows that the harms outlined in the TRO go on despite the TRO. And, the record shows those harms come by more paths than previously understood. For example, we already knew that slashes to staffing at the USDA's Forest Service were wreaking havoc on Western Watershed Project. That harm continues, with problems mounting from the Los Padres National Forest to the Sawtooth Valley National Recreation Area (Dkt. No. 70-18 ¶¶ 7–8, 10). But now, plaintiffs tell us about more problems from USDA staffing cuts, this time at the Natural Resources Conservation Service. Because staff was cut in grants administration, nonprofit Point Blue Conservation Science has not been paid for work; and, because future project approvals are likewise stalling, Point Blue will likely be frustrated in its ability to improve forestry, agriculture, and wildlife management with the USDA (Dkt. No. 70-15 ¶¶ 4–6). The American Geophysical Union points to other problems also emanating from terminations at the USDA, and to still others emanating from the Department of Energy (Dkt. No. 70-16). Similarly, we already knew about the imminent harms to VoteVets and Common Defense (and to those whom they serve) by way of OPM-directed terminations at the DOD and VA. Now, through a statement made against interest, we see that the Department of Treasury sought to retain its veterans who were probationers — only to be rebuffed by OPM (Dkt. No. 94-1 ¶ 12). Because stiffer evidence did not shore up the irreparable harms flowing from the unlawful directive to the other proposed agencies, the preliminary injunction did not extend to them.

Each agency had (and still has) discretion to hire and fire its *own* employees. Here, the agencies were *directed* by OPM to fire all probationary employees, and they executed that directive. To staunch the irreparable harms to organizational plaintiffs caused by OPM unlawfully slashing other agency's staff required immediately reinstating those employees.

*Finally*, the balance of the equities and the public interest (which merge when the government is the defendant) plainly favor the organizational plaintiffs. "The preservation of the rights in the Constitution and the legality of the process by which government agencies function certainly weighs heavily in the public interest." *Nat'l Treasury Emps. Union v. U.S.*

United States District Court
Northern District of California

13

1    *Dep't of Treasury*, 838 F. Supp. 631, 640 (D.D.C. 1993) (Judge Harold Greene); *see Nken v.*

2    *Holder*, 556 U.S. 418, 435 (2009).

3         Each *Winter* factor favored the granting of the injunction.

4         The Court found security — which defendant did not request — to be proper in the

5    amount of $0.

6

7                                    **CONCLUSION**

8         For the reasons stated from the bench, and further explained above, the Court granted the

9    injunction.

10

11   Dated:  March 14, 2025.

12

13                                                 _____

14                                                 WILLIAM ALSUP
                                                   UNITED STATES DISTRICT JUDGE
15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

14

1

2

3

4

5

6                          UNITED STATES DISTRICT COURT

7

8                        NORTHERN DISTRICT OF CALIFORNIA

9

10   AMERICAN FEDERATION OF
     GOVERNMENT EMPLOYEES, AFL-CIO,
11   et al.,                                    No.  C 25-01780 WHA

12              Plaintiffs,

13         v.
                                                **ORDER DENYING EX PARTE**
14   UNITED STATES OFFICE OF                    **MOTION TO STAY PRELIMINARY**
     PERSONNEL MANAGEMENT, et al.,              **INJUNCTION PENDING APPEAL**
15
                Defendants.
16

17

18         The undersigned issued a preliminary injunction on March 13, 2025 (Dkt. No. 115).

19   Defendants appealed (Dkt. No. 119), and now move for a stay pending appeal (Dkt. No. 127).

20   Plaintiffs oppose (Dkt. No. 129).

21         The "factors regulating the issuance of a stay" are as follows:  "(1) whether the stay

22   applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the

23   applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will

24   substantially injure the other parties interested in the proceeding; and (4) where the public

25   interest lies."  *Hilton v. Braunskill,* 481 U.S. 770, 776 (1987).

26         *First*, defendants' likelihood of success arguments were addressed at both the temporary

27   restraining order and preliminary injunction stage.  The memoranda supporting the TRO and PI

28

                                                                              **App.049**

are incorporated here (Dkt. Nos. 28, 132). For the reasons stated therein, this factor does not favor a stay.

*Second*, defendants' argument that a stay of the preliminary injunction would not injure plaintiffs retreads the arguments made in opposition to plaintiffs' motion for leave to amend (Dkt. No. 63). As explained in the order granting leave, defendants' purported voluntary cessation (via a two-sentence alteration to the January 20 memo) does not moot the case at hand (Dkt. No. 88). A stay would further injure plaintiffs because reinstatement becomes more difficult with every passing day. Terminated probationers are moving on with their lives, as they must. Fewer will be available to redress the harms suffered by the organizational plaintiffs tomorrow than there are today. And, the government has wholly failed to argue there is any other way to avoid the irreparable injuries flowing from the unlawful terminations except to reinstate the employees.

*Finally*, defendants argue that the public interest and the balance of the equities favor a stay. They rely in large part on six newly submitted declarations, one from each relief defendant agency subject to the injunction (Department of Defense (Dkt. No. 127-1), Department of Energy (Dkt. No. 128-2), Department of the Interior (Dkt. No. 127-3), Department of the Treasury (Dkt. No. 127-4), Department of Veterans Affairs (Dkt. No. 127-5), and Department of Agriculture (Dkt. No. 127-6). Two relief defendants (from DOD and DOI) assert, for the first time, that they reviewed their probationary employees' performance following OPM's January 20 memo (Dkt. No. 127-1 ¶ 7 (DOD); Dkt. No. 127-3 ¶ 7 (DOI)). The VA, Treasury, USDA, and DOE do not make that representation.

The declarations set out a substantially similar list of administrative harms that would result from reinstatement. These include the need to "identif[y], contact[], and onboard[]" the recently terminated probationers, "fill[] out human resources paperwork," "receiv[e] new equipment, obtain[] new security badges and clearances, and re-enroll[ probationers] in benefits programs" (Dkt. No. 127-2); the frustration of supervisors' ability to "appropriately manag[e] their workforce" (Dkt. No. 127-1); and general "confusion" and "uncertainty" (Dkt. No. 127-3; Dkt. No. 127-4).

United States District Court
Northern District of California

2

**App.050**

1       This order pauses to address defendants' attempts to frustrate fact-finding. The defense

2    submitted a single declaration, from defendant Charles Ezell, in opposition to plaintiffs'

3    motion for a TRO. The undersigned ordered defendant Ezell to appear for cross examination

4    at the subsequent evidentiary hearing, or, alternatively, to submit to a deposition at his

5    convenience. Plaintiffs were likewise ordered to make their declarants available for

6    examination. Defendants chose to withdraw the Ezell declaration to avoid submitting its

7    declarant to examination, in violation of this Court's order. Defense counsel "understood

8    coming out of the TRO hearing" that the undersigned "wanted to know what was actually

9    communicated" during several phone calls between OPM and the relief defendant agencies

10   (Dkt. No. 120). The purported reason to withdraw was that Ezell was not present at those

11   calls, so his testimony "would have scant evidentiary value" anyway (Dkt. No. 75 at 12).

12       The undersigned did not impose sanctions at the time, as it appeared defendants had

13   righted a wrong they would not repeat.

14       It was a surprise, then, that defendants submitted the declaration of Noah Peters, a "senior

15   advisor" at OPM (Dkt. No. 77). Defense counsel represented to the Court that Peters

16   participated in the calls at issue, but Peters declined to swear to it (*ibid.*). Indeed, Peters did

17   not claim personal knowledge as to *anything* in his declaration. Persuaded by defense

18   counsel's argument, the undersigned afforded the Peters Declaration scant evidentiary value.

19       Defendants refused to make any further effort to get at the truth, arguing that the only

20   way forward was to wait on them to produce their administrative record, and "for gaps in that

21   record to be litigated, to be supplemented by oral testimony, if necessary" (Dkt. No. 120 at 22).

22   Defendants otherwise complained that the rapid pace of litigation prohibited the production of

23   anything more than the Ezell declaration (Dkt. No. 120 at 20-21).

24       It is again surprising, then, that defendants managed (in the span of a single day) to

25   muster a half-dozen declarations from relief defendants. None of these declarations, or the

26   facts therein, were made available to the Court during its consideration of the TRO or PI now

27   in place. This is a last-ditch attempt to relitigate those orders on a new, untested record.

28       Turning to the merits, defendants' arguments fail to persuade.

**App.051**

United States District Court
Northern District of California

*First*, the administrative harms described do not move the needle in favor of a stay. NSF, for example, rehired its terminated probationers following the undersigned's TRO. Several other agencies have rehired large swaths of terminated workers for myriad reasons. The declarant for the USDA, for example, concedes that the agency "is already reinstating the terminated probationary employees, pursuant to a 45-day March 5, 2025 Stay Order from the Merit Systems Protection Board, which was requested by the Office of Special Counsel" (Dkt. No. 127-6 at ¶4). It is unclear how the denial of a stay would thus harm USDA — though it remains clear that granting the stay would put organizational plaintiffs at risk should there be any failure of relief from the MSPB order. Nowhere do relief defendants claim that they are uniquely incapable of rehiring recently terminated probationers, only that doing so would require them to contact and onboard employees, get them equipment, assign them duties, and so forth. Each "harm" stems from the unwinding of the unlawful act and the return to the status quo.

*Second*, defendants' attempt to cast the probationers' return to work as *harmful to those employees* is rejected. Each probationer remains free to refuse relief defendants' offer of reinstatement.

*Third*, the evidence available at the time showed that the relief agencies wished to retain their employees and terminated them only because OPM directed them to do so. Only two of the six relief defendants (DOD and DOI) now claim that they conducted performance reviews of their probationary employees prior to termination (Dkt. Nos. 127-1, 127-3).

*Fourth*, defendants' suggestion that the preliminary injunction "precludes the Office of Personnel Management ('OPM') from giving further guidance to agencies on personnel matters" is incorrect. The undersigned stated from the bench:

> To repeat, this order holds that OPM and Acting Director Ezell have no authority whatsoever to direct, order, or require in any way that any agency fire any employee.
>
> Now, given the arguments and the facts in this case, namely, that defendants have attempted to recast these directives as mere guidance, this order further prohibits defendants from giving guidance as to whether any employee should be terminated.

United States District Court
Northern District of California

4

**App.052**

1    (Dkt. No. 120 at 52–53 (emphasis added)).  The meaning of the order is plain:  OPM cannot

2    direct another agency to fire an employee simply by dressing up the directive as guidance.  The

3    undersigned has not and cannot circumscribe OPM's lawful performance of statutorily

4    authorized functions, including issuing guidance that goes no further.

5       *Finally*, defendants point out that the undersigned himself "noted that appellate

6    consideration of the preliminary injunction would be appropriate" (Dkt. No. 127 at 3).  True.

7    All parties may appeal the grant (or denial) of an injunction as of right.  28 U.S.C.

8    § 1292(a)(1).  Defendants are requesting a stay.  The propriety of appellate review has little

9    bearing on the propriety of a stay.

10       Defendants' request is **DENIED**.

12      **IT IS SO ORDERED.**

14    Dated:  March 15, 2025.

                                   WILLIAM ALSUP

                                     UNITED STATES DISTRICT JUDGE

United States District Court
Northern District of California

5

```
 1                UNITED STATES DISTRICT COURT

 2            FOR THE NORTHERN DISTRICT OF CALIFORNIA

 3                    SAN FRANCISCO DIVISION

 4

 5   AMERICAN FEDERATION OF
     GOVERNMENT EMPLOYEES, AFL-CIO;
     AMERICAN FEDERATION OF STATE      CASE NO. CV-25-01780 WHA
 6   COUNTY AND MUNICIPAL EMPLOYEES,
     AFL-CIO, ET AL.,                  SAN FRANCISCO, CALIFORNIA
 7
               PLAINTIFFS,             FEBRUARY 27, 2025
 8
          VS.                          PAGES 1 - 73
 9
     UNITED STATES OFFICE OF
10   PERSONNEL MANAGEMENT, ET AL.,

11             DEFENDANTS.

12

13                TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE WILLIAM H. ALSUP
14             UNITED STATES DISTRICT JUDGE

15   A-P-P-E-A-R-A-N-C-E-S

16   FOR THE PLAINTIFFS:   ALTSHULER BERZON LLP
                           BY:  STACEY M. LEYTON
17                              DANIELLE E. LEONARD
                                ROBIN S. THOLIN
18                              EILEEN B. GOLDSMITH
                                JAMES BALTZER
19                              SCOTT KRONLAND
                           177 POST STREET, SUITE 300
20                         SAN FRANCISCO, CALIFORNIA 94108

21
              (APPEARANCES CONTINUED ON THE NEXT PAGE.)
22

23
     OFFICIAL COURT REPORTER:   IRENE L. RODRIGUEZ, CSR, RMR, CRR
24                              CERTIFICATE NUMBER 8074

25        PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY,
     TRANSCRIPT PRODUCED WITH COMPUTER.
```

(57 of 216), Page 57 of 216 Case: 25-1677, 03/18/2025, DktEntry: 16.2, Page 57 of 216
Case 3:25-cv-01780-WHA    Document 44    Filed 02/26/25    Page 2 of 74

2

```
 1        A P P E A R A N C E S: (CONT'D)

 2

 3        FOR THE PLAINTIFFS:          AMERICAN FEDERATION OF GOVERNMENT
                                       EMPLOYEES
 4                                     BY:  RUSHAB SANGHVI
                                       80 F STREET, NW
 5                                     WASHINGTON, DC 20001

 6        FOR THE DEFENDANTS:          UNITED STATES ATTORNEY'S OFFICE
                                       BY:  KELSEY J. HELLEND
 7                                     450 GOLDEN GATE AVENUE, BOX 36055
                                       SAN FRANCISCO, CALIFORNIA 94102
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

(58 of 216), Page 58 of 216 Case: 25-1677, 03/18/2025, DktEntry: 16.2, Page 58 of 216
Case 3:25-cv-01780-WHA    Document 44    Filed 02/26/25    Page 3 of 74

3

```
 1        SAN FRANCISCO, CALIFORNIA              FEBRUARY 27, 2025

 2

 3                      P R O C E E D I N G S

 4        (COURT CONVENED AT 1:31 P.M.)

 5              THE CLERK:  TO THE ZOOM ATTENDEES, ANY RECORDING OF

 6        THIS PROCEEDING BY VIDEO, AUDIO, AND INCLUDING SCREENSHOTS IS

 7        STRICTLY PROHIBITED.

 8        CALLING CIVIL ACTION 25-1780, AMERICAN FEDERATION OF

 9        GOVERNMENT EMPLOYEES, ET AL., VERSUS UNITED STATES OFFICE OF

10        PERSONNEL MANAGEMENT.

11              COUNSEL, PLEASE APPROACH THE PODIUM AND STATE YOUR

12        APPEARANCES FOR THE RECORD BEGINNING WITH COUNSEL FOR

13        PLAINTIFFS.

14              MS. LEONARD:  GOOD AFTERNOON, YOUR HONOR.

15        DANIELLE LEONARD FROM ALTSHULER BERZON FOR PLAINTIFFS.

16              MS. LEYTON:  GOOD AFTERNOON, YOUR HONOR.

17        STACEY LEYTON, COUNSEL FOR PLAINTIFFS AS WELL.

18        AND I'M HERE WITH EILEEN GOLDSMITH, ROBIN THOLIN,

19        JAMES BALTZER, SCOTT KRONLAND, AND RUSHAB SANGHVI.

20              THE COURT:  WELCOME.

21              MR. HELLAND:  GOOD AFTERNOON, YOUR HONOR.

22        ASSISTANT UNITED STATES ATTORNEY KELSEY HELLEND FOR THE

23        DEFENSE.

24              THE COURT:  THANK YOU.  WELCOME.

25        OKAY.  WE'RE HERE ON A MOTION BY PLAINTIFFS FOR A TRO, AND
```

The timestamps in the left margin read: 01:31PM (lines 5–7, 8–11), 01:32PM (lines 12–25).

01:32PM  1    I'M READY TO HEAR ARGUMENT.  SO WE'LL START WITH THE MOVING

01:33PM  2    PARTY.

01:33PM  3              MS. LEONARD:  THANK YOU, YOUR HONOR.  GOOD

01:33PM  4    AFTERNOON.

01:33PM  5         THE PLAINTIFF COALITION OF LABOR CONSERVATION, VETERANS,

01:33PM  6    AND SMALL BUSINESS GROUPS IS HERE TODAY TO ASK THIS COURT TO

01:33PM  7    STOP THE UNLAWFUL TERMINATION OF FEDERAL EMPLOYEES ACROSS THIS

01:33PM  8    COUNTRY.

01:33PM  9         I'LL START WITH THE FACTUAL ISSUE THAT IS AT THE HEART OF

01:33PM  10   THIS CASE, AND THEN WE'LL HAPPILY DISCUSS ANY OF THE LEGAL

01:33PM  11   ISSUES THAT FLOW FROM THAT.

01:33PM  12        AND MY COLLEAGUE, STACEY LEYTON, WILL BE PREPARED IN

01:33PM  13   PARTICULAR TO DISCUSS ANY QUESTIONS REGARDING STANDING OR HARM.

01:33PM  14        FIRST AND FOREMOST, OPM GAVE THE ORDER TO TERMINATE

01:33PM  15   FEDERAL EMPLOYEES THAT IS AT ISSUE HERE.  "FIRE EVERYONE EXCEPT

01:33PM  16   FOR A LIMITED NUMBER OF PEOPLE WHO YOU ASK TO BE HELD BACK AS

01:33PM  17   MISSION CRITICAL."

01:33PM  18        THEN OPM APPROVED OR DISAPPROVED THOSE EXCEPTIONS AS WELL.

01:33PM  19        HOW DO WE KNOW THIS?

01:33PM  20        BECAUSE AGENCIES ACROSS THE FEDERAL GOVERNMENT HAVE SAID

01:33PM  21   SO.

01:34PM  22        TESTIMONY IN FRONT OF CONGRESS, STATEMENTS TO THEIR OWN

01:34PM  23   WORKERS:  OPM MADE US DO THIS, OPM DIRECTED THIS, OPM GAVE US

01:34PM  24   THE TEMPLATE THAT TOLD EMPLOYEES THAT THEY WERE BEING FIRED FOR

01:34PM  25   PERFORMANCE EVEN WHEN THEY WERE NOT.

(60 of 216), Page 60 of 216 Case: 25-1677, 03/18/2025, DktEntry: 16.2, Page 60 of 216
Case 3:25-cv-01780-WHA   Document 44   Filed 02/26/25   Page 5 of 74

5

01:34PM  1       AS AGAINST THIS MOUNTAIN OF EVIDENCE THAT OPM DIRECTED THE

01:34PM  2   ACTIONS AT ISSUE HERE, OPM HAS SUBMITTED A SINGLE DECLARATION,

01:34PM  3   YOUR HONOR, FROM ACTING DIRECTOR EZELL DENYING THAT OPM ORDERED

01:34PM  4   THESE TERMINATIONS.

01:34PM  5       BUT THE DOCUMENTS THEY ATTACH TO THAT DECLARATION PUT THE

01:34PM  6   TRUTH TO THE LIE, AND IT IS A LIE, YOUR HONOR.

01:34PM  7       THE FEBRUARY 14TH EMAIL IS AN ORDER TO AGENCIES THAT SAYS

01:34PM  8   WE NOW DEFINE PERFORMANCE AS ONLY THOSE MISSION CRITICAL

01:34PM  9   EMPLOYEES AND FIRE EVERYONE ELSE.  THAT IS WHAT THE ATTACHMENT

01:34PM 10   TO MR. EZELL'S DECLARATION TELLS THE AGENCIES TO DO.  AND

01:35PM 11   REPORT BACK AFTER YOU HAVE FIRED EVERYONE.

01:35PM 12       WE WILL PROVE IN THIS CASE THAT REMARKABLY, AND I DO NOT

01:35PM 13   SAY THIS LIGHTLY, YOUR HONOR, ACTING DIRECTOR EZELL IS NOT

01:35PM 14   TELLING THE TRUTH TO THIS COURT.

01:35PM 15       THE COURT:  I WANT TO MAKE SURE I'M FOCUSSING ON THE

01:35PM 16   RIGHT DOCUMENT.  THE ONE I HAVE HERE IS DATED JANUARY 20.

01:35PM 17       BUT YOU REFERRED TO AN EMAIL DATED FEBRUARY 14TH.

01:35PM 18       MS. LEONARD:  THAT IS CORRECT, YOUR HONOR.

01:35PM 19       THE COURT:  CAN I SEE THAT?  I THOUGHT IT WAS ALL

01:35PM 20   VERBAL.  SO I -- SHOW ME THE FEBRUARY 14TH ONE.  I DON'T HAVE

01:35PM 21   EVERYTHING UP HERE.  I JUST HAVE WHAT I -- DO YOU HAVE IT

01:35PM 22   HANDY?

01:35PM 23       MS. LEONARD:  I DO, AND WE CAN PASS UP A COPY OF IT.

01:35PM 24   IT IS -- THANK YOU.

01:36PM 25       THIS IS -- FOR THE RECORD, THIS IS AN EXHIBIT TO

(61 of 216), Page 61 of 216 Case: 25-1677, 03/18/2025, DktEntry: 16.2, Page 61 of 216
Case 3:25-cv-01780-WHA   Document 44   Filed 02/26/25   Page 6 of 74

6

| | | |
|---|---|---|
| 01:36PM | 1 | MR. EZELL'S DECLARATION.  IT WAS A FEBRUARY 14TH EMAIL. |
| 01:36PM | 2 | MR. HELLAND:  JUST TO CONFIRM, IS THIS AT DOCKET |
| 01:36PM | 3 | 37-1? |
| 01:36PM | 4 | MS. LEONARD:  YES. |
| 01:36PM | 5 | THE COURT:  WELL, WAIT A MINUTE.  I DO HAVE THIS |
| 01:36PM | 6 | ONE.  HANG ON A MINUTE.  WHY IS IT THAT I'M CONFUSED? |
| 01:36PM | 7 | MS. LEONARD:  SO THERE WAS FIRST A JANUARY 20TH |
| 01:36PM | 8 | COMMUNICATION. |
| 01:36PM | 9 | THE COURT:  YEAH. |
| 01:36PM | 10 | MS. LEONARD:  AND THEN WE CONTEND, AS IT WAS WIDELY |
| 01:36PM | 11 | REPORTED, ON FEBRUARY 13TH THERE WAS A TELEPHONE CALL WHERE |
| 01:36PM | 12 | THEY ORDERED AGENCIES TO FIRE, THAT THEY FOLLOWED UP WITH THIS. |
| 01:36PM | 13 | THE COURT:  ALL RIGHT.  I SEE THE -- I HAD IT AFTER |
| 01:36PM | 14 | ALL.  IT WAS PART OF THE JANUARY -- IT LOOKED LIKE IT WAS JUST |
| 01:36PM | 15 | PART OF THE JANUARY 20, BUT IT'S TWO DIFFERENT THINGS I GUESS. |
| 01:36PM | 16 | ALL RIGHT.  I'M NOW BACK ON TRACK.  SO GO BACK TO YOUR -- |
| 01:37PM | 17 | IT WOULD HELP ME TO HAVE A CHRONOLOGY HERE. |
| 01:37PM | 18 | SO THERE'S JANUARY 20 AND THEN YOU JUST REFERRED TO |
| 01:37PM | 19 | SOMETHING THAT I DIDN'T KNOW ABOUT, FEBRUARY 13TH. |
| 01:37PM | 20 | MS. LEONARD:  CORRECT.  SO ON JANUARY 20TH, WHAT |
| 01:37PM | 21 | THEY DID WAS ASK ALL THE AGENCIES TO IDENTIFY THE PROBATIONARY |
| 01:37PM | 22 | EMPLOYEES. |
| 01:37PM | 23 | AND THEN ON FEBRUARY 13TH -- I'M SORRY.  ON FEBRUARY 11TH, |
| 01:37PM | 24 | THE PRESIDENT ISSUED AN EXECUTIVE ORDER THAT TOLD AGENCIES TO |
| 01:37PM | 25 | START PLANNING FOR RIFS, BUT DIDN'T SAY ANYTHING ABOUT FIRING |

01:37PM  1    PROBATIONARY EMPLOYEES.

01:37PM  2         THEN ON FEBRUARY 13TH, YOUR HONOR, AS IS WIDELY REPORTED

01:37PM  3    IN THE PRESS, AND WE BELIEVE TO BE TRUE FROM STATEMENT MADE BY

01:37PM  4    AGENCIES AFTER THE FACT AS THEY TOLD THEIR EMPLOYEES, THERE WAS

01:37PM  5    A TELEPHONE CALL BETWEEN OPM AND THE AGENCIES.

01:37PM  6         THE COURT:  HOW MANY AGENCIES?

01:37PM  7         MS. LEONARD:  WE DO NOT KNOW BECAUSE IT WAS NOT

01:37PM  8    PUBLIC.

01:37PM  9         THE COURT:  LIKE 50?  OR ALL AGENCIES?

01:38PM  10        MS. LEONARD:  ALL, YOUR HONOR.

01:38PM  11        THE COURT:  WELL, THAT'S A LOT OF AGENCIES.  OKAY.

01:38PM  12   ALL RIGHT.  TELEPHONE CALL.  WHAT HAPPENED IN THAT CALL?

01:38PM  13        MS. LEONARD:  WE BELIEVE --

01:38PM  14        THE COURT:  WHAT DOES THE RECORD ACTUALLY SHOW

01:38PM  15   HAPPENED AS OPPOSED TO WHAT YOU'RE ARGUING?

01:38PM  16        MS. LEONARD:  WHAT AGENCIES HAVE SAID IS THAT OPM

01:38PM  17   ORDERED THE AGENCIES TO FIRE THEIR PROBATIONARY EMPLOYEES WITH

01:38PM  18   FEW EXCEPTIONS, YOUR HONOR.

01:38PM  19        THE COURT:  WITH TWO EXCEPTIONS?

01:38PM  20        MS. LEONARD:  WITH FEW EXCEPTIONS.

01:38PM  21        THE COURT:  ALL RIGHT.

01:38PM  22        MS. LEONARD:  AND THEN THEY FOLLOWED IT UP WITH THIS

01:38PM  23   COMMUNICATION TO AGENCIES ON FEBRUARY 14TH, WHICH SAYS WE HAVE

01:38PM  24   ASKED YOU -- WE HAVE ASKED THAT YOU SEPARATE PROBATIONARY

01:38PM  25   EMPLOYEES THAT YOU HAVE NOT IDENTIFIED AS MISSION CRITICAL BY

01:38PM 1   NO LATER THAN THE DAY ON MONDAY, FEBRUARY 17TH.  PRESIDENT'S

01:38PM 2   DAY, YOUR HONOR.

01:38PM 3         WE HAVE ATTACHED A TEMPLATE LETTER.

01:38PM 4         WE HAVE ASKED YOU TO SEPARATE YOUR EMPLOYEES.

01:38PM 5         SO ACTING DIRECTOR EZELL HAS TOLD THIS COURT, WE DIDN'T

01:38PM 6   ORDER ANY TERMINATIONS.  AND THE DOCUMENT THAT OPM SENT TO THE

01:38PM 7   AGENCIES ADMITS THAT THEY ORDERED THE TERMINATIONS, YOUR HONOR.

01:39PM 8              THE COURT:  WELL, SHOW ME WHICH ONE DOES THAT?  THE

01:39PM 9   FEBRUARY 14TH?

01:39PM 10             MS. LEONARD:  CORRECT.

01:39PM 11             THE COURT:  ALL RIGHT.  READ TO ME THE PARAGRAPH

01:39PM 12  THAT DOES THAT.

01:39PM 13             MS. LEONARD:  "WE HAVE ASKED THAT YOU SEPARATE

01:39PM 14  PROBATIONARY EMPLOYEES THAT YOU HAVE NOT IDENTIFIED AS MISSION

01:39PM 15  CRITICAL NO LATER THAN THE END OF THE DAY MONDAY,

01:39PM 16  FEBRUARY 17TH.  WE HAVE ATTACHED A TEMPLATE LETTER."

01:39PM 17        AND THAT TEMPLATE LETTER, YOUR HONOR, WHICH THE GOVERNMENT

01:39PM 18  DID NOT GIVE TO YOU, BUT WE HAVE.  WE HAVE GIVEN YOU THE

01:39PM 19  TEMPLATE LETTER.  IT IS ATTACHED TO A DOD COMMUNICATION THAT WE

01:39PM 20  HAVE IN WHICH THEY SAID THIS IS THE LETTER THAT WE GOT FROM

01:39PM 21  OPM, THE DEPARTMENT OF DEFENSE.

01:39PM 22        THE TEMPLATE LETTER SAYS, "YOU ARE FIRED FOR YOUR

01:39PM 23  PERFORMANCE."

01:39PM 24        OPM DIRECTED THESE TERMINATIONS, YOUR HONOR, AND OPM

01:39PM 25  ORDERED THE AGENCIES TO USE THIS LETTER IN WHICH THEY FIRED

| 01:39PM | 1 | PEOPLE FOR THEIR PERFORMANCE WHEN THEY KNEW THAT WAS NOT TRUE. |
| 01:39PM | 2 | THAT IS THE FACTUAL ISSUE AT THE HEART OF THE CASE, DID |
| 01:40PM | 3 | THEY DO THAT? |
| 01:40PM | 4 | WE BELIEVE THERE'S A MOUNTAIN OF EVIDENCE THAT HAS |
| 01:40PM | 5 | ESTABLISHED THAT THEY DID.  THE AGENCIES ARE SAYING THIS. |
| 01:40PM | 6 | SOMEONE TESTIFIED FROM THE VA TO CONGRESS JUST A FEW DAYS AGO |
| 01:40PM | 7 | THAT OPM DIRECTED US TO DO IT. |
| 01:40PM | 8 | THE I.R.S. HAS TOLD ALL OF ITS EMPLOYEES, OPM MADE US DO |
| 01:40PM | 9 | THIS. |
| 01:40PM | 10 | THE NATIONAL SCIENCE FOUNDATION TOLD ITS PROBATIONARY |
| 01:40PM | 11 | EMPLOYEES TUESDAY MORNING, 9:00 A.M., THEY CALLED A 10:00 A.M. |
| 01:40PM | 12 | MEETING, THE DAY AFTER PRESIDENT'S DAY, TO FIRE EVERYONE AND |
| 01:40PM | 13 | THEY SAID WE TRIED TO SAVE YOU, WE ADVOCATED FOR YOU, AND THEY |
| 01:40PM | 14 | TOLD US FIRE THEM ALL. |
| 01:40PM | 15 | THIS IS COMING FROM AGENCY AFTER AGENCY AFTER AGENCY, |
| 01:40PM | 16 | YOUR HONOR.  WE HAVE GIVEN YOU ALL OF THE STATEMENTS THAT WE |
| 01:40PM | 17 | HAVE, AND THEY HAVE GIVEN YOU IN RESPONSE A SINGLE DECLARATION |
| 01:40PM | 18 | FROM ACTING DIRECTOR EZELL IN WHICH THEY JUST BALDLY DENY IT. |
| 01:40PM | 19 | THERE IS NOT A SINGLE DECLARATION, YOUR HONOR, FROM ANY |
| 01:40PM | 20 | AGENCY OF THE FEDERAL GOVERNMENT, THE AGENCIES THEY NOW CLAIM, |
| 01:40PM | 21 | FALSELY, THAT MADE THESE DECISIONS INDEPENDENTLY, |
| 01:41PM | 22 | SPONTANEOUSLY, ALL AT EXACTLY THE SAME TIME, TO FIRE ALL OF |
| 01:41PM | 23 | THEIR PROBATIONARY EMPLOYEES. |
| 01:41PM | 24 | IT IS SIMPLY NOT CREDIBLE, YOUR HONOR. |
| 01:41PM | 25 | SO PLAINTIFFS ARE INCREDIBLY LIKELY TO SHOW AND PROVE IN |

(65 of 216), Page 65 of 216 Case: 25-1677, 03/18/2025, DktEntry: 16.2, Page 65 of 216
Case 3:25-cv-01780-WHA    Document 44    Filed 02/28/25    Page 10 of 74

10

01:41PM  1        THIS CASE THAT OPM DID THIS.

01:41PM  2             AND IF THAT IS TRUE, IF THAT IS TRUE, YOUR HONOR, IT IS

01:41PM  3        INCREDIBLY UNLAWFUL.  IT IS UNLAWFUL IN AT LEAST SIX DIFFERENT

01:41PM  4        WAYS.

01:41PM  5             SO IF WE START FROM THAT POINT, THAT FACTUAL ISSUE, IF WE

01:41PM  6        ARE ABLE TO PROVE THAT, AND WE BELIEVE EVEN JUST ON THIS TRO WE

01:41PM  7        HAVE SHOWN THE COURT THAT THAT IS WHAT HAPPENED, AND BY THE

01:41PM  8        TIME WE GET FURTHER IN THIS CASE, WE WILL CERTAINLY HAVE MORE

01:41PM  9        EVIDENCE, AND WE WILL GO OUT AND GET IT IF YOUR HONOR ALLOWS US

01:41PM  10       TO.

01:41PM  11            IF WE START FROM THAT FACTUAL DETERMINATION, OPM HAS NO

01:41PM  12       LEGAL AUTHORITY TO ORDER THE TERMINATION OF ANY EMPLOYEE AT A

01:42PM  13       FEDERAL AGENCY, LET ALONE ALL OF THE PROBATIONARY EMPLOYEES

01:42PM  14       NATIONWIDE.

01:42PM  15            THE COURT:  DOES THE GOVERNMENT OR THE DEFENDANT, I

01:42PM  16       GUESS, OPM, DOESN'T COUNSEL FOR OPM AGREE WITH YOU ON THAT

01:42PM  17       POINT, THAT OPM DOES NOT HAVE THE AUTHORITY TO FIRE AND HIRE?

01:42PM  18            MS. LEONARD:  I WOULD -- I'M SORRY.

01:42PM  19            THE COURT:  I THINK THEY AGREE WITH THAT.

01:42PM  20       BUT WHAT DO THEY ARGUE THAT THEY DID INSTEAD?

01:42PM  21            MS. LEONARD:  SO I AGREE THAT THEY HAVE CONCEDED

01:42PM  22       BECAUSE THEY HAVE NOT TRIED TO DEFEND OPM'S -- THEY SIMPLY

01:42PM  23       ARGUE THE FACTUAL POINT AND SAY WE DIDN'T DO IT, RELYING ONLY

01:42PM  24       ON THE SINGLE LINE IN DIRECTOR EZELL'S DECLARATION.

01:42PM  25            AND THEN THEY SAY WE JUST GAVE GUIDANCE, ALL WE DID WAS

01:42PM  1    GIVE GUIDANCE TO THE AGENCIES, AND THEY MADE THEIR OWN

01:42PM  2    INDEPENDENT DECISIONS.  ALL OF THE FACTS, THE TIMING -- IF THIS

01:42PM  3    WERE A TRIAL ON THIS ISSUE, YOUR HONOR, WE WOULD WIN TOMORROW.

01:42PM  4    THERE IS NO WAY THAT THE AGENCIES INDEPENDENTLY MADE THESE

01:43PM  5    DECISIONS IN THE TIMEFRAME AND ACCORDING TO THE LAW THAT THEY

01:43PM  6    HAVE TO FOLLOW.

01:43PM  7         BUT IF -- SO WE AGREE THAT THEY HAVE CONCEDED THAT OPM

01:43PM  8    DOESN'T HAVE THE LEGAL AUTHORITY.

01:43PM  9         WHAT THEY'VE TRIED TO SAY IS THAT IT WAS LAWFUL FOR THE

01:43PM  10   AGENCIES TO DO THIS BECAUSE THE GOVERNMENT'S POSITION FOR THE

01:43PM  11   FIRST TIME IN HISTORY OF THE UNITED STATES IS THAT THESE

01:43PM  12   EMPLOYEES CAN BE FIRED AT WILL.

01:43PM  13        THAT IS NOT THE LAW, YOUR HONOR.  PROBATIONARY EMPLOYEES

01:43PM  14   AND AGENCIES DO HAVE OBLIGATIONS BEFORE FIRING PROBATIONARY

01:43PM  15   EMPLOYEES.  WE'VE SET IT FORTH IN OUR BRIEFING.

01:43PM  16        AND MOREOVER, IF THEY ARE GOING TO ENGAGE IN A RIF, THERE

01:43PM  17   ARE STATUTORY OBLIGATIONS FOR THAT AND THAT THEY HAVE NOT

01:43PM  18   COMPLIED WITH;

01:43PM  19        AND THEY CERTAINLY THEY CERTAINLY CANNOT FIRE PEOPLE BASED

01:43PM  20   ON A LIE CLAIMING PERFORMANCE WAS THE REASON WHEN IT IS NOT.

01:43PM  21   THERE IS NO TIME -- WE HAVE A DECLARATION FROM THE FORMER OPM

01:44PM  22   DIRECTOR TO SAY THIS IS NOT LAWFUL AND THERE IS NO WAY, IT IS

01:44PM  23   NOT POSSIBLE FOR THE AGENCIES TO HAVE CONDUCTED THE TYPE OF

01:44PM  24   PERFORMANCE EVALUATIONS THAT THEY WOULD HAVE TO CONDUCT TO MAKE

01:44PM  25   THOSE LETTERS TRUE.

01:44PM  1          THOSE LETTERS ARE NOT TRUE.

01:44PM  2          SO WHAT OPM HAS ENGAGED IN HERE IS A WHOLESALE FRAUD ON

01:44PM  3   THE FEDERAL WORK FORCE TO TERMINATE THEM ALL ON THE PRETEXT OF

01:44PM  4   PERFORMANCE WHEN IT'S NOT TRUE.  THAT VIOLATES AT LEAST THE

01:44PM  5   STATUTES THAT GOVERN --

01:44PM  6              THE COURT:  COULD YOU SHOW ME THAT TEMPLATE LETTER.

01:44PM  7              MS. LEONARD:  YES.  THAT IS --

01:44PM  8              THE COURT:  I'VE SEEN SOME OF THESE.  I'VE TRIED TO

01:44PM  9   COME UP TO SPEED ON YOUR CASE.

01:44PM 10          SOME OF THEM DON'T SAY PERFORMANCE.

01:44PM 11              MS. LEONARD:  THE TEMPLATE THAT OPM PROVIDED,

01:44PM 12   YOUR HONOR -- SOME OF THEM -- THAT IS RIGHT THAT SOME OF THEM

01:44PM 13   SAY YOU'RE JUST BEING FIRED.

01:44PM 14          THE TEMPLATE --

01:45PM 15              THE COURT:  THAT'S RIGHT, SOME SAY YOU'RE FIRED AND

01:45PM 16   SOME SAY -- I DON'T KNOW, I'M TRYING TO FIND OUT HOW MANY

01:45PM 17   ACTUALLY DID SAY PERFORMANCE.

01:45PM 18              MS. LEONARD:  SO THE TEMPLATE FROM OPM IS ATTACHED

01:45PM 19   TO THE SCHWARZ REPLY DECLARATION.  IT'S EXHIBIT C, AND I CAN

01:45PM 20   GET YOU A COPY.

01:45PM 21              THE COURT:  OKAY.  GIVE ME A COPY, BUT I WOULD LIKE

01:45PM 22   YOU TO READ INTO THE RECORD FOR THE BENEFIT OF THE PUBLIC THE

01:45PM 23   KEY LANGUAGE.

01:45PM 24              MS. LEONARD:  I'M BEING CORRECTED.  IT'S EXHIBIT D.

01:45PM 25          DO YOU GUYS HAVE A COPY?

**App.065**

| | | |
|---|---|---|
| 01:45PM | 1 | LET ME GET YOU MY COPY, YOUR HONOR. |
| 01:45PM | 2 | (PAUSE IN PROCEEDINGS.) |
| 01:46PM | 3 | MS. LEONARD:  IT IS EXHIBIT D.  IT IS AN TEMPLATE |
| 01:46PM | 4 | THAT DOES NOT HAVE THE AGENCY NAME.  IT'S MEMORANDUM FOR |
| 01:46PM | 5 | BRACKET, EMPLOYEE, BRACKET, TITLE, BRACKET, ORGANIZATION, AT, |
| 01:46PM | 6 | BRACKET, AGENCY. |
| 01:46PM | 7 | AND THE LANGUAGE IN THIS TEMPLATE SAYS, "BASED ON THE OPM |
| 01:46PM | 8 | GUIDANCE REFERENCED ABOVE, THE AGENCY FINDS BASED ON YOUR |
| 01:46PM | 9 | PERFORMANCE THAT YOU HAVE NOT DEMONSTRATED THAT YOUR FURTHER |
| 01:46PM | 10 | EMPLOYMENT AT THE AGENCY WOULD BE IN THE PUBLIC INTEREST." |
| 01:46PM | 11 | THIS IS THE DOCUMENT THAT OPM GAVE TO EVERY AGENCY AND |
| 01:46PM | 12 | REQUIRED -- AND ORDERED THEM TO USE.  THAT ACTION BY OPM WAS |
| 01:46PM | 13 | NOT AUTHORIZED BY ANY STATUTE, EXCEEDS THEIR STATUTORY |
| 01:46PM | 14 | AUTHORITY, INTRUDES ON THE STATUTORY AUTHORITY OF EVERY AGENCY, |
| 01:46PM | 15 | AND IS ARBITRARY AND CAPRICIOUS IN VIOLATION OF THE APA, JUST |
| 01:46PM | 16 | TO NAME A FEW OF THE LAWS THAT THIS VIOLATES, YOUR HONOR. |
| 01:47PM | 17 | I COUNT SIX WAYS THAT OPM HAS VIOLATED THE LAW HERE. |
| 01:47PM | 18 | SO FIRST, OPM IS AUTHORIZING STATUTES, THE STATUTES THAT |
| 01:47PM | 19 | GIVE EMPLOYMENT AUTHORIZATION ONLY BY CONGRESS TO THE AGENCIES. |
| 01:47PM | 20 | THERE ARE HUNDREDS OF THOSE STATUTES, YOUR HONOR. |
| 01:47PM | 21 | THEN THERE'S THE CSRA PROTECTIONS FOR THE PROBATIONARY |
| 01:47PM | 22 | EMPLOYEES. |
| 01:47PM | 23 | THE COURT:  THAT MEANS WHAT, CIVIL SERVICE? |
| 01:47PM | 24 | MS. LEONARD:  THE CIVIL SERVICE REFORM ACT OF 1978, |
| 01:47PM | 25 | CORRECT. |

01:47PM  1          THE RIF STATUTE, WHICH IS PART OF THE CSRA, THE REDUCTION

01:47PM  2    IN FORCE.  IF THEY'RE GOING TO REDUCE THE SIZE OF THE FEDERAL

01:47PM  3    GOVERNMENT FOR REASONS THAT RELATE TO -- THAT ARE UNRELATED TO

01:47PM  4    PERFORMANCE, YOU NEED TO USE A RIF.

01:47PM  5          THE APA, ARBITRARY AND CAPRICIOUS.  THE APA REQUIREMENTS

01:47PM  6    FOR RULE MAKING.  THIS ACTION BY OPM IS A RULE.  IN FACT, THE

01:47PM  7    FEBRUARY 14TH -- THEY DON'T DENY IT.  THE GOVERNMENT DOESN'T

01:48PM  8    DENY IT.  THEY DON'T ARGUE OTHERWISE.  THIS IS A RULE.  IT

01:48PM  9    CHANGES RIGHTS AND OBLIGATIONS.

01:48PM 10          AND THE FEBRUARY 14TH EMAIL THAT WE POINTED YOU TO, IT

01:48PM 11    SAYS WE ARE REDEFINING PERFORMANCE.

01:48PM 12          WELL, THAT IS DEFINED IN THE REGULATIONS FOR PROBATIONARY

01:48PM 13    EMPLOYEES, AND IF YOU ARE GOING TO CHANGE LEGISLATIVELY ENACTED

01:48PM 14    ACT NOTICE AND COMMENT RULES, THAT'S A RULE UNDER THE APA.

01:48PM 15    THIS IS BLACK LETTER ADMINISTRATIVE LAW.

01:48PM 16          THEY HAD AT THE VERY LEAST HAD TO GO THROUGH NOTICE AND

01:48PM 17    COMMENT.  THEY DIDN'T DO THAT.

01:48PM 18          SO THAT'S SIX WAYS THAT THIS IS UNLAWFUL.

01:48PM 19          AND IF YOUR HONOR THINKS THAT THIS WHOLESALE ABDICATION

01:48PM 20    AND IGNORING OF THE STATUTES THAT CONGRESS HAS PASSED BY THE

01:48PM 21    ADMINISTRATION RISES TO THE CONSTITUTIONAL SEPARATION OF POWERS

01:48PM 22    PROBLEM, IF IT'S SO FAR OUTSIDE THE BOUNDS OF OPM'S STATUTORY

01:48PM 23    AUTHORITY, WHICH WE MAINTAIN THAT IT IS, THAT IS SEVEN,

01:48PM 24    YOUR HONOR.

01:48PM 25                  THE COURT:  THAT'S WHAT?

01:48PM  1          MS. LEONARD:  SEVEN WAYS THAT THEY HAVE VIOLATED THE

01:48PM  2     LAW.

01:48PM  3          SO THIS IS VERY UNLAWFUL.

01:49PM  4          AND THE QUESTION REALLY IS, YOUR HONOR, WELL, WHAT IS TO

01:49PM  5     BE DONE?

01:49PM  6          THE COURT:  WELL, WAIT.  OKAY.  I DON'T WANT TO GET

01:49PM  7     INTO THE NEXT THING.  THERE ARE TOO MANY POINTS.

01:49PM  8          SO LET'S HEAR WHAT THE GOVERNMENT SAYS ON WHAT THEY

01:49PM  9     ALLEGEDLY DID WRONG.

01:49PM  10         SO WE'LL HEAR FROM OPM NEXT, AND THEN WE'LL PICK IT UP AT

01:49PM  11    THAT POINT LATER ON.

01:49PM  12         ALL RIGHT.  LET'S GIVE OPM A CHANCE.

01:49PM  13         MR. HELLAND:  THANK YOU, YOUR HONOR.

01:49PM  14         RESPECTFULLY, I THINK PLAINTIFFS ARE CONFLATING A REQUEST

01:49PM  15    BY OPM WITH AN ORDER BY OPM, AND, UNFORTUNATELY, THAT MAKES A

01:49PM  16    WORLD OF DIFFERENCE IN THIS CASE.

01:49PM  17         I DO WANT TO PUT A PIN IN SOME LEGAL ISSUES.  I THINK

01:49PM  18    WE'LL COME BACK TO THEM LATER, BUT THEY'RE IMPORTANT QUESTIONS

01:49PM  19    ABOUT THIS COURT'S JURISDICTION TO EVEN RESOLVE THE DISPUTE

01:49PM  20    PRESENTED HERE.

01:49PM  21         THE COURT:  WE'RE GOING TO COME TO THAT.

01:49PM  22         MR. HELLAND:  I KNOW WE'LL COME TO THAT.

01:49PM  23         THE COURT:  ALL RIGHT.  I WANT TO STICK WITH THE

01:49PM  24    MERITS NOW.

01:49PM  25         MR. HELLAND:  YES.

01:49PM  1          THE COURT:  SO YOU'RE SLIDING OFF ONTO SOMETHING

01:49PM  2   ELSE WHERE YOU DON'T WANT TO TALK ABOUT WHAT SHE JUST SAID.

01:49PM  3       I WANT YOU TO TALK ABOUT HER POINT.

01:49PM  4          MR. HELLAND:  ABSOLUTELY, YOUR HONOR.

01:50PM  5          THE COURT:  AND I'LL GIVE YOU A CHANCE LATER FOR

01:50PM  6   JURISDICTION.

01:50PM  7          MR. HELLAND:  ABSOLUTELY.  THANK YOU.

01:50PM  8       AS A FACTUAL MATTER, I AGREE THAT THE FACTUAL DISPUTE IS

01:50PM  9   VERY IMPORTANT IN THIS CASE, AND, RESPECTFULLY, I DON'T THINK

01:50PM  10  THAT THE RECORD SHOWS WHAT PLAINTIFFS ARE CLAIMING THAT IT

01:50PM  11  SHOWS.

01:50PM  12      THE DECLARATION FROM ACTING DIRECTOR EZELL SHOWS THAT HE

01:50PM  13  ASKED AGENCIES TO UNDERTAKE A REVIEW OF THEIR PROBATIONARY

01:50PM  14  EMPLOYEES.

01:50PM  15      THE EMAIL THAT IS SUPPOSEDLY THE SMOKING GUN THAT YOU WERE

01:50PM  16  JUST READ SHOWS THAT OPM ASKED AGENCIES TO PERFORM CERTAIN

01:50PM  17  ACTIONS.

01:50PM  18      AN ORDER IS NOT USUALLY PHRASED AS A REQUEST.  ASKING IS

01:50PM  19  NOT ORDERING TO DO SOMETHING.

01:50PM  20      AGAIN, THAT IS THE HOUSE OF CARDS UPON WHICH THE

01:50PM  21  PLAINTIFFS' CLAIM IS BUILT, RIGHT?

01:50PM  22      IF OPM MERELY ASKED AGENCIES TO TAKE THEIR OWN ACTION,

01:50PM  23  THEN I THINK ALL OF PLAINTIFFS' CLAIMS, THEY FAIL.  THERE'S --

01:50PM  24  THEIR THEORY DEPENDS ON YOU CONSTRUING THIS REQUEST AS AN

01:51PM  25  ORDER.

01:51PM  1         I DON'T THINK ALSO THAT THE CONGRESSIONAL TESTIMONY OR THE

01:51PM  2    OTHER FORMS OF EVIDENCE THAT PLAINTIFFS HAVE SUBMITTED SHOWS

01:51PM  3    THAT IT WAS AN ORDER INSTEAD OF A REQUEST.

01:51PM  4         YOU HAVE OFFICIALS FROM THE AGENCIES SAYING THAT THEY WERE

01:51PM  5    ASKED BY OPM TO DO SOMETHING.  I THINK IF YOU LOOK AT THE VA

01:51PM  6    CONGRESSIONAL TESTIMONY THAT PLAINTIFFS HAVE REFERRED TO, EVEN

01:51PM  7    THERE IT WAS FRAMED AS WE WERE ASKED TO DO SOMETHING.

01:51PM  8         THE COURT:  WELL, I HAVE A SUMMARY OF THAT.  LET'S

01:51PM  9    GO THROUGH THEM.

01:51PM  10        NSF:  "WE WERE DIRECTED BY OPM LAST FRIDAY TO TERMINATE

01:51PM  11   ALL PROBATIONERS EXCEPT FOR A MINIMAL NUMBER OF MISSION

01:51PM  12   CRITICAL PROBATIONERS."  SO "DIRECTED" IS THE WORD THAT THEY

01:51PM  13   USE.

01:51PM  14        FURTHER DOWN, "THEY TOLD US THAT THEY DIRECTED US TO

01:51PM  15   REMOVE PROBATIONERS.  THERE WAS NO LIMITED DISCRETION.  THIS IS

01:51PM  16   NOT A DECISION THAT THE AGENCY MADE.  THIS IS A DIRECTION THAT

01:52PM  17   WE RECEIVED."

01:52PM  18        NOW, THAT'S FROM THE NSF.

01:52PM  19        DOD, DEPARTMENT OF DEFENSE.  THIS WAS, QUOTE, "IN

01:52PM  20   ACCORDANCE WITH DIRECTION FROM OPM ALL DOD COMPONENTS MUST

01:52PM  21   TERMINATE THE EMPLOYMENT OF ALL INDIVIDUALS WHO ARE CURRENTLY

01:52PM  22   SERVING A PROBATIONARY OR TRIAL PERIOD."

01:52PM  23        THEN THE VA.  THIS WAS PART OF THE CONGRESSIONAL TESTIMONY

01:52PM  24   JUST RECENTLY.  ONE OF THE CONGRESS PEOPLE SAY, "SO, NOBODY

01:52PM  25   ORDERED YOU TO CARRY OUT THESE TERMINATIONS?  YOU DID IT ON

01:52PM 1    YOUR OWN?

01:52PM 2         "WITNESS:  THERE WAS DIRECTION FROM THE OFFICE OF

01:52PM 3    PERSONNEL MANAGEMENT."

01:52PM 4         I.R.S. IN A TOWN HALL CHIEF HUMAN CAPITAL OFFICER STATED,

01:53PM 5    "I'VE NEVER SEEN THIS HAPPEN BEFORE.  I'M NOT SURE WHY IT'S

01:53PM 6    HAPPENING.  REGARDING THE REMOVAL OF THE PROBATIONARY

01:53PM 7    EMPLOYEES, AGAIN, THAT WAS SOMETHING THAT WAS DIRECTED FROM

01:53PM 8    OPM.  AND EVEN THE LETTERS THAT YOUR COLLEAGUES RECEIVED

01:53PM 9    YESTERDAY WERE LETTERS THAT WERE WRITTEN BY OPM PUT FORTH

01:53PM 10   THROUGH TREASURY AND GIVEN TO US."

01:53PM 11        AND THEN FINALLY, DEPARTMENT OF ENERGY.  "PER OPM

01:53PM 12   INSTRUCTIONS, DOE FINDS THAT YOUR FURTHER EMPLOYMENT WOULD NOT

01:53PM 13   BE IN THE PUBLIC INTEREST.  FOR THIS REASON, YOU'RE BEING

01:53PM 14   REMOVED FROM YOUR POSITION," ET CETERA, ET CETERA, "EFFECTIVE

01:53PM 15   TODAY."

01:53PM 16        NOW, HOW DO YOU -- WHAT DO YOU SAY TO THAT?  THAT SOUNDS

01:53PM 17   LIKE A DIRECT ORDER.

01:53PM 18             MR. HELLAND:  OH, I DISAGREE, YOUR HONOR.  I THINK

01:53PM 19   THERE ARE MAYBE TWO BUCKETS HERE.  THERE'S A BUCKET OF

01:53PM 20   STATEMENTS WHERE OFFICIALS ARE SAYING THAT THEY ACTED IN

01:53PM 21   ACCORDANCE WITH DIRECTION OR DIRECTIVE FROM OPM.  THAT'S NOT

01:53PM 22   INCONSISTENT WITH OPM HAVING ISSUED A REQUEST OR EVEN GUIDANCE

01:54PM 23   FOLLOWING THAT REQUEST.

01:54PM 24        ACTING IN ACCORDANCE WITH A REQUEST IS STILL MERELY -- IT

01:54PM 25   DOESN'T CHANGE THE FACT THAT WHAT ORIGINATED WAS A REQUEST.

01:54PM  1          THE OTHER BUCKET IS STATEMENTS FROM PEOPLE WHO WE DON'T

01:54PM  2     KNOW IF THEY WERE IN THE PHONE CALL OR WE DON'T KNOW WHO TOLD

01:54PM  3     THEM WHAT THEY HEARD CHARACTERIZING THIS AS --

01:54PM  4          THE COURT:  WE CAN HAVE A GOOD EVIDENTIARY HEARING

01:54PM  5     AND BRING YOUR GUY HERE, AND WE'LL BRING THESE OTHER PEOPLE

01:54PM  6     HERE, AND I'D LIKE TO HAVE A LITTLE TRIAL ON THIS.  IT WILL

01:54PM  7     TAKE A COUPLE OF DAYS.  WE CAN DO IT.  AND WE'LL GET TO THE

01:54PM  8     BOTTOM OF WHAT YOUR GUY SAID AND WHAT THESE PEOPLE HEARD ON THE

01:54PM  9     PHONE AND THAT -- BUT RIGHT NOW WE'RE DEALING WITH THE RECORD

01:54PM  10    THAT WE GOT.

01:54PM  11         MR. HELLAND:  EXACTLY, YOUR HONOR.

01:54PM  12    AND AT A TRO LEVEL, WE DON'T THINK THE RECORD THEY PUT

01:54PM  13    FORWARD QUALIFIES.  IT DOESN'T GET THEM OVER THE HUMP.  AGAIN,

01:54PM  14    IT'S A HIGH BURDEN ON A TRO.

01:54PM  15         THE GOVERNMENT'S CONFIDENT THAT IF WE DID PROCEED TO HAVE

01:54PM  16    AN EVIDENTIARY HEARING, A MINI TRIAL, IF THE COURT WERE TO LOOK

01:55PM  17    INTO THE UNDERLYING EVIDENCE, THE GOVERNMENT IS CONFIDENT IN

01:55PM  18    ITS POSITION ON WHAT HAPPENED.

01:55PM  19         THE COURT:  BUT THINK ABOUT THIS, THOUGH.  WE HAVE

01:55PM  20    ALL OF THESE AGENCIES -- I THINK EVEN YOU CONCEDE THAT THE

01:55PM  21    AGENCIES HAVE THE STATUTORY AUTHORITY TO HIRE AND FIRE, RIGHT?

01:55PM  22         MR. HELLAND:  YES.

01:55PM  23         THE COURT:  OKAY.  AND OPM CANNOT DO IT FOR THEM AND

01:55PM  24    CANNOT ORDER THEM TO DO IT, RIGHT?

01:55PM  25         MR. HELLAND:  YES.

01:55PM 1          THE COURT:  SO HERE WE HAVE A SITUATION WHERE

01:55PM 2   SUDDENLY SOMETHING ABERRATIONAL HAPPENS NOT JUST IN ONE AGENCY

01:55PM 3   BUT ALL ACROSS THE GOVERNMENT, IN MANY AGENCIES, ON THE SAME

01:55PM 4   DAY, THE SAME THING.

01:55PM 5          DOESN'T THAT SOUND LIKE TO YOU THAT SOMEBODY ORDERED IT TO

01:55PM 6   HAPPEN AS OPPOSED TO, OH, WE JUST GOT GUIDANCE?

01:55PM 7          OH, JUST GOT GUIDANCE?

01:55PM 8          IT'S ALL OF THOSE THINGS HAPPENING AT ONCE THAT TENDS TO

01:56PM 9   CORROBORATE WHAT THE PLAINTIFFS ARE SAYING.

01:56PM 10          MR. HELLAND:  RESPECTFULLY, I DISAGREE, YOUR HONOR.

01:56PM 11  WE DON'T DENY THAT THE ACTING DIRECTOR OF OPM ISSUED THIS

01:56PM 12  GUIDANCE TO ALL OF THESE AGENCIES.

01:56PM 13          PLAINTIFFS HAVE PUT FORWARD A STRAW MAN WHERE WE'RE TRYING

01:56PM 14  TO SAY THAT OPM HAD NO ROLE IN WHAT HAPPENED.

01:56PM 15          OPM CERTAINLY HAD A ROLE.  IT ISSUED A REQUEST.

01:56PM 16          SO THE FACT THAT ALL OF THESE STARTED HAPPENING QUICKLY,

01:56PM 17  ONE AFTER THE OTHER, IT IS MERELY EVIDENCE THAT OPM DID, IN

01:56PM 18  FACT, ISSUE THE REQUEST THAT WE SAY THAT IT DID.

01:56PM 19          BUT THAT DOESN'T MEAN THAT IT'S AN ORDER, RIGHT?  IT WOULD

01:56PM 20  BE STRANGE -- I'LL POINT OUT, SOME AGENCIES DID NOT, IN FACT,

01:56PM 21  TERMINATE ANY PROBATIONARY EMPLOYEES.  AGENCIES FELT WILLING TO

01:56PM 22  DISREGARD THE REQUEST:  THE DEPARTMENT OF JUSTICE, THE EEOC, A

01:56PM 23  NUCLEAR REGULATORY AGENCY, ALL OF THEM DID NOT TERMINATE

01:56PM 24  PROBATIONARY EMPLOYEES UNDER THIS, NOR WERE THERE ANY SORT OF

01:56PM 25  THREATENED PUNISHMENTS OR CONSEQUENCES IF AGENCIES DID NOT

(76 of 216), Page 76 of 216 Case: 25-1677, 03/18/2025, DktEntry: 16.2, Page 76 of 216
Case 3:25-cv-01780-WHA    Document 44    Filed 02/28/25    Page 21 of 74

21

01:56PM  1    FOLLOW THROUGH ON THE REQUEST THAT WAS MADE OF THEM BY OPM.

01:57PM  2         THE COURT:  WELL, THE HEAD OF THE AGENCY COULD BE

01:57PM  3    REPLACED IF THEY DIDN'T.  ISN'T THAT THE UNDERLYING?

01:57PM  4         MR. HELLAND:  BUT THERE'S NO EVIDENCE THAT THAT WAS

01:57PM  5    THREATENED FOR ANY HEADS OF AGENCIES.

01:57PM  6         THE COURT:  NOT YET, NOT YET.  BUT A LOT OF PEOPLE

01:57PM  7    HAVE BEEN TERMINATED QUICKLY IN THE -- RECENTLY, AND SO IT'S

01:57PM  8    PRETTY EASY TO TERMINATE AN AGENCY HEAD, AT LEAST THOSE SUBJECT

01:57PM  9    TO THE SERVICE CONSIDERATION OF THE PRESIDENT.

01:57PM 10         MR. HELLAND:  IF I MAY, YOUR HONOR, IF PLAINTIFFS

01:57PM 11    WANT TO PUT FORWARD EVIDENCE AT THE PRELIMINARY INJUNCTION

01:57PM 12    STAGE SAYING THAT, IN FACT, THE HEADS OF THESE AGENCIES WERE

01:57PM 13    THREATENED WITH TERMINATION THEMSELVES, THEY ARE FREE TO TRY TO

01:57PM 14    MARSHAL THAT EVIDENCE.  I DON'T THINK IT EXISTS, AND THEY

01:57PM 15    HAVEN'T PUT IT FORWARD AT THE TRO STAGE, WHICH IS WHERE WE ARE

01:57PM 16    NOW, OF COURSE.

01:57PM 17         THE COURT:  WELL, HOW COULD IT BE THAT THEY ALL

01:57PM 18    THOUGHT THAT THEY WERE DIRECTED TO DO THIS BY OPM?

01:57PM 19         MR. HELLAND:  WELL, THAT GETS ME TO THE OTHER POINT,

01:57PM 20    YOUR HONOR.  WE DON'T KNOW THAT THE ACTUAL HEADS OF THESE

01:57PM 21    AGENCIES DID THINK THAT THEY WERE DIRECTED.

01:57PM 22         WE HAVE STATEMENTS FROM HUMAN RESOURCES OFFICERS OR LOWER

01:58PM 23    LEVEL STAFF AT SOME OF THESE AGENCIES, WHICH FOR ALL WE KNOW

01:58PM 24    ARE MERELY CHARACTERIZING HOW SOMEONE ELSE TOLD THEM WHAT

01:58PM 25    HAPPENED.

(77 of 216), Page 77 of 216 Case: 25-1677, 03/18/2025, DktEntry: 16.2, Page 77 of 216
Case 3:25-cv-01780-WHA    Document 44    Filed 02/28/25    Page 22 of 74

22

01:58PM 1        WE DON'T KNOW THAT THEY HAVE FIRSTHAND KNOWLEDGE OF WHAT

01:58PM 2    OPM CONVEYED TO THE AGENCY HEADS ABOUT THE REQUEST THAT WAS

01:58PM 3    MADE.

01:58PM 4        THE COURT:  IS THERE A RECORDING OF THIS VERBAL

01:58PM 5    CONVERSATION ON FEBRUARY 13TH?

01:58PM 6        MR. HELLAND:  I AM NOT AWARE OF ONE, YOUR HONOR.

01:58PM 7        THE COURT:  WELL, HOW COME IT WAS VERBAL?  HOW COME

01:58PM 8    THERE WAS NO WRITTEN RECORD OF IT?

01:58PM 9        MR. HELLAND:  WELL --

01:58PM 10        THE COURT:  THERE'S A THING CALLED THE AGENCY

01:58PM 11    ADMINISTRATIVE RECORD.

01:58PM 12        MR. HELLAND:  AND, YOUR HONOR, I'M NOT SAYING THAT

01:58PM 13    THERE WASN'T.  I TRULY JUST DO NOT KNOW THE ANSWER TO THAT.

01:58PM 14        THERE WAS, OF COURSE, THE FEBRUARY 14TH FOLLOW-UP EMAIL

01:58PM 15    AND SO THAT SETS FORTH -- AND I BELIEVE IT'S SUPPOSED TO

01:58PM 16    SUMMARIZE THE GUIDANCE COMING OUT OF THAT CALL THE DAY BEFORE.

01:58PM 17        SO THERE IS THAT WRITTEN RECORD.  AND --

01:58PM 18        THE COURT:  WELL, THERE COULD HAVE BEEN OTHER THINGS

01:58PM 19    SAID IN THE VERBAL PART THAT JUST MADE THE MEMO ICING ON THE

01:58PM 20    CAKE.  IT WOULD BE INTERESTING TO KNOW WHO WAS IN THAT CALL AND

01:59PM 21    WHAT THEY REMEMBER BEING SAID.

01:59PM 22        OKAY.  SO YOUR BASIC POINT IS ALL RIGHT, THE AGENCY DOES

01:59PM 23    HAVE THE STATUTORY AUTHORITY, OPM, TO GIVE GUIDANCE, TRUE.

01:59PM 24    THAT'S TRUE.

01:59PM 25        AND IT CAN'T DIRECT AN ORDER, BUT IT CAN GIVE GUIDANCE

(78 of 216), Page 78 of 216 Case: 25-1677, 03/18/2025, DktEntry: 16.2, Page 78 of 216
Case 3:25-cv-01780-WHA    Document 44    Filed 02/28/25    Page 23 of 74

23

01:59PM 1    AND -- SO THE OTHER SIDE SAYS THAT YOU CAN'T JUST TERMINATE

01:59PM 2    PROBATIONARY EMPLOYEES, AN AGENCY CAN'T DO THAT UNLESS THERE'S

01:59PM 3    A RIF.

01:59PM 4        AND THEN YOU HAVE TO GO THROUGH THE RIF PROCEDURES.

01:59PM 5        AND THAT THIS AMOUNTS TO A RIF.  WHAT DO YOU -- A

01:59PM 6    REDUCTION IN FORCE.  WHAT DO YOU SAY TO THAT?

02:00PM 7        MR. HELLAND:  SO I DON'T BELIEVE THAT THESE WERE

02:00PM 8    REDUCTIONS IN FORCE, YOUR HONOR.  A RIF ELIMINATES POSITIONS,

02:00PM 9    IT DOESN'T TERMINATE EMPLOYEES.

02:00PM 10       IT IS TRUE THAT THE EXECUTIVE ORDER DIRECTED AGENCIES TO

02:00PM 11   BEGIN MAKING PREPARATIONS FOR RIFS.  SO THE IDEA THAT DOWN THE

02:00PM 12   ROAD THERE MAY BE RIFS, BUT RIFS DID NOT HAPPEN -- AS FAR AS I

02:00PM 13   UNDERSTAND, THE POSITIONS WHICH THESE PROBATIONARY EMPLOYEES

02:00PM 14   OCCUPIED STILL EXIST, THEREFORE, THEY HAVEN'T BEEN ELIMINATED

02:00PM 15   PURSUANT TO A RIF.

02:00PM 16       RATHER WHAT HAPPENED WAS PROBATIONARY EMPLOYEES WERE

02:00PM 17   TERMINATED.  SO THAT IS, EMPLOYEES WERE TERMINATED, NOT

02:00PM 18   POSITIONS TERMINATED.  AND THAT MAKES THE DIFFERENCE FOR

02:00PM 19   WHETHER THE RULES OF A RIF APPLY.

02:00PM 20       THE COURT:  ALL RIGHT.  I DON'T WANT -- I WANT TO

02:00PM 21   MAKE SURE THAT YOU HAVE A FULL OPPORTUNITY TO REPLY TO

02:00PM 22   EVERYTHING THAT HAS JUST BEEN SAID ON THIS SUBJECT OF WHAT

02:00PM 23   HAPPENED ON THE FACTS AND WE STILL HAVE OTHER ISSUES TO COME

02:00PM 24   TO.

02:00PM 25       BUT HAVE YOU SAID EVERYTHING THAT YOU WANT TO SAY ON THAT

(79 of 216), Page 79 of 216 Case: 25-1677, 03/18/2025, DktEntry: 16.2, Page 79 of 216
Case 3:25-cv-01780-WHA    Document 44    Filed 02/28/25    Page 24 of 74

24

02:01PM  1    POINT?

02:01PM  2              MR. HELLAND:  YES, YOUR HONOR.  I WOULD JUST, AGAIN,

02:01PM  3    EMPHASIZE THAT NOT EVERY AGENCY DID IN FACT TERMINATE

02:01PM  4    PROBATIONARY EMPLOYEES.  AND I THINK IF YOU TAKE A CLOSE LOOK

02:01PM  5    AT THE STATEMENTS THAT THE PLAINTIFFS HAVE PUT FORWARD, IT'S

02:01PM  6    EITHER NOT FROM PEOPLE THAT THEY HAVE SHOWN WERE IN THE ROOM,

02:01PM  7    AND, THEREFORE, HEARD WHAT HAPPENED OR THEY'RE ACTUALLY ONLY

02:01PM  8    SAYING THAT OPM ASKED US TO DO THIS.  THEY DIDN'T ORDER US TO

02:01PM  9    DO THIS.

02:01PM  10             THE COURT:  ALL RIGHT.  LET'S HEAR WHAT YOUR

02:01PM  11   REBUTTAL IS TO THE THOSE TWO POINTS.

02:01PM  12             MS. LEONARD:  SO COUNSEL FOR THE GOVERNMENT IS

02:01PM  13   MAKING FACTUAL ASSERTIONS THAT THERE IS ABSOLUTELY NO RECORD

02:01PM  14   EVIDENCE THAT THEY HAVE PRESENTED TO THIS COURT TO SUPPORT.

02:01PM  15        SO THE IDEA THAT NO AGENCIES FIRED PROBATIONARY EMPLOYEES,

02:01PM  16   THEY HAVE NOT GIVEN YOU THAT INFORMATION, YOUR HONOR.

02:01PM  17             THE COURT:  THAT'S BECAUSE THAT'S -- I GUESS THAT'S

02:01PM  18   NOT IN THE RECORD.  BUT LET'S SAY -- IS IT TRUE?  DO YOU KNOW?

02:01PM  19             MS. LEONARD:  WE DON'T KNOW, YOUR HONOR, BECAUSE

02:01PM  20   IT'S BEEN DONE IN SECRET, AND IT'S JUST REVEALING AGENCY BY

02:01PM  21   AGENCY.

02:01PM  22        WE HAVE HAD TO COLLECT INFORMATION AS IT IS REVEALED.

02:01PM  23             THE COURT:  HE CAN AT LEAST KNOW FOR THE JUSTICE

02:02PM  24   DEPARTMENT BECAUSE HE'S IN THE JUSTICE DEPARTMENT.  SO I THINK

02:02PM  25   HE WOULD KNOW ABOUT THAT JUSTICE DEPARTMENT.

02:02PM 1          MS. LEONARD:  I WOULD HOPE THAT HE WAS MAKING THAT

02:02PM 2     REPRESENTATION ACCURATELY ABOUT THE JUSTICE DEPARTMENT,

02:02PM 3     YOUR HONOR, DESPITE THE FACT THAT THERE'S NO EVIDENCE BEFORE

02:02PM 4     THE COURT.

02:02PM 5          I DO NOT KNOW THE ANSWER TO THAT, AND I DON'T KNOW WHETHER

02:02PM 6     THE JUSTICE DEPARTMENT WAS EXCEPTED FROM THE ORDER.

02:02PM 7          THE COURT:  WELL, LET'S ASSUME THAT IT TURNED OUT TO

02:02PM 8     BE TRUE FOR A MOMENT, AND WE HAVE AN EVIDENTIARY HEARING AND IT

02:02PM 9     TURNS OUT THAT THAT'S TRUE, THEN DOESN'T THAT HURT YOUR

02:02PM 10    POSITION THAT IT WAS ACROSS THE BOARD IN THE ENTIRE -- EVERY

02:02PM 11    AGENCY?

02:02PM 12         MS. LEONARD:  NO, NOT IF OPM MADE THE DECISION TO

02:02PM 13    GIVE THE EXCEPTION TO DOJ.

02:02PM 14         WHO MADE THE DECISION, YOUR HONOR?

02:02PM 15         WHO MADE THE DECISION ON THE EXCEPTIONS?

02:02PM 16         WHEN THE CDC SAYS WE TRIED TO SAVE PEOPLE AND THE ORDER

02:02PM 17    COMES FROM OPM "FIRE THEM ALL."

02:02PM 18         WHEN THE NATIONAL SCIENCE FOUNDATION SAYS, "WE WERE

02:02PM 19    ORDERED."  THE QUOTE IN THE RECORD IS "ORDERED," YOUR HONOR.

02:02PM 20    "WE WERE ORDERED TO DO THIS."

02:03PM 21         THE COURT:  ALL RIGHT.  THAT LEADS TO THE SECOND

02:03PM 22    POINT.  HOW DO WE KNOW THAT THE PERSON WHO SAID THAT WAS IN THE

02:03PM 23    MEETING?

02:03PM 24         MS. LEONARD:  WE DON'T NECESSARILY KNOW WHO WAS IN

02:03PM 25    THAT MEETING, BUT THERE IS NO RECORD EVIDENCE FROM THE

(81 of 216), Page 81 of 216 Case: 25-1677, 03/18/2025, DktEntry: 16.2, Page 81 of 216
Case 3:25-cv-01780-WHA    Document 44    Filed 02/28/25    Page 26 of 74

26

02:03PM 1    GOVERNMENT EITHER THAT THESE PEOPLE WHO ARE TESTIFYING IN FRONT

02:03PM 2    OF CONGRESS, THE HEAD, HEAD HUMAN RESOURCES PERSON AT VA, THE

02:03PM 3    HEAD HUMAN RESOURCES -- HUMAN CAPITAL AS THEY CALL IT AT THE

02:03PM 4    I.R.S., THE HEAD PERSON IS SAYING WE WERE ORDERED.

02:03PM 5        WE DON'T KNOW, BUT THEY ALSO HAVEN'T PUT ANYTHING IN THE

02:03PM 6    RECORD, YOUR HONOR, ABOUT THAT FEBRUARY 13TH CALL AT ALL.  THEY

02:03PM 7    HAVEN'T DENIED THAT IT HAPPENED.  THEY HAVEN'T DENIED THAT ANY

02:03PM 8    OF THE PEOPLE THAT WE PUT IN THE RECORD WERE THERE OR WERE

02:03PM 9    TOLD.

02:03PM 10       THERE'S NOT A SHRED OF EVIDENCE THAT THIS -- THAT

02:03PM 11   COUNTERACTS WHAT THESE AGENCIES ARE SAYING.

02:03PM 12       ARE THEY REALLY CONTENDING TO THIS COURT THAT ALL OF THESE

02:03PM 13   FEDERAL EMPLOYEES ARE LYING, YOUR HONOR?  THAT'S WHAT COUNSEL

02:03PM 14   IS SAYING.  I DON'T THINK IT'S CREDIBLE, YOUR HONOR.  IT'S NOT

02:04PM 15   CREDIBLE.

02:04PM 16           THE COURT:  WELL, NOT NECESSARILY LYING BUT

02:04PM 17   MISTAKEN.

02:04PM 18           MS. LEONARD:  IT'S HARD TO SEE HOW THEY COULD BE

02:04PM 19   MISTAKEN ABOUT AN ORDER TO FIRE PROBATIONARY -- ALL

02:04PM 20   PROBATIONARY EMPLOYEES.

02:04PM 21           THE COURT:  DIRECTION I THINK IS THE WORD THAT WAS

02:04PM 22   USUALLY USED, DIRECTION.

02:04PM 23           MS. LEONARD:  THEY WERE GIVEN DIRECTION, YOUR HONOR.

02:04PM 24       WE FULLY EMBRACE AND SUPPORT YOUR HONOR'S IDEA OF HAVING

02:04PM 25   AN EVIDENTIARY HEARING ON THIS, AND IF YOUR HONOR ALTERNATIVELY

(82 of 216), Page 82 of 216 Case: 25-1677, 03/18/2025, DktEntry: 16.2, Page 82 of 216
Case 3:25-cv-01780-WHA    Document 44    Filed 02/28/25    Page 27 of 74

27

02:04PM  1    WANTS TO AUTHORIZE US TO GO -- WE WILL GO GET THE DISCOVERY

02:04PM  2    TOMORROW, YOUR HONOR.  WE STAND AT THE READY TO PROVE THIS.

02:04PM  3          THE PLAINTIFFS, BUT MORE THAN PLAINTIFFS, SHOULD KNOW,

02:04PM  4    THIS COURT SHOULD KNOW THE TRUTH.

02:04PM  5          THE GOVERNMENT SHOULD NOT OPERATE IN SECRECY WHEN IT COMES

02:04PM  6    TO WHOLESALE ORDERS TO FIRE SO MANY PEOPLE.

02:04PM  7          AND I THINK IT SHOULD BE LOOKED WITH GREAT SKEPTICISM UPON

02:05PM  8    COUNSEL'S STATEMENT TO THIS COURT THAT THE AGENCIES MADE THESE

02:05PM  9    DECISIONS WHEN THEY HAVE NOT PUT A SHRED OF EVIDENCE.  WHY

02:05PM  10   DON'T THEY HAVE AGENCY DECLARATIONS, YOUR HONOR?  WHAT WAS IT

02:05PM  11   THAT THEY WANTED THE AGENCIES TO SAY THAT THEY REFUSE TO SAY TO

02:05PM  12   THIS COURT?  WHY AREN'T THEY ADDRESSING THIS, YOUR HONOR?

02:05PM  13          THE COURT:  WELL, ALL RIGHT.  THAT'S A GOOD POINT.

02:05PM  14   BUT HOW MANY DAYS DID THEY HAVE TO GET THIS OPPOSITION

02:05PM  15   TOGETHER, TWO?  THREE?

02:05PM  16          MS. LEONARD:  I THINK YOUR HONOR GAVE THEM MORE --

02:05PM  17   AS MUCH TIME AS WE HAD TO PUT THE WHOLE CASE TOGETHER.

02:05PM  18          THE COURT:  I THINK IT WAS VERY QUICK.  I THINK --

02:05PM  19   DIDN'T I SEND THE ORDER OUT ON -- WHEN WAS IT?  THIS WEEK.

02:05PM  20          MS. LEONARD:  WE FILED ON SUNDAY.  IT WAS THIS WEEK.

02:05PM  21   THEY HAD TO -- TO BE FAIR, THEY HAD A SHORT PERIOD OF

02:05PM  22   TIME, BUT THIS GOVERNMENT, WHEN THEY WANT TO FILE DECLARATIONS

02:05PM  23   IN SUPPORT OF THEIR POSITION CAN DO IT VERY QUICKLY, WE KNOW

02:05PM  24   THAT.

02:05PM  25          AND THEY HAVE NOT GIVEN --

| | | |
|---|---|---|
| 02:06PM | 1 | THE COURT:  SO YOU HAVE EIGHT LAWYERS THERE, IF I'M |
| 02:06PM | 2 | COUNTING RIGHT, AND THERE'S JUST ONE HERE. |
| 02:06PM | 3 | MS. LEONARD:  BECAUSE MAIN JUSTICE DIDN'T SEND |
| 02:06PM | 4 | ANYONE TO DEFEND THIS DECISION, YOUR HONOR, THAT'S WHY THERE'S |
| 02:06PM | 5 | ONLY ONE HERE. |
| 02:06PM | 6 | THE COURT:  ARE YOU A LOCAL HERE? |
| 02:06PM | 7 | MR. HELLAND:  I AM, YOUR HONOR. |
| 02:06PM | 8 | THE COURT:  OKAY. |
| 02:06PM | 9 | MS. LEONARD:  SO -- WHICH SAYS, SAYS A LOT. |
| 02:06PM | 10 | THE COURT:  I DON'T THINK -- I DON'T KNOW ABOUT |
| 02:06PM | 11 | THAT.  ALL RIGHT.  LOOK, WE'VE GOT TO MOVE TO OTHER ISSUES. |
| 02:06PM | 12 | MAYBE I'LL COME BACK TO SOME OF THIS ON THE MERITS. |
| 02:06PM | 13 | MS. LEONARD:  I JUST WANT TO MAKE TWO MINOR -- |
| 02:06PM | 14 | THE COURT:  LET'S MOVE TO THE -- OKAY.  GO AHEAD AND |
| 02:06PM | 15 | MAKE YOUR TWO OTHER MINOR POINTS. |
| 02:06PM | 16 | MS. LEONARD:  I JUST WANTED TO CLARIFY SOMETHING |
| 02:06PM | 17 | ABOUT WHAT WAS BEING SAID ABOUT IT'S A RIF. |
| 02:06PM | 18 | THE COURT:  ABOUT WHAT? |
| 02:06PM | 19 | MS. LEONARD:  IT'S A RIF AND RESPONDING TO THE |
| 02:06PM | 20 | POINTS OF WHETHER -- THERE ARE MULTIPLE WAYS, AS I EXPLAINED |
| 02:06PM | 21 | EARLIER, ABOUT THE WAY THAT THIS MASS TERMINATION ORDER FOR |
| 02:06PM | 22 | PROBATIONARY EMPLOYEES IS ILLEGAL WHETHER OR NOT IT VIOLATES |
| 02:06PM | 23 | THE RIF PROVISIONS. |
| 02:07PM | 24 | AND WE CAN HAVE A HEALTHY DEBATE ABOUT WHETHER THIS IS |
| 02:07PM | 25 | REALLY A RIF OR NOT A RIF, BUT SET ASIDE THE RIF, IT IS STILL |

02:07PM 1    UNLAWFUL BECAUSE PROBATIONARY EMPLOYEES ARE SUPPOSED TO BE

02:07PM 2    EVALUATED AND GIVEN REASONS.  THE AGENCIES ARE REQUIRED TO GIVE

02:07PM 3    THEM REASONS RELATED TO PERFORMANCE, AND THEY CANNOT LIE ABOUT

02:07PM 4    THEM, YOUR HONOR.

02:07PM 5         SO THAT IN AND OF ITSELF IS UNLAWFUL.  SETTING ASIDE

02:07PM 6    WHETHER THIS IS ACTUALLY A RIF OR NOT A RIF, WHICH IF YOU'RE

02:07PM 7    DOWNSIZING BECAUSE OF --

02:07PM 8              THE COURT:  WELL, HELP ME.  WHAT IS THE REGULATION

02:07PM 9    THAT SAYS WHAT YOU JUST TOLD ME, OR STATUTE?

02:07PM 10             MS. LEONARD:  IT IS -- THEY ARE SET FORTH -- SORRY.

02:07PM 11   THEY ARE SET FORTH IN OUR REPLY BRIEF, AND I WILL GIVE YOU THE

02:07PM 12   PAGE CITE.

02:07PM 13             THE COURT:  HERE'S WHAT I'VE GOT, 5 C.F.R. 315.803.

02:07PM 14   I'LL JUST READ IT OUT LOUD.  "THE AGENCY SHALL UTILIZE THE

02:07PM 15   PROBATIONARY PERIOD --" THIS IS AN OPM, I BELIEVE, REGULATION,

02:08PM 16   BUT IT'S TALKING ABOUT AGENCIES.

02:08PM 17        "THE AGENCIES SHALL UTILIZE THE PROBATIONARY PERIOD AS

02:08PM 18   FULLY AS POSSIBLE TO DETERMINE THE FITNESS OF THE EMPLOYEE AND

02:08PM 19   SHALL TERMINATE HIS OR HER SERVICES DURING THE PERIOD IF THE

02:08PM 20   EMPLOYEE FAILS TO DEMONSTRATE FULLY HIS OR HER QUALIFICATIONS

02:08PM 21   FOR CONTINUED EMPLOYMENT."  SO THAT'S A.

02:08PM 22        IS THAT THE ONE YOU'RE REFERRING TO?

02:08PM 23             MS. LEONARD:  THAT IS ONE OF THEM, YOUR HONOR.

02:08PM 24   THERE'S ALSO 804.

02:08PM 25             THE COURT:  804 I DON'T HAVE.  READ IT TO ME,

| | | |
|---|---|---|
| 02:08PM | 1 | PLEASE. |
| 02:08PM | 2 | MS. LEONARD:  804 HAS BEEN -- I DON'T HAVE THE |
| 02:08PM | 3 | LANGUAGE OF 804, BUT IT MAY TERMINATE AN EMPLOYEE FOR |
| 02:08PM | 4 | INADEQUATE PERFORMANCE, BUT AS THAT HAS BEEN INTERPRETED, THEY |
| 02:08PM | 5 | MUST GIVE HONEST REASONS, YOUR HONOR. |
| 02:08PM | 6 | THIS IS ALL ON PAGE 7 OF OUR REPLY BRIEF WHERE WE GO |
| 02:09PM | 7 | THROUGH THE AUTHORITIES AND THE INTERPRETATIONS OF THOSE |
| 02:09PM | 8 | AUTHORITIES. |
| 02:09PM | 9 | THE COURT:  ALL RIGHT.  I DON'T HAVE THAT HERE IN |
| 02:09PM | 10 | FRONT OF ME, BUT OKAY.  ALL RIGHT. |
| 02:09PM | 11 | MS. LEONARD:  THERE'S ALSO 5 U.S.C. 2301 WHICH SAYS, |
| 02:09PM | 12 | "ALL EMPLOYEES ARE TO BE RETAINED ON THE BASIS OF THE ADEQUACY |
| 02:09PM | 13 | OF THEIR PERFORMANCE." |
| 02:09PM | 14 | THAT'S THE CSRA FROM WHICH THE PROBATIONARY EMPLOYEES |
| 02:09PM | 15 | REGULATIONS, WHICH ARE NOTICE AND COMMENT APPROVED RULES FROM |
| 02:09PM | 16 | OPM, THAT ARE BEING CHANGED BY THE AGENCY NOW WITHOUT GOING |
| 02:09PM | 17 | THROUGH NOTICE AND COMMENT. |
| 02:09PM | 18 | THAT IS THE STATUTORY PROVISION FROM WHICH THAT FLOWS.  SO |
| 02:09PM | 19 | THIS IS ALL ON PAGE 7 OF OUR BRIEF. |
| 02:09PM | 20 | SO MY POINT, YOUR HONOR, WAS SIMPLY THAT WE CAN GET INTO |
| 02:09PM | 21 | WHETHER THIS WAS SUPPOSED TO BE A RIF OR WHETHER IT WAS A RIF, |
| 02:09PM | 22 | BUT EVEN SETTING ASIDE THAT, THAT IT WAS UNLAWFUL. |
| 02:09PM | 23 | IF YOUR HONOR HAS ANY FURTHER QUESTIONS ABOUT THE |
| 02:09PM | 24 | LEGALITY. |
| 02:09PM | 25 | THE COURT:  WELL, I WANT TO GIVE THE OTHER SIDE -- |

02:10PM  1    DO YOU WANT TO RESPOND TO ANYTHING THAT I JUST HEARD?  IF NOT,

02:10PM  2    WE'RE GOING TO GO TO A NEW POINT.  BUT IF YOU DO -- SHE DID

02:10PM  3    MORE THAN REBUTTAL.  SHE MADE NEW POINTS.

02:10PM  4         SO DO YOU HAVE ANYTHING YOU WANT TO ADD?

02:10PM  5              MR. HELLAND:  WELL, YOUR HONOR, I THINK THE ONLY

02:10PM  6    POINTS I WOULD SAY IN RESPONSE TO THAT MIGHT ANTICIPATE WHERE

02:10PM  7    YOU'RE GOING NEXT, WHICH IS THE JURISDICTIONAL QUESTIONS.

02:10PM  8              THE COURT:  ALL RIGHT.  LET'S GO TO JURISDICTION.

02:10PM  9         WHY DON'T YOU MAKE THE JURISDICTIONAL ARGUMENT, AND THEN

02:10PM  10   WE'LL LET THE OTHER SIDE RESPOND.

02:10PM  11              MR. HELLAND:  YES.  THANK YOU, YOUR HONOR.

02:10PM  12        WE PRESENTED SEVERAL JURISDICTIONAL ARGUMENTS IN OUR

02:10PM  13   PAPERS, BUT I THINK THE ONE THAT IS PERHAPS MOST STRAIGHT

02:10PM  14   FORWARD FOR THE COURT TO CONSIDER IS THE FACT THAT THESE TYPES

02:10PM  15   OF CLAIMS NEED TO BE CHANNELED THROUGH CERTAIN ADMINISTRATIVE

02:10PM  16   REVIEW PROCESSES.

02:10PM  17        THERE'S A LONG AND NEARLY UNBROKEN LINE OF CASES HOLDING

02:10PM  18   THAT WHEN FEDERAL EMPLOYEES OR ORGANIZATIONS REPRESENTING

02:10PM  19   FEDERAL EMPLOYEES ARE CHALLENGING THESE KINDS OF PERSONNEL

02:10PM  20   ACTIONS, THOSE CLAIMS NEED TO GO EITHER TO THE MERITS SYSTEMS

02:11PM  21   PROTECTION BOARD, THE MSPB, OR THE FLRA IN THE CASE OF UNION

02:11PM  22   CLAIMANTS.

02:11PM  23        I WOULD REFER YOUR HONOR -- THESE CASES ARE IN OUR PAPERS,

02:11PM  24   BUT THE AFGE V. TRUMP CASE OUT OF THE D.C. CIRCUIT FROM 2019

02:11PM  25   AND SEVERAL RECENT DISTRICT COURT DECISIONS, TWO FROM THE

02:11PM  1    DISTRICT OF COLUMBIA AND ONE FROM THE DISTRICT OF MASSACHUSETTS

02:11PM  2    MADE IN THE LAST COUPLE OF WEEKS THAT ADDRESS VERY SIMILAR

02:11PM  3    CLAIMS, SOMETIMES VIRTUALLY IDENTICAL CLAIMS BY VERY SIMILAR

02:11PM  4    PLAINTIFFS, SOMETIMES LITERALLY THE SAME PLAINTIFFS, WHERE THE

02:11PM  5    COURTS IN THOSE CASES HELD THOSE CLAIMS NEED TO GO THROUGH THE

02:11PM  6    ADMINISTRATIVE REVIEW PROCESS.

02:11PM  7            THE COURT:  WHAT WOULD BE THE ADMINISTRATIVE -- I

02:11PM  8    KNOW IT'S A MERITS SYSTEMS PROTECTION BOARD, RIGHT?

02:11PM  9            MR. HELLAND:  YEAH.

02:11PM  10           THE COURT:  ALL RIGHT.  SO HOW WOULD THAT WORK?  HOW

02:11PM  11   WOULD THE CLAIM BE PROCESSED?

02:11PM  12           MR. HELLAND:  THERE'S MULTIPLE WAYS THAT IT COULD

02:11PM  13   BE, YOUR HONOR.

02:11PM  14      SO INDIVIDUAL EMPLOYEES CAN PETITION TO THE MERITS SYSTEM

02:11PM  15   PROTECTION BOARD.  THEY CAN ALSO ASK FOR HELP FROM THE OFFICE

02:12PM  16   OF SPECIAL COUNSEL.

02:12PM  17      NOW, OUR DECLARATION WITH OUR OPPOSITION PRESENTED THE

02:12PM  18   COURT WITH AN EXAMPLE WHERE SIX EMPLOYEES, VERY RECENTLY, WENT

02:12PM  19   THROUGH THE OSC PROCESS AND OBTAINED A STAY OF THEIR

02:12PM  20   TERMINATIONS.

02:12PM  21           THE COURT:  BY THE?

02:12PM  22           MR. HELLAND:  BY THE MERITS SYSTEMS PROTECTION

02:12PM  23   BOARD.

02:12PM  24      SO THE OSC -- EVEN IF A CERTAIN EMPLOYEE DOESN'T HAVE THE

02:12PM  25   ABILITY TO PETITION THE MSPB DIRECTLY, THEY CAN ASK FOR HELP

02:12PM 1    FROM THE OSC.  THEY CAN ASK THE OSC TO INVESTIGATE A CLAIM.

02:12PM 2    THE OSC CAN THEN ASK THE MSPB TO STAY THE TERMINATION FOR TIME

02:12PM 3    FOR FURTHER INVESTIGATION AND CAN THEN SEEK FURTHER RELIEF

02:12PM 4    RELATED TO THOSE, AND THAT'S WHAT HAPPENED.

02:12PM 5          THE COURT:  THAT AROSE RIGHT OUT OF THIS VERY, THIS

02:12PM 6    ACTION THAT WE'RE CONCERNED WITH?

02:12PM 7          MR. HELLAND:  EXACTLY, EXACTLY, YOUR HONOR.  IT

02:12PM 8    SHOWS THAT THERE IS AN ALTERNATIVE SYSTEM WHERE THE AFFECTED

02:12PM 9    EMPLOYEES CAN SEEK RELIEF.

02:12PM 10    THE OTHER ADMINISTRATIVE PROCESS IS THE FLRA THAT IS

02:12PM 11   DESIGNED TO LET UNIONS BRING CERTAIN KINDS OF GRIEVANCES AND

02:12PM 12   IT'S ONE AS FAR AS I'M AWARE THAT THE UNION PLAINTIFFS HERE CAN

02:13PM 13   CERTAINLY MAKE USE OF.

02:13PM 14    SO AGAIN, IN THIS LINE OF CASES, <u>AFGE VERSUS TRUMP</u>, THE

02:13PM 15   THREE RECENT DISTRICT COURT DECISIONS, VERY SIMILAR CLAIMS HAVE

02:13PM 16   BEEN HELD CHANNELLED THROUGH THOSE ADMINISTRATIVE PROCESSES.

02:13PM 17    NOT ONLY THAT, BUT DISTRICT COURTS SUCH AS THIS ONE DO NOT

02:13PM 18   HAVE JURISDICTION TO ADDRESS THE CLAIMS.  CONGRESS HAS EXCLUDED

02:13PM 19   FROM THIS COURT'S JURISDICTION THE KINDS OF CLAIMS COVERED BY

02:13PM 20   THE CSRA.  NOTABLY, YOUR HONOR, PLAINTIFFS' REPLY BRIEFS ASK

02:13PM 21   NOT ADDRESS THOSE RECENT DISTRICT COURT DECISIONS AT ALL.  IT'S

02:13PM 22   COMPLETELY SILENT ON THEM EVEN THOUGH THEY ARE VERY, VERY

02:13PM 23   ANALOGOUS.

02:13PM 24    WE CITED THEM IN OUR BRIEFS, BUT WE CITED THE ECF DOCKETS.

02:13PM 25   I CONFIRMED THAT THEY HAVE SINCE BEEN ON -- MADE AVAILABLE ON

02:13PM 1   WESTLAW.  I'VE BROUGHT PRINTED COPIES IF YOU WOULD LIKE.  I CAN

02:13PM 2   SUBMIT THEM.

02:13PM 3       BUT THE IMPORTANT POINT IS THAT PLAINTIFFS IGNORED THEM.

02:13PM 4   THEIR CHOICE IN RESPONDING TO THEM IS TO SIMPLY IGNORE THEM.

02:13PM 5       THEY DO RESPOND TO THE 2019 D.C. DISTRICT COURT DECISION,

02:14PM 6   AFGE V. TRUMP, BUT THEIR RESPONSE IS ENTIRELY UNPERSUASIVE.

02:14PM 7       THEY TRY TO SAY THAT THE REASON THAT THAT CASE DOESN'T

02:14PM 8   APPLY IS, FIRST, THAT IT'S OUT OF CIRCUIT, AND, SECOND, THAT

02:14PM 9   APA CLAIMS WERE NOT PRESENTED IN THIS CASE.

02:14PM 10      WELL, FIRST OF ALL, IT MAKES SENSE THAT IT WAS OUT OF

02:14PM 11  CIRCUIT BECAUSE BY THEIR NATURE, THESE KINDS OF CLAIMS OFTEN GO

02:14PM 12  UP THROUGH THE COURTS IN D.C.  THERE'S HARDLY ANY IN-CIRCUIT

02:14PM 13  AUTHORITY.  AND THE ONE CASE, OF COURSE, THE COURT IS AWARE OF

02:14PM 14  IS THE VEIT CASE IN THE NINTH CIRCUIT WHICH HOLDS FOR THE

02:14PM 15  GOVERNMENT ON THIS CASE.  THE EMPLOYEES' CLAIMS THERE WERE HELD

02:14PM 16  CHANNELLED INTO THE PROCESS.

02:14PM 17      SO SETTING THAT ASIDE, LOOKING AT THE AFGE VERSUS TRUMP

02:14PM 18  CASE, THEIR OTHER ARGUMENT IS THAT IT DIDN'T INVOLVE APA

02:14PM 19  CLAIMS, BUT IT HAD AN EXTENDED DISCUSSION --

02:14PM 20          THE COURT:  WHAT DIDN'T INVOLVE?

02:14PM 21          MR. HELLAND:  THE CLAIMS IN THAT SPECIFIC CASE, THE

02:14PM 22  AFGE VERSUS TRUMP CASE.  I BELIEVE THAT --

02:14PM 23          THE COURT:  DID OR DID NOT INCLUDE?

02:14PM 24          MR. HELLAND:  DID NOT.

02:14PM 25          THE COURT:  OKAY.

02:14PM  1          MR. HELLAND:  NOW, CONSTITUTIONAL CLAIMS WERE

02:14PM  2   PRESENTED THERE JUST AS PLAINTIFFS HERE PRESENT CONSTITUTIONAL

02:15PM  3   CLAIMS, AND THOSE WERE HELD CHANNELLED THROUGH THE

02:15PM  4   ADMINISTRATIVE REVIEW PROCESS.

02:15PM  5          BUT TO PLAINTIFFS' POINT, THE ONE ARGUMENT THAT THEY DO

02:15PM  6   MAKE IN RESPONDING TO THAT CASE, THAT CASE DID DISCUSS OTHER

02:15PM  7   CASES THAT INVOLVED APA CLAIMS, IN FACT, ALSO INVOLVING THE

02:15PM  8   SAME PLAINTIFFS.

02:15PM  9          THE AFGE VERSUS SECRETARY OF THE AIR FORCE CASE FROM A FEW

02:15PM 10   YEARS EARLIER, APA CLAIMS WERE PRESENTED IN THAT CASE.  AGAIN,

02:15PM 11   WE CITED IT IN OUR PAPERS.  AND THE CLAIMS THERE, AGAIN, WERE

02:15PM 12   HELD CHANNELLED THROUGH THE ADMINISTRATIVE PROCESSES POST

02:15PM 13   DATING THE AFGE VERSUS TRUMP CASE.

02:15PM 14          THE FEDERAL LAW EMPLOYMENT OFFICERS CASE, ALSO OUT OF THE

02:15PM 15   D.C. CIRCUIT, THAT ONE ALSO INCLUDED APA CLAIMS, AND THEY WERE

02:15PM 16   ALSO HELD CHANNELLED THROUGH THE ADMINISTRATIVE PROCESSES.

02:15PM 17          SO THE ONLY RESPONSE THAT PLAINTIFFS HAVE PUT FORWARD FOR

02:15PM 18   WHY AFGE VERSUS TRUMP IS UNPERSUASIVE IS REFUTED BY THE

02:15PM 19   DISCUSSION IN AFGE VERSUS TRUMP ITSELF, WHICH AGAIN TOUCHED ON

02:15PM 20   APA, THE APA CASES THAT I JUST MENTIONED AND BY THOSE OTHER

02:16PM 21   CASES.

02:16PM 22          AND MOST, I THINK, ACUTELY, IT'S REFUTED BY THREE RECENT

02:16PM 23   DISTRICT COURT DECISIONS THAT HAVE REFUSED TO ISSUE TRO'S AND

02:16PM 24   HAVE HELD THAT THESE EXACT KIND OF CLAIMS NEED TO BE CHANNELLED

02:16PM 25   THROUGH THE ADMINISTRATIVE PROCESSES.

02:16PM   1        IT'S REMARKABLY TELLING TO ME THAT WE DISCUSSED THESE

02:16PM   2    CASES IN OUR PAPERS AND PLAINTIFFS DO NOT EVEN MENTION THEM,

02:16PM   3    EVEN THOUGH THEY ARE SO CLOSELY ANALOGOUS.

02:16PM   4            THE COURT:  WELL, WHAT DO THEY SAY?

02:16PM   5            MR. HELLAND:  WHAT DO THOSE CASES SAY?

02:16PM   6            THE COURT:  NO, NO.  WHAT DO THE PLAINTIFFS SAY IN

02:16PM   7    THEIR BRIEF THAT -- MAYBE THIS IS YOUR CHANCE TO -- THEY MUST

02:16PM   8    MAKE SOME ARGUMENT.

02:16PM   9            MR. HELLAND:  NO, NO.  I'M SURPRISED, BUT THEY DID

02:16PM  10    NOT, YOUR HONOR.  I CONTROL F'D, I LOOKED FOR IT.  THEY SIMPLY

02:16PM  11    IGNORE THESE DECISIONS THAT, YES, THEY'RE OUT OF CIRCUIT BUT --

02:16PM  12            THE COURT:  WELL, DID THEY SAY THAT THE OTHER

02:16PM  13    PLAINTIFFS, THE ORGANIZATIONAL PLAINTIFFS DO HAVE STANDING?

02:16PM  14            MR. HELLAND:  I'M SORRY?

02:16PM  15            THE COURT:  THERE ARE OTHER PLAINTIFFS IN THE CASE

02:16PM  16    OTHER THAN THE UNIONS.  WE HAVE FOUR OR FIVE ORGANIZATIONAL

02:17PM  17    PLAINTIFFS LIKE NATIONAL PARKS AND THE VA AND THOSE

02:17PM  18    ORGANIZATIONS.

02:17PM  19        THEY DID SAY SOMETHING ABOUT THOSE ORGANIZATIONS HAVE

02:17PM  20    STANDING, RIGHT?

02:17PM  21            MR. HELLAND:  THEY DID, YOUR HONOR.

02:17PM  22            THE COURT:  A DIFFERENT KIND OF INJURY.

02:17PM  23            MR. HELLAND:  WELL, SO -- YES, YOUR HONOR.

02:17PM  24        SO TO BE CLEAR, THEY DIDN'T MENTION THESE DECISIONS IN

02:17PM  25    THEIR REPLY BRIEF AFTER WE HAD DISCUSSED THEM IN OUR

```
02:17PM   1    OPPOSITION.
02:17PM   2              THE COURT:  RIGHT.
02:17PM   3              MR. HELLAND:  THEY DID MENTION THEM VERY BRIEFLY IN
02:17PM   4    THEIR MOVING PAPERS, I THINK, IN THEIR MOTION.  BUT THEIR
02:17PM   5    PRIMARY RESPONSE THERE WAS THE ONE THAT YOU ARE JUST MAKING
02:17PM   6    NOW, WHICH IS THAT THOSE OTHER CASES NOTED THE ABSENCE OF
02:17PM   7    NON-UNION PLAINTIFFS WHEREAS THERE ARE NON-UNION PLAINTIFFS
02:17PM   8    HERE.
02:17PM   9         THAT DOES NOT CHANGE THE OUTCOME.
02:17PM  10         WHAT MATTERS UNDER THUNDER BASIN IS WHETHER THERE'S AN
02:17PM  11    ADEQUATE FORUM FOR JUDICIAL REVIEW.
02:17PM  12         THE ADMINISTRATIVE PROCESSES PROVIDE THAT ADEQUATE FORUM
02:18PM  13    BOTH FOR THE UNIONS, FOR THE AFFECTED EMPLOYEES, AND THE FACT
02:18PM  14    THAT NON-UNION ORGANIZATIONS, WHICH HAVE AN EVEN MORE TENUOUS
02:18PM  15    CONNECTION TO THE CLAIMS OF THE EMPLOYEES AT ISSUE, DOES NOT
02:18PM  16    SOMEHOW SAVE THIS CASE OR PRESERVE JURISDICTION FOR THIS COURT.
02:18PM  17         THOSE -- SO CONGRESS HAS MADE THE DETERMINATION IN THE
02:18PM  18    CSRA THAT CERTAIN KINDS OF CLAIMS INVOLVING EMPLOYEE, FEDERAL
02:18PM  19    EMPLOYEE PERSONNEL ACTIONS NEED TO BE CHANNELLED THROUGH THE
02:18PM  20    ADMINISTRATIVE PROCESS.
02:18PM  21              THE COURT:  IS THIS A TRUE STATEMENT OR NOT, THAT
02:18PM  22    EVERY SINGLE PROBATIONARY EMPLOYEE WHO WAS TERMINATED HAS A
02:18PM  23    RIGHT TO GO TO THE MERITS SYSTEMS PROTECTION BOARD?
02:18PM  24              MR. HELLAND:  I BELIEVE THAT IS A NOT TRUE
02:18PM  25    STATEMENT, YOUR HONOR, BUT THEY CAN GO TO THE OSC.  THEY CAN
```

02:18PM 1   USE THEIR OWN UNION GRIEVANCE PROCESSES TO GO TO THE FLRA.

02:18PM 2       SO THE SAME CLAIMS CAN BE MADE THROUGH THE ADMINISTRATIVE

02:18PM 3   PROCESSES, NOTWITHSTANDING THAT NOT EVERY PROBATIONARY EMPLOYEE

02:19PM 4   HAS A RIGHT TO GO DIRECTLY TO THE MSPB.

02:19PM 5       MOREOVER, YOUR HONOR, IF I MAY?

02:19PM 6           THE COURT:  GO AHEAD.

02:19PM 7           MR. HELLAND:  THE NON-UNION ORGANIZATIONAL

02:19PM 8   PLAINTIFFS HERE, IT'S MY UNDERSTANDING AT LEAST, THAT THEY CAN

02:19PM 9   PETITION TO INTERVENE IN MSPB PROCEEDINGS OR THEY CAN FILE AS

02:19PM 10  AMICI AS WELL, SO TO THE EXTENT THAT THEY HAVE INTEREST, THEY

02:19PM 11  CAN BE HEARD THERE.

02:19PM 12      BUT THE SUPREME COURT IN SACKETT VERSUS EPA HAS SAID THAT

02:19PM 13  THE FACT THAT CONGRESS CREATED AN ADMINISTRATIVE REVIEW

02:19PM 14  STRUCTURE THAT REQUIRES ADMINISTRATIVE EXHAUSTION FROM CERTAIN

02:19PM 15  KINDS OF PLAINTIFFS CREATES A STRONG PRESUMPTION THAT OTHER

02:19PM 16  PARTIES DO NOT HAVE THEIR OWN CLAIMS, RIGHT?

02:19PM 17      AS APPLIED HERE, THE FACT THAT CONGRESS CREATED THIS

02:19PM 18  ELABORATE SCHEME WHERE INDIVIDUAL FEDERAL EMPLOYEES OR UNIONS

02:19PM 19  EACH HAVE, YOU KNOW, VERY COMPREHENSIVE AND SPECIFIC

02:19PM 20  ADMINISTRATIVE PROCESSES TO GO TO, THAT CREATES A STRONG

02:19PM 21  PRESUMPTION THAT OTHER PLAINTIFFS, ESPECIALLY PLAINTIFFS WHOSE

02:20PM 22  CLAIMS ARE MORE TENUOUSLY CONNECTED TO THE ACTIONS AT ISSUE, DO

02:20PM 23  NOT THEMSELVES HAVE THEIR OWN STAND-ALONE CLAIMS, RIGHT?

02:20PM 24  THAT'S SACKETT VERSUS EPA.

02:20PM 25      FOR THAT PRINCIPLE SACKETT CITES BLOCK VERSUS NUTRITIONAL

(94 of 216), Page 94 of 216 Case: 25-1677, 03/18/2025, DktEntry: 16.2, Page 94 of 216
Case 3:25-cv-01780-WHA    Document 44    Filed 02/28/25    Page 39 of 74

39

02:20PM 1    INSTITUTE, I BELIEVE, SOMETHING LIKE THAT.  AND THAT CASE

02:20PM 2    INVOLVED MILK PRODUCERS WHO HAD TO GO THROUGH AN ADMINISTRATIVE

02:20PM 3    PROCESS, AND THE SUPREME COURT HELD THAT MILK CONSUMERS DIDN'T

02:20PM 4    HAVE THEIR OWN STAND-ALONE CLAIMS.

02:20PM 5        AS APPLIED HERE, WHAT THAT MEANS IS THE FACT THAT ANY

02:20PM 6    NON-UNION PLAINTIFFS MAY NOT THEMSELVES BE ABLE TO DIRECTLY

02:20PM 7    PARTICIPATE IN THESE ADMINISTRATIVE PROCESSES, THAT DOESN'T

02:20PM 8    SAVE THEIR CLAIMS.  IT WOULD BE A VERY BIZARRE RESULT IF THIS

02:20PM 9    COURT'S JURISDICTION WERE MAINTAINED, ESPECIALLY FOR THE UNION

02:20PM 10   PLAINTIFFS AS WELL, BUT FOR THIS COURT'S JURISDICTION TO BE

02:20PM 11   MAINTAINED SIMPLY BECAUSE THEY'VE ADDED PARTIES WITH EVEN MORE

02:20PM 12   TENUOUSLY CONNECTED CLAIMS.

02:20PM 13            THE COURT:  ALL RIGHT.  LET'S HEAR -- WHO IS GOING

02:20PM 14   TO ARGUE FOR THIS POINT?

02:20PM 15            MS. LEONARD:  I AM.

02:20PM 16            THE COURT:  I THOUGHT YOU SAID SOMEONE WAS GOING TO

02:21PM 17   ARGUE.

02:21PM 18            MS. LEONARD:  MS. LEYTON IS GOING TO ARGUE STANDING

02:21PM 19   AND HARM, YOUR HONOR.

02:21PM 20            THE COURT:  WELL, THAT'S WHAT THIS IS, ISN'T IT?

02:21PM 21            MS. LEONARD:  NO.  THIS IS WHAT WE CALL

02:21PM 22   ADMINISTRATIVE CHANNELLING.  IT'S ONE OF THE SUBJECT MATTER

02:21PM 23   JURISDICTION BLOCKADES THAT THEY'RE TRYING TO PREVENT THIS

02:21PM 24   COURT FROM --

02:21PM 25            THE COURT:  THAT'S OKAY.  ALL RIGHT.  GO AHEAD.

02:21PM 1          MS. LEONARD:  SURE.  THIS IS A SLEIGHT OF HAND BY

02:21PM 2     THE GOVERNMENT, YOUR HONOR.

02:21PM 3          THEY ARE NOT TALKING ABOUT THE SAME KIND OF CLAIMS,

02:21PM 4     THEY'RE NOT TALKING ABOUT THE SAME KIND OF PLAINTIFFS, AND

02:21PM 5     THEY'RE NOT TALKING ABOUT THE SAME DEFENDANT.

02:21PM 6          SO FIRST I'M GOING TO START WITH THE PLAINTIFFS.

02:21PM 7          THE POINT THERE IS NO THUNDER BASIN ADMINISTRATIVE

02:21PM 8     CHANNELLING CASE THAT HAS EVER HELD THAT A NON-EMPLOYEE OR

02:21PM 9     NON-EMPLOYEE REPRESENTATIVE, THIRD PARTY ORGANIZATIONAL

02:21PM 10    PLAINTIFF, WITH AN APA CLAIM, SHOULD BE SENT TO THE MSPB OR THE

02:21PM 11    FLRA.

02:21PM 12         THAT IS SIMPLY AN INVENTION OF THE GOVERNMENT TO TRY TO

02:21PM 13    AVOID JURISDICTION FOR THOSE PLAINTIFFS.

02:21PM 14         CONGRESS DID NOT INTEND FOR THIRD PARTIES WITH AN APA

02:21PM 15    CLAIM CHALLENGING A GOVERNMENT WIDE POLICY TO BE SENT TO AN

02:22PM 16    AGENCY THAT IT CREATED TO HEAR INDIVIDUAL EMPLOYEE CLAIMS

02:22PM 17    AGAINST THEIR EMPLOYING AGENCY, YOUR HONOR.  IT IS A COMPLETE

02:22PM 18    MISREPRESENTATION OF WHAT CONGRESS INTENDED.  THERE'S NOTHING

02:22PM 19    IN THE STATUTE THAT SUPPORTS THAT.

02:22PM 20         THE STATUTE SAYS THAT THOSE PROCESSES ARE FOR INDIVIDUAL

02:22PM 21    EMPLOYEES AGAINST THEIR EMPLOYING AGENCY.

02:22PM 22         THESE ORGANIZATIONAL PLAINTIFFS, AND WE'LL GET TO THE

02:22PM 23    UNION PLAINTIFFS IN A MINUTE, BUT THE ORGANIZATIONAL PLAINTIFFS

02:22PM 24    OTHER THAN THE UNIONS HAVE AN APA CLAIM, YOUR HONOR.  THEY CAN

02:22PM 25    CHALLENGE, IF WE ESTABLISH STANDING, THEY CAN CHALLENGE A

(96 of 216), Page 96 of 216 Case: 25-1677, 03/18/2025, DktEntry: 16.2, Page 96 of 216
Case 3:25-cv-01780-WHA    Document 44    Filed 02/28/25    Page 41 of 74

41

02:22PM 1    GOVERNMENT WIDE POLICY AS UNLAWFUL UNDER THE APA.  THEY CAN

02:22PM 2    CHALLENGE IT AS UNCONSTITUTIONAL.  THERE IS NOTHING ABOUT THE

02:22PM 3    CSRA OR THE LABOR LAWS THAT SENDS THEIR CLAIMS TO THOSE

02:22PM 4    ADMINISTRATIVE AGENCIES, WHICH COULD NOT HEAR THOSE CLAIMS.

02:22PM 5    THE GOVERNMENT IS ABSOLUTELY WRONG THAT THEY ARE NOT A PARTY

02:22PM 6    THAT HAS THE ABILITY TO PARTICIPATE.

02:22PM 7          THE COURT:  YOU'RE SAYING THE APA CLAIMS MAKE IT

02:23PM 8    SPECIAL BECAUSE THE MERIT SYSTEMS PROTECTION BOARD CANNOT

02:23PM 9    DECIDE AN APA CLAIM, IS THAT IT?

02:23PM 10         MS. LEONARD:  SO THEY CAN'T DECIDE AN APA CLAIM

02:23PM 11    AGAINST A NON-EMPLOYER, THAT'S RIGHT, YOUR HONOR.  AND THIS IS

02:23PM 12    AN APA CLAIM AGAINST OPM.

02:23PM 13    SO THE PLAINTIFFS, THE NON-UNION PLAINTIFFS CAN'T BRING

02:23PM 14    THEIR CLAIMS THERE, AND THE GOVERNMENT CITES NO CASE LAW.  THIS

02:23PM 15    LATE CITATION TO SACKETT DOES NOT SUPPORT WHAT THE GOVERNMENT

02:23PM 16    IS SAYING ABOUT THIRD PARTIES BEING CHANNELLED UNDER

02:23PM 17    THUNDER BASIN.  THAT'S NOT WHAT THAT CASE SAYS.

02:23PM 18    IN FACT, SACKETT AND THE LINE OF CASES UNDER THE APA SAY

02:23PM 19    VERY STRONGLY THAT JUDICIAL REVIEW UNDER THE APA IS A COMMAND,

02:23PM 20    AND THE EXCEPTIONS TO JUDICIAL REVIEW UNDER THE APA ARE VERY,

02:23PM 21    VERY LIMITED, AND WE DO NOT IMPLY THOSE LIGHTLY.

02:23PM 22    AND WHAT THEY'RE TRYING TO DO HERE IS EXPAND THE EXCEPTION

02:23PM 23    TO SWALLOW THE APA CLAIMS IN THIS CASE.

02:23PM 24    BUT THE PLAINTIFFS, THE NON-UNION PLAINTIFFS CAN'T BE

02:24PM 25    CHANNELLED, THEN THE DEFENDANT IS DIFFERENT HERE.  WE ARE NOT

(97 of 216), Page 97 of 216 Case: 25-1677, 03/18/2025, DktEntry: 16.2, Page 97 of 216
Case 3:25-cv-01780-WHA   Document 44   Filed 02/28/25   Page 42 of 74

42

02:24PM 1    SUING THE EMPLOYING AGENCIES BECAUSE THEY'RE NOT THE ONES WHO

02:24PM 2    MADE THE DECISION, YOUR HONOR.

02:24PM 3        IF WE'RE RIGHT ABOUT THE FIRST POINT, OPM CANNOT BE A

02:24PM 4    DEFENDANT IN THOSE AGENCIES PROCESSES.  YOU CANNOT BRING A

02:24PM 5    CHALLENGE TO A GOVERNMENT WIDE RULE OR POLICY CREATED BY OPM IN

02:24PM 6    THOSE PROCESSES.  THAT'S SIMPLY NOT AVAILABLE, THEREFORE, THESE

02:24PM 7    ARE NOT THE TYPE OF CLAIMS THAT CONGRESS EVER INTENDED TO BE

02:24PM 8    HEARD THROUGH THOSE ADMINISTRATIVE AGENCIES.

02:24PM 9        PARTICULARLY, I WANT TO MAKE A PARTICULAR POINT ABOUT THE

02:24PM 10   PROCEDURAL APA CLAIM.  NO COURT HAS CHANNELLED THAT KIND OF

02:24PM 11   CLAIM IN THE NINTH CIRCUIT OR THE SUPREME COURT.

02:24PM 12       SO WHAT IS GOING ON HERE IS THAT THE D.C. CIRCUIT HAS

02:24PM 13   EXPANDED THE DOCTRINE BEYOND WHERE THE SUPREME COURT AND THE

02:24PM 14   NINTH CIRCUIT ARE.

02:24PM 15       AND THERE ARE MANY REASONS, WHICH WE PUT IN OUR BRIEF, FOR

02:25PM 16   THIS COURT TO HOLD THE LINE AND NOT EXPAND THE DOCTRINE BEYOND

02:25PM 17   WHERE THE NINTH CIRCUIT HAS GONE.  THIS IS NOT AN INDIVIDUAL

02:25PM 18   EMPLOYEE CASE MAKING AN AS APPLIED CHALLENGE TO AN ACTION TAKEN

02:25PM 19   BY ITS EMPLOYER.

02:25PM 20       THIS IS A CLAIM AGAINST OPM FOR CREATING A GOVERNMENT WIDE

02:25PM 21   UNLAWFUL POLICY ORDERING THE AGENCIES TO DO THINGS THAT HAVE --

02:25PM 22           THE COURT:  LET'S JUST SAY THAT YOU'RE RIGHT FOR A

02:25PM 23   MOMENT AND LET'S FIGURE OUT WHERE THIS WOULD LEAD.  I'M GOING

02:25PM 24   TO THINK OUT LOUD.

02:25PM 25       GIVE ME ONE OF YOUR ORGANIZATIONS THAT -- A NON-UNION

```
02:25PM   1    ORGANIZATION.  TELL ME THE NAME OF ONE OF THEM.

02:25PM   2              MS. LEONARD:  SO WE'VE GOT THE -- NOT ONE OF THE

02:25PM   3    UNIONS, OR ONE OF THE UNIONS?

02:25PM   4              THE COURT:  NON-UNION.

02:25PM   5              MS. LEONARD:  OH, SORRY.  WE CAN START -- WE'VE GOT

02:26PM   6    MAIN STREET ALLIANCE OR THE COALITION TO PROTECT AMERICAS

02:26PM   7    PARKS.

02:26PM   8              THE COURT:  SAY THAT AGAIN.

02:26PM   9              MS. LEONARD:  AMERICAS NATIONAL PARKS.

02:26PM  10              THE COURT:  WHAT IS THE ONE ABOUT THE PARKS AGAIN?

02:26PM  11              MS. LEONARD:  THE COALITION TO PROTECT AMERICAS

02:26PM  12    NATIONAL PARKS.

02:26PM  13         WE CAN CALL THEM THE PARKS COALITION IF THAT'S EASIER.

02:26PM  14              THE COURT:  ALL RIGHT.  BUT YOU DON'T HAVE ANY

02:26PM  15    DECLARATIONS FROM THE PARK SERVICE, OR DO YOU?

02:26PM  16              MS. LEONARD:  OH, WE DO.  WE ABSOLUTELY DO,

02:26PM  17    YOUR HONOR.

02:26PM  18         WE HAVE DECLARATIONS FROM THE ORGANIZATION AND --

02:26PM  19              THE COURT:  ABOUT PROBATIONARY EMPLOYEES?

02:26PM  20              MS. LEONARD:  WE HAVE DECLARATIONS FROM THE

02:26PM  21    ORGANIZATIONS, INCLUDING THE FORMER DIRECTOR OF THE NATIONAL

02:26PM  22    PARKS, ABOUT THE IMPACT ON CERTAIN --

02:26PM  23              THE COURT:  OH, I DID READ THAT.

02:26PM  24         BUT, I MEAN, DO YOU HAVE SOMETHING FROM WITHIN THE

02:26PM  25    NATIONAL PARK SERVICE SAYING THAT WE WERE ORDERED TO DO THIS?
```

(99 of 216), Page 99 of 216 Case: 25-1677, 03/18/2025, DktEntry: 16.2, Page 99 of 216
Case 3:25-cv-01780-WHA    Document 44    Filed 02/28/25    Page 44 of 74

44

02:26PM 1          I DON'T THINK YOU DO.

02:26PM 2              MS. LEONARD:  I DON'T THINK WE HAVE THAT PUBLIC

02:26PM 3     EVIDENCE HAS BEEN MADE OF THE NATIONAL -- FROM THE CURRENT

02:27PM 4     ORGANIZATION OF THE NATIONAL PARK SERVICE IN WHICH THEY HAVE

02:27PM 5     REVEALED ANYTHING ABOUT WHETHER THEY WERE ORDERED OR NOT.  I

02:27PM 6     THINK THAT'S RIGHT, YOUR HONOR.

02:27PM 7              THE COURT:  ALL RIGHT.  WELL, LET'S USE THEM ANYWAY.

02:27PM 8        LET'S SAY THAT WE WERE TO -- I'M NOT STICKING NOW WITH

02:27PM 9     JUST THE APA CLAIM.

02:27PM 10       IT THEN BECOMES IRRELEVANT IF THERE WAS AN ORDER UNDER THE

02:27PM 11    APA CLAIM.  THE QUESTION IS WHETHER THEY SHOULD HAVE GONE

02:27PM 12    THROUGH THE RULE MAKING PROCESS.

02:27PM 13       SO WHAT WOULD BE THE RELIEF?  LET'S SAY THAT THE JUDGE

02:27PM 14    AGREES WITH YOU, WHAT RELIEF DO YOU GET THAT IS ANY GOOD?  THE

02:27PM 15    PEOPLE HAVE ALREADY BEEN FIRED.

02:27PM 16       SO WHAT DO WE SAY, WHAT, GO BACK AND GO THROUGH RULE

02:27PM 17    MAKING?  STOP TRYING TO USE A RULE THAT HASN'T BEEN PROPERLY

02:27PM 18    ADOPTED?

02:27PM 19       WHAT WOULD BE THE FORM OF THE RELIEF?

02:27PM 20             MS. LEONARD:  SO THE APA REQUIRES THE COURT TO HOLD

02:28PM 21    UNLAWFUL AND SET ASIDE ANY UNLAWFUL AGENCY ACTION, INCLUDING

02:28PM 22    UNLAWFUL RULE MAKING.

02:28PM 23             THE COURT:  UNLAWFUL WHAT?

02:28PM 24             MS. LEONARD:  RULE MAKING, YOUR HONOR.  HOLD

02:28PM 25    UNLAWFUL AND SET ASIDE.  SET ASIDE IN ITS ENTIRETY

02:28PM 1        THE COURT:  SO LET'S SAY I -- WELL, LET ME -- WE'RE

02:28PM 2    GOING TO CONFUSE OUR COURT REPORTER.  TELL ME IF YOUR FINGERS

02:28PM 3    ARE GETTING TIRED AND WE'LL TAKE A BREAK.

02:28PM 4        SO LET'S SAY THAT I DECIDE THAT THIS DECEMBER -- SORRY,

02:28PM 5    FEBRUARY 14TH EMAIL IS A RULE.  OKAY?

02:28PM 6        MS. LEONARD:  OKAY.

02:28PM 7        THE COURT:  AND NOT ADVISORY BUT A COMMAND.  SO THEN

02:28PM 8    I SAY -- YOU SAY YOU'RE RIGHT AND I SET IT ASIDE.

02:28PM 9        WHAT GOOD DOES THAT DO YOU?

02:28PM 10       AND THEN I SAY, IF YOU'RE GOING TO DO THIS, YOU'VE GOT TO

02:28PM 11   GO THROUGH THE PUBLIC RULE MAKING PROCESS.

02:28PM 12       ALL RIGHT.  SO TELL ME WHY THAT'S PRACTICAL RELIEF?

02:28PM 13       MS. LEONARD:  SO IT'S PRACTICAL RELIEF BECAUSE THE

02:28PM 14   ORDER TO SET ASIDE IS AN ORDER TO OPM TO RESCIND THIS UNLAWFUL

02:29PM 15   PROGRAM, YOUR HONOR.

02:29PM 16       AND IN ORDER TO RESCIND THIS UNLAWFUL PROGRAM, THEY

02:29PM 17   NEED --

02:29PM 18       THE COURT:  YOU'VE JUST USED A WORD.  YOU'VE SLID

02:29PM 19   OFF.  AGAIN, YOU'VE GONE FROM THIS MEMO TO A PROGRAM.

02:29PM 20       I CAN SET IT ASIDE.  IF I CAN SET THIS ASIDE, I DON'T KNOW

02:29PM 21   WHAT -- THERE'S NO PROOF OF A CONTINUING PROGRAM.  THESE PEOPLE

02:29PM 22   HAVE ALREADY BEEN TERMINATED.

02:29PM 23       MS. LEONARD:  YOUR HONOR, DOD IS GOING TO TERMINATE

02:29PM 24   THOUSANDS OF PROBATIONARY EMPLOYEES TOMORROW, TOMORROW PURSUANT

02:29PM 25   TO THIS OPM DIRECTIVE.

02:29PM  1         IN OUR REPLY EVIDENCE WE HAVE GIVEN YOU --

02:29PM  2              THE COURT:  I DIDN'T REALIZE IT.  INFORM ME ABOUT

02:29PM  3    THAT.

02:29PM  4              MS. LEONARD:  THE DECLARATION OF PACE SCHWARZ TALKS

02:29PM  5    ABOUT DOD AND WHAT THEY HAVE ANNOUNCED.

02:29PM  6              THE COURT:  READ IT TO ME.  READ TO ME WHAT THEY

02:29PM  7    HAVE ANNOUNCED.

02:29PM  8              MS. LEONARD:  THEY HAVE ANNOUNCED -- THEY HAVE

02:30PM  9    ANNOUNCED -- ONE MOMENT, YOUR HONOR.

02:30PM  10        (PAUSE IN PROCEEDINGS.)

02:30PM  11             MS. LEONARD:  LOOKING FOR EXHIBIT C.  THIS IS DOD.

02:30PM  12   THEY'RE TALKING ABOUT THEIR CIVILIAN EMPLOYEES, BECAUSE, OF

02:30PM  13   COURSE, THE MILITARY IS A DIFFERENT ANIMAL.  BUT THE CIVILIAN

02:30PM  14   EMPLOYEES OF DOD, WHICH THERE ARE TENS OF THOUSANDS OF ALL OVER

02:30PM  15   THIS COUNTRY.

02:30PM  16        "FOR CIVILIAN POLICY COUNCIL MEMBERS."  THIS IS A --

02:30PM  17             THE COURT:  READ SLOWLY NOW.

02:30PM  18             MS. LEONARD:  SURE.

02:30PM  19        THIS IS "IN ACCORDANCE WITH DIRECTION FROM OPM, BEGINNING

02:30PM  20   FEBRUARY 28TH, 2025, ALL DOD COMPONENTS MUST TERMINATE THE

02:30PM  21   EMPLOYMENT OF ALL INDIVIDUALS WHO ARE CURRENTLY SERVING A

02:30PM  22   PROBATIONARY OR TRIAL PERIOD.  FEBRUARY 28TH."

02:30PM  23        THESE TERMINATIONS ARE ONGOING EVERY DAY, YOUR HONOR.

02:31PM  24   THEY ARE NOT ALL IN THE PAST.  THIS IS AN ONGOING RULE THAT

02:31PM  25   THEY ARE CONTINUING TO ENFORCE AND APPLY.

```
02:31PM   1              AND TO SET ASIDE THAT, WE SAY THAT NEEDS TO BE RESCINDED

02:31PM   2    AND THE STATUS QUO IN ORDER FOR THIS COURT TO EFFECTUATE RELIEF

02:31PM   3    THAT IS PROVIDED UNDER THE APA GOING FORWARD TO UNWIND THE

02:31PM   4    UNLAWFUL ACTIONS OF OPM.  THAT IS WHY WE ARE ASKING NOT ONLY

02:31PM   5    FOR THE TERMINATIONS TO BE STOPPED, YOUR HONOR, BUT ALSO FOR

02:31PM   6    THE STATUS QUO EMPLOYMENT STATUS TO BE PUT BACK IN PLACE,

02:31PM   7    BECAUSE OTHERWISE EVERY DAY THAT THIS GOES ON, YOUR HONOR, THE

02:31PM   8    EFFECTS CONTINUE AND SNOWBALL.

02:31PM   9              AND IT WILL BE IMPOSSIBLE FOR THIS COURT AT THE END OF

02:31PM  10    THIS CASE TO ISSUE EFFECTIVE RELIEF.

02:31PM  11              THE COURT:  DOD IS NOT A PARTY.  OPM IS THE ONLY

02:31PM  12    DEFENDANT.

02:31PM  13         SO HOW WOULD THAT WORK?  I WOULD ORDER OPM TO DO WHAT?

02:32PM  14              MS. LEONARD:  OPM AND ALL OF THOSE ACTING IN

02:32PM  15    CONCERT, YOUR HONOR.

02:32PM  16              THE COURT:  OH, COME ON.

02:32PM  17              MS. LEONARD:  THAT'S --

02:32PM  18              THE COURT:  NO, NO.  THAT'S LIKE SOME KIND OF GIANT

02:32PM  19    RICO THING.  YOU SHOULD HAVE MADE SOME OF THESE PEOPLE PARTIES

02:32PM  20    MAYBE.

02:32PM  21              MS. LEONARD:  WELL, IF YOUR HONOR BELIEVES THEY'RE

02:32PM  22    PARTIES NECESSARY TO EFFECTUATE RELIEF, WE'RE HAPPY TO JOIN

02:32PM  23    THEM UNDER RULE 19 TONIGHT.  WE WILL JOIN, IF YOUR HONOR

02:32PM  24    BELIEVES THAT.  SO THE CLAIM IS AGAINST OPM.  THE CLAIM IS

02:32PM  25    AGAINST OPM.
```

02:32PM 1        OPM ENGAGED IN THE UNLAWFUL ACT.

02:32PM 2            THE COURT:  LET'S STICK WITH JUST OPM.  WHAT WOULD I

02:32PM 3    SAY TO OPM BY WAY OF RELIEF IF WE DID AN ORDER TODAY?

02:32PM 4            MS. LEONARD:  OPM MUST RESCIND ITS ORDER TO ALL

02:32PM 5    FEDERAL AGENCIES TO FIRE ALL PROBATIONARY EMPLOYEES WITH -- AND

02:32PM 6    THEY MUST RESCIND ENFORCEMENT OF THAT ORDER BECAUSE IT IS

02:32PM 7    UNLAWFUL AND ALL OF THOSE ACTING IN CONCERT.

02:32PM 8        I KNOW YOUR HONOR IS -- THAT -- UNDER RULE 65, WE WOULD

02:33PM 9    SUBMIT THAT, WE WOULD SUBMIT THAT THAT SHOULD BE OBEYED BY THE

02:33PM 10   AGENCIES, AND IF IT IS NOT, THEN THERE'S AN ENFORCEMENT ISSUE.

02:33PM 11       BUT WE ARE VERY HAPPY, YOUR HONOR, TO -- FOR PURPOSES OF

02:33PM 12   EFFECTUATING RELIEF, BECAUSE THEY ARE THE AGENCIES WHO HAVE

02:33PM 13   IMPLEMENTED OPM'S UNLAWFUL RULE, WE CAN ADD THEM AS DEFENDANTS,

02:33PM 14   YOUR HONOR, IF IT'S NECESSARY.

02:33PM 15           THE COURT:  ALL RIGHT.  I WANT TO GIVE THE OTHER

02:33PM 16   SIDE A CHANCE TO RESPOND.

02:33PM 17           MR. HELLAND:  THANK YOU, YOUR HONOR.

02:33PM 18       THIS POINT ABOUT HOW THESE OTHER AGENCIES ARE NOT PARTIES

02:33PM 19   IS CRITICAL.  IT GOES TO AN EARLIER POINT THAT PLAINTIFFS MADE

02:33PM 20   ABOUT WHY DECLARATIONS WERE NOT SUBMITTED.

02:33PM 21       THE OTHER AGENCIES WERE NOT PARTIES.  THE GOVERNMENT IN

02:33PM 22   ITS TWO DAYS TO PREPARE ITS OPPOSITION, DID NOT CONTACT OR DID

02:33PM 23   NOT WORK WITH NON-PARTIES TO PREPARE DECLARATIONS IN SUPPORT

02:33PM 24   HERE.

02:33PM 25       RELATEDLY, I THINK IT WOULD BE VERY PROBLEMATIC TO ISSUE A

(104 of 216), Page 104 of 216    Case: 25-1677, 03/18/2025, DktEntry: 16.2, Page 104 of 216
Case 3:25-cv-01780-WHA    Document 44    Filed 02/28/25    Page 49 of 74

49

02:34PM 1    TEMPORARY RESTRAINING ORDER AGAINST SOME SET OF NON-PARTIES WHO

02:34PM 2    HAVE NOT THEMSELVES HAD A CHANCE TO REPRESENT THEIR INTERESTS.

02:34PM 3        OPM IS THE PARTY AND OPM PREPARED ITS OPPOSITION, BUT I

02:34PM 4    THINK IT WOULD BE PROBLEMATIC TO EXPAND THAT TO NON-PARTY

02:34PM 5    AGENCIES.

02:34PM 6        TO RESPOND TO A FEW POINTS THAT PLAINTIFFS MADE IN THEIR

02:34PM 7    ARGUMENT.  THE COURTS HAVE REPEATEDLY REJECTED THIS ARGUMENT,

02:34PM 8    INCLUDING IN THE CASES THAT I MENTIONED PREVIOUSLY, THAT

02:34PM 9    SO-CALLED SYSTEMATIC OR NATIONWIDE TYPE CLAIMS CANNOT BE

02:34PM 10   ADEQUATELY HEARD THROUGH THE ADMINISTRATIVE PROCESSES.

02:34PM 11       IT WAS MADE IN THE DISTRICT COURT CASES THAT I POINTED

02:34PM 12   YOUR HONOR TO PREVIOUSLY.  IT ALSO CAME UP IN THE ELGIN

02:34PM 13   SUPREME COURT CASE, ELGIN VERSUS TREASURY WHERE I BELIEVE IT

02:34PM 14   WAS A CLAIM AGAINST THE CONSTITUTIONALITY OF THE DRAFT.  IT WAS

02:34PM 15   A NATIONWIDE CHALLENGE, AND THAT WAS HELD TO BE IMPROPERLY

02:34PM 16   CHANNELLED THROUGH THE ADMINISTRATIVE PROCESSES.

02:34PM 17       I ALSO UNDERSTAND THAT THERE ARE MECHANISMS FOR CLASSWIDE

02:34PM 18   RELIEF IN THE ADMINISTRATIVE PROCESSES.  SO THIS IDEA THAT

02:35PM 19   LARGE NUMBERS OF EMPLOYEES WON'T BE ABLE TO BE HEARD, I THINK

02:35PM 20   IT'S BELIED BY THE REGULATIONS THAT CONTEMPLATE IT.

02:35PM 21           THE COURT:  ARE YOU SURE OF THAT OR ARE YOU SAYING

02:35PM 22   THAT IS YOUR GUESS, CLASSWIDE RELIEF?

02:35PM 23           MR. HELLAND:  NO.  IF YOU GIVE ME ONE SECOND, I

02:35PM 24   THINK I CAN POINT YOU TO THE REGULATION.

02:35PM 25       BUT NO.  I'VE BEEN INFORMED BY AGENCY COUNSEL THAT THERE

02:35PM 1    ARE REGULATIONS THAT ALLOW FOR CLASSWIDE RELIEF IN THE MSPB

02:35PM 2    PROCEEDINGS.

02:35PM 3        SO, AGAIN, THIS GOES TO THIS ISSUE OF SO-CALLED SYSTEM

02:35PM 4    WIDE CLAIMS, NATIONWIDE CLAIMS NOT BEING THE TYPE THAT CAN BE

02:35PM 5    HEARD.  BUT THEY CAN AND OTHER COURTS HAVE FOUND THAT THEY CAN.

02:35PM 6        AND, OF COURSE, EVEN IF THE AGENCIES THEMSELVES CANNOT --

02:35PM 7    IN THE ADMINISTRATIVE PROCESSES DON'T HAVE THE FULL COMPETENCE

02:35PM 8    TO REVIEW ALL OF THESE ISSUES, THERE IS A FURTHER APPEAL

02:35PM 9    PROCESS TO THE COURTS OF APPEALS SUCH THAT ARTICLE III COURTS

02:35PM 10   CAN CONSIDER THESE VERY ISSUES.

02:35PM 11       THIS IS A GROUND THAT COMES UP AGAIN AND AGAIN IN THESE

02:35PM 12   DECISIONS HOLDING THAT SIMILAR CLAIMS ARE CHANNELLED THROUGH

02:35PM 13   THE ADMINISTRATIVE REVIEW PROCESSES.

02:36PM 14       THOSE SAME DECISIONS, WHICH RECOGNIZE THAT ULTIMATELY

02:36PM 15   THERE WILL BE JUDICIAL REVIEW, ALSO EXPLAIN THAT AGENCIES HAVE

02:36PM 16   IMPORTANT ROLES TO PLAY IN THAT ADMINISTRATIVE PROCESS.  THEY

02:36PM 17   CAN CLARIFY THE FACTUAL RECORD; THEY CAN MAKE PRELIMINARY LEGAL

02:36PM 18   RULINGS THAT, YES, WHILE SUBJECT TO FURTHER JUDICIAL REVIEW ARE

02:36PM 19   THEMSELVES VERY HELPFUL FOR THE REVIEWING COURTS; AND, OF

02:36PM 20   COURSE, THEY CAN MOOT ISSUES, RIGHT?  OR THEY CAN DECIDE ISSUES

02:36PM 21   IN WAYS THAT ARE NARROWER PERHAPS THAN CONSTITUTIONAL GROUNDS

02:36PM 22   BUT ARE FAVORABLE TO THE EMPLOYEES SUCH THAT FURTHER JUDICIAL

02:36PM 23   REVIEW ISN'T EVEN NECESSARY.

02:36PM 24       SO, AGAIN, THERE'S ALL OF THESE CONSIDERATIONS WHICH SHOW

02:36PM 25   THAT THERE IS AN ADEQUATE REVIEW PROCESS IN THE ADMINISTRATIVE

(106 of 216), Page 106 of 216 Case: 25-1677, 03/18/2025, DktEntry: 16.2, Page 106 of 216
Case 3:25-cv-01780-WHA   Document 44   Filed 02/28/25   Page 51 of 74

51

```
02:36PM   1    PROCESSES HERE.
02:36PM   2         COUNSEL MADE THE POINT THAT OPM WOULD NOT BE A PROPER
02:36PM   3    DEFENDANT IN THE ADMINISTRATIVE PROCEEDINGS BECAUSE THE
02:36PM   4    AFFECTED EMPLOYEES THEMSELVES ARE GENERALLY, NOT ALWAYS, BUT
02:36PM   5    GENERALLY EMPLOYEES OF OTHER AGENCIES.
02:37PM   6         I DON'T KNOW OF ANY REASON WHY IN THOSE PROCEEDINGS, THOSE
02:37PM   7    EMPLOYEES COULDN'T STILL MAKE THE ARGUMENT THAT THEIR
02:37PM   8    TERMINATION WAS UNLAWFUL FOR REASONS THAT ALLEGEDLY STARTED
02:37PM   9    WITH OPM.
02:37PM  10         NOW, AS A FACTUAL MATTER, WE STILL MAINTAIN THAT IT WAS
02:37PM  11    MERELY A REQUEST.  THERE WAS NO ORDER HERE.  AND WE WOULD BE
02:37PM  12    WILLING TO STIPULATE, BY THE WAY, THAT OPM'S ACTIONS WERE NOT
02:37PM  13    BINDING, THAT THEY DID NOT ISSUE BINDING ACTIONS ON THE
02:37PM  14    AGENCIES.
02:37PM  15         BUT ALL THAT BEING SAID, I DON'T THINK THERE'S ANYTHING
02:37PM  16    PREVENTING EMPLOYEES FROM MAKING THIS ARGUMENT IN THE PROPER
02:37PM  17    ADMINISTRATIVE PROCEEDINGS SIMPLY BECAUSE AN OPM ACTION IS
02:37PM  18    SOMETHING THAT SET OFF THIS PROCESS --
02:37PM  19         THE COURT:  I HAVE A SOMEWHAT RELATED QUESTION.
02:37PM  20         IS THERE ANY OTHER DISTRICT COURT DECISION OR CASE NOW
02:37PM  21    PENDING THAT RAISES THE SAME ISSUE AS THIS CASE?
02:38PM  22         MR. HELLAND:  WELL, I BELIEVE THE AFGE VERSUS EZELL
02:38PM  23    CASE IN THE DISTRICT OF MASSACHUSETTS RAISED VIRTUALLY THIS
02:38PM  24    ISSUE, AND THE TRO THERE I BELIEVE WAS DENIED.  IT'S ONE OF THE
02:38PM  25    CASES THAT WE'VE CITED.
```

```
02:38PM   1            I DON'T KNOW THE SUBSEQUENT STATUS OF IT, THAT IS, I DON'T

02:38PM   2    KNOW IF APPEALS ARE UNDERWAY OR IF FURTHER BRIEFING IS

02:38PM   3    HAPPENING THERE BUT --

02:38PM   4            THE COURT:  WELL, WHICH UNION WAS IT IN THAT CASE?

02:38PM   5            MR. HELLAND:  I BELIEVE AFGE WAS THE LEAD NAMED

02:38PM   6    PLAINTIFF.  FOR MANY OF THESE CASES THERE'S MULTIPLE UNIONS

02:38PM   7    INVOLVED, BUT I BELIEVE AFGE, THE SAME LEAD NAMED PLAINTIFF

02:38PM   8    HERE WAS THE NAMED PLAINTIFF.

02:38PM   9            THE COURT:  LET ME ASK THE PLAINTIFFS, ISN'T

02:38PM  10    THERE -- IT SOUNDS LIKE JUDGE SHOPPING TO ME TO HAVE A CASE GO

02:38PM  11    ON IN BOSTON AND ONE GOING HERE BY THE SAME PLAINTIFF

02:38PM  12    CHALLENGING THE SAME CONDUCT.

02:38PM  13        SO WHAT DO YOU SAY TO THAT POINT?

02:38PM  14            MS. LEONARD:  THE CASE IN THE DISTRICT COURT IN

02:38PM  15    MASSACHUSETTS CHALLENGED THE FORK IN THE ROAD PROGRAM,

02:38PM  16    YOUR HONOR, WHICH IS VERY DIFFERENT FROM OPM'S ORDER TO

02:39PM  17    TERMINATE.

02:39PM  18            THE COURT:  WELL, THAT HAS NOTHING TO DO WITH

02:39PM  19    PROBATIONARY EMPLOYEES?

02:39PM  20            MS. LEONARD:  THAT IS THE FORK IN THE ROAD PROGRAM

02:39PM  21    THAT WAS OFFERED BY OPM TO 2 MILLION --

02:39PM  22            THE COURT:  I'M SORRY.  THAT'S A DIFFERENT THING.

02:39PM  23    OKAY.

02:39PM  24        IS THERE ANOTHER CASE WHERE THE SAME UNION IS CHALLENGING

02:39PM  25    THE SAME CONDUCT, THE PROBATIONARY THING?
```

| | | |
|---|---|---|
| 02:39PM | 1 | MR. HELLAND:  PERHAPS NOT THE SAME UNION, |
| 02:39PM | 2 | YOUR HONOR.  AND I MAY HAVE MISSPOKEN, AND I APOLOGIZE FOR |
| 02:39PM | 3 | DOING SO. |
| 02:39PM | 4 | I BELIEVE THE CASE I'M THINKING OF IS ACTUALLY THE NTU |
| 02:39PM | 5 | CASE IN THE DISTRICT OF COLUMBIA, AND I DON'T BELIEVE THAT |
| 02:39PM | 6 | THERE'S ANY OVERLAP IN THE PLAINTIFFS THERE. |
| 02:39PM | 7 | MS. LEONARD:  THERE IS NOT, YOUR HONOR. |
| 02:39PM | 8 | THE COURT:  OKAY.  THEN ENOUGH ON THAT ONE. |
| 02:39PM | 9 | MS. LEONARD:  AND IF I MAY TO RESPOND TO COUNSEL'S |
| 02:39PM | 10 | POINT ABOUT OUR NOT ADDRESSING THESE CASES AND HE WAS TALKING |
| 02:39PM | 11 | ABOUT SEARCHING THE REPLY BRIEF. |
| 02:39PM | 12 | THE REASON IS THEY WERE ADDRESSED IN OUR OPENING |
| 02:39PM | 13 | MEMORANDUM, YOUR HONOR, ON PAGE 26.  I JUST WANT TO MAKE THAT |
| 02:39PM | 14 | VERY CLEAR THAT WE ARE NOT SHYING AWAY FROM THE DECISIONS THAT |
| 02:39PM | 15 | CHANNELLED OTHER TYPES OF CLAIMS THAT ARE DIFFERENT FROM THIS |
| 02:39PM | 16 | CASE.  WE HAVE ADDRESSED THEM AND DISTINGUISHED THEM.  THAT'S |
| 02:40PM | 17 | IN OUR OPENING MEMORANDUM. |
| 02:40PM | 18 | THE COURT:  LET'S GO TO THE STANDING OF THE |
| 02:40PM | 19 | ORGANIZATIONAL -- NOT THE UNIONS, BUT THE NON-UNION |
| 02:40PM | 20 | ORGANIZATIONS. |
| 02:40PM | 21 | MS. LEYTON:  YES, YOUR HONOR. |
| 02:40PM | 22 | WE HAVE A NUMBER OF ORGANIZATIONS IN THIS CASE THAT ARE |
| 02:40PM | 23 | NOT UNIONS.  THEIR RELATIONSHIP TO THESE ACTIONS IS NOT TENUOUS |
| 02:40PM | 24 | AS COUNSEL HAS CHARACTERIZED.  THERE ARE NUMEROUS VETERANS |
| 02:40PM | 25 | ORGANIZATIONS, VOTE VETS AS WELL AS THE COMMON DEFENSE |

(109 of 216), Page 109 of 216    Case: 25-1677, 03/18/2025, DktEntry: 16.2, Page 109 of 216
Case 3:25-cv-01780-WHA    Document 44    Filed 02/26/25    Page 54 of 74

54

02:40PM 1    ORGANIZATION; THERE ARE NUMEROUS PARKS ORGANIZATIONS AND PUBLIC

02:40PM 2    LANDS ORGANIZATIONS, AND A SMALL BUSINESS ASSOCIATION.

02:40PM 3         THOSE ORGANIZATIONS HAVE DEMONSTRATED IN THEIR

02:40PM 4    DECLARATIONS EXTENSIVE AND WIDESPREAD HARM THAT IS BOTH

02:40PM 5    ANTICIPATED AND IMMINENT AND HARM THAT HAS ACTUALLY OCCURRED.

02:40PM 6         STARTING WITH, FOR EXAMPLE, THE VETERANS ORGANIZATIONS.

02:41PM 7    THE DECLARATIONS SHOW THE TERMINATION OF EMPLOYEES WHO ANSWER

02:41PM 8    PHONES AND SCHEDULE APPOINTMENTS AT THE VA HOSPITALS, WHO STAFF

02:41PM 9    THE CRISIS LINE THAT IS AVAILABLE FOR VETERANS WHO ARE FACING

02:41PM 10   MENTAL HEALTH CRISES WHO HAVE SUICIDAL IDEATION AND NEED TO BE

02:41PM 11   CONNECTED WITH SERVICES, THAT ENGAGE IN ADDICTION RECOVERY

02:41PM 12   RESEARCH, BURN PIT EXPOSURE RESEARCH, ALL SORTS OF VETERANS

02:41PM 13   SERVICES THAT ARE CRITICAL TO THOSE ORGANIZATIONS.

02:41PM 14        VOTE VETS, WHICH REPRESENTS 2 MILLION VETERANS AND THEIR

02:41PM 15   FAMILIES ACROSS THE COUNTRY, HAS BEEN INUNDATED WITH CALLS FROM

02:41PM 16   VETERANS WHO ARE EXPERIENCING THE IMPACT AND ARE CONCERNED

02:41PM 17   ABOUT THE IMPACT, AS WELL AS REPRESENTING MANY FEDERAL

02:41PM 18   EMPLOYEES BECAUSE 30 PERCENT OF FEDERAL EMPLOYEES ARE VETERANS

02:41PM 19   BECAUSE OF THE PREFERENCES THEY HAVE.

02:41PM 20        THE ENVIRONMENTAL ORGANIZATIONS HAVE DEMONSTRATED HARMS TO

02:41PM 21   PROTECTIONS OF SPECIOUS THAT THE BUREAU OF LAND MANAGEMENT IS

02:42PM 22   NO LONGER RESPONDING TO A FREEDOM OF INFORMATION ACT REQUEST;

02:42PM 23   THAT THE TOADS AND THE FISH THAT ARE PROTECTED BY ENVIRONMENTAL

02:42PM 24   STATUTES WILL NO LONGER BE PROTECTED; THAT JOSHUA TREE WAS NOT

02:42PM 25   OPEN BECAUSE THERE WAS INADEQUATE STAFFING UP AT THE HATCHERY

02:42PM  1    THAT PROTECTS THE TOADS HAS LOST THEIR SUPERVISOR.  ALL SORTS

02:42PM  2    OF IMPACTS ON PUBLIC LANDS AND ON THIS COUNTRY'S NATIONAL

02:42PM  3    RESOURCES, AND THESE ORGANIZATIONS HAVE DEMONSTRATED HARMS TO

02:42PM  4    CRITICAL SAFETY PROJECTS:

02:42PM  5         CIVILIAN FIREFIGHTERS ON NAVAL BASES HAVE BEEN TERMINATED;

02:42PM  6    RESEARCH ON FIREFIGHTER SAFETY HAS BEEN LOST; FAA EMPLOYEES WHO

02:42PM  7    ARE WORKING ON SAFETY REGULATIONS AND WHO ARE PROCESSING

02:42PM  8    CANDIDATES FOR AIR TRAFFIC CONTROL PROGRAMS HAVE BEEN

02:42PM  9    TERMINATED; AND 10 PERCENT OF NSF EMPLOYEES WERE LAID OFF

02:42PM  10   TERMINATING CRITICAL MANAGERS OF NSF GRANT PROGRAMS.  SO THESE

02:42PM  11   ORGANIZATIONS HAVE DEMONSTRATED THAT THEIR MEMBERS HAVE FACED

02:42PM  12   INJURIES AND WILL BE HARMED AS WELL AS THE DECLARATIONS FROM

02:43PM  13   THE UNIONS DOCUMENTING THE EXTENSIVE IRREPARABLE HARM TO THEIR

02:43PM  14   MEMBERS.

02:43PM  15        AND I WOULD JUST LIKE TO ADD, YOUR HONOR, THAT THE

02:43PM  16   AGENCIES THAT ARE NOT CURRENTLY PARTIES BUT COULD BE ADDED AS

02:43PM  17   RULE 19 PARTIES IMPLEMENTED THE ORDER THAT OPM ISSUED THAT WAS

02:43PM  18   UNLAWFUL.

02:43PM  19        OUR CLAIM OF UNLAWFULNESS IS NOT ONLY PREDICATED ON OPM'S

02:43PM  20   ROLE OF OVERRIDING THE HEADS OF THE AGENCIES BUT IS ALSO

02:43PM  21   PREDICATED ON THE FACT THAT OPM INSTRUCTED THE AGENCIES TO DO

02:43PM  22   SOMETHING THAT WAS INDEPENDENTLY UNLAWFUL BECAUSE THEY TOLD THE

02:43PM  23   AGENCIES TO SAY THAT THESE EMPLOYEES WERE BEING FIRED FOR

02:43PM  24   PERFORMANCE REASONS, SOMETHING THAT WILL CREATE A STAIN ON THE

02:43PM  25   RECORD OF THESE EMPLOYEES AND HARM THEM IN THE FUTURE, EVEN

(111 of 216), Page 111 of 216    Case: 25-1677, 03/18/2025, DktEntry: 16.2, Page 111 of 216
Case 3:25-cv-01780-WHA    Document 44    Filed 02/28/25    Page 56 of 74

56

02:43PM  1    THOUGH THAT WAS NOT TRUE AND EVEN THOUGH IT IS ILLEGAL FOR THE

02:43PM  2    AGENCIES TO DO THAT.

02:43PM  3        SO IN ORDER TO CEASE THE UNLAWFULNESS AND RESTORE THE

02:43PM  4    STATUS QUO, IT IS NECESSARY NOT ONLY TO ENJOIN THE THOUSANDS OF

02:43PM  5    TERMINATIONS THAT WE KNOW ARE SCHEDULED FOR TOMORROW, THE

02:44PM  6    THOUSANDS OF TERMINATIONS THAT MAY BE SCHEDULED FOR TOMORROW

02:44PM  7    AND THE UPCOMING WEEKS, BUT ALSO TO ORDER THE AGENCIES TO -- TO

02:44PM  8    ORDER THE OPM TO HAVE THE AGENCIES RESCIND THEIR UNLAWFUL

02:44PM  9    IMPLEMENTATION OF THE OPM ORDER.  THAT IS WHAT IS NECESSARY TO

02:44PM  10   STOP THE ONGOING HARM TO THE ENVIRONMENT, TO VETERANS, TO THOSE

02:44PM  11   WHO ENJOY THE NATIONAL PARKS AND PUBLIC LANDS, AND TO ALL OF

02:44PM  12   THE IMPORTANT GOVERNMENT SERVICES THAT HAVE BEEN HARMED AND

02:44PM  13   WILL CONTINUE TO FACE ONGOING HARM UNTIL OPM'S DIRECTIVE AND

02:44PM  14   THE IMPLEMENTATION OF THAT DIRECTIVE IS ENJOINED.

02:44PM  15           THE COURT:  OKAY.  THANK YOU.

02:44PM  16           MR. HELLAND:  THANK YOU, YOUR HONOR.

02:44PM  17       OUR PRIMARY RESPONSE HERE IS THE FACTUAL ONE.  THERE WAS

02:44PM  18   NOT AN ORDER HERE, THERE WAS A REQUEST.  THE REQUEST WAS

02:44PM  19   CARRIED OUT BY SOME BUT NOT ALL AGENCIES, AND IT'S THOSE

02:44PM  20   AGENCIES INDEPENDENT INTERVENING ACTIONS THAT MORE PROXIMATELY

02:44PM  21   CREATE THE ALLEGED HARMS THAT PLAINTIFFS ARE DESCRIBING.

02:44PM  22       SO, IN OTHER WORDS, THE CHAIN OF CAUSATION BETWEEN THE

02:45PM  23   CHALLENGED ACTION AND THE ALLEGED HARMS IS TOO LONG TO SUPPORT

02:45PM  24   ARTICLE III STANDING.

02:45PM  25       SEPARATELY, THERE'S THE QUESTION OF REDRESSABILITY OR THE

02:45PM 1    RELATED CHANNELLING THROUGH THE ADMINISTRATIVE PROCESSES.

02:45PM 2        WHAT PLAINTIFFS ARE SEEKING HERE, THE RELIEF THAT THEY'RE

02:45PM 3    SEEKING IS THE REINSTATEMENT OF THESE FEDERAL EMPLOYEES WHOM

02:45PM 4    PLAINTIFFS SAY ONCE REINSTATED WILL BE ABLE TO TAKE ALL OF

02:45PM 5    THESE GOVERNMENT ACTIONS AND PERFORM THESE SERVICES THAT

02:45PM 6    PLAINTIFFS SAY ARE SO IMPORTANT.

02:45PM 7        WHILE THE MECHANISM FOR DOING THAT IS GOING THROUGH THE

02:45PM 8    ADMINISTRATIVE PROCESSES BECAUSE THE REINSTATEMENT OF THOSE

02:45PM 9    FEDERAL EMPLOYEES ARE EXACTLY THE KINDS OF PERSONNEL ACTIONS

02:45PM 10   THAT CONGRESS HAS SAID NEED TO BE CHANNELLED THROUGH THOSE

02:45PM 11   PROCESSES.

02:45PM 12       THE COURT:  BUT HOW COULD THE, HOW COULD THIS GROUP

02:45PM 13   THAT REPRESENTS THE PARKS, COALITION TO PROTECT AMERICA'S

02:45PM 14   NATIONAL PARKS, HOW COULD THEY GO TO THE MSPB AND LAUNCH --

02:46PM 15   THEY'RE NOT AN EMPLOYEE.

02:46PM 16       MR. HELLEND:  RIGHT.

02:46PM 17       THE COURT:  THEY HAVEN'T BEEN TERMINATED.

02:46PM 18   THE AGENCY WILL JUST LOOK AT THEM AND SAY YOU'RE JUST AN

02:46PM 19   INTERLOPER AND SIT ON THERE AND DO NOTHING.

02:46PM 20   I DON'T SEE HOW THE COALITION TO PROTECT AMERICAS NATIONAL

02:46PM 21   PARKS HAS ANY REMEDY AT THE MSPB.

02:46PM 22       MR. HELLAND:  WELL, I THINK THE POLITE WORD FOR AN

02:46PM 23   INTERLOPER IS AN INTERVENER, AND THEY COULD PETITION TO

02:46PM 24   INTERVENE.  SO THEY COULD BE HEARD OR THEY COULD ASK TO HAVE --

02:46PM 25       THE COURT:  THEY CAN'T INTERVENE UNLESS THE EMPLOYEE

02:46PM 1   BRINGS A CLAIM AND A LOT OF THEM ARE JUST GOING TO SAY FORGET

02:46PM 2   IT.  THEY DON'T WANT ME, I GUESS I'M GOING TO LEAVE, AND WITH A

02:46PM 3   STAIN ON MY RECORD.

02:46PM 4       BUT THEY'RE NOT GOING TO GO TO THE TROUBLE, A LOT OF THEM,

02:46PM 5   SOME OF THEM WILL, AND YOU MENTIONED SIX ALREADY HAVE.  BUT

02:46PM 6   THERE ARE THOUSANDS HERE.

02:46PM 7           MR. HELLAND:  WELL, SIX HAVE GONE THROUGH THE OFFICE

02:47PM 8   OF SPECIAL COUNSEL IN A RECORDED PROCEEDING, WHICH HAS ALREADY

02:47PM 9   RESULTED IN A STAY AND FOR WHICH WE UNDERSTAND THE SPECIAL

02:47PM 10  COUNSEL IS EXAMINING WAYS TO EXPAND THAT TO OTHER EMPLOYEES.

02:47PM 11      BUT HUNDREDS OF EMPLOYEES HAVE PETITIONED THE MSPB RELATED

02:47PM 12  TO THESE ACTIONS.  SO CERTAINLY AFFECTED EMPLOYEES ARE PURSUING

02:47PM 13  THAT.

02:47PM 14          THE COURT:  BUT NOT ALL, BUT NOT ALL.  AND MAYBE NOT

02:47PM 15  EVEN A MAJORITY, RIGHT?

02:47PM 16          MR. HELLAND:  PERHAPS NOT A MAJORITY.

02:47PM 17          THE COURT:  MAYBE JOSHUA TREE WILL HAVE TO STAY

02:47PM 18  CLOSED.

02:47PM 19          MR. HELLAND:  RIGHT, WHICH BRINGS ME BACK TO MY

02:47PM 20  FIRST POINT.  I BELIEVE THAT THAT IS JUST TOO ATTENUATED FROM

02:47PM 21  THE CHALLENGED ACTION HERE TO SUPPORT ARTICLE III STANDING.

02:47PM 22      YOU'RE TALKING ABOUT AN OPM REQUEST THAT GOES TO AN

02:47PM 23  AGENCY, THE AGENCY MAKES ITS OWN REVIEW, THAT RESULTS IN

02:47PM 24  STAFFING DECISIONS, THOSE STAFFING DECISIONS HAVE THEIR OWN

02:47PM 25  CONSEQUENCES IN TERMS OF WHETHER JOSHUA TREE OR YOSEMITE OR ANY

| | | |
|---|---|---|
| 02:47PM | 1 | NUMBER OF OTHER NATIONAL PARKS LOCATIONS CONTINUE TO RECEIVE |
| 02:47PM | 2 | STAFFING.  THERE'S SO MANY LINKS IN THAT CHAIN THAT IT DOESN'T |
| 02:47PM | 3 | SUPPORT ARTICLE III STANDING FOR THIS KIND OF CLAIM. |
| 02:48PM | 4 | I THINK CLAPPER IS PROBABLY THE BEST CASE ON POINT FOR |
| 02:48PM | 5 | THAT, BUT THE FUNDAMENTAL POINT REMAINS THAT YOU NEED TO HAVE A |
| 02:48PM | 6 | CLOSE CONNECTION BETWEEN THE CHALLENGED ACTION AND THE INJURY |
| 02:48PM | 7 | IN ORDER TO SUPPORT ARTICLE III STANDING AND THE VARIOUS STEPS |
| 02:48PM | 8 | THAT ARE AT ISSUE HERE ARE SIMPLY TOO MANY. |
| 02:48PM | 9 | THE COURT:  ANY REBUTTAL? |
| 02:48PM | 10 | MS. LEYTON:  YOUR HONOR, JUST ONE LEGAL POINT THAT I |
| 02:48PM | 11 | WANT TO POINT OUT, AND THIS RELATES TO WHAT MY COCOUNSEL |
| 02:48PM | 12 | ADDRESSED WITH CHANNELLING, BUT THE STATUTES REGARDING THE MSPB |
| 02:48PM | 13 | DO NOT ALLOW ORGANIZATIONS TO INTERVENE, AND THAT IS ADDRESSED |
| 02:48PM | 14 | ON PAGES 13 AND 14 OF OUR REPLY BRIEF.  SO I WOULD CALL YOUR |
| 02:48PM | 15 | ATTENTION TO THAT. |
| 02:48PM | 16 | I WOULD ALSO JUST POINT OUT, THIS IS CLASSIC ARTICLE III |
| 02:48PM | 17 | STANDING CLASSIC IRREPARABLE HARM, THIS KIND OF INJURY TO THE |
| 02:48PM | 18 | ABILITY TO ENJOY NATIONAL PARKS, TO GOVERNMENT SERVICES. |
| 02:49PM | 19 | THERE IS NO SUPPORT FOR THE ARGUMENT THAT THESE |
| 02:49PM | 20 | ORGANIZATIONS WOULD GET CHANNELLED.  THERE'S NO PRECEDENCE FOR |
| 02:49PM | 21 | THAT. |
| 02:49PM | 22 | AND THE REMEDIES THAT THE EMPLOYEES COULD OBTAIN IN THAT |
| 02:49PM | 23 | PROCEEDING, BACKPAY MANY YEARS FROM NOW, WOULD IN NO WAY REMEDY |
| 02:49PM | 24 | THE IMMEDIATE AND THE IRREPARABLE INJURY THAT THESE |
| 02:49PM | 25 | ORGANIZATIONS AND THEIR MEMBERS WHO THEY STAND IN THE SHOES OF, |

(115 of 216), Page 115 of 216    Case: 25-1677, 03/18/2025, DktEntry: 16.2, Page 115 of 216
Case 3:25-cv-01780-WHA    Document 44    Filed 02/28/25    Page 60 of 74

60

02:49PM  1    WHICH THE GOVERNMENT DOES NOT CONTEST, ARE FACING EVERY DAY

02:49PM  2    THAT THESE TERMINATIONS ARE ALLOWED TO STAND.

02:49PM  3              THE COURT:  ALL RIGHT.  WHAT OTHER ISSUES ARE THERE

02:49PM  4    THAT NEED TO BE ARGUED?  ANYTHING MORE?

02:49PM  5              MR. HELLAND:  I DON'T THINK WE HAVE OTHER ISSUES,

02:49PM  6    YOUR HONOR.

02:49PM  7         I WOULD ASK IN CLOSING THAT YOUR HONOR TAKE A VERY CLOSE

02:49PM  8    LOOK AT THE RECORD EVIDENCE.  I'M THINKING ABOUT THE WAY I

02:49PM  9    DESCRIBED THE BUCKETS PREVIOUSLY, BECAUSE I DON'T THINK IT

02:49PM  10   SUPPORTS THE ORDER THAT PLAINTIFFS ARE CHARACTERIZING IT.  I

02:49PM  11   THINK IT SHOWS THAT IT WAS MERELY A REQUEST AND ASK.

02:50PM  12        AND I WOULD ALSO ENCOURAGE YOUR HONOR TO TAKE A VERY CLOSE

02:50PM  13   LOOK TO LOOK AT THE THREE DISTRICT COURT DECISIONS THAT I'VE

02:50PM  14   BEEN REFERRING TO AND THE AFGE V. TRUMP D.C. CIRCUIT DECISION.

02:50PM  15              THE COURT:  THANK YOU.

02:50PM  16         MS. LEONARD:  THANK YOU, YOUR HONOR.

02:50PM  17         I THINK I WANT TO JUST CLOSE BY COMING BACK TO THE POINT

02:50PM  18   ABOUT THE SCOPE OF REMEDY BECAUSE THE GOVERNMENT HAS ARGUED

02:50PM  19   THAT WE SHOULD NOT BE ENTITLED TO A REMEDY THAT COULD ACTUALLY

02:50PM  20   ADDRESS THE PROBLEM THAT THIS CASE SEEKS TO ADDRESS, WHICH IS

02:50PM  21   RIPPING OUT THIS UNLAWFUL RULE FROM THE ROOT AND ENJOINING ITS

02:50PM  22   IMPLEMENTATION ACROSS THIS COUNTRY TO PREVENT THE HARMS THAT MY

02:50PM  23   COLLEAGUE WAS ADDRESSING.

02:50PM  24         WE RECOGNIZE THAT THIS IS AN EXTRAORDINARY ASK,

02:50PM  25   YOUR HONOR.

02:50PM  1      WE DO NOT DO THIS LIGHTLY.

02:50PM  2      BUT THESE ARE EXTRAORDINARY TIMES AND THIS IS

02:50PM  3  EXTRAORDINARY HARM.

02:50PM  4      AND ON BEHALF OF MY CLIENTS AND ALL OF THOSE SITTING IN

02:50PM  5  THIS COURTROOM WATCHING THIS CASE, BECAUSE THEY EITHER LOST

02:50PM  6  THEIR JOBS OR ARE NOT ABLE TO OBTAIN THE SERVICES FROM THE

02:50PM  7  FEDERAL GOVERNMENT THAT SHE SHOULD BE ABLE TO OBTAIN, WE ASK

02:50PM  8  THIS COURT RESPECTFULLY TO STOP THE UNLAWFUL DISMANTLING OF OUR

02:51PM  9  FEDERAL GOVERNMENT AND PUT OUR GOVERNMENT BACK TO WORK.

02:51PM 10      THE COURT:  OKAY.  JUST BEAR WITH ME A SECOND.

02:51PM 11      (PAUSE IN PROCEEDINGS.)

02:51PM 12      THE COURT:  I'M GOING TO GRANT LIMITED RELIEF, NOT

02:52PM 13  AS BROAD AS PLAINTIFFS WANT.  I'LL EXPLAIN WHY, AND I'LL GIVE A

02:52PM 14  MEMORANDUM OPINION IN DUE COURSE, BUT SINCE YOU'VE LEARNED THAT

02:52PM 15  EMPLOYEES ARE GOING TO BE TERMINATED TOMORROW FROM DOD, I THINK

02:52PM 16  I BETTER SAY WHAT I'M GOING TO SAY NOW.

02:52PM 17      CONGRESS HAS GIVEN THE AUTHORITY TO HIRE AND FIRE TO THE

02:52PM 18  AGENCIES THEMSELVES.

02:52PM 19      THE DEPARTMENT OF DEFENSE, FOR EXAMPLE, HAS STATUTORY

02:52PM 20  AUTHORITY TO HIRE, TO FIRE.

02:52PM 21      OPM DOES NOT.  OFFICE OF PERSONNEL MANAGEMENT DOES NOT

02:52PM 22  HAVE ANY AUTHORITY WHATSOEVER UNDER ANY STATUTE IN THE HISTORY

02:53PM 23  OF THE UNIVERSE TO HIRE AND FIRE EMPLOYEES WITHIN ANOTHER

02:53PM 24  AGENCY.

02:53PM 25      IT CAN HIRE ITS OWN EMPLOYEES, YES, IT CAN FIRE THEM.  BUT

02:53PM  1    IT CANNOT ORDER OR DIRECT SOME OTHER AGENCY TO DO SO.

02:53PM  2        I THINK ACTUALLY THE GOVERNMENT AGREES WITH THAT.  THE

02:53PM  3    DEFENSE AGREES WITH THAT.  IT WASN'T CLEAR BEFORE, BUT I THINK

02:53PM  4    THEY DO.

02:53PM  5        BUT THAT IS A CRYSTAL CLEAR STARTING POINT FOR THE

02:53PM  6    ANALYSIS HERE.

02:54PM  7        SO I'M GOING TO GO THROUGH SOME OF THE EVIDENCE.

02:54PM  8        THE QUESTION ON THE FACTS IS WHETHER OR NOT OPM ORDERED

02:54PM  9    THE AGENCIES TO TERMINATE PROBATIONARY EMPLOYEES WITH VERY

02:54PM  10   LIMITED EXCEPTIONS VERSUS WHETHER OPM GAVE GUIDANCE AND THAT

02:54PM  11   GUIDANCE WAS THEN TAKEN TO HEART BY THE AGENCIES THEMSELVES WHO

02:54PM  12   MADE THEIR OWN DECISION AND TERMINATED THESE PROBATIONARY

02:54PM  13   EMPLOYEES AND WILL DO SO IN THE FUTURE.

02:54PM  14       OPM DOES HAVE THE AUTHORITY TO GIVE GUIDANCE.  IT'S NOT

02:54PM  15   BINDING.  IT'S JUST GUIDANCE.

02:54PM  16       AND THE AGENCIES COULD THUMB THEIR NOSE AT OPM IF THEY

02:54PM  17   WANTED TO IF IT'S GUIDANCE.

02:54PM  18       BUT IF IT'S AN ORDER OR CAST AS AN ORDER, THEN THE

02:55PM  19   AGENCIES MAY THINK THAT THEY HAVE TO COMPLY EVEN THOUGH I'M

02:55PM  20   TELLING THEM RIGHT NOW THAT THEY DON'T.

02:55PM  21       OPM HAS NO AUTHORITY TO TELL ANY AGENCY IN THE

02:55PM  22   UNITED STATES GOVERNMENT, OTHER THAN ITSELF, WHO THEY CAN HIRE

02:55PM  23   AND WHO THEY CAN FIRE, PERIOD.

02:55PM  24       SO ON THE MERITS I THINK WE START WITH THAT IMPORTED

02:55PM  25   PROPOSITION.

(118 of 216), Page 118 of 216    Case: 25-1677, 03/18/2025, DktEntry: 16.2, Page 118 of 216
Case 3:25-cv-01780-WHA    Document 44    Filed 02/28/25    Page 63 of 74

63

02:55PM 1    NOW, ON JANUARY 20TH, CHARLES EZELL, ACTING DIRECTOR,

02:55PM 2 PROMULGATED A MEMORANDUM BASICALLY SAYING TAKE A LOOK AT ALL OF

02:55PM 3 THESE PROBATIONARY EMPLOYEES AND TAKE A CLOSE, HARD LOOK AND

02:56PM 4 SEE HOW MANY OF THEM YOU WANT TO RETAIN.

02:56PM 5    AND THEN ON FEBRUARY 13TH -- THE DEADLINE WAS SUPPOSED TO

02:56PM 6 BE THE 14TH.  ON FEBRUARY 13TH THERE WAS A PHONE CALL THAT I

02:56PM 7 WISH I HAD A TRANSCRIPT OF, BUT NO ONE HAS SUPPLIED ME WITH

02:56PM 8 THAT QUITE DIRECTLY.

02:56PM 9    BUT IN THAT IT WAS THEN FOLLOWED UP BY THE FEBRUARY 14TH

02:56PM 10 EMAIL.  AND THE REASON I BELIEVE THAT PLAINTIFFS ARE LIKELY TO

02:56PM 11 SUCCEED ON THE MERITS ON WHETHER OR NOT IT WAS AN ORDER IS

02:56PM 12 BECAUSE SO MANY AGENCIES HAVE SAID SO.  MAYBE THEY WEREN'T ON

02:56PM 13 THE PHONE CALL, BUT THEY HAVE SAID SO TO CONGRESS IN OTHER

02:57PM 14 PLACES UNDER OATH THAT IT WAS A DIRECTIVE.

02:57PM 15    I'LL JUST SUMMARIZE.

02:57PM 16    NSF, WE WERE DIRECTED.

02:57PM 17    DOD, IN ACCORDANCE WITH DIRECTION FROM OPM.

02:57PM 18    THE VA, THERE WAS DIRECTION FROM THE OFFICE OF PERSONNEL

02:57PM 19 MANAGEMENT.

02:57PM 20    I.R.S., REGARDING THE REMOVAL OF PROBATIONARY EMPLOYEES,

02:57PM 21 AGAIN, THAT WAS SOMETHING THAT WAS DIRECTED FROM OPM.  EVEN THE

02:57PM 22 LETTERS THAT YOUR COLLEAGUES RECEIVED YESTERDAY WERE LETTERS

02:57PM 23 THAT WERE WRITTEN BY OPM PUT THROUGH THE TREASURY AND GIVEN TO

02:57PM 24 US.

02:57PM 25    DOE, PER OPM INSTRUCTIONS, DOE FINDS YOUR FURTHER

(119 of 216), Page 119 of 216          Case: 25-1677, 03/18/2025, DktEntry: 16.2, Page 119 of 216
Case 3:25-cv-01780-WHA          Document 44          Filed 02/28/25          Page 64 of 74

64

02:57PM  1     EMPLOYMENT.

02:57PM  2         SO HOW COULD ALL OF THIS -- THIS IS SO -- HOW COULD SO

02:57PM  3     MUCH OF THE WORK FORCE BE AMPUTATED SUDDENLY OVER NIGHT?  IT'S

02:58PM  4     SO IRREGULAR AND SO WIDESPREAD AND SO ABERRANT FROM -- IN THE

02:58PM  5     HISTORY OF OUR COUNTRY, HOW COULD THAT ALL HAPPEN WITH EACH

02:58PM  6     AGENCY DECIDING ON ITS OWN TO DO SOMETHING SO ABERRATIONAL?  I

02:58PM  7     DON'T BELIEVE IT.  I BELIEVE THEY WERE DIRECTED OR ORDERED TO

02:58PM  8     DO SO BY OPM IN THAT TELEPHONE CALL.  THAT'S THE WAY THE

02:58PM  9     EVIDENCE POINTS.

02:58PM  10        NOW, IT COULD BE -- I WANT TO COMPLIMENT THE GOVERNMENT

02:58PM  11    LAWYER BECAUSE YOU HAVE A -- THIS IS A HARD CASE TO MAKE, AND

02:58PM  12    YOU'VE DONE AN HONORABLE JOB.  BUT THE EVIDENCE, EVEN THOUGH

02:58PM  13    IT'S CIRCUMSTANTIAL, IT'S NOT REALLY PRELIMINARY, BUT IT'S ALL

02:58PM  14    WE'VE GOT RIGHT NOW, IT POINTS AGAINST YOU AND IT POINTS IN

02:58PM  15    FAVOR OF THE PLAINTIFFS THAT THERE WAS AN ORDER TO TERMINATE

02:59PM  16    THESE PEOPLE.

02:59PM  17        NOW, IT COULD BE I THINK -- LET'S SAY THE JUSTICE

02:59PM  18    DEPARTMENT -- I DON'T KNOW, IT'S NOT IN THE RECORD -- THAT THEY

02:59PM  19    DIDN'T DO THIS.  WELL, THE JUSTICE DEPARTMENT IS FULL OF

02:59PM  20    LAWYERS.  THEY'RE GOING TO KNOW THAT OPM IS JUST OUT IN LEFT

02:59PM  21    FIELD.  THEY DON'T HAVE THE AUTHORITY TO TELL US TO DO THIS,

02:59PM  22    SCREW THEM.  SO THERE ARE GOING TO BE SOME AGENCIES WHO DO

02:59PM  23    THAT.

02:59PM  24        BUT THERE ARE GOING TO BE OTHER AGENCIES WHO ARE NOT AS

02:59PM  25    STRONG, NOT AS WELL-VERSED, WILLING TO KOWTOW TO OPM WHO TELLS

```
02:59PM   1     THEM WHAT TO DO.

02:59PM   2          SO THAT'S WHAT HAS HAPPENED HERE, WE'VE LOST A LOT OF

02:59PM   3     PROBATIONARY EMPLOYEES.

02:59PM   4          ALL RIGHT.  NOW, ULTRA VIRES.  OPM DOESN'T HAVE AUTHORITY

02:59PM   5     TO DO THAT.  IT'S ULTRA VIRES.  OPM DOES NOT HAVE AUTHORITY TO

03:00PM   6     DO THIS.  ULTRA VIRES, THAT MEANS IT'S BEYOND WHAT CONGRESS

03:00PM   7     TOLD THEM THEY HAVE THE AUTHORITY TO DO.

03:00PM   8          BUT THAT'S NOT THE END OF THIS COMPLICATED PROBLEM.

03:00PM   9          LET'S TURN TO THE ISSUE OF JURISDICTION.

03:00PM  10          THE GOVERNMENT I AGREE WITH.

03:00PM  11          WITH RESPECT TO THE UNION PLAINTIFFS, EVERY CASE IS ON

03:00PM  12     POINT AGAINST YOU.  IT'S SAYING YOU'VE GOT TO CHANNEL YOUR

03:00PM  13     CLAIMS THROUGH THE EMPLOYEES MERITS SYSTEMS PROTECTION BOARD.

03:00PM  14     NOW, I'M GOING TO FOLLOW THOSE OTHER DECISIONS WITH RESPECT TO

03:00PM  15     THE UNIONS.

03:00PM  16          I DO THINK THAT THERE IS AN ARGUMENT TO BE MADE IN FAVOR

03:00PM  17     OF THE UNIONS THAT I DON'T THINK YOU ACTUALLY MADE IT, BUT

03:01PM  18     MAYBE YOU SOMEHOW IN A FOOTNOTE DID, BUT TO MY MIND, WHEN

03:01PM  19     CONGRESS SET UP THE MSPB, WHICH I KIND OF REMEMBER, IT WAS

03:01PM  20     THINKING OF AN INDIVIDUAL WHO GOT SCREWED OVER IN THE CIVIL

03:01PM  21     SERVICE.  IT WASN'T THINKING OF MASSIVE, MASSIVE TERMINATIONS

03:01PM  22     THAT WOULD TAKE YEARS TO ADJUDICATE.

03:01PM  23          SO IS AN AGENCY ACTION THIS WIDESPREAD WITHIN THE

03:01PM  24     GOVERNMENT REALLY SOMETHING THAT CONGRESS INTENDED TO CHANNEL

03:01PM  25     THROUGH THE MERITS SYSTEMS PROTECTION BOARD?
```

(121 of 216), Page 121 of 216    Case: 25-1677, 03/18/2025, DktEntry: 16.2, Page 121 of 216
Case 3:25-cv-01780-WHA    Document 44    Filed 02/28/25    Page 66 of 74

66

| | | |
|---|---|---|
| 03:01PM | 1 | IF I WERE WRITING ON A CLEAN SLATE I WOULD SAY NO, BUT |
| 03:01PM | 2 | IT'S NOT A CLEAN SLATE.  AND ON THE SLATE THAT WE'VE GOT, |
| 03:01PM | 3 | PLAINTIFFS LOSE ON JURISDICTION AS TO THE UNIONS. |
| 03:01PM | 4 | BUT AS TO THE ORGANIZATIONS, THE PLAINTIFFS WIN.  I DO |
| 03:01PM | 5 | BELIEVE THAT THE PLAINTIFFS HAVE ORGANIZATIONAL STANDING UNDER |
| 03:02PM | 6 | SIERRA CLUB V. MORTON AND ITS PROGENY.  AND THEY'VE SHOWED THAT |
| 03:02PM | 7 | THE MEMBERS ARE HURT, THE ORGANIZATIONS ARE HURT BY THESE |
| 03:02PM | 8 | MASSIVE LAYOFFS -- NOT LAYOFFS, TERMINATIONS.  THEY'RE NOT EVEN |
| 03:02PM | 9 | LAYOFFS, THEY'RE TERMINATIONS, IN MANY CASES FOR PERFORMANCE, |
| 03:02PM | 10 | WHICH IS NOT TRUE. |
| 03:02PM | 11 | I JUST WANT TO SAY, IN ONE CASE, FIVE DAYS BEFORE HE WAS |
| 03:02PM | 12 | TERMINATED FOR PERFORMANCE HE GOT A GLOWING REPORT.  THAT WAS A |
| 03:02PM | 13 | GUY IN THE NSA I THINK. |
| 03:02PM | 14 | THAT DOESN'T LOOK RIGHT.  THAT'S JUST NOT RIGHT IN OUR |
| 03:02PM | 15 | COUNTRY, IS IT, THAT WE RUN OUR AGENCIES WITH LIES LIKE THAT |
| 03:02PM | 16 | AND STAIN SOMEBODY'S RECORD FOR THE REST OF THEIR LIFE?  WHO IS |
| 03:02PM | 17 | GOING TO WANT TO WORK IN A GOVERNMENT THAT WOULD DO THAT TO |
| 03:02PM | 18 | THEM? |
| 03:02PM | 19 | PROBATIONARY EMPLOYEES ARE THE LIFEBLOOD OF OUR |
| 03:03PM | 20 | GOVERNMENT.  THEY COME IN AT THE LOW LEVEL, AND THEY WORK THEIR |
| 03:03PM | 21 | WAY UP, AND THAT'S HOW WE RENEW OURSELVES AND REINVENT |
| 03:03PM | 22 | OURSELVES IN THE GOVERNMENT IS THROUGH PROBATIONARY EMPLOYEES. |
| 03:03PM | 23 | THEY'RE THE BRIGHT MINDS THAT COME OUT OF COLLEGE AND PH.D.'S, |
| 03:03PM | 24 | THE GENIUSES, AND THEY COME IN AS PROBATIONARY EMPLOYEES AND |
| 03:03PM | 25 | MAYBE THEY RISE UP, AND THEY ARE CONTRIBUTING TO OUR COUNTRY |

```
03:03PM   1    AND THEY WANT TO CONTRIBUTE.

03:03PM   2         SO WHEN WE TERMINATE PROBATIONARY EMPLOYEES IN A MASSIVE

03:03PM   3    WAY, IT HURTS THE MISSION OF THE AGENCIES WHICH IN TURN, THIS

03:03PM   4    COMES TO THEIR CONCRETE INJURY, IT HURTS THE MISSION OF THESE

03:03PM   5    ORGANIZATIONAL PLAINTIFFS.

03:03PM   6         SO I THINK THERE IS JURISDICTION AND STANDING WITH RESPECT

03:03PM   7    TO THE ORGANIZATIONAL PLAINTIFFS.

03:04PM   8         NOW, IN TERMS OF RELIEF, I MIGHT SAY IT BETTER IN

03:04PM   9    SOMETHING IN WRITING, BUT I DON'T HAVE IT READY YET.  BUT I AM

03:04PM  10    GOING TO HOLD THAT BY WAY OF RELIEF THAT THIS FEBRUARY 14TH

03:04PM  11    EMAIL COMMUNICATION AND THE JANUARY 20TH COMMUNICATION AND ALL

03:04PM  12    EFFORTS BY OPM IN SUPPORT THEREOF VIS-A-VIS THE AGENCIES THAT

03:04PM  13    ARE AFFECTED BY THESE PLAINTIFFS, AND I'VE GOT TO LIMIT IT TO

03:04PM  14    THOSE PLAINTIFFS AND THOSE AGENCIES, IS ILLEGAL, SHOULD BE

03:04PM  15    STOPPED, RESCINDED, AND I'M ORDERING OPM TO TELL THOSE AGENCIES

03:04PM  16    THAT.  IT'S ON THE GROUND OF ULTRA VIRES, AND IT'S ALSO ON THE

03:05PM  17    GROUND THAT IT VIOLATES THE APA AS A -- THEY SHOULD HAVE GONE

03:05PM  18    THROUGH THE PUBLIC RULE MAKING PROCESS, BUT THAT'S NOT THE MAIN

03:05PM  19    POINT.  THE MAIN POINT IS ULTRA VIRES.

03:05PM  20         SO I DO NOT HAVE A -- I HAVE NOT TRACED IT OUT.  I HAD IT

03:05PM  21    TRACED OUT SOMEWHERE.  THE COMMUNICATIONS WOULD ONLY HAVE TO GO

03:05PM  22    FROM OPM TO THE AGENCIES THAT ARE AFFECTED BY THESE

03:05PM  23    ORGANIZATIONAL PLAINTIFFS.

03:05PM  24         IT'S NOT EVERYBODY IN THE GOVERNMENT.  YOU DON'T HAVE

03:05PM  25    EVERYTHING COVERED.  I DON'T WANT TO HEAR ARGUMENT.  I'M RULING
```

03:05PM  1          NOW.

03:05PM  2                SO IT WOULD BE THE NATIONAL PARKS SERVICE.  IT WOULD BE

03:05PM  3          EVERY AGENCY THAT IS INVOLVED WITH THE VETERANS ADMINISTRATION.

03:05PM  4          IT WOULD BE BLM, PARK SERVICE, NSF.

03:06PM  5                (DISCUSSION OFF THE RECORD.)

03:06PM  6                THE COURT:  MY LAW CLERK IS TELLING ME I MISSPOKE,

03:06PM  7          BUT I DON'T UNDERSTAND WHAT HE'S TALKING ABOUT.  SO I'LL FIX IT

03:06PM  8          IN A MEMORANDUM OPINION.

03:06PM  9                BUT THAT'S MY RULING FOR TEMPORARY RELIEF.

03:06PM 10                SO I WANT YOU TO COMMUNICATE THIS BACK.

03:06PM 11                NOW, WHAT ABOUT THE DOD?  WELL, THE DOD IS NOT A PARTY AND

03:06PM 12          THERE'S NOBODY IN OUR RECORD -- IS THERE ANYONE IN OUR RECORD

03:06PM 13          THAT WAS DOD?

03:07PM 14                I DON'T THINK SO.  TELL ME.

03:07PM 15                I DON'T WANT TO HEAR ARGUMENT.  I JUST WANT TO HEAR AN

03:07PM 16          ANSWER TO MY QUESTION, DO YOU HAVE AN ORGANIZATION THAT TIES

03:07PM 17          INTO DOD?

03:07PM 18                MS. LEYTON:  IT DEPENDS ON A QUESTION THAT I HAVE.

03:07PM 19          THE VOTE VETS DOES REPRESENT MANY FEDERAL EMPLOYEES BECAUSE

03:07PM 20          30 PERCENT OF FEDERAL EMPLOYEES ARE VETERANS, SO THEY HAVE

03:07PM 21          MANY, MANY MEMBERS WHO ARE WORKING AT THE DEPARTMENT OF

03:07PM 22          DEFENSE.

03:07PM 23                THE COURT:  ALL RIGHT.  BASED ON THAT I'M GOING TO

03:07PM 24          SAY THAT I AM ORDERING OPM TODAY TO COMMUNICATE TO DOD TOMORROW

03:07PM 25          BEFORE THESE TERMINATIONS THAT THE JUDGE HAS RULED THAT THIS IS

03:07PM 1    INVALID, THE FEBRUARY 14TH, JANUARY 20TH, AND ALL EFFORTS BY

03:07PM 2    OPM TO ENFORCE IT ARE INVALID PENDING FURTHER ORDER OF THE

03:07PM 3    COURT.

03:07PM 4        NOW, I CAN'T ORDER DOD NOT TO TERMINATE THEM BECAUSE

03:07PM 5    THEY'RE NOT A PARTY BECAUSE YOU DIDN'T BRING THEM IN AS A

03:08PM 6    PARTY, BUT I'M DOING THE BEST I CAN WITH THE DECK I'VE BEEN

03:08PM 7    DEALT.

03:08PM 8        ALL RIGHT.  I WANT TO SET A HEARING AT WHICH -- WE SHOULD

03:08PM 9    HAVE AN EVIDENTIARY HEARING.

03:08PM 10       AND THE GOVERNMENT GETS TO DEPOSE -- NOT DEPOSE.  WE'RE

03:08PM 11   GOING TO HAVE HIM TESTIFY HERE IN COURT.

03:08PM 12       NOW, THE RULES GIVE YOU -- SAY I'VE GOT TO DO IT WITHIN

03:08PM 13   14 DAYS.  I'M WILLING TO DO IT WITHIN 14 DAYS, BUT IF YOU WILL

03:08PM 14   ALL STIPULATE, WE CAN DO IT LATER, I WOULD PREFER TO DO IT

03:08PM 15   LATER.

03:08PM 16       BUT WE'RE GOING TO HAVE EZELL COME OUT HERE AND HE'S GOING

03:08PM 17   TO BE UNDER OATH RIGHT UP THERE AND THESE LAWYERS ARE GOING TO

03:08PM 18   QUIZ HIM.  AND IF THERE IS ANY RECORD OF THAT TELEPHONE CALL,

03:08PM 19   IT SHOULD BE PRESERVED AND PRESENTED HERE IN COURT.

03:08PM 20       SO I WANT TO SEE THAT.

03:08PM 21       ALL RIGHT.  WHAT IS YOUR -- I DON'T WANT YOU TO ARGUE --

03:09PM 22   LET'S JUST FOCUS ON -- DO YOU UNDERSTAND WHAT I'M SAYING ABOUT

03:09PM 23   THE TRO?

03:09PM 24           MS. LEONARD:  I DO, YOUR HONOR.

03:09PM 25       ONE POINT OF CLARIFICATION.  THERE'S ONE MORE

| | | |
|---|---|---|
| 03:09PM | 1 | ORGANIZATION, MAIN STREET ALLIANCE, THAT IS SMALL BUSINESS, AND |
| 03:09PM | 2 | THE SMALL BUSINESS ADMINISTRATION -- |
| 03:09PM | 3 | THE COURT:  THEN THEY SHOULD BE NOTIFIED, SBA SHOULD |
| 03:09PM | 4 | BE NOTIFIED. |
| 03:09PM | 5 | MS. LEONARD:  AND THEN ALSO, YOUR HONOR, WE WOULD BE |
| 03:09PM | 6 | HAPPY TO DO THAT HEARING WITHIN 14 DAYS. |
| 03:09PM | 7 | THE COURT:  AM I HEARING 14 DAYS? |
| 03:09PM | 8 | THE CLERK:  YOU ARE, YOUR HONOR. |
| 03:09PM | 9 | THE COURT:  I AM.  OKAY.  I'M A SENIOR JUDGE, AND |
| 03:09PM | 10 | I'M NOT HERE EVERY DAY ANYMORE. |
| 03:09PM | 11 | OKAY.  WOULD YOU LIKE TO DO IT IN 14 DAYS? |
| 03:09PM | 12 | MR. HELLAND:  I THINK WE CAN BE -- I HAVE TO CONSULT |
| 03:09PM | 13 | WITH AGENCIES. |
| 03:09PM | 14 | THE COURT:  ALL RIGHT. |
| 03:09PM | 15 | MR. HELLAND:  I'M ALSO HAPPY TO CONFER WITH |
| 03:09PM | 16 | PLAINTIFFS ON THE SCHEDULE.  WE CAN SET IT FOR 14 DAYS BUT |
| 03:09PM | 17 | PERHAPS -- - |
| 03:09PM | 18 | THE COURT:  ALL RIGHT.  LET'S SET IT FOR 14 DAYS. |
| 03:09PM | 19 | WE'LL START IT AT 8:00 A.M. RIGHT HERE. |
| 03:09PM | 20 | NOW, YOU SHOULD TELL US WHICH ONES OF THEIR MANY |
| 03:10PM | 21 | DECLARANTS YOU WOULD LIKE TO CROSS-EXAMINE BECAUSE WE'RE GOING |
| 03:10PM | 22 | TO BE FAIR BOTH WAYS.  AND IF THERE'S ANYBODY ELSE IN THE -- I |
| 03:10PM | 23 | THINK MAYBE IT WOULD BE NICE TO HAVE SOMEBODY WHO WAS IN THAT |
| 03:10PM | 24 | PHONE CALL FROM THE AGENCIES, BUT YOU DON'T EVEN KNOW WHO THEY |
| 03:10PM | 25 | ARE YET. |

| | |
|---|---|
| 03:10PM | 1 |

03:10PM  1          MS. LEONARD:  IF I MAY, YOUR HONOR, ON THAT POINT?

03:10PM  2    WOULD WE BE ABLE TO GET EXPEDITED DISCOVERY IN THE FORM OF THE

03:10PM  3    GOVERNMENT IDENTIFYING THE INDIVIDUALS WHO WERE ON THAT PHONE

03:10PM  4    CALL WITHIN A COUPLE DAYS SO THAT WE CAN DECIDE --

03:10PM  5          THE COURT:  YES.  WHY DON'T WE GIVE THEM UNTIL NEXT

03:10PM  6    TUESDAY AT NOON, JUST THE IDENTIFICATION OF THOSE PEOPLE, AND

03:10PM  7    THEN MAYBE YOU GET TO PICK OUT THREE OR FOUR OF THOSE PEOPLE,

03:10PM  8    AND WE'LL ORDER THEM TO BE HERE AT THE EVIDENTIARY HEARING.

03:10PM  9       BUT THERE'S NOT TIME TO GO INTO DOCUMENT DISCOVERY AND

03:10PM  10   ALL.  THIS IS NOT YOUR BIG ANTITRUST CASE.  WE'VE GOT TO BE

03:10PM  11   VERY NARROWLY FOCUSSED.

03:10PM  12      BUT WOULD YOU LIKE TO DEPOSE ANY -- I THINK YOU SHOULD

03:11PM  13   THINK ABOUT IT AND LET THEM KNOW AND SAY, HEY, I WANT TO TALK

03:11PM  14   TO MR. NEUBACHER.  IS THAT HIS NAME?  HE USED TO BE THE

03:11PM  15   SUPERVISOR -- I THINK I USED -- I DIDN'T KNOW HIM PERSONALLY,

03:11PM  16   BUT BACK WHEN I HAD A LOT TO DO WITH YOSEMITE, I THINK HE WAS

03:11PM  17   THE SUPERINTENDANT, BUT HE'S NOT THERE ANYMORE.

03:11PM  18      SO YOU PICK OUT ONE.  YOU PICK OUT FIVE.  AND THEN IT MAY

03:11PM  19   TAKE US MORE THAN ONE DAY, BUT I HOPE WE CAN GET IT ALL DONE IN

03:11PM  20   ONE DAY IN TERMS OF AN EVIDENTIARY HEARING.

03:11PM  21      I CAN'T ORDER WHAT I'M ABOUT TO SAY BECAUSE WE DON'T HAVE

03:11PM  22   THE PARTIES IN FRONT OF ME TO GIVE RELIEF, BUT I AM GOING TO

03:11PM  23   COUNT ON THE GOVERNMENT TO DO THE RIGHT THING AND TO GO A

03:11PM  24   LITTLE BIT FURTHER THAN I HAVE ORDERED AND TO LET SOME OF THESE

03:12PM  25   AGENCIES KNOW WHAT I HAVE RULED BECAUSE I WOULD HATE FOR

(127 of 216), Page 127 of 216    Case: 25-1677, 03/18/2025, DktEntry: 16.2, Page 127 of 216
Case 3:25-cv-01780-WHA    Document 44    Filed 02/28/25    Page 72 of 74

72

```
03:12PM   1    PROBATIONARY EMPLOYEES TO LOSE THEIR JOB AND FOR THE GOVERNMENT

03:12PM   2    TO BE COMPROMISED.  AS I SAID, THESE ARE YOUNG PEOPLE AND

03:12PM   3    PROBATIONARY EMPLOYEES ARE THE LIFEBLOOD OF THESE AGENCIES, AND

03:12PM   4    IT WOULD BE A SHAME FOR SOMEBODY -- FOR THEM TO BE COMPROMISED

03:12PM   5    AND PREJUDICED NOT KNOWING ABOUT THE RULING AT LEAST BY ONE

03:12PM   6    DISTRICT JUDGE OUT IN CALIFORNIA.

03:12PM   7        I'LL TRY TO GET OUT A MEMORANDUM OPINION THAT EXPLAINS A

03:12PM   8    LITTLE BIT MORE.

03:12PM   9        OKAY.  ARE THERE ANY -- DO YOU UNDERSTAND THE RELIEF

03:12PM  10    GRANTED?

03:12PM  11             MR. HELLAND:  I DO, YOUR HONOR.

03:12PM  12             THE COURT:  ALL RIGHT.  ANYTHING YOU WANT TO BRING

03:12PM  13    UP ABOUT THE SCHEDULE GOING FORWARD?

03:12PM  14             MS. LEONARD:  ONE MORE PIECE OF BUSINESS,

03:12PM  15    YOUR HONOR.  WE HAVE ALREADY USED OUR ONE FREE AMENDMENT AND TO

03:13PM  16    THE EXTENT THAT WE WISH TO ADD AGENCIES AS RULE 19 DEFENDANTS,

03:13PM  17    DO WE HAVE LEAVE TO AMEND THE COMPLAINT AGAIN, YOUR HONOR?

03:13PM  18             THE COURT:  YEAH, I'D SAY YOU SHOULD HAVE LEAVE TO

03:13PM  19    DO THAT BUT THAT'S GOING TO BE -- IT COULD BE A VERY BIG JOB.

03:13PM  20    BUT, YES, YOU HAVE LEAVE TO AT LEAST MAKE THE MOTION.  I'M NOT

03:13PM  21    GRANTING OR APPROVING IT IN ADVANCE.  YOU HAVE LEAVE TO MAKE

03:13PM  22    THE MOTION.

03:13PM  23             MS. LEYTON:  THANK YOU, YOUR HONOR.

03:13PM  24             THE COURT:  OKAY.  WE HAVE NO FURTHER BUSINESS

03:13PM  25    TODAY.  WE HAVE A PLAN FOR GOING FORWARD.  GOOD LUCK TO BOTH
```

(128 of 216), Page 128 of 203   Case: 25-1677, 03/18/2025, DktEntry: 16.2, Page 128 of 216
Case 3:25-cv-01780-WHA   Document 44   Filed 02/26/25   Page 73 of 74

73

```
03:13PM  1        SIDES.

03:13PM  2               THE CLERK:   CLERK COURT IS ADJOURNED.

03:13PM  3          (COURT CONCLUDED AT 3:13 P.M.)

         4

         5

         6

         7

         8

         9

        10

        11

        12

        13

        14

        15

        16

        17

        18

        19

        20

        21

        22

        23

        24

        25
```

1

2

3                    CERTIFICATE OF REPORTER

4

5

6

7        I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE

8    UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9    CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10   HEREBY CERTIFY:

11        THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15

16                    IRENE RODRIGUEZ, CSR, RMR, CRR
                      CERTIFICATE NUMBER 8074
17

18                    DATED:  FEBRUARY 28, 2025

19

20

21

22

23

24

25

Pages 1 - 26

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William Alsup, Judge

AMERICAN FEDERATION OF         )
GOVERNMENT EMPLOYEES, AFL-CIO, )
et al.,                        )
                               )
          Plaintiffs,          )
                               )
  VS.                          )  **NO. C 25-01780-WHA**
                               )
UNITED STATES OFFICE OF        )
PERSONNEL MANAGEMENT, et al.,  )
                               )
          Defendants.          )
_____)

San Francisco, California
Thursday, March 6, 2025

**TRANSCRIPT OF REMOTE VIDEOCONFERENCE PROCEEDINGS**

**APPEARANCES**: (Appearances via Zoom.)

For Plaintiffs:
                    ALTSHULER BERZON LLP
                    177 Post Street, Suite 300
                    San Francisco, California 94108
          BY:  **STACEY M. LEYTON, ATTORNEY AT LAW**
               **DANIELLE E. LEONARD, ATTORNEY AT LAW**

For Defendants:
                    UNITED STATES ATTORNEY'S OFFICE
                    450 Golden Gate Avenue - Box 36055
                    San Francisco, California 94102
          BY:  **KELSEY J. HELLAND, ASST. U.S. ATTORNEY**

Reported Remotely By:  Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG
                    Official Reporter, CSR No. 12219

<u>**Thursday - March 6, 2025**</u>                              <u>**1:05 p.m.**</u>

P R O C E E D I N G S

---o0o---

**THE CLERK:**  Before we get started, one announcement:

Any recording of this proceeding by video, audio, or

screenshots is strictly prohibited by this Court.

We will get started momentarily.

(Pause in proceedings.)

**THE CLERK:**  This court is now in session.  The

Honorable William Alsup is presiding.

Calling Civil Action 25-1780, American Federation of

Government Employees, et al. versus United States Office of

Personnel Management, et al.

Counsel, please state your appearances for the record,

beginning with counsel for plaintiffs.

**MS. LEONARD:**  Good afternoon, Your Honor.  Danielle

Leonard from Altshuler Berzon for the plaintiffs.

**MS. LEYTON:**  Good afternoon, Your Honor.  Stacey

Leyton also from Altshuler Berzon, also for the plaintiffs.

**MR. HELLAND:**  And good afternoon, Your Honor.  This is

Assistant United States Attorney Kelsey Helland for the

defendants.

**THE COURT:**  All right.  Angie, is that it?

**THE CLERK:**  That's it, Your Honor.

**THE COURT:**  Okay.  Well, let's get started.

1    And I apologize if I get cut off.  It was very hard for me

2    to connect up here; and I'm far away from San Francisco, so

3    let's make good use of the time.

4    What is the need for this hearing?  Go ahead, Plaintiffs.

5    Hello?

6        **MS. LEYTON:**  It appears that Ms. Leonard has frozen,

7    so I will -- I will begin.

8    We have asked for this status conference because we have

9    indication that defendants do not intend to produce Mr. Ezell

10   at the upcoming hearing, as was ordered; and so we are

11   attempting to raise that issue with Your Honor.

12   It looks like Ms. Leonard has now rejoined.

13       **MS. LEONARD:**  Yes.  I'm very sorry.  Somehow it -- it

14   removed me -- something removed me from the -- from the Zoom

15   session.  I apologize.

16   And now I've been re-added, although that's my father's

17   name there, "Daniel Leonard"; but we'll fix that.  So, Your

18   Honor, I apologize for that.  I'm not sure what happened, but

19   we all have technical issues right now.

20   I'm assuming from Ms. Leyton's statement that you asked us

21   to explain what we are asking for.

22       **THE COURT:**  Yes.  Well, all right.  So let's hear what

23   the Government has to say.

24       **MR. HELLAND:**  Yes.  Thank you, Your Honor.

25   In short, no final decision has yet been made whether to

1   produce Mr.Ezell for the scheduled evidentiary hearing or to

2   seek relief from the Court's order, which would be done well in

3   advance of that upcoming hearing.

4       So it is not, Your Honor, the case that we've represented

5   we will not be producing Mr.Ezell, rather simply no decision

6   has been made from that.

7       As far as the timing goes, Your Honor, I do want to convey

8   that the Government is willing to consent to let the TRO remain

9   in place for two more weeks so that any issues related to

10  scheduling or other logistical or legal issues concerning the

11  upcoming hearing can be addressed.  But, in short, Your Honor,

12  it's not true that we have represented to the plaintiffs that

13  we won't be producing Mr. Ezell.

14      **THE COURT:**  Well, when do you think you will make a

15  decision?

16      **MR. HELLAND:**  Your Honor, by Monday.  We would ask

17  that by Monday we either confirm that we'll be producing

18  Mr. Ezell and any other witnesses that plaintiffs have

19  identified, or that we would move for any relief by that time

20  as well.

21      **THE COURT:**  Well, you will recall that when the

22  subject of an evidentiary hearing first came up, because of the

23  difference of Ezell versus the other declarations, I thought

24  you were quite enthusiastic and expectant about the evidentiary

25  hearing and him coming to testify -- testify.  So I am a little

```
 1    surprised by this turn of events.

 2        But here's the thing:  Is the issue that -- a burden on

 3    him to get on an airplane and come across the country?  Is that

 4    the issue?

 5            MR. HELLAND:  There -- Your Honor, at a very high

 6    level, there are multiple issues that we are actively

 7    considering.  I'm not authorized to take a position on any

 8    particular issue, but there's just a host of issues that we're

 9    working through related to the hearing.

10            THE COURT:  Well, here is -- because time is short and

11    this is Thursday.  Monday we will have burned up three or four

12    more days.  I have thought about the problem, and if the

13    problem is that he doesn't -- he's busy and doesn't want to

14    take the time to come in person, then I suggest that the

15    plaintiffs could come to Washington and take his deposition;

16    two hours should be sufficient.  And that could, then, be --

17    you could take your part of the deposition and they could take

18    their part of the deposition.  And -- but the plaintiffs

19    deserve two hours themselves, so -- plus whatever time you

20    would use.

21        So that would save him being on an airplane, coming to

22    San Francisco.  And then we could use his deposition in lieu of

23    the live testimony.  So I give that to you as an option.

24        And I suppose that another option could be that he could

25    appear remotely at the hearing and be examined by both sides
```

 1   from either his home or his office.  That would also save time.

 2   So those are -- those would be ways to reduce the burden of

 3   appearing at an evidentiary hearing.

 4       Now, you do need to remember this, though:  You yourself

 5   put forward his declaration.  In fact, it's the only

 6   declaration that the Government put forward and there is a

 7   serious fact issue.  And it is highly unusual for any party in

 8   litigation to try to get away with they get their say but no

 9   cross-examination.

10       One possibility would be that his -- his declaration would

11   be struck if he refuses to be examined under oath by the other

12   side.  You just can't have it both ways.

13       And I'm sure you understand what I'm saying.  This is not

14   like discovery, where the other side wants to go take

15   depositions of someone else who is not in -- this is someone

16   you yourself advanced as a declarant; and that is an important

17   thing for the Government to keep in mind.

18       Okay.  Monday -- what time on Monday will you let us know

19   your position?

20       **MR. HELLAND:**  We would ask for 5:00 p.m. Pacific,

21   Your Honor.

22       **MS. LEONARD:**  Your Honor, if I may be heard on the

23   timing of this?

24       **THE COURT:**  Yes.  Go ahead.

25       **MS. LEONARD:**  We would ask that the Government be --

```
 1    inform of us of its position today.  They've had since last
 2    Thursday, and what we're talking about is the Government's
 3    decision to defy this Court's order that you entered last
 4    Thursday.
 5        It is -- the issues that they are raising are not issues
 6    regarding inconvenience.  They are considering whether to
 7    appeal Your Honor's order.  And they've had that order since
 8    last Thursday.  Mr. Helland did not raise any objection at the
 9    hearing at all.  So this is by way, I suppose, of
10    reconsideration without even know knowing what these issues
11    are.
12        We are here today because time is of the essence, and with
13    respect to Mr. Helland and his clients, we need to know whether
14    we are going to be able to examine this witness or if the
15    declaration is going to be struck or what the result of this
16    is.  There's no reason -- absolutely no reason why the
17    Government cannot make a decision on its position with respect
18    to Mr. Ezell, and whether it is going to comply with this
19    Court's lawful order.
20            THE COURT:  Wait.  I thought they -- the TRO they did
21    comply with that.
22            MR. HELLAND:  Yes, Your Honor.
23            THE COURT:  Isn't is that what -- so what order are
24    they not complying with?
25            MS. LEONARD:  The order to produce to Mr. Ezell at the
```

```
 1   upcoming hearing.  You ordered that on the record at the TRO
 2   hearing, and they are considering not complying.
 3            THE COURT:  Look -- go ahead.
 4            MR. HELLAND:  If I may, Your Honor.  I don't mean to
 5   speak over you but --
 6            THE COURT:  Please, go ahead.
 7            MR. HELLAND:  As we've made clear at this hearing and,
 8   I think, to plaintiffs' counsel previously, we are not
 9   contemplating simply ignoring Your Honor's order or not
10   complying with it; we will either comply or we will seek relief
11   from it in advance of the hearing.  I want to be very clear
12   about that.
13        As far as the timing goes, Your Honor, as I've already
14   said we would -- the Government would be willing to extend the
15   TRO for two more weeks to give more time for these issues to --
16   to play out.
17            THE COURT:  What's wrong with giving them that time?
18        They're willing to extend the TRO.  I think the --
19   you know, it is the Government; they have to consult with
20   various arms of the government to decide what their strategy
21   will be.  And they will give us the answer by 5:00 on Monday,
22   and then if need be, we will extend the TRO by two weeks -- up
23   to two weeks.  So -- yes.
24            MS. LEONARD:  Apologies.
25            THE COURT:  Go ahead.
```

```
 1        MS. LEONARD:  Apologies.  It's very hard to -- on the

 2   Zoom to know when to -- if I'm interrupting.  I apologize.

 3        Your Honor, the issue with that is the whole reason we're

 4   here is to ask for immediate injunctive relief to prevent the

 5   ongoing harm that has been caused by OPM's unlawful actions.

 6        Extending the TRO is certainly a minimum, if we're going

 7   to move the PI hearing.  But we are asking for further relief

 8   both with respect to other agencies and with respect to the

 9   actual relief ordered by the Court.

10        At the TRO hearing, Your Honor, you -- and in your order,

11   indicated that you didn't believe that reinstatement could be

12   ordered based on the fact that the agencies were not joined.

13   We have now, very quickly, moved to join the agencies that have

14   received OPM's orders and have taken, themselves, unlawful

15   action terminating these employees.

16        The harm that is being caused is snowballing every day in

17   the loss of services, and even a two-week extension will cause

18   irreparable harm, Your Honor.  So we're prepared to move

19   forward as quickly as possible.  These are simply delay tactics

20   by the Government that has had your order since last Thursday.

21   And they're -- they're not even offering a good-cause reason,

22   Your Honor, for the -- for why they can't give you -- give you

23   their position and why they need this extension.  Their only --

24   their only reason is they haven't decided yet whether to

25   appeal.
```

1    And they -- the Government can make and its lawyers can

2    make that decision very quickly, Your Honor, and they should

3    have already decided that by now, frankly.

4        **THE COURT:**  Well, listen, I'm a former member of the

5    Solicitor General's Office, back when Jimmy Carter was

6    president, and in order to appeal, they have to get the SG's

7    approval.  So that's just one -- that's one step they've got to

8    go through; but there are other arms of the Department of

9    Justice and that -- they would -- and also the Office of

10   Personnel Management.

11       I don't think you're being -- I think you're exaggerating

12   the need and not appreciating the Government's need to sort it

13   out.  So I'm going to -- I disagree with you.

14       The Government -- don't wait until 5:00 p.m., I'm going to

15   give you until noon on Monday --

16       **MR. HELLAND:**  Understood.

17       **THE COURT:**  -- noon West Coast time on Monday.

18       And by that point, you need to either -- if you're going

19   to seek relief, that's when you have to do it.  You can't just

20   send a letter saying, "We're going to do it."  You've got to

21   file your motion.

22       Do -- I think that's what you mean; right?

23       **MR. HELLAND:**  Yes.

24       **THE COURT:**  You'll seek relief on Monday.

25       **MR. HELLAND:**  Yes, absolutely, Your Honor.  Yes.

1           **THE COURT:**  Now, it could be -- let's just make sure

2   we all understand.

3           If you -- let's say that you were to object to the order

4   to produce Ezell, and then go up on appeal.  The other part of

5   the -- the rest of the evidentiary hearing could go forward.

6   For example, plaintiffs, I believe from the hearing, are going

7   to present witnesses who can tell us what was said in the

8   telephone conference call that took place between the two --

9   the January 20 and the February 14th; I think, it was on

10  February 13.

11          I expect that's what the plaintiffs will do.  That's what

12  I had asked them to do because I would like to know what

13  happened in that phone call.  That part could go forward even

14  if -- even if Ezell does not testify.

15          So I -- I'm -- right now, I'm inclined to keep the -- keep

16  the hearing date even if Ezell does not testify.  But I will

17  listen and read your papers.

18          One other thing I want to say to the plaintiffs.  When I

19  said put -- you had permission to bring a motion to add

20  agencies as parties, I was -- I didn't use the right phrase.

21  But I was -- meant relief defendants.  In other words, they

22  should only be parties to the limited extent necessary to give

23  relief to something that OPM is found to have done wrong.

24          But what -- there's no way that I'm going to allow you to

25  bring in all these agencies and then, if other terminations

1    occur that are independent of OPM, that the agency does on its

2    own without -- without OPM's direction, then that's for another

3    lawsuit.  That's not for Old Bill to deal with.  That has to be

4    a brand-new lawsuit somewhere else.

5         My case, this case is OPM, OPM, OPM, and Ezell, Ezell,

6    Ezell, and the agencies only to the limited extent that they

7    are necessary to be relief defendants.

8         So I hope I'm making myself clear on that.  It just cannot

9    evolve into a gigantic lawsuit against all terminations.  I

10   am -- regardless of whether OPM is involved in the -- in the

11   case.

12        Do you understand what I'm saying?

13             MS. LEONARD:  I do, Your Honor.  But one point of

14   clarification if I may.

15             THE COURT:  Sure.

16             MS. LEONARD:  Because we have a certain number of

17   terminations that have happened to date, and I understand and

18   hear Your Honor and what you are saying about terminations that

19   are coming down the line and might be happening from this

20   moment forward.  But we have a certain number of terminations

21   that have happened to date and our understanding of the

22   Government's position is they are defending against the

23   unlawfulness of those terminations in two different ways.  They

24   are saying the agencies did it already and that OPM -- that,

25   you know, contrary to our evidence that OPM did it, and if they

```
 1   did it, it was lawful.

 2        So for the terminations that have happened to date, we --

 3   we had amended the complaint to -- to state a claim, Your

 4   Honor, even if they are right that the agencies did this to

 5   date, those are still unlawful terminations, Your Honor.

 6        THE COURT:  No, no.  If they're unlawful, those go to

 7   the Merit Systems Protection Board.

 8        That is kind of the classic case that -- where I would not

 9   have subject matter jurisdiction.  The -- so I am not agreeing

10   with you on that.

11        This case started out and should remain OPM-centric, and

12   OPM has got to be the one who did something unlawful in order

13   for you to get relief in this case.  It just can't be that

14   we're going to bring in all these other agencies, even if --

15   even if the agency did something independent, had nothing to do

16   with OPM, and let's say that it was in violation of the Civil

17   Service Reform Act, that's a clear case that goes to the Merit

18   Systems Protection Board.

19        So I am -- I'm not agreeing with you on that.

20        All right.  But I just -- I felt like, when your motion

21   came in, that -- this case is moving fast, so that's -- I'll

22   rule formally on it in due course; but that is my major

23   concern.

24        MS. LEONARD:  Understood, Your Honor.

25        THE COURT:  In terms of relief defendants -- relief
```

1   defendants, no problem.  That is -- that is a legitimate

2   addition.

3      Okay.  Now, to come back, have we done all the damage we

4   can do for now or can I -- do I need to stay on the line?

5      **MS. LEONARD:**  Your Honor, we do have two more issues

6   to raise with you today, here.

7      And the first is with respect to -- we understand that

8   we'll be getting the Government's position with respect to

9   whether or not they're going to try to challenge and appeal

10   your order with respect to Mr.Ezell.

11      They have produced the list of the participants on the

12   phone -- the February 13th phone call between OPM and the

13   agencies.  We have identified four of the individuals on that

14   list, as Your Honor ordered at the -- at the hearing last

15   Thursday.  And the Government has also not confirmed that they

16   will produce those individuals for the hearing.

17      They are also not giving us an answer on that issue.  And

18   we obviously need to know whether they're going to do that in

19   order to be able to cross-examine them and get to the truth of

20   what happened with respect to these OPM orders.

21      So that is issue Number 1.

22      There's a second issue, Your Honor.  The New York Times

23   reported today that one of the individuals, the chief human

24   capital officer of the IRS, that Your Honor cited in -- in the

25   order after the plaintiffs put forward the evidence of that

1   person's public statements regarding OPM's direction, was

2   placed by the defendants on admin- -- was placed by its agency

3   on administrative leave.  And it's very concerning, Your Honor,

4   that that occurred after Your Honor's order identifying that

5   evidence.

6        We would like to subpoena that person to come testify at

7   the PI hearing next week, Your Honor.  And we would like

8   the Court's permission to do so.

9        So there are two issues:  The four people from the list;

10  and the IRS -- they call them "chicos" -- the IRS "chico" who

11  the Government put on administrative leave after her statements

12  were cited in Your Honor's order.

13          MR. HELLAND:  May I briefly be heard on these?

14          THE COURT:  Sure.

15          MR. HELLAND:  So I had envisioned that the first point

16  was already covered by Your Honor's order.  I think, Your Honor

17  commented on it or at least a related point already.  So I

18  would just propose that our response to both of these points be

19  presented by the same noon Monday deadline.  We can either

20  include them in our papers or separately respond to plaintiffs

21  directly on these points.  But we would just do so at that same

22  time, Your Honor.

23          THE COURT:  Well, before I agree to that, is it true

24  that the IRS person was put on administrative leave?

25          MR. HELLAND:  This is literally the first I'm hearing

```
 1    of it, Your Honor.  I had not heard that before plaintiffs'

 2    counsel mentioned it just now.

 3             MS. LEONARD:  We can represent to Your Honor that we

 4    believe it to be true.

 5             THE COURT:  Well, have you subpoenaed the people that

 6    you want?

 7        You should go ahead and subpoena them to appear at the

 8    hearing.  Don't wait for the Government to agree or not to

 9    agree.  You -- you're a big firm.  You have vast resources.

10    You should go subpoena those people.

11        But, in addition, I want the Government to tell me on

12    Monday at noon that -- whether they're going to produce them

13    voluntarily at the hearing or at a deposition or by -- remotely

14    at -- at the evidentiary hearing.

15             MR. HELLAND:  Yes, Your Honor.  Understood.

16             THE COURT:  Do the plaintiffs have any other witnesses

17    to that telephone call that are cooperative with you?

18             MS. LEONARD:  So the list of -- we would need to

19    subpoena individuals.

20        So, Your Honor, we understood that your -- you ordered the

21    Government already to produce up to four of the individuals on

22    that list, so that's what we have asked them to do.  Any other

23    individuals who are current government employees we would need

24    to subpoena.

25             THE COURT:  I don't remember how I worded my order.
```

```
 1    So if I ordered it, okay, I'll stand by that.  I just don't
 2    remember now; and I can't say that you're reading what I said
 3    correctly.
 4        I would like to have those people at the hearing, and I
 5    would ask the Government to please cooperatively bring them.
 6    But if you're going to insist on a subpoena, then -- then I
 7    would at least ask you to accept service of the subpoena.
 8            MR. HELLAND:  I hear you, Your Honor; and we will set
 9    our response on all of this forward at -- on noon on Monday.
10            MS. LEONARD:  So, Your Honor, you can see the problem
11    with the timing that we have here, because we have had -- so
12    the order was in the transcript of the hearing on -- on
13    Thursday.  I think Your Honor was quite clear.
14        And when we talked about that telephone call as to
15    their -- their need to give us the list of individuals and then
16    our ability to call up to four of them at the hearing, we have
17    complied with that and we are quite concerned, again, that what
18    we're hearing hear today is that the Government is shifting
19    positions and is not -- is considering not making those
20    individuals available in response to this Court's order.
21        We would -- we would -- we -- we're concerned that if we
22    wait until Monday to get their position, Your Honor, that with
23    respect to both Mr. Ezell and, now, these four other witnesses,
24    that it will be difficult to conduct any hearing on -- on
25    Thursday if the Government is refusing to put forward any of
```

```
 1    the witnesses for that hearing.

 2        And -- and the timing, again, is being driven by what we

 3    see as an escalating harm every single day.  And we would like

 4    the opportunity to --

 5        THE COURT:  Is there any -- I mean, there were several

 6    agencies that I -- that -- for which you had standing and that

 7    I ordered OPM to rescind the memos.  And I -- from reading the

 8    press it seemed to me that that has been done.

 9        Is there an agency where they did not rescind and an

10    agency is just going ahead and -- under some weird belief that

11    OPM can direct them to terminate people?

12        I don't think so.

13        MS. LEONARD:  The Department of Defense, Your Honor.

14    The Department of Defense has continued to terminate people

15    using the template from OPM.  We can provide you with the

16    proof.

17        THE COURT:  Yes, but is it -- the template is one

18    thing.  But is Department of Defense doing this under

19    compulsion from OPM?

20        MS. LEONARD:  We believe that they are.  And if it

21    looks like a duck, walks like a duck, and quacks like a duck,

22    just because you put a paper on it that says "Oh, it's the

23    agency's discretion" -- which is what OPM did this week -- that

24    doesn't mean it's not a duck, Your Honor.

25        They are absolutely still acting under compulsion from OPM
```

```
1   and all of the --

2          THE COURT:  Oh, I don't know.  You're going to have to

3   have proof of that.

4      Which one of your plaintiffs has standing to sue the DOD?

5          MR. HELLAND:  I believe the veterans' organizations.

6          THE COURT:  No, I thought they were suing -- for the

7   VA -- the Veterans Administration, I totally agree.  But for

8   Department of Defense --

9          MS. LEONARD:  I believe, that was the basis of

10  Your Honor's order last week, yes.

11     And I would also say, Your Honor, if I may, that all of

12  the terminations to date we will prove to Your Honor were done

13  because of centralized instructions from OPM.  And the question

14  in this case, absolutely, is:  How do we effectuate relief and

15  stop the irreparable harm that those terminations are causing?

16         THE COURT:  You should be -- you should be getting

17  your evidence ready to prove that.  It's not just your say-so.

18  I believe that you probably suspect that sincerely, but that's

19  a strong statement that you just made, and you should come to

20  the evidentiary hearing with some witnesses who can bear that

21  out.

22     And for the moment, though, the witnesses that are under

23  the control of the Government, they have a legitimate -- I

24  don't want to say "right," but interest that I'm going to give

25  them time to consider and talk with others in the government.
```

```
1    So I'm not -- I'm sticking with noon on Monday for the

2    Government to respond.

3         And, yes, you will have to possibly move heaven and Earth

4    on a short leash -- okay? -- timetable.

5         While you're doing all that, I have a criminal trial

6    starting on Monday.  I will have to interrupt the criminal

7    trial to hear your case -- which I will do, but I -- you know,

8    your case is not the only case that I have, and not the only

9    case the Government has.  So I'm -- I'm sorry.  You're asking

10   for too much and I'm denying -- I'm denying a more expedited

11   schedule for the Government.  They --

12             MS. LEONARD:  I understand --

13             THE COURT:  They're going to go tell us and make their

14   motion, if they're going to do it at all, Monday at noon.  And

15   today is Thursday and -- I'm sorry, but I think they need the

16   time to do it.  That's the only -- it's fair.

17        Now, with respect to the IRS person, that would be deeply

18   disturbing if somebody was terminated for that reason.  I'm not

19   saying I have jurisdiction, even, over it, but it would greatly

20   disturb me if compliance with my orders turns out to get people

21   on administrative leave.

22        So I'm going to order the Government attorney now to

23   investigate this and report by tomorrow at noon by letter.

24        You can do that.

25             MR. HELLAND:  And, Your Honor, is that a letter that
```

```
 1    you want to --
 2             THE COURT:  To me -- to me and counsel to tell me --
 3    to tell me is it true --
 4             MR. HELLAND:  Thank you, Your Honor.
 5             THE COURT:  -- that they put him on administrative
 6    leave, and did this lawsuit have anything whatsoever to do with
 7    that administrative leave.
 8             MR. HELLAND:  Thank you, Your Honor.
 9         I just want to be clear.  This is not something that would
10    be filed on a public docket, but will be submitted to Your
11    Honor --
12             THE COURT:  No, it will be on the public document.
13             MR. HELLAND:  Oh, okay.
14             THE COURT:  On the public docket.  Yes.
15         You can do it by letter or by -- by formal noticed
16    statement that would -- just a report to the Court on whether
17    it's true and -- or if it's not fully true, to what extent is
18    it true.
19             MR. HELLAND:  Understood, Your Honor.
20             THE COURT:  All right.  Now, does the plaintiff have
21    anything more?
22             MS. LEONARD:  With respect to the hearing next week --
23    so I think we understand absolutely and we appreciate all the
24    balancing of considerations and -- going into Your Honor's
25    order; and we will wait for the Government's position.
```

1      And if they agree to make the people available, there is

2   no problem; we will be ready to go on Thursday, and we will

3   confirm that.

4      If they refuse to make the four individuals on the list

5   who have the direct knowledge of the telephone call between OPM

6   and the agencies -- which they have now admitted occurred, and

7   if they refuse to make Mr. Ezell available, notwithstanding the

8   declaration, should we submit our -- I'm asking what happens

9   then, Your Honor, in terms of the Court's preferred procedures

10  next.

11      Because we will need to, I believe, discuss the

12  implications for the evidentiary hearing and the PI,

13  including -- so should we file a response to the Government's

14  position by noon the next day?  What would your -- what would

15  the Court prefer?

16          **THE COURT:**  Yeah, that would be a good step to take.

17      But my plan is to have the hearing no matter what.

18  Even -- unless the Court of Appeals directs me not to have the

19  hearing, we're going to have the hearing.

20      And even if the Government witnesses don't show up, that

21  could just result in striking the declaration.  That would be a

22  home run for you, the plaintiffs, because then the -- they

23  would have no proof and the -- so I'm going to have the

24  hearing.  I'm going to hold this hearing in person in

25  San Francisco, and whoever's witnesses come, I'm going to

```
 1   listen to them.

 2        And we will also have argument over where we go next, and

 3   whether or not the TRO is merely extended or strengthened or

 4   whatever.

 5        But, you know, you have access, Plaintiffs, to witnesses,

 6   I'm sure, that are not beholden to the Government, and you

 7   ought to be thinking about bringing them to the hearing and

 8   presenting them live.

 9            MS. LEONARD:  Your Honor --

10            THE COURT:  Give the other side notice of who they're

11   going to be so they can prepare to cross-examine.  But you

12   should be prepared to bring your witnesses.

13        I'm sorry.  Go ahead.  I interrupted you.

14            MS. LEONARD:  No, I interrupted you, Your Honor.  I

15   apologize.

16        Part of the problem here is that the Government has taken

17   the actions that it has taken in secrecy, Your Honor.  And the

18   participants on the phone calls and Zoom meetings between OPM

19   and the agencies are government employees.  And we are asking

20   the Government, per Your Honor's orders, to make those people

21   available.

22        So it is difficult for us to provide Your Honor with

23   witnesses with direct knowledge of the content.  We certainly

24   have circumstantial evidence -- but direct knowledge of content

25   of those communications -- which is really at the heart of it
```

```
 1    and what Your Honor was seeking to hear the truth on -- without

 2    the Government making those individuals available.

 3         THE COURT:  Well, all right.  Yes.  I see your

 4    problem.

 5         And one thing you might be considering to do is a -- a

 6    prompt -- by "prompt" I mean within a few hours -- filing

 7    within the Court of Appeals to get your side of the equation

 8    before the Court of Appeals.  And -- so if that's where the

 9    issue is going to wind up, that's where -- listen here.

10         I want to be very clear.  When I say the Government has a

11    legitimate need to balance all these -- have their

12    conversations, please do not misrepresent that to the Court of

13    Appeals.  I in no way think that it would be proper for the

14    Government to put forward Mr. Ezell as a witness and refuse to

15    let him be cross-examined.  Zero.

16         Do not say to the Court of Appeals that -- when I use the

17    words "a legitimate," I meant that you have a legitimate need

18    to consult within the Government; but on the merits of what

19    you're trying to, I totally disagree.  I think these people

20    should be made available to be -- so that we can get at the

21    truth of what happened here.

22         So that's -- let's be very clear.  Don't misrepresent what

23    I'm saying in this phone call on the merits that -- I stand by

24    what I said earlier.  They should show up next Thursday until

25    such time as I either change the order or the Court of Appeals
```

```
 1   makes me do so.

 2        MS. LEONARD:  Your Honor, in -- Your Honor had

 3   suggested earlier with respect to Mr. Ezell that we -- one of

 4   Government's alternatives, if there really is a scheduling

 5   issue, would be to make him available in D.C. for deposition.

 6     With respect to the other four individuals, the plaintiffs

 7   would be willing to go to D.C. and take their depositions early

 8   next week so that could be used at the -- at the preliminary

 9   injunction hearing as well.  Of course, we prefer --

10        THE COURT:  That would be very much appreciated.  I

11   think that might solve some of the logistics problems, if there

12   are -- if it really is logistics.

13        MS. LEONARD:  And we, of course, would prefer if the

14   Government would make them available, as they have been ordered

15   to do.

16     But I wanted to make it very clear that the plaintiffs are

17   very willing to do that and so if the objection is to bringing

18   them here to this Court -- which, of course, this Court has

19   venue and jurisdiction over this case and the ability to order

20   their appearance.  But if that is the objection, that is not an

21   objection that the Government should be raising.

22        THE COURT:  Well, if they -- yes, that's fine.  Thank

23   you for that.

24     That could, in certain circumstances, solve the problem.

25   It depends on what is motivating the Government, and the
```

```
 1   Government doesn't want to say yet.

 2        So all right.  Are we done?

 3             MR. HELLAND:  I believe so, Your Honor.

 4             MS. LEONARD:  I believe that is all from -- Your

 5   Honor, we understand that you have authorized us to subpoena

 6   the IRS CHCO who has --

 7             THE COURT:  Yes, please do.

 8             MS. LEONARD:  Thank you.

 9             THE COURT:  Please do.  And if the Government will

10   not, by noon tomorrow, accept service, the Government attorney,

11   then you have the Court's permission to track her down and

12   serve her in person.

13        Now, there is a thing called the Touhy regulations.  I

14   think it's T-O-U-H-Y.  So you better look into that.  Maybe

15   that only applies to the DOJ, but you better look and see

16   what -- if you have to go through some administrative hoops to

17   subpoena a government employee.

18             MS. LEONARD:  I appreciate that, Your Honor.

19             THE COURT:  Okay.  Thank you all.  I look forward to

20   seeing you next week.

21             MR. HELLAND:  Thank you, Your Honor.

22             MS. LEONARD:  Thank you very much, Your Honor.

23             THE CLERK:  Court is adjourned.

24                  (Proceedings adjourned at 1:44 p.m.)

25                       ---o0o---
```

1

2                    <u>**CERTIFICATE OF REPORTER**</u>

3          I certify that the foregoing is a correct transcript

4    from the record of proceedings in the above-entitled matter.

5

6    DATE:   Friday, March 7, 2025

7

8

9

10

11    _____
           Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG, CSR No. 12219
                  Official Reporter, U.S. District Court

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Pages 1 - 59

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William Alsup, Judge

AMERICAN FEDERATION OF          )
GOVERNMENT EMPLOYEES, AFL-CIO,  )
et al.,                         )
                                )
          Plaintiffs,           )
                                )
  VS.                           )     NO. 25-cv-01780-WHA
                                )
UNITED STATES OFFICE OF         )
PERSONNEL MANAGEMENT, et al.,   )
                                )
          Defendants.           )
_____  )

San Francisco, California
Thursday, March 13, 2025

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiffs:
                    ALTSHULER BERZON LLP
                    177 Post Street, Suite 300
                    San Francisco, CA  94108
              BY:   **DANIELLE EVELYN LEONARD, ATTORNEY AT LAW**
                    **STACEY M. LEYTON, ATTORNEY AT LAW**
                    **EILEEN B. GOLDSMITH, ATTORNEY AT LAW**

                    STATE DEMOCRACY DEFENDERS ACTION
                    2022 Columbia Road, NW, Suite 214
                    Washington, DC 20009-1309
              BY:   **NORMAN L. EISEN, ATTORNEY AT LAW**

          **(APPEARANCES CONTINUED ON THE NEXT PAGE.)**

REPORTED REMOTELY BY:  Kendra A. Steppler, RPR, CRR
                       Official United States Reporter

**App.155**

**APPEARANCES:** **(Continued)**

```
                    STATE OF WASHINGTON ATTORNEY GENERAL
                    1125 Washington Street SE
                    Olympia, WA 98501-2283
           BY:      TERA M. HEINTZ, ATTORNEY AT LAW

For Defendants:

                    UNITED STATES ATTORNEY'S OFFICE
                    450 Golden Gate Avenue, Box 36055
                    San Francisco, CA 94102
           BY:      KELSEY J. HELLAND, ASST. U.S. ATTORNEY
```

```
 1   Thursday - March 13, 2025                           8:01 a.m.

 2                      P R O C E E D I N G S

 3                          ---oOo---

 4         THE COURTROOM DEPUTY:  All rise.  Court is now in

 5   session.  The Honorable William Alsup is presiding.

 6         THE COURT:  Good morning, everyone.

 7         ALL:  Good morning, Your Honor.

 8         THE COURT:  Please be seated.

 9         THE COURTROOM DEPUTY:  Calling Civil Action 25-1780,

10   American Federation of Government Employees, et al. v. U.S.

11   Office of Personnel Management, et al.

12      This hearing -- people on the Zoom -- attendees -- no

13   recording, whether by audio or video or screenshot, is allowed.

14   It's prohibited -- it's prohibited.

15         THE COURT:  That was unclear.  You said "allowed."

16         THE COURTROOM DEPUTY:  No.  No recording.

17         THE COURT:  You said "prohibited."  Which is it?

18         THE COURTROOM DEPUTY:  No recording, audio or

19   screenshots, are allowed.

20      Counsel, please approach the podium and state your

21   appearances for the record, beginning with counsel for

22   plaintiffs.

23         MS. LEONARD:  Good morning, Your Honor.  Danielle

24   Leonard, Altshuler Berzon, for the plaintiffs.  With me at

25   counsel table are Stacey Leyton and Eileen Goldsmith from
```

```
 1   Altshuler Berzon, Norm Eisen from the State Democracy Defenders
 2   Fund, and Tera Heintz from the Attorney General's Office of the
 3   State of Washington.
 4            THE COURT:  Welcome.
 5            MR. HELLAND:  And good morning, Your Honor.  Assistant
 6   United States Attorney Kelsey Helland for the Government.
 7            THE COURT:  Thank you.  Welcome.
 8        All right.  We're here on a motion for preliminary
 9   injunction, and we'll hear some argument.
10        Are there any other items that we need to address?  Let's
11   hear first from plaintiffs.
12            MS. LEONARD:  Thank you, Your Honor.
13        I'm happy to provide argument on the preliminary
14   injunction.  I do think that there are some additional items to
15   address that we can --
16            THE COURT:  Well, just --
17            MS. LEONARD:  -- get to after we --
18            THE COURT:  -- let me hear what -- let's make a list
19   of whatever it is you have in mind.  I don't want to hear the
20   arguments on them yet, but let's -- tell me what needs to be
21   decided.
22            MS. LEONARD:  We have a pending request that a certain
23   additional declaration be struck from the record that was filed
24   yesterday.
25        We also --
```

1          THE COURT:  Is that Noah Peters?

2          MS. LEONARD:  Yes, Your Honor.

3          THE COURT:  All right.  So let's -- what else?

4          MS. LEONARD:  There is also the issue of Mr. Ezell's

5    failure to appear in response to your court order that he

6    appear on Monday.

7          THE COURT:  What else?  There was some --

8          MS. LEONARD:  That's --

9          THE COURT:  -- somebody from the IRS wanted to come

10   and testify but wanted immunization, which I can't give.  So

11   I -- is that person here and wants to testify or is that moot?

12         MS. LEONARD:  So it's not moot, Your Honor.  But just

13   for clarification, it wasn't necessarily immunization.  It was

14   just a court order enforcing the subpoena to provide --

15         THE COURT:  No, you don't need a court order to

16   enforce a subpoena.  That's what the subpoena itself is.

17         MS. LEONARD:  Your Honor, there's --

18         THE COURT:  No.  I'm not going to do that.

19         MS. LEONARD:  Okay.

20         THE COURT:  I know what's going on there.  Some lawyer

21   wants to be able to say that Judge Alsup has immunized her and

22   given her a blank check to say whatever she wants and not be

23   punished for it.  No.  If she wants to come and testify, I will

24   hear what she has to say.  But, no, you don't need a court

25   order.  I'm not going to do that.

1          **MS. LEONARD:**  Okay.  I very much appreciate that

2     clarification, Your Honor, but I also for -- just to clarify,

3     that the person wanted protection against retaliation.

4          **THE COURT:**  I can't give her that in advance.

5          **MS. LEONARD:**  Okay.

6          **THE COURT:**  Do you understand that?

7          **MS. LEONARD:**  I --

8          **THE COURT:**  This is a sideshow.  Why are you going of

9     into a sideshow?

10         **MS. LEONARD:**  Because we --

11         **THE COURT:**  All right.  Is she here and does she want

12    to testify?

13         **MS. LEONARD:**  She's not here today.

14         **THE COURT:**  Okay, then it's moot.  All right.  Let's

15    move on.

16         What else is on your list?

17         **MS. LEONARD:**  I think that's it, Your Honor.

18         **THE COURT:**  All right.  We will deal with Noah Peters

19    and Ezell's failure to appear in the course of general

20    argument.  You get to go first.

21         **MS. LEONARD:**  Thank you, Your Honor.

22         Your Honor, many of the issues that are raised by our

23    request for a preliminary injunction have already been

24    addressed in your Court's -- in the orders thus far in the

25    case, including the order resolving the TRO and the recent --

1    more recent order on granting leave to amend.

2        And so those legal issues I'm happy to address further if

3    there is a need, but I'm going to try to keep this focused on

4    the issues that are still in play.

5        And what we have before the Court is record evidence that

6    conclusively establishes that OPM directed the terminations at

7    issue.  We have a very unusual circumstance where the

8    Government has not mounted -- has attempted to say they

9    factually dispute that.  But as Your Honor is very familiar

10   with the course of events here, have actually withdrawn the

11   declaration by which they were attempting to dispute that.  And

12   there is no record evidence on the other side by which they've

13   disputed this fact and the mountain of evidence that Your Honor

14   recognized at the TRO stage.

15       **THE COURT:**  Well, but then they substituted Noah

16   Peters.  So what is the -- your opinion on that and what is the

17   law that backs it up?

18       **MS. LEONARD:**  So they have not substituted Mr. Peters'

19   declaration, Your Honor, because he -- that testimony was not

20   presented for cross-examination and should not be considered by

21   the Court.  It was presented with an *ex parte* motion to stop

22   this hearing today, Your Honor.  That is the purpose for which

23   they presented that declaration, to slide it into the record.

24       Out of an abundance of caution, we asked them to withdraw

25   that declaration because they are not making Mr. Peters

1    available to be cross-examined, just like all of the other

2    Government witnesses that we tried to present to the Court to

3    have the truth of what has happened come out and that they have

4    refused and blocked from appearing here.  They have not

5    presented --

6         **THE COURT:**  I tend to agree with you on that.  And the

7    Government, I believe, has tried to frustrate the Judge's

8    ability to get at the truth of what happened here and then set

9    forth sham declarations to -- a sham declaration -- they

10   withdrew it, then substitutes another.  That's not the way it

11   works in the U.S. District Court.  I'm going to talk to the

12   Government about that in a minute.

13        I had expected to have an evidentiary hearing today in

14   which these people would testify.  And if they wanted to get

15   your people on the stand, I was going to make that happen too.

16   It would be fair.  But, instead, we've been frustrated in that.

17        But I still -- we're here on a preliminary injunction.

18   And if you want me to just wait until months go by, until we

19   ever get the evidentiary hearing, I will do that.  But we do

20   have a record here, and I'd like to hear your views on what

21   relief should be issued today -- T-O-D-A-Y -- today.

22        **MS. LEONARD:**  Thank you, Your Honor.

23        We are aligned in wanting that to happen, as well, and

24   believing that these issues are a distracting sideshow, however

25   important the truth is.

1    The record before Your Honor absolutely supports the

2    issuance of a preliminary injunction today.  And the reason is,

3    even if the Peters' declaration's considered, which it

4    shouldn't be for all those reasons, it's not credible.  There's

5    a mountain of evidence before the Court that OPM directed it.

6    OPM's actions were unlawful.  The plaintiffs have standing.

7    And there is irreparable harm that is occurring every minute.

8    And it is snowballing.

9         So the real question here, Your Honor, is remedy.  And we

10   are happy to go straight to that point rather than repeating

11   some --

12             THE COURT:  All right.  Tell me what remedy you want.

13             MS. LEONARD:  Okay.  So my colleague, Ms. Leyton, is

14   actually going to address the remedy issues, so I'm going to

15   turn it over to her.

16             THE COURT:  Okay.

17             MS. LEYTON:  Thank you, Your Honor.

18        As a remedy, we would request vacatur of the OPM action,

19   rescission of the directive to the agencies, and rescission of

20   the terminations that were carried out pursuant to that

21   directive.

22        OPM issued the directive.  Our belief is that the evidence

23   in the record establishes that.  There is no credible contrary

24   evidence that it's caused the widespread loss and deterioration

25   of Federal Government services, including, as documented by the

1    declarations, habitat and conservation harms, national parks

2    harms, veterans' services, a variety of harms that are

3    illustrated by the tens of declarations that we have submitted.

4    And it's causing injury to a variety of plaintiffs.

5         So the only appropriate relief is to order both OPM to

6    rescind its directives and the agencies to rescind the actions

7    that they took pursuant to the unlawful directive in

8    implementation of that directive.

9         The voluntary cessation cases, which we cited in our reply

10   brief, provide some guidance.  There, the question there is

11   whether the Government has done enough that the Court should

12   no -- no longer need act in order to remedy the relevant

13   injuries.

14   The first prong of the voluntary cessation injury is about

15   a different subject.  It's about whether we can be assured --

16             **THE COURT:**  All right.  Well, let me ask you --

17        **MS. LEYTON:**  Yes.

18             **THE COURT:**  -- this.

19   Are there -- I've read through some of the papers

20   submitted to me that some of the people who were terminated

21   were rehired; is that true?

22        **MS. LEYTON:**  Yes, Your Honor.  After this Court issued

23   an order, some were rehired pursuant to that, and then there

24   has been some public outcry over things like the loss of the

25   nuclear safety people.

**App.164**

```
1            THE COURT:  All right.  But have there been others who

2    were terminated who have not yet been rehired?

3            MS. LEYTON:  Most have not been rehired, Your Honor.

4            THE COURT:  Can you give me some examples?

5            MS. LEYTON:  The examples where they were rehired

6    included the Department of Labor rescinded the terminations

7    that had not taken effect.  All of the other agencies that we

8    have documented -- the Forest Service, the Department of

9    Agriculture, the Department of Education, the Department of

10   Labor -- most of the agencies have not rehired people.

11        The ones where we are aware, where the probationary

12   employees were rehired, were the National Science Foundation,

13   which occurred fairly quickly after this Court's order; the CDC

14   rescinded some of the terminations; the Department of Labor

15   rescinded terminations that had not yet happened; the

16   Department of Agriculture has taken steps but has not yet

17   rescinded the -- has not yet brought people back to work, is

18   our understanding.  And that was addressed in some of the

19   declarations that we submitted earlier this week.

20           THE COURT:  All right.  Where does it stand with

21   relief being sought from the Merit Systems Protection Board by

22   terminated employees?

23           MS. LEYTON:  The Merit Systems Protection Board

24   initially addressed six individual employees and ordered those

25   employees back to work.  Then there was a class of Department
```

**App.165**

1    of Agriculture employees -- 6,000 Department of Agriculture

2    employees -- who were ordered back to work.  That's what our

3    most recently submitted declarations address.

4        Our understanding is that those people are not yet back to

5    work.  The Office of Special Counsel, Hampton Dellinger, was

6    terminated after that order issued, after he sought that class

7    relief, and so we are not aware that those individuals have

8    actually been brought back to work to restore the services that

9    they were providing, which is the injury that this Court is

10   seeking to redress.

11       **THE COURT:**  I'm going to have some more questions

12   later about that whole process, but I want to hold up for a

13   moment and stick with the main things.

14       Okay.  What else by way of relief are you seeking today?

15       **MS. LEYTON:**  That is the key relief.

16       We would also ask that there be a compliance report from

17   the Federal Government.  Our understanding, as this Court noted

18   in its order, is that OPM should have a list of all of the

19   probationary employees who were terminated.  And so we would

20   like confidential reports from OPM as to which probationary

21   employees have been brought back to their job so that those

22   Government services can be restored.  We would ask for a

23   timeline and for reports to this Court.

24       Under either our *ultra vires* claim or the APA claim, the

25   appropriate remedy is to restore the status quo.  Vacatur is

1  supposed to unwind the unlawful agency action, and injunctive

2  relief is available under both the APA and our *ultra vires*

3  claim in order to redress the injuries that have occurred.

4      And in order to do that, this Court needs to be assured

5  that those actions that were taken pursuant to the unlawful

6  order have been fully unwound, meaning that people have been

7  brought back to work so that the services can be restored.

8          **THE COURT:**  All right.  Thank you.

9      Let's hear from the Government.

10         **MS. LEYTON:**  Thank you, Your Honor.

11         **MR. HELLAND:**  Thank you, Your Honor.

12     I didn't hear counsel address any of the evidence that we

13  submitted yesterday, including contemporaneous statements from

14  agency heads saying that they were the ones who made the

15  decision to terminate probationary employees.

16     We submitted, yesterday, press releases from the VA, from

17  the Department of Defense, from the USDA, including statements

18  from the Senate-confirmed officials or high-ranking career

19  officials in those departments saying these were tough

20  decisions, but ultimately it's the right thing to do.  Or the

21  USDA press release.  USDA is pursuing an aggressive workforce

22  optimization plan.

23     This is set against the backdrop of the

24  February 11th Executive Order, where the President directed

25  agencies to dramatically improve workforce efficiency to shrink

1    the size of the Federal Government, and the White House fact

2    sheet from that same date, February 11th, that said that

3    shrinking the size of the federal workforce is one of the

4    Administration's top priorities.

5        At the TRO hearing, Your Honor was, I think, looking for a

6    reason, other than OPM's mandate, that all of these agencies

7    would be taking this same action at the same time.  I submit

8    that this backdrop, including the evidence that we submitted

9    yesterday, shows the obvious alternative explanation.

10       This was a priority for the Administration.  The political

11   leadership of these agencies were taking this action

12   themselves.  In fact, we previously pointed out to Your Honor

13   that on February 7th, before the OPM communications that

14   plaintiffs have put at the center of this case, the SBA had

15   already started terminating probationary employees.  That was

16   reported in the media.

17       I don't think plaintiffs have yet acknowledged this

18   evidence that these were the actions of the political

19   leadership of these agencies in response to a priority -- a

20   clearly communicated public priority -- of the Administration

21   rather than an order from OPM.

22       That's first, Your Honor.  Your Honor, has -- may I speak

23   to a couple of questions that Your Honor had?

24           **THE COURT:**  Go ahead.

25           **MR. HELLAND:**  So, first, Your Honor, with respect to

 1   the MSPB actions, it's my understanding that there's not just

 2   one class petition pending, but there are several from

 3   almost -- I don't know if it's almost all, but many of the

 4   agencies that are here.  There's a website, in fact, that lists

 5   the class petitions by agency.  So many of the agencies

 6   involved here are covered by those.

 7         As far as I know, Your Honor, the MSPB has not yet decided

 8   whether to accept those as class actions, but those requests

 9   are pending.  There's still time for that to play out.

10         And then going to the probationary employees who were

11   reinstated, Your Honor, I think NSF here is the exception that

12   proves the rule.  All of these other agencies -- after

13   receiving Your Honor's order, after OPM amended its guidance on

14   March 4th to clarify that it hadn't been and still was not

15   directing terminations -- virtually all of them decided not to

16   bring back the probationary employees that their leadership had

17   decided to terminate.  NSF did bring them back.  That was

18   within its prerogative do so.  But virtually no other agency

19   did.  Maybe a couple others.  So I think that that actually

20   shows that --

21         **THE COURT:**  Well, maybe that's why we need an

22   injunction that tells them to rehire them.  You will not bring

23   the people in here to be cross-examined.  You're afraid to do

24   so because you know cross-examination would reveal the truth.

25         **MR. HELLAND:**  Respectfully --

```
 1        THE COURT:  This is the U.S. District Court.  Whenever
 2   you submit declarations, those people should be submitted to
 3   cross-examination, just like the plaintiffs' side should be.
 4   And we -- then we get at the truth of whether that's what --
 5   your story is actually true.  I tend to doubt it.  I tend to
 6   doubt that you're telling me the truth whenever we hear all the
 7   evidence eventually.
 8        Why can't you bring your people in to be cross-examined or
 9   to be deposed at their convenience?  I said two hours for
10   Mr. Ezell, a deposition, at his convenience.  And you withdrew
11   his declaration rather than do that?  Come on.  That's a sham.
12        Go ahead.  I'm -- it upsets me.  I want you to know that.
13   I've been practicing or serving in this court for over
14   50 years, and I know how we get at the truth.  And you're not
15   helping me get at the truth.  You're giving me press releases,
16   sham documents.
17        All right.  I'm getting mad at you and I shouldn't.
18   You're trying to do your best, and I apologize.
19        All right.  Go ahead.  I do have a question, though.  I
20   want you to answer on the --
21        MR. HELLAND:  Thank you, Your Honor.
22        THE COURT:  Just a minute.  I'm going to let you
23   respond.
24        But all of those -- see, they give me so much stuff, I
25   can't find the thing that I wanted now.  But the letter that --
```

1   that template letter, which I don't have here anymore -- the

2   template letter said to the employees that got terminated that

3   "You may" -- it didn't say "you do," it said, "You may have

4   rights to appeal to the MSP."  "You may have" -- I'll quote it

5   now.  I have it here.  Quote, "You may have a right to file an

6   appeal with the Merit Systems Protection Board" -- may have --

7   "on the limited" -- limited -- "grounds set forth in 5 C.F.R.

8   315806."

9        Well, I looked at that to see what that was, and it is

10  limited to circumstances that existed prior to their

11  employment.  Did you realize that when you told me that they

12  had the right to go to the MSPB?

13       **MR. HELLAND:**  Well, Your Honor, these probationary

14  employees -- many of them -- are going to the MSPB, including

15  on grounds that --

16       **THE COURT:**  Yes, but the letter -- your own letter

17  says that they have only a right to do so on grounds that

18  things that existed prior -- if the termination was based on

19  something prior to their employment.

20       **MR. HELLAND:**  I cannot speak to whether the letter

21  that you're referring to is limited in advising these --

22       **THE COURT:**  Here.  I'll let you look at it.  It is

23  limited.  Take a look at it.  The appeal rights that were

24  referred to there just call out that one thing.  And when you

25  actually look at the regulation, it has nothing to do with this

```
1    case.  It's a sham, in my opinion.

2         Now, it could be that some employees are trying -- it is

3    true that some employees have tried to go to the MSPB.  That is

4    true.  And some relief -- and, by the way, the President fired

5    the special counsel; true?

6              MR. HELLAND:  I believe that's true.

7              THE COURT:  Yeah, he fired him.  So there is no

8    special counsel anymore for the MSPB.  And then one of the --

9    one of the members was either fired or retired.

10        In the prior Administration in 2017 to 2022 -- or 2020 --

11   there was not a quorum of the MSPB.  Do you remember that?  So

12   there was no way to get relief from the MSPB during that

13   four-year period.  I have a feeling that's where it's headed

14   now, is to decimate the MSPB, get rid of the special counsel,

15   and these employees will have no recourse even under that

16   limited sentence.

17        That troubles me.  It makes me wonder whether I got misled

18   on saying there was no jurisdiction because I relied on you.

19   You said there was a remedy at the MSPB; and, therefore, I said

20   the unions didn't have subject-matter jurisdiction.  I question

21   that.  I'm going to ask for briefing on that after today,

22   because I believe I got misled by the U.S. Government on the

23   efficacy of the MSPB.

24        Yes, in statute theory, it may be.  But based on that

25   regulation and based on that letter and based on the
```

 1    cannibalization of the Office of Special Counsel and the MSPB

 2    today, I -- there's not much of a remedy there.  Possibly I'm

 3    wrong, but I'm going to ask for briefing on it.

 4        But I'll let you give me your response to that concern.

 5    Please go ahead.

 6            **MR. HELLAND:**  Thank you, Your Honor.

 7        I am aware that employees have been reinstated pursuant to

 8    MSPB orders.  I believe there was a widespread stay issued as

 9    against the Department of Agriculture that affected a large

10    number of probationary employees at that agency.  So I do not

11    think it is the case that the MSPB is without ability to grant

12    relief to affected probationary employees.  I think that's

13    happening.

14        I do not know what's going to happen down the road.  And

15    that may well be an appropriate subject for further briefing or

16    reconsideration.  But as it stands now, Your Honor, I think the

17    MSPB is capable of granting this relief.

18        I --

19            **THE COURT:**  Just a minute.  Just a second.

20        The Administration has -- the member of the -- on

21    March 5th, 2025, board member, Cathy Harris, granted a second

22    45-day stay request on probationary employees at USDA.  So

23    you're correct about that; however, the President has attempted

24    to fire her, but Judge Rudolph Contreras granted summary

25    judgment in her favor and held that the removal by the

 1   Administration was unlawful.  Is that correct?

 2           MR. HELLAND:  I have no reason to doubt that.

 3           THE COURT:  Well, we won't decide the efficacy of the

 4   MSPB today, but we're going to have to look at that again.  And

 5   maybe we do have subject-matter jurisdictions after these

 6   unions if there's -- if the channel through which Congress

 7   sought to move those grievances by employees has been

 8   decimated.

 9           MR. HELLAND:  Your Honor, briefly.

10           THE COURT:  Yes.

11           MR. HELLAND:  The unions, of course, would go through

12   the FLRA, not the MSPB, so --

13           THE COURT:  Not the unions, yes, but the employees --

14           MR. HELLAND:  Sure.

15           THE COURT:  -- the employees who they represent.

16   Okay.

17           MR. HELLAND:  May I respond to Your Honor's concerns

18   about the declarations and --

19           THE COURT:  Please, yes.  I'd like to hear it.

20           MR. HELLAND:  Thank you.

21   Your Honor, I respectfully disagree that we have submitted

22   false evidence or have withdrawn evidence in an attempt to

23   frustrate Your Honor's efforts to find the truth.

24       We prepared the Ezell declaration within the two days that

25   we had to respond to the TRO thinking that that would be an

1    authoritative statement of the agency's position of what

2    happened.

3         If you review that declaration again -- I understand that

4    it's stricken.  I'm not relying on it for its truth.  But if

5    you review that declaration again, he says, in the opening

6    paragraph, that the materials reflected therein were based on

7    his personal knowledge as well information provided to him.  We

8    were presenting it in his capacity as the acting director of

9    that agency.

10        The paragraphs in that declaration talking about the

11   February communications do not say that Mr. Ezell personally

12   said anything or took any action.  Those paragraphs are framed

13   as coming from OPM.  That's in contrast to the January 20th

14   memo that he did personally author and send out.  So, again, we

15   put that forward in the TRO context on expedited briefing.

16        We understood coming out of the TRO hearing that

17   Your Honor wasn't interested in the agency's summary of what

18   happened.  Your Honor wanted to know what was actually

19   communicated on the February 13th call or February 14th call.

20        Well, Mr. Ezell was not on those calls.  He was not on the

21   February 13th call at all.  And from what we understand, he was

22   at the beginning of the February 14th call and then left.  So

23   he is not the person with firsthand knowledge of those events.

24   Others are, and we -- I -- I expect Your Honor will be

25   frustrated to hear this, but we continue to look forward to

1    presenting our case in terms of what was actually communicated

2    on those calls.

3         But this is an APA case, Your Honor.  There's a procedure

4    for generating an administrative record, which we are working

5    on and have started to submit to Your Honor, including the

6    February 12th email, which I understand was basically read as a

7    script on the February 13th call.

8         **THE COURT:**  You know, your Noah Peters declaration --

9    nowhere does he -- does he ever say he was personally present

10   during the call?

11        **MR. HELLAND:**  Noah Peters is on the list of

12   participants of the February 13th call that we shared with

13   plaintiffs' counsel.

14        **THE COURT:**  That's not the same thing.  Does he say

15   under oath that he was on the call?  No.

16        **MR. HELLAND:**  Honestly, Your Honor, I thought that he

17   did.  And it may not be in that declaration.

18        **THE COURT:**  Oh, maybe I read it too quickly.

19        **MR. HELLAND:**  So, Your Honor, we are in the process of

20   compiling the administrative record.  The procedure in APA

21   cases is for the agency to prepare a record, for gaps in that

22   record to be litigated, to be supplemented by oral testimony if

23   necessary.  The Government believes that that's the procedure

24   to follow here.

25        We're not trying to frustrate the ability to find the

1    truth.  We think that this is an APA case.  And the way the

2    record is developed in APA cases is through the process that I

3    just described.

4          THE COURT:  Yes, but you haven't given me any

5    administrative record, and I -- so I have to go based -- they

6    need emergency relief.

7        And I have a few words to say about administrative

8    records.  Would you like to hear those?

9          MR. HELLAND:  I will just submit, Your Honor, that we

10   have said the things that we filed yesterday as documentary

11   evidence will be in the administrative record, including the

12   February 12th email, the February 14th email, the FAQs that

13   followed those.  This is the essence of the administrative

14   record that is being compiled.

15         THE COURT:  I'm going to tell you, I think this is a

16   good point because this is a recurring problem in APA cases --

17   about the administrative record.  The rest of -- I see people

18   in the gallery -- their eyes are glazing over because they hear

19   something called "administrative record" and it just puts them

20   to sleep.  Well, it's exceedingly important.

21       It is generally true that under the Administrative

22   Procedure Act, if you sue to set aside agency action, the

23   agency provides the record on which the decision was made, and

24   then the Court looks at that and decides -- rules according to

25   the law based on that record.  And there -- that is the normal

```
 1    rule.  And sometimes you get to go outside that and take

 2    additional discovery, but most cases are decided on the

 3    administrative record.

 4         Now, back when I was in the Justice Department -- this was

 5    in '78, '79, and '80, in the Stone Age -- I was in the

 6    Solicitor General's Office.  I reviewed a lot of administrative

 7    records.  And then, in those days, everything that was before

 8    the agency or at least those people -- not just the

 9    decision-maker but the people reporting to the

10    decision-maker -- even the bad memos -- those -- or

11    deliberative memos -- those were all included.  Now, as time

12    goes on, though, that became inconvenient to very -- in future

13    years.

14         And to fast-forward, in recent years, sometimes the

15    Government lawyers present a sanitized record.  It only has the

16    good stuff that supports the agency action.  It omits all of

17    the bad stuff.

18         You think I'm making this up.  It's absolutely true.

19         Now, whenever President Obama was President, I had a case.

20    And it just -- and there was a question about the adequacy of

21    the record.  And it turned out that your department, the

22    Justice Department, had actually put out a good memo that

23    required the agencies to include much more than just the stuff

24    that the decision-maker saw.  I don't know, that's probably

25    been deep-sixed by now.  But that was the rule back around
```

1    2008.  And so that gave a little bit of sunshine into what had

2    actually happened in the agency.

3         But after that, we went back to the Dark Ages, and there's

4    nothing -- these agency records are just sanitized to allow the

5    decision to be upheld with only the documents that support it

6    and none of the other material that would undercut the agency

7    action that was in play in the agency at the time the thing was

8    being decided.

9         So I say to you, I have -- I want you -- if you're going

10   to give me an administrative record, let's do an honest one and

11   a complete one and not one that is sanitized.  That's my advice

12   to the Government.

13        And that history, I believe you'll find, is actually

14   100 percent true as I have -- so I have some frustration with

15   administrative records.  And I'm skeptical of them, because I

16   think they go to some trouble to sanitize and not give me the

17   true administrative record.

18        Okay.  But right now, even if you gave me a perfect

19   administrative record, you have it.  And these people over here

20   want immediate relief.  And they are entitled to get a ruling

21   on the record that I do have.  So that's the answer on that

22   part.

23             **MR. HELLAND:**  May I speak to that briefly, Your Honor?

24             **THE COURT:**  Yes, you may.  Please go ahead.

25             **MR. HELLAND:**  We, as you know, have offered to

1   stipulate to continue the TRO pending further development of

2   the factual record.

3       So, furthermore, our position being that OPM didn't and

4   hasn't been, since the TRO, direct these terminations.  We

5   don't see the urgency demanding relief that plaintiffs are

6   putting forward.  We think that the Court's order from the TRO

7   is clear, that agencies have been complying with it, and that

8   provides time for further factual development.

9           **THE COURT:**  Well, that's not quite true.  I don't

10  quite agree with what you just said.

11      All right.  What else would you like to say?

12          **MR. HELLAND:**  I want to pause just for one more moment

13  on Acting Director Ezell, just because I think the agency's

14  reasons for not wanting him to submit to a deposition are

15  broader than just the limited facts of the TRO that we put

16  forward.

17      Every Presidential Administration in modern history has

18  jealously guarded their agency heads against being forced to

19  give testimony.  That's since the *Morgan* case about 80 years

20  ago now.  So that is not something unique to this

21  Administration.  It is not something about Secretary Ezell's

22  testimony.  That is just an Executive Branch prerogative to --

23          **THE COURT:**  Is he a secretary?

24          **MR. HELLAND:**  He's an acting director.

25          **THE COURT:**  Director -- acting director -- but he's

```
 1    not a secretary of the Department?

 2            MR. HELLAND:  No, correct.

 3            THE COURT:  Okay.

 4            MR. HELLAND:  But I think he is the highest-level

 5    official at that Department.

 6            THE COURT:  At that agency?

 7            MR. HELLAND:  At that agency.

 8            THE COURT:  Yes, okay.  All right.

 9            MR. HELLAND:  The only other thing, then, I --

10            THE COURT:  Yes, but you chose to submit his

11    declaration.

12            MR. HELLAND:  Yes, in the context of the TRO.

13            THE COURT:  And then you said, "No, but he can't be

14    cross-examined."  So you must submit -- you can't just give

15    me -- you can't just say, "Here's the declaration.  You have to

16    accept it without question whenever there is a question."

17            MR. HELLAND:  Absolutely, Your Honor.  And so the --

18    as you know, the purpose of a TRO is an expedited process.

19    Both sides put together what evidence they can in a very short

20    time frame.  And then the period between the issuance of the

21    TRO and the further preliminary injunction is supposed to flesh

22    out the facts.

23        So that is the stage that we are in now.  We're compiling

24    the administrative record.  We've publicly filed several of the

25    documents that would go into that administrative record.
```

1    Our purpose, again, for submitting the declaration for the

2    TRO was to submit an authoritative statement from the agency in

3    very expedited circumstances.  But it is not supposed to shield

4    the agency from review of its actions.  It's to articulate and

5    provide some evidence for a TRO decision on a couple days'

6    notice.

7    I note my opposing counsel discussed relief very briefly,

8    Your Honor, and I want to speak to that.

9    **THE COURT:**  I want to hear your argument.  Please go

10   ahead.

11   **MR. HELLAND:**  Thank you.

12   Well, so, first of all, again, we have stipulated that the

13   TRO can continue as a preliminary injunction as is.  So we

14   agree already, to that extent, of further relief.

15   I don't think that ordering the rescissions of the

16   terminations is an appropriate thing either on this record or

17   for Your Honor to be granting.  Again, the MSPB, the FLRA --

18   those administrative agencies have the authority to stay

19   terminations, to order reinstatements, to issue that form of

20   relief.  I don't think that that's appropriate there.  I

21   certainly don't think it's appropriate when the agencies that

22   were added as parties two days ago have not had the chance to

23   file any briefing or to -- plaintiffs have not even moved for

24   relief against those new defendants.  They moved against OPM

25   two weeks ago.

1    So I think there's a further process that would have to

2    happen, which would include briefing on the authority for

3    Your Honor to even issue that relief.

4    To the extent any further relief beyond the TRO is

5    appropriate in the near term, we would submit that it should be

6    limited to something like each agency performing an independent

7    review of the decisions previously made, reaffirming that they

8    were done under the agency's authorities, not OPM's direction.

9    I think that's more appropriate and consistent with

10   Your Honor's authority and jurisdiction as well as the factual

11   record here.

12        **THE COURT:**  Okay.

13   Response?

14        **MS. LEONARD:**  The terminations were not done at the

15   agency's discretion, and they were not done properly in

16   accordance with the law on the basis of performance,

17   Your Honor.

18   The suggestion that opposing counsel just made, that

19   somehow the agency should be able to rereview the decision to

20   fire probationary employees on mass at the direction of OPM is

21   somehow an appropriate remedy is divorced from reality and the

22   record that's before this Court.

23   But to address some specific -- to pointedly address some

24   of the specific points that -- and quickly -- that opposing

25   counsel made, there was an exchange about appeal rights to the

```
 1    MSPB.  And I think this is incredibly important, Your Honor,

 2    because from the very first moment -- on the first day of this

 3    Administration -- that OPM started directing agencies through

 4    the January 20th memorandum to collect and list -- something

 5    that had never happened before in the history of this

 6    country -- compile and submit to OPM a list of all your

 7    probationary employees so you can get ready to fire them.  They

 8    told them they don't have appeal rights.  "We are firing them

 9    because they don't have appeal rights."  That's how insidious

10    this action was.

11         THE COURT:  Read that -- where do you get that?  I'm

12    trying to remember where I saw that before.  Read that to me

13    again.

14         MS. LEONARD:  Yes.  That's in the January 20th memo,

15    which was originally attached, Your Honor, as an attachment to

16    the now withdrawn Ezell declaration.  But they've just

17    resubmitted all the documents that he submitted without a

18    declaration.  But we don't contest that that's actually what --

19         THE COURT:  Read to me the sentence you're talking

20    about.

21         MS. LEONARD:  [As read]:

22         "Probationary periods are an essential tool for

23         agencies to assess performance.  Employees on

24         probationary periods can be terminated during that

25         period without triggering appeal rights to the Merit
```

**App.184**

```
 1        Systems Protection Board."

 2        That is Mr. Ezell --

 3            THE COURT:  Is that an exact quote?

 4            MS. LEONARD:  That is an exact quote.

 5            THE COURT:  From the January 20 memo by who?

 6            MS. LEONARD:  By Mr. Ezell, OPM, to the agencies.

 7   This has been the plan from the very beginning:  Fire them all

 8   because they can't appeal, Your Honor.  That is what OPM has

 9   consistently said to the agencies in every single communication

10   that's before this Court.

11        It was not just a February 13th phone call and a

12   February 14th CHCO meeting.  And they say, "Oh, but Mr. Ezell

13   was not on that."  We don't know if that's true or not,

14   Your Honor.  We would like to get to the truth.  But what's in

15   front of this Court is every single communication, including

16   the ones that they have now belatedly tried to say are the

17   administrative record.

18        They have said:  Terminate everyone who's not mission

19   critical because they cannot appeal.  That's the plan.  That's

20   what OPM has done here, and that is profoundly --

21            THE COURT:  How many employees -- probationary

22   employees -- were terminated on or about February 14th?

23            MS. LEONARD:  We don't know, Your Honor.  We

24   believe --

25            THE COURT:  Give me an estimate.
```

1          **MS. LEONARD:**  I believe it is far higher than 10,000

2     employees, Your Honor.  We know that at least by February 14th,

3     more than five agencies had terminated.  On February 13th, the

4     VA terminated.

5          And the press releases that they have cited -- they were

6     in our complaint, Your Honor.  He said we are not addressing

7     them?  They were in our complaint, Your Honor, because they

8     actually show that this was a centralized effort.

9          The VA press release that they're saying shows agency

10    discretion says, I quote [as read]:

11              "The dismissals announced today are part of a

12         government-wide Trump Administration effort to make

13         agencies more efficient, effective, and responsive to

14         the American people."

15         OPM told them to do this, Your Honor.  And we have proven

16    it on the record.  They have not put anything in, in response

17    to that, other than press releases that actually support

18    plaintiffs.  It's profoundly unlawful, Your Honor.

19         And with respect to the representations regarding the --

20    that's the importance of the appeal rights.  It's twofold.

21    It's both a factual matter to show how centralized this was and

22    the reasons for it, which are incredibly disturbing, frankly,

23    for the U.S. Government to be terminating these employees

24    because they have no appeal rights.

25         But also it goes straight to the point that Your Honor is

1   raising about channeling.  And we welcome -- and I was prepared

2   here to try to -- try to -- try to beg for one more chance,

3   Your Honor, to address this issue, because I think it is

4   absolutely right -- what Your Honor raised at the TRO

5   hearing -- the question about these mass actions with respect

6   to so many employees.

7       Is that really what Congress intended when it set up these

8   agencies?  And now that it is, these agencies are being

9   dismantled.  And, by the way, the President has fired the

10  members of the FLRA too.  They say, "Oh, the unions can go to

11  the FLRA."  The President fired them too.

12          THE COURT:  How many members -- I didn't know about

13  that part.

14          MS. LEONARD:  It's --

15          THE COURT:  How many members are there on the FLSB or

16  whatever it is?

17          MS. LEONARD:  So the MSPB I believe the President

18  removed one so that there is not a majority -- so it's a

19  one-one split.  And that --

20          THE COURT:  Well, that person --

21          MS. LEONARD:  Got put back.

22          THE COURT:  -- demoted them but did not remove them.

23  Demoted them from vice chair; right?

24          MS. LEONARD:  But one was removed.  That's now tied

25  up.  And the Government is fighting in the D.C. Circuit to off

1   them.

2       And then the FLRA, I believe it's also one additional

3   member has been -- has been --

4           **THE COURT:**  And one --

5           **MS. LEONARD:**  I'm looking at my cocounsel, Mr. Eisen,

6   who might have better facts than I do on this.

7       But one member has been removed by the President to stymie

8   that agency from actually doing anything, Your Honor.  And

9   they're fighting that in the D.C. Circuit.  They're opposing

10  the orders that have -- that is an unlawful order.  They're

11  fighting those orders to put those people back.  The OSC is

12  gone.

13          **THE COURT:**  All right.  One out of three?  One out of

14  five?  How many -- how many?

15          **MS. LEONARD:**  Three.  One out of three removed.

16          **THE COURT:**  All right.  And this is the FL --

17          **MS. LEONARD:**  RA.  The Federal Labor -- the Federal

18  Labor Relations Authority, Your Honor, which is the board set

19  up by the FSLMRS, which is the labor relations statute for

20  federal employees.  So they removed them.

21      The OSC is gone.  The pattern is very clear.  This is all

22  centralized action, of course, from this Administration.  The

23  pattern is clear to -- there is no channel, Your Honor.  There

24  is no channel.

25          **THE COURT:**  All right.  But let me ask you, Congress

1   did pass the Reduction in Force Act, which, by definition,

2   contemplates that there can be a reduction in force within an

3   agency; isn't that true?

4          MS. LEONARD:  That's part of this -- there are

5   reduction in force statutes as part of the CSRA, absolutely.

6   But they're ignoring them and eviscerating them, Your Honor.

7          THE COURT:  Well, I know you say they have not been

8   followed.  And possibly that's true.  But I wouldn't want

9   anyone listening to this call on the Zoom to think that this

10  case is about stopping the termination of anybody from the

11  Government, even when it's in the hundreds, because there is a

12  statute that allows that, called the Reduction in Force Act, if

13  the steps that are required by statute are followed.

14         MS. LEONARD:  Absolutely, Your Honor.

15         THE COURT:  That's true; isn't it?

16         MS. LEONARD:  It is for agencies to decide to do

17  reduction in force.  And what we have here absolutely,

18  Your Honor, on the record before the Court, is not agencies'

19  decisions to terminate anything.  It's OPM's.  And that's a

20  question for another day, whether OPM can order RIFs.  That's a

21  question for another day, Your Honor.  And maybe that day is

22  coming very soon.  OPM cannot order those either.  But agencies

23  can make those decisions.  But OPM here ordered this.

24         THE COURT:  All right.  Maybe.  But if it's done

25  right, there can be a reduction in force within an agency.

```
 1    That has to be true.
 2         MS. LEONARD:  There's -- absolutely.  There's a
 3    statute that allows it and regs that set up the many steps,
 4    including notice and notice to states and local governments who
 5    are affected.  There are many steps.  And it requires -- it
 6    takes years of planning, actually, Your Honor.  It can't be
 7    done in a day.
 8         THE COURT:  It can't be done in one day, but there's a
 9    lot of ground between one day and years.  So I -- okay.  But
10    that, as you say, is for another day.
11         But Congress itself has said you can have -- an agency can
12    do a reduction in force if it's done correctly under the law.
13    So I -- I want everyone to be aware of that.
14         Your lawsuit is not challenging that proposition.  Your
15    lawsuit is saying these terminations were in violation of other
16    laws and ultra vires, and that's a separate point.
17         All right.
18         MS. LEONARD:  That is right.
19         THE COURT:  What else would you like to say?
20         MS. LEONARD:  Just one second to make sure I'm
21    covering all the -- I did want to clarify one other factual
22    point that I feel like we, in our TRO papers, perhaps didn't
23    present as clearly as we could have to the Court.  And I think
24    it's incredibly important and don't want it to be lost.
25         It's not just employees who were hired right out of
```

```
 1    college or at the outset of their careers who were affected by

 2    these unlawful terminations.  Anyone who received a promotion

 3    is a probationary employee.  Directors of entire departments

 4    were gone in a day, Your Honor.

 5         This action by OPM made swiss cheese of the federal

 6    agencies at every level.  That is why that is directly

 7    connected to the level of harm that this is causing.  Because

 8    it's not just new folks -- they can go find a career somewhere

 9    else -- it is -- they're the future of the American workforce,

10    and I don't mean to undermine their importance.  But it is

11    people with decades of federal service.  The most experienced

12    people.  If they have been promoted from acting director to

13    director of their particular division, they were gone.  That

14    is --

15              THE COURT:  All right.  You mean --

16              MS. LEONARD:  -- the problem here.

17              THE COURT:  -- they don't go back to their original

18    position?  They're just terminated?

19              MS. LEONARD:  They're gone, Your Honor, within hours.

20              THE COURT:  How long were they terminated?

21              MS. LEONARD:  Turn in your keys.

22              THE COURT:  Even though they worked for 30 years?

23              MS. LEONARD:  Even though they worked for 30 years,

24    Your Honor.  That is why the harm is so widespread and so

25    profound.  It is -- this action was intended to cripple these
```

1  agencies, and that is what it has done.  And it is profoundly

2  problematic.

3       And we didn't want that to be lost on the Court, because I

4  think, in our TRO papers, we didn't -- we didn't make that as

5  prominent as we, perhaps, should have.  And that is absolutely

6  established in the record here.

7       "Probationary" means -- and the formal director of OPM,

8  who submitted a declaration in support of this preliminary

9  injunction -- it's in that dec., as well, and other

10  declarations we've submitted in support -- it's anyone who was

11  new to their position, Your Honor, not just to the Federal

12  Government.

13            THE COURT:  I did not appreciate that point.  Thank

14  you.

15       What else would you like to say?

16            MS. LEONARD:  One more point of clarification about

17  the OSC because I think there's been a further implication,

18  perhaps, from something that opposing counsel said.  Only the

19  OSC, who isn't there anymore --

20            THE COURT:  OSC?

21            MS. LEONARD:  Office of Special Counsel.

22            THE COURT:  Oh, all right.

23            MS. LEONARD:  -- can initiate a stay request with the

24  MSPB.  Only the OSC can do that.  The only class stay

25  request -- "stay" meaning reinstate the employees pending

```
 1    resolution -- the only class one that was actually initiated by
 2    Hampton Dellinger before he was fired was U.S. -- well, during
 3    his period of reinstatement before he was then fired again by
 4    the D.C. Circuit -- was with respect to USDA.
 5        He did not -- the other six -- the other five agencies of
 6    the original six employees -- there were not class requests
 7    that had been filed yet.  So the idea that those are pending
 8    before the MSPB is not correct, Your Honor.  There were no
 9    class stay requests.
10        And with respect to the USDA, I want the record to be very
11    clear about what's happened.  They are not complying with the
12    MSPB's order to reinstate.  What they did was they put people
13    back on pay -- they just announced this, I believe, yesterday,
14    in a press release, a week after the reinstatement order --
15    they put people back on pay, but they haven't put them back in
16    their position.
17        So what they've done is they're waiting out the 45 days.
18    It's a temporary stay.  It's going to expire.  There's no OSC
19    to ask for it to be extended.
20        This is the announcement.  This is the Forest Service
21    directly to the union:  On March 5th, the MSPB issued a 45-day
22    stay of the termination of U.S. Department of Agriculture
23    probationary employees.
24        By Wednesday, March 12th, the Department will place all
25    terminated probationary employees in pay status and provide
```

**App.193**

1    them with backpay.

2          That's great.  Happy about that.

3          The Department will quickly develop a phased plan for the

4    return to duty.  And while those plans materialize, all

5    probationary employees will be paid.

6          We do not believe that they are going to return any of

7    these employees to actual service, Your Honor.  They certainly

8    haven't yet.  This is the record before the Court.  They

9    haven't restored the services, Your Honor, when they were

10   directly ordered by the MSPB to reinstate those employees to

11   service.

12         **THE COURT:**  In the Office of Special Counsel, are --

13   they got rid of Dellinger; right?

14         **MS. LEONARD:**  Yes.

15         **THE COURT:**  But are there other acting special

16   counsels that are --

17         **MS. LEONARD:**  There's been one appointed, Your Honor,

18   and he is the head of the VA.  The head of an agency is the new

19   whistleblower protector.

20         **THE COURT:**  The head of the what?

21         **MS. LEONARD:**  The Veterans Administration.

22         **THE COURT:**  Has been moved over to be -- and is no

23   longer the head of the VA?

24         **MS. LEONARD:**  No.  He's also still the head of the VA.

25         **THE COURT:**  All right.

1          MS. LEONARD:  I don't understand how it could possibly

2    be that the head of the defendant agency is the person who is

3    supposed to protect the whistleblowers, Your Honor.  But that

4    is what this Administration has done.

5          THE COURT:  Are there subordinate lawyers in that

6    unit?

7          MS. LEONARD:  In the OSC?

8          THE COURT:  Yeah.

9          MS. LEONARD:  I am sure that there are.  He -- I'm

10   sure the OSC has people who work for him.  They've probably

11   actually had all of their probationary employees fired too,

12   just like the FLRA did and the MSPB did.

13       But setting that aside, Your Honor -- that's true --

14         THE COURT:  You don't know that --

15         MS. LEONARD:  I --

16         THE COURT:  You're just guessing at that.

17         MS. LEONARD:  They're on the list.  They're on the

18   list of people who had probationary employees, but -- and

19   they're on the CHCO directive from February 14th.  There's a

20   representative of the small agency counsel -- the FLRA, MSPB,

21   OSC -- they're all part of that.

22         THE COURT:  Well, are they -- were there -- were there

23   lawyers who were non-probationary working in the unit?

24         MS. LEONARD:  I am sure that there are, Your Honor.

25         THE COURT:  All right.

1          **MS. LEONARD:**  I'm sure that there are.  But they don't

2    have the authority to move for a stay.  Only the OSC has that.

3          **THE COURT:**  So you're telling me that a probationary

4    employee in some random agency cannot directly go to the MSPB?

5    Is that true?

6          **MS. LEONARD:**  They can.  They can file their

7    individual -- they can file their individual action against

8    their employer agency at the MSPB.  Some of them can.  Some of

9    the probationary employees -- this is very complicated.

10   It's -- who has the appeal rights where is exceptionally

11   complicated, depending on the category of service.  Some of

12   them can only go to the OSC.  A big portion of them can only go

13   to the OSC.

14         **THE COURT:**  Well, what's the difference between those

15   that can only go to the OSC versus those that can go straight

16   to the Merit Systems Protection Board?

17         **MS. LEONARD:**  It depends on the category of service,

18   Your Honor, and the reason that they're invoking.  And the

19   best -- the best place that I have seen summarizing this --

20   people have been writing a lot of material about -- to try to

21   explain this.  The best place is the OSC intake -- it's like --

22   as a union lawyer, I'm very familiar with the unfair labor

23   practice form at the NLRB where you check the boxes.  The OSC

24   has the same thing.

25         And so the OSC has an intake form where -- it's like

```
 1    three pages long -- where you have to identify all the sort of
 2    ins and outs whether you qualify to go to the OSC or not.  So I
 3    cannot recite that here today, Your Honor, full candor.  It
 4    depends on whether you're in competitive service or in what
 5    category and what you're basing your allegations on, if it's
 6    discrimination or not.  It's an incredibly complicated sort of
 7    if then, who gets to go there or not.  Some -- at a highest
 8    level, some can go to the OSC, and that's their only avenue,
 9    and now that avenue is gone.
10        We are very happy to brief this further if Your Honor
11    would like further briefing on -- particularly as you've
12    invited on the channeling issues, whether it's at this point.
13    We obviously do not want to delay any injunction.  And what I
14    would -- we would propose is there is no need, Your Honor, for
15    purposes of this preliminary injunction, to reach the
16    channeling issue, even with respect to the unions.
17        We would invite and ask for another chance to convince
18    Your Honor that the channeling argument that was presented by
19    the Government and the representations were not correct.  And
20    that the claims against OPM are not channeled, Your Honor, even
21    for my union clients.  And we would invite another chance to
22    convince Your Honor of that.
23        But for purposes of the PI today, the other organizations
24    and the State of Washington have standing -- irreparable
25    harm -- more than enough to issue that PI without reaching and
```

1    making further law with respect to the channeling.

2        I would -- one further point about that, Your Honor.  I do

3    believe that your TRO order actually extends the law further

4    than it has been in the Ninth Circuit.  Not just applying it,

5    but extends it.  No case has ever channeled a claim against OPM

6    over a Government-wide rule in the Ninth Circuit.  No case has

7    ever channeled a procedural APA claim in the Ninth Circuit.

8    Your TRO order was the first, and we would respectfully welcome

9    another chance.

10        And we don't want that TRO decision to take on a life of

11    its own, Your Honor, and we would welcome another chance to try

12    to convince you that these claims are not channeled.  Because,

13    as Your Honor has indicated here today, the channel's gone,

14    Your Honor.

15        **THE COURT:**  Let me give the defendants a chance to

16    respond.  You had a long talk there.

17        Go ahead.  Please, let's hear from the defense.

18        **MR. HELLAND:**  Thank you, Your Honor.

19        Taking the very last point first, I think the "in the

20    Ninth Circuit" caveat there is doing a lot of work.  There's of

21    course many decisions from outside the Ninth Circuit, including

22    the D.C. Circuit, the Federal Circuit, the First Circuit.

23    These have been, you know, addressed in the papers on the TRO

24    briefing.

25        To the extent Your Honor is reconsidering its initial

```
1    channeling decision, we agree further briefing would be
2    appropriate.
3         THE COURT:  Yeah, that's -- I'm not going to do it
4    today, but I want to raise the issue and ask for briefing.  So
5    I agree with you on that.
6         Go ahead.
7         MR. HELLAND:  Thank you.
8         I come back to a point I made at the outset.  The press
9    releases that we've submitted show that the independent
10   political appointment -- the political leadership of these
11   agencies were taking credit publicly for the decisions.
12        We do not deny that OPM had a role in coordinating these
13   efforts.  I think the documents that we've put forward are very
14   clear about that.
15        But plaintiffs' theory of this case isn't just that OPM
16   coordinated this; it's that OPM ordered it.  That the agencies
17   didn't think that they had the authority not to do it.  Well,
18   if that's the case, why would the leaders of these agencies be
19   issuing press releases the same day or shortly after these
20   decisions were made?  They wouldn't.  The reason --
21        THE COURT:  Well, I would like to see some depositions
22   taken on that, but you stonewalled me on it.  I would like to
23   know -- maybe -- maybe the press release was an orchestrated
24   thing.  It wouldn't be the first time.
25        MR. HELLAND:  It starts to sound a bit
```

```
 1   conspiratorial --

 2            THE COURT:  Yeah.

 3            MR. HELLAND:  -- to think that these press releases

 4   coming out of multiple agencies when, again, the Administration

 5   has just put out Executive Orders and fact sheets making clear

 6   that this is an agenda priority for the Administration.

 7        I think the pretty obvious alternative explanation is

 8   everybody knew the new Administration was prioritizing this.

 9   And the political appointments wanted to comply with that

10   Administration priority.

11            THE COURT:  Okay.

12            MR. HELLAND:  Finally, Your Honor, the additional

13   documents that we put forward, which, again, will be part of

14   the administrative record in this case, including specifically

15   the February 12th email, I invite you to look closely at the

16   language of that.  I think you'll see it is not an OPM order.

17   The language of that reflects that OPM had asked agencies to

18   prepare lists and asked them, with a please, "Separate those

19   that you know you want to separate by a date certain."  Right?

20   It put it to the agencies, "those that you know you want to

21   separate."

22        This was not an order from OPM.  The Administration record

23   will show, and it does show on the record that we've put before

24   Your Honor, that OPM was coordinating this, was asking for

25   information, was asking that action be taken by certain times,
```

1 but the decisions on these employment actions were made by the

2 agencies and were fully endorsed by their political leadership.

3   Thank you, Your Honor.

4   **THE COURT:** Okay. Give me a moment.

5   The Court is going to grant some additional relief by way

6 of preliminary injunction. I want to give some background.

7   Congress, in the Reduction in Force Act, makes it clear

8 that an agency can engage in a reduction in force. So I want

9 everyone to be completely aware that if an agency decides to do

10 a reduction in force, it can do so, so long as it complies with

11 the several requirements of the Reduction in Force Act.

12   So this should not -- the words that I give you today

13 should not be taken as some kind of criticism that a wild and

14 crazy judge in San Francisco has said that the Administration

15 cannot engage in a reduction in force. I'm not saying that at

16 all. Of course, if it does, it has to comply with the

17 statutory requirements, the Reduction in Force Act, the Civil

18 Service Act, the Constitution, maybe other statutes. But it

19 can be done if it's done in accordance with the law.

20   This case is not about that. What this case is about is

21 really an attempt to do a reduction in force, but to force it

22 through the OPM, Office of Personnel Management, to have the

23 OPM direct agencies to terminate probationary employees as an

24 easy way to get a reduction in force underway.

25   Because, as counsel pointed out, its own memo says they

```
 1    don't have appeal rights -- probationary employees don't have

 2    appeal rights -- and so let's get started with the process by

 3    just terminating all probationary employees except those that

 4    are mission critical.

 5         Now, I went through the evidence last time.  I'm not going

 6    to go through it quite as extensively, but I am going to touch

 7    on some of the points.  Something new came in by the -- from

 8    the plaintiffs.  It involved the Forest Service.

 9         On February 13th, 2025, a Forest Service briefing paper

10    from Human Resources Management at the Forest Service says

11    this -- or said this -- quote [as read]:

12             "All" -- that's spelled A-L-L -- "All federal

13             agencies, including the Department of Agriculture,

14             were notified on February 12th, 2025, by the Office

15             of Personnel Management to terminate all employees

16             who have not completed their probationary or trial

17             period."

18         That then led to the termination of a lot of people, but

19    one in particular I'll give as an example.  Leandra Bailey was

20    a physical science info specialist in Albuquerque.  In

21    September of last year, she had received a performance review

22    in which she was, quote, "fully successful," closed quote, in

23    every category.  Not just some; every category.  On

24    February 13th, she was terminated using the OPM template

25    letter.
```

1    In addition to directing these terminations, OPM gave a

2    proposed letter.  The letter said -- I'm reading from it --

3    Memorandum for Leandra Bailey, February 13, from Deedra Fogle,

4    Director Human Source Management, U.S. Forest Service.  This is

5    just one sentence, quote [as read]:

6         "The agency finds, based on your performance,

7         that you have not demonstrated that your further

8         employment at the agency would be in the public

9         interest," closed quote.

10   This despite the fact that her most recent review was

11   fully successful in every category.

12   Now, how could it be, you might ask, that the agency could

13   find that based on her performance when her performance had

14   been stellar?  The reason that OPM wanted to put this based on

15   performance was, at least in part, in my judgment, a gimmick to

16   avoid the Reduction in Force Act.  Because the law always

17   allows you to fire somebody for performance.

18   So OPM was thinking:  Okay, if we tell them to use this

19   template letter, then that will give us an argument against the

20   Reduction in Force Act or maybe some other act -- Civil Service

21   Reform Act.

22   Now, this -- what I'm about to say is not the legal basis

23   for what I'm going to order today, but I just want to say, it

24   is sad -- a sad day -- when our Government would fire some good

25   employee and say it was based on performance when they know

1    good and well that's a lie.

2        Excellent in all -- fully -- what was the phrase?  I don't

3    want to misstate it.  "Fully successful in every category," yet

4    they terminate her based on performance.  That should not have

5    been done in our country.  It was a sham in order to try to

6    avoid statutory requirements.

7        It also happens to be that whenever you fire somebody

8    based on performance, then they can't get unemployment

9    insurance.  So that makes it even worse, doesn't it?

10       And then it makes it even worse because the next employer

11   is going to say, "Well, have you ever been terminated based on

12   performance?"  They're going to have to say, "Yes," to

13   thousands of people.

14       Now, the reason this is not a basis for the ruling today

15   is that the -- that is a grievance that goes to the employee,

16   and the -- and we still haven't decided -- I mean, I have

17   decided but I'm going to take another look at it, as to whether

18   they're channeled -- that grievance has to be channeled through

19   the Merit Systems Protection Board.

20       But it is illustrative of the manipulation that was going

21   on by OPM to try to orchestrate this Government-wide

22   termination of probationary employees.

23       I'm going to go back to what I read [as read]:

24           "All" -- this is from the Forest Service -- "All

25       federal agencies, including the Department of

1       Agriculture, were notified on February 12th by the

2       Office of Personnel Management to terminate all

3       employees who have not completed their probationary

4       or trial period."

5       Now, there's more evidence than that.  Some of that I went

6  over last time.

7       Department of Energy sent a termination letter saying [as

8  read]:

9            "Per OPM instructions, Department of Energy

10       finds your further employment would not be in the

11       public interest."

12      Another termination letter from the Bonneville Power

13  Administration per OPM instructions, Civilian Personnel Policy

14  Counsel, Department of Defense in accordance with direction

15  from OPM and before Congress, Chief Human Capital Officer for

16  the Veterans Administration testified under oath recently,

17  February 25th [as read]:

18      **"QUESTION:**  So nobody ordered you to carry out these

19       terminations?  You did it on your own?

20      **"WITNESS:**  There was direction from the Office of

21  Personnel Management, the USDA."

22      Quote, [as read]:

23           "Agencies were directed to begin providing

24       termination notices."

25      So the Court finds that OPM did direct all the agencies to

1   terminate probationary employees with the exception of

2   mission-critical employees.  The Court rejects the Government's

3   attempt to use these press releases and to read between the

4   lines to say that the agency heads made their own decision with

5   no direction from OPM.

6        The relief that's going to be granted as is follows:

7        The temporary restraining order well be extended.  In

8   addition, relief defendant Veterans Administration shall

9   immediately offer reinstatement to any and all probationary

10  employees terminated on or about February 13th and 14th, 2025.

11       This order finds that all such terminations were directed

12  by defendants' OPM and Acting Director Ezell and were unlawful

13  because OPM and Ezell had no authority to do so.

14       Further, relief defendant Veterans Administration shall

15  cease any and all use of the template termination notice

16  provided by defendant OPM and/or Acting Director Ezell to the

17  VA and to other agencies on or about February 13th and 14th and

18  shall immediately advise all probationary employees terminated

19  on or about February 13 and 14 that the notice and termination

20  have been found to be unlawful by the United States District

21  Court for the Northern District of California.

22       Relief defendant Veterans Administration shall cease any

23  termination of probationary employees at the direction of

24  defendants OPM and Acting Director Ezell.

25       To repeat, this order holds that OPM and Acting

1    Director Ezell have no authority whatsoever to direct, order,

2    or require in any way that any agency fire any employee.

3        Now, given the arguments and the facts in this case,

4    namely, that defendants have attempted to recast these

5    directives as mere guidance, this order further prohibits

6    defendants from giving guidance as to whether any employee

7    should be terminated.

8        Any terminations of agencies' employees must be made by

9    the agencies themselves, if made at all, and must be made in

10   conformity with the Civil Service Reform Act and the Reduction

11   in Force Act and any other Constitutional or statutory

12   requirement.

13       In seven calendar days, relief defendant VA shall submit a

14   list of all probationary employees terminated on or about

15   February 13th and 14th with an explanation as to each of what

16   has been done to comply with this order.

17       Now, this order so far has only mentioned the Veterans

18   Administration, but the same relief is extended -- and I'm not

19   going to repeat it, but I rely on the good faith of the

20   Government -- I'm extending the same relief to the Department

21   of Agriculture, Department of Defense, Department of Energy,

22   Department of the Interior, Department of Treasury.  And those

23   are the ones where I believe the record is the strongest that

24   relief is necessary.  And so it's the VA plus those other

25   agencies.

```
 1        And this is without prejudice to extending the relief
 2   later in the future to other agencies and it's without
 3   prejudice to shrinking the relief in the future upon a proper
 4   showing.
 5        Okay.  I will try to get out a short memorandum opinion
 6   that elaborates on this order, but this is the order and it
 7   counts effective immediately.  Please don't say, "Oh, I'm
 8   waiting for the written order."  This is the order from the
 9   bench.
10        Okay.  I want -- I'm giving the plaintiffs authority
11   promptly to depose, in Washington, Noah Peters, who submitted
12   this other declaration.  I am -- discovery is now open.  And,
13   within reason, you can, on both sides, take depositions and ask
14   for documents, but be reasonable.
15        The easiest mistake you plaintiffs can make is to be
16   unreasonably broad in your discovery.  I promise you, I won't
17   allow that.  But narrowly directed, reasonable discovery is in
18   order in this case to get at the truth because the Government
19   is saying one thing and you're saying another.
20        Right now your record is the strongest, and I think that
21   your position is correct on the facts.  But it deserves to be
22   tested by discovery.
23        Finally, I believe that the channeling argument -- I
24   believe that the channeling argument that I relied on that says
25   that all employee grievances should be channeled through the
```

```
 1   MSPB might have been in error because -- I'm not making a
 2   ruling now -- I'm going to invite briefing -- because the whole
 3   point of the January 20 memorandum was to say the probationary
 4   employees have no appeal rights.  And the letter that was
 5   sent -- the template letter -- said, "You may have a right to
 6   file an appeal with the Merit Systems Protection Board on the
 7   limited grounds set forth in 5 C.F.R. 315806," which I looked
 8   up, and that has nothing to do with this case.  It gives you a
 9   right to appeal if you get terminated based on something that
10   happened before your employment.  Let's say that you were a
11   convicted felon and didn't disclose that.  Well, that's not
12   this case.
13       So if there is no ability to appeal and get not just some
14   limited -- I mean, a real effective way to undo the harm to
15   these individual employees, I don't see how this could be
16   channeled.  So the -- to the extent that the unions here were
17   seeking to vindicate the rights of their employees, you know,
18   like I thought you were, I may have made an error.
19       Now, I did rely upon the Government's representations that
20   the MSPB was an effective remedy.  I thought it was.  And I'm
21   not yet ready to say it wasn't.  But I didn't know all this at
22   the time I made that ruling.
23       So I would like to give you each an opportunity to brief
24   this.  I'll give you, say, one week to brief this.  I'll give
25   you until the end of next week, to Friday at noon, to brief
```

```
 1   whether or not the unions have standing based upon the fact
 2   that the channel has been destroyed.  So no channeling because
 3   no channel -- no effective channel.
 4        Now, this -- and then if you want to make the same
 5   argument for the Federal Labor Relations Board -- or
 6   Authority --
 7             MS. LEONARD:  Authority.
 8             THE COURT:  -- whatever it is, you can brief that too,
 9   all within the 10 pages.
10        I'm ordering the Government to make this guy, Noah,
11   available soon, within the next two weeks.
12        If you want to appeal to the Court of Appeals, God bless
13   you.  I want you to because I'm tired of seeing you stonewall
14   on trying to get at the truth.  Instead of giving me snippets,
15   I want somebody to go under oath and tell us what happened in
16   these phone calls and at other times was it really an agency --
17   so you can depose some people in the agencies if they really
18   are claiming they did it on their own and was not influenced by
19   OPM.  We should get it, but be reasonable in the discovery.
20        The only one I'm ordering for sure is Noah Peters within
21   the next two weeks.  You've got to go to Washington to take his
22   deposition.  And it can be two hours.  All right?
23        So, see, the way the Government does it, they want to come
24   in with an ex parte and just stall, stall, stall.  Just go
25   ahead and take your appeal.  We've got a preliminary injunction
```

1   now.  I've ordered some discovery.  Just go ahead and put it up

2   there on appeal and see if the Court of Appeals feels that what

3   I have done here today by way of relief is unjustified.  I'm --

4   that's fine.

5      I'm doing the best I can with the record I got, and this

6   is a quick-moving time frame.  These people have been

7   terminated.  I want to make it clear that, right now, I'm just

8   ruling based on services -- these organizational plaintiffs --

9   and I'm not considering the State of Washington.

10     The organizational plaintiffs that got the TRO are

11   complaining about the deprivation of services by these agencies

12   and resources that they count on, and that is still the basis

13   for their standing and the basis for the subject-matter

14   jurisdiction.  But I am raising the question whether or not the

15   additional subject-matter jurisdiction exists because the

16   channel that Congress wanted to be effective has been ruined.

17     All right.  Anything further today?

18     **MS. LEONARD:**  Yes, Your Honor.  Two points of

19   clarification.

20     First of all, I believe Mr. Peters is a lawyer, and I

21   would ask for three hours, Your Honor.  We all know how hard it

22   is to depose lawyers.

23     **THE COURT:**  Three hours.

24     **MS. LEONARD:**  Thank you.

25     **THE COURT:**  Okay.  But the three hours of airtime, all

```
 1   right?
 2          MS. LEONARD:  Thank you.  For our questioning?
 3          THE COURT:  For your questioning.
 4          MS. LEONARD:  Thank you, Your Honor.
 5       But more seriously, actually, not that that's not a
 6   serious issue, to clarify, the evidence that plaintiffs have
 7   presented with respect to other agencies and the harm -- and I
 8   know Your Honor's very familiar with the record -- I just want
 9   to clarify because there is extensive irreparable harm with
10   respect to NOAA, NIH, FAA that is incredibly urgent.  How do we
11   get in front of you the -- I have a list that we have prepared.
12   I'm happy to give to the Government a copy of every agency and
13   every plaintiff that they're connected with.  And we're happy
14   to give you the declarations --
15          THE COURT:  Can I see what you're talking about?
16          MS. LEONARD:  Sure.  It's every agency and every
17   plaintiff that has shown harm through the declarations with
18   respect to that agency.
19       And we're happy to submit this by later today with the
20   declaration cites.  I believe we already have that prepared as
21   well.  This was just my cheat sheet, Your Honor, if that would
22   assist you.
23          THE COURT:  Well, does counsel object if I keep this
24   cheat sheet?
25          MR. HELLAND:  No.
```

```
 1            THE COURT:  Thank you.

 2       I -- this is not good enough for -- I mean, you'd have to

 3  connect the dots better than this, but I see where you're

 4  going.

 5       You can submit more, but I am not promising -- I'm basing

 6  it based on my understanding of the present record of who has

 7  standing and who is suffering irreparable harm, so -- but I

 8  could be wrong on one or two.  I was wrong last time on one

 9  issue, so I -- you can submit something more and we'll consider

10  it.

11            MS. LEONARD:  Thank you very much, Your Honor.

12            THE COURT:  Anything on your side?

13            MR. HELLAND:  No.  Thank you, Your Honor.

14            THE COURT:  All right.

15       All right.  I want to make it clear that I don't think

16  counsel for the Government has done anything dishonorable.

17  I've given him a hard time.  He's doing the best he can with

18  the case he's got.  And thank you for your service in the

19  Justice Department.

20       Okay.  I think we're done for today.

21            THE COURTROOM DEPUTY:  Court is adjourned.

22                 (Proceedings adjourned at 9:30 a.m.)

23                          ---oOo---

24

25
```

**App.213**

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript

from the record of proceedings in the above-entitled matter.

DATE:   Thursday, March 13, 2025

_____

Kendra A. Steppler, RPR, CRR

Official Reporter, U.S. District Court