No. 25-1677

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

American Federation of Government Employees (AFGE), et al.,

*Plaintiffs-Appellees*,

v.

United States Office of Personnel Management, et al.,

*Defendants-Appellants*.

On appeal from the United States District Court
for the Northern District of California
No. 3:25-cv-01780-WHA
The Honorable Judge William Alsup

## BRIEF OF AMICI CURIAE COUNTY OF SANTA CLARA
## AND 23 ADDITIONAL LOCAL GOVERNMENTS AND
## LOCAL GOVERNMENT OFFICIALS IN SUPPORT OF
## PLAINTIFFS-APPELLEES

OFFICE OF THE COUNTY COUNSEL
COUNTY OF SANTA CLARA
Tony LoPresti
Kavita Narayan
Meredith A. Johnson
Raphael N. Rajendra
Jenny S. Lam
Stefanie L. Wilson
70 West Hedding Street, East Wing, 9th Floor
San José, CA 95110-1770
Telephone:  (408) 299-5900
Facsimile:  (408) 292-7240

*Attorneys for* Amicus Curiae *County of Santa Clara, Calif.*

*Additional amici and counsel listed on signature pages*

**RULE 26.1 CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1, amici curiae are governmental entities and individuals for whom no corporate disclosure is required.


Dated:  March 18, 2025            By:   /s/ Raphael N. Rajendra
                                         Raphael N. Rajendra


                                  Attorney for *Amicus Curiae*
                                  County of Santa Clara, Calif.

## TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................i

TABLE OF AUTHORITIES .................................................................ii

INTEREST OF AMICI CURIAE ..........................................................1

SUMMARY OF ARGUMENT...............................................................3

ARGUMENT ......................................................................................6

    I.    Close and Ongoing Collaboration and Interdependence Among
           Local, State, and Federal Officials Have Longstanding
           Constitutional and Statutory Bases ........................................6

           A.    Federal, State, and Local Personnel Effectuate
                  Constitutional Federalism Through Robust Interaction on
                  Matters Essential to the Public Good. .......................6

           B.    Federal Employment-Related Laws Recognize and
                  Respect Multilayered Governance and the
                  Interrelationships Through Which It Is Practiced....................14

    II.    Local Governments and the People Themselves Depend on
           Adequately Staffed Federal Agencies....................................16

           A.    Effective Preparedness and Response to Public Safety
                  Emergencies Demands Adequately Staffed Federal
                  Agencies. .................................................................17

           B.    Dismantling Federal Agencies Will Undermine and
                  Stymie Local Public Health Agency Efforts, With
                  Devastating Effects on Public Health. .......................25

CONCLUSION .................................................................................30

ADDITIONAL AMICI AND COUNSEL ..............................................33

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Alden v. Maine,*
527 U.S. 706 (1999) ........................................................................13

*Atl. Richfield Co. v. Christian,*
590 U.S. 1 (2020) ..............................................................................9

*Bond v. United States,*
564 U.S. 211 (2011) ..........................................................................7

*Bond v. United States,*
572 U.S. 844 (2014) ..........................................................................7

*California v. United States,*
438 U.S. 645 (1978) ..........................................................................9

*Health & Hosp. Corp. of Marion Cnty. v. Talevski,*
599 U.S. 166 (2023) ..........................................................................8

*Hodel v. Virginia Surface Min. & Recl. Ass'n, Inc.,*
452 U.S. 264 (1981), *overruled on other grounds by
Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528 (1985) ...............9

*King v. Smith,*
392 U.S. 309 (1968) ..........................................................................9

*Medtronic, Inc. v. Lohr,*
518 U.S. 470 (1996) ..........................................................................7

*Nat'l League of Cities v. Usery,*
426 U.S. 833 (1976), *overruled on other grounds by
Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528 (1985) ...............7

*New York v. United States,*
505 U.S. 144 (1992) ..........................................................................8

*NFIB v. Sebelius,*
567 U.S. 519 (2012) ..........................................................................7

*Printz v. United States,*
521 U.S. 898 (1997) ..........................................................................7

*Wisconsin Dep't of Health & Fam. Servs. v. Blumer,*
534 U.S. 473 (2002) ..........................................................................9

## STATUTES

UNITED STATES CODE

2 U.S.C. § 1501 ....................................................................................9
2 U.S.C. § 1534 ..................................................................................10
5 U.S.C. § 2301 ..................................................................................14
5 U.S.C. § 301 ....................................................................................14
5 U.S.C. § 3101 ..................................................................................14
5 U.S.C. § 3502 ..................................................................................14
6 U.S.C. § 121 ....................................................................................10
6 U.S.C. § 321k ..................................................................................10
6 U.S.C. § 361 ....................................................................................13
6 U.S.C. § 753 ....................................................................................10
7 U.S.C. § 7656 ..................................................................................10
7 U.S.C. § 8914 ..................................................................................11
12 U.S.C. § 4118 ................................................................................11
15 U.S.C. § 8521 ................................................................................12
16 U.S.C. § 551c-1 ......................................................................11, 23
21 U.S.C. § 350f ................................................................................11
33 U.S.C. § 3204 ................................................................................10
34 U.S.C. § 60506 ..............................................................................11
38 U.S.C. § 303 ..................................................................................15
42 U.S.C. § 247d-3a ..........................................................................11
42 U.S.C. § 280g-18 ..........................................................................10
42 U.S.C. § 290bb-36c ......................................................................10
42 U.S.C. § 300hh-10 ........................................................................11
42 U.S.C. § 4370j ..............................................................................12
42 U.S.C. § 5143 ................................................................................11
42 U.S.C. § 5144 ................................................................................11
43 U.S.C. § 3101 ................................................................................10
43 U.S.C. § 3102 ................................................................................10
47 U.S.C. § 615 ..................................................................................10

## REGULATIONS

UNITED STATES CODE OF FEDERAL REGULATIONS

21 C.F.R. Part 312, Subpart I ............................................................27
5 C.F.R. §§ 315.804-806 ...................................................................14
5 C.F.R. §§ 351.801-803 ...................................................................14

///

# OTHER AUTHORITIES

Bridget A. Fahey,
> *Coordinated Rulemaking and Cooperative Federalism's*
> *Administrative Law*, 132 Yale L.J. 1320 (2023) .............................................8

Bridget A. Fahey,
> *Data Federalism*, 135 Harv. L. Rev. 1007 (2022) .........................................8

Executive Order 13,100 of August 25, 1998, 63 Fed. Reg. 45,661 (Aug. 25, 1998)
> ("President's Council on Food Safety").......................................................11

*The Federalist* No. 39 (James Madison) (Clinton Rossiter ed., 1961).....................6
*The Federalist* No. 43 (James Madison) (Clinton Rossiter ed., 1961).....................7
*The Federalist* No. 45 (James Madison) (Clinton Rossiter ed., 1961).....................7
*The Federalist* No. 51 (James Madison) (Clinton Rossiter ed., 1961).....................6

## INTEREST OF AMICI CURIAE[1]

The work of government is the work of government employees.  At its core, government works to protect and serve the public.  Yet governments cannot work effectively when their workforces are cut so dramatically and abruptly that public facilities are shuttered, emails go unanswered, and calls for assistance languish in unmonitored voicemail systems.  That is why the widescale terminations at issue in this case do not simply present a concern for terminated federal employees, the federal staff left behind to pick up the pieces, or the individual agencies where staff is cut.  The terminations pose risks and harms to the health and safety—and, in concrete ways, the literal *lives*—of the American people.  By constitutional design, in myriad congressional enactments, and through day-to-day practice, *all* layers of government work in tandem and reliance on one another to provide the services that local governments furnish directly to their residents in the forms of emergency management, public safety, healthcare, and disease prevention, among others.  So the abrupt hobbling of *federal* agencies prevents *local* governments from serving the public with which they interact every single day.  Amici, local governments and officials from across the country, experience this reality first-hand.

---

[1] All parties have consented to the filing of this amicus brief.  No party's counsel authored this brief in whole or in part, and no person or entity other than Amici or their counsel made a monetary contribution intended to fund the preparation or submission of this brief.

Local government staff who operate all sorts of programs—from emergency planning and response, to infrastructure repair and environmental protection, to public health, and beyond—depend on their federal (and state) counterparts to pick up the phone, reply to emails, attend meetings, and simply collaborate on shared work. Local government staff must also confront and mitigate the harms that result when federal agencies lose the staff they need to conduct food-safety inspections, respond to urgent requests for federally controlled medications, participate in safety drills ahead of major events, and disseminate weather reports. This is why, when Defendants-Appellants Office of Personnel Management (OPM) and Charles Ezell ordered agencies across the federal government to conduct abrupt and overbroad terminations *en masse*, it dramatically heightened the risk of serious and irreparable harms to the American people themselves.

Amici represent counties and cities—the level of government closest to the people and most directly responsible for their well-being. Amici are uniquely exposed to the ways Defendants' wholesale dismantling of *one* level of government will prevent *all* levels of government from functioning effectively to keep water safe to drink, food safe to eat, residents from getting sick and dying, and communities from collapsing after devastating fires, floods, or attacks.

///

///

2

Amici's experiences illuminate the breadth, depth, and imminence of the threat

Defendants' actions pose to the American people.[2]

## SUMMARY OF ARGUMENT

The Constitution presumes and requires that governance by and for the

American people is carried out by multiple layers of government. Each has

capacity, expertise, and power within its own realm, and each acts in concert and

reliance on the effectiveness, partnership, support, and limits of the others. The

result is a constitutional ecology in which local, state, and federal governments

regularly interact with one another to share resources and information; develop,

approve, and carry out plans, approvals, and agreements; respond to emergencies;

and otherwise advance the common good. By design and in day-to-day practice,

this body of work—and the interrelationships and mutually agreeable cooperation

on which it depends—ultimately serves to protect and advance the health, safety,

welfare, and liberty of the public. As the layer of government closest to the

people, local governments have the vantage point to see how these

interrelationships directly serve the American public. Because of that perspective,

local governments like Amici are also uniquely well positioned to explain why

---

[2] There are 24 Amici comprising 15 local governments and nine local government officials, all of whom are listed at the end of this brief. Amici are a subset of the local governments and officials who filed an amicus brief in the proceedings below.

mass disruption and dismantling of federal agencies harm the public by making it much more difficult to serve and protect the people.

Like all ecologies, this system of inter-related governance contemplates that each layer of government makes its own choices about its operations—including by exercising its own authority, within lawful bounds, over employment matters. But as Plaintiffs-Appellees showed below, OPM and Ezell exceeded those bounds by directing agencies to terminate probationary employees *en masse*. This has devastated the workforces and capacities of the dozens of federal agencies on which local and state governments rely. The laws thus violated establish that federal agencies must exercise their employment authority in deliberate and careful ways—and, critically, that they do so with due regard for the consequences their staffing choices have on state and local governments. As these laws establish the rights of federal employees themselves, they also protect the American people. When the federal government destabilizes and dismantles its own agencies—and especially when it does so abruptly, without careful planning and adequate notice—it prevents local and state governments from implementing programs and taking actions to protect and serve their residents.

This is not simply theoretical. Amici's experiences demonstrate the extraordinarily wide range of ways in which local governments interact with and rely on federal agencies in order to meet their duty to safeguard residents' health

and safety, just as the limited reach of the federal government requires federal agencies to work with local governments.  As a result, prompt and time-sensitive interactions between local and federal staff are critical in matters as diverse as treating rare, infectious, or emergent diseases; protecting the public from hazardous materials; preparing for, responding to, and helping residents recover from floods, wildfires, natural disasters, and massive public-safety events; and preventing and reducing addressing homelessness.  The fundamental, century-and-a-half-long premise underpinning this interdependence is that as the federal government has gathered the resources and built the infrastructure to shape American society and support the American people, it has committed to operating its institutions in predictable ways that collaborate with and support—and, at a bare minimum, do not undercut—state and local government protection of their residents.

This interaction in service of the common, public good is the daily work of government—and, therefore, of government employees.  This is precisely why OPM's attempt to abruptly demolish the federal workforce at so many different agencies all at once poses such serious, imminent, and often irreparable harms to the American people.

///

///

## ARGUMENT

### I.     Close and Ongoing Collaboration and Interdependence Among Local, State, and Federal Officials Have Longstanding Constitutional and Statutory Bases

Constitutional text and practice establish "the compound republic of America," through which multilayered governance operates coherently for the health, safety, well-being, and liberty of the people whom government serves. *The Federalist* No. 51, at 323 (James Madison) (Clinton Rossiter ed., 1961); *see also The Federalist* No. 39, at 244-45 (James Madison). These layers each have their own expertise, strengths, capacities, roles, and limitations, which they leverage for the benefit of the American people by working together, not in silos. The resulting ecosystem is a complex and multidimensional relationship among localities, states, and the federal government that is carried out every day by the employees through which governments do their work. Congress has recognized and facilitated this ecosystem in a vast array of contexts, including through the laws governing federal employment that Defendants disregard.

### A.     Federal, State, and Local Personnel Effectuate Constitutional Federalism Through Robust Interaction on Matters Essential to the Public Good.

As the unit of government closest to the people, localities are the front line for carrying out the fundamental province of government: to protect "the lives, limbs, health, comfort, and quiet of all persons," *Medtronic, Inc. v. Lohr*, 518 U.S.

6

470, 475 (1996) (internal quotation marks and citation omitted), and to act broadly "for the public good," *Bond v. United States*, 572 U.S. 844, 854 (2014).  The Constitution recognizes the critical role of local governance by establishing a "federal structure [that] allows local policies 'more sensitive to the diverse needs of a heterogeneous society.'"  *Bond v. United States*, 564 U.S. 211, 221 (2011) (citation omitted); *see also The Federalist* No. 43, at 272-73 (James Madison); *The Federalist* No. 45, at 289 (James Madison); *cf. Nat'l League of Cities v. Usery*, 426 U.S. 833, 851 (1976) (recognizing constitutional importance of local control in "such areas as fire prevention, police protection, sanitation, public health, and parks and recreation"), *overruled on other grounds by Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528 (1985).

Our constitutional structure recognizes and protects the role of states and local governments in preserving the well-being of the American people.  *NFIB v. Sebelius*, 567 U.S. 519, 535-36 (2012) ("the vital functions of modern government" are grounded in the "police power" exercised by state and local governments).  In some instances, it preserves that role by emphasizing the federal government's limited and enumerated powers.  *E.g.*, *Bond*, 572 U.S. at 854.  For example, the Constitution's prohibition on commandeering limits the federal government's ability to require non-voluntary cooperation from states and local governments.  *Printz v. United States*, 521 U.S. 898, 918-20 (1997); *New York v.*

7

*United States*, 505 U.S. 144, 161-66 (1992); *see also Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 203 n.6 (2023) (Thomas, J., dissenting) (noting that "[t]he anticommandeering doctrine protects 'political subdivisions' of States against federal cooptation, as well as the States themselves").

In many instances, however, governments at multiple levels protect the public health and welfare by *interacting* and *working with* one another on shared initiatives.  *See generally* Bridget A. Fahey, *Coordinated Rulemaking and Cooperative Federalism's Administrative Law*, 132 Yale L.J. 1320 (2023); Bridget A. Fahey, *Data Federalism*, 135 Harv. L. Rev. 1007, 1074-79 (2022).  As described below, Congress has passed myriad laws that recognize and facilitate interrelationships among local, state, and federal governments.  Congress has also established structures that all but guarantee that state and local governments will experience and need to address the harmful externalities that arise when federal agencies lose capacity to conduct their own work.

Some kinds of congressionally sanctioned interactions fall within the rubric of "cooperative federalism."  In this model, a statutory or regulatory scheme contemplates formalized interactions among levels of government to establish and implement state-specific rules for federal programs within defined parameters.  *See* Fahey, *Coordinated Rulemaking*, 132 Yale L.J. at 1326, 1333-43.  Medicaid is the paramount example, both because its funding accounts for a large percentage of

8

state and local budgets and because it has such a direct and visible connection to the health and lives of millions of people. *See, e.g.*, *Wisconsin Dep't of Health & Fam. Servs. v. Blumer*, 534 U.S. 473, 495 (2002). But it is far from the only one. Many programs deploy this framework, stretching back to at least the turn of the century. *See, e.g.*, *Atl. Richfield Co. v. Christian*, 590 U.S. 1, 24 (2020) (recognizing CERCLA as an example of cooperative federalism); *California v. United States*, 438 U.S. 645, 650-51 (1978) (same for Reclamation Act of 1902); *Hodel v. Virginia Surface Min. & Recl. Ass'n, Inc.*, 452 U.S. 264, 289 (1981) (same for Surface Mining Act), *overruled on other grounds by Garcia*, 469 U.S. 528; *King v. Smith*, 392 U.S. 309, 316 (1968) (same for Aid to Families with Dependent Children program).

But Congress and federal agencies also recognize and structure interactions among local, state, and federal public employees in other circumstances, too. In fact, Congress has made clear that federal willingness to collaborate, consult, and interact with participating local and state governments is a matter of *government-wide* importance: it enacted the Unfunded Mandates Reform Act of 1995 "to strengthen the partnership between the Federal Government and State, local, and tribal governments," 2 U.S.C. § 1501(1), which it does by requiring agencies to invite and consider "meaningful and timely input" on regulatory proposals from

///

the "elected officers of State, local, and tribal governments" or their designees, *id.*
§ 1534(a).

Solicitude for local and state collaboration echoes throughout the United
States Code and in all manner of administrative actions and structures unrelated to
the formal model of cooperative federalism exemplified by Medicaid.  The wide
breadth of examples underscores Congress's awareness that effective governance
depends on interaction and mutually agreeable collaboration among the levels of
government.  Congressional insistence on multilevel coordination is especially
pronounced in emergency preparedness and response.  Examples include FCC
planning for deployment of modern 9-1-1 systems, 47 U.S.C. § 615; U.S.
Geological Survey work to identify, assess, and plan for potential landslide
hazards, 43 U.S.C. §§ 3101(8), 3102(b); the Department of Homeland Security's
work "to ensure appropriate exchanges of information . . . relating to threats of
terrorism," 6 U.S.C. § 121(d)(8); EPA and FEMA's creation of a tsunami hazard
mitigation program, 33 U.S.C. § 3204(b); HHS's national suicide and mental
health hotlines, 42 U.S.C. §§ 280g-18(c)(4), 290bb-36c(c)(3); USDA's deployment
of a team to address crises like "threat[s] to human health from food-borne
pathogens," 7 U.S.C. § 7656(b)(6), (d); FEMA's responsibilities to develop
operational plans, 6 U.S.C. § 753(b)(2), craft "model standards and guidelines for
credentialing critical infrastructure workers" who respond to disasters, *id.* § 321k,

10

ensure that every federal agency "emergency response team[] . . . work[s] in coordination with State and local officials and onsite personnel," 42 U.S.C. § 5144(b)(3), and "coordinate the administration of relief" after emergency declarations, *id.* § 5143(b), (c). Federal law's invitation to collaborate with local and state governments also runs through statutory schemes concerning preparation and response to public health incidents,[3] problems with the food supply,[4] management of natural resources,[5] criminal justice,[6] and amelioration of hardships faced by low-income people.[7]

///

---

[3] *E.g.*, 42 U.S.C. § 247d-3a(g)(1) (HHS, when developing criteria to assess preparedness to respond to public health emergencies); 42 U.S.C. § 300hh-10(b)(4) (HHS, "to ensure effective integration of Federal public health and medical assets during a public health emergency" and to train for "all-hazards medical and public health preparedness and response").

[4] *E.g.*, 7 U.S.C. § 8914(b)(2) (USDA, when developing and executing comprehensive strategic plans to respond to diseases or pests of concern); 21 U.S.C. § 350f(b), (d)(3), (i)(2) (FDA, when addressing the safety of the food supply); *see also* Executive Order 13,100 of August 25, 1998, 63 Fed. Reg. 45,661 (Aug. 25, 1998) ("President's Council on Food Safety") (establishing President's Council on Food Safety and requiring it to coordinate with state and local governments).

[5] *E.g.*, 16 U.S.C. § 551c-1(b) (USDA, to authorize prescribed burns on Forest Service land subject to extreme fire danger level).

[6] *E.g.*, 34 U.S.C. § 60506(a) (Attorney General and other federal agency heads, on programs "relating to the reentry of individuals returning from incarceration to the community").

[7] *E.g.*, 12 U.S.C. § 4118 (HUD, regarding low-income housing relief).

This framework lives not just in statute, but in the daily work of federal employees and their state and local counterparts.  Environmental agencies offer several representative exemplars.  The National Weather Service has a multipronged system to coordinate with state and local governments.[8]  It touts that it "works closely" with state and local officials around emergency planning: among other things, NWS "provides direct support to government decision makers and safety officials," "can reach locally into the communities by providing consistent Impact-based Decision Support Services" to local emergency-management personnel, and "work[s] hand-in-hand with" these personnel "to coordinate weather impacts for major events that have an impact on public safety."[9]  NWS explains that "[t]his teamwork is important, not just when emergencies happen, but also behind the scenes to better plan for critical events."[10]

The EPA is another example.  Congress established a Municipal Ombudsman to provide "technical assistance to municipalities" concerning the Clean Water Act, 42 U.S.C. § 4370j(b), and EPA directs the Ombuds to serve more generally as a "resource to assist municipalities in navigating EPA's Clean Water

---

[8] NWS, *Information for State and Local Governments*, https://www.weather.gov/dsb/state_local [https://perma.cc/RU5P-7CVN].

[9] NWS, *Federal, State and Local Partners*, https://www.weather.gov/about/fsl-partners [https://perma.cc/P2ZS-2YYM].

[10] *Id.*  Local and state personnel are "NWS Core partners."  15 U.S.C. § 8521(d).

Act programs."[11]  EPA staff, sometimes together with FEMA staff, interact with state and local officials in other ways, too, on matters such as climate change[12] and first-responder and emergency-management trainings for radiological and nuclear-terrorism emergencies, during which a unified command structure is often necessary to ensure "close coordination with federal, state and local officials."[13]

In these and many other ways, Congress and federal agencies themselves foster collaboration, interdependence, and mutually agreeable partnerships among local, state, and federal officials.  These partnerships are indispensable to the day-to-day life of "our federalism" under which local, state, and federal governments are "joint participants in the governance of the Nation."  *Alden v. Maine*, 527 U.S. 706, 748 (1999).

---

[11] EPA, *Municipal Ombudsman*, https://www.epa.gov/ocir/municipal-ombudsman [https://perma.cc/CS7D-8G6K].  Many agencies have offices of external and intergovernmental affairs responsible for prioritizing collaboration with state and local officials.  *E.g.*, 6 U.S.C. § 361 (establishing such office within DHS).

[12] EPA, *EPA Climate Resources for Local Governments*, https://www.epa.gov/system/files/documents/2024-12/climate-links-lgac-us-letter-landscape.pdf [https://perma.cc/U6CE-P8J7].

[13] EPA, *EPA for State and Local Governments*, https://www.epa.gov/ocir/epa-state-and-local-governments [https://perma.cc/SKG5-2UYD]; EPA, *PAG Manual: Protection Action Guides and Planning Guidance for Radiological Incidents*, at 73 (Jan. 2017), at https://www.epa.gov/sites/default/files/2017-01/documents/epa_pag_manual_final_revisions_01-11-2017_cover_disclaimer_8.pdf [https://perma.cc/T75V-CJ5D].

**B.    Federal Employment-Related Laws Recognize and Respect Multilayered Governance and the Interrelationships Through Which It Is Practiced.**

The centrality and ubiquity of interactions and relationships among local, state, and federal government employees is an essential backdrop against which to understand three features of the way Congress has structured the federal workforce. *First*, the hiring and firing power rests with agency heads, not in a centralized office like OPM. 5 U.S.C. §§ 301, 3101. *Second*, even for probationary employees, termination must be based on the agency's good-faith and individualized determination that the employee's "work performance or conduct during this period fails to demonstrate his fitness or his qualifications for continued employment." 5 C.F.R. §§ 315.804-806; 5 U.S.C. § 2301(b)(2), (6). And *third*, where terminations are necessary to effectuate an agency's reorganization, the agency must follow procedures governing Reductions in Force (RIFs), including, for RIFs involving "a significant number of employees," giving advance notice to states and "the chief elected official of such unit or each of such units of local government as may be appropriate." 5 U.S.C. § 3502(d); 5 C.F.R. §§ 351.801-803.

Consider first that employment decisions rest with agency heads. This makes sense: Congress assigns to these positions ultimate responsibility and accountability for the successful achievement of the agency's mission. For instance, Congress holds the Secretary of Veterans Affairs "responsible for the

proper execution and administration of all laws administered by the Department and for the control, direction, and management of the Department." 38 U.S.C. § 303. An agency head acting with good-faith awareness of their duties would appreciate the importance of hiring and retaining personnel dedicated to the agency and capable of advancing its objectives; be able to develop agency-specific criteria to identify those personnel; and understand that abruptly decimating the agency's workforce undercuts their own ability to achieve their agency's mission— including, as pertinent here, continuation of the agency's relationships and interdependencies with its local and state counterparts through which it fulfills statutory mandates and otherwise conducts its work.

Together, the individualized, employee-specific assessments necessary to terminate probationary employees and the advance notice of RIFs to employees and state and local governments also protect the relationships between federal agencies and their local and state counterparts. For agency employees responsible for intergovernmental collaboration, the assessment must necessarily consider the extent to which the employees engage in the collaborative interactions that statute, policy, and job description demand. At the same time, the individualized nature of the process prevents widespread and abrupt changes to an agency's capacity. The RIF regulations acknowledge and protect intergovernmental relationships during major shifts in agency direction or approach: an agency must inform its local and

15

state partners well before it undertakes any significant reorganization precisely because those changes affect local and state governments within the ecosystem, and advance notice allows them to plan for an agency's change in workforce.

*        *        *

Local governments—and, through them, the people themselves—rely on the legal framework and the daily practice of interdependent collaboration. Government workers give life and meaning to the agencies they staff and the collaborations that support them. Local governments and officials like Amici have an interest in the stability of the federal workforce and, therefore, in compliance with the deliberative and considered path that Congress requires agencies to follow to make employment decisions, reduce their workforces, and reorganize. It is hardly surprising that Defendants' actions to generate abrupt, widespread, and chaotic workforce cuts simultaneously violate those laws *and* pose risks to local governments and the people they serve.

## II.    Local Governments and the People Themselves Depend on Adequately Staffed Federal Agencies.

Amici's experiences working with federal agency staff concretize and illuminate the risks of Defendants' actions. Because local and federal governments are interdependent, the effects radiate outward from the affected agencies themselves to the detriment of American health, safety, and welfare for which all levels of government are responsible. To underscore that this can literally mean

16

the difference between life and death, Amici focus here primarily on public safety and public health—but those are by no means the only matters in which dismantling the federal workforce harms local governments and the people.

### A.    Effective Preparedness and Response to Public Safety Emergencies Demands Adequately Staffed Federal Agencies.

Amici operate law enforcement, criminal justice, and other public safety agencies, employ first responders, and engage in public communications that place them on the front lines of preparing for and responding to natural disasters and other emergencies.  This work requires heavy coordination and collaboration with federal and state counterparts.

Take the Super Bowl.  Every year a local jurisdiction hosts this massive annual event.  Santa Clara hosted Super Bowl L in 2016, and is preparing to host Super Bowl LX and some World Cup games in 2026.  Other local jurisdictions host similar large-scale sporting events, such as the Indianapolis 500 and the Kentucky Derby.  These events are so large and concentrated, and present public-safety risks of such magnitude, that DHS assigns them the highest available Special Event Assessment Ratings and facilitates interagency coordination to prepare for them.[14]

---

[14] DHS, *Fact Sheet, SEAR*, https://www.dhs.gov/sites/default/files/publications/19_0905_ops_sear-fact-sheet.pdf [https://perma.cc/GD7L-RDSH].

Congressional testimony from federal, state, and local public-safety officials all underscore that no level of government can effectively manage the public safety risks of such large events alone. Taking as a case study Super Bowl XLVIII, played in February 2014 in East Rutherford, New Jersey, these officials all emphasized the importance of collaboration. The federal coordinator testified that federal agencies organized themselves into a Federal Cooperation Team with staff "drawn from the local jurisdiction of the event to capitalize on" their "strong, local relationships." This was essential to overall safety preparations, because, as a state police official noted, officials needed to "coordinate[] the activities of over 100 different Federal, State, county, and local agencies" comprising "28 subcommittee working groups" and "many disciplines." This ultimately supported the work of a local fire department, which, its chief explained, "prepared an overall operation and response plan to strategically deploy assets throughout a coordinated response effort," including interagency training and drills, among other activities.[15] This intense and long-term interagency coordination was true and will again be true for

---

[15] *Mass Gathering Security: A Look at the Coordinated Approach to Super Bowl XLVIII in New Jersey and Other Large-Scale Events: Field Hearing Before the Subcomm. on Emergency Preparedness, Response, and Comms.*, H.R. Rep. Serial No. 113-73 (June 23, 2014), at 7, 9-10, 12, 18 (testimony of DHS Special Agent in Charge Andrew McLees, New Jersey State Police Deputy Superintendent Edward Cetnar, and City of Newark Fire Chief John G. Centanni), https://www.congress.gov/113/chrg/CHRG-113hhrg90883/CHRG-113hhrg90883.pdf [https://perma.cc/HP3J-P3CS].

18

Santa Clara,[16] just as it was for New Orleans last month[17] and Las Vegas last year.[18]  Without support and timely access to these federal personnel, local governments cannot adequately prepare for, protect, and mitigate harm to their jurisdictions during large-scale events.

Emergency management addresses much more than large, one-off sporting events, and local emergency-management officials collaborate with federal counterparts in a variety of ways to plan for and respond to emergencies.  For Santa Clara's Office of Emergency Management, for instance, weather is always a critical preparedness factor—both because weather itself can present emergent risks and also because weather is a key part of the situational awareness essential for emergency responders.[19]  This is why OEM, like many other local emergency-

---

[16] DHS, *Secretary Johnson Highlights Super Bowl 50 Security Operations* (Feb. 3, 2016), https://www.dhs.gov/archive/news/2016/02/03/secretary-johnson-highlights-super-bowl-50-security-operations [https://perma.cc/J9KE-RPRB].

[17] DHS, *DHS Agencies Support Super Bowl LIX Security* (Feb. 3, 2025), https://www.dhs.gov/news/2025/02/03/dhs-agencies-support-super-bowl-lix-security  [https://perma.cc/5U3U-UW48].

[18] DHS, *DHS Works with NFL, Nevada, and Las Vegas Partners to Secure Super Bowl LVIII* (Feb. 7, 2024) https://www.dhs.gov/archive/news/2024/02/07/dhs-works-nfl-nevada-and-las-vegas-partners-secure-super-bowl-lviii [https://perma.cc/62JV-YEHR].

[19] Cnty. of Santa Clara, *Emergency Ops. Plan* (Jan. 2022), at 8-9, 14-15, 79, https://files.santaclaracounty.gov/exjcpb1566/migrated/2022%20EOP_County%20of%20Santa%20Clara_01.20.2022%20Accessibility%20Check.pdf (recognizing potential for weather-related emergencies and that "[c]urrent weather forecast" is essential to Daily Situation Awareness Update).

management agencies, has long relied on the National Weather Service to proactively provide real-time information about emergent threats, respond promptly to requests for information and briefings for local officials, and, when necessary, develop detailed spot weather reports for specific areas of concern—particularly when assessing wildfires, floods, hazardous materials risks, search and rescue operations, and other public-safety threats and severe weather events.[20] NWS staff develop and disseminate this information by gathering data from satellites, radar, and other systems, developing and operating computer modelling programs, interpolating observers' collected data and visual confirmation, synthesizing it all to create "accurate outlooks, forecasts, and warnings," continuously updating NWS's heavily trafficked website, and interfacing directly with emergency-management and other officials at all levels of government.[21] OEM relies on the NWS employees who produce these reports because NWS's precise and specific predictions form the platform for local first responders' efforts

---

[20] NWS, *Instruction 10-401: Fire Weather Services Product Specification*, at 10-15  (Apr. 15, 2024), https://www.weather.gov/media/directives/010_pdfs/pd01004001curr.pdf [https://perma.cc/Z6YB-ZD53]; Nat'l Wildfire Coordinating Group, *Types of Fire Weather Forecasts* (Jan. 7, 2025), https://www.nwcg.gov/publications/pms425/3-types-of-fire-weather-forecasts [https://perma.cc/4NLW-USH5].

[21] NWS, *Who We Are* (Feb. 1, 2010), https://www.weather.gov/media/mkx/general/noaa-nws-who-we-are.pdf [https://perma.cc/R6FH-YEX8].

to prevent fatalities, injuries, and property-related loss and damage during and after emergencies.  Local governments' emergency-response efforts will undoubtedly suffer if NWS lacks sufficient knowledgeable employees to quickly develop the expert predictions and analyses and then share them on a time-sensitive basis with local emergency-management officials.  Media reports confirm that inadequate NWS staffing undermines public safety across the country.[22]

FEMA is also a critical partner for effective disaster response and recovery. FEMA's employees provide local governments, communities, and individuals critical, time-sensitive operational support during and after natural disasters like hurricanes, floods, tornadoes, and wildfires, as well as emergencies like mass shootings and terrorist attacks.  Over the last four years, FEMA's workforce has responded to 278 disasters nationwide by providing water, meals, generators, loans, grants, and other labor-intensive support to local governments and residents.[23]  FEMA's extensive experience supports its recognition in its "Post-

---

[22] A. Graff & C. Baker, *Cuts to National Weather Service Leave Forecasters Reeling*, N.Y. Times (Mar. 1, 2025), https://www.nytimes.com/2025/03/01/weather/national-weather-serivce-cuts-trump-impact.html.

[23] FEMA, *FEMA Four Years in Review* (Jan. 17, 2025), https://www.fema.gov/press-release/20250121/fema-four-years-review, *archived at* Wayback Machine, https://web.archive.org/web/20250207163643/https://www.fema.gov/press-release/20250121/fema-four-years-review#expand (captured Feb. 7, 2025) [https://perma.cc/T8YE-4AXR].

Disaster Guide for Local Officials" that "[s]uccessful recovery requires accessing a full range of federal, state, local, tribal, territorial, private, and non-governmental resources."[24]

For instance, FEMA employees provided localized, on-the-ground support during and after the SCU Lightning Complex wildfires that scorched Santa Clara County in 2020.  In coordination with Santa Clara's OEM, FEMA quickly built, opened, and operated a Mobile Registration Intake Center to support residents.[25] To do so, FEMA staff retrieved, supplied, and drove mobile homes and other vehicles to the affected area, built infrastructure, and then staffed the center with employees knowledgeable about the processes and requirements for residents to get low-interest loans and other assistance.  FEMA's work complemented local officials' disaster-response work and efforts to anticipate and mitigate the harms of future fires.[26]  FEMA staff provided similar support after severe storms and

---

[24] FEMA, *Achieving Equitable Recovery: A Post-Disaster Guide for Local Officials*, at 2 (Jan. 2023), https://www.fema.gov/sites/default/files/documents/fema_achieving-equitable-recovery-a-post-disaster-guide-local-officials-draft.pdf [https://perma.cc/9QAV-FXRU].

[25] FEMA, *Mobile Registration Intake Center Open in Santa Clara County* (Oct. 16, 2020), https://www.fema.gov/press-release/20250121/mobile-registration-intake-center-open-santa-clara-county [https://perma.cc/393B-KPJ6].

[26] *See, e.g.*, Cnty. of Santa Clara Dep't of Planning & Development, *SCU Lightning Complex Fire recovery and rebuild*, https://plandev.santaclaracounty.gov/programs-and-studies/planning-studies/scu-lightning-complex-fire-recovery-and-rebuild.

flooding in Winter 2022-2023, opening and staffing labor-intensive disaster recovery centers up and down the state.[27]  Given the heavy workload necessary for this kind of assistance, and that FEMA was already understaffed, it is a near certainty that mass terminations at FEMA will diminish disaster-recovery effectiveness and increase risks of dislocation, financial and physical harm, and even death for disaster victims.[28]

Wildfire safety and management is another case in point.  The U.S. Forest Service, which manages the National Forest System, coordinates extensively with state and local governments when managing national wildland and conducting prescribed burns.[29]  These efforts are critical to public safety not only within

---

[27] *See, e.g.*, FEMA, *Three Disaster Recovery Centers Open in Santa Cruz County* (Feb. 16, 2023), https://www.fema.gov/press-release/20230217/three-disaster-recovery-centers-open-santa-cruz-county [https://perma.cc/5TLZ-9MWM]; FEMA, *Disaster Recovery Center Opens in Merced County* (Jan. 18, 2023), https://www.fema.gov/press-release/20230123/disaster-recovery-center-opens-merced-county [https://perma.cc/WJ27-6FNE].

[28] L. Sommer, *What the firings at FEMA could mean for the next hurricane or wildfire*, NPR (Feb. 21, 2025), https://www.npr.org/2025/02/21/nx-s1-5301064/trump-fema-layoffs-disasters-hurricanes [https://perma.cc/KV4V-LYXX] (current and former FEMA employees expect that probationary employee terminations are "likely to hinder FEMA's ability to respond to disasters").

[29] 16 U.S.C. § 551c-1(b); Nat'l Wildfire Coordinating Group, *About Us*, https://www.nwcg.gov/about-us [https://perma.cc/M9ZW-JHB7]; Dep't of Interior, *Behind the Scenes: Who is Responsible for Wildfire*, https://www.doi.gov/wildlandfirenews/behind-scenes-who-responsible-wildfire-management-us [https://perma.cc/F749-9AFA]; U.S. Forest Serv. *Wildland Fire*, https://www.fs.usda.gov/managing-land/fire.

national forests, but also in neighboring cities and counties. The City of San Diego learned that lesson first-hand when a wildfire that started in the Cleveland National Forest in 2003 spread outward, killing more than a dozen people, consuming hundreds of thousands of acres, and causing losses of $200 million in the city alone.[30] Because inadequate Forest Service staffing can preclude or undermine effective wildland management, *en masse* cuts within that agency place neighboring people and lands in direct and potentially immediate jeopardy of wildfires, flooding, and other natural hazards whose ravages local governments are directly accountable for addressing. Cuts to Forest Service staff would also mean fewer mutual-aid resources available for local jurisdictions and greater demands on local firefighters to help fight fires on federal land. Marin County faces these risks directly, since it relies on federal agency partners to maintain forest health and prevent wildfires, manage invasive species, monitor and track wildlife, and prevent illegal use of trails on public lands.

///

///

---

[30] City of San Diego, *2003 - Cedar Fire*, https://www.sandiego.gov/fire/about/majorfires/2003cedar [https://perma.cc/GD7L-RDSH]; FEMA, *The California Fires Coordination Group: A Report to the Secretary of Homeland Security*, at 15 (Feb. 13, 2004), https://www.fema.gov/pdf/library/draft_cfcg_report_0204.pdf [https://perma.cc/KNA5-8B4C].

**B.    Dismantling Federal Agencies Will Undermine and Stymie Local Public Health Agency Efforts, With Devastating Effects on Public Health.**

Many local governments operate public health programs that monitor and address the spread of infectious diseases and other matters of community-wide health concern.  The federal public-health infrastructure is robust, so adequate federal staffing—especially at the CDC, FDA, and other components of HHS—is essential to local governments' ability to treat residents and safeguard community health.

Local health departments and emergency-management offices rely on these federal employees to quickly deliver medicine during public health emergencies. Consider the Strategic National Stockpile, which stores large quantities of medicine and supplies for deployment in response to terrorist attacks, disease outbreaks, earthquakes, and other emergencies that would exhaust local supplies. HHS's Administration for Strategic Preparedness and Response (ASPR) staffs the office responsible for the stockpile "24 hours a day, 7 days a week, and 365 days a year."[31]  A local public health official who needs "emergency medical countermeasures" submits a request to "ASPR watch officers," who then coordinate immediately with federal officials and confer "with all involved parties"

_____

[31] HHS ASPR, *Requesting SNS Assets*, https://aspr.hhs.gov/SNS/Pages/Requesting-SNS-Assets.aspx.

as soon as possible, often within minutes.[32]  After they approve the request, ASPR

staff work to make the medication available as quickly as possible.  Federal

workers' prompt, indeed *immediate*, response is necessary because the issues they

address may be urgent and life-threatening—"especially for Category A threats

like anthrax or smallpox that require rapid response."[33]  But abrupt terminations at

ASPR cast serious doubt on HHS's ability to respond effectively to stockpile

requests.[34]  Similar programs, dynamics, and risks exist for CDC's Drug Service

and FDA's Expanded Access programs, which both require federal employees to

respond immediately to local public-health officials' and healthcare providers'

requests for federally controlled medications that are not generally available but

are essential to treat contagious diseases and threats such as anthrax, botulism,

smallpox, and mpox.[35]  Cuts to FDA and CDC staff are likely to diminish those

---

[32] *Id.*; HHS ASPR, *Products: Strategic National Stockpile*, https://aspr.hhs.gov/SNS/Pages/Products.aspx.

[33] ASPR, *Requesting SNS Assets*, *supra* note 31.

[34] A. Tin, *Thousands of probationary federal health agency workers fired by letter this weekend. Here's what it said.*, CBS News (Feb. 15, 2025), https://www.cbsnews.com/news/thousands-of-probationary-federal-health-agency-workers-fired-by-letter-this-weekend.

[35] FDA, *Expanded Access to Investigational Drugs for Treatment Use— Questions and Answers: Guidance for Industry* (Oct. 2017), https://www.fda.gov/media/85675/download; FDA, *Expanded Access* (Jun. 1, 2016), https://www.fda.gov/news-events/public-health-focus/expanded-access; CDC, *CDC Drug Service*, https://www.cdc.gov/laboratory/drugservice/index.html [https://perma.cc/X4MC-C2V2]; CDC, *Our Formulary*,

agencies' ability to respond as urgently to these requests as medical and public-health circumstances require.

HHS workforce cuts pose further risks to public health. Local governments that operate pharmacies depend on adequate staffing at the FDA to maintain the FDA's drug shortages list, which is the linchpin to authorize pharmacies to produce their own compounded drugs as substitutes.[36] Without adequate staff to ensure prompt updates to that list, local compounding pharmacies cannot make the drugs necessary to treat their patients. And for individuals flying into their jurisdictions, local health departments rely on real-time information exchanges with CDC staff to learn of and prepare quarantine and other appropriate measures. Likewise, for sick and exposed individuals who intend to fly into or out of their jurisdictions and who could thereby expose additional individuals, local health departments also partner with the CDC to elevate issues quickly and get individuals added to the federal Do Not Board list for air travel and the federal Public Health Lookout for travel through a port of entry by land, sea, or air.[37] For

---

https://www.cdc.gov/laboratory/drugservice/formulary.html [https://perma.cc/EMM4-7PN4]; *see generally* 21 C.F.R. Part 312, Subpart I (expanded access regulations).

[36] FDA, *Compounding when Drugs are on FDA's Drug Shortages List* (Dec. 18, 2024), https://www.fda.gov/drugs/human-drug-compounding/compounding-when-drugs-are-fdas-drug-shortages-list.

[37] *See* CDC, *Travel Restrictions to Prevent the Spread of Contagious Disease*, https://www.cdc.gov/port-health/travel-restrictions/index.html

example, Santa Clara's Public Health Department worked with the CDC in 2024 to add a resident with infectious tuberculosis to the federal Do Not Board list after the resident refused to comply with his treatment regimen and threatened to board an international flight.[38]

The CDC also operates a Laboratory Response Network that comprises public health laboratories run by state and local governments, the CDC, other federal agencies, and other partners. Together, these laboratories form a national network capable of responding to bioterrorism, chemical terrorism, emerging infectious diseases, and other public-health emergencies by ensuring rapid testing, notifications, and response coordination among local, state, and federal partners.[39] In the early days of the COVID-19 pandemic, state and local health departments and healthcare providers had no other option than to send samples to the CDC to

---

[https://perma.cc/HJ53-3PRC]; CDC, *Protecting Travelers' Health from Airport to Community: Investigating Contagious Diseases on Flights* (May 15, 2024), https://www.cdc.gov/port-health/contact-investigation/index.html [https://perma.cc/DCV9-EMHN].

[38] *See generally* CDC, *Improving the CDC Quarantine Station Network's Response to Emerging Threats*, at 155-56 (2022), https://www.ncbi.nlm.nih.gov/books/NBK583906/pdf/Bookshelf_NBK583906.pdf [https://perma.cc/9JXD-DEXE] ("collaborations with various [state, territorial, local, and tribal] partners are critical in preventing onward transmission of infectious diseases.").

[39] CDC, *About The Laboratory Response Network* (Oct. 17, 2024) https://www.cdc.gov/laboratory-response-network/php/about/index.html [https://perma.cc/HJ53-3PRC].

28

confirm whether a patient had COVID-19.  While that is no longer true for COVID-19, it could be for new and emergent infectious diseases.  Local health departments also rely on CDC staff to share information about emerging infectious diseases and other public health threats, like mpox;[40] coordination among states to respond to specific cases; guidance on unusual cases; and development of vaccine recommendations.

Local governments also bear the brunt when federal agency staffs are cut abruptly and dramatically.  Food safety typifies this point.  While local health departments are responsible for inspecting food facilities, investigating foodborne illnesses, and preventing the spread of communicable diseases, the safety of the nation's food supply ultimately rests with the FDA and USDA.  Local health authorities can, and do, monitor and communicate with the public about the spread of emergent diseases, like the Winter 2025 emergence of Avian Influenza A (H5N1), but the FDA maintains responsibility for ensuring the safety of the milk, dairy products, and animal feed supply and the USDA's Food Safety Inspection Service has exclusive jurisdiction over disease and contamination prevention for

---

[40] CDC, *National Notifiable Diseases Surveillance System*, https://www.cdc.gov/nchs/hus/sources-definitions/nndss.htm [https://perma.cc/A62Q-QGXQ; CDC, *How We Conduct Case Surveillance*, https://www.cdc.gov/nndss/what-is-case-surveillance/conducting.html [https://perma.cc/3NNZ-LJ4Q]; CDC, *Collaborating Office for Medical Examiners and Coroners*, https://www.cdc.gov/emerging-infections-program/php/network-activities/index.html [https://perma.cc/8RUD-NCHF].

almost the entirety of the nation's meat supply.[41]  Yet USDA's inspection ranks are already stretched too thin for effective regulation and enforcement;[42] further cuts would spell disaster for local public-health officials and hospital systems responsible for treating to people sickened by foodborne illnesses.[43]

*          *          *

These are just some of the myriad ways that local governments and officials nationwide fulfill their duties to protect and serve their residents through interactions, relationships, voluntary cooperation, and interdependency with the federal employees who staff and operate administrative agencies charged with a wide range of activities that promote the public good.

## CONCLUSION

Governance—the work of government employees—maintains its validity when it advances the common good: when it protects and uplifts people precisely

---

[41] FDA, *Investigation of Avian Influenza A (H5N1) Virus in Dairy Cattle* (Mar. 14, 2025), https://www.fda.gov/food/alerts-advisories-safety-information/investigation-avian-influenza-h5n1-virus-dairy-cattle; USDA, *National Agricultural Statistics Service*, https://usda.library.cornell.edu/concern/publications/r207tp32d.

[42] *E.g.*, Hr'g Before Senate Committee on Ag, Nut, and Forestry, 118th Cong (Mar. 16, 2023), at 51 (testimony of Secretary of Agriculture Tom Vilsack), https://www.congress.gov/118/chrg/CHRG-118shrg53651/CHRG-118shrg53651.pdf [https://perma.cc/3BZX-9TMD].

[43] *See* U.S. GAO, GAO-25-107613, *Food Safety: USDA Should Take Additional Actions to Strengthen Oversight of Meat and Poultry* (Jan. 2025), https://www.gao.gov/assets/gao-25-107613.pdf [https://perma.cc/78EV-QT8S].

when they would otherwise be left to suffer alone the tragedy of the commons, the pains of market failures, and the costs of unchecked externalities.  Defendants' actions to dismantle federal agency workforces undermines this fundamental office of governance.  Amici's experiences demonstrate that the harm wrought by Defendants' unlawful actions to abruptly and broadly decimate the federal workforce extends far beyond the directly affected agencies and into the daily lives of the American people.  As the front line of American governance, local governments and officials know firsthand just how widespread, devastating, and imminent those harms are for the lives, limbs, health, comfort, and quiet of all persons they serve.

///

///

///

///

///

///

///

///

///

///

31

For these reasons, the Court should not stay the district court's preliminary injunction.

DATED: March 18, 2025

Respectfully submitted,

**COUNTY OF** SANTA **CLARA**
TONY LOPRESTI,
County Counsel

By:    /s/ Raphael N. Rajendra

Kavita Narayan
Chief Assistant County Counsel
Meredith A. Johnson
Lead Deputy County Counsel
Raphael N. Rajendra
Jenny S. Lam
Stefanie L. Wilson
Deputy County Counsels
70 West Hedding Street
East Wing, 9th Floor
San Jose, California 95110
Tel. (408) 299-5900
Fax (408) 292-7240
Raphael.Rajendra@cco.sccgov.org

*Attorneys for* Amicus Curiae *County of Santa Clara, California*

*Additional amici and counsel listed on following pages*

**ADDITIONAL AMICI AND COUNSEL**

**Local Governments**

DAVID CHIU
City Attorney
City Hall Room 234
One Dr. Carlton B. Goodlett Pl.
San Francisco, CA 94102
*Attorney for the City and County of San Francisco, Calif.*

MARY B. RICHARDSON-LOWRY
Corporation Counsel
121 North LaSalle Street, Suite 600
Chicago, Illinois 60602
*Attorney for the City of Chicago, Ill.*

ZACHARY M. KLEIN
Columbus City Attorney
77 N. Front Street, 4th Floor
Columbus, OH 43215
*Attorney for the City of Columbus, Ohio*

ALEXANDRA RUGGIE
Corporation Counsel
2100 Ridge Avenue
Evanston, IL 60201
*Attorney for the City of Evanston, Ill.*

KRISTYN ANDERSON
City Attorney
City of Minneapolis, Minnesota
350 S. Fifth Street
Minneapolis, MN 55415
*Attorney for the City of Minneapolis, Minn.*

MURIEL GOODE-TRUFANT
Corporation Counsel
100 Church Street
New York, New York 10007
*Attorney for the City of New York, New York*

KRYSIA KUBIAK
City Solicitor and Chief Legal Officer
414 Grant Street
Pittsburgh, PA 15219
*Attorney for the City of Pittsburgh, Pa.*

HEATHER FERBERT
City Attorney
1200 Third Ave., Suite 1620
San Diego, CA 92101
*Attorney for the City of San Diego, Calif.*

DOUGLAS T. SLOAN
City Attorney
1685 Main Street, Room 310
Santa Monica, CA 90401
*Attorney for the City of Santa Monica, Calif.*

MIKE RANKIN
City Attorney
P.O. Box 27210
Tucson, AZ 85726-7210
*Attorney for the City of Tucson, Ariz.*

CHRISTIAN D. MENEFEE
Harris County Attorney
JONATHAN G. C. FOMBONNE
Deputy County Attorney & First
Assistant
TIFFANY S. BINGHAM
Managing Counsel
Office of the Harris County Attorney
1019 Congress, 15th Floor
Houston, Texas 77002
*Attorneys for Harris County, Tex.*

DAVID J. HACKETT
General Counsel to King County
Executive
Chinook Building
401 5th Avenue, Suite 800
Seattle, WA 98104
*Attorney for King County, Wash.*

BRIAN E. WASHINGTON
County Counsel
3501 Civic Center Drive, Rm 275
San Rafael, CA 94903
*Attorney for the County of Marin, Calif.*

WALLACE W. DIETZ
Director of Law
108 Metropolitan Courthouse
P.O. Box 196300
Nashville, TN 37219-6300
*Attorney for the Metropolitan Government of Nashville & Davidson County, Tenn.*

## Local Government Officials

RYAN RICHARDSON
*City Attorney, City of Oakland, Calif.*

ELI SAVIT
*Prosecuting Attorney, Washtenaw County, Mich.*

CHRISTIAN D. MENEFEE
*County Attorney, Harris County, Tex.*

DANIEL BLISS
*Mayor, City of Evanston, Ill.*

RYAN MELLO
*County Executive, Pierce County, Wash.*

JOHN CLARK
*Mayor, Town of Ridgway, Colo.*

MICHAEL CHAMEIDES
*Supervisor, Columbia County, New York*

ROBERT J. HARVIE, JR.
*Commissioner & Chair, County of Bucks, Pa.*

DIANE M. ELLIS-MARSEGLIA, LCSW
*Commissioner & Vice-Chair, County of Bucks, Pa.*

34

## CERTIFICATE OF COMPLIANCE

I certify that this document complies with the length limitation set forth in

Federal Rule of Appellate Procedure 29(a)(5) because it contains 6,421 words,

exclusive of the portions of the brief exempted by Federal Rule of Appellate

Procedure 32(f).  I certify that this document complies with the typeface

requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style

requirements of Federal Rule of Appellate Procedure 32(a)(6).


Dated:  March 18, 2025             By:   /s/ Raphael N. Rajendra
                                         Raphael N. Rajendra

3230899

35