Nos. 25-1677, 25-2637

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

———————————

AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, et al.,

Plaintiffs-Appellees,

v.

UNITED STATES OFFICE OF PERSONNEL MANAGEMENT, et al.,

Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the Northern District of California

———————————

EXCERPTS OF RECORD
VOLUME 1 of 3

———————————

YAAKOV M. ROTH
  *Acting Assistant Attorney General*

PATRICK D. ROBBINS
  *Acting United States Attorney*

MARK R. FREEMAN
COURTNEY L. DIXON
CASEN B. ROSS
JOSHUA M. KOPPEL
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7270*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-1923*

1

2

3

4

5

6                          UNITED STATES DISTRICT COURT

7

8                          NORTHERN DISTRICT OF CALIFORNIA

9

10   AMERICAN FEDERATION OF
     GOVERNMENT EMPLOYEES, AFL-CIO,
11   et al.,                                    No.  C 25-01780 WHA

12               Plaintiffs,

13         v.                                   **ORDER ON MOTION FOR
                                                PRELIMINARY INJUNCTION BY
14   UNITED STATES OFFICE OF                    UNION PLAINTIFFS AND STATE
     PERSONNEL MANAGEMENT, et al.,              OF WASHINGTON**

15               Defendants.

16

17

18                                **INTRODUCTION**

19         Three groups of plaintiffs — private organizations, public-sector labor unions, and the

20   State of Washington — challenge the Office of Personnel Management's unlawful usurpation

21   of other federal agencies' authority to hire and fire their own employees.  After holding that

22   OPM's recent directive to fire employees at other agencies was unlawful, the district court

23   granted provisional relief, including an order requiring the reinstatement of employees at six

24   federal agencies.  That reinstatement order, however, was stayed by the Supreme Court.  Since

25   then, additional plaintiffs have joined the suit and seek additional relief, and an order held that

26   the public-sector labor union plaintiffs have standing to seek provisional relief.  This order

27   rules on provisional relief as to those plaintiffs.

28

United States District Court
Northern District of California

**FINDINGS OF FACT**

In February 2025, the United States Office of Personnel Management unlawfully directed the mass termination of thousands of probationary employees in all federal agencies.  OPM did not merely suggest such terminations — it directed them.

*First*, OPM directed federal agencies to fire their probationary employees.

In a January 20 memo to federal agencies, OPM directed each agency to identify all employees on probationary periods and send a list to OPM.  (Dkt. No. 111-1 at 1).  The memo explained:  "Employees on probationary periods can be terminated during that period without triggering appeal rights to the Merit Systems Protection Board (MSPB)" (*ibid*.).  In a February 12 email, OPM directed agencies "to action those you know you wish to separate by the end of the day tomorrow, 2/13/2025, using the attached template letter," and requested further "daily" progress reports "through at least the end of the week" (Dkt. No. 111-5 at 1).

At this time, OPM conducted conference calls with the Chief Human Capital Officer Council "every day"  (Dkt. No. 188-1 at 63:13–17).  OPM also held "probably about maybe 7 to 15" individual calls with various chiefs of staff and other agency political appointees concerning probationary employees (Dkt. No. 188-1 at 65:19–66:2).  Despite requests by the district judge, defendants have declined to place direct evidence of the contents of those calls into the record.

In a February 14 email, OPM pushed the "action" deadline back, stating:

> We have asked that you separate probationary employees that you have not identified as mission critical no later than end of the day Monday, 2/17.  We have attached a template letter.

(Dkt. No. 111-2 at 1).

A "Forest Service Briefing Paper" circulated by its human resource management to "Supervisor[s]/Leader[s]" stated:

> All federal agencies, including the Department of Agriculture, were notified on February 12, 2025, by the Office of Personnel Management (OPM) to terminate all employees who have not completed their probationary or trial period. . . .  OPM *directed* agencies to separate Probationary employees starting 2/13/25 . . . .

United States District Court
Northern District of California

> Based on this *direction* it is necessary to start providing notices of separation to employees in probationary and trial period positions starting 2/13/25.

(Dkt. No. 71 at 16 (emphasis added) (February 13, 2025)).

On February 13, the Department of Energy sent one or more termination letters stating: "*Per OPM instructions*, DOE finds that your further employment would not be in the public interest" (Dkt. No. 70-14 at 15 (emphasis added)).

That same day, a probationer at the Bonneville Power Administration (within the DOE) received a termination letter that stated: "*Per OPM instructions*, DOE finds that your further employment would not be in the public interest. For this reason, you are being removed from your position with DOE and the federal civil service effective today" (Dkt. No. 39-4 at 10 (emphasis added)).

On February 14, a probationer terminated by the Foreign Agricultural Service asked the Department of Agriculture's deputy CHCO, Crystal Harris, about the "specific details of my performance that were evaluated and found to be insufficient" (Dkt. No. 39-6 at 5–6). The response: "[A]gencies were *directed* to begin providing termination notices . . . beginning immediately upon OPM notification" (*ibid.*).

On February 18, meanwhile, the National Science Foundation fired its probationers *en masse* via Zoom. During that call, NSF officials stated: "We were *directed* last Friday [February 14] by OPM to terminate all probationers except for a minimal number of mission critical probationers" (Dkt. No. 18-9 at 27 (emphasis added)). When confronted by the terminated probationers, the officials continued: "Up until Friday [February 14]. Yes. We were told by OPM it was the agency's discretion whether to remove probations or not. We chose to retain them all" (*id*. at 26). But "late Friday night," "[t]hey told us that they *directed* us to remove probationers." "[T]here was no limited discretion. This is not a decision the agency made. This is a *direction* we received" (*id*. at 21 (emphasis added)). Asked if NSF had at least *attempted* to negotiate with OPM to minimize the number of terminations, NSF responded: "There's no negotiation" (*id*. at 34). Significantly, as soon as an earlier order

United States District Court
Northern District of California

1    herein made clear that OPM had no such authority, NSF's director re-hired nearly all those

2    probationers.

3          In a February 21 Internal Revenue Service "town hall," IRS Chief Human Capital Officer

4    Traci DiMartini stated:

> I'm not sure why it's happening . . . .  Regarding the removal of
> the probationary employees, again, that was something that was
> *directed* from OPM.  And even the letters that your colleagues
> received yesterday were letters that were written by OPM, put
> forth through Treasury, and given to us . . . .  I cannot explain to
> you why this has happened.  I've never seen OPM *direct* people at
> any agency to terminate.

9    (Dkt. No. 39-5 at 8–9 (emphasis added)).

10   She continued:

> And our actions are being watched by OPM.  So that's, again,
> something else that's unprecedented. . . .  Everything we do is
> scrutinized.  Everything is being looked at twice.  Any changes
> that are made in our system that show any type of action that has
> been deemed impermissible, we have to respond to why it
> happened.

15   (*id*. at 7–8).

16         On February 25, Tracey Therit, chief human capital officer for the Department of

17   Veterans Affairs, testified under oath at a congressional hearing before the House Committee

18   on Veterans Affairs:

> **RANKING MEMBER TAKANO**:  So nobody ordered you to
> carry out these terminations?  You did it on your own?
>
> **MS. THERIT**:  There was *direction* from the Office of Personnel
> Management.

23   (Dkt. No. 39-1 at 13 (emphasis added)).

24         On February 26, members of the Civilian Personnel Policy Council at the Department of

25   Defense stated by email:  "In accordance with *direction* from OPM, beginning February 28,

26   2025, all DOD Components must terminate the employment of all individuals who are

27   currently serving a probationary or trial period" (Dkt. No. 39-4 at 14 (emphasis added)).

28

United States District Court
Northern District of California

In a March 6 sworn declaration filed in the District of Maryland and introduced into the

record by plaintiffs, meanwhile, IRS Chief Human Capital Officer DiMartini stated:

> I attended several virtual meetings with Trevor Norris and other Human Capital Officers at Treasury agencies (which include the Office of the Comptroller of the Currency, the Bureau of Engraving and Printing, and the U.S. Mint) during which we discussed the *directive* to conduct mass terminations of probationary employees.
>
> . . . .
>
> Mr. Norris informed us that Charles Ezell, the Acting Director of OPM, Amanda Scales, Mr. Ezell's Chief of Staff, and Noah Peters, were the individuals spearheading the termination of probationary employees at OPM.
>
> . . . .
>
> Mr. Norris specifically instructed me and the other Human Capital Officers at Treasury that *OPM would not allow us to exempt military veterans from the probationary terminations*.

(Dkt. No. 94-1 at 3–4 (emphasis added)).

An agency's "decision" *not* to terminate was contingent on OPM approval via an

"exemptions process" (*ibid.*; Dkt. No. 188-1 at 87–88; 140:2–4).

After providing OPM with the required lists of employees and seeking exemptions, if

any, the federal agencies put OPM's termination directive into practice, firing more than

24,000 probationary employees in three weeks.

*Second*, OPM directed agencies to fire those employees under the false pretense of

"performance."

In early February, OPM disseminated a template termination letter to be used by all

agency chief human capital officers (Dkt. No. 87-1).  The OPM template stated:

> The Agency finds, based on your performance, that you have not demonstrated that your further employment at the Agency would be in the public interest. For this reason, the Agency informs you that the Agency is removing you from your position of [TITLE] with the Agency and the federal civil service effective [insert date and time, if necessary].

(*ibid.* (highlighting added)).

From IRS Chief Human Capital Officer DiMartini:

> My colleagues and I asked Mr. Norris what the termination letter for affected probationary employees should consist of, and they informed me that OPM had drafted a letter, Treasury made a few modifications, and that we were instructed to send this letter out.

(Dkt. No. 94-1 at 3–4).

The IRS did *not* consider probationer performance:

> My office did not review or consider the actual job performance or conduct of any IRS probationary employee when issuing the termination notices. I also know that Treasury did not review or consider the actual job performance or conduct of any IRS probationary employee when issuing the termination notices. I know this because this fact was discussed openly in meetings. Practically speaking, it would take weeks or months to evaluate the job performance of 6,700 probationary employees.

(*id*. at 4).

The Department of Agriculture, for example, used the OPM template to terminate probationers "based on [their] performance" (Dkt. Nos. 18-5 at 11 (emphasis added); 181-1 at 15–16). The Department of Agriculture's deputy chief human capital officer stated OPM "*directed* the use of a specific template and language for the notice beginning immediately upon OPM notification" (Dkt. No. 39-6 at 6 (emphasis added)). The Department of Transportation informed probationers that "based on your performance you have not demonstrated that your further employment at the DOT FAA would be in the public interest" (Dkt. Nos. 18-17 (emphasis added); 181-1 at 12–13). The Department of Defense circulated the OPM template to its civilian personnel policy council members, "[a]s provided by OPM, and for your convenience" (Dkt. No. 39-4 at 15).

On February 13, Leandra Bailey, a Physical Science Information Specialist for the Forest Service, was terminated (Dkt. No. 71). In her most recent performance review, she received the highest mark possible in every category (*id*. at 11). The OPM template she received nevertheless stated: "The Agency finds, *based on your performance*, that you have not demonstrated that your further employment at the Agency would be in the public interest" (*id*. at 13 (emphasis added)).

On February 18, Dr. Andrew Frassetto, a probationer terminated by the NSF, received the OPM template (Dkt. No. 18-9 at 38). In a February 13 performance review — *five days* before he was terminated "*based on* [*his*] *performance*" — Dr. Frassetto's supervisor reported in a performance review:

> [H]is role [is] mission critical. Dr. Frassetto has been an outstanding program director, and he has taken the lead role in overseeing this important and complicated portfolio for the division. Dr. Frassetto came to NSF with a unique skill set in interdisciplinary scientific research . . . . He has already demonstrated an outstanding ability to balance the various aspects of his job responsibilities and is highly effective at organizing and completing all his work in an accurate and timely manner.
>
> . . . .
>
> Dr. Frassetto's work on this portfolio has been outstanding and he has brought important experience to the role and has demonstrated highly competent project management and oversight. He is a program director who has needed minimal supervision and eagerly seeks special assignments at higher levels of difficulty. He has been an outstanding contributor to the division, directorate, and agency.

(*id*. at 7–8).

NSF said: "The cause comes from boilerplate we received from OPM. The cause says that the agency finds based on your performance that you have not demonstrated that your further employment at the agency would be in the public interest" (*id*. at 30 (emphasis added)).

Other agencies made slight tweaks to OPM's language — but maintained the central pretense. For example, the Department of Health and Human Services substituted "fitness" for "performance," telling those fired: "Unfortunately, the Agency finds that *you are not fit for continued employment* because your ability, knowledge, and skills do not fit the Agency's current needs . . . ." (Dkt. No. 18-10 (emphasis added)). They otherwise stayed true to the OPM template, down to the footnotes (*ibid*.).

The National Oceanic and Atmospheric Administration used the same "fitness" language. Dr. Alexandra Avila, a marine scientist from Port Angeles, Washington, began working at NOAA's Olympic Coast National Marine Sanctuary (Olympic Coast NMS) in September 2024 (Dkt. No. 156-3 ¶3). NOAA's Office of National Marine Statuaries helped fund Dr. Avila's

United States District Court
Northern District of California

1   doctorate through a $180,000 scholarship. Following completion of her Ph.D., Dr. Avila

2   completed two post-doctorate fellowships through Oregon Sea Grant, also a part of NOAA,

3   and then joined NOAA's Olympic Coast NMS, where she worked until she was fired on

4   February 27 (*id*. ¶10). Dr. Avila's most recent performance review — completed *nine days*

5   before her termination — reported that she "is a highly functioning and valuable member of

6   the OCNMS team and her first 4 months as OCNMS have been a resounding success!" (*id*. at

7   10). Prompted to document any "Deficiencies, Areas of Concern," or "Suggestions/Strategies

8   for Improvement" by NOAA's standardized review form, her supervisor responded "None"

9   and "None" (*ibid*.).

10       NOAA terminated Dr. Avila nine days later, using language similar to that used in HHS's

11   termination letters: "[T]he Agency finds that you are not fit for continued employment

12   because your ability, knowledge and/or skills do not fit the Agency's current needs" (*id*. at 7;

13   Dkt. No. 18-10). The termination letter otherwise followed the OPM script (Dkt. No. 156-3 at

14   7–8).

15       Krista Finlay, a natural resource management specialist with NOAA's National Marine

16   Fisheries Service (NMFS) "received the highest possible commendations her supervisor could

17   make" in her most recent performance reviews, and her supervisors identified her as "mission

18   critical for NOAA" in reports requested by OPM (Dkt. No. 70-9 ¶¶ 2, 10–11). Finlay was

19   terminated on February 27 because she, like Dr. Avila and those at HHS, was "not fit for

20   continued employment because [her] ability, knowledge and/or skills do not fit the Agency's

21   current needs" (*id*. ¶ 13). Her branch chief — who first realized Finlay was fired when she

22   forwarded the termination email to him — believed a mistake had been made and assured her

23   that "local NOAA officials would do everything in their power to advocate for" her (with no

24   apparent success) (*id*. ¶ 15).

25       The template was a sham, citing "performance" as the basis for the terminations in order

26   to evade statutory and regulatory requirements, including, for example, the construction of an

27   "order of retention" that honors veterans' preference eligibility.

28               *         *         *

United States District Court
Northern District of California

United States District Court
Northern District of California

1    The present action has come to include three distinct groups of plaintiffs:  (1) private

2    organizations, (2) public-sector labor unions, and (3) the State of Washington (Dkt. No. 90 ¶¶

3    15–30).

4    On February 23, the union and organizational plaintiffs moved for a temporary

5    restraining order (Dkt. No. 18).  On February 27, the undersigned granted a temporary

6    restraining order on behalf of the organizational plaintiffs but held that this district court likely

7    lacked jurisdiction as to the claims of the union plaintiffs (Dkt. No. 42, 45).  On March 11,

8    plaintiffs filed their second amended complaint, adding the State of Washington to the matter

9    (Dkt. No. 90).  On March 13, the undersigned extended the existing TRO and issued a

10   preliminary injunction, again based only on the claims of the organizational plaintiffs,

11   requiring six relief defendant agencies to offer reinstatement to probationary employees

12   terminated on or about February 13 or 14 (Dkt. No. 120 at 51–52).  Also on March 13, the

13   undersigned stated that the question of relief for both the union plaintiffs and the State of

14   Washington would be considered following additional briefing (*id*. at 18, 57).

15   The government timely appealed the March 13 injunction (Dkt. No. 119).  Our court of

16   appeals denied the government's request for an immediate administrative stay (Dkt. No. 136)

17   and emergency motion for a stay pending appeal (Dkt. No. 157).  On March 24, the

18   government petitioned the Supreme Court for an administrative stay.  The Supreme Court

19   granted the stay on April 8.  *OPM v. AFGE*, No. 24A904, 2025 WL 1035208 (Apr. 8, 2025).

20   The Supreme Court clarified that "[t]his order does not address the claims of the other

21   plaintiffs, which did not form the basis of the District Court's preliminary injunction."  *Ibid*.

22   This order concerns the remaining plaintiffs:  The unions and State of Washington.

23   Following further briefing on the issue, an order held that the district court has jurisdiction over

24   the union plaintiffs (Dkt. No. 153) and issued an order to show cause why the relief extended

25   to the private organizations (or more, or less) should not be extended to the union plaintiffs

26   (Dkt. No. 154).  It also set a briefing schedule for Washington's motion for a preliminary

27   injunction (Dkt. No. 164).  The parties have finished all briefing, and oral argument was heard

28   on April 9.

The unions assert that probationary employees have been terminated *en masse* at the following agencies, and request an injunction reversing those actions pending resolution of this litigation:  the Departments of Agriculture, Commerce, Defense, Education, Energy, Health and Human Services, Homeland Security, Housing and Urban Development, Interior, Treasury, Transportation, and Veterans Affairs, the Environmental Protection Agency, General Services Administration, National Science Foundation, and Small Business Administration (Dkt. No. 161-1 at 2–3).

For its part, the State of Washington seeks an injunction reinstating employees at:  the Departments of Agriculture, Commerce, Defense, Education, Health and Human Services, Homeland Security, Housing and Urban Development, and the Interior (Dkt. No. 156 at 2).

This order grants provisional relief but not as broadly as requested.

## ANALYSIS

"A plaintiff seeking a preliminary injunction must establish that [1] he is likely to succeed on the merits, that [2] he is likely to suffer irreparable harm in the absence of preliminary relief, that [3] the balance of equities tips in his favor, and [4] that an injunction is in the public interest."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  "Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents."  *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579 (2017).  "[A] court need not grant the total relief sought by the applicant but may mold its decree to meet the exigencies of the particular case."  *Id.* at 580 (internal quotation marks omitted).

1. **LIKELIHOOD OF SUCCESS ON THE MERITS.**

   A. **PLAINTIFFS' ULTRA VIRES AND APA CLAIMS.**

*First*, OPM's directive constituted an *ultra vires* act that infringed upon all impacted agencies' statutory authority to hire and fire their own employees.

"The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive

action, tracing back to England." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). "Equitable actions to enjoin *ultra vires* official conduct do not depend upon the availability of a statutory cause of action; instead, they seek a 'judge-made remedy' for injuries stemming from unauthorized government conduct, and they rest on the historic availability of equitable review." *Sierra Club v. Trump*, 963 F.3d 874, 890–91 (9th Cir. 2020) (citing *Armstrong*, 575 U.S. at 327), *vacated and remanded on other grounds (mootness)*, 142 S. Ct. 46 (2021).

No statute — anywhere, ever — has granted OPM the authority to direct the termination of employees in other agencies. "Administrative agencies [like OPM] are creatures of statute. They accordingly possess only the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*, 595 U.S. 109, 117 (2022).

Instead, Congress's statutory scheme grants to each agency head the authority to manage its own affairs, including the hiring and firing of employees. 5 U.S.C. § 3101 ("Each Executive agency, military department, and the government of the District of Columbia may employ such number of employees of the various classes recognized by chapter 51 of this title as Congress may appropriate for from year to year."); 5 U.S.C. § 301 ("The head of an Executive department or military department may prescribe regulations for the government of his department, the conduct of its employees . . . ."); *see also, e.g.,* 42 U.S.C. § 7231 (DOE) (re employees); *id.* § 7253 (re reorgs.); 38 U.S.C. §§ 303, 510 (VA); 10 U.S.C. § 113 (DOD).

The same is true of OPM. Congress has vested its director with the authority to "secur[e] accuracy, uniformity, and justice in the functions of the Office," "appoint[] individuals to be employed by the Office," and "direct[] and supervis[e] employees of the Office." 5 U.S.C. § 1103(a)(1)–(3). But that's it. OPM did not have the authority to direct the firing of employees, probationary or otherwise, in any *other* federal agency.

Defendants concede as much. Their opposition rests instead on the factual contention that OPM did not issue a directive. Its sanitized record provided in support — press releases, a feeble start to a yet-to-come "administrative record," and the deposition of newly-appointed OPM Special Advisor Noah Peters — is unpersuasive.

United States District Court
Northern District of California

1    For example, defendants point to a trio of OPM Memos to suggest that agencies made

2    their own decisions.  The first, issued on January 20, directed agencies to "identify all

3    [probationary employees] and send a report to OPM listing [them].  In addition, *agencies*

4    *should promptly determine* whether those employees should be retained at the agency" (Dkt.

5    No. 37 at 1 (emphasis added)).  The second, circulated on February 12, directed agencies to

6    "action those *you know you wish to separate* by the end of the day tomorrow, 2/13/2025, using

7    the attached template letter" (Dkt. No. 111-5 at 1 (emphasis added)).  The third, sent out on

8    February 14, "*asked*" the agencies to "separate probationary employees that *you* have not

9    identified as mission-critical no later than end of the day Monday, 2/17" (Dkt. No. 111-2 at 1

10   (emphasis added)).

11   A mountain of evidence shows that the actual situation was not as these memos would

12   make it seem.

13   The February 14 memo itself went on to note that "[t]hrough *the exemptions process,*

14   agencies have identified the highest-performing probationers in mission critical areas" (*id*. at 2

15   (emphasis added)).  OPM Special Advisor Peters clarified that agencies went to OPM for

16   "exemptions" from the *en masse* termination program during a three-week long "process."

17   The EEOC, FAA, and "some sort of nuclear inspection agency" requested, and received,

18   "exemptions" from OPM (Dkt. No. 188-1 at 87:13–88:16).  If the agencies exercised ultimate

19   discretion, why did OPM make them apply for exemptions?  The reason is obvious — OPM's

20   directive did not leave the agencies free to keep their probationers.  Defendants respond that

21   the exemption process was also just a suggestion:  "But at any time an agency could have just

22   said . . . we're not going to do anything"  (*id*. at 89:10–13).

23   The record betrays defendants' characterization of the exemptions process as a toothless

24   formality.  IRS Chief Human Capital Officer DiMartini, for example, attested that Treasury

25   obeyed OPM's denial of an exemption for veterans:

26        Mr. Norris specifically instructed me and the other Human Capital
          Officers at Treasury that *OPM would not allow us to exempt*
27        *military veterans from the probationary terminations*.

28

(Dkt. No. 94-1 at 4 (emphasis added)).

The record also shows that NSF, which did try to "just ignore" OPM's real-but-not-real exemption process *was directed to — and did — fire*. The NSF officials implementing the OPM directive stated: "Up until Friday [February 14]. Yes. We were told by OPM it was the agency's discretion whether to remove probations or not. We were told by OPM it was the agency's discretion whether to remove probations or not. *We chose to retain them all*" (Dkt. No. 18-9 at 26 (emphasis added). But "late, late Friday night," "[t]hey told us that they *directed* us to remove probationers" (*ibid.* (emphasis added)). "[T]here was no limited discretion. *This is not a decision the agency made*. This is a *direction* we received" (*id.* at 21) (emphasis added). Defendants point to no other agency that "just ignored it" — only those that were *granted* an exemption (and DOJ, which Special Advisor Peters swore was both *granted* an exemption, and "just ignored it," as convenient). [*] And even if some agencies refused to follow OPM's directive, the evidence is overwhelming that most felt compelled to and did follow it. An "ask," followed by a directive, is a directive. A choice — you may choose to retain your probationers — followed by a caveat — if OPM grants your exemption request — is not a choice.

Most of all, the government fails to rebut evidence drawn from a broad swathe of agencies proving that they were operating under OPM direction: "OPM *directed* agencies to separate Probationary employees starting 2/13/25" (USDA);"We were *directed* last Friday by OPM to terminate all probationers" (NSF); "Regarding the removal of the probationary employees, again, that was something that was *directed* from OPM" (Treasury); "There was *direction* from the Office of Personnel Management" (VA); "In accordance with *direction* from OPM . . . all DOD Components must terminate the employment of all individuals who

---

[*] Peters initially claimed that DOJ requested, and received, an exemption from the termination directive (Dkt. No. 188-1 at 87:13–88:16). Later in his deposition, Peters' recollection reversed course: "I *think* DOJ just said, 'We're not doing this,' And *I don't even know* that there was any reach back on or any response to that" (Dkt. No. 188-1 at 136:1–4 (emphasis added)). Peters did not otherwise identify a single agency that "just ignored" the exemption process.

are currently serving a probationary or trial period" (DOD) (emphases added). Defendants did not credibly rebut any of those statements (*see* Dkt. No. 188-1 at 11:15, 126:11–14, 130:1–15).

*Finally*, on March 14, defendants submitted declarations from six of the twenty-two relief defendant agencies (Dkt. Nos. 127-1–7). Of the six, just two (the Departments of the Interior and Defense) stated, in identical terms, that they "reviewed all probationary and trial period appointees' performances to determine which individuals to keep and which to terminate" (Dkt. Nos. 127-1 ¶ 7; 127-3 ¶ 7). The remaining four agencies (Treasury, Energy, Agriculture and the VA) omitted that claim from otherwise sound-alike declarations. These made-for-litigation declarations are unconvincing on their own and do not convincingly rebut the evidence above.

## B.    ARTICLE III STANDING.

"The 'gist of the question of standing' is whether the plaintiff has a sufficiently 'personal stake in the outcome of the controversy' to ensure that the parties will be truly adverse and their legal presentations sharpened." *Washington v. Trump*, 847 F.3d 1151 (9th Cir. 2017) (quoting *Massachusetts v. EPA*, 549 U.S. 497, 516 (2007)). A plaintiff must show that "it has suffered a concrete and particularized injury that is either actual or imminent, that the injury is fairly traceable to the defendant, and that it is likely that a favorable decision will redress that injury." *Massachusetts*, 549 U.S. at 517.

Both representational standing and direct organizational standing are at issue here.

"An organization has standing to bring suit on behalf of its members if '(1) at least one of its members would have standing to sue in his own right, (2) the interests the suit seeks to vindicate are germane to the organization's purpose, and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 680–81 (9th Cir. 2023) (en banc) (quoting *Fleck & Assocs., Inc. v. City of Phoenix*, 471 F.3d 1100, 1105–06 (9th Cir. 2006)).

An organization has direct organizational standing, meanwhile, "where it establishes that the defendant's behavior has frustrated its mission and caused it to divert resources in response

to that frustration of purpose." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 663 (9th Cir. 2021). "Of course, organizations cannot manufacture the injury by incurring litigation costs or simply choosing to spend money fixing a problem that otherwise would not affect the organization at all, but they can show they would have suffered some other injury had they not diverted resources to counteracting the problem." *Ibid*. (internal quotation marks omitted); *see also FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 384–86 (2024). At bottom, the test is whether the challenged action has "directly affected and interfered with [the organization's] core business activities." *Hippocratic Med.*, 602 U.S. at 395.

### *(i)     Union plaintiffs.*

Public union plaintiffs "each represent probationary employees who have been summarily fired, and falsely informed that their termination was based on performance" (Dkt. No. 90 ¶ 145). "Each Union Plaintiff has the core function of representing employees in federal bargaining units in collective bargaining and providing counseling, advice, and representation to represented employees in the event of adverse employment actions" (*id*. ¶ 146).

*First*, the union plaintiffs stand in the shoes of their members, some of whom have been injured due to termination under the pretext of "performance" (Dkt. No. 198-2). Termination is as clear an injury as any. Each terminated probationer has lost their livelihood, access to health insurance, and myriad other rights and privileges tied to their employment. For example, an unnamed international economist with the Foreign Agricultural Service (FAS), Veteran Doe, was let go on grounds of "performance" (Dkt. No. 18-5 ¶¶ 10, 20). Before joining FAS, he spent five years serving as a Navy Corpsman (*id*. ¶ 20). He was deployed twice, to Iraq and Southeast Asia, where he provided medical support to the Marine Corps (*ibid*.). Veteran Doe must now find more affordable housing for himself and his young son and expects to use credit and his retirement savings to cover his living expenses while he looks for work (*ibid*.). The government's failure to timely furnish the standardized termination forms necessary to file for unemployment insurance has further delayed Veteran Doe's access to financial aid (*ibid*.). "He thought he was protected as a veteran, by his status as a

[Presidential Management Fellow], and by his outstanding performance. He feels betrayed by the government because he went to bat for this country as a soldier serving two overseas deployments, but the government did not go to bat for him" (*ibid.*).

The above is more than enough injury for standing. But there's more still. The decision to terminate Veteran Doe under the pretense of "performance" will, unless redressed, continue to injure him for the rest of his working life. Each time he applies for a job, he will no doubt be asked if he has been terminated for performance, and, as it stands, he will have to concede that he has — no matter the truth of it. The decision to deploy false pretense also inflicted a grievous legal injury: It stripped Veteran Doe of the few statutory protections afforded to probationary employees, including hard-earned veteran preferences during reductions in force.

The financial and legal injuries suffered by Veteran Doe are common to all terminated probationers. While this order cannot possibly document how those common injuries have thrown each terminated civil servant's life into disarray, as they did Veteran Doe's, it recognizes that that was the outcome of OPM's directive. For example, AFSCME Local 1653, which represents a bargaining unit of over 2,000 civil servants at the Federal Aviation Administration, reports:

> One probationary employee who was terminated was diagnosed with thyroid cancer the following day and will now lose her health insurance in the face of this catastrophic diagnosis. Another affected employee is a single mother of three that was already waiting tables on the weekends to make ends meet. Now she has lost her primary employment. Another employee was a federal contractor working at the FAA for more than twenty (20) years, who was recently promoted to the federal service in recognition for her outstanding performance.

(Dkt. No. 18-17 ¶ 20).

These injuries are fairly traceable to each civil servant's termination at the behest of OPM. The unions have standing to seek redress on behalf of their members.

*Second*, the unions have themselves been harmed. Terminated union members cease to pay their union dues — collected through voluntary payroll deductions — and thus reduce a key source of operational funding (Dkt. Nos. 18-5 ¶ 23; 18-6 ¶ 20; 18-10 ¶ 19; 18-12 ¶ 17–18;

18-14 ¶ 13).  Diminished funds will in turn diminish union plaintiffs' ability to provide

services to members.

These terminations have also frustrated the union plaintiffs' ability to perform their core

functions.  For example, Kory Blake, an area field services director for the Eastern Region of

the AFSCME, has been diverted from his typical work — organizing and representing a

largely non-Federal workforce in Maryland, DC, and Virginia — to address the terminations of

the union's affected federal employee members (Dkt. No. 18-6 ¶ 17).  Blake was not alone:

> AFSCME has assigned several AFSCME International Union staff,
> including myself, from various departments to address the issues
> arising from the mass terminations and to support our members.
> This includes three attorneys from AFSCME's Office of the
> General Counsel to assess the terminations, conduct legal research
> on how to protect affected members' legal rights, and engage in
> legal advocacy; staff from AFSCME's Data and Analytics
> department to help gather and analyze member data to understand
> the scope of the terminations and engage in member outreach;
> several additional staff from AFSCME's Organizing and Field
> Services department not normally assigned to assist our federal
> sector affiliates who are engaging directly with our affected
> affiliates and members to provide support and coordinate
> resources[.]
>
> . . . .
>
> [T]hree out of a total of eight attorneys in the AFSCME Office of
> the General Counsel are spending an extensive amount of their
> workday addressing the terminations. One of those AFSCME
> attorneys is assigned to support AFSCME's organizing efforts in
> other states but has had to temporarily pause that important
> representation work—which is work that grows union
> membership— to focus on addressing the mass terminations on an
> almost full-time basis.

(Dkt. No. 18-6 ¶ 16–17).

The president of AFGE Local 2883 — representing a bargaining unit of over 1,500 civil

servants at the Center for Disease Control — attests:

> Since HHS issued its probationary employee termination letters,
> the Union has had to divert all its time and resources to engage
> with the membership on this issue and address their concerns. The
> substantial increase in emails, phone calls, and text messages
> concerning the probationary employee terminations has diverted
> time and resources that the Union dedicates to its mission of
> advocating and negotiating for improved workplace conditions,
> organizing new members, representing employees, and non-urgent

> administrative tasks to maintain the Union.
>
> The demands placed on my time to respond to member inquiries about the mass termination have required me to set aside the representation needs of other bargaining unit employees until the evenings and weekends, have interfered with my ability to carry out my tour of duty, and necessarily postponed collective bargaining negotiations with CDC's labor relations team, scheduled for the week of February 17, 2025

(Dkt. No. 18-10 ¶¶ 14–15).

Everett Kelley, AFGE's national president, further attests:

> Altogether, AFGE staff have been forced to spend literally thousands of hours responding to the calls and emails from members and affiliates related to probationary employee terminations that would have otherwise been spent on other matters.
>
> For instance, the time spent responding to and addressing probationary terminations have prevented AFGE's field representatives from filing grievances for affiliates, advising affiliates on other pressing matters such as responding to attacks on collective bargaining and organizing unrepresented members.

(Dkt. No. 18-12 ¶ 10–11; *see also* Dkt. Nos. 18-5 ¶ 11–14; 18-10 ¶ 8–9).

The unions have established that OPM's directive "directly affected and interfered with [their] core business activities" and organizational mission. *Hippocratic Med.*, 602 U.S. at 395. That injury is fairly traceable to OPM's directive to terminate probationary civil servants *en masse*. Union plaintiffs have direct organizational standing.

The government's counters fall short.

*First*, the government argues that the unions lack standing because the second amended complaint does not describe their organizational harms with the requisite specificity (Dkt. Nos. 160 at 9; 180 at 3). In one breath, the government demands that this injunction be decided within the four corners of the complaint; in the next, it insists that the analysis must be limited to a yet-to-come "administrative record"; in the third, it grounds its counterfactual in the declaration and now deposition of OPM Special Advisor Noah Peters — not a part of the complaint *or* the administrative record. The undersigned has considered the *whole* record in crafting the present injunction.

*Second*, the government argues that union plaintiffs do not have representational standing because they have not provided a complete accounting of each terminated probationer (Dkt. No. 180 at 5). The government did not provide union plaintiffs notice when it terminated their members, and when asked for a list of affected civil servants, several agencies failed to provide that information (Dkt. No. 18-5 ¶ 10; 18-6 ¶ 11). "As a general rule of representational standing, when it is clear and not speculative that a member of a group will be adversely affected by a challenged action and a defendant does not need to know the identity of a particular member to defend against an organization's claims, the organization does not have to identify particular injured members by name." *Mi Familia Vota v. Fontes*, 129 F.4th 691, 708 (9th Cir. 2025).

*Third*, the government argues that union plaintiffs cannot show representational standing because they "have not alleged . . . nor could they show, that *all* of their members: [] have been affected by the terminations of probationary employees as not all their members are probationary employees" (Dkt. No. 180 at 5 (emphasis added)). True, union plaintiffs represent non-probationary employees unaffected by the OPM directive at issue here. So what? The Sierra Club was not asked to show that every last member sat in solitude and wonderment at Mineral King. *See Sierra Club v. Morton*, 405 U.S. 727 (1972). An organization establishes representational standing where it shows that some subset of its members have been, or imminently stand to be, injured. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 182–183 (2000). Union plaintiffs have done so here.

*Fourth*, the government argues that union plaintiffs' injury is not redressable in federal court: "Quite simply, reinstatement is not an available equitable remedy" (Dkt. No. 167 at 17 (citing *Sampson v. Murray*, 415 U.S. 61, 83 (1974)). Because this order does not grant the remedy of additional reinstatement, the government's argument is moot.

*Finally*, the government attempts to re-litigate mootness, arguing that its compliance with the February 27 TRO rendered this action moot (Dkt. No. 167 at 18-19). The undersigned heard — and denied — that argument in a prior order (Dkt. No. 88). That analysis is incorporated here.

United States District Court
Northern District of California

### (ii)    State of Washington.

Washington fails to make out standing based on the purported loss of federal services. Washington argues, for example, that the termination of natural resource management specialists at NOAA will result in NOAA's inability to timely "writ[e] biological opinions to permit the release of chinook salmon from WDFW and Washington Treaty Tribes hatcheries," as required by Section 7 of the Endangered Species Act (Dkt. No. 70-9 ¶ 5). Terminations at NOAA's Olympic Coast National Marine Sanctuary (Olympic Coast NMS), meanwhile, will render NOAA an ineffective partner in the management of that area (Dkt. No. 70-11 ¶ 7–13). Disruptions caused by terminations at FEMA, meanwhile, threatens the continued operation of Washington's Floodplains by Design program, which has spent some $280 million dollars to restore 131 miles of river and protect 7,778 acres of land and is now receiving funding applications for work through 2027 (Dkt. No. 70-2. ¶¶ 7–10). As to Housing and Urban Development, meanwhile, Washington asserts: "*If* termination of HUD staffing extends the delay in federal contracting, reimbursement, and release of grant funds, the County *may* have to cancel contracts with service providers" (Dkt. No. 70-6 at 6 (emphasis added)). As to the CDC: "The State continues to rely on data from the CDC relating to other highly contagious diseases, including measles. The recent measles outbreak has reached Washington, and the State relies on adequate staffing levels at CDC to help track and contain this disease if it spreads" (Dkt. No. 70-7 at 6-7).

The present record does not support Washington's assertion that the cessation or diminishment of federal services constitutes an actual or imminent injury "fairly traceable to the challenged action." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010). The Supreme Court has "repeatedly reiterated that 'threatened injury must be *certainly impending* to constitute injury in fact,' and that '[a]llegations of *possible* future injury' are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). The assertion that the termination of probationers at NOAA and other agencies will necessarily result in the diminishment of the specific services and partnerships identified by Washington rests on a speculative chain of contingencies. There

is little record evidence to suggest that NOAA, FEMA, *et. al.*, cannot function without the probationary employees at issue here. While Washington asserts that it "continues to rely on data from the CDC relating to []highly contagious diseases, including measles," for example, the inference that the termination of probationers has rendered the generation of that data impossible is entirely speculative. The notion that delays at NOAA will interfere with Washington's annual release of chinook Salmon likewise rests on the unsupported inference that there *will be* a delay, and that the termination of probationary employees will be the proximate cause of that delay.

Washington also faces a redressability problem. NOAA, CDC, HUD, and others have been subject to deferred resignation programs and the widespread termination of non-probationary employees, neither of which are at issue here. What is to say that the reinstatement of probationary employees will adequately remedy the harms identified by Washington or return each agency to what Washington believes to be "adequate staffing levels" (Dkt. No. 70-7 ¶ 11)? If, for example, NOAA has decided to reduce the testing capacity of the Pacific Marine Environmental Laboratory, will the return of probationary workers under court order remedy purported impending delays in sample turnaround? How will the Court, moreover, ensure that each probationer is not only rehired and returned to active duty, but is assigned to the specific tasks and teams identified by Washington? Such micromanagement of agency staffing is a problem.

Washington has, however, established a legitimate financial injury. The state's Employment Security Department reports that it saw a 470% increase in unemployment benefit claims from federal employees from February 13 to March 3, when compared to the same period in the prior year (Dkt. No. 70-8 ¶¶ 11, 13). Washington has established that at least some of those claimants were probationary employees. The state has expended considerable additional time and resources to process those employees' unemployment insurance claims (Dkt. No. 70-8 ¶¶ 11, 13) ("Overall, the intake process is far more time-consuming for federal employee unemployment benefits claimants than for most claimants"). The diversion of resources necessary to service federal employees' claims has delayed benefits payments to

Washingtonians and required Washington to expend additional funds from its Administrative Contingency Account and Employment Services Administrative Account (*id.* ¶¶ 15, 16). "A dollar of economic harm is [] an injury-in-fact for standing purposes." *E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1267 n.5 (9th Cir. 2020) (quoting *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 5 (D.C. Cir. 2017)).

The government counters that the Supreme Court "expressly held that indirect injuries are insufficient to create standing for a state to sue" in *United States v. Texas* (Dkt. No. 167 at 11 (citing *United States v. Texas*, 599 U.S. 670, 674 (2023)).

The government misstates *United States v. Texas*. "The holding of a case is not the same thing as a quotation from a case. The holding is the proposition of law which requires that the particular facts in that case produce the result." *United States v. Andrade-Larrios*, 39 F.3d 986, 990 (9th Cir. 1994).

In *Texas*, a cohort of states challenged new guidelines for immigration enforcement issued by the Department of Homeland Security, arguing that the guidelines "violated federal statutes that purportedly required the Department to arrest *more* criminal noncitizens pending their removal." *Texas*, 599 U.S. at 673-74. *Texas* reaffirmed the well-established rule that parties do not have a judicially cognizable interest in the prosecution of others. *Id.* at 677. The government's attempt to graft *Texas* onto the present dispute runs headlong into *Texas* itself:

> And this case raises only the narrow Article III standing question of whether the Federal Judiciary may in effect order the Executive Branch to take enforcement actions against violators of federal law—here, by making more arrests. Under this Court's Article III precedents and the historical practice, the answer is no.

*Id.* at 684–85. It is unsurprising, then, that our court of appeals has already rejected this argument. *State v. Su*, 121 F.4th 1, 13 n.5 (9th Cir. 2024).

## C.    IRREPARABLE HARM.

In *Winter*, the Supreme Court reversed a preliminary injunction based only on a "possibility" of irreparable harm, explaining: "Issuing a preliminary injunction based on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as

an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is

entitled to such relief." *Winter*, 555 U.S. at 22. The party seeking a preliminary injunction

must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*,

555 U.S. at 22. "[U]nsupported and conclusory statements regarding harm" are not

enough. *Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir.

2013).

### *(i)     The unions.*

There is much less need now for an order reinstating probationary employees than there

was in March — when the district court did order reinstatement. On March 4, in response to

this Court's TRO, OPM re-circulated a revised version of the January 20 memo, which read:

> Please note that, by this memorandum, OPM is not directing
> agencies to take any specific performance-based actions regarding
> probationary employees. Agencies have ultimate decision-making
> authority over, and responsibility for, such personnel actions.

(Dkt. Nos. 64-1 at 2; 188-1 at 149:11–21). On May 13, the district court issued a preliminary

injunction requiring six relief defendants to reinstate their probationary employees. That same

day, a separate preliminary injunction issued by a district court in Maryland required all

remaining relief defendants, except NSF, to rehire their probationers. NSF, meanwhile, had

rehired all probationers following this district court's TRO. Yes, both district court orders

were eventually stayed, but much good was done in the interim. Compliance reports submitted

in this district court and in Maryland showed that relief defendants rehired their terminated

probationers *after* having received the March 4 revised memorandum. So, if any reinstated

employees are now terminated (yet again), it will be because the agency has made the decision

to do so, not because OPM has directed it. The whole point of this lawsuit has been OPM's

*ultra vires* act — not terminations made wholly by agencies themselves.

Union plaintiffs' contention that they continue to face irreparable organizational harms

falls short for the same reason. Just as there is little to suggest that agencies are still acting at

the behest of OPM, there is little on the record to suggest that the unions' core business

functions are still being frustrated by such terminations.  Plaintiffs' declarations attesting to

such disruptions have by now grown stale.

*          *          *

Plaintiffs have, however, made out irreparable harm flowing from OPM's template

termination letter, and its pretense of "performance" based firings.  In our circuit, the "loss of

opportunity to pursue [one's] chosen profession[] constitutes irreparable harm." *Arizona*

*Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014) (cleaned up); *see Chalk v.*

*U.S. Dist. Ct. Cent. Dist. of California*, 840 F.2d 701, 709-10 (9th Cir. 1988).  In *Brewer*,

Arizona Governor Janice Brewer issued an executive order directing state agencies to prevent

DACA recipients from becoming eligible for any state identification, including a driver's

license. *Brewer*, 757 F.3d at 1059 (internal quotations omitted).  Plaintiffs, five individual

DACA recipients and the Arizona DREAM Act Coalition, filed suit and moved for a

preliminary injunction. *Ibid*.  Our court of appeals held that plaintiffs had "introduced ample

evidence that Defendants' policy causes them to suffer irreparable harm" by "limiting their

professional opportunities." *Id*. at 1068 ("Plaintiffs' ability to drive is integral to their ability

to work — after all, eighty-seven percent of Arizona workers commute to work by car. It is

unsurprising, then, that Plaintiffs' inability to obtain driver's licenses has hurt their ability to

advance their careers.").

Here, "performance" (or "fitness") was a total sham, a pretense supplied by OPM via

their template termination letter.  As IRS Chief Human Capital Officer DiMartini explained, "it

would take weeks or months to evaluate the job performance of 6,700 probationary

employees" (Dkt. No. 94-1 at 4).  OPM's deadline, meanwhile, afforded federal agencies mere

days.  As a result, countless high-performing employees, including those highlighted above,

were terminated through a lie.  The terminations were so divorced from reality that one *non-*

probationary USDA employee, who had "received two cash awards for her excellent

performance" and was recognized in 2023 for "expanding U.S. agriculture exports through

trade supporting initiatives" was wrongfully terminated because of "performance" on February

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1   13 (Dkt. No. 18-5 at 8).  USDA reversed course when she notified them that she was a full year

2   removed from her probationary period.

3        Termination under the false pretense of performance is an injury that will persist for the

4   working life of each civil servant.  In pursuing future employment, each will have to concede

5   that they have been terminated based on performance.  The stain created by OPM's pretense

6   will follow each employee through their careers and will limit their professional opportunities.

7   As in *Brewer*, the irreparable nature of many probationers' injury is heightened because

8   "[s]etbacks early in their careers are likely to haunt Plaintiffs for the rest of their lives."

9   *Brewer*, 757 F.3d at 1068.  The below injunction is narrowly tailored to address the ongoing

10   harm made out by plaintiffs.

11             **(ii)**    ***State of Washington.***

12      Washington asserts that it faces irreparable harms from the "widespread impairment to

13   services provided to the public and fragile ecosystems in national parks and other public lands"

14   (Dkt. No. 156-1 at 13).  As explained with regards to standing, the link between the

15   terminations at issue here and the purported impairment to services provided by the employing

16   agencies is "premised on a speculative chain of possibilities."  *Clapper*, 568 U.S. at 410.

17          **D.**    ***THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST.***

18      Where the government is a party, the balance of the equities and the public interest

19   merge.  *See Nken v. Holder,* 556 U.S. 418, 435 (2009).  The government argues that it has a

20   "strong interest in maintaining its authority to manage its own internal affairs" (Dkt. No. 167 at

21   28; *see also* Dkt. No. 180 at 15).  That argument loses much of its force where plaintiffs show

22   — as they have here — that the government is likely to have managed those affairs in an

23   unlawful manner.  "The preservation of the rights in the Constitution and the legality of the

24   process by which government agencies function certainly weighs heavily in the public

25   interest." *Nat'l Treasury Emps. Union v. U.S. Dep't of Treasury*, 838 F. Supp. 631, 640

26   (D.D.C. 1993) (Judge Harold Greene).  The assertion that plaintiffs have no interest in

27   "restor[ing] or maintain[ing] employment at federal agencies at their preferred level and in

28   their preferred manner," meanwhile, mischaracterizes the relief sought by plaintiffs and is, in

United States District Court
Northern District of California

any event, moot considering the scope of the relief granted (Dkt. No. 180 at 15).

**PROVISIONAL RELIEF**

Provisional relief is hereby granted as follows:

1. Defendants OPM and Charles Ezell are enjoined from ordering, directing, or telling any other federal agency to terminate the employment of any federal employee or group of federal employees.

2. All relief defendant agencies are enjoined from following any OPM order or direction to fire any agency employee.

3. All relief defendant agencies are enjoined from any further use of the OPM template termination letter provided by OPM — including any altered or modified versions.

4. All relief defendant agencies who used the OPM template termination notice — or variation thereof — shall provide recipients with a written statement, directed to the employee individually, stating that their termination was not "performance" or fitness based but was made as part of a government-wide mass termination. This shall be done by **MAY 8, 2025**.

5. If a particular termination was in fact carried out after an individualized evaluation of that employee's performance or fitness, the Chief Human Capital Officer (or equivalent) of that agency may instead submit, by **MAY 8, 2025, AT NOON**, a declaration, under oath and seal, stating so and providing the individual reasoning underpinning that termination.

6. Each Chief Human Capital Officer (or equivalent) at the relief defendant agencies shall acknowledge, in writing, having received and read this order. Such acknowledgements shall be filed with the Court by **MAY 8, 2025, AT NOON**.

7. Nothing in this order prohibits any federal agency from terminating any employee so long as the agency makes that decision wholly on its own, does not use the OPM template termination notice, and is otherwise in compliance with applicable law.

United States District Court
Northern District of California

The government requests a security pursuant to Rule 65(c), which provides that the court "may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The government does not provide any insight into the purported costs and damages it may sustain. "The district court retains discretion 'as to the amount of security required, *if any*.'" *Diaz v. Brewer*, 656 F.3d 1008, 1015 (9th Cir. 2011) (quoting *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir.2009)). In *Diaz*, the district court granted a preliminary injunction "to prevent a state law from taking effect that would have terminated eligibility for health-care benefits of state employees' same-sex partners." *Id*. at 1010. Our court of appeals affirmed the district court's decision not to require a bond. *Id*. at 1015.

The undersigned finds that security is appropriate in the amount of one dollar per union plaintiff.

**IT IS SO ORDERED.**

Dated:  April 18, 2025.

_____
WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

1

2

3

4

5

6                    UNITED STATES DISTRICT COURT

7

8                    NORTHERN DISTRICT OF CALIFORNIA

9    AMERICAN FEDERATION OF
     GOVERNMENT EMPLOYEES, AFL-CIO,
10   et al.,                                        No.  C 25-01780 WHA

11              Plaintiffs,

12        v.                                        **MEMORANDUM**

13   UNITED STATES OFFICE OF
     PERSONNEL MANAGEMENT, et al.,
14
                Defendants.
15   ───────────────────────────────

16

17                        **INTRODUCTION**

18        Each federal agency has the statutory authority to hire and fire its employees, even at

19   scale, subject to certain safeguards.  The Office of Personnel Management has no authority to

20   hire and fire employees in another agency.  Yet that is what happened here — *en masse*.  OPM

21   directed all (or at least most) federal agencies to terminate all probationary employees for

22   "performance."  Because the organizational plaintiffs in this case have shown they will suffer

23   irreparable harm resulting from the immediate impairment of public services (and meet other

24   tests), they are entitled to a preliminary injunction.  The Court granted it from the bench —

25   ordering the reinstatement of probationary employees at the relevant agencies.

26

27

28

*United States District Court*
*Northern District of California*

**STATEMENT**

*First*, OPM directed other agencies to fire their probationary employees.

A "Forest Service Briefing Paper" circulated by its human resource management to "Supervisor[s]/Leader[s]" stated:

> All federal agencies, including the Department of Agriculture, were notified on February 12, 2025, by the Office of Personnel Management (OPM) to terminate all employees who have not completed their probationary or trial period. . . . OPM *directed* agencies to separate Probationary employees starting 2/13/25 . . . . Based on this *direction* it is necessary to start providing notices of separation to employees in probationary and trial period positions starting 2/13/25.

(Dkt. No. 71 at 16 (emphasis added) (February 13, 2025)).

Then, in February 13 and 14 phone calls, OPM discussed probationary employee terminations with leadership from other agencies. Defendants have not provided transcripts of those calls nor declarations from any person who attests to having participated on one.

On February 13, the Department of Energy sent a probationary business cost analyst a termination letter stating: "*Per OPM instructions*, DOE finds that your further employment would not be in the public interest" (Dkt. No. 70-14 at 15 (emphasis added)).

That same day, a probationer at the Bonneville Power Administration (within the DOE) received a termination letter that stated: "*Per OPM instructions*, DOE finds that your further employment would not be in the public interest. For this reason, you are being removed from your position with DOE and the federal civil service effective today" (Dkt. No. 39-4 at 10 (emphasis added)).

On February 14, a probationer terminated by the Foreign Agricultural Service asked the Department of Agriculture's deputy chief human capital officer by email about the "specific details of my performance that were evaluated and found to be insufficient" (Dkt. No. 39-6 at 5–6). The response: "[A]gencies were *directed* to begin providing termination notices . . . beginning immediately upon OPM notification" (*ibid.*).

On February 18, meanwhile, the National Science Foundation fired its probationers *en masse* via Zoom. During that call, NSF officials stated: "We were *directed* last Friday

United States District Court
Northern District of California

United States District Court
Northern District of California

[February 14] by OPM to terminate all probationers except for a minimal number of mission critical probationers" (Dkt. No. 18-9 at 27 (emphasis added)).  When confronted by the terminated probationers, the officials continued:  "Up until Friday [February 14].  Yes.  We were told by OPM it was the agency's discretion whether to remove probations or not.  We chose to retain them all" (*id*. at 26).  But "late Friday night," "[t]hey told us that they *directed* us to remove probationers" (*ibid.* (emphasis added)).  "[T]here was no limited discretion.  This is not a decision the agency made.  This is a *direction* we received" (*id*. at 21) (emphasis added).  Asked if NSF had at least *attempted* to negotiate with OPM to minimize the number of terminations, NSF responded:  "There's no negotiation" (*id*. at 34).  Defendants concede that on March 3, three days after the undersigned issued a memorandum opinion and amended the temporary restraining order, NSF's director re-hired nearly all the probationers terminated February 18.

In a February 21 Internal Revenue Service "town hall," IRS Chief Human Capital Officer Traci DiMartini stated:

> I'm not sure why it's happening . . . .  Regarding the removal of the probationary employees, again, that was something that was *directed* from OPM.  And even the letters that your colleagues received yesterday were letters that were written by OPM, put forth through Treasury, and given to us . . . .  I cannot explain to you why this has happened.  I've never seen OPM *direct* people at any agency to terminate.

(Dkt. No. 39-5 at 8–9 (emphasis added)).

She continued:

> And our actions are being watched by OPM.  So that's, again, something else that's unprecedented. . . .  Everything we do is scrutinized.  Everything is being looked at twice.  Any changes that are made in our system that show any type of action that has been deemed impermissible, we have to respond to why it happened.

(*id*. at 7–8).

On February 25, Tracey Therit, chief human capital officer for the Department of

Veterans Affairs, testified under oath at a congressional hearing before the House Committee

on Veterans Affairs:

> **RANKING MEMBER TAKANO**:  So nobody ordered you to carry out these terminations?
>
> You did it on your own?
>
> **MS. THERIT**:  There was *direction* from the Office of Personnel Management.

(Dkt. No. 39-1 at 13 (emphasis added)).

On February 26, members of the Civilian Personnel Policy Council at the Department of

Defense stated by email:  "In accordance with *direction* from OPM, beginning February 28,

2025, all DOD Components must terminate the employment of all individuals who are

currently serving a probationary or trial period" (Dkt. No. 39-4 at 14 (emphasis added)).

In a March 6 sworn declaration filed in the District of Maryland and introduced into the

record by plaintiffs, meanwhile, IRS CHCO DiMartini stated:

> I attended several virtual meetings with Trevor Norris and other Human Capital Officers at Treasury agencies (which include the Office of the Comptroller of the Currency, the Bureau of Engraving and Printing, and the U.S. Mint) during which we discussed the *directive* to conduct mass terminations of probationary employees.
>
> . . . .
>
> Mr. Norris informed us that Charles Ezell, the Acting Director of OPM, Amanda Scales, Mr. Ezell's Chief of Staff, and Noah Peters, were the individuals spearheading the termination of probationary employees at OPM.
>
> . . . .
>
> Mr. Norris specifically instructed me and the other Human Capital Officers at Treasury that *OPM would not allow us to exempt military veterans from the probationary terminations*.

(Dkt. No. 94-1 at 3–4 (emphasis added)).

United States District Court
Northern District of California

*Second*, OPM directed agencies to fire those employees under the pretense of "performance."

In early February, OPM disseminated a template termination letter to agency chief human capital officers (Dkt. No. 87-1). The OPM template was largely generic, with placeholder text to be filled out by each respective agency (its image reproduced here, in two excerpts):

[DATE], 2025

MEMORANDUM FOR [EMPLOYEE], [TITLE], [ORGANIZATION]

FROM:              [NAME]
                   [TITLE]

SUBJECT:           Notification of Termination During Probationary Period

REFERENCES:        5 U.S.C. § 7511
                   [5 U.S.C. § 3321(a)]
                   [5 C.F.R. §§ 315.803 and 804]
                   [5 C.F.R. § 316.304]
                   [INSERT AGENCY POLICY]

    This is to provide notification that the Agency is removing you from your position of [TITLE]  and federal service consistent with the above references.

    On [INSERT DATE OF APPOINTMENT], the Agency appointed you to the position of [TITLE]. As documented on your appointment Standard Form 50 (SF-50), you appointment is subject to a probationary/trial period. The agency also informed you of this requirement in the job opportunity announcement for the position.

(*ibid*.).

While it did not account for the specific employee (or even agency), the OPM template *did* articulate a specific reason for termination:

    The Agency finds, based on your performance, that you have not demonstrated that your further employment at the Agency would be in the public interest. For this reason, the Agency informs you that the Agency is removing you from your position of [TITLE] with the Agency and the federal civil service effective [insert date and time, if necessary].

(*ibid*. (highlighting added)).

From IRS CHCO DiMartini:

> My colleagues and I asked Mr. Norris what the termination letter for affected probationary employees should consist of, and they informed me that OPM had drafted a letter, Treasury made a few modifications, and that we were instructed to send this letter out.

(Dkt. No. 94-1 at 3–4).

The IRS did not consider probationer performance:

> My office did not review or consider the actual job performance or conduct of any IRS probationary employee when issuing the termination notices. I also know that Treasury did not review or consider the actual job performance or conduct of any IRS probationary employee when issuing the termination notices. I know this because this fact was discussed openly in meetings. Practically speaking, it would take weeks or months to evaluate the job performance of 6,700 probationary employees.

(*id.* at 4).

The Department of Agriculture used the OPM template to terminate probationers "based on [their] performance" (Dkt. No. 18-5 at 11 (emphasis added)). USDA's deputy chief human capital officer stated OPM "*directed* the use of a specific template and language for the notice beginning immediately upon OPM notification" (Dkt. No. 39-6 at 6 (emphasis added)). The Department of Transportation informed probationers that "based on your performance you have not demonstrated that your further employment at the DOT FAA would be in the public interest" (Dkt. No. 18-17 (emphasis added)). The Department of Defense circulated the OPM template to its civilian personnel policy council members, "[a]s provided by OPM, and for your convenience" (Dkt. No. 39-4 at 15).

On February 13, Leandra Bailey, a Physical Science Information Specialist for the Forest Service, was terminated (Dkt. No. 71). In her most recent performance review, she received the highest mark possible in every category (*id.* at 11). The OPM template she received nevertheless stated: "The Agency finds, based on your performance, that you have not demonstrated that your further employment at the Agency would be in the public interest" (*id.* at 13 (emphasis added)).

On February 18, Dr. Andrew Frassetto, a probationer terminated by the NSF, received the OPM template (Dkt. No 18-9 at 38). In a February 13 performance review — *five days* before he was terminated "*based on* [*his*] *performance*" — Dr. Frassetto's supervisor reported in a performance review:

> [H]is role [is] mission critical. Dr. Frassetto has been an outstanding program director, and he has taken the lead role in overseeing this important and complicated portfolio for the division. Dr. Frassetto came to NSF with a unique skill set in interdisciplinary scientific research . . . . He has already demonstrated an outstanding ability to balance the various aspects of his job responsibilities and is highly effective at organizing and completing all his work in an accurate and timely manner.
>
> . . . .
>
> Dr. Frassetto's work on this portfolio has been outstanding and he has brought important experience to the role and has demonstrated highly competent project management and oversight. He is a program director who has needed minimal supervision and eagerly seeks special assignments at higher levels of difficulty. He has been an outstanding contributor to the division, directorate, and agency.

(*id*. at 7–8).

NSF said: "The cause comes from boilerplate we received from OPM. The cause says that the agency finds based on your performance that you have not demonstrated that your further employment at the agency would be in the public interest" (*id*. at 30 (emphasis added)).

Other agencies made slight tweaks to OPM's language — but maintained the central pretense. For example, the Department of Health and Human Services reworded the OPM template's "performance" language — "based on your performance, [] you have not demonstrated that your further employment at the Agency would be in the public interest" — to "fitness": "Unfortunately, the Agency finds that *you are not fit for continued employment* because your ability, knowledge, and skills do not fit the Agency's current needs . . . ." (Dkt. No. 18-10 (emphasis added)). They otherwise stayed true to the OPM template, down to the footnotes (*ibid*.).

OPM directed agencies to fire their probationers under the pretense of "performance" to, at least in part, circumvent statutory and regulatory reduction in force procedures and foreclose

appeal to the Merit Systems Protection Board. In defendant Ezell's words: "Employees on probationary periods can be terminated during that period without triggering appeal rights to the Merit Systems Protection Board (MSPB)" (Dkt. No. 37 at 1).

Virtually all the foregoing facts were uncovered by counsel for plaintiffs. Defendants have provided virtually no transparency.

\*          \*          \*

Plaintiffs filed their complaint on February 19, 2025 (Dkt. No. 1). Four days later, they amended that complaint and moved for a temporary restraining order (Dkt. Nos. 17, 18). The undersigned ordered expedited briefing and held a hearing on February 27, during which a temporary restraining order was granted. A memorandum opinion and an amended TRO followed the next day (Dkt. No. 28). As part of that order, the undersigned required that defendant Ezell, who had volunteered his own declaration in support of defendants' opposition to a TRO, be cross-examined during a forthcoming evidentiary hearing on preliminary injunction. Plaintiffs, meanwhile, subpoenaed several agency employees to testify. Defendants were afforded the opportunity to request the production of any number of plaintiffs' declarants but did not. On March 10, three days before the evidentiary hearing, defendants moved to vacate that hearing, quash all subpoenas, and be relieved from having to produce defendant Ezell and other witnesses for deposition (Dkt. No. 75-1). The Court denied the motion to vacate, granted in part the motion to quash the subpoenas to appear, but denied relief as to defendant Ezell, who uniquely was a party and had volunteered his own testimony (Dkt. No. 89 at 2). Defendants ultimately withdrew Ezell's declaration and he did not appear. Finally, also on March 11, plaintiffs filed a second amended complaint that added several federal agencies (and their heads) as relief defendants, bringing them within this Court's ability to grant relief.

The March 13 hearing went ahead, and the undersigned issued a preliminary injunction from the bench, on the record to date and counsels' argument. As stated at the hearing, the preliminary injunction flows only from claims made by organizational plaintiffs.

United States District Court
Northern District of California

**ANALYSIS**

"A plaintiff seeking a preliminary injunction must establish that [1] he is likely to succeed on the merits, that [2] he is likely to suffer irreparable harm in the absence of preliminary relief, that [3] the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

*First*, OPM's directive constituted an *ultra vires* act that violated its and all impacted agencies' statutory authority.

"The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). "Equitable actions to enjoin *ultra vires* official conduct do not depend upon the availability of a statutory cause of action; instead, they seek a 'judge-made remedy' for injuries stemming from unauthorized government conduct, and they rest on the historic availability of equitable review." *Sierra Club v. Trump*, 963 F.3d 874, 890–91 (9th Cir. 2020) (citing *Armstrong*, 575 U.S. at 327), *vacated and remanded on other grounds (mootness)*, 142 S. Ct. 46 (2021).

No statute — anywhere, ever — has granted OPM the authority to direct the termination of employees in other agencies. "Administrative agencies [like OPM] are creatures of statute. They accordingly possess only the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*, 595 U.S. 109, 117 (2022).

Instead, Congress's statutory scheme grants to each agency head the authority to manage its own affairs, including the hiring and firing of employees. 5 U.S.C. § 3101 ("Each Executive agency, military department, and the government of the District of Columbia may employ such number of employees of the various classes recognized by chapter 51 of this title as Congress may appropriate for from year to year."); 5 U.S.C. § 301 ("The head of an Executive department or military department may prescribe regulations for the government of his department, the conduct of its employees . . . ."); *see also, e.g.,* 42 U.S.C. § 7231 (DOE) (re employees); *id.* § 7253 (re reorgs.); 38 U.S.C. §§ 303, 510 (VA); 10 U.S.C. § 113 (DOD).

United States District Court
Northern District of California

1    The same is true of OPM.  Congress has vested its director with the authority to "secur[e]

2    accuracy, uniformity, and justice in the functions of the Office," "appoint[] individuals to be

3    employed by the Office," and "direct[] and supervis[e] employees of the Office."  5 U.S.C.

4    § 1103(a)(1)–(3).  But that's it.  OPM did not have the authority to direct the firing of

5    employees, probationary or otherwise, in any *other* federal agency.

6    Defendants concede as much.  Their opposition to relief rests instead on the factual

7    contention that OPM did not issue a directive.  The sanitized record provided in support —

8    press releases and a feeble start to a yet-to-come "administrative record" (Dkt. Nos. 110, 111)

9    — is unpersuasive.

10    For example, defendants point to a February 14 OPM memo where OPM "asked" the

11    agencies to select for termination only those probationers they did *not* identif[y] as mission-

12    critical no later than end of the day Monday, 2/17" (Dkt. No. 111-2 at 1 (emphasis

13    added)).  But the balance of the record shows the actual situation was not as this memo would

14    make it seem.  *First*, even the fig leaf of agency discretion allowed for in the letter was

15    illusory.  As the NSF officials implementing the OPM directive stated:  "Up until Friday

16    [February 14].  Yes.  We were told by OPM it was the agency's discretion whether to remove

17    probations or not.  We were told by OPM it was the agency's discretion whether to remove

18    probations or not.  *We chose to retain them all*" (Dkt. No. 18-9 at 26).  But "late, late Friday

19    night," "[t]hey told us that they *directed* us to remove probationers" (*ibid.* (emphasis

20    added)).  "[T]here was no limited discretion.  *This is not a decision the agency made*.  This is a

21    *direction* we received" (*id*. at 21) (emphasis added).  An "ask," followed by a directive, is a

22    directive.  *Second*, even if the agency discretion were real (it wasn't), the February 14 OPM

23    memo directed that discretion towards evaluating who was "mission-critical," not who was

24    high-performing (Dkt. No. 111-2 at 1).  The OPM template letter used to effectuate those

25    terminations — "[t]he Agency finds, *based on your performance*, that you have not

26    demonstrated that your further employment at the Agency would be in the public interest"

27    (Dkt. No. 87-1 at 1 (emphasis added)) — was an obvious pretext intended to obstruct appeal

28

United States District Court
Northern District of California

and avoid statutory and regulatory reduction-in-force procedures (for example, the honoring of veteran preferences in the order of retention) (Dkt. No. 94-1 at 3–5).

The declaration of OPM senior advisor Noah Peters fares no better (Dkt. No. 77). *First*, Peters does not claim personal knowledge as to *anything* in his declaration. *Second*, Peters does not state that he participated in *any* of the calls he describes. Defense counsel argued, as to Acting Director Ezell's declaration, that *agency heads* "lack[ ] specific knowledge of disputed issues of fact," and "such declarations are based on information obtained by the official in course of performing his or her official duties and provide background information and summarize agency decision making reflected in other, sometimes lengthy or complex official documents" (Dkt. No. 75 at 8). Peters is not an agency head, he is a "senior advisor" who joined OPM two months ago. Peters' concluding paragraph — "At no point on these calls did OPM direct or require any agencies to terminate probationary employees. At all times, the tone was friendly, cordial, and cooperative." — is hearsay within hearsay (Dkt. No. 77 at 3 (emphasis added)). Defendants concede that *someone* from OPM *was* present on each of the calls described but have refused to provide the Court with declarations from *any* such employee with direct knowledge of the facts. *Finally*, Peters' assertion that there was no directive is cabined to "these calls." Nowhere does he state that OPM did not issue a directive *at all* (*ibid.*).

Plaintiffs have nourished the record with a mountain of countervailing evidence (agency memos, termination letters, congressional testimony, meeting transcripts, emails, and more) including, for example: "In accordance with *direction* from OPM . . . all DOD Components must terminate the employment of all individuals who are currently serving a probationary or trial period" (DOD), "[t]here was *direction* from the Office of Personnel Management" (VA), "agencies were *directed* to begin providing termination notices . . . immediately upon OPM notification" (USDA), "that was something that was *directed* from OPM" (IRS), "[t]hey told us that they *directed* us to remove probationers" (NSF), "OPM *directed* agencies to separate Probationary employees starting 2/13/25" (Forest Service) (emphases added).

1      Also on the merits, plaintiffs' APA claims are likely to succeed for much the same

2  reason.  OPM's *ultra vires* directive is likely to constitute an unlawful final agency action that

3  is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in

4  excess of statutory jurisdiction, authority, or limitations, or short of statutory right," and

5  "without observance of procedure required by law."  5 U.S.C. § 706(2)(A), (C), (D).

6      Based on the full record at the time of injunction, some of it excerpted here, defendants'

7  opposition is rejected (except to the extent addressed next on jurisdiction and standing).

8      As to jurisdiction, the conclusions in the February 28 memorandum stand (for now).

9  Facts not before the court during the TRO hearing suggest that the FLRA and MSPB may be

10  alternative channels in theory alone (if at all).  The undersigned ordered further briefing on that

11  point and will not yet disturb the prior conclusion, which is incorporated here.

12      Standing was also set out in the February 28 memorandum, with that legal analysis also

13  incorporated here.  To be clear, no employees bring claims in this action, and unions' claims

14  on their behalf have not yet been determined to be the sort that can be heard in district court (as

15  above).  But the organizational plaintiffs themselves face concrete harms.  These flow from the

16  way the unlawfully directed terminations disable the federal agency services on which they or

17  their members depend, or otherwise imperil their organizational mission or membership —

18  such as by requiring the organizations to steal resources from their existing work to solve new

19  problems entirely of OPM's making.  For example, Vote Vets Action Fund Inc., has diverted

20  resources from its complementing array of veterans' services to cover primary needs newly

21  unmet by VA services with slashed staffing, like the short-staffed Veterans Crisis Line (*see*

22  Dkt. No. 45 at 20–23).  Nearly all the plaintiffs that the TRO found likely to have standing (*id.*

23  at 13–22) have added support to our record since (Coalition to Protect America's National

24  Parks (Dkt. No. 70-19), Common Defense Civic Engagement (Dkt. No. 70-17), Main Street

25  Alliance (Dkt. No. 70-20), and Western Watersheds Project (Dkt. No. 70-18)).  Plus, other

26  organizational plaintiffs have shown likely harms at OPM's hand (relevantly, Point Blue

27  Conservation Science (Dkt. No. 70-15), and American Geophysical Union (Dkt. No. 70-16)).

28

United States District Court
Northern District of California

*Second*, irreparable harms are imminent for these plaintiffs if not enjoined. Fresh record evidence shows that the harms outlined in the TRO go on despite the TRO. And, the record shows those harms come by more paths than previously understood. For example, we already knew that slashes to staffing at the USDA's Forest Service were wreaking havoc on Western Watershed Project. That harm continues, with problems mounting from the Los Padres National Forest to the Sawtooth Valley National Recreation Area (Dkt. No. 70-18 ¶¶ 7–8, 10). But now, plaintiffs tell us about more problems from USDA staffing cuts, this time at the Natural Resources Conservation Service. Because staff was cut in grants administration, nonprofit Point Blue Conservation Science has not been paid for work; and, because future project approvals are likewise stalling, Point Blue will likely be frustrated in its ability to improve forestry, agriculture, and wildlife management with the USDA (Dkt. No. 70-15 ¶¶ 4–6). The American Geophysical Union points to other problems also emanating from terminations at the USDA, and to still others emanating from the Department of Energy (Dkt. No. 70-16). Similarly, we already knew about the imminent harms to VoteVets and Common Defense (and to those whom they serve) by way of OPM-directed terminations at the DOD and VA. Now, through a statement made against interest, we see that the Department of Treasury sought to retain its veterans who were probationers — only to be rebuffed by OPM (Dkt. No. 94-1 ¶ 12). Because stiffer evidence did not shore up the irreparable harms flowing from the unlawful directive to the other proposed agencies, the preliminary injunction did not extend to them.

Each agency had (and still has) discretion to hire and fire its *own* employees. Here, the agencies were *directed* by OPM to fire all probationary employees, and they executed that directive. To staunch the irreparable harms to organizational plaintiffs caused by OPM unlawfully slashing other agency's staff required immediately reinstating those employees.

*Finally*, the balance of the equities and the public interest (which merge when the government is the defendant) plainly favor the organizational plaintiffs. "The preservation of the rights in the Constitution and the legality of the process by which government agencies function certainly weighs heavily in the public interest." *Nat'l Treasury Emps. Union v. U.S.*

1   *Dep't of Treasury*, 838 F. Supp. 631, 640 (D.D.C. 1993) (Judge Harold Greene); *see Nken v.*

2   *Holder*, 556 U.S. 418, 435 (2009).

3        Each *Winter* factor favored the granting of the injunction.

4        The Court found security — which defendant did not request — to be proper in the

5   amount of $0.

6

7                              **CONCLUSION**

8        For the reasons stated from the bench, and further explained above, the Court granted the

9   injunction.

10

11  Dated:  March 14, 2025.

12

13                                            _____

14                                            WILLIAM ALSUP
                                              UNITED STATES DISTRICT JUDGE

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Pages 1 - 59

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William Alsup, Judge

```
AMERICAN FEDERATION OF          )
GOVERNMENT EMPLOYEES, AFL-CIO,  )
et al.,                         )
                                )
            Plaintiffs,         )
                                )
   VS.                          )   NO. 25-cv-01780-WHA
                                )
UNITED STATES OFFICE OF         )
PERSONNEL MANAGEMENT, et al.,   )
                                )
            Defendants.         )
_____)
```

San Francisco, California
Thursday, March 13, 2025

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiffs:

ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA  94108
BY: **DANIELLE EVELYN LEONARD, ATTORNEY AT LAW**
**STACEY M. LEYTON, ATTORNEY AT LAW**
**EILEEN B. GOLDSMITH, ATTORNEY AT LAW**

STATE DEMOCRACY DEFENDERS ACTION
2022 Columbia Road, NW, Suite 214
Washington, DC 20009-1309
BY: **NORMAN L. EISEN, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON THE NEXT PAGE.)**

REPORTED REMOTELY BY:  Kendra A. Steppler, RPR, CRR
Official United States Reporter

**APPEARANCES:** (Continued)

                    STATE OF WASHINGTON ATTORNEY GENERAL
                    1125 Washington Street SE
                    Olympia, WA 98501-2283
            BY:  **TERA M. HEINTZ, ATTORNEY AT LAW**

For Defendants:

                    UNITED STATES ATTORNEY'S OFFICE
                    450 Golden Gate Avenue, Box 36055
                    San Francisco, CA 94102
            BY:  **KELSEY J. HELLAND, ASST. U.S. ATTORNEY**

| | |
|---|---|
| 1 | **Thursday - March 13, 2025**                 **8:01 a.m.** |

```
 1   Thursday - March 13, 2025                        8:01 a.m.

 2                      P R O C E E D I N G S

 3                           ---oOo---

 4            THE COURTROOM DEPUTY:  All rise.  Court is now in

 5   session.  The Honorable William Alsup is presiding.

 6            THE COURT:  Good morning, everyone.

 7            ALL:  Good morning, Your Honor.

 8            THE COURT:  Please be seated.

 9            THE COURTROOM DEPUTY:  Calling Civil Action 25-1780,

10   American Federation of Government Employees, et al. v. U.S.

11   Office of Personnel Management, et al.

12       This hearing -- people on the Zoom -- attendees -- no

13   recording, whether by audio or video or screenshot, is allowed.

14   It's prohibited -- it's prohibited.

15            THE COURT:  That was unclear.  You said "allowed."

16            THE COURTROOM DEPUTY:  No.  No recording.

17            THE COURT:  You said "prohibited."  Which is it?

18            THE COURTROOM DEPUTY:  No recording, audio or

19   screenshots, are allowed.

20       Counsel, please approach the podium and state your

21   appearances for the record, beginning with counsel for

22   plaintiffs.

23            MS. LEONARD:  Good morning, Your Honor.  Danielle

24   Leonard, Altshuler Berzon, for the plaintiffs.  With me at

25   counsel table are Stacey Leyton and Eileen Goldsmith from
```

4

```
1    Altshuler Berzon, Norm Eisen from the State Democracy Defenders
2    Fund, and Tera Heintz from the Attorney General's Office of the
3    State of Washington.
4             THE COURT:  Welcome.
5             MR. HELLAND:  And good morning, Your Honor.  Assistant
6    United States Attorney Kelsey Helland for the Government.
7             THE COURT:  Thank you.  Welcome.
8        All right.  We're here on a motion for preliminary
9    injunction, and we'll hear some argument.
10       Are there any other items that we need to address?  Let's
11   hear first from plaintiffs.
12            MS. LEONARD:  Thank you, Your Honor.
13       I'm happy to provide argument on the preliminary
14   injunction.  I do think that there are some additional items to
15   address that we can --
16            THE COURT:  Well, just --
17            MS. LEONARD:  -- get to after we --
18            THE COURT:  -- let me hear what -- let's make a list
19   of whatever it is you have in mind.  I don't want to hear the
20   arguments on them yet, but let's -- tell me what needs to be
21   decided.
22            MS. LEONARD:  We have a pending request that a certain
23   additional declaration be struck from the record that was filed
24   yesterday.
25       We also --
```

5

```
1            THE COURT:  Is that Noah Peters?

2            MS. LEONARD:  Yes, Your Honor.

3            THE COURT:  All right.  So let's -- what else?

4            MS. LEONARD:  There is also the issue of Mr. Ezell's

5    failure to appear in response to your court order that he

6    appear on Monday.

7            THE COURT:  What else?  There was some --

8            MS. LEONARD:  That's --

9            THE COURT:  -- somebody from the IRS wanted to come

10   and testify but wanted immunization, which I can't give.  So

11   I -- is that person here and wants to testify or is that moot?

12           MS. LEONARD:  So it's not moot, Your Honor.  But just

13   for clarification, it wasn't necessarily immunization.  It was

14   just a court order enforcing the subpoena to provide --

15           THE COURT:  No, you don't need a court order to

16   enforce a subpoena.  That's what the subpoena itself is.

17           MS. LEONARD:  Your Honor, there's --

18           THE COURT:  No.  I'm not going to do that.

19           MS. LEONARD:  Okay.

20           THE COURT:  I know what's going on there.  Some lawyer

21   wants to be able to say that Judge Alsup has immunized her and

22   given her a blank check to say whatever she wants and not be

23   punished for it.  No.  If she wants to come and testify, I will

24   hear what she has to say.  But, no, you don't need a court

25   order.  I'm not going to do that.
```

```
 1          MS. LEONARD:  Okay.  I very much appreciate that
 2   clarification, Your Honor, but I also for -- just to clarify,
 3   that the person wanted protection against retaliation.
 4          THE COURT:  I can't give her that in advance.
 5          MS. LEONARD:  Okay.
 6          THE COURT:  Do you understand that?
 7          MS. LEONARD:  I --
 8          THE COURT:  This is a sideshow.  Why are you going of
 9   into a sideshow?
10          MS. LEONARD:  Because we --
11          THE COURT:  All right.  Is she here and does she want
12   to testify?
13          MS. LEONARD:  She's not here today.
14          THE COURT:  Okay, then it's moot.  All right.  Let's
15   move on.
16       What else is on your list?
17          MS. LEONARD:  I think that's it, Your Honor.
18          THE COURT:  All right.  We will deal with Noah Peters
19   and Ezell's failure to appear in the course of general
20   argument.  You get to go first.
21          MS. LEONARD:  Thank you, Your Honor.
22       Your Honor, many of the issues that are raised by our
23   request for a preliminary injunction have already been
24   addressed in your Court's -- in the orders thus far in the
25   case, including the order resolving the TRO and the recent --
```

1    more recent order on granting leave to amend.

2        And so those legal issues I'm happy to address further if

3    there is a need, but I'm going to try to keep this focused on

4    the issues that are still in play.

5        And what we have before the Court is record evidence that

6    conclusively establishes that OPM directed the terminations at

7    issue.  We have a very unusual circumstance where the

8    Government has not mounted -- has attempted to say they

9    factually dispute that.  But as Your Honor is very familiar

10   with the course of events here, have actually withdrawn the

11   declaration by which they were attempting to dispute that.  And

12   there is no record evidence on the other side by which they've

13   disputed this fact and the mountain of evidence that Your Honor

14   recognized at the TRO stage.

15       **THE COURT:**  Well, but then they substituted Noah

16   Peters.  So what is the -- your opinion on that and what is the

17   law that backs it up?

18       **MS. LEONARD:**  So they have not substituted Mr. Peters'

19   declaration, Your Honor, because he -- that testimony was not

20   presented for cross-examination and should not be considered by

21   the Court.  It was presented with an *ex parte* motion to stop

22   this hearing today, Your Honor.  That is the purpose for which

23   they presented that declaration, to slide it into the record.

24       Out of an abundance of caution, we asked them to withdraw

25   that declaration because they are not making Mr. Peters

1   available to be cross-examined, just like all of the other

2   Government witnesses that we tried to present to the Court to

3   have the truth of what has happened come out and that they have

4   refused and blocked from appearing here.  They have not

5   presented --

6           **THE COURT:**  I tend to agree with you on that.  And the

7   Government, I believe, has tried to frustrate the Judge's

8   ability to get at the truth of what happened here and then set

9   forth sham declarations to -- a sham declaration -- they

10  withdrew it, then substitutes another.  That's not the way it

11  works in the U.S. District Court.  I'm going to talk to the

12  Government about that in a minute.

13      I had expected to have an evidentiary hearing today in

14  which these people would testify.  And if they wanted to get

15  your people on the stand, I was going to make that happen too.

16  It would be fair.  But, instead, we've been frustrated in that.

17      But I still -- we're here on a preliminary injunction.

18  And if you want me to just wait until months go by, until we

19  ever get the evidentiary hearing, I will do that.  But we do

20  have a record here, and I'd like to hear your views on what

21  relief should be issued today -- T-O-D-A-Y -- today.

22          **MS. LEONARD:**  Thank you, Your Honor.

23      We are aligned in wanting that to happen, as well, and

24  believing that these issues are a distracting sideshow, however

25  important the truth is.

```
 1          The record before Your Honor absolutely supports the
 2     issuance of a preliminary injunction today.  And the reason is,
 3     even if the Peters' declaration's considered, which it
 4     shouldn't be for all those reasons, it's not credible.  There's
 5     a mountain of evidence before the Court that OPM directed it.
 6     OPM's actions were unlawful.  The plaintiffs have standing.
 7     And there is irreparable harm that is occurring every minute.
 8     And it is snowballing.
 9          So the real question here, Your Honor, is remedy.  And we
10     are happy to go straight to that point rather than repeating
11     some --
12               THE COURT:  All right.  Tell me what remedy you want.
13               MS. LEONARD:  Okay.  So my colleague, Ms. Leyton, is
14     actually going to address the remedy issues, so I'm going to
15     turn it over to her.
16               THE COURT:  Okay.
17               MS. LEYTON:  Thank you, Your Honor.
18          As a remedy, we would request vacatur of the OPM action,
19     rescission of the directive to the agencies, and rescission of
20     the terminations that were carried out pursuant to that
21     directive.
22          OPM issued the directive.  Our belief is that the evidence
23     in the record establishes that.  There is no credible contrary
24     evidence that it's caused the widespread loss and deterioration
25     of Federal Government services, including, as documented by the
```

```
1   declarations, habitat and conservation harms, national parks
2   harms, veterans' services, a variety of harms that are
3   illustrated by the tens of declarations that we have submitted.
4   And it's causing injury to a variety of plaintiffs.
5        So the only appropriate relief is to order both OPM to
6   rescind its directives and the agencies to rescind the actions
7   that they took pursuant to the unlawful directive in
8   implementation of that directive.
9        The voluntary cessation cases, which we cited in our reply
10  brief, provide some guidance.  There, the question there is
11  whether the Government has done enough that the Court should
12  no -- no longer need act in order to remedy the relevant
13  injuries.
14       The first prong of the voluntary cessation injury is about
15  a different subject.  It's about whether we can be assured --
16            THE COURT:  All right.  Well, let me ask you --
17            MS. LEYTON:  Yes.
18            THE COURT:  -- this.
19       Are there -- I've read through some of the papers
20  submitted to me that some of the people who were terminated
21  were rehired; is that true?
22            MS. LEYTON:  Yes, Your Honor.  After this Court issued
23  an order, some were rehired pursuant to that, and then there
24  has been some public outcry over things like the loss of the
25  nuclear safety people.
```

1            **THE COURT:**  All right.  But have there been others who

2  were terminated who have not yet been rehired?

3            **MS. LEYTON:**  Most have not been rehired, Your Honor.

4            **THE COURT:**  Can you give me some examples?

5            **MS. LEYTON:**  The examples where they were rehired

6  included the Department of Labor rescinded the terminations

7  that had not taken effect.  All of the other agencies that we

8  have documented -- the Forest Service, the Department of

9  Agriculture, the Department of Education, the Department of

10  Labor -- most of the agencies have not rehired people.

11      The ones where we are aware, where the probationary

12  employees were rehired, were the National Science Foundation,

13  which occurred fairly quickly after this Court's order; the CDC

14  rescinded some of the terminations; the Department of Labor

15  rescinded terminations that had not yet happened; the

16  Department of Agriculture has taken steps but has not yet

17  rescinded the -- has not yet brought people back to work, is

18  our understanding.  And that was addressed in some of the

19  declarations that we submitted earlier this week.

20            **THE COURT:**  All right.  Where does it stand with

21  relief being sought from the Merit Systems Protection Board by

22  terminated employees?

23            **MS. LEYTON:**  The Merit Systems Protection Board

24  initially addressed six individual employees and ordered those

25  employees back to work.  Then there was a class of Department

 1    of Agriculture employees -- 6,000 Department of Agriculture

 2    employees -- who were ordered back to work.  That's what our

 3    most recently submitted declarations address.

 4         Our understanding is that those people are not yet back to

 5    work.  The Office of Special Counsel, Hampton Dellinger, was

 6    terminated after that order issued, after he sought that class

 7    relief, and so we are not aware that those individuals have

 8    actually been brought back to work to restore the services that

 9    they were providing, which is the injury that this Court is

10    seeking to redress.

11         **THE COURT:**  I'm going to have some more questions

12    later about that whole process, but I want to hold up for a

13    moment and stick with the main things.

14         Okay.  What else by way of relief are you seeking today?

15         **MS. LEYTON:**  That is the key relief.

16         We would also ask that there be a compliance report from

17    the Federal Government.  Our understanding, as this Court noted

18    in its order, is that OPM should have a list of all of the

19    probationary employees who were terminated.  And so we would

20    like confidential reports from OPM as to which probationary

21    employees have been brought back to their job so that those

22    Government services can be restored.  We would ask for a

23    timeline and for reports to this Court.

24         Under either our *ultra vires* claim or the APA claim, the

25    appropriate remedy is to restore the status quo.  Vacatur is

1    supposed to unwind the unlawful agency action, and injunctive

2    relief is available under both the APA and our *ultra vires*

3    claim in order to redress the injuries that have occurred.

4        And in order to do that, this Court needs to be assured

5    that those actions that were taken pursuant to the unlawful

6    order have been fully unwound, meaning that people have been

7    brought back to work so that the services can be restored.

8        **THE COURT:**  All right.  Thank you.

9        Let's hear from the Government.

10        **MS. LEYTON:**  Thank you, Your Honor.

11        **MR. HELLAND:**  Thank you, Your Honor.

12        I didn't hear counsel address any of the evidence that we

13    submitted yesterday, including contemporaneous statements from

14    agency heads saying that they were the ones who made the

15    decision to terminate probationary employees.

16        We submitted, yesterday, press releases from the VA, from

17    the Department of Defense, from the USDA, including statements

18    from the Senate-confirmed officials or high-ranking career

19    officials in those departments saying these were tough

20    decisions, but ultimately it's the right thing to do.  Or the

21    USDA press release.  USDA is pursuing an aggressive workforce

22    optimization plan.

23        This is set against the backdrop of the

24    February 11th Executive Order, where the President directed

25    agencies to dramatically improve workforce efficiency to shrink

1    the size of the Federal Government, and the White House fact

2    sheet from that same date, February 11th, that said that

3    shrinking the size of the federal workforce is one of the

4    Administration's top priorities.

5        At the TRO hearing, Your Honor was, I think, looking for a

6    reason, other than OPM's mandate, that all of these agencies

7    would be taking this same action at the same time.  I submit

8    that this backdrop, including the evidence that we submitted

9    yesterday, shows the obvious alternative explanation.

10       This was a priority for the Administration.  The political

11   leadership of these agencies were taking this action

12   themselves.  In fact, we previously pointed out to Your Honor

13   that on February 7th, before the OPM communications that

14   plaintiffs have put at the center of this case, the SBA had

15   already started terminating probationary employees.  That was

16   reported in the media.

17       I don't think plaintiffs have yet acknowledged this

18   evidence that these were the actions of the political

19   leadership of these agencies in response to a priority -- a

20   clearly communicated public priority -- of the Administration

21   rather than an order from OPM.

22       That's first, Your Honor.  Your Honor, has -- may I speak

23   to a couple of questions that Your Honor had?

24           **THE COURT:**  Go ahead.

25           **MR. HELLAND:**  So, first, Your Honor, with respect to

 1   the MSPB actions, it's my understanding that there's not just

 2   one class petition pending, but there are several from

 3   almost -- I don't know if it's almost all, but many of the

 4   agencies that are here.  There's a website, in fact, that lists

 5   the class petitions by agency.  So many of the agencies

 6   involved here are covered by those.

 7        As far as I know, Your Honor, the MSPB has not yet decided

 8   whether to accept those as class actions, but those requests

 9   are pending.  There's still time for that to play out.

10        And then going to the probationary employees who were

11   reinstated, Your Honor, I think NSF here is the exception that

12   proves the rule.  All of these other agencies -- after

13   receiving Your Honor's order, after OPM amended its guidance on

14   March 4th to clarify that it hadn't been and still was not

15   directing terminations -- virtually all of them decided not to

16   bring back the probationary employees that their leadership had

17   decided to terminate.  NSF did bring them back.  That was

18   within its prerogative do so.  But virtually no other agency

19   did.  Maybe a couple others.  So I think that that actually

20   shows that --

21        **THE COURT:**  Well, maybe that's why we need an

22   injunction that tells them to rehire them.  You will not bring

23   the people in here to be cross-examined.  You're afraid to do

24   so because you know cross-examination would reveal the truth.

25        **MR. HELLAND:**  Respectfully --

**THE COURT:**  This is the U.S. District Court.  Whenever you submit declarations, those people should be submitted to cross-examination, just like the plaintiffs' side should be. And we -- then we get at the truth of whether that's what -- your story is actually true.  I tend to doubt it.  I tend to doubt that you're telling me the truth whenever we hear all the evidence eventually.

Why can't you bring your people in to be cross-examined or to be deposed at their convenience?  I said two hours for Mr. Ezell, a deposition, at his convenience.  And you withdrew his declaration rather than do that?  Come on.  That's a sham.

Go ahead.  I'm -- it upsets me.  I want you to know that. I've been practicing or serving in this court for over 50 years, and I know how we get at the truth.  And you're not helping me get at the truth.  You're giving me press releases, sham documents.

All right.  I'm getting mad at you and I shouldn't. You're trying to do your best, and I apologize.

All right.  Go ahead.  I do have a question, though.  I want you to answer on the --

**MR. HELLAND:**  Thank you, Your Honor.

**THE COURT:**  Just a minute.  I'm going to let you respond.

But all of those -- see, they give me so much stuff, I can't find the thing that I wanted now.  But the letter that --

1    that template letter, which I don't have here anymore -- the

2    template letter said to the employees that got terminated that

3    "You may" -- it didn't say "you do," it said, "You may have

4    rights to appeal to the MSP."  "You may have" -- I'll quote it

5    now.  I have it here.  Quote, "You may have a right to file an

6    appeal with the Merit Systems Protection Board" -- may have --

7    "on the limited" -- limited -- "grounds set forth in 5 C.F.R.

8    315806."

9        Well, I looked at that to see what that was, and it is

10   limited to circumstances that existed prior to their

11   employment.  Did you realize that when you told me that they

12   had the right to go to the MSPB?

13       MR. HELLAND:  Well, Your Honor, these probationary

14   employees -- many of them -- are going to the MSPB, including

15   on grounds that --

16       THE COURT:  Yes, but the letter -- your own letter

17   says that they have only a right to do so on grounds that

18   things that existed prior -- if the termination was based on

19   something prior to their employment.

20       MR. HELLAND:  I cannot speak to whether the letter

21   that you're referring to is limited in advising these --

22       THE COURT:  Here.  I'll let you look at it.  It is

23   limited.  Take a look at it.  The appeal rights that were

24   referred to there just call out that one thing.  And when you

25   actually look at the regulation, it has nothing to do with this

1   case.  It's a sham, in my opinion.

2       Now, it could be that some employees are trying -- it is

3   true that some employees have tried to go to the MSPB.  That is

4   true.  And some relief -- and, by the way, the President fired

5   the special counsel; true?

6           **MR. HELLAND:**  I believe that's true.

7           **THE COURT:**  Yeah, he fired him.  So there is no

8   special counsel anymore for the MSPB.  And then one of the --

9   one of the members was either fired or retired.

10      In the prior Administration in 2017 to 2022 -- or 2020 --

11  there was not a quorum of the MSPB.  Do you remember that?  So

12  there was no way to get relief from the MSPB during that

13  four-year period.  I have a feeling that's where it's headed

14  now, is to decimate the MSPB, get rid of the special counsel,

15  and these employees will have no recourse even under that

16  limited sentence.

17      That troubles me.  It makes me wonder whether I got misled

18  on saying there was no jurisdiction because I relied on you.

19  You said there was a remedy at the MSPB; and, therefore, I said

20  the unions didn't have subject-matter jurisdiction.  I question

21  that.  I'm going to ask for briefing on that after today,

22  because I believe I got misled by the U.S. Government on the

23  efficacy of the MSPB.

24      Yes, in statute theory, it may be.  But based on that

25  regulation and based on that letter and based on the

1    cannibalization of the Office of Special Counsel and the MSPB

2    today, I -- there's not much of a remedy there.  Possibly I'm

3    wrong, but I'm going to ask for briefing on it.

4         But I'll let you give me your response to that concern.

5    Please go ahead.

6              MR. HELLAND:  Thank you, Your Honor.

7         I am aware that employees have been reinstated pursuant to

8    MSPB orders.  I believe there was a widespread stay issued as

9    against the Department of Agriculture that affected a large

10   number of probationary employees at that agency.  So I do not

11   think it is the case that the MSPB is without ability to grant

12   relief to affected probationary employees.  I think that's

13   happening.

14        I do not know what's going to happen down the road.  And

15   that may well be an appropriate subject for further briefing or

16   reconsideration.  But as it stands now, Your Honor, I think the

17   MSPB is capable of granting this relief.

18        I --

19             THE COURT:  Just a minute.  Just a second.

20        The Administration has -- the member of the -- on

21   March 5th, 2025, board member, Cathy Harris, granted a second

22   45-day stay request on probationary employees at USDA.  So

23   you're correct about that; however, the President has attempted

24   to fire her, but Judge Rudolph Contreras granted summary

25   judgment in her favor and held that the removal by the

1    Administration was unlawful.  Is that correct?

2            MR. HELLAND:  I have no reason to doubt that.

3            THE COURT:  Well, we won't decide the efficacy of the

4    MSPB today, but we're going to have to look at that again.  And

5    maybe we do have subject-matter jurisdictions after these

6    unions if there's -- if the channel through which Congress

7    sought to move those grievances by employees has been

8    decimated.

9            MR. HELLAND:  Your Honor, briefly.

10           THE COURT:  Yes.

11           MR. HELLAND:  The unions, of course, would go through

12   the FLRA, not the MSPB, so --

13           THE COURT:  Not the unions, yes, but the employees --

14           MR. HELLAND:  Sure.

15           THE COURT:  -- the employees who they represent.

16       Okay.

17           MR. HELLAND:  May I respond to Your Honor's concerns

18   about the declarations and --

19           THE COURT:  Please, yes.  I'd like to hear it.

20           MR. HELLAND:  Thank you.

21       Your Honor, I respectfully disagree that we have submitted

22   false evidence or have withdrawn evidence in an attempt to

23   frustrate Your Honor's efforts to find the truth.

24           We prepared the Ezell declaration within the two days that

25   we had to respond to the TRO thinking that that would be an

1 authoritative statement of the agency's position of what
2 happened.
3      If you review that declaration again -- I understand that
4 it's stricken.  I'm not relying on it for its truth.  But if
5 you review that declaration again, he says, in the opening
6 paragraph, that the materials reflected therein were based on
7 his personal knowledge as well information provided to him.  We
8 were presenting it in his capacity as the acting director of
9 that agency.
10      The paragraphs in that declaration talking about the
11 February communications do not say that Mr. Ezell personally
12 said anything or took any action.  Those paragraphs are framed
13 as coming from OPM.  That's in contrast to the January 20th
14 memo that he did personally author and send out.  So, again, we
15 put that forward in the TRO context on expedited briefing.
16      We understood coming out of the TRO hearing that
17 Your Honor wasn't interested in the agency's summary of what
18 happened.  Your Honor wanted to know what was actually
19 communicated on the February 13th call or February 14th call.
20      Well, Mr. Ezell was not on those calls.  He was not on the
21 February 13th call at all.  And from what we understand, he was
22 at the beginning of the February 14th call and then left.  So
23 he is not the person with firsthand knowledge of those events.
24 Others are, and we -- I -- I expect Your Honor will be
25 frustrated to hear this, but we continue to look forward to

1    presenting our case in terms of what was actually communicated

2    on those calls.

3         But this is an APA case, Your Honor.  There's a procedure

4    for generating an administrative record, which we are working

5    on and have started to submit to Your Honor, including the

6    February 12th email, which I understand was basically read as a

7    script on the February 13th call.

8         **THE COURT:**  You know, your Noah Peters declaration --

9    nowhere does he -- does he ever say he was personally present

10   during the call?

11        **MR. HELLAND:**  Noah Peters is on the list of

12   participants of the February 13th call that we shared with

13   plaintiffs' counsel.

14        **THE COURT:**  That's not the same thing.  Does he say

15   under oath that he was on the call?  No.

16        **MR. HELLAND:**  Honestly, Your Honor, I thought that he

17   did.  And it may not be in that declaration.

18        **THE COURT:**  Oh, maybe I read it too quickly.

19        **MR. HELLAND:**  So, Your Honor, we are in the process of

20   compiling the administrative record.  The procedure in APA

21   cases is for the agency to prepare a record, for gaps in that

22   record to be litigated, to be supplemented by oral testimony if

23   necessary.  The Government believes that that's the procedure

24   to follow here.

25        We're not trying to frustrate the ability to find the

1    truth.  We think that this is an APA case.  And the way the

2    record is developed in APA cases is through the process that I

3    just described.

4         **THE COURT:**  Yes, but you haven't given me any

5    administrative record, and I -- so I have to go based -- they

6    need emergency relief.

7         And I have a few words to say about administrative

8    records.  Would you like to hear those?

9         **MR. HELLAND:**  I will just submit, Your Honor, that we

10   have said the things that we filed yesterday as documentary

11   evidence will be in the administrative record, including the

12   February 12th email, the February 14th email, the FAQs that

13   followed those.  This is the essence of the administrative

14   record that is being compiled.

15        **THE COURT:**  I'm going to tell you, I think this is a

16   good point because this is a recurring problem in APA cases --

17   about the administrative record.  The rest of -- I see people

18   in the gallery -- their eyes are glazing over because they hear

19   something called "administrative record" and it just puts them

20   to sleep.  Well, it's exceedingly important.

21        It is generally true that under the Administrative

22   Procedure Act, if you sue to set aside agency action, the

23   agency provides the record on which the decision was made, and

24   then the Court looks at that and decides -- rules according to

25   the law based on that record.  And there -- that is the normal

1    rule.  And sometimes you get to go outside that and take

2    additional discovery, but most cases are decided on the

3    administrative record.

4        Now, back when I was in the Justice Department -- this was

5    in '78, '79, and '80, in the Stone Age -- I was in the

6    Solicitor General's Office.  I reviewed a lot of administrative

7    records.  And then, in those days, everything that was before

8    the agency or at least those people -- not just the

9    decision-maker but the people reporting to the

10   decision-maker -- even the bad memos -- those -- or

11   deliberative memos -- those were all included.  Now, as time

12   goes on, though, that became inconvenient to very -- in future

13   years.

14       And to fast-forward, in recent years, sometimes the

15   Government lawyers present a sanitized record.  It only has the

16   good stuff that supports the agency action.  It omits all of

17   the bad stuff.

18       You think I'm making this up.  It's absolutely true.

19       Now, whenever President Obama was President, I had a case.

20   And it just -- and there was a question about the adequacy of

21   the record.  And it turned out that your department, the

22   Justice Department, had actually put out a good memo that

23   required the agencies to include much more than just the stuff

24   that the decision-maker saw.  I don't know, that's probably

25   been deep-sixed by now.  But that was the rule back around

1    2008. And so that gave a little bit of sunshine into what had

2    actually happened in the agency.

3        But after that, we went back to the Dark Ages, and there's

4    nothing -- these agency records are just sanitized to allow the

5    decision to be upheld with only the documents that support it

6    and none of the other material that would undercut the agency

7    action that was in play in the agency at the time the thing was

8    being decided.

9        So I say to you, I have -- I want you -- if you're going

10   to give me an administrative record, let's do an honest one and

11   a complete one and not one that is sanitized. That's my advice

12   to the Government.

13        And that history, I believe you'll find, is actually

14   100 percent true as I have -- so I have some frustration with

15   administrative records. And I'm skeptical of them, because I

16   think they go to some trouble to sanitize and not give me the

17   true administrative record.

18        Okay. But right now, even if you gave me a perfect

19   administrative record, you have it. And these people over here

20   want immediate relief. And they are entitled to get a ruling

21   on the record that I do have. So that's the answer on that

22   part.

23            **MR. HELLAND:** May I speak to that briefly, Your Honor?

24            **THE COURT:** Yes, you may. Please go ahead.

25            **MR. HELLAND:** We, as you know, have offered to

1    stipulate to continue the TRO pending further development of

2    the factual record.

3         So, furthermore, our position being that OPM didn't and

4    hasn't been, since the TRO, direct these terminations.  We

5    don't see the urgency demanding relief that plaintiffs are

6    putting forward.  We think that the Court's order from the TRO

7    is clear, that agencies have been complying with it, and that

8    provides time for further factual development.

9         **THE COURT:**  Well, that's not quite true.  I don't

10   quite agree with what you just said.

11        All right.  What else would you like to say?

12        **MR. HELLAND:**  I want to pause just for one more moment

13   on Acting Director Ezell, just because I think the agency's

14   reasons for not wanting him to submit to a deposition are

15   broader than just the limited facts of the TRO that we put

16   forward.

17        Every Presidential Administration in modern history has

18   jealously guarded their agency heads against being forced to

19   give testimony.  That's since the *Morgan* case about 80 years

20   ago now.  So that is not something unique to this

21   Administration.  It is not something about Secretary Ezell's

22   testimony.  That is just an Executive Branch prerogative to --

23        **THE COURT:**  Is he a secretary?

24        **MR. HELLAND:**  He's an acting director.

25        **THE COURT:**  Director -- acting director -- but he's

```
 1    not a secretary of the Department?

 2             MR. HELLAND:  No, correct.

 3             THE COURT:  Okay.

 4             MR. HELLAND:  But I think he is the highest-level

 5    official at that Department.

 6             THE COURT:  At that agency?

 7             MR. HELLAND:  At that agency.

 8             THE COURT:  Yes, okay.  All right.

 9             MR. HELLAND:  The only other thing, then, I --

10             THE COURT:  Yes, but you chose to submit his

11    declaration.

12             MR. HELLAND:  Yes, in the context of the TRO.

13             THE COURT:  And then you said, "No, but he can't be

14    cross-examined."  So you must submit -- you can't just give

15    me -- you can't just say, "Here's the declaration.  You have to

16    accept it without question whenever there is a question."

17             MR. HELLAND:  Absolutely, Your Honor.  And so the --

18    as you know, the purpose of a TRO is an expedited process.

19    Both sides put together what evidence they can in a very short

20    time frame.  And then the period between the issuance of the

21    TRO and the further preliminary injunction is supposed to flesh

22    out the facts.

23        So that is the stage that we are in now.  We're compiling

24    the administrative record.  We've publicly filed several of the

25    documents that would go into that administrative record.
```

1    Our purpose, again, for submitting the declaration for the

2  TRO was to submit an authoritative statement from the agency in

3  very expedited circumstances.  But it is not supposed to shield

4  the agency from review of its actions.  It's to articulate and

5  provide some evidence for a TRO decision on a couple days'

6  notice.

7    I note my opposing counsel discussed relief very briefly,

8  Your Honor, and I want to speak to that.

9         **THE COURT:**  I want to hear your argument.  Please go

10  ahead.

11        **MR. HELLAND:**  Thank you.

12    Well, so, first of all, again, we have stipulated that the

13  TRO can continue as a preliminary injunction as is.  So we

14  agree already, to that extent, of further relief.

15    I don't think that ordering the rescissions of the

16  terminations is an appropriate thing either on this record or

17  for Your Honor to be granting.  Again, the MSPB, the FLRA --

18  those administrative agencies have the authority to stay

19  terminations, to order reinstatements, to issue that form of

20  relief.  I don't think that that's appropriate there.  I

21  certainly don't think it's appropriate when the agencies that

22  were added as parties two days ago have not had the chance to

23  file any briefing or to -- plaintiffs have not even moved for

24  relief against those new defendants.  They moved against OPM

25  two weeks ago.

29

1      So I think there's a further process that would have to

2  happen, which would include briefing on the authority for

3  Your Honor to even issue that relief.

4      To the extent any further relief beyond the TRO is

5  appropriate in the near term, we would submit that it should be

6  limited to something like each agency performing an independent

7  review of the decisions previously made, reaffirming that they

8  were done under the agency's authorities, not OPM's direction.

9  I think that's more appropriate and consistent with

10  Your Honor's authority and jurisdiction as well as the factual

11  record here.

12      **THE COURT:**  Okay.

13  Response?

14      **MS. LEONARD:**  The terminations were not done at the

15  agency's discretion, and they were not done properly in

16  accordance with the law on the basis of performance,

17  Your Honor.

18      The suggestion that opposing counsel just made, that

19  somehow the agency should be able to rereview the decision to

20  fire probationary employees on mass at the direction of OPM is

21  somehow an appropriate remedy is divorced from reality and the

22  record that's before this Court.

23      But to address some specific -- to pointedly address some

24  of the specific points that -- and quickly -- that opposing

25  counsel made, there was an exchange about appeal rights to the

1    MSPB.  And I think this is incredibly important, Your Honor,

2    because from the very first moment -- on the first day of this

3    Administration -- that OPM started directing agencies through

4    the January 20th memorandum to collect and list -- something

5    that had never happened before in the history of this

6    country -- compile and submit to OPM a list of all your

7    probationary employees so you can get ready to fire them.  They

8    told them they don't have appeal rights.  "We are firing them

9    because they don't have appeal rights."  That's how insidious

10   this action was.

11          THE COURT:  Read that -- where do you get that?  I'm

12   trying to remember where I saw that before.  Read that to me

13   again.

14          MS. LEONARD:  Yes.  That's in the January 20th memo,

15   which was originally attached, Your Honor, as an attachment to

16   the now withdrawn Ezell declaration.  But they've just

17   resubmitted all the documents that he submitted without a

18   declaration.  But we don't contest that that's actually what --

19          THE COURT:  Read to me the sentence you're talking

20   about.

21          MS. LEONARD:  [As read]:

22          "Probationary periods are an essential tool for

23      agencies to assess performance.  Employees on

24      probationary periods can be terminated during that

25      period without triggering appeal rights to the Merit

1-ER-72

1    Systems Protection Board."

2    That is Mr. Ezell --

3        **THE COURT:**  Is that an exact quote?

4        **MS. LEONARD:**  That is an exact quote.

5        **THE COURT:**  From the January 20 memo by who?

6        **MS. LEONARD:**  By Mr. Ezell, OPM, to the agencies.

7    This has been the plan from the very beginning:  Fire them all

8    because they can't appeal, Your Honor.  That is what OPM has

9    consistently said to the agencies in every single communication

10   that's before this Court.

11       It was not just a February 13th phone call and a

12   February 14th CHCO meeting.  And they say, "Oh, but Mr. Ezell

13   was not on that."  We don't know if that's true or not,

14   Your Honor.  We would like to get to the truth.  But what's in

15   front of this Court is every single communication, including

16   the ones that they have now belatedly tried to say are the

17   administrative record.

18       They have said:  Terminate everyone who's not mission

19   critical because they cannot appeal.  That's the plan.  That's

20   what OPM has done here, and that is profoundly --

21       **THE COURT:**  How many employees -- probationary

22   employees -- were terminated on or about February 14th?

23       **MS. LEONARD:**  We don't know, Your Honor.  We

24   believe --

25       **THE COURT:**  Give me an estimate.

1    **MS. LEONARD:**  I believe it is far higher than 10,000

2    employees, Your Honor.  We know that at least by February 14th,

3    more than five agencies had terminated.  On February 13th, the

4    VA terminated.

5        And the press releases that they have cited -- they were

6    in our complaint, Your Honor.  He said we are not addressing

7    them?  They were in our complaint, Your Honor, because they

8    actually show that this was a centralized effort.

9        The VA press release that they're saying shows agency

10    discretion says, I quote [as read]:

11            "The dismissals announced today are part of a

12        government-wide Trump Administration effort to make

13        agencies more efficient, effective, and responsive to

14        the American people."

15    OPM told them to do this, Your Honor.  And we have proven

16    it on the record.  They have not put anything in, in response

17    to that, other than press releases that actually support

18    plaintiffs.  It's profoundly unlawful, Your Honor.

19        And with respect to the representations regarding the --

20    that's the importance of the appeal rights.  It's twofold.

21    It's both a factual matter to show how centralized this was and

22    the reasons for it, which are incredibly disturbing, frankly,

23    for the U.S. Government to be terminating these employees

24    because they have no appeal rights.

25        But also it goes straight to the point that Your Honor is

```
 1    raising about channeling.  And we welcome -- and I was prepared
 2    here to try to -- try to -- try to beg for one more chance,
 3    Your Honor, to address this issue, because I think it is
 4    absolutely right -- what Your Honor raised at the TRO
 5    hearing -- the question about these mass actions with respect
 6    to so many employees.
 7         Is that really what Congress intended when it set up these
 8    agencies?  And now that it is, these agencies are being
 9    dismantled.  And, by the way, the President has fired the
10    members of the FLRA too.  They say, "Oh, the unions can go to
11    the FLRA."  The President fired them too.
12         THE COURT:  How many members -- I didn't know about
13    that part.
14         MS. LEONARD:  It's --
15         THE COURT:  How many members are there on the FLSB or
16    whatever it is?
17         MS. LEONARD:  So the MSPB I believe the President
18    removed one so that there is not a majority -- so it's a
19    one-one split.  And that --
20         THE COURT:  Well, that person --
21         MS. LEONARD:  Got put back.
22         THE COURT:  -- demoted them but did not remove them.
23    Demoted them from vice chair; right?
24         MS. LEONARD:  But one was removed.  That's now tied
25    up.  And the Government is fighting in the D.C. Circuit to off
```

1    them.

2        And then the FLRA, I believe it's also one additional

3    member has been -- has been --

4        **THE COURT:** And one --

5        **MS. LEONARD:** I'm looking at my cocounsel, Mr. Eisen,

6    who might have better facts than I do on this.

7        But one member has been removed by the President to stymie

8    that agency from actually doing anything, Your Honor.  And

9    they're fighting that in the D.C. Circuit.  They're opposing

10    the orders that have -- that is an unlawful order.  They're

11    fighting those orders to put those people back.  The OSC is

12    gone.

13        **THE COURT:** All right.  One out of three?  One out of

14    five?  How many -- how many?

15        **MS. LEONARD:** Three.  One out of three removed.

16        **THE COURT:** All right.  And this is the FL --

17        **MS. LEONARD:** RA.  The Federal Labor -- the Federal

18    Labor Relations Authority, Your Honor, which is the board set

19    up by the FSLMRS, which is the labor relations statute for

20    federal employees.  So they removed them.

21        The OSC is gone.  The pattern is very clear.  This is all

22    centralized action, of course, from this Administration.  The

23    pattern is clear to -- there is no channel, Your Honor.  There

24    is no channel.

25        **THE COURT:** All right.  But let me ask you, Congress

1   did pass the Reduction in Force Act, which, by definition,

2   contemplates that there can be a reduction in force within an

3   agency; isn't that true?

4        **MS. LEONARD:** That's part of this -- there are

5   reduction in force statutes as part of the CSRA, absolutely.

6   But they're ignoring them and eviscerating them, Your Honor.

7        **THE COURT:** Well, I know you say they have not been

8   followed. And possibly that's true. But I wouldn't want

9   anyone listening to this call on the Zoom to think that this

10   case is about stopping the termination of anybody from the

11   Government, even when it's in the hundreds, because there is a

12   statute that allows that, called the Reduction in Force Act, if

13   the steps that are required by statute are followed.

14        **MS. LEONARD:** Absolutely, Your Honor.

15        **THE COURT:** That's true; isn't it?

16        **MS. LEONARD:** It is for agencies to decide to do

17   reduction in force. And what we have here absolutely,

18   Your Honor, on the record before the Court, is not agencies'

19   decisions to terminate anything. It's OPM's. And that's a

20   question for another day, whether OPM can order RIFs. That's a

21   question for another day, Your Honor. And maybe that day is

22   coming very soon. OPM cannot order those either. But agencies

23   can make those decisions. But OPM here ordered this.

24        **THE COURT:** All right. Maybe. But if it's done

25   right, there can be a reduction in force within an agency.

```
 1    That has to be true.

 2         MS. LEONARD:  There's -- absolutely.  There's a

 3    statute that allows it and regs that set up the many steps,

 4    including notice and notice to states and local governments who

 5    are affected.  There are many steps.  And it requires -- it

 6    takes years of planning, actually, Your Honor.  It can't be

 7    done in a day.

 8         THE COURT:  It can't be done in one day, but there's a

 9    lot of ground between one day and years.  So I -- okay.  But

10    that, as you say, is for another day.

11         But Congress itself has said you can have -- an agency can

12    do a reduction in force if it's done correctly under the law.

13    So I -- I want everyone to be aware of that.

14         Your lawsuit is not challenging that proposition.  Your

15    lawsuit is saying these terminations were in violation of other

16    laws and *ultra vires*, and that's a separate point.

17         All right.

18         MS. LEONARD:  That is right.

19         THE COURT:  What else would you like to say?

20         MS. LEONARD:  Just one second to make sure I'm

21    covering all the -- I did want to clarify one other factual

22    point that I feel like we, in our TRO papers, perhaps didn't

23    present as clearly as we could have to the Court.  And I think

24    it's incredibly important and don't want it to be lost.

25         It's not just employees who were hired right out of
```

1  college or at the outset of their careers who were affected by

2  these unlawful terminations.  Anyone who received a promotion

3  is a probationary employee.  Directors of entire departments

4  were gone in a day, Your Honor.

5       This action by OPM made swiss cheese of the federal

6  agencies at every level.  That is why that is directly

7  connected to the level of harm that this is causing.  Because

8  it's not just new folks -- they can go find a career somewhere

9  else -- it is -- they're the future of the American workforce,

10  and I don't mean to undermine their importance.  But it is

11  people with decades of federal service.  The most experienced

12  people.  If they have been promoted from acting director to

13  director of their particular division, they were gone.  That

14  is --

15            THE COURT:  All right.  You mean --

16            MS. LEONARD:  -- the problem here.

17            THE COURT:  -- they don't go back to their original

18  position?  They're just terminated?

19            MS. LEONARD:  They're gone, Your Honor, within hours.

20            THE COURT:  How long were they terminated?

21            MS. LEONARD:  Turn in your keys.

22            THE COURT:  Even though they worked for 30 years?

23            MS. LEONARD:  Even though they worked for 30 years,

24  Your Honor.  That is why the harm is so widespread and so

25  profound.  It is -- this action was intended to cripple these

```
 1    agencies, and that is what it has done.  And it is profoundly
 2    problematic.
 3         And we didn't want that to be lost on the Court, because I
 4    think, in our TRO papers, we didn't -- we didn't make that as
 5    prominent as we, perhaps, should have.  And that is absolutely
 6    established in the record here.
 7         "Probationary" means -- and the formal director of OPM,
 8    who submitted a declaration in support of this preliminary
 9    injunction -- it's in that dec., as well, and other
10    declarations we've submitted in support -- it's anyone who was
11    new to their position, Your Honor, not just to the Federal
12    Government.
13              THE COURT:  I did not appreciate that point.  Thank
14    you.
15         What else would you like to say?
16              MS. LEONARD:  One more point of clarification about
17    the OSC because I think there's been a further implication,
18    perhaps, from something that opposing counsel said.  Only the
19    OSC, who isn't there anymore --
20              THE COURT:  OSC?
21              MS. LEONARD:  Office of Special Counsel.
22              THE COURT:  Oh, all right.
23              MS. LEONARD:  -- can initiate a stay request with the
24    MSPB.  Only the OSC can do that.  The only class stay
25    request -- "stay" meaning reinstate the employees pending
```

1    resolution -- the only class one that was actually initiated by

2    Hampton Dellinger before he was fired was U.S. -- well, during

3    his period of reinstatement before he was then fired again by

4    the D.C. Circuit -- was with respect to USDA.

5        He did not -- the other six -- the other five agencies of

6    the original six employees -- there were not class requests

7    that had been filed yet.  So the idea that those are pending

8    before the MSPB is not correct, Your Honor.  There were no

9    class stay requests.

10       And with respect to the USDA, I want the record to be very

11   clear about what's happened.  They are not complying with the

12   MSPB's order to reinstate.  What they did was they put people

13   back on pay -- they just announced this, I believe, yesterday,

14   in a press release, a week after the reinstatement order --

15   they put people back on pay, but they haven't put them back in

16   their position.

17       So what they've done is they're waiting out the 45 days.

18   It's a temporary stay.  It's going to expire.  There's no OSC

19   to ask for it to be extended.

20       This is the announcement.  This is the Forest Service

21   directly to the union:  On March 5th, the MSPB issued a 45-day

22   stay of the termination of U.S. Department of Agriculture

23   probationary employees.

24       By Wednesday, March 12th, the Department will place all

25   terminated probationary employees in pay status and provide

 1   them with backpay.

 2        That's great.  Happy about that.

 3        The Department will quickly develop a phased plan for the

 4   return to duty.  And while those plans materialize, all

 5   probationary employees will be paid.

 6        We do not believe that they are going to return any of

 7   these employees to actual service, Your Honor.  They certainly

 8   haven't yet.  This is the record before the Court.  They

 9   haven't restored the services, Your Honor, when they were

10   directly ordered by the MSPB to reinstate those employees to

11   service.

12        THE COURT:  In the Office of Special Counsel, are --

13   they got rid of Dellinger; right?

14        MS. LEONARD:  Yes.

15        THE COURT:  But are there other acting special

16   counsels that are --

17        MS. LEONARD:  There's been one appointed, Your Honor,

18   and he is the head of the VA.  The head of an agency is the new

19   whistleblower protector.

20        THE COURT:  The head of the what?

21        MS. LEONARD:  The Veterans Administration.

22        THE COURT:  Has been moved over to be -- and is no

23   longer the head of the VA?

24        MS. LEONARD:  No.  He's also still the head of the VA.

25        THE COURT:  All right.

1    **MS. LEONARD:** I don't understand how it could possibly
2    be that the head of the defendant agency is the person who is
3    supposed to protect the whistleblowers, Your Honor. But that
4    is what this Administration has done.
5            **THE COURT:** Are there subordinate lawyers in that
6    unit?
7            **MS. LEONARD:** In the OSC?
8            **THE COURT:** Yeah.
9            **MS. LEONARD:** I am sure that there are. He -- I'm
10   sure the OSC has people who work for him. They've probably
11   actually had all of their probationary employees fired too,
12   just like the FLRA did and the MSPB did.
13       But setting that aside, Your Honor -- that's true --
14           **THE COURT:** You don't know that --
15           **MS. LEONARD:** I --
16           **THE COURT:** You're just guessing at that.
17           **MS. LEONARD:** They're on the list. They're on the
18   list of people who had probationary employees, but -- and
19   they're on the CHCO directive from February 14th. There's a
20   representative of the small agency counsel -- the FLRA, MSPB,
21   OSC -- they're all part of that.
22           **THE COURT:** Well, are they -- were there -- were there
23   lawyers who were non-probationary working in the unit?
24           **MS. LEONARD:** I am sure that there are, Your Honor.
25           **THE COURT:** All right.

1          MS. LEONARD:  I'm sure that there are.  But they don't

2     have the authority to move for a stay.  Only the OSC has that.

3          THE COURT:  So you're telling me that a probationary

4     employee in some random agency cannot directly go to the MSPB?

5     Is that true?

6          MS. LEONARD:  They can.  They can file their

7     individual -- they can file their individual action against

8     their employer agency at the MSPB.  Some of them can.  Some of

9     the probationary employees -- this is very complicated.

10    It's -- who has the appeal rights where is exceptionally

11    complicated, depending on the category of service.  Some of

12    them can only go to the OSC.  A big portion of them can only go

13    to the OSC.

14         THE COURT:  Well, what's the difference between those

15    that can only go to the OSC versus those that can go straight

16    to the Merit Systems Protection Board?

17         MS. LEONARD:  It depends on the category of service,

18    Your Honor, and the reason that they're invoking.  And the

19    best -- the best place that I have seen summarizing this --

20    people have been writing a lot of material about -- to try to

21    explain this.  The best place is the OSC intake -- it's like --

22    as a union lawyer, I'm very familiar with the unfair labor

23    practice form at the NLRB where you check the boxes.  The OSC

24    has the same thing.

25         And so the OSC has an intake form where -- it's like

```
 1   three pages long -- where you have to identify all the sort of
 2   ins and outs whether you qualify to go to the OSC or not.  So I
 3   cannot recite that here today, Your Honor, full candor.  It
 4   depends on whether you're in competitive service or in what
 5   category and what you're basing your allegations on, if it's
 6   discrimination or not.  It's an incredibly complicated sort of
 7   if then, who gets to go there or not.  Some -- at a highest
 8   level, some can go to the OSC, and that's their only avenue,
 9   and now that avenue is gone.
10        We are very happy to brief this further if Your Honor
11   would like further briefing on -- particularly as you've
12   invited on the channeling issues, whether it's at this point.
13   We obviously do not want to delay any injunction.  And what I
14   would -- we would propose is there is no need, Your Honor, for
15   purposes of this preliminary injunction, to reach the
16   channeling issue, even with respect to the unions.
17        We would invite and ask for another chance to convince
18   Your Honor that the channeling argument that was presented by
19   the Government and the representations were not correct.  And
20   that the claims against OPM are not channeled, Your Honor, even
21   for my union clients.  And we would invite another chance to
22   convince Your Honor of that.
23        But for purposes of the PI today, the other organizations
24   and the State of Washington have standing -- irreparable
25   harm -- more than enough to issue that PI without reaching and
```

1    making further law with respect to the channeling.

2         I would -- one further point about that, Your Honor.  I do

3    believe that your TRO order actually extends the law further

4    than it has been in the Ninth Circuit.  Not just applying it,

5    but extends it.  No case has ever channeled a claim against OPM

6    over a Government-wide rule in the Ninth Circuit.  No case has

7    ever channeled a procedural APA claim in the Ninth Circuit.

8    Your TRO order was the first, and we would respectfully welcome

9    another chance.

10        And we don't want that TRO decision to take on a life of

11   its own, Your Honor, and we would welcome another chance to try

12   to convince you that these claims are not channeled.  Because,

13   as Your Honor has indicated here today, the channel's gone,

14   Your Honor.

15        **THE COURT:**  Let me give the defendants a chance to

16   respond.  You had a long talk there.

17        Go ahead.  Please, let's hear from the defense.

18        **MR. HELLAND:**  Thank you, Your Honor.

19        Taking the very last point first, I think the "in the

20   Ninth Circuit" caveat there is doing a lot of work.  There's of

21   course many decisions from outside the Ninth Circuit, including

22   the D.C. Circuit, the Federal Circuit, the First Circuit.

23   These have been, you know, addressed in the papers on the TRO

24   briefing.

25        To the extent Your Honor is reconsidering its initial

1    channeling decision, we agree further briefing would be

2    appropriate.

3        **THE COURT:**  Yeah, that's -- I'm not going to do it

4    today, but I want to raise the issue and ask for briefing.  So

5    I agree with you on that.

6        Go ahead.

7        **MR. HELLAND:**  Thank you.

8        I come back to a point I made at the outset.  The press

9    releases that we've submitted show that the independent

10   political appointment -- the political leadership of these

11   agencies were taking credit publicly for the decisions.

12       We do not deny that OPM had a role in coordinating these

13   efforts.  I think the documents that we've put forward are very

14   clear about that.

15       But plaintiffs' theory of this case isn't just that OPM

16   coordinated this; it's that OPM ordered it.  That the agencies

17   didn't think that they had the authority not to do it.  Well,

18   if that's the case, why would the leaders of these agencies be

19   issuing press releases the same day or shortly after these

20   decisions were made?  They wouldn't.  The reason --

21       **THE COURT:**  Well, I would like to see some depositions

22   taken on that, but you stonewalled me on it.  I would like to

23   know -- maybe -- maybe the press release was an orchestrated

24   thing.  It wouldn't be the first time.

25       **MR. HELLAND:**  It starts to sound a bit

```
 1   conspiratorial --
 2           THE COURT:  Yeah.
 3           MR. HELLAND:  -- to think that these press releases
 4   coming out of multiple agencies when, again, the Administration
 5   has just put out Executive Orders and fact sheets making clear
 6   that this is an agenda priority for the Administration.
 7       I think the pretty obvious alternative explanation is
 8   everybody knew the new Administration was prioritizing this.
 9   And the political appointments wanted to comply with that
10   Administration priority.
11           THE COURT:  Okay.
12           MR. HELLAND:  Finally, Your Honor, the additional
13   documents that we put forward, which, again, will be part of
14   the administrative record in this case, including specifically
15   the February 12th email, I invite you to look closely at the
16   language of that.  I think you'll see it is not an OPM order.
17   The language of that reflects that OPM had asked agencies to
18   prepare lists and asked them, with a please, "Separate those
19   that you know you want to separate by a date certain."  Right?
20   It put it to the agencies, "those that you know you want to
21   separate."
22       This was not an order from OPM.  The Administration record
23   will show, and it does show on the record that we've put before
24   Your Honor, that OPM was coordinating this, was asking for
25   information, was asking that action be taken by certain times,
```

1  but the decisions on these employment actions were made by the

2  agencies and were fully endorsed by their political leadership.

3      Thank you, Your Honor.

4      **THE COURT:**  Okay.  Give me a moment.

5      The Court is going to grant some additional relief by way

6  of preliminary injunction.  I want to give some background.

7      Congress, in the Reduction in Force Act, makes it clear

8  that an agency can engage in a reduction in force.  So I want

9  everyone to be completely aware that if an agency decides to do

10  a reduction in force, it can do so, so long as it complies with

11  the several requirements of the Reduction in Force Act.

12      So this should not -- the words that I give you today

13  should not be taken as some kind of criticism that a wild and

14  crazy judge in San Francisco has said that the Administration

15  cannot engage in a reduction in force.  I'm not saying that at

16  all.  Of course, if it does, it has to comply with the

17  statutory requirements, the Reduction in Force Act, the Civil

18  Service Act, the Constitution, maybe other statutes.  But it

19  can be done if it's done in accordance with the law.

20      This case is not about that.  What this case is about is

21  really an attempt to do a reduction in force, but to force it

22  through the OPM, Office of Personnel Management, to have the

23  OPM direct agencies to terminate probationary employees as an

24  easy way to get a reduction in force underway.

25      Because, as counsel pointed out, its own memo says they

1  don't have appeal rights -- probationary employees don't have

2  appeal rights -- and so let's get started with the process by

3  just terminating all probationary employees except those that

4  are mission critical.

5      Now, I went through the evidence last time. I'm not going

6  to go through it quite as extensively, but I am going to touch

7  on some of the points. Something new came in by the -- from

8  the plaintiffs. It involved the Forest Service.

9      On February 13th, 2025, a Forest Service briefing paper

10  from Human Resources Management at the Forest Service says

11  this -- or said this -- quote [as read]:

12          "All" -- that's spelled A-L-L -- "All federal

13          agencies, including the Department of Agriculture,

14          were notified on February 12th, 2025, by the Office

15          of Personnel Management to terminate all employees

16          who have not completed their probationary or trial

17          period."

18      That then led to the termination of a lot of people, but

19  one in particular I'll give as an example. Leandra Bailey was

20  a physical science info specialist in Albuquerque. In

21  September of last year, she had received a performance review

22  in which she was, quote, "fully successful," closed quote, in

23  every category. Not just some; every category. On

24  February 13th, she was terminated using the OPM template

25  letter.

1    In addition to directing these terminations, OPM gave a

2  proposed letter.  The letter said -- I'm reading from it --

3  Memorandum for Leandra Bailey, February 13, from Deedra Fogle,

4  Director Human Source Management, U.S. Forest Service.  This is

5  just one sentence, quote [as read]:

6         "The agency finds, based on your performance,

7     that you have not demonstrated that your further

8     employment at the agency would be in the public

9     interest," closed quote.

10    This despite the fact that her most recent review was

11  fully successful in every category.

12    Now, how could it be, you might ask, that the agency could

13  find that based on her performance when her performance had

14  been stellar?  The reason that OPM wanted to put this based on

15  performance was, at least in part, in my judgment, a gimmick to

16  avoid the Reduction in Force Act.  Because the law always

17  allows you to fire somebody for performance.

18    So OPM was thinking:  Okay, if we tell them to use this

19  template letter, then that will give us an argument against the

20  Reduction in Force Act or maybe some other act -- Civil Service

21  Reform Act.

22    Now, this -- what I'm about to say is not the legal basis

23  for what I'm going to order today, but I just want to say, it

24  is sad -- a sad day -- when our Government would fire some good

25  employee and say it was based on performance when they know

1   good and well that's a lie.

2       Excellent in all -- fully -- what was the phrase?  I don't

3   want to misstate it.  "Fully successful in every category," yet

4   they terminate her based on performance.  That should not have

5   been done in our country.  It was a sham in order to try to

6   avoid statutory requirements.

7       It also happens to be that whenever you fire somebody

8   based on performance, then they can't get unemployment

9   insurance.  So that makes it even worse, doesn't it?

10      And then it makes it even worse because the next employer

11  is going to say, "Well, have you ever been terminated based on

12  performance?"  They're going to have to say, "Yes," to

13  thousands of people.

14      Now, the reason this is not a basis for the ruling today

15  is that the -- that is a grievance that goes to the employee,

16  and the -- and we still haven't decided -- I mean, I have

17  decided but I'm going to take another look at it, as to whether

18  they're channeled -- that grievance has to be channeled through

19  the Merit Systems Protection Board.

20      But it is illustrative of the manipulation that was going

21  on by OPM to try to orchestrate this Government-wide

22  termination of probationary employees.

23      I'm going to go back to what I read [as read]:

24          "All" -- this is from the Forest Service -- "All

25      federal agencies, including the Department of

1    Agriculture, were notified on February 12th by the

2    Office of Personnel Management to terminate all

3    employees who have not completed their probationary

4    or trial period."

5    Now, there's more evidence than that.  Some of that I went

6 over last time.

7    Department of Energy sent a termination letter saying [as

8 read]:

9        "Per OPM instructions, Department of Energy

10    finds your further employment would not be in the

11    public interest."

12    Another termination letter from the Bonneville Power

13 Administration per OPM instructions, Civilian Personnel Policy

14 Counsel, Department of Defense in accordance with direction

15 from OPM and before Congress, Chief Human Capital Officer for

16 the Veterans Administration testified under oath recently,

17 February 25th [as read]:

18    **"QUESTION:**  So nobody ordered you to carry out these

19    terminations?  You did it on your own?

20    **"WITNESS:**  There was direction from the Office of

21 Personnel Management, the USDA."

22    Quote, [as read]:

23        "Agencies were directed to begin providing

24    termination notices."

25    So the Court finds that OPM did direct all the agencies to

terminate probationary employees with the exception of mission-critical employees.  The Court rejects the Government's attempt to use these press releases and to read between the lines to say that the agency heads made their own decision with no direction from OPM.

The relief that's going to be granted as is follows:

The temporary restraining order well be extended.  In addition, relief defendant Veterans Administration shall immediately offer reinstatement to any and all probationary employees terminated on or about February 13th and 14th, 2025.

This order finds that all such terminations were directed by defendants' OPM and Acting Director Ezell and were unlawful because OPM and Ezell had no authority to do so.

Further, relief defendant Veterans Administration shall cease any and all use of the template termination notice provided by defendant OPM and/or Acting Director Ezell to the VA and to other agencies on or about February 13th and 14th and shall immediately advise all probationary employees terminated on or about February 13 and 14 that the notice and termination have been found to be unlawful by the United States District Court for the Northern District of California.

Relief defendant Veterans Administration shall cease any termination of probationary employees at the direction of defendants OPM and Acting Director Ezell.

To repeat, this order holds that OPM and Acting

1  Director Ezell have no authority whatsoever to direct, order,

2  or require in any way that any agency fire any employee.

3       Now, given the arguments and the facts in this case,

4  namely, that defendants have attempted to recast these

5  directives as mere guidance, this order further prohibits

6  defendants from giving guidance as to whether any employee

7  should be terminated.

8       Any terminations of agencies' employees must be made by

9  the agencies themselves, if made at all, and must be made in

10  conformity with the Civil Service Reform Act and the Reduction

11  in Force Act and any other Constitutional or statutory

12  requirement.

13       In seven calendar days, relief defendant VA shall submit a

14  list of all probationary employees terminated on or about

15  February 13th and 14th with an explanation as to each of what

16  has been done to comply with this order.

17       Now, this order so far has only mentioned the Veterans

18  Administration, but the same relief is extended -- and I'm not

19  going to repeat it, but I rely on the good faith of the

20  Government -- I'm extending the same relief to the Department

21  of Agriculture, Department of Defense, Department of Energy,

22  Department of the Interior, Department of Treasury.  And those

23  are the ones where I believe the record is the strongest that

24  relief is necessary.  And so it's the VA plus those other

25  agencies.

1    And this is without prejudice to extending the relief

2 later in the future to other agencies and it's without

3 prejudice to shrinking the relief in the future upon a proper

4 showing.

5    Okay.  I will try to get out a short memorandum opinion

6 that elaborates on this order, but this is the order and it

7 counts effective immediately.  Please don't say, "Oh, I'm

8 waiting for the written order."  This is the order from the

9 bench.

10    Okay.  I want -- I'm giving the plaintiffs authority

11 promptly to depose, in Washington, Noah Peters, who submitted

12 this other declaration.  I am -- discovery is now open.  And,

13 within reason, you can, on both sides, take depositions and ask

14 for documents, but be reasonable.

15    The easiest mistake you plaintiffs can make is to be

16 unreasonably broad in your discovery.  I promise you, I won't

17 allow that.  But narrowly directed, reasonable discovery is in

18 order in this case to get at the truth because the Government

19 is saying one thing and you're saying another.

20    Right now your record is the strongest, and I think that

21 your position is correct on the facts.  But it deserves to be

22 tested by discovery.

23    Finally, I believe that the channeling argument -- I

24 believe that the channeling argument that I relied on that says

25 that all employee grievances should be channeled through the

1   MSPB might have been in error because -- I'm not making a
2   ruling now -- I'm going to invite briefing -- because the whole
3   point of the January 20 memorandum was to say the probationary
4   employees have no appeal rights.  And the letter that was
5   sent -- the template letter -- said, "You may have a right to
6   file an appeal with the Merit Systems Protection Board on the
7   limited grounds set forth in 5 C.F.R. 315806," which I looked
8   up, and that has nothing to do with this case.  It gives you a
9   right to appeal if you get terminated based on something that
10  happened before your employment.  Let's say that you were a
11  convicted felon and didn't disclose that.  Well, that's not
12  this case.

13      So if there is no ability to appeal and get not just some
14  limited -- I mean, a real effective way to undo the harm to
15  these individual employees, I don't see how this could be
16  channeled.  So the -- to the extent that the unions here were
17  seeking to vindicate the rights of their employees, you know,
18  like I thought you were, I may have made an error.

19      Now, I did rely upon the Government's representations that
20  the MSPB was an effective remedy.  I thought it was.  And I'm
21  not yet ready to say it wasn't.  But I didn't know all this at
22  the time I made that ruling.

23      So I would like to give you each an opportunity to brief
24  this.  I'll give you, say, one week to brief this.  I'll give
25  you until the end of next week, to Friday at noon, to brief

1    whether or not the unions have standing based upon the fact
2    that the channel has been destroyed.  So no channeling because
3    no channel -- no effective channel.
4         Now, this -- and then if you want to make the same
5    argument for the Federal Labor Relations Board -- or
6    Authority --
7              **MS. LEONARD:**  Authority.
8              **THE COURT:**  -- whatever it is, you can brief that too,
9    all within the 10 pages.
10        I'm ordering the Government to make this guy, Noah,
11   available soon, within the next two weeks.
12        If you want to appeal to the Court of Appeals, God bless
13   you.  I want you to because I'm tired of seeing you stonewall
14   on trying to get at the truth.  Instead of giving me snippets,
15   I want somebody to go under oath and tell us what happened in
16   these phone calls and at other times was it really an agency --
17   so you can depose some people in the agencies if they really
18   are claiming they did it on their own and was not influenced by
19   OPM.  We should get it, but be reasonable in the discovery.
20        The only one I'm ordering for sure is Noah Peters within
21   the next two weeks.  You've got to go to Washington to take his
22   deposition.  And it can be two hours.  All right?
23        So, see, the way the Government does it, they want to come
24   in with an *ex parte* and just stall, stall, stall.  Just go
25   ahead and take your appeal.  We've got a preliminary injunction

1　now.  I've ordered some discovery.  Just go ahead and put it up

2　there on appeal and see if the Court of Appeals feels that what

3　I have done here today by way of relief is unjustified.  I'm --

4　that's fine.

5　　　　I'm doing the best I can with the record I got, and this

6　is a quick-moving time frame.  These people have been

7　terminated.  I want to make it clear that, right now, I'm just

8　ruling based on services -- these organizational plaintiffs --

9　and I'm not considering the State of Washington.

10　　　　The organizational plaintiffs that got the TRO are

11　complaining about the deprivation of services by these agencies

12　and resources that they count on, and that is still the basis

13　for their standing and the basis for the subject-matter

14　jurisdiction.  But I am raising the question whether or not the

15　additional subject-matter jurisdiction exists because the

16　channel that Congress wanted to be effective has been ruined.

17　　　　All right.  Anything further today?

18　　　　　　MS. LEONARD:  Yes, Your Honor.  Two points of

19　clarification.

20　　　　First of all, I believe Mr. Peters is a lawyer, and I

21　would ask for three hours, Your Honor.  We all know how hard it

22　is to depose lawyers.

23　　　　　　THE COURT:  Three hours.

24　　　　　　MS. LEONARD:  Thank you.

25　　　　　　THE COURT:  Okay.  But the three hours of airtime, all

58

```
 1   right?
 2            MS. LEONARD:  Thank you.  For our questioning?
 3            THE COURT:  For your questioning.
 4            MS. LEONARD:  Thank you, Your Honor.
 5        But more seriously, actually, not that that's not a
 6   serious issue, to clarify, the evidence that plaintiffs have
 7   presented with respect to other agencies and the harm -- and I
 8   know Your Honor's very familiar with the record -- I just want
 9   to clarify because there is extensive irreparable harm with
10   respect to NOAA, NIH, FAA that is incredibly urgent.  How do we
11   get in front of you the -- I have a list that we have prepared.
12   I'm happy to give to the Government a copy of every agency and
13   every plaintiff that they're connected with.  And we're happy
14   to give you the declarations --
15            THE COURT:  Can I see what you're talking about?
16            MS. LEONARD:  Sure.  It's every agency and every
17   plaintiff that has shown harm through the declarations with
18   respect to that agency.
19        And we're happy to submit this by later today with the
20   declaration cites.  I believe we already have that prepared as
21   well.  This was just my cheat sheet, Your Honor, if that would
22   assist you.
23            THE COURT:  Well, does counsel object if I keep this
24   cheat sheet?
25            MR. HELLAND:  No.
```

1       **THE COURT:**  Thank you.

2       I -- this is not good enough for -- I mean, you'd have to

3   connect the dots better than this, but I see where you're

4   going.

5       You can submit more, but I am not promising -- I'm basing

6   it based on my understanding of the present record of who has

7   standing and who is suffering irreparable harm, so -- but I

8   could be wrong on one or two.  I was wrong last time on one

9   issue, so I -- you can submit something more and we'll consider

10  it.

11      **MS. LEONARD:**  Thank you very much, Your Honor.

12      **THE COURT:**  Anything on your side?

13      **MR. HELLAND:**  No.  Thank you, Your Honor.

14      **THE COURT:**  All right.

15      All right.  I want to make it clear that I don't think

16  counsel for the Government has done anything dishonorable.

17  I've given him a hard time.  He's doing the best he can with

18  the case he's got.  And thank you for your service in the

19  Justice Department.

20      Okay.  I think we're done for today.

21      **THE COURTROOM DEPUTY:**  Court is adjourned.

22              (Proceedings adjourned at 9:30 a.m.)

23                      ---oOo---

24

25

1
2
3              **CERTIFICATE OF REPORTER**
4              I certify that the foregoing is a correct transcript
5      from the record of proceedings in the above-entitled matter.
6
7      DATE:   Thursday, March 13, 2025
8
9
10     _____
11              Kendra A. Steppler, RPR, CRR
12              Official Reporter, U.S. District Court
13
14
15
16
17
18
19
20
21
22
23
24
25