Nos. 25-1677, 25-2637

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

————————————————

AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, et al.,

Plaintiffs-Appellees,

v.

UNITED STATES OFFICE OF PERSONNEL MANAGEMENT, et al.,

Defendants-Appellants.

————————————————

On Appeal from the United States District Court
for the Northern District of California

————————————————

**EXCERPTS OF RECORD**
**VOLUME 2 of 3**

————————————————

YAAKOV M. ROTH
  *Acting Assistant Attorney General*

PATRICK D. ROBBINS
  *Acting United States Attorney*

MARK R. FREEMAN
COURTNEY L. DIXON
CASEN B. ROSS
JOSHUA M. KOPPEL
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7270*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-1923*

PATRICK D. ROBBINS (CABN 152288)
Acting United States Attorney
PAMELA T. JOHANN (CABN 145558)
Chief, Civil Division
KELSEY J. HELLAND (CABN 298888)
Assistant United States Attorney
U.S. ATTORNEY'S OFFICE
450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495

ERIC HAMILTON
Deputy Assistant Attorney General
DIANE KELLEHER
Branch Director
CHRISTOPHER HALL
Assistant Branch Director
JAMES D. TODD, JR.
Senior Trial Counsel
YURI S. FUCHS
GREGORY CONNER
Trial Attorneys
U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, DC 20044

*Counsel for Defendants*

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, *et al.* <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES OFFICE OF PERSONNEL MANAGEMENT, *et al.*, <br><br> Defendants. | Case No. 3:25-cv-1780-WHA <br><br> **DEFENDANTS' NOTICE OF STEPS TAKEN TO COMPLY WITH THE APRIL 18, 2025 PRELIMINARY INJUNCTION** |

Please take notice that Defendants are filing on behalf of all relief defendant agencies declarations informing the Court of steps taken to comply with this Court's April 18, 2025 preliminary injunction. In order to inform the Court of the steps taken by the relief defendant agencies to comply with paragraphs 4-6 of the Court's April 18, 2025 preliminary injunction, Defendants submit the following:

1. U.S. Department of Agriculture's ("USDA") declaration, acknowledging that its Chief Human Capital Officer (or its equivalent) has read and received the order and that it has provided recipients of the OPM template termination notice with a written statement that their termination was not "performance" or fitness based but was made as part of a government-wide mass termination. A separate declaration from USDA is being submitted under seal to provide details of employees whose terminations were carried out after an individualized evaluation of their performance.

2. U.S. Department of Commerce's declaration, acknowledging that its Chief Human Capital Officer has read and received the order and that it has provided recipients of the OPM template termination notice with a written statement that their termination was not "performance" or fitness based but was made as part of a government-wide mass termination.

3. U.S. Department of Defense's ("DoD") declaration, acknowledging that its Chief Human Capital Officer (or its equivalent) has read and received the order and that it has provided recipients of the OPM template termination notice with a written statement that their termination was not "performance" or fitness based but was made as part of a government-wide mass termination. A separate declaration and list from DoD are being submitted under seal to provide details of employees whose terminations were carried out after an individualized evaluation of their performance.

4. U.S. Department of Education's declaration, acknowledging that its Chief Human Capital Officer has read and received the order and that it has provided recipients of the OPM template termination notice with a written statement that their termination was not "performance" or fitness based but was made as part of a government-wide mass termination.

5. U.S. Department of Energy's declaration, acknowledging that its Chief Human Capital Officer has read and received the order and that it has provided recipients of the OPM template termination notice with a written statement that their termination was not "performance" or fitness based but was made as part of a government-wide mass termination. An unredacted version of that declaration is being submitted under seal to provide details of employees whose terminations were carried out after an individualized evaluation of their performance.

6. U.S. Department of Health and Human Services' declaration, acknowledging that its Chief Human Capital Officer has read and received the order and that it has provided recipients of the OPM template termination notice with a written statement that their termination was not "performance" or fitness based but was made as part of a government-wide mass termination.

7. U.S. Department of Homeland Security's declaration, acknowledging that its Chief Human Capital Officer has read and received the order and that it has provided recipients of the OPM template termination notice with a written statement that their termination was not "performance" or fitness based but was made as part of a government-wide mass termination.

8. U.S. Department of Housing and Urban Development's declaration, acknowledging that its Chief Human Capital Officer has read and received the order and that it has provided recipients of the OPM template termination notice with a written statement that their termination was not "performance" or fitness based but was made as part of a government-wide mass termination.

9. U.S. Department of Justice's declaration, acknowledging that its Chief Human Capital Officer has read and received the order and stating that the Department of Justice did not use the OPM template termination notice or any variation thereof.

10. U.S. Department of Interior's declaration, acknowledging that its Chief Human Capital Officer has read and received the order and that it has provided recipients of the OPM template termination notice with a written statement that their termination was not "performance" or fitness based but was made as part of a government-wide mass termination.

11. U.S. Department of Labor's declaration, acknowledging that its Chief Human Capital Officer has read and received the order and that it has provided recipients of the OPM

template termination notice with a written statement that their termination was not
"performance" or fitness based but was made as part of a government-wide mass termination.

12.    U.S. Department of State's declaration, acknowledging that its Chief Human
Capital Officer (or its equivalent) has read and received the order and that it has provided
recipients of the OPM template termination notice with a written statement that their termination
was not "performance" or fitness based but was made as part of a government-wide mass
termination. An unredacted version of that declaration is being submitted under seal to provide
details of employees whose terminations were carried out after an individualized evaluation of
their performance.

13.    U.S. Department of the Treasury's declaration, acknowledging that the equivalent
of its Chief Human Capital Officer has read and received the order and that it has provided
recipients of the OPM template termination notice with a written statement that their termination
was not "performance" or fitness based but was made as part of a government-wide mass
termination.

14.    U.S. Department of Transportation's declaration, acknowledging that its Chief
Human Capital Officer has read and received the order and that it has provided recipients of the
OPM template termination notice with a written statement that their termination was not
"performance" or fitness based but was made as part of a government-wide mass termination.

15.    U.S. Veterans' Administration's ("VA") declaration, acknowledging that its Chief
Human Capital Officer has read and received the order and that it has provided recipients of the
OPM template termination notice, who were not terminated based on individualized
determinations, with a written statement that their termination was not "performance" or fitness
based but was made as part of a government-wide mass termination. Separate declarations from
the VA are being submitted under seal to provide details of employees whose terminations were
carried out after an individualized evaluation of their performance.

16.    U.S. Environmental Protection Agency's declaration, acknowledging that its
Chief Human Capital Officer has read and received the order and that it has provided recipients

of the OPM template termination notice with a written statement that their termination was not "performance" or fitness based but was made as part of a government-wide mass termination.

17.    U.S. General Services Administration's declaration, acknowledging that its Chief Human Capital Officer has read and received the order and that it has provided recipients of the OPM template termination notice with a written statement that their termination was not "performance" or fitness based but was made as part of a government-wide mass termination.

18.    U.S. National Aeronautics and Space Administration's ("NASA") declaration, acknowledging that its Chief Human Capital Officer has read and received the order and stating that NASA did not use the OPM template termination notice or any variation thereof.

19.    National Science Foundation's ("NSF") declaration, acknowledging that its Chief Human Capital Officer (or its equivalent) has read and received the order and that it has provided recipients of the OPM template termination notice with a written statement that their termination was not "performance" or fitness based but was made as part of a government-wide mass termination. A list from NSF is being submitted under seal to provide details of one employee whose termination was carried out after an individualized evaluation of said employee's performance.

20.    U.S. Office of Management and Budget's declaration, acknowledging that its Chief Human Capital Officer (or its equivalent) has read and received the order and that it has provided the recipient of the OPM template termination notice with a written statement that his termination was not "performance" or fitness based but was made as part of a government-wide mass termination.

21.    U.S. Small Business Administration's declaration, acknowledging that its Chief Human Capital Officer has read and received the order and that it has provided recipients of the OPM template termination notice with a written statement that their termination was not "performance" or fitness based but was made as part of a government-wide mass termination.

22.    U.S. Social Security Administration's declaration, acknowledging that its Chief Human Capital Officer has read and received the order and that it has provided recipients of the

OPM template termination notice with a written statement that their termination was not

"performance" or fitness based but was made as part of a government-wide mass termination.


Dated: May 8, 2025                          Respectfully submitted,

                                            PATRICK D. ROBBINS (CABN 152288)
                                            Acting United States Attorney
                                            PAMELA T. JOHANN (CABN 145558)
                                            Chief, Civil Division
                                            KELSEY J. HELLAND (CABN 298888)
                                            Assistant United States Attorney
                                            U.S. ATTORNEY'S OFFICE
                                            450 Golden Gate Avenue, Box 36055
                                            San Francisco, California 94102-3495

                                            ERIC HAMILTON
                                            Deputy Assistant Attorney General

                                            DIANE KELLEHER
                                            Branch Director

                                            CHRISTOPHER HALL
                                            Assistant Branch Director

                                            JAMES D. TODD, JR.
                                            Senior Trial Counsel

                                            s/ Yuri S. Fuchs
                                            YURI S. FUCHS
                                            GREGORY CONNER
                                            Trial Attorneys
                                            U.S. DEPARTMENT OF JUSTICE
                                            Civil Division, Federal Programs Branch
                                            P.O. Box 883
                                            Washington, DC 20044

                                            *Counsel for Defendants*

1 PATRICK D. ROBBINS (CABN 152288)
Acting United States Attorney
2 PAMELA T. JOHANN (CABN 145558)
Chief, Civil Division
3 KELSEY J. HELLAND (CABN 298888)
Assistant United States Attorney
4 U.S. ATTORNEY'S OFFICE
450 Golden Gate Avenue, Box 36055
5 San Francisco, California 94102-3495

6 ERIC HAMILTON
Deputy Assistant Attorney General
7 DIANE KELEHER
Branch Director
8 CHRISTOPHER HALL
Assistant Branch Director
9 JAMES D. TODD, JR.
Senior Trial Counsel
10 U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
11 P.O. Box 883
Washington, DC 20044
12

13 *Counsel for Defendants*

14                    **UNITED STATES DISTRICT COURT**
15           **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
                      **SAN FRANCISCO DIVISION**
16

17 AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES, *et al.*
18

19           Plaintiffs,

20              v.

21 UNITED STATES OFFICE OF PERSONEL
MANAGEMENT, *et al.*,
22

23           Defendants.

Case No. 3:25-cv-1780-WHA

**DECLARATION OF MARY PLETCHER RICE**

24

25

26

27

28

Declaration of Mary Pletcher Rice
3:25-cv-1780-WHA

I, Mary Pletcher Rice, declare, pursuant to 28 U.S.C. § 1746, as follows:

1. I am the Acting Principal Deputy Assistant Secretary for Administration within Departmental Administration at the United States Department of Agriculture ("USDA" or "Department") headquartered in Washington, D.C.  I make this Declaration based on my own personal knowledge, on information contained in the records of USDA, or on information provided to me by USDA employees.  I have served in this position since January 31, 2025, and I have been employed at USDA since 2018.  I submitted previous declarations in this matter and rely on and incorporate my prior declaration testimony in making this declaration.

2. In my role at USDA, I currently oversee the Department's Office of Human Resources Management and I have purview over USDA subagencies' Chief Operating Officers and Human Resources Offices.

3. I received and read the April 18, 2025 Order on Motion for Preliminary Injunction by Union Plaintiffs and State of Washington, in the above-captioned case.

4. On May 7, 2025, USDA sent an email to each of the previously-terminated probationary employees ("Affected Probationary Employees"), explaining that the prior termination "was not performance or fitness based but was made as part of a government-wide mass termination."

5. USDA sent each email to the USDA government email address and the personal email address (if any) that were on file for each Affected Probationary Employee.

   Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.



MARY RICE  Digitally signed by MARY RICE
Date: 2025.05.08 09:48:20
-04'00'

_____
MARY PLETCHER RICE

Declaration of Mary Pletcher Rice
3:25-cv-1780-WHA

1    PATRICK D. ROBBINS (CABN 152288)
     Acting United States Attorney
2    PAMELA T. JOHANN (CABN 145558)
     Chief, Civil Division
3    KELSEY J. HELLAND (CABN 298888)
     Assistant United States Attorney
4    U.S. ATTORNEY'S OFFICE
     450 Golden Gate Avenue, Box 36055
5    San Francisco, California 94102-3495

6    ERIC HAMILTON
     Deputy Assistant Attorney General
7    DIANE KELEHER
     Branch Director
8    CHRISTOPHER HALL
     Assistant Branch Director
9    JAMES D. TODD, JR.
     Senior Trial Counsel
10   U.S. DEPARTMENT OF JUSTICE
     Civil Division, Federal Programs Branch
11   P.O. Box 883
     Washington, DC 20044
12

13   *Counsel for Defendants*

14                  UNITED STATES DISTRICT COURT
15          FOR THE NORTHERN DISTRICT OF CALIFORNIA
                    SAN FRANCISCO DIVISION
16

17   AMERICAN FEDERATION OF                    Case No. 3:25-cv-1780-WHA
     GOVERNMENT EMPLOYEES, *et al.*
18
                                              **DECLARATION OF JESSICA S.**
19          Plaintiffs,                        **PALATKA IN SUPPORT OF**
                                              **DEFENDANT DEPARTMENT OF**
20          v.                                 **COMMERCE'S REPORT REGARDING**
                                              **COMPLIANCE WITH APRIL 18, 2025**
21   UNITED STATES OFFICE OF PERSONEL          **ORDER**
     MANAGEMENT, *et al.*,
22
            Defendants.
23

24

25

26

27

28

     Declaration of Jessica S. Palatka in Support of Defendant Department of Commerce's Report Regarding
     Compliance with April 18, 2025 Order
     3:25-cv-1780-WHA                          2-ER-112

1    I, Jessica S. Palatka, declare, pursuant to 28 U.S.C. § 1746, as follows:

2    1.    I am the Chief Human Capital Officer for the U.S. Department of Commerce

3 (Commerce) headquartered in Washington, D.C.  I make this Declaration based on my own

4 personal knowledge, on information contained in the records of the Department of Commerce, or

5 on information provided to me by Commerce employees.

6    2.    I have served as Chief Human Capital Officer for Commerce since September

7 2021.  In my role at Commerce, I am responsible for personnel management.  I have the

8 responsibility for overseeing the personnel enterprise and tracking and recording of personnel

9 actions, including terminations.  I assist in ensuring that all personnel actions comply with

10 federal law, including those related to probationary employees.

11    3.    I acknowledge having received and read this Court's April 18, 2025 Order.

12    4.    I confirm that, as required by this Court's April 18, 2025 Order, by close of

13 business on May 8, 2025, the Department of Commerce will have provided recipients of the

14 Office of Personnel Management (OPM) template termination letter (or variation thereof) with

15 written notice, directed to each recipient personally, that their earlier termination "was not

16 'performance' or fitness based but was made as part of a government-wide mass termination."

17    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

18 and correct.

19 Dated: May 8, 2025

20

21

22    JESSICA    Digitally signed by
     JESSICA PALATKA

23 /s/  PALATKA  Date: 2025.05.08
     10:24:09 -04'00'

24 _____
   JESSICA S. PALATKA
25 CHIEF HUMAN CAPITAL OFFICER
   U.S. DEPARTMENT OF COMMERCE

26

27

28

Declaration of Jessica S. Palatka in Support of Defendant Department of Commerce's Report Regarding
Compliance with April 18, 2025 Order
3:25-cv-1780-WHA                    2-ER-113
                                       1

1  PATRICK D. ROBBINS (CABN 152288)
   Acting United States Attorney
2  PAMELA T. JOHANN (CABN 145558)
   Chief, Civil Division
3  KELSEY J. HELLAND (CABN 298888)
   Assistant United States Attorney
4  U.S. ATTORNEY'S OFFICE
   450 Golden Gate Avenue, Box 36055
5  San Francisco, California 94102-3495

6  ERIC HAMILTON
   Deputy Assistant Attorney General
7  DIANE KELEHER
   Branch Director
8  CHRISTOPHER HALL
   Assistant Branch Director
9  JAMES D. TODD, JR.
   Senior Trial Counsel
10 U.S. DEPARTMENT OF JUSTICE
   Civil Division, Federal Programs Branch
11 P.O. Box 883
   Washington, DC 20044
12

13 *Counsel for Defendants*

14                 **UNITED STATES DISTRICT COURT**
15           **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
                      **SAN FRANCISCO DIVISION**
16

17 AMERICAN FEDERATION OF            Case No. 3:25-cv-1780-WHA
   GOVERNMENT EMPLOYEES, *et al.*
18
                                     **DECLARATION OF TIMOTHY D. DILL**
19        Plaintiffs,                **IN SUPPORT OF DEFENDANTS' MAY 8,**
                                     **2025 FILING**
20           v.

21 UNITED STATES OFFICE OF PERSONNEL
   MANAGEMENT, *et al.*,
22
          Defendants.
23

24

25

26

27

28

1    I, Timothy D. Dill, declare, pursuant to 28 U.S.C. § 1746, as follows:

2    1.    I am currently the official performing the duties of the Assistant Secretary of

3  Defense for Manpower and Reserve Affairs of the Department of Defense ("Department"),

4  headquartered in Washington, D.C. I have served in this position since January 22, 2025. The

5  information below is based on my personal knowledge and information available to me in my

6  role at the Department.

7    2.    In my role at the Department, I am responsible for personnel policy for the

8  Department of Defense's civilian workforce. That responsibility includes tracking and recording

9  personnel actions, including terminations. I am responsible for ensuring that all personnel

10  actions, including those related to probationary employees, comply with federal law.

11    3.    I received and read the court's order for provisional relief issued in the above

12  captioned case on April 18, 2025.

13    4.    Per the court order, the Department directed DoD Military Departments and other

14  DoD Components to notify the one hundred seventy-eight (178) probationary employees

15  separated, or notified of termination, based upon the OPM template termination notice that their

16  termination was not performance or fitness based but was made as part of a government-wide

17  mass termination. The Department anticipates that these actions will be completed by May 8,

18  2025.

19    5.    The Department provided notification that the Defense Commissary Agency

20  terminated eleven (11) probationary employees effective March 1, 2025, after an individualized

21  evaluation of each of the employee's performance or fitness. Attached hereto is a list of the

22  eleven (11) terminated probationary employees and the reasons for their terminations, along with

23  a declaration by Mr. Craig Smith of the Defense Commissary Agency.

24

25    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

26  and correct to the best of my knowledge.

27

28

1    Dated: May 6, 2025

2

3

4                                                    Timothy D. Dill
                                                     Performing the Duties of the
5                                                    Assistant Secretary of Defense for
                                                     Manpower and Reserve Affairs

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, et al., | Case No. C 25-01780 WHA |
| Plaintiffs, | |
| v. | |
| UNITED STATES OFFICE OF PERSONNEL MANAGEMENT, et al., | |
| Defendants. | |

## DECLARATION OF JACQUELINE CLAY

Pursuant to 28 U.S.C. § 1746, I, declare as follows:

1.      I am the Chief Human Capital Officer for the U.S. Department of Education, headquartered in Washington, D.C.  I make this Declaration based on my own personal knowledge, on information contained in the records of the Department of Education, or on information provided to me by the Department of Education employees.

2.      I have served in this position since June 19, 2022.  In my role at the Department of Education, I am responsible for personnel management. I have the responsibility for overseeing the personnel enterprise and tracking and recording of personnel actions, including terminations. I assist in ensuring that all personnel actions comply with federal law, including those related to probationary employees.

3.      As of Monday, March 17, 2025, the Department of Education had 65 probationary employees who had been terminated by the agency following OPM's template termination letter ("ED Probationary Employees"). As of that date, the Department of Education had processed reinstatement of all 65 ED Probationary Employees. As of Friday, March 20, 2025, all 65 ED Probationary Employees were fully reinstated into administrative leave status including access to email, administrative leave status notification, benefits and SF-50 notification to the employee's personnel folder completed.

4.      I have received a copy of and have read this Court's order, ORDER ON MOTION FOR PRELIMINARY INJUNCTION BY UNION PLAINTIFFS AND STATE OF WASHINGTON, entered April 18, 2025 (ECF No. 202) (the "April 18 Order").

5.      Pursuant to the April 18 Order, on May 7, 2025, the Department of Education communicated via email individually to each of the 65 ED Probationary Employees a written statement that the employee's termination was not performance or fitness based but was made as part of a government-wide mass termination.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 7, 2025


for Jacqueline Clay


2

1  PATRICK D. ROBBINS (CABN 152288)
   Acting United States Attorney
2  PAMELA T. JOHANN (CABN 145558)
   Chief, Civil Division
3  KELSEY J. HELLAND (CABN 298888)
   Assistant United States Attorney
4  U.S. ATTORNEY'S OFFICE
   450 Golden Gate Avenue, Box 36055
5  San Francisco, California 94102-3495

6  ERIC HAMILTON
   Deputy Assistant Attorney General
7  DIANE KELEHER
   Branch Director
8  CHRISTOPHER HALL
   Assistant Branch Director
9  JAMES D. TODD, JR.
   Senior Trial Counsel
10 U.S. DEPARTMENT OF JUSTICE
   Civil Division, Federal Programs Branch
11 P.O. Box 883
   Washington, DC 20044
12
13 *Counsel for Defendants*

14              **UNITED STATES DISTRICT COURT**
15          **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
                    **SAN FRANCISCO DIVISION**
16
17 AMERICAN FEDERATION OF               Case No. 3:25-cv-1780-WHA
   GOVERNMENT EMPLOYEES, *et al.*
18
19          Plaintiffs,                 **MAY 6, 2025 DECLARATION OF**
                                        **REESHA TRZNADEL**
20              v.

21 UNITED STATES OFFICE OF PERSONNEL
   MANAGEMENT, *et al.*,
22
23          Defendants.

24
25
26
27
28

I, Reesha Trznadel, declare, pursuant to 28 U.S.C. § 1746, as follows:

1.      I am the Acting Chief Human Capital Officer of the Department of Energy ("DOE"), headquartered in Washington, D.C. I make this Declaration based on my own personal knowledge, on information contained in the records of DOE, or on information provided to me by DOE employees.

2.      I have served in this position since February 28, 2025. In my Acting role at DOE, I oversee those responsible for personnel management. I oversee those responsible for tracking and recording personnel actions, including terminations. I assist in ensuring that all personnel actions comply with federal law, including those related to probationary employees.

3.      I have received and read this Court's "ORDER ON MOTION FOR PRELIMINARY INJUNCTION BY UNION PLAINTIFFS AND STATE OF WASHINGTON" entered April 18, 2025, ECF No. 202.

4.      In accordance with that Order, on April 30, 2025, via electronic mail, I instructed all DOE Departmental elements to distribute a written statement to their probationary employees who received a variation of the Office of Personnel Management template termination notice on February 13 or 14, 2025, with the exception of any employees who were later terminated for unrelated individualized reasons. I instructed that this written statement be directed to the employee individually; be transmitted via electronic mail no later than May 1, 2025; and state that the employee's "termination was not 'performance' or fitness based but was made as part of a government-wide mass termination."

5.      To the best of my knowledge, all DOE Departmental elements have distributed this written statement consistent with my instructions. However, this written statement was not distributed to five DOE probationary employees who have been terminated (or whose terminations are pending) for individualized reasons unrelated to the mass termination notices sent on February 13 or 14, 2025. In the following table, I include the name, termination date, and individualized reasoning supporting the termination of each of these five probationary employees.



Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 6, 2025

REESHA
TRZNADEL

Digitally signed by
REESHA TRZNADEL
Date: 2025.05.06
13:45:12 -04'00'

REESHA TRZNADEL
ACTING CHIEF HUMAN CAPITAL OFFICER
US DEPARTMENT OF ENERGY

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES, *et al.*,

Plaintiff,

v.

UNITED STATES OFFICE OF
PERSONNEL MANAGEMENT, *et al.*,

Defendants.

Case no. 3:25-cv-1780-WHA

### DECLARATION OF THOMAS NAGY, JR.

Pursuant to 28 U.S.C. § 1746, I, Thomas Nagy, Jr., declare as follows:

1.      I am the Deputy Assistant Secretary for Human Resources/Chief Human Capital Officer, United States Department of Health and Human Services ("HHS" or "Department") headquartered in Washington, D.C.  I make this declaration based on my own personal knowledge and information provided to me by the Department's Human Resources Office.

2.      I have served in this position since March 17, 2025.  In my role at HHS, I am responsible for personnel management. I have the responsibility for overseeing the personnel enterprise for the Department.

3.      I have received and read the April 18, 2025, Order on Motion for Preliminary Injunction by Union Plaintiffs and State of Washington (Preliminary Injunction Order).

4.      To comply with Paragraph 4 of the Preliminary Injunction Order, HHS shall send written notices to all probationary employees who received a notice of termination that was based on the Office of Personnel Management ("OPM") template termination letter provided by OPM.

The written notices shall state that each employee's termination was not performance or fitness-based, but was made as part of a government-wide mass termination.

5.      HHS shall send these written notices on or before Thursday, May 8, 2025, by work or personal email.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 06, 2025

THOMAS J.
NAGY JR -S

Digitally signed by
THOMAS J. NAGY JR -S
Date: 2025.05.06 16:57:18
-04'00'

Thomas Nagy, Jr.

United States District Court
Northern District of California

1

2

3

4

5

6                              UNITED STATES DISTRICT COURT

7                              NORTHERN DISTRICT OF CALIFORNIA

8

9

10    AMERICAN FEDERATION OF
      GOVERNMENT EMPLOYEES, AFL-CIO,
11    et al.,                                              No.  C 25-01780 WHA

12                    Plaintiffs,

13          v.                                             **DECLARATION OF ROLAND
                                                           EDWARDS**
14    UNITED STATES OFFICE OF
      PERSONNEL MANAGEMENT, et al.,
15
                      Defendants.
16

17

18                        **DECLARATION OF ROLAND EDWARDS**

19          Pursuant to 28 U.S.C. § 1746, I, Roland Edwards, state as follows:

20          I am the Chief Human Capital Officer for the Department of Homeland Security

21    (DHS).  I have received and read the April 18, 2025 Order on Motion for Preliminary Injunction

22    in this case.  Per the April 18, 2025 Order, DHS has provided written notice to each terminated

23    employee that his or her termination was not performance or fitness-based, but rather, that those

24    terminations were made as part of a government-wide mass termination.

25    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and

26     correct.

27

BENJAMIN
R EDWARDS

Digitally signed by
BENJAMIN R EDWARDS
Date: 2025.05.07
18:27:06 -04'00'

_____
Roland Edwards

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES, AFL-CIO,
et al.,

        Plaintiffs,

        v.

UNITED STATES OFFICE OF
PERSONNEL MANAGEMENT, et al.,

        Defendants.

No. C 25-01780 WHA

## DECLARATION OF LORI A. MICHALSKI

Pursuant to 28 U.S.C. § 1746, I, Lori A. Michalski declare as follows:

1.     I am the Chief Human Capital Officer, Department of Housing and Urban Development, headquartered in Washington, D.C. I make this Declaration based on my own personal knowledge, on information contained in the records of the U.S. Department of Housing and Urban Development (HUD), or on information provided to me by HUD employees.

2.     I have served in this position since February 2021. In my role at the Department of Housing and Urban Development, I am responsible for personnel management. I have the responsibility for overseeing the personnel enterprise and the tracking and recording of personnel actions, including terminations. I assist in ensuring that all personnel actions comply with federal law, including those related to probationary employees.

3.     I received and read the Order on Motion for Preliminary Injunction by Union Plaintiffs and State of Washington issued by this Court on April 18, 2025 (Order).

4.      Although HUD used a variation of the OPM template termination notice, HUD did not specifically state in its termination letters that the reasons for the terminations were based on performance or fitness based.

5.      Instead, HUD stated that it is terminating employment during an employee's probationary period, "as part of a workforce restructuring of the Agency."  Therefore, HUD's letters appear to comply with the Order.  A true and correct copy of termination letters that were issued for competitive service and excepted service employees are attached to this declaration as Exhibit A.

6.      Nevertheless, in accordance with the Order, HUD has issued new letters to the terminated employees stating that their "termination was not performance or fitness based" but was made "as part of a government-wide mass termination."

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 7, 2025

LORI
MICHALSKI
Digitally signed by LORI
MICHALSKI
DN: CN = LORI MICHALSKI C +
US, O = U.S. Government OU =
Department of Housing and Urban
Development
Date: 2025.05.07 11:46:09 -04'00'

/s/

Lori A. Michalski

2

# Exhibit A



## U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

*Via e-mail*

February 14, 2025

| | |
|---|---|
| FROM: | Matthew E. Ammon, performing the Delegable Duties of the Deputy Secretary, as Delegated by the Secretary of the Department of Housing and Urban Development |
| SUBJECT: | Notice of Termination During Trial Period (Excepted Service) |

The purpose of this notice is to notify you of the decision to terminate your employment with the U.S. Department of Housing and Urban Development (HUD), during your trial period, in order to promote the efficiency of the federal service in accordance with the priorities of the Administration.

The purpose of the trial period is to provide the federal government with an opportunity to evaluate a new federal employee's conduct and performance on the job in order to determine if an appointment should become final and if continued employment as a federal employee is warranted.

After careful consideration, the Agency is terminating your employment as of the date of the transmission of this email, during your trial period as part of a workforce restructuring of the Agency. You should work with your supervisor to initiate the separation process and return your HUD equipment before your termination date. Failure to return government property may result in a deduction of your paycheck. Any personal items left behind in your work area will be mailed to your current address of record. Please let your supervisor know if you have changed your mailing address.

If you had opted into the Deferred Resignation Program by messaging OPM prior to its closing at 7:20pm ET on February 12, 2025, you will receive an Agreement to sign and will be allowed to resign or retire in accordance with the terms of the program. If you believe you opted into the program and are receiving this notice in error, please contact DeferredResignationQuestions@HUD.Gov for verification. Please annotate Probationary Verification in the subject line.

You are advised that you do not have a right to reply to this personnel action or to grieve your termination under either the administrative or negotiated grievance procedure. However, if you believe you received this notice in error because you are not currently in a trial period, please send an e-mail to: ProbationaryNotice@hud.gov with the subject "Verification of Probationary Status."

If you believe that the Department discriminated against you on the basis of your race, color, religion, sex, national origin, age, disability, genetic information, and/or reprisal, you may file a complaint of discrimination. In order to pursue this matter through the discrimination complaints process, you must

contact a HUD EEO Counselor within 45 days of the effective date of this adverse action. A HUD EEO Counselor may be contacted through the HUD Office of Departmental Equal Employment Opportunity (ODEEO) by telephone at (202) 708-3362 or by writing to:

> Department of Housing and Urban Development
> Director of EEO
> 451 7th Street, S.W., Room 2102
> Washington, D.C. 20410

Should you elect to file a complaint of discrimination, your complaint will be processed in accordance with 29 CFR § 1614.

If you believe this termination is being taken against you in reprisal for acts covered under the Whistleblower Protection Enhancement Act, you may seek corrective action by filing a complaint with the Office of Special Counsel (OSC) (see www.osc.gov). If you choose to file a complaint with OSC, and if OSC does not take corrective action, you may then file an Individual Right of Action (IRA) appeal with the MSPB. In an IRA appeal, the only issues before the MSPB are those listed in 5 U.S.C. § 1221(e), i.e., whether the appellant has demonstrated that a protected disclosure or protected activity was a contributing factor in one or more covered personnel actions and, if so, whether the agency has demonstrated by clear and convincing evidence that it would have taken the same personnel action(s) in the absence of the protected disclosure(s). Other than raising an affirmative defense of reprisal for whistleblowing activities, other affirmative defenses, such as claims of discrimination or harmful procedural error, may not be raised. In an IRA appeal that concerns an adverse action under 5 U.S.C. § 7512, the agency need not prove its charges, nexus, or the reasonableness of the penalty.

Your election of one of these avenues of review will be considered final on the date any appeal or complaint is filed.



**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**

*Via e-mail*

February 14, 2025

FROM:               Matthew E. Ammon, performing the Delegable Duties of the Deputy Secretary, as
                    Delegated by the Secretary of the Department of Housing and Urban
                    Development

SUBJECT:            Notice of Termination During Probationary Period (Competitive Service)

The purpose of this notice is to notify you of the decision to terminate your employment with the U.S.
Department of Housing and Urban Development (HUD), during your probationary period, in accordance
with 5 C.F.R. § 315.804, in order to promote the efficiency of the federal service in accordance with the
priorities of the Administration.

The purpose of the probationary period is to provide the federal government with an opportunity to
evaluate a new federal employee's conduct and performance on the job to determine if an appointment
should become final and if continued employment as a federal employee is warranted.

After careful consideration, the Agency is terminating your employment as of the date of the
transmission of this email, during your probationary period, as part of a workforce restructuring of the
Agency.  You should work with your supervisor to initiate the separation process and return your HUD
equipment.  Failure to return government property may result in a deduction of your paycheck. Any
personal items left behind in your work area will be mailed to your current address of record. Please let
your supervisor know if you have changed your mailing address.

If you had opted into the Deferred Resignation Program by messaging OPM prior to the program closing
at 7:20pm ET on February 12, 2025, you will receive a Deferred Resignation Agreement to sign and will
be allowed to resign or retire in accordance with the terms of the program. If you believe you opted into
the program and are receiving this notice in error, please contact
DeferredResignationQuestions@HUD.Gov for verification. Please annotate Probationary Verification in
the subject line.

You are advised that you do not have a right to reply to this personnel action or to grieve your
termination under either the administrative or negotiated grievance procedure. You may appeal this
action to the Merit Systems Protection Board (MSPB) if you believe that your termination was based on:
(1) partisan political reasons or (2) marital status. If you believe that your termination was due to
discrimination based on race, color, religion, sex, national origin, disability, or age (provided that at the

time of the alleged discriminatory action you were at least 40 years of age), and/or because of participation in a protected Equal Employment Opportunity (EEO) activity, you may include this allegation when appealing to the MSPB if such discrimination is raised in addition to one of the two reasons cited above.

An appeal to the MSPB is filed by submitting a completed appeal form (copy attached), providing the information required by the form in writing or submitting an electronic appeal to the MSPB. Your appeal must be filed no later than thirty (30) calendar days after the effective date of the action being appealed, or thirty (30) calendar days after the date of receipt of this Notice of Termination, whichever is later. If the thirty (30) calendar day deadline falls on a weekend or holiday, then it must be filed no later than the following workday. If you submit an appeal after the thirty (30) calendar day time period, your appeal will be dismissed as untimely filed unless you demonstrate good reason for the delay. The Board's regulation on the timeliness of an appeal is 5 CFR §1201.22(c) (Timeliness of Appeals).

Filing of an appeal must be made by commercial or personal delivery, facsimile, mail, or electronic filing to the MSPB Office nearest your duty station. The contact information for the MSPB Office nearest your duty station can be found at: https://www.mspb.gov/about/contact.htm. The link to the MSPB's electronic filing appeal platform is: https://e-appeal.mspb.gov/etk-mspb-appeals-prod/login.request.do.

In accordance with the MSPB regulations, at 5 CFR § 1201.21(f), an appeal should include the following information identifying the HUD official to receive the MSPB's acknowledgement order and copy of the appeal:

> Javes Myung, Assistant General Counsel for Personnel Law
> Office of the General Counsel
> U.S. Department of Housing and Urban Development
> *451 7th Street SW, Room 2124, Washington DC 20410*
> *Javes.Myung@hud.gov*

Information on how to file an appeal electronically via "e-Appeal" may be found at the MSPB web site: http://www.mspb.gov or https://e-appeal.mspb.gov/etk-mspb-appeals-prod/login.request.do(for specific instructions concerning an e-Appeal. A copy of the MSPB regulations (5 C.F.R. 1201 *et seq*.) may be found at www.mspb.gov.

If you believe that the Department discriminated against you on the basis of your race, color, religion, sex, national origin, age, disability, genetic information, and/or reprisal, you may file a complaint of discrimination. In order to pursue this matter through the discrimination complaints process, you must contact a HUD EEO Counselor within 45 days of the effective date of this adverse action. A HUD EEO Counselor may be contacted through the HUD Office of Departmental Equal Employment Opportunity (ODEEO) by telephone at (202) 708-3362 or by writing to:

> Department of Housing and Urban Development
> Director of EEO
> 451 7th Street, S.W., Room 2102
> Washington, D.C. 20410

Should you elect to file a complaint of discrimination, your complaint will be processed in accordance with 29 CFR § 1614. Should you elect to file an MSPB appeal, as described above, you may also allege discrimination because of race, color, religion, sex, national origin, age, or disability.

If you believe this adverse action is being taken against you in reprisal for acts covered under the Whistleblower Protection Enhancement Act, you may either include this allegation as an affirmative defense in an appeal of the adverse action to the MSPB, as described above, or you may seek corrective action by filing a complaint with the Office of Special Counsel (OSC) (see www.osc.gov).

If you choose to file a complaint with OSC, and if OSC does not take corrective action, you may then file an Individual Right of Action (IRA) appeal with the MSPB. In an IRA appeal, the only issue before the MSPB are those listed in 5 U.S.C. § 1221(e), i.e., whether the appellant has demonstrated that a protected disclosure or protected activity was a contributing factor in one or more covered personnel actions and, if so, whether the agency has demonstrated by clear and convincing evidence that it would have taken the same personnel action(s) in the absence of the protected disclosure(s). Other than raising an affirmative defense of reprisal for whistleblowing activities, other affirmative defenses, such as claims of discrimination or harmful procedural error, may not be raised. In an IRA appeal that concerns an adverse action under 5 U.S.C. § 7512, the agency need not prove its charges, nexus, or the reasonableness of the penalty.

Your election of one of these avenues of review will be considered final on the date any appeal or complaint is filed.

Finally, if you believe you received this notice in error because you are not currently in a probationary period, please send an e-mail to: ProbationaryNotice@hud.gov with the subject "Verification of Probationary Status."

Attachment:
MSPB Appeal Form

## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| American Federation of Government Employees, AFL-CIO, *et al.*, | ) ) ) ) |
| Plaintiffs, | ) No. 3:25-CV-1780-WHA |
| v. | ) ) ) |
| United States Office of Personnel Management, *et al.*, | ) ) ) |
| Defendants. | ) ) ) ) |

### <u>Declaration of Mike Williams</u>

1. I am over 18 years of age, of sound mind, and otherwise competent to make this sworn Declaration. The evidence set out in this Declaration is based on my personal knowledge.

2. I am the Chief Human Capital Office for the U.S. Department of Justice and have served in this position since June 18, 2023.

3. I have received and read the April 18, 2025 Order issued in the matter of *AFGE v. OPM*, No. 3:25-CV-1780 (N.D. Cal.).

4. The Department of Justice did not terminate any probationary employees at the direction of the U.S. Office of Personnel Management (OPM), nor did the Department of Justice use OPM's template termination notice, or any version of it.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

MIKE WILLIAMS
Digitally signed by
MIKE WILLIAMS
Date: 2025.05.02
12:45:16 -04'00'

Mike Williams
Chief Human Capital Officer, and
Deputy Assistant Attorney General for
Human Resources and Administration
U.S. Department of Justice

PATRICK D. ROBBINS (CABN 152288)
Acting United States Attorney
PAMELA T. JOHANN (CABN 145558)
Chief, Civil Division
KELSEY J. HELLAND (CABN 298888)
Assistant United States Attorney
U.S. ATTORNEY'S OFFICE
450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495

ERIC HAMILTON
Deputy Assistant Attorney General
DIANE KELEHER
Branch Director
CHRISTOPHER HALL
Assistant Branch Director
JAMES D. TODD, JR.
Senior Trial Counsel
U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, DC 20044

*Counsel for Defendants*

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

|  |  |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, *et al.* <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES OFFICE OF PERSONNEL MANAGEMENT, *et al.*, <br><br> Defendants. | Case No. 3:25-cv-1780-WHA <br><br> **DECLARATION OF STEPHANIE M. HOLMES IN SUPPORT OF DEFENDANTS' COMPLIANCE WITH APRIL 18, 2025, ORDER ON MOTION FOR PRELIMINARY INJUNCTION BY UNION PLAINTIFFS AND STATE OF WASHINGTON** |

Declaration of Stephanie M. Holmes in Support of Defendants' Compliance with Order on Motion for Preliminary
Injunction by Union Plaintiffs and State of Washington, dated April 18, 2025
3:25-cv-1780-WHA                    2-ER-134

1    I, Stephanie M. Holmes, declare, pursuant to 28 U.S.C. § 1746, as follows:

2    1.    I am Acting Chief Human Capital Officer for the U.S. Department of the Interior

3    ("Department"), headquartered in Washington, D.C.  I have served in this position since

4    February 24, 2025. I make this declaration based on my own personal knowledge, on

5    information contained in the records of the Department, or on information provided to me by

6    Department employees.

7    2.    In my role at the Department, I am responsible for personnel management. I have

8    the responsibility of overseeing the personnel enterprise and tracking and recording of personnel

9    actions, including terminations. I assist in ensuring that all personnel actions comply with federal

10   law, including those related to probationary and trial period appointees.

11   3.    I have received and read the District Court's April 18, 2025 Order on Motion for

12   Preliminary Injunction by Union Plaintiffs and State of Washington ("April 18, 2025 Order") in

13   the above-referenced matter.

14   4.    Per the April 18, 2025 Order, the Department has provided written notice to each

15   terminated employee that his or her termination was not performance or fitness-based, but rather,

16   those terminations were made as part of a government-wide mass termination.

17   Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

18   and correct.

19

20   Dated: May 6, 2025

21

22   /s/    STEPHANIE HOLMES    Digitally signed by STEPHANIE HOLMES
         Date: 2025.05.06 15:18:16 -04'00'

23        STEPHANIE M. HOLMES

24

25

26

27

28

Declaration of Stephanie M. Holmes in Support of Defendants' Compliance with Order on Motion for Preliminary
Injunction, dated April 18, 2025
3:25-cv-1780-WHA

1  PATRICK D. ROBBINS (CABN 152288)
   Acting United States Attorney
2  PAMELA T. JOHANN (CABN 145558)
   Chief, Civil Division
3  KELSEY J. HELLAND (CABN 298888)
   Assistant United States Attorney
4  U.S. ATTORNEY'S OFFICE
   450 Golden Gate Avenue, Box 36055
5  San Francisco, California 94102-3495

6  ERIC HAMILTON
   Deputy Assistant Attorney General
7  DIANE KELEHER
   Branch Director
8  CHRISTOPHER HALL
   Assistant Branch Director
9  JAMES D. TODD, JR.
   Senior Trial Counsel
10 U.S. DEPARTMENT OF JUSTICE
   Civil Division, Federal Programs Branch
11 P.O. Box 883
   Washington, DC 20044
12

13 *Counsel for Defendants*

14                 **UNITED STATES DISTRICT COURT**

15           **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
                    **SAN FRANCISCO DIVISION**
16

17 AMERICAN FEDERATION OF                    Case No. 3:25-cv-1780-WHA
   GOVERNMENT EMPLOYEES, *et al.*
18
                                            **DECLARATION OF SYDNEY ROSE IN**
19          Plaintiffs,                      **RESPONSE TO THE COURT'S APRIL 18,**
                                            **2025, ORDER**
20              v.

21 UNITED STATES OFFICE OF PERSONEL
   MANAGEMENT, *et al.*,
22
            Defendants.
23

24

25

26

27

28

1    I, Sydney Rose, declare, pursuant to 28 U.S.C. § 1746, as follows:

2    1.    I am the Chief Human Capital Officer of the U.S. Department of Labor

3    ("Department"), headquartered in Washington, D.C.  I have served in this position since March

4    24, 2013.

5    2.    In my role at the Department, I am responsible for personnel management.  I have

6    the responsibility for overseeing the human resources enterprise and tracking and recording of

7    personnel actions, including terminations.  I assist in ensuring that all personnel actions comply

8    with Federal law, including those related to probationary employees.

9    3.    I acknowledge having received and read the Court's April 18, 2025, Order.

10    4.    I confirm that the Department is in the process of providing, and by May 8, 2025,

11    will have provided, recipients of the OPM template termination notice that their termination was

12    not "performance" or fitness based.

13    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

14    and correct.

15    Dated: May 5, 2025

16

17

18    SYDNEY    Digitally signed by
               SYDNEY ROSE
19    ROSE     Date: 2025.05.06
               10:29:15 -04'00'

20    _____
      SYDNEY ROSE
21    CHIEF HUMAN CAPITAL OFFICER
      US DEPARTMENT OF LABOR

22

23

24

25

26

27

28

Declaration of Sydney Rose in Response to the Court's April 18, 2025, Order
3:25-cv-1780-WHA

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

|  |  |
|---|---|
| AMERICAN FEDERATION OF, GOVERNMENT EMPLOYEES, *et al.* )<br>)<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>UNITED STATES OFFICE OF PERSONNEL )<br>MANAGEMENT, *et al.*, )<br>)<br>Defendants. )<br>) | Case No. 3:25-cv-01780-WHA<br><br>The Hon. William H. Alsup<br><br>Date: May 7, 2025 |

## DECLARATION OF LEW J. OLOWSKI

1. I am the Director of the Bureau of Global Talent Management for the Department of State (the "Department"). In this role I serve as the equivalent of the Chief Human Capital Officer for the Department.

2. I certify that I have received and read the Order of this Court dated April 18, 2025.

3. On or about February 26, 2025, eight probationary employees at the Department received notices informing them that their employment with the Department was being terminated (hereinafter, "Notices"). The Notices were based on a variation of the template termination letter circulated by the Office of Personnel Management ("OPM").

4. I certify that the following five probationary employees who received Notices were terminated after an individualized evaluation of that employee's performance or fitness. The following four employees were terminated for both unsatisfactory performance and conduct issues:



The following employee was terminated for conduct issues:

5. I certify that one probationary employee, ███ █████ received a Notice in error, on or after the date that she voluntarily resigned from the Department. The Department will send this employee a written communication by May 8, 2025 stating that the Notice she received was in error, and that she was not in fact terminated.

6. I certify that the remaining two probationary employees who received Notices, ██████ ████ and ████ █████ were not terminated after an individualized evaluation of that employee's performance or fitness. The Department will send both of these employees a written communication by May 8, 2025 stating that his or her termination was not performance- or fitness-based, but was made as part of a government-wide mass termination.

Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct. Executed on May 7, 2025.

Lew J. Olowski

1  PATRICK D. ROBBINS (CABN 152288)
   Acting United States Attorney
2  PAMELA T. JOHANN (CABN 145558)
   Chief, Civil Division
3  KELSEY J. HELLAND (CABN 298888)
   Assistant United States Attorney
4  U.S. ATTORNEY'S OFFICE
   450 Golden Gate Avenue, Box 36055
5  San Francisco, California 94102-3495

6  ERIC HAMILTON
   Deputy Assistant Attorney General
7  DIANE KELEHER
   Branch Director
8  CHRISTOPHER HALL
   Assistant Branch Director
9  JAMES D. TODD, JR.
   Senior Trial Counsel
10 U.S. DEPARTMENT OF JUSTICE
   Civil Division, Federal Programs Branch
11 P.O. Box 883
   Washington, DC 20044
12

13 *Counsel for Defendants*

14              UNITED STATES DISTRICT COURT
15      FOR THE NORTHERN DISTRICT OF CALIFORNIA
               SAN FRANCISCO DIVISION
16

17 AMERICAN FEDERATION OF                Case No. 3:25-cv-1780-WHA
   GOVERNMENT EMPLOYEES, *et al.*
18
                                        **DECLARATION OF TREVOR NORRIS**
19       Plaintiffs,

20              v.

21 UNITED STATES OFFICE OF PERSONEL
   MANAGEMENT, *et al.*,
22
         Defendants.
23

24

25

26

27

28

1    I, Trevor Norris, declare, pursuant to 28 U.S.C. § 1746, as follows:

2        1.      I am Deputy Assistant Secretary (DAS) for Human Resources (HR) for the United

3    States Department of the Treasury, headquartered in Washington, D.C. I have served in this

4    position since October 2017.

5        2.      As DAS for HR, I oversee all human capital programs for the Department of the

6    Treasury and its bureaus (collectively, "Treasury"). I have the responsibility for tracking and

7    recording personnel actions, including terminations.

8        3.      I have received and read the Court's April 18, 2025 Order for provisional relief.

9        4.      In compliance with Paragraph 4 of the Order, Treasury and its bureaus have

10   provided all impacted probationary employees who received a version of the "OPM template

11   termination notice" a letter stating that his or her termination was not performance- or fitness-

12   based but was made as part of a "government-wide mass termination."

13

14       Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

15   and correct.

16

17   Dated: April 5, 2025

18

19

20

21   Trevor Norris

22

23

24

25

26

27

28

Declaration of Trevor Norris
3:25-cv-1780-WHA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

American Federation of Government
Employees, et al.,

       Plaintiffs,

       v.

United States Office of Personnel
Management, et al.,

       Defendants.

Case No. 3:25-cv-1780

## DECLARATION OF ANNE BYRD

Pursuant to 28 U.S.C. § 1746, I, Anne Byrd, declare as follows:

1.　　I am the Assistant Secretary for Administration for the United States Department of Transportation ("DOT"), which is headquartered in Washington, D.C.  I make this Declaration based on my own personal knowledge, on information contained in DOT records, or on information provided to me by DOT employees.

2.　　I have served in this position since February 25, 2025.  In my role at DOT, I serve as DOT's Chief Human Capital Officer pursuant to Secretarial delegation. 49 C.F.R. § 1.38.  I am responsible for personnel management.  I have the responsibility for overseeing the personnel enterprise and tracking and recording of personnel actions, including terminations.  I assist in ensuring that all personnel actions comply with federal law, including those related to probationary employees.  Prior to my appointment, I served as a Senior Advisor to the Secretary of Transportation since February 3, 2025.

3.      I have received and read the Order on Motion for Preliminary Injunction by Union Plaintiffs and State of Washington issued in the above-captioned matter on April 18, 2025 (the "April 18 Order").

4.      Between February 14 and 24, 2025, DOT terminated approximately 786 probationary employees using a notice template provided by the U.S. Office of Personnel Management or a variation thereof. Pursuant to a court order issued in another case, these employees were reinstated on March 17, 2025, except for those whose terminations had been rescinded or who had resigned.

5.      In accordance with the April 18 Order, DOT has now provided each of the 786 individuals referenced above with "a written statement, directed to the employee individually, stating that [the employee's] termination was not 'performance' or fitness based but was made as part of a government-wide mass termination." DOT provided these notices by government or personal email, as appropriate.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 5, 2025

Anne Byrd

Anne Byrd

2

2-ER-143

1  PATRICK D. ROBBINS (CABN 152288)
   Acting United States Attorney
2  PAMELA T. JOHANN (CABN 145558)
   Chief, Civil Division
3  KELSEY J. HELLAND (CABN 298888)
   Assistant United States Attorney
4  U.S. ATTORNEY'S OFFICE
   450 Golden Gate Avenue, Box 36055
5  San Francisco, California 94102-3495

6  ERIC HAMILTON
   Deputy Assistant Attorney General
7  DIANE KELEHER
   Branch Director
8  CHRISTOPHER HALL
   Assistant Branch Director
9  JAMES D. TODD, JR.
   Senior Trial Counsel
10 U.S. DEPARTMENT OF JUSTICE
   Civil Division, Federal Programs Branch
11 P.O. Box 883
   Washington, DC 20044
12
13 *Counsel for Defendants*

14                    **UNITED STATES DISTRICT COURT**
15            **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
                        **SAN FRANCISCO DIVISION**
16

17 AMERICAN FEDERATION OF                    Case No. 3:25-cv-1780-WHA
   GOVERNMENT EMPLOYEES, *et al.*
18
                                            **DECLARATION OF TRACEY THERIT IN**
19        Plaintiffs,                        **COMPLIANCE WITH ORDER ON**
                                            **MOTION FOR PRELIMINARY**
20        v.                                 **INJUNCTION BY UNION PLAINTIFFS**
                                            **AND STATE OF WASHINGTON**
21 UNITED STATES OFFICE OF PERSONEL
   MANAGEMENT, *et al.*,
22
          Defendants.
23

24

25

26

27

28

Declaration of Tracey Therit in Compliance with the Court's Order on Motion for Preliminary Injunction by Union
Plaintiffs and State of Washington (April 18, 2025), 3:25-cv-1780-WHA

2-ER-144

1      I, Tracey Therit, declare, pursuant to 28 U.S.C. § 1746, as follows:

2      1.      I am the Chief Human Capital Officer of the Department of Veterans Affairs

3   ("Department"), headquartered in Washington, D.C.  I have served in this position since July

4   2019.

5      2.      I have worked for the VA for 19 years, and the federal government for 34 years. The

6   Office of the Chief Human Capital Officer provides governance, policy and guidance with regard to

7   recruitment, staffing, enterprise-wide HR systems, classification, compensation, leave, performance

8   management, recognition, work-life and benefits, workforce and succession planning, employee and

9   labor relations, learning and development and alternative dispute resolution.

10     3.      I received and read the April 18, 2025, preliminary injunction order from the

11  District Court for the Northern District of California in the above-captioned case.

12     4.      Pursuant to that order, VA provided notice to each affected probationary

13  employee that, as required by the Court, the "earlier termination was not performance or fitness

14  based but was made as part of a government-wide mass termination."

15     5.      Employees who were terminated based on individualized evaluations did not

16  receive the above notice.

17     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

18  and correct.

19  Dated:

20

21                              *Tracey Therit*

22

23                              Tracey Therit

24

25

26

27

28

Declaration of Tracey Therit in Compliance with the Court's Order on Motion for Preliminary Injunction by Union
Plaintiffs and State of Washington (April 18, 2025), 3:25-cv-1780-WHA

2-ER-145

1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

American Federation of Government
Employees, et al.,

        Plaintiffs,

        v.

United States Office of Personnel
Management, et al.,

        Defendants.

Case No.  3:25-cv-1780

## DECLARATION OF HELENA WOODEN-AGUILAR

Pursuant to 28 U.S.C. § 1746, I, Helena Wooden-Aguilar, declare as follows:

1.      I am the Chief Human Capital Officer, Office of Mission Support, at the U.S. Environmental Protection Agency ("EPA"), headquartered in Washington, D.C.  I make this declaration based on my own personal knowledge, on information contained in EPA records, or on information provided to me by EPA employees.

2.      I have served in this position since November 2023.  In my role at EPA, I am responsible for supporting agency strategic planning and performance improvement efforts by ensuring human capital plans, strategies and investments advance organizational goals set forth in the Agency's strategic and annual plans.

3.      I have received and read the Court's April 18, 2025, Order.

4.      Between May 3 and 6, 2025, EPA sent an email (Attachment A) and a copy of the Court's April 18, 2025, Order, individually to the personal and/or Agency email addresses, as applicable, of the individuals that received a notice of termination in February 2025 based on a

variation of the Office of Personnel Management template termination during a probationary or trial period notice.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 6, 2025

HELENA WOODEN-AGUILAR

Digitally signed by HELENA WOODEN-AGUILAR
Date: 2025.05.06 20:32:26 -04'00'

/s/

Helena Wooden-Aguilar

2

Attachment A to *Declaration of Helena Wooden Aguilar*, dated May 6, 2025 (3:25-cv-1780).

Dear ==[Employee]==,

This letter is being provided to you in accordance with the preliminary injunction issued by the Northern District of California in *American Federation of Government Employees v. U.S. Office of Personnel Management*, No. 3:25-cv-1780 WHA (N.D. Cal.).

On April 18, 2025, U.S. District Judge William Alsup of the Northern District of California required Environmental Protection Agency (EPA) to provide you with "a written statement, directed to [you] individually, stating that [your] termination was not 'performance' or fitness based but was made as part of a government-wide mass termination." Judge Alsup's decision is attached.

The EPA is appealing the Court's April 18, 2025, Order and will argue it to be both legally and factually erroneous. Nonetheless, the EPA must comply with the Order unless and until it is stayed or reversed by an appellate court.

In accordance with the Court's April 18, 2025, Order, the EPA hereby, informs you, as required by the Court, that your earlier termination "was not 'performance' or fitness based but was made as part of a government-wide mass termination."

This letter is to be (i) implemented consistent with applicable law, and (ii) it shall not serve as any basis for liability against the Environmental Protection Agency or any other agency or instrumentality of the Federal government, before any court or in any administrative proceeding. The Environmental Protection Agency reserves all rights.


Regards,


Helena Wooden-Aguilar

Deputy Assistant Administrator for Workplace Strategy

Office of Mission Support - U.S. EPA

|  |  |
|---|---|
| American Federation of Government Employees,et al., Plaintiffs,<br><br>v.<br><br>United States of Personnel Management, et al., Defendants | No. 3:25-cv-1780 (N.D. Cal.) |

## DECLARATION OF ARRON HELM

Pursuant to 28 U.S.C. § 1746, I, Arron Helm declare as follows:

1.      I am the  Chief Human Capital Officer, Office of Human Resources Management, at the General Services Administration headquartered in Washington, D.C. I make this declaration based on my own personal knowledge, on information contained in the records of the General Services Administration, and/or on information provided to me by the Office of Human Resources Management, General Services Administration employees.

2.      I have served in this position since July 2024. In my role at the General Services Administration, I am responsible for personnel management. I am responsible for overseeing the personnel enterprise and tracking and recording of personnel actions, including terminations. I assist in ensuring that all personnel actions comply with federal law, including those related to probationary employees.

3.      As of Monday, May 5, 2025, the General Services Administration provided a written notice to a total of 366 individuals who had previously received probationary period

termination notices  that his or her termination was not performance- or fitness-based but was made as part of a government-wide mass termination.

4.      As of Monday, May 5, 2025, I have received and read the Order on Motion for Preliminary Injunction by Union Plaintiffs and State of Washington in the case of American Federation of Government Employees, AFL-CIO, et al., Plaintiffs, v. United States Office of Personnel Management, et al., Defendants, No. C 25-01780 WHA, filed on April 18, 2025, by United States District Judge William Alsup.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that that foregoing is true and correct.


Date: 5/5/2025

Signed by:

*Arron Helm*

9C2BC648FECF491...

Arron Helm

1 | PATRICK D. ROBBINS (CABN 152288)
Acting United States Attorney
2 | PAMELA T. JOHANN (CABN 145558)
Chief, Civil Division
3 | KELSEY J. HELLAND (CABN 298888)
Assistant United States Attorney
4 | U.S. ATTORNEY'S OFFICE
450 Golden Gate Avenue, Box 36055
5 | San Francisco, California 94102-3495

6 | ERIC J. HAMILTON
Deputy Assistant Attorney General
7 | DIANE KELLEHER
Branch Director
8 | CHRISTOPHER HALL
Assistant Branch Director
9 | JAMES D. TODD, JR.
Senior Trial Counsel
10 | YURI S. FUCHS
GREGORY CONNER
11 | Trial Attorneys
U.S. DEPARTMENT OF JUSTICE
12 | Civil Division, Federal Programs Branch
P.O. Box 883
13 | Washington, DC 20044

14 | *Counsel for Defendants*

15

16 | **UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

17

18 | AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, *et al.*

Case No. 3:25-cv-1780-WHA

19

20 |     Plaintiffs,

21 |     v.

**DECLARATION OF KELLY ELLIOTT**

22 | UNITED STATES OFFICE OF PERSONNEL MANAGEMENT, *et al.*,

23

24 |     Defendants.

25

26

27

28

Declaration of Kelly Elliot
3:25-cv-1780-WHA

KELLY ELLIOTT, pursuant to 28 U.S.C. § 1746, hereby declares as follows:

1. I am the Chief Human Capital Officer at the National Aeronautics and Space Administration ("NASA"). In that capacity, I am responsible for leading the human capital practices that support NASA's workforce of more than 18,000 employees. I have held that position since December 2023, after being named as NASA's Acting Chief Human Capital Officer in February 2023. I have worked at NASA since 2005, and the principal responsibilities of each of my NASA roles during that time have related to human capital and/or human resources.

2. I provide this declaration based on my personal knowledge, reasonable inquiry, and information obtained from various records, systems, databases, other NASA employees, and information portals maintained and relied upon by NASA in the regular course of business.

3. I have received and read the Court's order entered in this action on April 18, 2025 (the "Order"). *See* ECF No. 202 ¶ 6.

4. I have also reviewed certain communications referred to in the Order, which related to probationary employees. *See* ECF Nos. 111-1, 111-2, 111-5, 87-1. I reviewed either identical or substantively identical versions of these documents in January and February 2025. I understand the Order's reference to an "OPM template termination notice" to mean the document filed at ECF No. 87-1.

5. NASA did not use and has not used the OPM template termination notice—including any altered or modified versions or any variation thereof—to terminate or fire any NASA employee. *See* ECF No. 202 ¶¶ 4–5.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: May 2, 2025                    Respectfully submitted,



Kelly Elliott
Digitally signed by Kelly Elliott
Date: 2025.05.02 14:30:32 -04'00'

_____
Kelly Elliott
Chief Human Capital Officer
National Aeronautics and Space Administration

Declaration of Kelly Elliott
3:25-cv-1780-WHA

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO; AMERICAN FEDERATION OF STATE, COUNTY *and* MUNICIPAL EMPLOYEES, AFL-CIO; *et al*. | Case No. 3:25-cv-01780-WHA |
| Plaintiffs, | |
| v. | Judge William H. Alsup |
| UNITED STATES OFFICE OF PERSONNEL MANAGEMENT, *et al*., | |
| Defendants. | |

## DECLARATION OF STARLISHA ANDERSON

Pursuant to 28 U.S.C. § 1746, I, Starlisha Anderson, declare as follows:

1.  I am employed as the Acting Division Director, Office of Information and Resource Management (OIRM), Division of Human Resource Management (HRM), National Science Foundation (NSF).

2.  I have held this position since December 29, 2024.

3.  In my current position, I am responsible for oversight over the NSF portfolio of Human Resource (HR) services, policy, communications, and budget.  This includes critical HR functions such as staffing and recruitment, employee-management relations, compensation and benefits, executive services, and strategic human capital planning and accountability.

4.  On February 18, 2025, NSF terminated 84 NSF probationary employees.

5.  On March 3, 2025, NSF began the process of reinstating most of the terminated NSF probationary employees.  NSF concluded the reinstatement process on March 10, 2025.

2

6.    I have received and read the *Order on Motion for Preliminary Injunction by Union Plaintiffs and State of Washington* dated April 18, 2025.

7.    On May 5, 2025, on behalf of NSF, I provided a written notice to each relevant NSF employee, that his or her termination was not performance- or fitness-based but was made as part of a "government-wide mass termination."

8.    Of the 84 NSF probationary employees who were terminated on February 18, 2025, one employee was, in fact, terminated pursuant to an individualized evaluation of that employee's performance or fitness and was not reinstated.  Attached to this declaration is a list including that employee and the reason for the termination.  *See* Attachment.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this 5th day of May 2025.

STARLISHA J ANDERSON

Digitally signed by STARLISHA J ANDERSON
Date: 2025.05.05 16:04:49 -04'00'

STARLISHA ANDERSON
Acting Division Director, OIRM/HRM
National Science Foundation

Attachment

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, et al., | Civil Action No. 3:25-cv-1780 |
| Plaintiffs, | |
| v. | |
| UNITED STATES OFFICE OF PERSONNEL MANAGEMENT, et al., | |
| Defendants. | |

## DECLARATION OF SARAH W. SPOONER

I, Sarah W. Spooner, make the following declaration based on personal knowledge, information, and belief made available to me in the course of my official duties:

1.      I currently serve as the Assistant Director for Management and Operations for the Office of Management and Budget (OMB), Executive Office of the President.  I have occupied this position since 2017.  My position as Assistant Director for Management and Operations is the equivalent of an agency Chief Human Capital Officer (CHCO).

2.      In this capacity, I am familiar with OMB's separation of probationary employees and the basis upon which those employees were separated.

3.      OMB separated one probationary employee on February 25, 2025, using a variation of OPM's template termination notice.  Pursuant to the court's order of April 18, 2025, OMB has provided that individual with a written statement, directed to the employee individually, stating that his termination was not based on his performance but was made as part of a government-wide mass termination of probationary employees.

4.      OMB separated one other probationary employee on March 6, 2025, after reviewing that

employee's individual performance.  OMB's notice to the employee provided that employee

with OMB's reasoning underpinning the separation.  OMB's notice to the employee noted that,

"[d]uring your appointment with OMB, we have provided feedback regarding areas of

improvement, including communication (i.e., proper use of grammar, spelling), adaptability to

receiving feedback, and strengthening professional interactions. While your efforts are noted,

there has not been the necessary progress for continued employment."

5.      I have received and read the court's April 18, 2025, order.


        I declare under the penalty of perjury that the foregoing is true and accurate to the best of
my knowledge and belief.


Executed on this __5th____ day of May 2025.



SARAH          Digitally signed by
               SARAH SPOONER
SPOONER        Date: 2025.05.05
               10:17:14 -04'00'
_____
Sarah W. Spooner
Assistant Director for Management and Operations
Office of Management and Budget
Executive Office of the President

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES, *et al*.

      Plaintiffs,

      v.

UNITED STATES OFFICE OF PERSONNEL
MANAGEMENT, *et al*.,

      Defendants.

Case No. 3:25-cv-1780-WHA

### DECLARATION OF JOHN SERPA

Pursuant to 28 U.S.C. § 1746, I, John Serpa declare as follows:

1.     I am SBA's Chief Human Capital Officer headquartered in Washington, D.C.  I make this declaration based on my own personal knowledge, on information contained in the records of the Small Business Administration (SBA), or on information provided to me by SBA employees.

2.     I have served in this position since March 24, 2025.  In my role at the SBA, I am responsible for personnel management. I have the responsibility for overseeing the personnel enterprise and tracking and recording of personnel actions, including terminations. I assist in ensuring that all personnel actions comply with federal law, including those related to probationary employees.

3.     I have received and read Judge Alsup's April 18, 2025, Order on Motion for Preliminary Injunction.

4.      All affected probationary employees who received a variation of the OPM template termination notice have received written notice by email directed to the employee individually, stating that their termination was not "performance" or fitness based but was made as part of a "government-wide mass termination."

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 7, 2025

*John Serpa*

John Serpa

2

PATRICK D. ROBBINS (CABN 152288)
Acting United States Attorney
PAMELA T. JOHANN (CABN 145558)
Chief, Civil Division
KELSEY J. HELLAND (CABN 298888)
Assistant United States Attorney
U.S. ATTORNEY'S OFFICE
450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495

ERIC HAMILTON
Deputy Assistant Attorney General
DIANE KELEHER
Branch Director
CHRISTOPHER HALL
Assistant Branch Director
JAMES D. TODD, JR.
Senior Trial Counsel
U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, DC 20044

*Counsel for Defendants*

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, *et al.*<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OFFICE OF PERSONEL MANAGEMENT, *et al.*,<br><br>Defendants. | Case No. 3:25-cv-1780-WHA<br><br>**DECLARATION OF FLORENCE FELIX-LAWSON IN ACKNOWLEDGMENT OF APRIL 18, 2025 ORDER ON MOTION FOR PRELIMINARY INJUNCTION BY UNION PLAINTIFFS AND STATE OF WASHINGTON** |

I, Florence Felix-Lawson declare, pursuant to 28 U.S.C. § 1746, as follows:

1.      I am the Assistant Deputy Commissioner for the Office of Mission Support and the Chief Human Capital Officer for the Social Security Administration ("SSA").  I have served in the Chief Human Capital Officer position since November 1, 2024 and as the Assistant Deputy Commissioner for the Office of Mission Support since February 28, 2025.

2.      SSA has issued notices to each individual employee responsive to the requirements of paragraph 4 of the Provisional Relief section of this court's April 18, 2025 Order on Motion for Preliminary Injunction by Union Plaintiffs and State of Washington issued in the above-styled case.

3.      As ordered, I acknowledge having received and read this court's April 18, 2025 Order on Motion for Preliminary Injunction by Union Plaintiffs and State of Washington issued in the above-styled case.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 5, 2025

/s/ *Florence Felix-Lawson*
_____
FLORENCE FELIX-LAWSON
CHIEF HUMAN CAPITAL OFFICER
ASSISTANT DEPUTY COMMISSIONER
OFFICE OF MISSION SUPPORT
SOCIAL SECURITY ADMINISTRATION

1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9

10                         NORTHERN DISTRICT OF CALIFORNIA

11

12   AMERICAN FEDERATION OF
     GOVERNMENT EMPLOYEES, AFL-CIO,
13   et al.,                                     No.  C 25-01780 WHA

14              Plaintiffs,

15        v.                                     **ORDER TO SHOW CAUSE**

16   UNITED STATES OFFICE OF
     PERSONNEL MANAGEMENT, et al.,
17
                Defendants.
18   ───────────────────────────────────

19

20        The temporary restraining order denied relief to the public-sector union plaintiffs,

21   explaining that the district court likely lacked subject-matter jurisdiction to hear their claims

22   (*see* TRO Mem. 11–13).  The preliminary injunction order repeated that result, while noting

23   that the Court would reconsider the issue in light of further briefing and facts (*see* PI

24   Mem. 12).  Based on that further briefing, today's order concluded that the district court has

25   subject-matter jurisdiction to hear the public-sector union plaintiffs' claims.

26        Parties are therefore ORDERED TO SHOW CAUSE why the relief extended to the

27   organizational plaintiffs (or more, or less) should not be extended to the public-sector union

28   plaintiffs.

Simultaneous responses are due by **FRIDAY, MARCH 28, 2025**.  Replies are due by **APRIL 4**.  Argument will be heard in person on **WEDNESDAY, APRIL 9 AT 8 AM**.

**IT IS SO ORDERED.**

Dated:  March 24, 2025.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES, AFL-CIO,
et al.,

             Plaintiffs,

    v.

UNITED STATES OFFICE OF
PERSONNEL MANAGEMENT, et al.,

             Defendants.

No.  C 25-01780 WHA

**ORDER RE SUBJECT-MATTER
JURISDICTION**

**INTRODUCTION**

Early on, I followed three recent decisions in other district courts holding that claims brought by public-sector unions concerning federal employee terminations had to be channeled through the Merit Systems Protection Board and/or the Federal Labor Relations Authority and therefore the district court had no subject-matter jurisdiction over those claims, although I accepted subject-matter jurisdiction over claims by the organizational plaintiffs. After further briefing, however, this order holds that the district court does have subject-matter jurisdiction over these claims by public-sector unions and that my earlier ruling to the contrary was mistaken.

**ANALYSIS**

"The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. "Not *may* have jurisdiction, but *shall*." *Axon Enter. v. FTC*, 598 U.S. 175, 205 (2023) (Gorsuch, J., concurring). Congress nonetheless may countermand jurisdiction by enacting other schemes for specific claims — usually review by an agency and then by an appeals court. The result is that a district court shall hear a challenge to an agency action unless (1) Congress provided a statutory review scheme limiting Section 1331 and (2) the claims brought are of the type Congress intended to be reviewed within it. *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212–13 (1994) (also identifying guideposts for inferring Congress's intent); *Axon Enter.*, 598 U.S. at 185–96 (applying guideposts to hold that despite statutory review schemes plaintiffs' claims needed to be heard in district court, reversing Court of Appeals for the Ninth Circuit).

In this case, all agree that the Civil Service Reform Act of 1978 established a comprehensive system for reviewing personnel action against federal employees and practices related to collective bargaining. *United States v. Fausto*, 484 U.S. 439, 455 (1988); *Karahalios v. Nat'l Fed'n of Fed. Emps., Loc. 1263*, 489 U.S. 527, 536–37 (1989). That system features review by the Merit Systems Protection Board of certain employee terminations (*e.g.*, 5 U.S.C. §§ 1204(a), 4303(e)–(f), 7511–13), and review by the Federal Labor Relations Authority of certain unfair labor practices (§ 7105(a)(2)). All agree this scheme impliedly excludes district courts from reviewing the same kinds of claims. This order therefore focuses on what the public-sector union plaintiffs claim and whether those claims are of the type intended to be channeled into this scheme.[1]

What the public-sector unions claim — along with other plaintiffs — is that the Office of Personnel Management acted *ultra vires* when it directed agencies to terminate tens of

---

[1]   This order uses "public-sector unions" because it concerns the five labor-union plaintiffs that represent federal employees — not the one labor-union plaintiff that represents private-sector employees (*compare* 2d Am. Compl. ¶¶ 15–19, *with id.* ¶ 26). The one private-sector union, the Association of Flight Attendants-CWA, AFL-CIO, complains that slashed staffing at the Federal Aviation Administration jeopardizes commercial-flight safety. The prior order already decided the district court has subject-matter jurisdiction for such organizations' claims (TRO Mem. 13).

2

thousands of probationary employees *en masse* using "performance" as a pretext (2d Am. Compl. Claim I).  Plaintiffs also bring three Administrative Procedure Act claims against OPM occasioned by these events:  That OPM's directive was "in excess of [OPM's] authority," "arbitrary" as to real employee performance or agency need, and procedurally busted — violating APA Subsections 706(2)(C), (A), and (D) (Claims II, III, and IV).  A final APA claim alleges that OPM directed other agencies' employees to report to OPM — violating Subsection 706(2)(D) (Claim V).  The public-sector unions assert associational and organizational standing.  How are they injured?  Their members' unlawful terminations cause the public-sector unions to lose dues, divert or raise resources to help those terminated, and suffer legal wrongs (*id.* ¶¶ 145–49).  As relief, they seek a declaration and a recission of the directives, ensuring parties — and employees — remain in the positions they held but for the unlawful directives.

Whether these claims are of the type that should be channeled through the CSRA is informed by *Thunder Basin*'s three factors.  Claims are not channeled into the CSRA's scheme if they are "outside the agency's expertise," "if the suit is 'wholly collateral to [the] statute's review provisions,'" and "if 'a finding of preclusion could foreclose all meaningful judicial review.'"  *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 489 (2010) (quoting *Thunder Basin*, 510 U.S. at 212–13).  Of course, "the same conclusion might follow if the factors point in different directions.  The ultimate question is how best to understand what Congress has done . . . ."  *Axon Enter.*, 598 U.S. at 186.  This order takes each factor in turn.

## 1.    OUTSIDE THE AGENCY'S EXPERTISE?

The public-sector unions' claims "raise[ ] only a 'standard' issue of administrative and constitutional law, relating not at all to 'considerations of agency policy.'"  *Id.* at 188 (quoting *Free Enter. Fund*, 561 U.S. at 491).  The *ultra vires* claim asks whether the OPM had *any* authority to direct another agency to terminate its employees, and whether by purporting to speak such power into existence the executive violated the constitution's separation of executive and legislative functions.  "The [MSPB and FLRA] know[ ] a good deal about [employment and labor] policy, but nothing special about the separation of powers.  For that

1    reason, [the Supreme Court has observed], 'agency adjudications are generally ill suited to

2    address structural constitutional challenges' — like those [ ] here." *See id.* at 194–95 (quoting

3    *Carr v. Saul*, 593 U.S. 83, 92 (2021)) (re FTC).

4         Nor are the public-sector unions' *ultra vires* and APA claims intertwined with factual and

5    policy questions that would benefit from the MSPB's or the FLRA's expertise.  This is not a

6    case where a threshold question requires their expertise — such as whether an employee's

7    "resignation amounted to a constructive discharge" — before reaching a statutory or

8    constitutional claim about the directive to terminate.  *E.g.*, *Elgin v. Dep't of Treasury*, 567 U.S.

9    1, 22–23 (2012) (employee's claims proper before MSPB).  Nor is it one where the core

10   questions are wrapped up in the employer-agency policy choices that the MSPB or the FLRA

11   commonly parse — such as whether one military branch acted arbitrarily when it ordered its

12   dual-status employees to wear military uniforms while performing civilian functions, sowing

13   "confusion . . . when having or not having the protections of the Geneva Conventions [wa]s all

14   too real."  *E.g.*, *AFGE v. Sec'y of the Air Force*, 716 F.3d 633, 635, 638 (D.C. Cir. 2013)

15   (cleaned up) (unions' claims channeled to FLRA).  "[T]he Government here [ ] pretend[s] that

16   [the] constitutional claims are similarly intertwined with or embedded in matters on which the

17   [MSPB and the FLRA] are expert."  *See Axon Enter.*, 598 U.S. at 195.  But defendants point to

18   no specific fact or issue in our circumstances.

19        2.    COLLATERAL TO THE STATUTE'S REVIEW PROVISIONS?

20        The public-sector unions' claims are also collateral to the types of claims brought before

21   the MSPB or the FLRA.  The channeling "inquiry contemplates (as our collateral-order

22   doctrine also does) that even [if some underlying agency] proceeding is pending, an occasional

23   claim may get immediate review [in a district court] — in part because it involves something

24   discrete."  *Id.* at 194; *cf. Abney v. United States*, 431 U.S. 651, 659 (1977) (double jeopardy

25   collateral to guilt or innocence).

26        Here, the public-sector unions' *ultra vires* or "separation-of-powers claim is not about"

27   each employer agency's purported decision to terminate any or all of its employees.  *Cf. Axon*

28   *Enter.*, 598 U.S. at 191.  Instead, it is about a prior controlling event:  Did the OPM exceed its

United States District Court
Northern District of California

authority when it directed all federal agencies to terminate their probationers *en masse*? This distinguishes these claims from others that have attacked, substantively or procedurally, one agency's decision about one employee or its own workforce, which are the kinds of claims appellate courts have channeled into the CSRA. *E.g.*, *Fausto*, 484 U.S. at 441–43 (challenge to FWS decision to terminate one FWS employee — channeled to MSPB); *Elgin*, 567 U.S. at 22–23 (IRS decision to terminate one IRS employee, in light of OPM's employment-eligibility findings per regulations — to MSPB); *Veit v. Heckler*, 746 F.2d 508, 509 (9th Cir. 1984) (SSA's merit rating of one SSA employee — district court review refused); *Saul v. United States*, 928 F.2d 829, 831, 837, 843–44 (9th Cir. 1991) (SSA supervisors' "job-related wrongs" upon one SSA employee — to MSPB); *Karahalios*, 489 U.S. at 533 (one DOD employee's fair representation by union before DOD — to FLRA); *Air Force*, 716 F.3d at 635–36, 639–40 (Air Force dress code for Air Force workforce — to FLRA). The claims here are instead like others challenging the executive's power to impose government-wide personnel policy, not "any [one] personnel action," claims which have remained in district court. *E.g.*, *Feds for Med. Freedom v. Biden*, 63 F.4th 366, 369 (5th Cir.) (en banc), *vacated as moot*, 144 S. Ct. 480 (2023).

When reckoning with this caselaw, defendants vague out: They do not attempt to show how the facts of this case compare with the first string of cases, instead merely saying that plaintiffs never "distinguish the facts of their case" from those of *Fausto*, *Elgin*, or *Veit* (Defs.' TRO Opp. 14). Plaintiffs plainly did, and do so again (Pls.' TRO Br. 26; Pls.' Supp. Br. 7). Nor do defendants meaningfully attempt to show how the facts of this case contrast with those of *Feds for Medical Freedom*, instead shrugging off that decision as "inapposite" only because the separation-of-powers claims were there brought against the president, not against the OPM (Defs.' TRO Opp. 14–15). But defendants fail to persuade why that distinction makes a difference here. Defendants are correct that these claims do not attack the constitutionality of an agency review scheme itself, unlike other separation-of-power claims recently channeled out of agency schemes and into district court. *E.g.*, *Free Enter. Fund*, 510 U.S. at 490–91, 497–98. But a separation-of-powers claim is a separation-of-powers claim. And, these claims

1   still zero in on the "illegitimate decisionmaker" that ordered the terminations, not on any one

2   resulting termination. *Cf. Axon Enter.*, 598 U.S. at 191.

3       The public-sector unions' "separation-of-powers claim is not [simply] about" OPM's

4   rulemaking.  Instead, the *ultra vires* challenge to OPM's directive to terminate agencies'

5   probationers — about ten percent of some agencies' workforces — presents structural,

6   constitutional questions akin to those that would arise if the OPM directed agencies to impound

7   ten percent of their funding or shutter ten percent of their services.  In short, the claims here are

8   collateral to the employer agencies' actions regarding any one employee.  The claims attack a

9   different agency without any such authority.

10      ### 3.    PRECLUDED FROM ALL MEANINGFUL JUDICIAL REVIEW?

11      The public-sector unions' *ultra vires* and other claims will not be subject to judicial

12  review if not litigated here.  *See id.* at 190 (rule).  As it turns out, the *ultra vires* claim is not

13  one that can be brought directly in the MSPB or the FLRA.  Worse, there is not even some

14  other claim that could be brought reliably through the MSPB or the FLRA such that this one

15  might be resurrected by a court of appeals.  This is unsurprising:  OPM Acting Director

16  Charles Ezell told all agency heads that terminations of probationary employees were

17  unreviewable through the MSPB:

18          Probationary periods are an essential tool for agencies to assess
19          employee performance and manage staffing levels.  Employees on
            probationary periods can be terminated during that period without
20          triggering appeal rights to the [MSPB].

21  (Dkt. No. 64-1 (January 20, 2025, memorandum)).  Nor did Ezell note any prospect for review

22  via collective bargaining agreements or the FLRA.

23          *A.    VIA THE MERIT SYSTEMS PROTECTION BOARD?*

24      Under the MSPB's statutory scheme, there is arguably no way to bring a direct challenge

25  to a mass removal.  But this issue matters none for probationary employees.  "An employee"

26  cannot contest even "a removal" *if she is probationary*.  5 U.S.C. § 7513(d) (relief); *id.*

27  §§ 7511(a)(1), 7512 (bar); *id.* § 4303(e)–(f); *Forest v. MSPB*, 47 F.3d 409, 412 (Fed. Cir.

28  1995).

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Under the MSPB's statutory scheme, a probationer could ask the Office of Special

2    Counsel to investigate a "prohibited personnel practice" implicated by her termination. 5

3    U.S.C. § 1214(a)(1)(A). The OSC could choose to seek a stay of the action at the MSPB, and

4    later petition for its correction there, too. *Id.* § 1214(b)(1)–(2). If the MSPB took up the

5    petition, its decision would be reviewable by a federal court. *Id.* § 1214(c) (incorporating

6    Section 7703(b)). But the OSC's decision to decline to petition the MSPB would not be. Only

7    a "final order or decision of the [MSPB]" is reviewable. *Ibid.* Thus, Section 1214 "provides

8    only for judicial review of [*MSPB*] action, and not every [*OSC*] action is encapsulated in a

9    final [*MSPB*] order." *See Free Enter. Fund*, 561 U.S. at 490.

10    This is like the situation in *Free Enterprise Fund*, where the Supreme Court "found that

11    the [Securities] Exchange Act provided no 'meaningful avenue of relief' for [an accounting]

12    firm, given the separation between the [Public Company Accounting Oversight] Board and the

13    [Securities and Exchange] Commission. Not every [PCAOB] action, we explained, culminates

14    in [SEC] action — which alone the statute makes reviewable in a court of appeals." *Axon*

15    *Enters.*, 598 U.S. at 188 (citation omitted) (quoting 561 U.S. at 490–91). "That meant the

16    [claimant], absent district court jurisdiction, might never have had judicial recourse." *Id.* at

17    190.

18        **B.    VIA THE FEDERAL LABOR RELATIONS AUTHORITY?**

19    Now, we turn to peer down the pathways trodden by collective bargainers, some of which

20    also lead through the MSPB, but most of which lead through the FLRA.

21    We start with the collective bargaining agreements themselves: Employees covered by

22    such agreements can elect to challenge agency actions under the statutory scheme (above) or

23    under their agreement's scheme (arbitration). *See* 5 U.S.C. § 7121. But no party here argues

24    that any agreement provided an avenue for arbitrating the issues in this case.

25    The other collective-bargaining related pathways are also unavailing. They focus on

26    preserving the opportunity for workers to bargain as such, *e.g.*, *id.* § 7105(a)(2)(G), 7116,

27    7118, which again no party contends is implicated here. That distinguishes this case from

28    *AFGE v. Trump*, which challenged an executive order that expressly sought to constrain how

agencies bargained. 929 F.3d 748, 753–54 (D.C. Cir. 2019) (channeled to FLRA). There, those bargaining claims could carry with them — whether reviewed by the FLRA or reached *de novo* by the court of appeals — the constitutional and statutory claims. *Id.* at 756. The problem here is that there are no bargaining claims to begin with. The challenge to the OPM directive that ordered mass terminations across all (or most) agencies cannot readily be recast as a dispute on, for instance, negotiability. 5 U.S.C. §§ 7105(a)(2)(E) (incorporating Section 7117(c)(1)). And, in any case, the FLRA appears unable to review grievances about "a Government-wide rule or regulation" as such. *Id.* § 7117(a)(1); *see Trump*, 929 F.3d at 757; *U.S. Dep't of Treasury v. FLRA*, 996 F.2d 1246, 1252 & n.6 (D.C. Cir. 1993).

For similar reasons, asking the FLRA's General Counsel to investigate the OPM's directive as an unfair labor practice is unavailing. 5 U.S.C. § 7118(a). Even were the General Counsel to investigate the termination, there is no assurance it would submit a complaint to the FLRA. The General Counsel must issue a "written statement" explaining its decision, *ibid.*, but the statutory scheme does not provide for judicial review of the statement — only for review of "any final order of the [FLRA]," *id.* § 7123(a). Once again, that separation "mean[s] the [public-sector unions], absent district court jurisdiction, might never have [ ] judicial recourse." *Axon Enters.*, 598 U.S. at 190. And that sums up the prospective pathways through the FLRA.

In sum, but for district court jurisdiction, the public-sector unions will be precluded from judicial recourse and relief even for their separation-of-powers claim. Because "Congress rarely allows claims about agency action to escape effective judicial review," particularly constitutional claims, this final *Thunder Basin* factor favors permitting them to go forward in district court. *Axon Enter.*, 598 U.S. at 186 (citing *Bowen v. Mich. Acad. Of Fam. Physicians*, 476 U.S. 667, 670 (1986)); *see Thunder Basin*, 510 U.S. at 207 n.8 (citing *Dunlop v. Bachowski*, 421 U.S. 560, 567 (1975)); *cf. Mathews v. Eldridge*, 424 U.S. 319, 330 (1976).

\*          \*          \*

The resulting conclusion is not the one reached before. And, it is not the one three other district courts reached in recent orders, all at the outset of the actions (TRO Mem. 11–12): *Am.*

1    *Foreign Serv. Ass'n v. Trump*, No. 25-cv-352 (CJN), 2025 WL 573762, at *8–11 (D.D.C. Feb.

2    21, 2025) (Judge Carl Nichols) (dissolving TRO); *AFGE v. Ezell*, Civ. No. 25-10276-GAO,

3    2025 WL 470459, at *2 (D. Mass. Feb. 12, 2025) (Judge George O'Toole, Jr.) (dissolving

4    TRO); *Nat'l Treasury Emps. Union v. Trump*, No. 25-cv-420 (CRC), 2025 WL 561080, at *5–

5    8 (D.D.C. Feb. 20, 2025) (Judge Christopher Cooper) (denying TRO).  This order pauses to

6    point out why this decision now comes out differently than these orders.

7         In *American Foreign Service*, the plaintiff unions represented employees of the United

8    States Agency for International Development.  2025 WL 573762, at *1, 8–11.  But those

9    employees were subject to the Foreign Service Act of 1980, not the CSRA.  Because the

10   employees *could* seek relief through the FSA's review scheme (including for constitutional

11   claims on appeal), there was no basis for their unions to do so in district court.

12        In *Ezell*, the plaintiff unions represented employees across the federal government who

13   received a "Fork in the Road" email purporting to offer deferred resignation — to stop work

14   now, resign later, and get paid between.  2025 WL 470459, at *1.  After concluding the unions

15   in any case lacked standing, the district court applied all three *Thunder Basin* factors in one

16   paragraph, asserting that the unions' aggrieved members — who were not exclusively

17   probationary — could bring claims through the CSRA's processes.  *Id.* at *2.  Not so here.

18        Finally, in *National Treasury*, the plaintiff unions (none overlapping with ours)

19   represented federal employees who faced termination because of an executive order that

20   directed "mass firings through RIFs" in ways violating requirements for RIFs.  Am. Compl.

21   ¶¶ 9, 31, 38–39, 42–44, 52, *Nat'l Treasury*, No. 25-cv-420 (CRC) (D.D.C. Feb. 17, 2025).  "In

22   addition," the unions alleged that "OPM has contacted agencies to direct them to terminate

23   their probation[ers]," and that "OPM invited [2.2 million employees] to opt into a deferred

24   resignation program."  *Id.* ¶¶ 53–62, 63–68.  These allegations boiled down to two claims:

25   That the "mass firing of employees and the attempt to force resignations across the federal

26   civilian workforce [I] violate separation of powers principles" and "[II] the [APA] by

27   implementing RIFs contrary to regulations."  *Id.* at Count I, II.  In its order applying *Thunder*

28   *Basin*, the district court emphasized the FLRA's and MSPB's experience in labor relations and

United States District Court
Northern District of California

United States District Court
Northern District of California

1  complex reduction-in-force provisions.  2025 WL 561080, at *8 & n.5.  Because some claims

2  could go forward through one or both schemes (the order did not specify which claims or

3  where), and because constitutional claims could be asserted on appeal, channeling the claims

4  into CSRA review did not foreclose judicial recourse.  *Id.* at *7.  Not here.  As above, our case

5  does not turn on the intricacies of RIFs, nor take on *non-probationers'* terminations.  In our

6  case, the alleged wrongs — of sweeping separations-of-powers violations and generic APA

7  rulemaking violations — will go without judicial recourse if not brought in district court.

8       That said, this order is not the first to decide district courts have subject-matter

9  jurisdiction to hear claims related to the same OPM directive to terminate probationary

10  employees.  In *Maryland v. United States Department of Agriculture*, state governments

11  complained of the federal government's failure to notify them before probationers' mass

12  terminations, as RIF provisions oblige.  Civ. No. JKB-25-0748, 2025 WL 800216, at *3 (D.

13  Md. Mar. 13, 2025) (Judge James Bredar), *appeal docketed*, No. 25-1248 (4th Cir. Mar. 17,

14  2025).  The district court concluded that the CSRA provided no prospect for judicial recourse,

15  and thus that "the CSRA does not preclude this Court's jurisdiction."  *Id.* at *15.  For some of

16  the same reasons (and for some different ones, above), this Court determines the same is

17  ultimately true here for the public-sector unions' claims.

18                    *          *          *

19       The foregoing is dispositive.  It is unnecessary to reach the further question whether any

20  impairment by the president of the OSC, MSPB, or FLRA — or argument by the government

21  attacking the constitutionality of the OSC, MSPB, and FLRA in its other pending cases —

22  provides a further basis for subject-matter jurisdiction in the district court for the claims in this

23  case.[2]

24  _____

25  [2]  The CSRA's review channels are being restrained.  *As for the OSC*, Special Counsel Hampton
    Dellinger was fired by the president on February 7, 2025 — about a week before the OPM's
26  phone calls with agency heads concerning mass terminations.  Dellinger took to district court and
    on summary judgment won an injunction to remain in his post but resigned following the appeals
27  court's stay pending appeal.  The new special counsel, Secretary of Veterans Affairs Doug
    Collins, retains both posts.  *As for the MSPB*, three days after firing Special Counsel Dellinger, the
28  President fired MSPB Chair Cathy Harris, reducing the number of presiding board members to
    just one — below the quorum to render final decisions.  Chair Harris, like Special Counsel

All three *Thunder Basin* factors counsel that the public-sector unions' claims are not of the kind Congress intended to be reviewed through the CSRA.  As in *Free Enterprise Fund*, 561 U.S. at 489, "we presume that Congress does not intend to limit" its command:  The district court "shall have original jurisdiction."  28 U.S.C. § 1331.

## CONCLUSION

The district court has subject-matter jurisdiction to hear and decide the public-sector union plaintiffs' claims.  It also has subject-matter jurisdiction to hear and decide the organizational plaintiffs' claims for the reasons set out before (TRO Mem. 12–13).

**IT IS SO ORDERED.**

Dated:  March 24, 2025.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

Dellinger, won permanent injunctive relief in the district court but now faces possible vacatur pending appeal.  This would not be the first time that the MSPB's ability to provide relief was disabled.  From January 7, 2017 to March 3, 2022, the MSPB "could not decide any petitions for review or other headquarters cases requiring [MSPB board] action because it did not have a quorum of members," creating a backlog of 3,793 cases.  MSPB Press Release (Oct. 1, 2024), https://www.mspb.gov/publicaffairs/press_releases/MSPB_Provides_Update_on_Inherited_Invent ory.pdf.  *As for the FLRA*, also on February 10, the President fired FLRA Chair Susan Tsui Grundmann.  She also won injunctive relief against her removal, and "the government has not yet appealed the court's order" (Defs.' Supp. Br. 8).

11

1

2

3

4

5

6

7

8

9

10

11

United States District Court
Northern District of California

12

13

14

15

16

17

18

19

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES, AFL-CIO,
et al.,

        Plaintiffs,

    v.

UNITED STATES OFFICE OF
PERSONNEL MANAGEMENT, et al.,

        Defendants.

No.  C 25-01780 WHA

**NOTICE OF BRIEFING
SCHEDULES**

20

21

22

23

24

25

    The March 13 preliminary injunction did not consider claims advanced by plaintiff State

of Washington, who first joined this matter in plaintiffs' second amended complaint.  If

Washington is going to bring a motion for preliminary injunction, it should do so promptly, by

**WEDNESDAY, MARCH 26, 2025, AT NOON**.  Defendants' opposition will be due **MONDAY,**

**MARCH 31 AT NOON**, and any reply must be filed by **APRIL 3, 2025, AT NOON**.  Oral argument

will be heard in person on **WEDNESDAY, APRIL 9 AT 8 AM**.

26

27

28

    With regards to defendants' compliance with the preliminary injunction now in place,

plaintiffs' counsel state that they "await further instruction from the Court regarding how it

wishes to proceed with respect to compliance and enforcement of the preliminary injunction"

1  (Dkt. No. 142 at 6).  It should be up to plaintiffs and their counsel to file a proper motion to

2  compel compliance and/or to seek contempt of court.  It is not the role of the judge to direct

3  plaintiffs' litigation strategy.  Any such motion should be briefed and will be heard on the

4  same schedule stated above as to the State of Washington.

6      **IT IS SO ORDERED.**

8  Dated:  March 21, 2025

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

United States District Court
Northern District of California

2-ER-176 2

PATRICK D. ROBBINS (CABN 152288)
Acting United States Attorney
PAMELA T. JOHANN (CABN 145558)
Chief, Civil Division
KELSEY J. HELLAND (CABN 298888)
Assistant United States Attorney
U.S. ATTORNEY'S OFFICE
450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495
(415) 436-7200

ERIC HAMILTON
Deputy Assistant Attorney General
DIANE KELLEHER
Branch Director
CHRISTOPHER HALL
Assistant Branch Director
JAMES D. TODD, JR.
Senior Trial Counsel
YURI S. FUCHS
Trial Attorney
U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, DC 20044

*Counsel for Defendants*

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, *et al.* | Case No. 3:25-cv-1780-WHA |
| Plaintiffs, | **NOTICE FILING OF CERTAIN AGENCY DECLARATIONS AND REDACTED AGENCY LISTS OF EMPLOYEES** |
| v. | |
| UNITED STATES OFFICE OF PERSONNEL MANAGEMENT, *et al.*, | Honorable William H. Alsup |
| Defendants. | |

Please take notice that Defendants are filing redacted lists of "all probationary employees terminated on or about February 13th and 14th with an explanation as to each of what has been done to comply with this [Court's] order." Tr. of March 13, 2025, Hrg., at 53:13-16, 20-22, ECF No. 120. Defendants are redacting the personal identifying information ("PII") of third-party federal employees that should remain confidential from the following information they are submitting:

1. Ex. 1: U.S. Department of Agriculture's List of Employees

2. Ex. 2: U.S. Department of Defense's List of Employees

3. Ex. 3: U.S. Department of Energy's List of Employees

4. Ex. 4: U.S. Department of the Interior's List of Employees

5. Ex. 5: U.S. Department of the Treasury's List of Employees

6. Ex. 6: U.S. Department of Veterans Affairs' List of Employees

Because the agency lists of employees of the U.S. Department of Agriculture and the U.S. Department of Defense Defendants do not contain information showing what has been done to comply with the Court's notice requirements for each employee, those agencies are filing declarations from agency officials that provide that explanation. *See* Ex. 7-8

DATED: March 20, 2025

Respectfully submitted,

PATRICK D. ROBBINS (CABN 152288)
Acting United States Attorney
PAMELA T. JOHANN (CABN 145558)
Chief, Civil Division
KELSEY J. HELLAND (CABN 298888)
Assistant United States Attorney
U.S. ATTORNEY'S OFFICE
450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495

ERIC HAMILTON
Deputy Assistant Attorney General

DIANE KELLEHER
Branch Director
CHRISTOPHER HALL
Assistant Branch Director

JAMES D. TODD, JR.
Senior Trial Counsel

*s/ Yuri S. Fuchs*
YURI S. FUCHS
Trial Attorney
U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, DC 20044

*Counsel for Defendants*

1   PATRICK D. ROBBINS (CABN 152288)
    Acting United States Attorney
2   PAMELA T. JOHANN (CABN 145558)
    Chief, Civil Division
3   KELSEY J. HELLAND (CABN 298888)
    Assistant United States Attorney
4   U.S. ATTORNEY'S OFFICE
    450 Golden Gate Avenue, Box 36055
5   San Francisco, California 94102-3495

6   ERIC HAMILTON
    Deputy Assistant Attorney General
7   DIANE KELEHER
    Branch Director
8   CHRISTOPHER HALL
    Assistant Branch Director
9   JAMES D. TODD, JR.
    Senior Trial Counsel
10   U.S. DEPARTMENT OF JUSTICE
    Civil Division, Federal Programs Branch
11   P.O. Box 883
    Washington, DC 20044
12

13   *Counsel for Defendants*

14

15           **UNITED STATES DISTRICT COURT**
     **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
           **SAN FRANCISCO DIVISION**

16

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, *et al.* | Case No. 3:25-cv-1780-WHA |
|       Plaintiffs, | **DECLARATION OF MARY PLETCHER RICE** |
|         v. | |
| UNITED STATES OFFICE OF PERSONEL MANAGEMENT, *et al.*, | |
|       Defendants. | |

24

25

26

27

28

Declaration of Mary Pletcher Rice
3:25-cv-1780-WHA

I, Mary Pletcher Rice, declare, pursuant to 28 U.S.C. § 1746, as follows:

1.      I am the Acting Principal Deputy Assistant Secretary for Administration within Departmental Administration at the United States Department of Agriculture ("USDA" or "Department"), headquartered in Washington, D.C.  I make this Declaration based on my own personal knowledge, on information contained in the records of USDA, or on information provided to me by USDA employees.  I have served in this position since January 31, 2025, and I have been employed at USDA since 2018.

2.      In my role at USDA, I currently oversee the Department's Office of Human Resources Management and I have purview over USDA subagencies' Chief Operating Officers and Human Resources Offices.

3.      Approximately 5,714 probationary employees were terminated from USDA beginning February 13, 2025, and concluding on or around February 17, 2025 I have been provided, and have reviewed, the preliminary injunction ("PI") issued in the above-captioned case on March 13, 2025 and the memorandum issued on March 14, 2025, requiring USDA to reinstate all affected probationary employees, who were terminated.

4.      USDA has reinstated the terminated probationary employees, pursuant to a 45-day March 5, 2025, Stay Order issued by the Merit Systems Protection Board ("MSPB"), which was requested by the Office of Special Counsel and pursuant to a March 13, 2025 temporary restraining order issued by the U.S. District Court of Maryland ordering Defendants to reinstate all affected probationary employees by March 17, 2025.

5.      On March 12, 2025, USDA reinstated all 5,714 Affected Probationary Employees by restoring them to the status they were in prior to their terminations and providing each with back pay from the date of their respective termination. As part of a phased plan for return-to-duty, upon returning to pay status, the Affected Probationary Employee will initially be placed on paid administrative leave. USDA has notified all Affected Probationary Employees that they have been restored to the status they were in prior to their terminations.  USDA is in the process of completing a second notification to the probationary employees to be clear that this is based on the MSPB order and this Court's Order.

Declaration of Mary Pletcher Rice
3:25-cv-1780-WHA

6.      An excel chart is attached to this declaration listing the 5,714 names of all affected probationary employees, the completion of the first notification of reinstatement due to the MSPB order, and the progress in completing a second notification for this Court's order.

7.      All of the listed affected probationary employees have been notified of this Court's preliminary injunction through a USDA press release titled "USDA Status Update on Probationary Employees" that was updated on March 19, 2025.  The update can be found at https://www.usda.gov/about-usda/news/press-releases/2025/03/11/usda-status-update-probationary-employees.  A screen capture of the update is attached to this declaration.

8.      Pursuant to completion of a second round of notifications, USDA has emailed or in the case where email addresses were unavailable, telephoned individual notices of this Court's preliminary injunction and this is indicated on the attached excel chart.

9.      USDA is diligently working on completing the second round of notices to all affected probationary employees listed on the attached chart.

10.      A group of 1,070 seasonal Forest Service Affected Probationary Employees who were not in pay status at the time of their terminations (due to the off-season) have been reinstated to their prior unpaid status. Additionally, there are six Affected Probationary Employees in the Foreign Agricultural Service who were administratively furloughed prior to their terminations, and who have been reinstated to their prior administrative furlough status.

11.      USDA is acting diligently to complete the administrative steps related to notifying the Affected Probationary Employees of their reinstatement, processing the reinstatements for purposes of all relevant USDA record systems, and returning the reinstated employees to duty status.

12.      Whether required by operation of the March 5, 2025, MSPB Stay Order, the District Court of Maryland's s March 13, 2025 Temporary Restraining Order or this Court's March 13, 2025 Preliminary Injunction, reinstating the terminated probationary employees is complex and places the following logistical burdens on USDA and its approximately 29 subordinate Mission Areas, Agencies, and Staff Offices, including USDA's multiple human resources offices: (1) initiating the process of placing all removed probationary employees, who

Declaration of Mary Pletcher Rice
3:25-cv-1780-WHA

received February 2025 termination letters, into pay status, and providing backpay, from the date of the termination notice through the present, which involves several systems and applies across multiple pay periods; (2) ascertaining whether some of the probationary employees choose to resign, due to having secured other employment or not wanting to return to duty at USDA; (3) reinstituting and ensuring operational status of secured LincPasses, office space, and equipment (including laptops in most instances) for those individuals whose mission criticality requires on-site work; and (4) addressing, as appropriate, any identified or substantiated threats to the physical safety of USDA's existing 111,000 person workforce and security of USDA's physical plants and assets across the nation (5) and addressing other issues such as a terminated probationary employee who pleaded guilty to a crime related to covering up a murder and another terminated probationary employee found to be a foreign national citizen from a "country of particular concern" as determined by the U.S. Department of State in 2023.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 20, 2025

/s/ MARY RICE  Digitally signed by MARY RICE Date: 2025.03.20 11:11:19 -06'00'

MARY PLETCHER RICE

Declaration of Mary Pletcher Rice
3:25-cv-1780-WHA

2-ER-183
3

PATRICK D. ROBBINS (CABN 152288)
Acting United States Attorney
PAMELA T. JOHANN (CABN 145558)
Chief, Civil Division
KELSEY J. HELLAND (CABN 298888)
Assistant United States Attorney
U.S. ATTORNEY'S OFFICE
450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495

ERIC HAMILTON
Deputy Assistant Attorney General
DIANE KELLEHER
Branch Director
CHRISTOPHER HALL
Assistant Branch Director
JAMES D. TODD, JR.
Senior Trial Counsel
YURI S. FUCHS
Trial Attorney
U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, DC 20044

*Counsel for Defendants*

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, *et al.*<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OFFICE OF PERSONNEL MANAGEMENT, *et al.*,<br><br>Defendants. | Case No. 3:25-cv-1780-WHA<br><br>**NOTICE IN RESPONSE TO THE COURT'S SUPPLEMENT TO THIRD REQUEST FOR INFORMATION**<br><br>The Hon. William H. Alsup |

Defendants hereby respectfully respond to this Court's March 18, 2025, Supplement to Third Request for Information ("Supplement"), ECF No. 140. In that Supplement, the Court ordered that relief defendant Department of Defense ("DoD") "state the extent to which any rehired probationary employees are being placed on administrative leave" and "provide a declaration" to the Court. Supplement. Defendants provide the attached declaration from DoD, explaining how and why probationary employees have been placed on administrative leave. *See* Decl. of Timothy D. Dill, attached as Ex. 1. As reflected in that declaration, as to DOD: "[e]mployees with pending termination notices will remain on administrative leave until the termination notice is revoked and they are able to complete [DoD] onboarding procedures," and "[p]reviously terminated employees who have been reinstated are authorized administrative leave dating from the time of their termination until their completion of onboarding procedures." Dill Decl. ¶ 6.

Dated: March 19, 2025

Respectfully submitted,

PATRICK D. ROBBINS (CABN 152288)
Acting United States Attorney
PAMELA T. JOHANN (CABN 145558)
Chief, Civil Division
KELSEY J. HELLAND (CABN 298888)
Assistant United States Attorney
U.S. ATTORNEY'S OFFICE
450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495

ERIC HAMILTON
Deputy Assistant Attorney General

DIANE KELLEHER
Branch Director

CHRISTOPHER HALL
Assistant Branch Director

JAMES D. TODD, JR.
Senior Trial Counsel

s/ Yuri S. Fuchs
YURI S. FUCHS
Trial Attorney
U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, DC 20044

*Counsel for Defendants*

1  PATRICK D. ROBBINS (CABN 152288)
   Acting United States Attorney
2  PAMELA T. JOHANN (CABN 145558)
   Chief, Civil Division
3  KELSEY J. HELLAND (CABN 298888)
   Assistant United States Attorney
4  U.S. ATTORNEY'S OFFICE
   450 Golden Gate Avenue, Box 36055
5  San Francisco, California 94102-3495

6  ERIC HAMILTON
   Deputy Assistant Attorney General
7  DIANE KELEHER
   Branch Director
8  CHRISTOPHER HALL                    ˋ
   Assistant Branch Director
9  JAMES D. TODD, JR.
   Senior Trial Counsel
10 U.S. DEPARTMENT OF JUSTICE
   Civil Division, Federal Programs Branch
11 P.O. Box 883
   Washington, DC 20044
12

13 *Counsel for Defendants*

14              **UNITED STATES DISTRICT COURT**
15          **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
                  **SAN FRANCISCO DIVISION**
16

17 AMERICAN FEDERATION OF                  Case No. 3:25-cv-1780-WHA
   GOVERNMENT EMPLOYEES, *et al.*
18
        Plaintiffs,                        **DECLARATION OF TIMOTHY D. DILL**
19                                         **IN SUPPORT OF DEFENDANTS'**
                                           **NOTICE IN RESPONSE TO THE**
20          v.                             **COURT'S THIRD REQUEST FOR**
                                           **INFORMATION**
21 UNITED STATES OFFICE OF PERSONNEL
   MANAGEMENT, *et al.*,
22
        Defendants.
23

24

25

26

27

28

I, Timothy D. Dill, declare, pursuant to 28 U.S.C. § 1746, as follows:

1.    I am currently the official performing the duties of the Assistant Secretary of Defense for Manpower and Reserve Affairs of the Department of Defense ("Department"), headquartered in Washington, D.C. I have served in this position since January 22, 2025. The information below is based on my personal knowledge and information I have received in my role at the Department.

2.    In my role at the Department, I am responsible for personnel policy for the Department of Defense's civilian workforce. That responsibility includes tracking and recording personnel actions, including terminations. I am responsible for ensuring that all personnel actions, including those related to probationary employees, comply with federal law.

3.    I am aware of the preliminary injunction issued in this case on March 13, 2025, requiring the Department to offer reinstatement to all probationary employees terminated on or about February 13 and 14, 2025.

4.    Department records indicate that since February 13, 2025, the Department separated, or notified of termination, 364 probationary employees in light of recent OPM guidance.

5.    The Department has directed DoD Military Departments and Components to offer reinstatement or revoke pending termination notices for these employees. DoD Military Departments and Components have reinstated, or revoked pending termination notices, for approximately 65 employees. The remainder are pending notification, declined to accept the offer of reinstatement, or requested additional time to consider the offer.

6.    Employees with pending termination notices will remain on administrative leave until the termination notice is revoked and they are able to be complete Department onboarding procedures. Previously terminated employees who have been reinstated are authorized administrative leave dating from the time of their termination until their completion of onboarding procedures. That placement of former employees on administrative leave is the first in a series of steps to reinstate probationary employees. The onboarding process will include

Declaration of Timothy D. Dill in Support of Defendants' Notice in Response to the Court's Third Request for Information  3:25-cv-1780-WHA

certain training, completing human resources paperwork, obtaining new security badges, and re-enrolling in benefits programs.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: March 19, 2025

Timothy D. Dill
Performing the Duties of the
Assistant Secretary of Defense for
Manpower and Reserve Affairs

Declaration of Timothy D. Dill in Support of Defendants' Notice in Response to the Court's Third Request for Information  3:25-cv-1780-WHA

2-ER-189

1
2
3                    UNITED STATES DISTRICT COURT
4
5                  NORTHERN DISTRICT OF CALIFORNIA
6
AMERICAN FEDERATION OF
7   GOVERNMENT EMPLOYEES, AFL-CIO,                No.  C 25-01780 WHA
    et al.,
8                 Plaintiffs,
9          v.                                     **SUPPLEMENT TO THIRD REQUEST
                                                  FOR INFORMATION**
10   UNITED STATES OFFICE OF
    PERSONNEL MANAGEMENT, et al.,
11
                  Defendants.
12
13
14          On March 17, the undersigned requested that defendants "state the extent to which any

15   rehired probationary employees are being placed on administrative leave" (Dkt. No. 138).

16   Defendants' response reproduces compliance reports produced in a separate action, *State of*

17   *Maryland v. United States Department of Agriculture*, without more (Dkt. No. 139).

18          The Department of Defense, an enjoined relief defendant in this action, is not among the

19   "restrained defendants" in *Maryland*.  Defendants' reproduction of the *Maryland* declarations

20   is therefore silent as to DOD.  Defendants shall redress that deficiency and provide a

21   declaration from DOD by **MARCH 19, 2025, AT NOON**.  If plaintiffs wish to file a response,

22   they must do so by **MARCH 20, 2025, AT NOON**.

23
24          **IT IS SO ORDERED.**
25
26   Dated:  March 18, 2025.
27
                                                  _____
28                                                WILLIAM ALSUP
                                                  UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES, AFL-CIO,
et al.,

          Plaintiffs,

       v.

UNITED STATES OFFICE OF
PERSONNEL MANAGEMENT, et al.,

          Defendants.

No.  C 25-01780 WHA

**THIRD REQUEST FOR
INFORMATION**

The Court has read news reports that, in at least one agency, probationary employees are being rehired but then placed on administrative leave *en masse*.  This is not allowed by the preliminary injunction, for it would not restore the services the preliminary injunction intends to restore.  Defendants shall state the extent to which any rehired probationary employees are being placed on administrative leave by MARCH 18, 2025, AT NOON.

**IT IS SO ORDERED.**

Dated:  March 17, 2025.

_____
WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES, AFL-CIO,
et al.,

        Plaintiffs,

     v.

UNITED STATES OFFICE OF
PERSONNEL MANAGEMENT, et al.,

        Defendants.

No.  C 25-01780 WHA

**ORDER DENYING EX PARTE
MOTION TO STAY PRELIMINARY
INJUNCTION PENDING APPEAL**

The undersigned issued a preliminary injunction on March 13, 2025 (Dkt. No. 115).
Defendants appealed (Dkt. No. 119), and now move for a stay pending appeal (Dkt. No. 127).
Plaintiffs oppose (Dkt. No. 129).

The "factors regulating the issuance of a stay" are as follows:  "(1) whether the stay
applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the
applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will
substantially injure the other parties interested in the proceeding; and (4) where the public
interest lies." *Hilton v. Braunskill,* 481 U.S. 770, 776 (1987).

*First*, defendants' likelihood of success arguments were addressed at both the temporary
restraining order and preliminary injunction stage.  The memoranda supporting the TRO and PI

United States District Court
Northern District of California

are incorporated here (Dkt. Nos. 28, 132).  For the reasons stated therein, this factor does not favor a stay.

*Second*, defendants' argument that a stay of the preliminary injunction would not injure plaintiffs retreads the arguments made in opposition to plaintiffs' motion for leave to amend (Dkt. No. 63).  As explained in the order granting leave, defendants' purported voluntary cessation (via a two-sentence alteration to the January 20 memo) does not moot the case at hand (Dkt. No. 88).  A stay would further injure plaintiffs because reinstatement becomes more difficult with every passing day.  Terminated probationers are moving on with their lives, as they must.  Fewer will be available to redress the harms suffered by the organizational plaintiffs tomorrow than there are today.  And, the government has wholly failed to argue there is any other way to avoid the irreparable injuries flowing from the unlawful terminations except to reinstate the employees.

*Finally*, defendants argue that the public interest and the balance of the equities favor a stay.  They rely in large part on six newly submitted declarations, one from each relief defendant agency subject to the injunction (Department of Defense (Dkt. No. 127-1), Department of Energy (Dkt. No. 128-2), Department of the Interior (Dkt. No. 127-3), Department of the Treasury (Dkt. No. 127-4), Department of Veterans Affairs (Dkt. No. 127-5), and Department of Agriculture (Dkt. No. 127-6).  Two relief defendants (from DOD and DOI) assert, for the first time, that they reviewed their probationary employees' performance following OPM's January 20 memo (Dkt. No. 127-1 ¶ 7 (DOD); Dkt. No. 127-3 ¶ 7 (DOI)).  The VA, Treasury, USDA, and DOE do not make that representation.

The declarations set out a substantially similar list of administrative harms that would result from reinstatement.  These include the need to "identif[y], contact[], and onboard[]" the recently terminated probationers, "fill[] out human resources paperwork," "receiv[e] new equipment, obtain[] new security badges and clearances, and re-enroll[ probationers] in benefits programs" (Dkt. No. 127-2); the frustration of supervisors' ability to "appropriately manag[e] their workforce" (Dkt. No. 127-1); and general "confusion" and "uncertainty"  (Dkt. No. 127-3; Dkt. No. 127-4).

This order pauses to address defendants' attempts to frustrate fact-finding. The defense submitted a single declaration, from defendant Charles Ezell, in opposition to plaintiffs' motion for a TRO. The undersigned ordered defendant Ezell to appear for cross examination at the subsequent evidentiary hearing, or, alternatively, to submit to a deposition at his convenience. Plaintiffs were likewise ordered to make their declarants available for examination. Defendants chose to withdraw the Ezell declaration to avoid submitting its declarant to examination, in violation of this Court's order. Defense counsel "understood coming out of the TRO hearing" that the undersigned "wanted to know what was actually communicated" during several phone calls between OPM and the relief defendant agencies (Dkt. No. 120). The purported reason to withdraw was that Ezell was not present at those calls, so his testimony "would have scant evidentiary value" anyway (Dkt. No. 75 at 12).

The undersigned did not impose sanctions at the time, as it appeared defendants had righted a wrong they would not repeat.

It was a surprise, then, that defendants submitted the declaration of Noah Peters, a "senior advisor" at OPM (Dkt. No. 77). Defense counsel represented to the Court that Peters participated in the calls at issue, but Peters declined to swear to it (*ibid.*). Indeed, Peters did not claim personal knowledge as to *anything* in his declaration. Persuaded by defense counsel's argument, the undersigned afforded the Peters Declaration scant evidentiary value.

Defendants refused to make any further effort to get at the truth, arguing that the only way forward was to wait on them to produce their administrative record, and "for gaps in that record to be litigated, to be supplemented by oral testimony, if necessary" (Dkt. No. 120 at 22). Defendants otherwise complained that the rapid pace of litigation prohibited the production of anything more than the Ezell declaration (Dkt. No. 120 at 20-21).

It is again surprising, then, that defendants managed (in the span of a single day) to muster a half-dozen declarations from relief defendants. None of these declarations, or the facts therein, were made available to the Court during its consideration of the TRO or PI now in place. This is a last-ditch attempt to relitigate those orders on a new, untested record.

Turning to the merits, defendants' arguments fail to persuade.

*First*, the administrative harms described do not move the needle in favor of a stay. NSF, for example, rehired its terminated probationers following the undersigned's TRO. Several other agencies have rehired large swaths of terminated workers for myriad reasons. The declarant for the USDA, for example, concedes that the agency "is already reinstating the terminated probationary employees, pursuant to a 45-day March 5, 2025 Stay Order from the Merit Systems Protection Board, which was requested by the Office of Special Counsel" (Dkt. No. 127-6 at ¶4). It is unclear how the denial of a stay would thus harm USDA — though it remains clear that granting the stay would put organizational plaintiffs at risk should there be any failure of relief from the MSPB order. Nowhere do relief defendants claim that they are uniquely incapable of rehiring recently terminated probationers, only that doing so would require them to contact and onboard employees, get them equipment, assign them duties, and so forth. Each "harm" stems from the unwinding of the unlawful act and the return to the status quo.

*Second*, defendants' attempt to cast the probationers' return to work as *harmful to those employees* is rejected. Each probationer remains free to refuse relief defendants' offer of reinstatement.

*Third*, the evidence available at the time showed that the relief agencies wished to retain their employees and terminated them only because OPM directed them to do so. Only two of the six relief defendants (DOD and DOI) now claim that they conducted performance reviews of their probationary employees prior to termination (Dkt. Nos. 127-1, 127-3).

*Fourth*, defendants' suggestion that the preliminary injunction "precludes the Office of Personnel Management ('OPM') from giving further guidance to agencies on personnel matters" is incorrect. The undersigned stated from the bench:

> To repeat, this order holds that OPM and Acting Director Ezell have no authority whatsoever to direct, order, or require in any way that any agency fire any employee.
>
> Now, given the arguments and the facts in this case, namely, that defendants have attempted to recast these directives as mere guidance, this order further prohibits defendants from giving guidance as to whether any employee should be terminated.

United States District Court
Northern District of California

1    (Dkt. No. 120 at 52–53 (emphasis added)).  The meaning of the order is plain:  OPM cannot

2    direct another agency to fire an employee simply by dressing up the directive as guidance.  The

3    undersigned has not and cannot circumscribe OPM's lawful performance of statutorily

4    authorized functions, including issuing guidance that goes no further.

5         *Finally*, defendants point out that the undersigned himself "noted that appellate

6    consideration of the preliminary injunction would be appropriate" (Dkt. No. 127 at 3).  True.

7    All parties may appeal the grant (or denial) of an injunction as of right.  28 U.S.C.

8    § 1292(a)(1).  Defendants are requesting a stay.  The propriety of appellate review has little

9    bearing on the propriety of a stay.

10        Defendants' request is **DENIED**.

12    **IT IS SO ORDERED.**

14    Dated:  March 15, 2025.

_____

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

United States District Court
Northern District of California

PATRICK D. ROBBINS (CABN 152288)
Acting United States Attorney
PAMELA T. JOHANN (CABN 145558)
Chief, Civil Division
KELSEY J. HELLAND (CABN 298888)
Assistant United States Attorney
U.S. ATTORNEY'S OFFICE
450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495

ERIC HAMILTON
Deputy Assistant Attorney General
DIANE KELLEHER
Branch Director
CHRISTOPHER HALL
Assistant Branch Director
JAMES D. TODD, JR.
Senior Trial Counsel
YURI S. FUCHS
Trial Attorney
U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, DC 20044

*Counsel for Defendants*

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

|  |  |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, *et al.*<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OFFICE OF PERSONNEL MANAGEMENT, *et al.*,<br><br>Defendants. | Case No. 3:25-cv-1780-WHA<br><br>**DEFENDANTS' *EX PARTE* MOTION TO STAY THE COURT'S MARCH 13, 2025, PRELIMINARY INJUNCTION PENDING APPEAL**<br><br>The Hon. William H. Alsup |

Pursuant to Fed. R. Civ. P. 62, and this Court's statements at the March 13, 2025, hearing, Defendants respectfully move for a stay pending appeal of the Court's March 13, 2025, Order granting a preliminary injunction. Defendants seek a stay of the Order as to all relief order with the exception of the Court's decision to extend the previous Temporary Restraining Order ("TRO")—a TRO that Defendants have complied with. *See* Defs.' *Ex Parte* Mot. to Vacate at 3-4, ECF No. 75. The Court should stay the injunction pending appeal in light of the strength of Defendants' arguments and the harms that Defendants will suffer in the absence of a stay.

First, Defendants' arguments that Plaintiffs lack standing and that the Court lacks subject matter jurisdiction under the doctrine announced in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994) are likely to succeed on appeal. Plaintiffs' federal employment and labor challenges are exclusively channeled away from district court review under both the Civil Service Reform Act ("CSRA"), Pub. L. No. 95-454 (codified in various sections under Title 5 of the U.S. Code), and Federal Service Labor-Management Relations Statute ("FSL-MRS"), 5 U.S.C. §§ 7101–35. Plaintiffs' claims fail for lack of subject matter jurisdiction. *See, e.g., Nat'l Treasury Emps. Union, et al. v. Trump et al.*, No. 25-cv-420, 2025 WL 561080 *6-*8 (D.D.C. Feb. 20, 2025); Mem. Op. at 2-5, *AFGE, et al., v. Ezell, et al.*, No. 25-cv-10276 (D. Mass. Feb. 12, 2025), ECF No. 66.

Second, as detailed in the attached declarations provided by officials from the Departments of Agriculture, Defense, Energy, the Interior, the Treasury, and Veterans Affairs, the relief ordered by the preliminary injunction constitutes an extraordinary intrusion into the authority of the Executive Branch and its agencies by: (i) requiring six agencies to reinstate previously terminated probationary employees; and (ii) precluding the Office of Personnel Management ("OPM") from giving further guidance to agencies on personnel matters. As those declarations reflect, agencies will face tremendous administrative burdens, personnel uncertainty, and interference with their internal functions as a result of complying with the Court's preliminary injunction. *See* Decls. of Department of Defense, Department of Energy, Department of Interior, Department of Treasury, Department of Veterans Affairs, attached as Exs. 1-5; *see also* Decl. of Department of Agriculture, attached as Ex. 6. This uncertainty would only be

amplified if the Court's preliminary injunction is reversed on appeal, and this Court itself noted that appellate consideration of the preliminary injunction would be appropriate. *See* Tr. of Mar. 13, 2025, Hrg. at 57:1-3, ECF No. 90. Furthermore, the preliminary injunction subverts the normal order of operations in an Administrative Procedure Act ("APA") action, permitting discovery and a deposition of an OPM official before the filing of an administrative record or even any responsive pleading by Defendants. As a result, apart from the portion of the Court's March 13, 2025, Order extending its prior TRO, Defendants seek a stay of the Court's order.

Defendants respectfully request an immediate ruling. If relief is not immediately granted, Defendants intend to seek relief from the U.S. Court of Appeals for the Ninth Circuit.

## BACKGROUND

On February 19, 2025, Plaintiffs sued OPM and its Acting Director, Charles Ezell. Plaintiffs then filed an amended complaint while moving *ex parte* for a TRO and order to show cause on February 23, 2025. *See* Compl., ECF No. 1; Am. Compl., ECF No. 17; Pls.' TRO Mot., ECF No. 18. Plaintiffs' claims rest on allegations that OPM had "ordered" federal agencies to terminate probationary employees and that this was an *ultra vires* act that exceeded the scope of OPM's statutory authority and otherwise violated the APA. *See* Am. Compl. ¶¶ 104–42; Pls.' TRO Mot. at 15–22. On February 24, 2025, this Court ordered Defendants to respond to Plaintiffs' TRO motion by February 26, 10:00am PST, and set a hearing on Plaintiffs' motion for February 27, 1:30pm PST. *See* Order Setting Hearing, ECF No. 21.

At the conclusion of the February 27 hearing, this Court issued an oral TRO, which it later reduced to writing. As amended, the Court held that "OPM's January 20 memo, February 14 email, and all other efforts by OPM to direct the termination of employees . . . are unlawful, invalid, and must be stopped and rescinded." Mem. Op. & Order Amending TRO at 24, ECF No. 45. The Court ordered OPM to provide written notice of its order to the Bureau of Land Management ("BLM"), Department of Defense ("DOD"), Fish and Wildlife Service ("FWS"), National Park Service ("NPS"), Small Business Administration ("SBA"), and Veterans Administration ("VA"). *See id*. The Court then set a follow-up evidentiary hearing for March 13, 2025, at 8 AM. *See id*.

On March 4, 2025, Plaintiffs moved for leave to file a Second Amended Complaint ("SAC"), proposing to add some 43 additional defendants, including other federal agencies and agency heads that Plaintiffs allege were ordered by OPM to terminate probationary employees. *See* Pl.'s Redline of SAC ¶¶ 34–76, ECF No. 49-1. The Court granted Plaintiffs' motion for leave to file that Second Amended Complaint on March 10, 2025, and Plaintiffs subsequently filed the Second Amended Complaint the following day. *See* ECF Nos. 88, 90.

On March 13, 2025, the Court held a hearing. At the conclusion of the hearing, the Court ordered as relief that: (1) the Court's prior February 27, 2025, TRO be extended; (2) the Departments of Agriculture, Defense, Energy, Interior, the Treasury, and Veterans Affairs were to: immediately offer reinstatement to probationary employees terminated on or about February 13 and 14, 2025; immediately notify the terminated employees that the Court held that their terminations were unlawful; cease terminating probationary employees; cease using a prior template for probationary employees used by OPM; and to file by March 20, 2025, with the Court a list of all terminated employes and what had been done for each employee to comply with the Court's Order; (3) OPM cease providing guidance as to whether any probationary employee should be terminated, and that agencies were to develop their own guidance; (4) discovery was to open in the action with, among other things, Plaintiffs being permitted to depose OPM employee Noah Peters within the next two weeks.[1]

## ARGUMENT

Courts consider four factors in assessing a motion for stay pending appeal: (1) the movant's likelihood of prevailing on the merits of the appeal; (2) whether the movant will suffer irreparable harm absent a stay; (3) the harm that other parties will suffer if a stay is granted; and (4) the public interest. *See Hilton v. Braunskill*, 481 U.S. 770, 776 (1987); *Humane Soc'y of U.S. v. Gutierrez*, 523 F.3d 990, 991 (9th Cir. 2008). When the government is a party, its interests and the public interest "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, the strength of Defendants arguments coupled with the breadth of the Court's March 13, 2025, preliminary

---

[1] The Court also directed the parties to provide further briefing on Defendants' channeling arguments, but this portion of the Order is not relevant for the purposes of this *ex parte* stay motion.

injunction and the relevant equitable considerations weigh in favor of granting the partial stay pending appellate review that Defendants have requested.

On the first factor, as Defendants explained in their briefing on Plaintiffs' motion for a TRO, Plaintiffs fail to establish a likelihood of success on the merits of their claims. Plaintiffs lack standing to pursue many of their claims because their asserted harms are far too speculative, and they cannot seek injunctive relief on behalf of third-party federal employees who are not before this Court.

The non-union Plaintiffs fail to show injury in fact. To establish injury in fact, a plaintiff must show that the defendant's action affects him or her in a "personal and individual way," *Lujan*, 504 U.S. at 560 n.1, rather than being a "generalized grievance," *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024). A plaintiff must show more than a "possible future injury"; he or she must show that harm has actually occurred or is "certainly impending." *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) (citation omitted). And "threatened injury must be *certainly impending* to constitute injury in fact, and that [a]llegations of *possible* future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation omitted).

In this case, the claims of injury by the non-union Plaintiffs are far too speculative to support standing to maintain this lawsuit. They are instead based on nothing more than a chain of unsupported and conclusory inferences that the termination of probationary employees will somehow lead to "anticipated reductions and delays in services," Pls.' Second Am. Compl. ¶¶ 151–52, ECF No. 90, "imminent harm to [their] mission to protect and restore wildlife and public lands," *id*. ¶ 153, "likely . . . impair[ment of] the quality of . . . services," *id*. ¶ 155, or "the risk [of] severe disruptions to . . . services," *id*. ¶ 157. None of these speculative and conclusory assertions is sufficient to show that a harm has actually occurred or is "certainly impending." *Accord Whitmore*, 495 U.S. at 158 (citation omitted). Absent such a showing, the non-union Plaintiffs lack standing to maintain this action and therefore will not be able to succeed on their claims.

Nor can Plaintiffs pursue their claims in federal district court; instead, Congress has

provided adjudication in the FLRA and the MSPB as the sole administrative avenues before
which challenges to federal employee terminations may be brought before review may be had in
the court of appeals. *See, e.g.*, *Elgin v. Dep't of the Treasury*, 567 U.S. 1, 13 (2012); *United
States v. Fausto*, 484 U.S. 439, 455 (1988); *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 929
F.3d 748, 752 (D.C. Cir. 2019). Indeed, the non-union Plaintiffs' claims must also be channeled
through the administrative processes. Non-union organizations may seek leave to intervene or
participate as *amici curiae* in MSPB and FLRA proceedings. *See* 5 C.F.R. §§ 1201.34, 2422.8.
As the MSPB regulations make clear, "[a]ny person, organization or agency may, by motion, ask
the judge for permission to intervene," and "[a] motion for permission to intervene will be
granted where the requester will be affected directly by the outcome of the proceeding." *Id.* §
1201.34(c). With limited exceptions, "[i]ntervenors have the same rights and duties as parties."
*Id.* § 1201.34(d). And "[a]n amicus curiae is a person or organization who, although not a party
to an appeal, gives advice or suggestions by filing a brief with the judge or the Board regarding
an appeal." *Id.* § 1201.34(e). Thus, non-union Plaintiffs may raise their claims in the MSPB and
FLRA proceedings in which federal employees and their unions are already litigating similar
issues.[2]

But even if such mechanisms were not available to the non-union Plaintiffs to raise their
claims, that would still not be enough to overcome Congress's determination that claims such as
those presented here must be channeled through the MSPB and FLRA. As the Supreme Court
has held, "[w]here a statute provides that particular agency action is reviewable at the instance of
one party, who must first exhaust administrative remedies, the inference that it is not reviewable
at the instance of other parties, who are not *subject* to the administrative process, is strong."
*Sackett v. EPA*, 566 U.S. 120, 130 (2012) (emphasis in original). For this proposition the Court
cited *Block v. Community Nutrition Institute*, which held that a statutory scheme requiring claims
brought by milk *producers* to go through an administrative process precluded judicial review of

---

[2] Moreover, there are mechanisms for obtaining classwide relief in MSPB proceedings.
*See* 5 C.F.R. § 1201.27 ("One or more employees may file an appeal as representatives of a class
of employees."); *Anselmo v. King*, 902 F. Supp. 273, 276 (D.D.C. 1995) ("The MSPB has the
power to certify a class.").

an APA claim brought by milk *consumers*. 467 U.S. 340, 346-48 (1984). As the Court explained in *Community Nutrition*, "[r]espondents would have us believe that, while Congress unequivocally directed [milk] handlers first to complain to the Secretary that the prices set by milk market orders are too high, it was nevertheless the legislative judgment that the same challenge, if advanced by consumers, does not require initial administrative scrutiny. There is no basis for attributing to Congress the intent to draw such a distinction." *Id.* at 347; *see also*, 484 U.S. at 443 (noting the CSRA meant to provide the comprehensive remedial scheme for evaluating adverse personnel actions). As a result, the government's appeal is likely to prevail in showing that the non-union Plaintiffs' claims fail for lack of subject matter jurisdiction.

On the second factor, Plaintiffs will not suffer irreparable harm in the event of a stay. As a preliminary matter, where a plaintiff seeks injunctive relief, a case "is normally moot upon the termination of the conduct at issue" unless "there is a likelihood of recurrence." *Demery v. Arpaio*, 378 F.3d 1020, 1025–26 (9th Cir. 2004). Such a case is "no longer a 'Case' or 'Controversy' for purposes of Article III," "[n]o matter how vehemently the parties continue to dispute the lawfulness of the conduct that precipitated the lawsuit." *Already, LLC v. Nike, Inc.*, 133 S. Ct. 721, 726, 727 (2013). To this point, on March 4, 2025, OPM issued revised guidance clarifying that "OPM is not directing agencies to take any specific performance-based actions regarding probationary employees[,]" and further clarifying that "[a]gencies have ultimate decision-making authority over, and responsibility for, such personnel actions." Mem. from Charles Ezell, Acting Director, OPM, to Heads and Acting Heads of Departments and Agencies (Revised March 4, 2025), ECF No. 78. Thus, OPM has made it abundantly clear since the Court's TRO that it is not directing the termination of probationary employees and Plaintiffs cannot be harmed by OPM guidance on probationary employees. OPM's actions comply with this Court's February 27, 2025, order and render this case moot. This Court should "presume the government is acting in good faith" when it makes declarations of this type. *America Cargo Transp., Inc. v. United States*, 625 F.3d 1176, 1180 (9th Cir. 2010). The circumstances here fully warrant that presumption.

In any event, OPM's actions preclude any additional further award of preliminary

injunctive relief under well-settled principles of equitable discretion. Even if cessation of conduct does not moot a case, a plaintiff must still bear the burden of demonstrating that equitable relief is warranted, a showing that requires "more than the mere possibility" of recurrence "which serves to keep the case alive." *United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953); *see also TRW, Inc. v. F.T.C.*, 647 F.2d 942, 954 (9th Cir. 1981) (discussing difference between standards and burdens of proof). To obtain equitable relief, a plaintiff must establish a "likelihood of substantial and immediate irreparable injury." *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 502 (1974)). That "requirement . . . cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again." *Lyons*, 461 U.S. at 111. Another point highlights the lack of irreparable harm: many probationary employees have been able to challenge their terminations in the MSPB, which has issued stay orders on probationary terminations. *See, e.g.*, Defs' Opp'n to Mot. for TRO, at 6, ECF No. 33; *see also* Ex. 6 ¶ 4.[3]

Third, the balance of equities and public interest overwhelmingly favor a stay pending appeal. The preliminary injunctive relief ordered by the Court at the March 13, 2025, is overbroad. While Defendants do not object to (or seek any stay of) any extension of the TRO, Defendants submit that the Court granted improper relief when it ordered the Departments of Agriculture, Defense, Energy, Interior, the Treasury, and Veterans Affairs to: (i) immediately offer reinstatement to probationary employees terminated on or about February 13 and 14, 2025; (ii) immediately notify the terminated employees that the Court held that their terminations were unlawful; (iii) cease terminating probationary employees; (iv) cease using a prior template for probationary employees used by OPM; and (v) to file by March 20, 2025, with the Court a list of all terminated employes and what had been done for each employee to comply with the Court's

---

[3] The existence of MSPB orders staying the termination of probationary employees does not undermine Defendants' need for a stay here. For one, the MSPB stay order could be lifted, but Defendants would still be required to comply with this Court's preliminary injunction absent a stay. For another, the narrower MSPB stay order emphasizes that the Court's preliminary injunction is far broader than what is needed to protect terminated probationary employees from suffering harm. In fact, that MSPB stay order ostensibly eliminates the need for relief as to any probationary employees of USDA. *See* Ex. 6 ¶¶ 4-5.

Order. The Court's Order was similarly improper when it ordered: OPM to cease providing guidance as to whether any probationary employee should be terminated and that agencies were to develop their own guidance; and discovery to open in the action with Plaintiffs being permitted to depose OPM employee Noah Peters within the next two weeks.

Each portion of the Court's relief is against the public interest and public equities. In directing certain named agencies to reinstate employees and guiding their employment practices *en masse*, the relief exceeds the scope of the Court's equitable powers. Reinstatement of employees is an "extraordinary remedy" even in employment actions by individuals. *Equal Emp. Opportunity Comm'n v. City of Janesville*, 630 F.2d 1254, 1259 (7th Cir. 1980). But here, the Court has ordered that remedy as to thousands of individuals and precluded six federal agencies from taking any further employment action as to an entire class of employees going forward. That is a remarkable intrusion into the operation of the Executive Branch and into the functioning of each of these agencies as they seek to implement the President's workforce optimization initiative. *See, e.g.*, *White v. Berry*, 171 U.S. 366, 377 (1898) (holding that a court cannot, "by injunction, restrain an executive officer from making a wrongful removal of a subordinate appointee, nor restrain the appointment of another"); *see also* Ex. 1 ¶ 13; Ex. 2 ¶ 12; Ex. 3 ¶ 14. Indeed, as a practical matter, the requirement for agencies to reinstate employees puts significant burdens on agencies, including the administrative burdens of having to onboard reinstated employees while leaving supervisors in a murky state of affairs should an appellate court reverse this Court's preliminary injunction. *See* Ex. 1 ¶¶ 9-12; Ex. 2 ¶¶ 8-11; Ex. 3 ¶¶ 10-13; Ex. 4 ¶¶ 5-8; Ex. 5 ¶¶ 8-10; Ex. 6 ¶ 5. In precluding OPM from providing guidance to agencies on personnel matters, the Court effectively binds the agency from exercising its assigned role in the Executive Branch. *See, e.g.*, 5 U.S.C. § 1103.

Finally, in opening discovery and directing a deposition to be conducted, the Court subverts the normal order of operation in an APA case. As Defendants previously explained "court reviewing agency action under the APA must limit its review to the administrative record." *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 992 (9th Cir. 2014) (citing *Camp v. Pitts*, 411 U.S. 138, 142 (1973)); *see also Bellion Spirits, LLC v. United States*,

335 F.Supp.3d 32, 43 (D.D.C. 2018) (holding that constitutional challenges to agency actions, such as Plaintiffs' *ultra vires* claim must also be decided on an administrative record). While supplementation of that record may be permissible with exceptions that may only occur where, after the record has been filed, the administrative record "is incomplete" and where "necessary to plug holes in the administrative record." *Wilson v. Comm'r*, 705 F.3d 980, 991 (9th Cir. 2013) (quotations omitted); *see also Kunaknana v. Clark*, 742 F.2d 1145, 1152 (9th Cir. 1984). No administrative record has been filed in this action, and, indeed, no responsive pleadings have been filed in this action either. As a result, Defendants submit that this Court should not have and cannot yet order discovery in this APA action unless and until it determines that the administrative record is incomplete.

## CONCLUSION

For good cause shown herein, this Court should grant Defendants' motion to stay its preliminary injunction apart from its order extending the TRO. Defendants respectfully request an immediate ruling on this motion, after which time Defendants intend to seek relief from the Ninth Circuit.

Dated: March 14, 2025

Respectfully submitted,

PATRICK D. ROBBINS (CABN 152288)
Acting United States Attorney
PAMELA T. JOHANN (CABN 145558)
Chief, Civil Division
KELSEY J. HELLAND (CABN 298888)
Assistant United States Attorney
U.S. ATTORNEY'S OFFICE
450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495

ERIC HAMILTON
Deputy Assistant Attorney General

DIANE KELLEHER
Branch Director
CHRISTOPHER HALL
Assistant Branch Director

JAMES D. TODD, JR.
Senior Trial Counsel

s/ Yuri S. Fuchs
YURI S. FUCHS
Trial Attorney
U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, DC 20044

*Counsel for Defendants*

1  PATRICK D. ROBBINS (CABN 152288)
   Acting United States Attorney
2  PAMELA T. JOHANN (CABN 145558)
   Chief, Civil Division
3  KELSEY J. HELLAND (CABN 298888)
   Assistant United States Attorney
4  U.S. ATTORNEY'S OFFICE
   450 Golden Gate Avenue, Box 36055
5  San Francisco, California 94102-3495

6  ERIC HAMILTON
   Deputy Assistant Attorney General
7  DIANE KELEHER
   Branch Director
8  CHRISTOPHER HALL
   Assistant Branch Director
9  JAMES D. TODD, JR.
   Senior Trial Counsel
10 U.S. DEPARTMENT OF JUSTICE
   Civil Division, Federal Programs Branch
11 P.O. Box 883
   Washington, DC 20044
12

13 *Counsel for Defendants*

14                    UNITED STATES DISTRICT COURT
15           FOR THE NORTHERN DISTRICT OF CALIFORNIA
                      SAN FRANCISCO DIVISION
16

17 | AMERICAN FEDERATION OF | Case No. 3:25-cv-1780-WHA |
   | GOVERNMENT EMPLOYEES, *et al.* | |
18 | | **DECLARATION OF TIMOTHY D. DILL** |
19 | Plaintiffs, | **IN SUPPORT OF DEFENDANTS'** |
   | | **MOTION FOR STAY OF MARCH 13,** |
20 | v. | **2025, ORDER** |
21 | UNITED STATES OFFICE OF PERSONEL | |
   | MANAGEMENT, *et al.*, | |
22 | | |
   | Defendants. | |
23 | | |

24

25

26

27

28

I, Timothy D. Dill, declare, pursuant to 28 U.S.C. § 1746, as follows:

1.      I am currently the official performing the duties of the Assistant Secretary of Defense for Manpower and Reserve Affairs of the Department of Defense ("Department"), headquartered in Washington, D.C. I have served in this position since January 22, 2025.

2.      In my role at the Department, I am responsible for personnel management. I have the responsibility for tracking and recording personnel actions, including terminations. I assist in ensuring that all personnel actions comply with federal law, including those related to probationary employees.

3.      Probationary employees in the competitive service are employees who have been employed for less than one year. In the excepted service, the probationary period is two years.

4.      The probationary period is part of the hiring process, and probationary employees have extremely limited protections against termination compared to employees with final appointments.

5.      The probationary period is essentially an extended trial period for a finalized appointment. Supervisors evaluate probationary employees to determine whether the employees would be a good fit for long-term employment. While on probation, an employee receives no assurance of a final appointment.

6.      On January 20, 2025, my office received a guidance memorandum from the Office of Personnel Management ("OPM"), which requested that agencies review all probationary employees and identify which employees should be retained and which should be terminated.

7.      Consistent with the OPM guidance, the Department reviewed all probationary employees' performance to determine which employees to keep and which to terminate.

8.      Department records indicate that it fired 16 total probationary employees on or about February 13 and 14, 2025.

9.      The Court's order, requiring the Department to reinstate all probationary employees terminated on or about February 13 and 14, 2025, will impose substantial burdens on

1   the Department, cause significant confusion, and potentially subject terminated employees to

2   extreme whiplash.

3        10.    Offers of reinstatement will impose significant administrative burdens on the

4   Department.  Among other things, all reinstated employees will require onboarding, including

5   certain training, filling out human resources paperwork, obtaining new security badges, and re-

6   enrolling in benefits programs.

7        11.    Offers of reinstatement will also cause confusion for agency and employee alike.

8   Employees who were terminated just weeks ago will be offered reinstatement.  Yet an appellate

9   ruling could reverse the district court's order before terminated employees accept their

10  reinstatement or before they reenter on the job.  The Department could withdraw any offers of

11  reinstatement in that circumstance.  And even if the employees are reinstated prior to any

12  reversal of the district court's order, the reinstated employees will remain on probation and could

13  again be terminated.  In short, employees could be subjected to multiple changes in their

14  employment status in a matter of weeks.

15       12.    The tremendous uncertainty associated with this state of affairs would preclude

16  supervisors from appropriately managing their workforce.  Work schedules and assignments

17  would effectively be tied to hearing and briefing schedules set by the courts.  It would be

18  extremely difficult to assign new work to reinstated employees in light of the uncertainty over

19  their future status.

20       13.    Finally, offering reinstatement to terminated probationary employees will

21  interfere with the effective functioning of the Department.  Reinstating such employees would

22  undermine the efficiency of the Department.  In addition, it would interfere with the

23  Department's plans to implement the President's workforce optimization initiative.  The

24  Department has engaged in a broader effort to determine civilian reductions based on a

25  comprehensive readiness impact analysis on the size and appropriate mix of the Total Force.

26       Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

27  and correct.

28

Declaration of Timothy D. Dill in Support of Defendants' Motion to Stay March 13, 2025, Order
3:25-cv-1780-WHA

1   Dated: March 14, 2025

2

3   _____

4   Timothy D. Dill
    Performing the Duties of the

5   Assistant Secretary of Defense for
    Manpower and Reserve Affairs

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   PATRICK D. ROBBINS (CABN 152288)
    Acting United States Attorney
2   PAMELA T. JOHANN (CABN 145558)
    Chief, Civil Division
3   KELSEY J. HELLAND (CABN 298888)
    Assistant United States Attorney
4   U.S. ATTORNEY'S OFFICE
    450 Golden Gate Avenue, Box 36055
5   San Francisco, California 94102-3495

6   ERIC HAMILTON
    Deputy Assistant Attorney General
7   DIANE KELEHER
    Branch Director
8   CHRISTOPHER HALL
    Assistant Branch Director
9   JAMES D. TODD, JR.
    Senior Trial Counsel
10  U.S. DEPARTMENT OF JUSTICE
    Civil Division, Federal Programs Branch
11  P.O. Box 883
    Washington, DC 20044
12
13  *Counsel for Defendants*

14                    UNITED STATES DISTRICT COURT
15            FOR THE NORTHERN DISTRICT OF CALIFORNIA
                      SAN FRANCISCO DIVISION
16

17  AMERICAN FEDERATION OF              Case No. 3:25-cv-1780-WHA
    GOVERNMENT EMPLOYEES, *et al.*
18
19          Plaintiffs,                 **DECLARATION OF REESHA**
                                        **TRZNADEL IN SUPPORT OF**
20              v.                      **DEFENDANTS' MOTION FOR STAY OF**
                                        **MARCH 13, 2025, ORDER**
21  UNITED STATES OFFICE OF PERSONEL
    MANAGEMENT, *et al.*,
22
23          Defendants.

24
25
26
27
28

Declaration of Reesha Trznadel in Support of Defendants' Motion for Stay of March 13, 2025, Order
3:25-cv-1780-WHA

I, Reesha Trznadel, declare, pursuant to 28 U.S.C. § 1746, as follows:

1.      I am the Acting Chief Human Capital Officer of the Department of Energy ("Department"), headquartered in Washington, D.C. I have served in this position since February 28, 2025.

2.      In my Acting role at the Department, I oversee those responsible for personnel management. I oversee those responsible for tracking and recording personnel actions, including terminations. I assist in ensuring that all personnel actions comply with federal law, including those related to probationary employees.

3.      Probationary employees in the competitive service are generally employees who have been employed for less than one year. In the excepted service, the probationary period is two years for most employees.

4.      The probationary period is part of the hiring process, and the Department is generally subject to less stringent procedural requirements when terminating a probationary employee versus terminating employees with final appointments.

5.      The probationary period is an extended tryout for a finalized appointment. Supervisors evaluate probationary employees to determine whether the employees would be a good fit for long-term employment. An employee's appointment is not final until they have completed their probationary period.

6.      On January 20, 2025, although I was not serving in this position at that time, it is my understanding that the Department received a guidance memorandum from the Office of Personnel Management ("OPM"), which requested that agencies identify all probationary employees and determine whether those employees should be retained.

7.      The Department terminated approximately 555 probationary employees between February 13 and 14, 2025.

8.      The Court's order, requiring the Department to reinstate all probationary employees terminated on or about February 13 and 14, 2025, could impose administrative burdens on the Department.

9.      Offers of reinstatement could impose administrative burdens on the Department. Among other things, all reinstated employees will have to be identified, contacted, and onboarded again. The onboarding process includes going through training, filling out human resources paperwork, receiving new equipment, obtaining new security badges and clearances, and re-enrolling in benefits programs.

10.      I understand from managers that offers of reinstatement could cause confusion. Employees who were terminated just weeks ago will be offered reinstatement. Yet an appellate ruling could reverse the district court's order before terminated employees accept their reinstatement or before they reenter on the job. The Department could withdraw any offers of reinstatement in that circumstance. And even if the employees are reinstated prior to any reversal of the district court's order, the reinstated employees will remain on probation and could again be terminated. In short, employees could be subjected to multiple changes in their employment status in a matter of weeks.

11.      I understand from managers that the uncertainty associated with this state of affairs could impede supervisors from efficiently managing their workforce. Work schedules and assignments would effectively be tied to hearing and briefing schedules set by the courts. It would be inefficient and disruptive to assign new work to reinstated employees in light of the uncertainty over their future status.

12.      Finally, I understand from managers that offering reinstatement to terminated probationary employees could interfere with the effective functioning of the Department. Since February, the Department has made meaningful changes to accommodate the challenged terminations, including reassigning the necessary functions of the terminated employees.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 14, 2025

/s/ Reesha Trznadel
_____
REESHA TRZNADEL
ACTING CHIEF HUMAN CAPITAL OFFICER
US DEPARTMENT OF ENERGY

1  PATRICK D. ROBBINS (CABN 152288)
   Acting United States Attorney
2  PAMELA T. JOHANN (CABN 145558)
   Chief, Civil Division
3  KELSEY J. HELLAND (CABN 298888)
   Assistant United States Attorney
4  U.S. ATTORNEY'S OFFICE
   450 Golden Gate Avenue, Box 36055
5  San Francisco, California 94102-3495

6  ERIC HAMILTON
   Deputy Assistant Attorney General
7  DIANE KELEHER
   Branch Director
8  CHRISTOPHER HALL
   Assistant Branch Director
9  JAMES D. TODD, JR.
   Senior Trial Counsel
10 U.S. DEPARTMENT OF JUSTICE
   Civil Division, Federal Programs Branch
11 P.O. Box 883
   Washington, DC 20044
12
13 *Counsel for Defendants*

14              **UNITED STATES DISTRICT COURT**
15         **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
                 **SAN FRANCISCO DIVISION**
16

17 AMERICAN FEDERATION OF                    Case No. 3:25-cv-1780-WHA
   GOVERNMENT EMPLOYEES, *et al.*
18
                                             **DECLARATION OF MARK D. GREEN IN**
19          Plaintiffs,                      **SUPPORT OF DEFENDANTS' MOTION**
                                             **FOR STAY OF MARCH 13, 2025, ORDER**
20               v.

21 UNITED STATES OFFICE OF PERSONNEL
   MANAGEMENT, *et al.*,
22
            Defendants.
23

24
25
26
27
28

Declaration of Mark D. Green in Support of Defendants' Motion to Stay March 13, 2025, Order
3:25-cv-1780-WHA

I, Mark D. Green, declare, pursuant to 28 U.S.C. § 1746, as follows:

1. I am the Deputy Assistant Secretary for Human Capital, Learning, and Safety at the U.S. Department of the Interior ("Department"), headquartered in Washington, D.C. I have served in this position since September 2022.

2. In my role at the Department, I am responsible for personnel management. I have the responsibility for tracking and recording personnel actions, including terminations. I assist in ensuring that all personnel actions comply with federal law, including those related to probationary and trial period appointees.

3. Probationary appointees in the competitive service are individuals who have been working in their respective positions for less than one year. In the excepted service, the trial period is generally two years.

4. Probationary and trial periods are part of the hiring process, and probationary and trial period appointees have extremely limited protections against termination compared to individuals who satisfy the definition of "employee," and accordingly enjoy greater due process protections.

5. Probationary and trial periods are essentially extended tryouts for finalized appointments. Supervisors evaluate probationary and trial period appointees to determine whether the individuals would be a good fit for long-term employment. While working throughout probationary or trial periods, individuals receive no assurance of final appointments and of becoming employees.

6. On or about January 20, 2025, I reviewed a guidance memorandum issued by the Office of Personnel Management ("OPM"), which requested that the Department and other agencies review all probationary and trial period appointees and identify which individuals should be retained and which should be terminated.

7. Consistent with the OPM guidance, the Department reviewed all probationary and trial period appointees' performances to determine which individuals to keep and which to terminate.

8.      The Department continued this review process even after OPM clarified its earlier guidance on February 14 and 24, 2025.

9.      On or after February 14, 2025, the Department terminated the competitive service appointments of 1303 individuals during their respective probationary periods and terminated the excepted service appointments of 409 individuals during their respective trial periods. Although OPM offered language for potential use in developing termination notices, the Department did not adopt OPM's suggestions, and instead, independently developed language used in the termination notices that informed affected individuals of these personnel decisions.

10.     The Court's order, requiring the Department to reinstate all probationary and trial period appointees terminated on or after February 14, 2025, will impose substantial burdens on the Department, cause significant confusion, and potentially subject terminated individuals to the receipt of conflicting or contradictory information.

11.     Offers of reinstatement will impose significant administrative burdens on the Department. Among other things, all reinstated individuals will have to be onboarded again, which would include the labor-intensive processes of coordinating human resources efforts and paperwork, issuing new security badges, re-enrolling affected individuals in benefits programs, and calculating and processing the amount of any financial obligation that the Department may owe as a result of the reinstatement offers and the amounts, if any, that reinstated individuals request to have withheld for various work-related benefits.

12.     Offers of reinstatement will also cause confusion for the Department and terminated individuals, more than three hundred (300) of whom have appeals currently pending before Administrative Judges assigned to U.S. Merit Systems Protection Board (MSPB) Regional and Field Offices. Persons who were terminated just weeks ago would receive reinstatement offers, the issuance of which would impact pending or potential MSPB appeals. Yet an appellate ruling could reverse the district court's order before terminated individuals accept their reinstatement or before they re-enter on the job. The Department could withdraw any offers of reinstatement in that circumstance and correspondingly impact pending or potential MSPB appeals. And even if the individuals are reinstated prior to any reversal of the district

Declaration of Mark D. Green in Support of Defendants' Motion to Stay March 13, 2025, Order
3:25-cv-1780-WHA

1  court's order, the reinstated individuals may remain as probationary or trial period appointees

2  and could again be subject to termination actions, which would again inform affected individuals

3  of their rights associated with filing MSPB appeals, filing complaints pursuant to processes

4  established by the U.S. Equal Employment Opportunity Commission, and filing complaints

5  pursuant to processes established by the U.S. Office of Special Counsel.  In short, individuals

6  could be subjected to multiple changes in their employment status in a matter of weeks and could

7  be forced to untangle the maze of their potential appeal rights.

8      13.    The tremendous uncertainty associated with this confusion and these

9  administrative burdens would preclude supervisors from appropriately managing their

10  workforce. Work schedules and assignments would effectively be tied to hearing and briefing

11  schedules set by the courts. It would be extremely difficult to assign new work to reinstated

12  individuals in light of the uncertainty over their future status.

13      14.    Finally, offering reinstatement to terminated probationary or trial period

14  appointees will interfere with the effective functioning of the Department. On and after February

15  14, 2025, the Department has made meaningful changes to address the challenged terminations,

16  including reassigning the duties performed by the terminated individuals, many of whom would

17  have no duties to perform if they accepted reinstatement.

18      Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

19  and correct.

20  Dated: March 14, 2025

21

22

23  /s/ _____ Digitally signed by
    MARK GREEN
    Date: 2025.03.14
    14:33:28 -04'00'

24  MARK D. GREEN

25

26

27

28

Declaration of Mark D. Green in Support of Defendants' Motion to Stay March 13, 2025, Order
3:25-cv-1780-WHA
3

1　PATRICK D. ROBBINS (CABN 152288)
　　Acting United States Attorney
2　PAMELA T. JOHANN (CABN 145558)
　　Chief, Civil Division
3　KELSEY J. HELLAND (CABN 298888)
　　Assistant United States Attorney
4　U.S. ATTORNEY'S OFFICE
　　450 Golden Gate Avenue, Box 36055
5　San Francisco, California 94102-3495

6　ERIC HAMILTON
　　Deputy Assistant Attorney General
7　DIANE KELEHER
　　Branch Director
8　CHRISTOPHER HALL
　　Assistant Branch Director
9　JAMES D. TODD, JR.
　　Senior Trial Counsel
10　U.S. DEPARTMENT OF JUSTICE
　　Civil Division, Federal Programs Branch
11　P.O. Box 883
　　Washington, DC 20044
12

13　*Counsel for Defendants*

14　　　　　　　UNITED STATES DISTRICT COURT
　　　　　　**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
15　　　　　　　　**SAN FRANCISCO DIVISION**

16

17　AMERICAN FEDERATION OF
　　GOVERNMENT EMPLOYEES, *et al.*
18

19　　　　　Plaintiffs,

20　　　　　　v.

21　UNITED STATES OFFICE OF PERSONNEL
　　MANAGEMENT, *et al.*,
22

23　　　　　Defendants.

24

Case No. 3:25-cv-1780-WHA

**DECLARATION OF TREVOR NORRIS IN
SUPPORT OF DEFENDANTS' MOTION
FOR STAY OF MARCH 13, 2025, ORDER**

25

26

27

28

I, Trevor Norris, declare, pursuant to 28 U.S.C. § 1746, as follows:

1.    I am Deputy Assistant Secretary (DAS) for Human Resources (HR) for the United States Department of the Treasury, headquartered in Washington, D.C.  I have served in this position since October 2017.

2.    As DAS for HR, I oversee all human capital programs for the Department of the Treasury and its bureaus (collectively, "Treasury"). I have the responsibility for tracking and recording personnel actions, including terminations.

3.    Based on my roles and responsibilities, I am familiar with the number of separated probationary Treasury employees affected by the Court's March 13, 2025, Order.

4.    Treasury separated 7,605 probationary employees between February 19 and March 7, 2025.

5.    The Court's order requiring reinstatement of these terminated employees will impose substantial burdens on Treasury, cause significant confusion, and potentially subject terminated employees to extreme whiplash.

6.    Treasury would face several administrative challenges in returning terminated probationary employees to the rolls and onboarding them. These include developing official notice to mail and/or email to affected employees; processing back pay; restoration of benefits; issuing equipment; putting the individuals back into personnel systems; finding work space since the Agency has executed a return to office as of March 10, 2025; allowing building access; re-credentialing; and reallocation of work.

7.    Offers of reinstatement will also cause confusion for agency and employee alike. Employees who were terminated just weeks ago will be offered reinstatement. Yet an appellate ruling could reverse the district court's order before terminated employees accept their reinstatement or before they reenter on the job. Treasury could withdraw any offers of reinstatement in that circumstance. And even if the employees are reinstated prior to any reversal of the district court's order, the reinstated employees will remain on probation and could again be terminated. Further, in response to President Trump's February 11, 2025, Executive Order *Implementing the President's "Department of Government Efficiency" Workforce Optimization*

1    *Initiative*, Treasury has submitted Phase 1 of its Agency Reduction in Force and Reorganization

2    Plan (ARRP) to the Office of Management and Budget and Office of Personnel Management.

3    This plan contemplates significant personnel reductions in Treasury bureaus under Reduction in

4    Force procedures that will almost certainly result in subsequent removal of an unknown number

5    of these probationary employees.  In short, employees could be subjected to multiple changes in

6    their employment status in a matter of weeks.

7         8.    The uncertainty associated with this situation would challenge supervisors in

8    effectively managing their workforce. Work schedules and assignments would effectively be tied

9    to hearing and briefing schedules set by the courts. It would be difficult to assign new work to

10   reinstated employees considering the uncertainty over their future status.

11

12        Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

13   and correct.

14   Dated: March 14, 2025

15

16        John T.    Digitally signed
           by John T. Norris

17        Norris     Date: 2025.03.14
                     13:20:05 -04'00'

18        J. Trevor Norris

19

20

21

22

23

24

25

26

27

28

Declaration of Trevor Norris in Support of Defendants' Motion to Stay March 13, 2025, Order
3:25-cv-1780-WHA

PATRICK D. ROBBINS (CABN 152288)
Acting United States Attorney
PAMELA T. JOHANN (CABN 145558)
Chief, Civil Division
KELSEY J. HELLAND (CABN 298888)
Assistant United States Attorney
U.S. ATTORNEY'S OFFICE
450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495

ERIC HAMILTON
Deputy Assistant Attorney General
DIANE KELEHER
Branch Director
CHRISTOPHER HALL
Assistant Branch Director
JAMES D. TODD, JR.
Senior Trial Counsel
U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, DC 20044

*Counsel for Defendants*

## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

|  |  |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, *et al.* <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES OFFICE OF PERSONEL MANAGEMENT, *et al.*, <br><br> Defendants. | Case No. 3:25-cv-1780-WHA <br><br> **DECLARATION OF MARK ENGELBAUM IN SUPPORT OF DEFENDANTS' MOTION FOR STAY OF MARCH 13, 2025, ORDER** |

I, Mark Engelbaum, declare, pursuant to 28 U.S.C. § 1746, as follows:

1.      I am the Assistant Secretary of Human Resources and Administration/Operations, Security, and Preparedness of the Department of Veterans Affairs ("Department"), headquartered in Washington, D.C.  I have served in this position since February 13, 2025.

2.      In my role at the Department, I am responsible for personnel management. I have the responsibility for overseeing the personnel enterprise and tracking and recording of personnel actions, including terminations. I assist in ensuring that all personnel actions comply with federal law, including those related to probationary employees.

3.      Probationary employees in the competitive service are employees who have been employed for less than one year. In the excepted service, the probationary period may be up to two years.

4.      The probationary period is part of the hiring process, and probationary employees have limited protections against termination.

5.      The probationary period is essentially an extended tryout to determine the fitness of the employee and, according to regulation, an agency "shall terminate his or her services during this period if the employee fails to demonstrate fully his or her qualifications for continued employment."

6.      On January 20, 2025, the VA received a guidance memorandum from the Office of Personnel Management ("OPM"), which stated that "agencies should identify all employees on probationary periods" and "should promptly determine whether those employees should be retained at the agency."

7.      The  Department fired approximately 500 probationary employees between February 13 and 14, 2025, out of approximately 46,000 probationary employees onboard at that time.

8.      The Court's order, requiring the Department to reinstate all probationary employees terminated on or about February 13 and 14, 2025, will impose substantial burdens on the Department, cause significant confusion, and will cause turmoil for the terminated employees.

9.      Specifically, all employees offered reinstatement will have to be onboarded again, including going through applicable training, filling out human resources paperwork, obtaining new security badges, re-enrolling in benefits programs and payroll, reinstituting applicable security clearance actions, receiving government furnished equipment, and other requisite administrative actions, such as auditing personnel requests to ensure any actions that would have otherwise been taken during their period of separation are completed.

10.      Additionally, an appellate ruling could reverse the district court's order before terminated employees accept their reinstatement or before / after they reenter on the job. In short, employees could be subjected to multiple changes in their employment status in a matter of weeks.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 14, 2025


_/s/ Mark Engelbaum_
Mark Engelbaum

1 PATRICK D. ROBBINS (CABN 152288)
Acting United States Attorney
2 PAMELA T. JOHANN (CABN 145558)
Chief, Civil Division
3 KELSEY J. HELLAND (CABN 298888)
Assistant United States Attorney
4 U.S. ATTORNEY'S OFFICE
450 Golden Gate Avenue, Box 36055
5 San Francisco, California 94102-3495

6 ERIC HAMILTON
Deputy Assistant Attorney General
7 DIANE KELEHER
Branch Director
8 CHRISTOPHER HALL
Assistant Branch Director
9 JAMES D. TODD, JR.
Senior Trial Counsel
10 U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
11 P.O. Box 883
Washington, DC 20044
12

13 *Counsel for Defendants*

14                    **UNITED STATES DISTRICT COURT**
15             **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
                        **SAN FRANCISCO DIVISION**
16

17 AMERICAN FEDERATION OF          Case No. 3:25-cv-1780-WHA
   GOVERNMENT EMPLOYEES, *et al.*
18
            Plaintiffs,              **DECLARATION OF MARY PLETCHER**
19                                   **RICE IN SUPPORT OF DEFENDANTS'**
               v.                    **MOTION FOR STAY OF MARCH 13,**
20                                   **2025, ORDER**
   UNITED STATES OFFICE OF PERSONEL
21 MANAGEMENT, *et al.*,

22         Defendants.

23

24

25

26

27

28

Declaration of Mary Pletcher Rice in Support of Defendants' Motion to Stay March 13, 2025, Order
3:25-cv-1780-WHA

1       I, Mary Pletcher Rice, declare, pursuant to 28 U.S.C. § 1746, as follows:

2       1.      I am the Acting Principal Deputy Assistant Secretary for Administration within

3 Departmental Administration at the United States Department of Agriculture ("USDA" or

4 "Department"), headquartered in Washington, D.C.  I have served in this position since January

5 31, 2025, and I have been employed at USDA since 2018.

6       2.      In my role at USDA, I currently oversee the Department's Office of Human

7 Resources Management and I have purview over USDA subagencies' Chief Operating Officers

8 and Human Resources Offices.

9       3.      Approximately 5,714 probationary employees were terminated from USDA

10 beginning February 13, 2025, and concluding on or around February 17, 2025.

11       4.      USDA is already reinstating the terminated probationary employees, pursuant to a

12 45-day March 5, 2025, Stay Order from the Merit Systems Protection Board, which was

13 requested by the Office of Special Counsel.

14       5.      Whether required by operation of the March 5, 2025, MSPB Stay Order and/or

15 this Court's March 13, 2025, Order granting a preliminary injunction, reinstating the terminated

16 probationary employees is complex and places the following logistical burdens on USDA and its

17 approximately 29 subordinate Mission Areas, Agencies, and Staff Offices, including USDA's

18 multiple human resources offices: (1) initiating the process of placing all removed probationary

19 employees, who received February 2025 termination letters, into pay status, and providing

20 backpay, from the date of the termination notice through the present, which involves several

21 systems and applies across multiple pay periods; (2) ascertaining whether some of the

22 probationary employees choose to resign, due to having secured other employment or not

23 wanting to return to duty at USDA; (3) reinstituting and ensuring operational status of secured

24 LincPasses, office space, and equipment (including laptops in most instances) for those

25 individuals whose mission criticality requires on-site work; and (4) addressing, as appropriate,

26 any identified or substantiated threats to the physical safety of USDA's existing 111,000 person

27 workforce and security of USDA's physical plants and assets across the nation.

28

1    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

2  and correct.

3

4  Dated: March 14, 2025

5

6    MARY RICE    Digitally signed by
                   MARY RICE
7                  Date: 2025.03.14
                   15:01:04 -04'00'

8    _____
     MARY PLETCHER RICE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Declaration of Mary Pletcher Rice in Support of Defendants' Motion to Stay March 13, 2025, Order
3:25-cv-1780-WHA

PATRICK D. ROBBINS (CABN 152288)
Acting United States Attorney
PAMELA T. JOHANN (CABN 145558)
Chief, Civil Division
KELSEY J. HELLAND (CABN 298888)
Assistant United States Attorney
U.S. ATTORNEY'S OFFICE
450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495

ERIC HAMILTON
Deputy Assistant Attorney General
DIANE KELLEHER
Branch Director
CHRISTOPHER HALL
Assistant Branch Director
JAMES D. TODD, JR.
Senior Trial Counsel
YURI S. FUCHS
Trial Attorney
U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, DC 20044

*Counsel for Defendants*

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, *et al.*<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OFFICE OF PERSONNEL MANAGEMENT, *et al.*,<br><br>Defendants. | Case No. 3:25-cv-1780-WHA<br><br>**DEFENDANTS' NOTICE OF FILING OF EVIDENCE**<br><br>The Hon. William H. Alsup |

Defendants write to: (i) submit additional documentation and to (ii) identify materials of which the Court may take judicial notice, both in support of their legal arguments in advance of the Court's March 13, 2025 hearing. Previously, in support of their Opposition to Plaintiffs' Motion for a Temporary Restraining Order on February 26, 2025, *see* ECF No. 33, Defendants submitted the following materials:

- Office of Personnel Management's ("OPM") Guidance on Probationary Periods, Administrative Leave and Details, dated January 20, 2025. *See* Ex. 1 (previously ECF No. 37).

- An email dated February 14, 2025 from OPM to the Chief Human Capital Officers ("CHCO") council providing additional information to agencies. *See* Ex. 2 (previously ECF No. 37-1).

- A frequently asked questions ("FAQs") document issued by OPM on February 24, 2025, providing additional information on how agencies should evaluate probationary employees. *See* Ex. 3 (previously ECF No. 37-2).

- An email dated February 24, 2025 from OPM to CHCOs and Deputy CHCOs attaching the aforementioned FAQs document. *See* Ex. 4 (previously ECF No. 37-3).

Because these items were part of the now-withdrawn declaration of Acting OPM Administrator Charles Ezell, Defendants re-submit them as exhibits attached to this filing. Defendants will include all of them in the forthcoming administrative record in this matter.

Subsequently, on March 7, 2025, Defendants submitted in support of their opposition to Plaintiffs' motion for leave to file a Second Amended Complaint:

- OPM's revised guidance on March 4, 2025 clarifying that "OPM is not directing agencies to take any specific performance-based actions regarding probationary employees[,]" and further clarifying that "[a]gencies have ultimate decision-making authority over, and responsibility for, such personnel actions." ECF No. 64-1; *see also* ECF No. 78.

And then in response to this Court's Second Request for Information, Defendants submitted on March 10, 2025:

- A template letter attached to a February 14, 2025 email sent by OPM to various CHCOs. ECF No. 87-1.

As a further part of their evidentiary presentation before this Court, Defendants now submit the following, additional documentary evidence in support of their arguments that OPM did not direct agencies to terminate probationary employees, which Defendants will include in the forthcoming administrative record prepared for this APA matter:

- A February 12, 2025 e-mail titled "[Action Due 2/13] Probationary Employee Actions" sent by OPM to Chiefs of Staff clarifying next steps following OPM's guidance, *see* Ex. 5, and attaching a template letter previously produced by Defendants, *see* ECF No. 87-1.

In addition, Defendants identify the following materials of which the Court may take judicial notice in support of their arguments that OPM did not direct agencies to terminate probationary employees:

- The President's Executive Order titled "Hiring Freeze," dated January 20, 2025, in which the President imposed a freeze on federal hiring; ordered the Office of Management and Budget to "submit a plan to reduce the size of the Federal Government's workforce through efficiency improvements and attrition"; and instructed that, "[i]n carrying out this memorandum, the heads of executive departments and agencies shall seek efficient use of existing personnel and funds to improve public services and the delivery of these services," *see* Ex. 6, *also available at* https://www.whitehouse.gov/presidential-actions/2025/01/hiring-freeze.
- The President's Executive Order titled "Implementing The President's 'Department of Government Efficiency' Workforce Optimization Initiative," dated February 11, 2025, in which the President ordered that "Agency Heads shall promptly undertake preparations to initiate large-scale reductions in force (RIFs),

consistent with applicable law, and to separate from Federal service temporary
employees and reemployed annuitants working in areas that will likely be subject
to the RIFs," *see* Ex. 7, *also available at*
https://www.whitehouse.gov/presidential-actions/2025/02/implementing-the-
presidents-department-of-government-efficiency-workforce-optimization-
initiative.

- A Fact Sheet published by the White House titled "Fact Sheet: President Donald
  J. Trump Works to Remake America's Federal Workforce," dated February 11,
  2025, indicating that "Agency Heads will coordinate and consult with DOGE to
  shrink the size of the federal workforce and limit hiring to essential positions";
  that "Agencies will undertake plans for large-scale reductions in force and
  determine which agency components (or agencies themselves) may be eliminated
  or combined because their functions aren't required by law"; that "President
  Donald J. Trump is committed to reducing the size and scope of the federal
  government"; and that "President Trump has made reforming the federal
  workforce a key priority for his second term." *See* Ex. 8, *also available at*
  https://www.whitehouse.gov/fact-sheets/2025/02/fact-sheet-president-donald-j-
  trump-works-to-remake-americas-federal-workforce.

- A February 13, 2025 statement from the Department of Veteran Affairs ("VA"),
  noting that VA's terminations of probationary employees exempted employees
  "in mission-critical positions" and were "part of a government-wide Trump
  Administration effort to make agencies more efficient, effective and responsive to
  the American People," and including the following statement from VA Secretary
  Doug Collins "This was a tough decision, but ultimately it's the right call to better
  support the Veterans, families, caregivers, and survivors the department exists to
  serve." *See* Ex. 9, *also available at* https://news.va.gov/press-room/va-dismisses-
  more-than-1000-employees.

- A February 14, 2025 statement from the Department of Agriculture ("USDA"), explaining that "USDA is pursuing an aggressive plan to optimize its workforce by eliminating positions" as "[p]er the President's directives." *See* Ex. 10, *also available at* https://www.usda.gov/about-usda/news/press-releases/2025/02/14/secretary-rollins-takes-bold-action-stop-wasteful-spending-and-optimize-usda-better-serve-american.

- A February 21, 2025 statement from the Department of Defense titled "DoD Probationary Workforce Statement," indicating that "the Department of Defense is re-evaluating our probationary workforce, consistent with the President's initiative to reform the Federal workforce to maximize efficiency and productivity," and that "This re-evaluation of probationary employees is being done across government, not just at the Defense Department, but we believe in the goals of the program, and our leaders are carrying out that review carefully and smartly." *See* Ex. 11, *also available at* https://www.defense.gov/News/Releases/Release/Article/4074278/dod-probationary-workforce-statement.

- A March 11, 2025 statement from the Department of Education announcing a reduction in force, to be conducted in accordance with separate legal requirements applicable to reductions in force, "[a]s part of the Department of Education's final mission." Ex. 12, *also available at* https://www.ed.gov/about/news/press-release/us-department-of-education-initiates-reduction-force.

Defendants intend to rest on this documentary evidence and their legal arguments at the upcoming hearing. Defendants submit that further discovery and evidentiary issues in this APA case should be taken up, if necessary, following Defendants' preparation of an administrative record. *See* ECF No. 97 at 1-2.

Dated: March 12, 2025

Respectfully submitted,

PATRICK D. ROBBINS (CABN 152288)
Acting United States Attorney
PAMELA T. JOHANN (CABN 145558)
Chief, Civil Division
KELSEY J. HELLAND (CABN 298888)
Assistant United States Attorney
U.S. ATTORNEY'S OFFICE
450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495

ERIC HAMILTON
Deputy Assistant Attorney General

DIANE KELLEHER
Branch Director

CHRISTOPHER HALL
Assistant Branch Director

JAMES D. TODD, JR.
Senior Trial Counsel

s/ Yuri S. Fuchs
YURI S. FUCHS
Trial Attorney
U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, DC 20044

*Counsel for Defendants*

Att. A

**UNITED STATES OFFICE OF PERSONNEL MANAGEMENT**
Washington, DC 20415

The Director

# MEMORANDUM

| | |
|---|---|
| **TO:** | Heads and Acting Heads of Departments and Agencies |
| **FROM:** | Charles Ezell, Acting Director, U.S. Office of Personnel Management |
| **DATE**: | January 20, 2025 |
| **RE**: | Guidance on Probationary Periods, Administrative Leave and Details |

---

The U.S. Office of Personnel Management (OPM) is providing the following guidance to agencies regarding critical potential personnel actions. Specifically, this memorandum deals with 1) probationary periods, and 2) administrative leave and details.

## I.  Probationary Periods

Probationary periods are an essential tool for agencies to assess employee performance and manage staffing levels.[1] Employees on probationary periods can be terminated during that period without triggering appeal rights to the Merit Systems Protection Board (MSPB).[2]

Generally, employees in the competitive service with less than one year of service, and in the excepted service with less than two years of service, can be terminated without triggering MSPB appeal rights.[3] This applies to temporary employees on appointments "not to exceed" a date certain.[4]

No later than January 24, 2025, agencies should identify all employees on probationary periods, who have served less than a year in a competitive service appointment, or who have served less than two years in an excepted service appointment, and send a report to OPM listing all such employees to employeeaccountability@opm.gov, with a copy to Amanda Scales at amanda.scales@opm.gov. In addition, agencies should promptly determine whether those employees should be retained at the agency.

## II.  Administrative Leave and Details

---

[1] *See* U.S. Merit Systems Protection Board Report to the President and Congress, *The Probationary Period: A Critical Assessment Opportunity* (August 2005), https://www.mspb.gov/studies/studies/The_Probationary_Period_A_Critical_Assessment_Opportunity_224555.pdf.

[2] *Starkey v. Dep't of Hous. and Urban Dev.*, 2024 MSPB 6, ¶ 16; *Marynowski v. Dep't of the Navy*, 2012 MSPB 82, ¶ 4 (2012).

[3] *Forest v. Merit Sys. Prot. Bd*, 47 F.3d 409, 412 (Fed. Cir. 1995); *Holmes v. Merit Sys. Prot. Bd*., 655 F. App'x 816, 818 (Fed. Cir. 2016); see also 5 U.S.C. §§ 7511(a)(1)(A), (C).

[4] *See Forest,* 47 F.3d at 410*; Holmes,* 655 F. App'x at 816.

"Federal agencies have the discretion to grant paid administrative leave to employees to help manage their workforces when it is in their best interest to do so."[5] The flexibility given to agencies in using paid administrative leave reflects the fact that "heads of Executive agencies have broad authority to manage their organizations, including the authority to grant administrative leave, unless prohibited by law."[6]

OPM regulations note four pertinent areas where paid administrative leave is appropriate: (1) "the absence is directly related to the agency's mission," (2) "the absence is officially sponsored or sanctioned by the agency," or (3) "the absence will clearly enhance the professional development or skills of the employee in the employee's current position," or (4) "the absence is in the interest of the agency or of the Government as a whole."[7] "An agency must retain the discretion to grant or not grant administrative leave in any circumstance based on agency judgments regarding mission needs."[8]

Placing an employee on paid administrative leave may be an appropriate action where the agency component in which the employee works is being eliminated or restructured, or where the agency weighs changes to the individual's role at the agency as part of a workforce realignment. It also may be appropriate when a new agency manager determines that the absence of the employee from the office "is in the interest of the agency or of the Government as a whole."[9] Agencies are encouraged to use flexibilities associated with paid administrative leave as they implement agency restructuring initiatives or determine the best ways to manage agency components going forward.

In addition, agency heads have broad discretion to detail employees "among the bureaus and offices of [their] department[s]" for up to 120 days by written order.[10] An agency may temporarily detail an employee to "unclassified duties."[11] Such details may provide additional

---

[5] *Administrative Leave, Investigative Leave, and Notice Leave*, 89 Fed. Reg. 10,2256-01 (Dec. 17, 2024).

[6] U.S. Office of Personnel Management, *Fact Sheet: Administrative Leave*, https://www.opm.gov/policy-data-oversight/pay-leave/leave-administration/fact-sheets/administrative-leave/.

[7] 5 C.F.R. § 630.1403(a)(1).

[8] 5 C.F.R. § 630.1403(a)(4). OPM reiterates that while "[t]he effective date for these regulations addressing administrative leave (subpart N) and investigative and notice leave (subpart O) is 30 days after the date of publication," nonetheless "the compliance date is set as 270 days after the date of publication." 89 Fed. Reg. at 10,2257. That is, agencies must " revise and implement their internal policies consistent with the Act within 270 calendar days from the date OPM prescribes the regulations," and "[a]gencies are responsible for compliance with time limits provided for in the Act, these OPM regulations, and any related guidance." *Id.* OPM thus believes that agencies are not required to comply with the administrative leave rule and new regulations until September 13, 2025, the deadline for agencies to issue their own implementing regulations. **OPM requests that agencies not issue any agency-specific rules until such rules have been reviewed and approved by OPM.**

[9] 5 C.F.R. § 630.1403(a)(1).

[10] 5 U.S.C. § 3341.

[11] *Frankel v. Dep't of Educ.*, 17 M.S.P.R. 453, 455–56 (1983).

flexibilities to agencies during the transition period and as agencies undertake reorganization efforts and close offices.

Please do not hesitate to contact OPM if you have any questions regarding these matters at employeeaccountability@opm.gov, with a copy to Amanda Scales at amanda.scales@opm.gov.

cc: Chief Human Capital Officers (CHCOs), Deputy CHCOs, and Human Resources Directors

Att. B

**From:** CHCO Council
**Sent:** Friday, February 14, 2025 12:48 PM
**Subject:** Follow up: CHCO Council Special Session

CHCOs and Deputy CHCOs,

Thank you for your time today.

This message clarifies immediate next steps for probationary employees.

Over the past several days, agencies have worked to review, clean up, and finalize their lists of probationary employees they wish to keep, and wish to terminate, and begin taking action.

We have asked that you separate probationary employees that you have not identified as mission-critical no later than end of the day Monday, 2/17. We have attached a template letter.  The separation date should be as soon as possible that is consistent with applicable agency policies (including those in CBAs).

Guidance from the Office of Personnel Management ("OPM") states, "An appointment is not final until the probationary period is over," and the probationary period is part of "the hiring process for employees."  A probationer is still an applicant for a finalized appointment to a particular position as well as to the Federal service.   "Until the probationary period has been completed," a probationer has "the burden to demonstrate why it is in the public interest for the Government to finalize an appointment to the  civil service for this particular individual." Thus, the probationary period is part of the federal hiring process; there is currently a hiring freeze; and a probationer has no right to continued employment in the federal government.

An employee's performance must be measured in light of the existing needs and interests of government. OPM has emphasized that individual employee performance measurement should be "aligned with and support organizational goals" and "focus[] employee efforts on achieving organizational and group goals." An employee's performance must be viewed through the current needs and best interest of the government, in light of the President's directive to dramatically reduce the size of the federal workforce.

Through the exemptions process, agencies have identified the highest-performing probationers in mission critical areas. Regulations on probationary periods state: "The agency shall utilize the

2-ER-238

probationary period as fully as possible to determine the fitness of the employee and shall terminate his or her services during this period if the employee fails to demonstrate fully his or her qualifications for continued employment." 5 CFR 315.803.  OPM believes "qualifications for continued employment" in the current context means that only the highest-performing probationers in mission-critical areas should be retained.

After actioning, please update the previous probationary employee spreadsheet you've sent us to include the information below. **Please resend the updated version to** tracking@opm.gov **with Amanda Scales and Jamie Sullivan on cc by 8:00pm EST Monday**. This tracker should include:

- Which probationary employees have been terminated and which you plan to keep. For those you plan to keep, provide an explanation of why.
- For each probationary employee, indicate if they have opted into the deferred resignation program or not. This can be done by cross-checking the latest submissions sent to you via tracking@opm.gov. Please also indicate whether you have signed a written deferred resignation agreement with them or not.
- Probation end date.

**Please continue providing these reports daily through at least the end of next week.**

We have also attached a template Probationary tracker for your reports today.

Thank you,
OPM

(138 of 275), Page 138 of 275 Case: 25-1677, 05/22/2025, DktEntry: 45.3, Page 138 of 275
Case 3:25-cv-01780-WHA Document 157-3 Filed 03/26/25 Page 1 of 5
Att. C

## FAQs on Probationary Periods

### *Probationary Periods in the Competitive Service*

**Q: How should agencies evaluate the performance of an employee serving a probationary or trial period?**
A: An employee's performance must be measured in light of the existing needs and interests of government. OPM has emphasized that individual employee performance measurement should be "aligned with and support organizational goals" and "focus[] employee efforts on achieving organizational and group goals." An employee's performance must be viewed through the current needs and best interest of the government, in light of the President's directive to dramatically reduce the size of the federal workforce.

**Q: Under 5 C.F.R. § 315.803, agencies are expected to fully utilize probationary periods and terminate an employee during this period "if the employee fails to demonstrate fully his or her qualifications for continued employment." How should agencies evaluate whether an employee demonstrated his or her qualifications for continued employment?**
A: OPM believes "qualifications for continued employment" means that only the highest-performing probationers in mission-critical areas should be retained.

**Q: What procedures should an agency follow when terminating a probationary employee for unsatisfactory performance or conduct?**
A: When an agency decides to terminate an employee serving a probationary period because work performance or conduct fails to demonstrate fitness or qualifications for continued employment, the agency must notify the employee in writing as to why the employee is being terminated and the effective day of the action. 5 C.F.R. § 315.804. The notice must include the agency's conclusions as to the inadequacies of the employee's performance or conduct.

In addition, under 5 C.F.R. § 315.804(b), the probationary period ends when the employee completes his or her scheduled tour of duty on the day before the anniversary date of the appointment.[1]

**Q: What procedures should an agency follow when terminating a probationary employee for conditions arising before appointment?**
A: When an agency decides to terminate an employee serving a probationary period for reasons related to conditions arising before appointment, the employee is entitled to the following procedures established under 5 C.F.R. § 315.805:

- advance written notice from the agency stating the reasons, in detail for the proposed action;
- a reasonable time for responding in writing to the agency; and,

---

[1] *See e.g. Stewart v. Dep't of Transp.*, 2023 MSPB 18, ¶17 (2023).

1

- a notice, in writing, of the reasons for the agency's decision, and the right to appeal to the MSPB.

### *Appeal Rights and Negotiated Grievance Procedures*

**Q: Does prior federal service count towards completion of an employee's probationary period?**

A: Under certain conditions, prior federal civilian service counts toward the completion of the probationary period.[2] If an agency employee meets the statutory definition of "employee" under 5 U.S.C. § 7511(a), the employee may have adverse action procedural rights and may not be terminated using probationary termination procedures.

**Q: May an employee serving a probationary period appeal a termination to the MSPB?**

A: Under 5 C.F.R. § 315.806, an employee may appeal to the MSPB only if the termination is not required by statute and the employee alleges that the agency discriminated against him or her based on partisan political reasons or marital status. Where an agency terminates a probationary employee based in whole or in part on conditions arising before appointment, the employee may appeal to the MSPB if he or she alleges that the agency did not follow the procedures established under 5 C.F.R. § 315.805.

**Q: What procedures must agencies follow when terminating a term employee in the competitive service during a trial period?**

A: Terminating an employee on a trial period in the competitive service are subject to the same procedures described above for terminating an employee on a probationary period in the competitive service.

**Q: What procedures must agencies follow when terminating an employee appointed to a position in the excepted service who is serving a trial period?**

A: The head of an agency may establish a probationary or trial period for an employee given a permanent appointment in the excepted service unless otherwise provided in statute or regulation. The head of the agency must also establish procedures for terminations in the excepted service.

**Q: May an employee serving a probationary or trial period grieve a termination under negotiated grievance procedures?**

A: Generally, employees serving a probationary or trial period do not have recourse under negotiated grievance procedures to challenge terminations exercised under 5 U.S.C. 3321 and OPM's regulations at 5 C.F.R. part 315, subpart H. It is well established that procedural protections that enable probationary employees to challenge terminations and termination-related matters are inconsistent with these legal authorities and, therefore, unenforceable through negotiated

---

[2] *See* 5 C.F.R. § 315.802.

2

grievance procedures.[3] However, agencies operating under different personnel systems need to verify whether the same or similar legal authorities apply to their personnel.

**Q: Which nature of action codes and legal authority codes are used to process probationary termination personnel actions?**

A: Chapter 31 of OPM's Guide to Processing Personnel Actions (GPPA) provides information on appropriate nature of action codes (NOAC) and legal authority codes (LAC) for "Separations Other than Resignations and Retirements." This includes probationary terminations. The NOAC and LAC selected should be consistent with the reasons the agency stated in the probationary termination notices. For example, Rules 31, 32, and 33 address separations based on unacceptable or unsatisfactory performance or other factors unrelated to misconduct or delinquency. If the employee is serving 1) an initial probationary period; or 2) a trial period required by civil service or agency regulation; or 3) a probationary period in the Senior Executive Service, then the NOAC would be 385; the appropriate LAC would be 1) L2M; 2) L4M; or 3) V2M, respectively. Rule 34 of the GPPA addresses the appropriate NOAC and LAC for employees serving on an appointment not described in Rules 31-33.

The GPPA describes other reasons the probationary termination may have been based on. As noted earlier, the NOAC and LAC selected should be consistent with the reasons the agency stated in the termination notices.

Rule 66 of the GPPA may be appropriate "under circumstances not described elsewhere" in Table 31-B of the GPPA. If the reasons stated in the termination letter are outside the other rules in Table 31-B of the GPPA, Rule 66 could be applied.

### *Probationary Periods in the Senior Executive Service (SES)*

**Q: How long is the probationary period for SES career appointments?**

A: An individual who receives an SES career appointment must serve a one-year probationary period.

**Q: What procedural protections must agencies consider when evaluating whether to terminate an SES career appointee?**

A: The procedural protections and placement rights to which the probationer is entitled are determined by the basis for the removal action and the individual's appointment status just before entering the SES.

---

[3] *Nat'l Treasury Emps. Union and Internal Revenue Serv.*, 67 FLRA 24, 26 (2012) (*citing Nat'l Treasury Emps. Union v. Fed. Labor Relations Auth.*, 848 F.2d 1273 (D.C. Cir. 1988) *and Dep't of Justice, Immigration and Naturalization Serv. v. Fed. Labor Relations Auth.*, 708 F.2d 724 (D.C. Circ. 1983)); *Am. Fed'n of Gov't Emps. Council of Marine Corps Locals and Marine Corps*, 35 FLRA 1023, 1026-27 (1990).

3

**Q: Do all career SES appointees terminated during the probationary period have placement rights?**

A: No, only those career SES appointees, who at the time of appointment to the SES held a career or career-conditional appointment, or an appointment of equivalent tenure as defined at 5 C.F.R. § 359.701(a), retain placement rights. Probationers who are not entitled to guaranteed placement are separated from the Federal service.

**Q: What placement rights do prior career or career-conditional SES career appointees (as defined in 5 C.F.R. § 359.701(a) have?**

A: A prior career or career-conditional SES career appointee who is removed from the SES during his or her probationary period due to performance is guaranteed to be placed in a position of GS-15 or above (e.g., Senior Level).

**Q: How does the 120-day moratorium on removal during probation affect an agency's ability to terminate a probationary SES career appointee?**

A: Generally, removal from the SES for unacceptable performance or conduct may not be made effective within 120 days after the appointment of a new agency head, or the appointment in the agency of the career appointee's most immediate supervisor who: is a noncareer appointee and has the authority to remove the career appointee; however, 5 C.F.R. § 359.406(c) addresses exceptions to the 120-day moratorium. One of the exceptions is when the career appointee received a final rating of unsatisfactory before the appointment of a new agency head or the appointment of the career appointee's most immediate noncareer supervisor who has the authority to remove the career appointee. The procedures required when invoking an exception are detailed in § 359.406(d). The imposition of the 120-day moratorium does not extend the probationary period.

**Q: What procedures must an agency follow when removing a probationary SES career appointee for unacceptable performance?**

A: The agency shall notify the appointee in writing before the effective date of the action. The notice shall state, at a minimum, (1) the agency's conclusions as to the inadequacies of the appointee's performance; (2) whether the appointee has placement rights under 5 C.F.R. § 359.701 and, if so, identify the position to which the appointee will be assigned; and (3) the effective date of the action. A removal under this section need not be based upon a final rating under the agency's SES appraisal system.

**Q: What procedures must an agency follow when removing a probationary SES career appointee for conduct?**

A: The agency shall notify the appointee in writing before the effective date of the action; however, there is no required minimum notice period. The notice shall state, at a minimum, (1) the basis for the removal action and (2) the effective date of the action.

*Miscellaneous Questions*

**Q: Is the union entitled to receive information about probationary and trial employees?**

4

A: The union must demonstrate a particularized need for requested information, which is a threshold requirement in determining whether the release of information is necessary under Section 7114(b)(4) of the Statute. A union requesting information under that section must establish a particularized need for the information by articulating, with specificity, why it needs the requested information, including the uses to which the union will put the information and the connection between those uses and the union's representational responsibilities under the Statute. Satisfying this burden requires more than conclusory or bare assertions, and it is not satisfied merely by showing that the requested information would be relevant or useful. Rather, the union must articulate its need for each document, or all information requested. It is also well established that general efforts to "ensur[e] compliance with Merit System Principles," "monitor contract compliance," "address bargaining unit . . . concerns," represent employees in "further legal actions," and otherwise audit management are insufficient to meet particularized need requirements.[4]

---

[4] *See Dep't of the Air Force, Kirtland Air Force Base and Am. Fed'n of Gov't Emps. Local 2263*, 60 FLRA 791 (2005).

Att. D

| | |
|---|---|
| **From:** | CHCO Council |
| **Subject:** | CHCO Updates |
| **Date:** | Monday, February 24, 2025 9:27:11 AM |
| **Attachments:** | Probationary Period FAQs.docx |
| | Guidance on Return to In-Person Work and Deferred Resignation Program Processing and Reporting.docx |

Good morning, CHCOs and Deputy CHCOs:

Please note that we've rescheduled today's Special Session for noon today and intend to provide additional information concerning the governmentwide email sent this past weekend. We will plan to discuss RIF competitive areas during tomorrow's CHCO Council meeting.

We are also sharing information on two other important topics. We can answer any questions related to these topics at the 12 pm call today.

### I.      Probationary Employees

On Monday, January 20, 2025, the OPM Memorandum *Guidance on Probationary Periods, Administrative Leave and Details*, reminded agencies that probationary periods are an essential step in evaluating employee performance. Probationary periods serve as one of the most effective tools available to agencies in evaluating whether applicants will advance the agency's missions and functions. Where agencies fail to take advantage of this tool, poor performers tend to remain in the federal service far too long because supervisors are less likely to remove an employee with full appeal rights.

As agencies continue to make decisions on whether to retain probationary employees, OPM has received numerous questions. To assist agencies in carrying out their decisions, OPM offers, attached, the following frequently asked questions for agencies.

### II.      Processing and Reporting Actions Related to Return to In-Person Work and DRP

OPM has prepared the attached guidance on processing and reporting actions related to return to in-person work.

Thank you,

The CHCO Council Team

| | |
|---|---|
| **From:** | Tracking |
| **To:** | Sullivan, James D.; Scales, Amanda D. |
| **Cc:** | Peters, Noah; Bjelde, Brian |
| **Subject:** | [Action Due 2/13] Probationary Employee Actions |
| **Date:** | Wednesday, February 12, 2025 8:12:43 PM |
| **Attachments:** | Termination of Probationary Employee 021225.docx |

*Bcc: CoS & key partners; DOGE Leads*

Hi all,

This message clarifies immediate next steps for probationary employees following OPM's guidance earlier in the week.

Over the past several days, agencies have worked to review, clean up, and finalize their lists of probationary employees and begin taking action. **Please partner with your CHCO to action those you know you wish to separate from by the end of the day tomorrow, 2/13/2025, using the attached template letter (modified to account for whether the employee is in the competitive or excepted service).** The separation date should be either immediately or as soon as possible, consistent with applicable agency policies (including those in CBAs).

After actioning, please update the previous probationary employee spreadsheet you've sent us to include the information below. **Please resend the updated version to tracking@opm.gov with Amanda Scales and Jamie Sullivan on cc by 5:00pm EST tomorrow**. This tracker should include:

- Which probationary employees have been terminated and which you plan to keep. For those you plan to keep, provide an explanation of why.

- For each probationary employee, indicate if they opted into the deferred resignation program or not. This can be done by cross-checking the latest submission sent to you via tracking@opm.gov. Please also indicate whether you have signed a written deferred resignation agreement with them or not.

- Probation end date.

- In a separate tab, provide total # of DRP submissions that have been granted thus far.

**Please continue providing these reports daily through at least the end of the week.**

We've also prepared additional guidance around common questions:

- Employees do not need to have received any particular performance rating previously to be separated.

- Through the exemptions process, you have identified high-performing employees in mission critical areas. While you must provide notice of performance deficiencies in the notice, regulations on probationary periods state: "The agency shall utilize the probationary period as fully as possible to determine the fitness of the employee and shall terminate his or her services during this period if the employee fails to demonstrate fully his or her qualifications for continued employment." 5 CFR 315.803. This guidance applies to probationers who have not

demonstrated that their continued employment is in the public interest, and counsels that the government separate from them.  Until the probationary period has been completed, a probationer has the burden to demonstrate why it is in the public interest for the Government to finalize an appointment to the civil service for this particular individual.

Thank you,
OPM

*The* WHITE HOUSE

PRESIDENTIAL ACTIONS

Hiring Freeze

The White House

January 20, 2025

By the authority vested in me as President by the Constitution and the laws of the United States of America, I hereby order a freeze on the hiring of Federal civilian employees, to be applied throughout the executive branch.  As part of this freeze, no Federal civilian position that is vacant at noon on January 20, 2025, may be filled, and no new position may be created except as otherwise provided for in this memorandum or other applicable law.  Except as provided below, this freeze applies to all executive departments and agencies regardless of their sources of operational and programmatic funding.

This order does not apply to military personnel of the armed forces or to positions related to immigration enforcement, national security, or public safety.  Moreover, nothing in this memorandum shall adversely impact the provision of Social Security, Medicare, or Veterans' benefits.  In addition, the Director of the Office of Personnel Management (OPM) may grant exemptions from this freeze where those exemptions are otherwise necessary.

Within 90 days of the date of this memorandum, the Director of the Office of Management and Budget (OMB), in consultation with the Director of OPM and the Administrator of the United States DOGE Service (USDS), shall submit a plan to reduce the size of the Federal Government's workforce through efficiency improvements and attrition.  Upon issuance of the OMB plan, this memorandum shall expire for all executive

2-ER-248

departments and agencies, with the exception of the Internal Revenue Service (IRS). This memorandum shall remain in effect for the IRS until the Secretary of the Treasury, in consultation with the Director of OMB and the Administrator of USDS, determines that it is in the national interest to lift the freeze.

Contracting outside the Federal Government to circumvent the intent of this memorandum is prohibited.

In carrying out this memorandum, the heads of executive departments and agencies shall seek efficient use of existing personnel and funds to improve public services and the delivery of these services. Accordingly, this memorandum does not prohibit making reallocations to meet the highest priority needs, maintain essential services, and protect national security, homeland security, and public safety.

This memorandum does not limit the nomination and appointment of officials to positions requiring Presidential appointment or Senate confirmation, the appointment of officials to non-career positions in the Senior Executive Service or to Schedule A or C positions in the Excepted Service, the appointment of officials through temporary organization hiring authority pursuant to section 3161 of title 5, United States Code, or the appointment of any other non-career employees or officials if approved by agency leadership appointed by the President. Moreover, it does not limit the hiring of personnel where such a limit would conflict with applicable law.

This memorandum does not abrogate any collective bargaining agreement in effect on the date of this memorandum.

NEWS

ADMINISTRATION

ISSUES

CONTACT

VISIT

2-ER-249



THE WHITE HOUSE

1600 Pennsylvania Ave NW
Washington, DC 20500

WH.GOV

Copyright

Privacy

Style Guide

3/12/25, 7:28 PM      Case 3:25-cv-01780-WHA      Document 11-3      Filed 05/12/25 VA dismisses more than 1,000 employees | VA News      Page 1 of 6



VA | News

News ⌄      Resources ⌄      VA

Contact Us

Home  /  Press Room

# VA dismisses more than 1,000 employees

FOR IMMEDIATE RELEASE

February 13, 2025  9:06 pm

**Mission-critical positions are exempt from the reductions, which will enable VA to redirect over $98 million annually to health care, benefits and services for VA beneficiaries.**

**WASHINGTON –** The Department of Veterans Affairs today announced the dismissal of more than 1,000 employees.

3/12/25, 7:28 PM                    Case 3:25-cv-01780-WHA          VA dismisses more than 1,000 employees | VA News          Page 2 of 6



than two years in an excepted service appointment.

The personnel moves will save the department more than $98 million per year, and VA will redirect all of those resources back toward health care, benefits and services for VA beneficiaries.

There are currently more than 43,000 probationary employees across the department, the vast majority of whom are exempt from today's personnel actions because they serve in mission-critical positions – primarily those supporting benefits and services for VA beneficiaries – or are covered under a collective bargaining agreement. VA employees who elected to participate in the Office of Personnel Management's [deferred resignation program](#) are also exempt from today's personnel actions.

The dismissals are effective immediately and have been communicated directly to each employee. As an additional safeguard to ensure VA benefits and services are not impacted, the first Senior Executive Service (SES) or SES-equivalent leader in a dismissed employee's chain of command can request that the employee be exempted from removal.

The dismissals announced today are part of a government-wide Trump Administration effort to make agencies more efficient, effective and responsive to the American People. To that end, VA is refocusing on its core mission: providing the best possible care and benefits to Veterans, their families, caregivers and survivors.

"At VA, we are focused on saving money so it can be better spent on Veteran care. We thank these employees for their

3/12/25, 7:28 PM                    Case 3:25-cv-01780-WHA    VA dismisses more than 1,000 employees | VA News    Page 3 of 6



VA | News

News    Resources    V/

said VA Secretary Doug Collins. "To be perfectly clear: these moves will not negatively impact VA health care, benefits or beneficiaries. In the coming weeks and months, VA will be announcing plans to put these resources to work helping Veterans, their families, caregivers and survivors."

###

---



Reporters and media outlets with questions or comments should contact the Office of Media Relations at vapublicaffairs@va.gov



Veterans with questions about their health care and benefits (including GI Bill). Questions, updates and documents can be submitted online.

Contact us online through Ask VA



Veterans can also use our chatbot to get information about VA benefits and services. The chatbot won't connect you with a person, but it can show you where to go on VA.gov to find answers to some common questions.

Learn about our chatbot and ask a question

3/12/25, 7:28 PM Case 3:25-cv-01780-WHA VA dismisses more than 1,000 employees | VA News Document 1 Filed 05/12/25 Page 4 of 6

 VA | News

News     Resources     VA

**Topics**     OPM     Personnel Cuts

---

### LET OTHERS KNOW ABOUT THIS



# More from the Press Room

---

NEWS RELEASES

MARCH 6, 2025

## VA to complete Federal EHR deployment at nine

NEWS RELEASES

MARCH 5, 2025

## Secretary Collins: We owe America's

NEWS RELEASES

MARCH 3, 2025

## VA to terminate 585 non-mission-critical or

2-ER-254

3/12/25, 7:28 PM    Case 3:25-cv-01780-WHA    VA dismisses more than 1,000 employees - VA News    Page 5 of 6



## News

News          Resources          VA

VA targets 2026 for completing Federal Electronic Health Record system deployment at nine additional sites.

WASHINGTON

Please view a video message from VA Secretary [...]

These contracts, which will be phased out over the next few days, represent less than one percent of the roughly 90,000 contracts VA currently has in place.

Last updated February 14, 2025



VA | U.S. Department of Veterans Affairs

**U.S. Department of Veterans Affairs**
810 Vermont Ave., NW
Washington, DC 20420
**1-800-698-2411**

## VA News

**An official website of the U.S. Department of Veterans Affairs**

VA.gov

ChooseVA

DiscoverVA

DigitalVA

VA Forms

VA Publications

About VA

VA mobile apps

Accessibility at VA

No FEAR Act data

Whistleblower Protection

Office of the Inspector General

VA plans, budget, finances, and performance

Agency Financial Report

Privacy policy

FOIA requests

Disclaimers

Open data

https://news.va.gov/press-room/va-dismisses-more-than-1000-employees/

2-ER-255

3/12/25, 7:28 PM      Case 3:25-cv-01780-WHA      VA dismisses more than 1,000 employees - VA News      Page 6 of 6

VA | News

News      Resources      VA

Looking for U.S. government information and services? Visit USA.gov

https://news.va.gov/press-room/va-dismisses-more-than-1000-employees/      6/6

 **U.S. Department of Agriculture**

**PRESS RELEASE**

# Secretary Rollins Takes Bold Action to Stop Wasteful Spending and Optimize USDA to Better Serve American Agriculture

PUBLISHED:  **February 14, 2025**

SHARE:     

## Secretary Rollins Takes Bold Action to Stop Wasteful Spending and Optimize USDA to Better Serve American Agriculture

**Washington, D.C., Feb. 14, 2025**—Today, U.S. Secretary of Agriculture Brooke Rollins addressed more than 400 USDA staffers, stakeholders and friends and pledged to bring greater efficiency to USDA to ensure it better serves American farmers, ranchers, and the agriculture community. She reviewed findings from the Department of Government Efficiency and welcomes the opportunity to optimize the USDA workforce and stop wasteful spending.

"I welcome DOGE's efforts at USDA because we know that its work makes us better, stronger, faster, and more efficient. I will expect full access and transparency to DOGE in the days and weeks to come," **said Secretary Rollins**.

Since January 20th, USDA has begun a comprehensive review of contracts, personnel, and employee trainings and DEI programs. In many cases, programs funded by the Biden administration focused on DEI initiatives that are contrary to the values of millions of American taxpayers.

Today, USDA is announcing the first tranche in a series of bold reforms.

**Contracts**

2-ER-257

USDA terminated 78 contracts, which totaled more than $132 million. Additionally, more than 1,000 contracts are currently under review for potential termination. Here are just 10 examples of the frivolous Biden-era contracts USDA recently terminated or proposed procurements that were discontinued before they went into effect:

1. Media contracts, including Politico subscriptions: $2.77 million

2. Diversity, Equity, and Inclusion Onboarding Specialist: $374,000

3. Diversity Dialogue Workshops: $254,000

4. International Development for Historically Underrepresented Communities: $298,000

5. Brazilian Forest and Gender Consultant: $229,000

6. Women and Forest Carbon Initiative Mentorship Program: $121,000

7. African and Middle Eastern and Latin America and Caribbean Regions for training, education, and access to professional and economic opportunities for women and increasing their participation in climate change adaptation activities: $91,000

8. Central American Gender Assessment Consultant: $29,000

9. Neighborhood Electric Vehicle Utility Van: $33,000

10. Hawaii conference room rental for 100-person USDA Meeting on Biodiversity: $11,000

## Employee Trainings and DEI Programs

On Day One, Secretary Rollins issued a memo to officially rescinded of all Diversity, Equity, Inclusion, and Accessibility (DEIA) programs to reprioritize unity, equality, and meritocracy.

To this end, USDA has identified and canceled 948 employee trainings, 758 of which focused on DEI alone. Other canceled trainings include Environmental Justice and gender ideology.

## Workforce Optimization

USDA is pursuing an aggressive plan to optimize its workforce by eliminating positions that are no longer necessary, bringing its workforce back to the office, and relocating employees out of the National Capital region into our nation's heartland to allow our rural communities to flourish.

This is just the beginning. Over the next few days and weeks, Secretary Rollins will have the opportunity to review thousands of contracts, grants, cooperative agreements and spending across the agency to ensure that every dollar is being spent as effectively as possible to serve the people, not the bureaucracy.

2-ER-258

Per the President's directives, Secretary Rollins will lead a new era of USDA to ensure that it is the most efficient, nimble, and innovative department to serve American Agriculture since it was Established by President Abraham Lincoln.

###

USDA is an equal opportunity provider, employer, and lender.

PRESS RELEASE

**Release No.:
0023.25**

U.S. Department of Agriculture

## RELEASE

### IMMEDIATE RELEASE

# DoD Probationary Workforce Statement

Feb. 21, 2025

As the Secretary announced yesterday, the Department of Defense is re-evaluating our probationary workforce, consistent with the President's initiative to reform the Federal workforce to maximize efficiency and productivity.

This re-evaluation of probationary employees is being done across government, not just at the Defense Department, but we believe in the goals of the program, and our leaders are carrying out that review carefully and smartly.

We anticipate reducing the Department's civilian workforce by 5-8% to produce efficiencies and refocus the Department on the President's priorities and restoring readiness in the force.

We expect approximately 5,400 probationary workers will be released beginning next week as part of this initial effort, after which we will implement a hiring freeze while we conduct a further analysis of our personnel needs, complying as always with all applicable laws.

As the Secretary made clear, it is simply not in the public interest to retain individuals whose contributions are not mission-critical. Taxpayers deserve to have us take a thorough look at our workforce top-to-bottom to see where we can eliminate redundancies.

As we take these important steps to reshape the workforce to meet the President's priorities, the Department will treat our workers with dignity and respect as it always does. Those who commit themselves to defending our nation deserve nothing less.

- Darin Selnick, Performing the Duties of Under Secretary of Defense for Personnel and Readiness

Hosted by Defense Media Activity - WEB.mil

1  Scott A. Kronland (SBN 171693)
   Stacey M. Leyton (SBN 203827)
2  Eileen B. Goldsmith (SBN 218029)
   Danielle E. Leonard (SBN 218201)
3  Robin S. Tholin (SBN 344845)
   James Baltzer  (SBN 332232)
4  ALTSHULER BERZON LLP
   177 Post Street, Suite 300
5  San Francisco, CA 94108
   Tel. (415) 421-7151
6  Fax (415) 362-8064
   skronland@altber.com
7  sleyton@altber.com
   egoldsmith@altber.com
8  dleonard@altber.com
   rtholin@altber.com
9  jbaltzer@altber.com
10
11 *Attorneys for Plaintiff Organizations*

12 [Additional Counsel on signature page]

13

14              UNITED STATES DISTRICT COURT

15         FOR THE NORTHERN DISTRICT OF CALIFORNIA

16               SAN FRANCISCO DIVISION

17 | AMERICAN FEDERATION OF | Case No. 3:25-cv-01780-WHA |
18 | GOVERNMENT EMPLOYEES, AFL-CIO; | |
   | AMERICAN FEDERATION OF STATE | **SECOND AMENDED COMPLAINT FOR** |
19 | COUNTY and MUNICIPAL EMPLOYEES, | **DECLARATORY AND INJUNCTIVE** |
   | AFL-CIO; *et al.* | **RELIEF** |
20 |
   |          Plaintiffs,
21 |
   |     v.
22 |
23 | UNITED STATES OFFICE OF PERSONNEL
   | MANAGEMENT, *et al.*,
24 |
25 |
26 |          Defendants.

27

28

1       Plaintiffs American Federation of Government Employees, AFL-CIO ("AFGE"), American

2  Federation of State County and Municipal Employees, AFL-CIO ("AFSCME"), AFGE Local 1216,

3  United Nurses Associations of California/Union of Health Care Professionals, AFSCME, AFL-CIO

4  ("UNAC/UHCP"), and AFGE Local 2110 (collectively, "Union Plaintiffs"), along with Main Street

5  Alliance, Coalition To Protect America's National Parks, Western Watersheds Project, Vote Vets

6  Action Fund Inc., Common Defense Civic Engagement, the American Public Health Association, the

7  Association of Flight Attendants-CWA, AFL-CIO ("AFA"), the American Geophysical Union,

8  Climate Resilient Communities, Point Blue Conservation Science, and the State of Washington

9  (collectively, "Plaintiffs"), file this complaint seeking to enjoin the terminations of tens of thousands

10  of federal employees in contravention of federal constitutional and statutory law, against Defendants

11  the United States Office of Personnel Management ("OPM"), Acting OPM Director Charles Ezell,

12  and the Federal Agency Defendants (listed below), who are sued solely for purposes of obtaining

13  complete relief, and hereby plead as follows:

**INTRODUCTION**

15       1.     On or about February 13, 2025, Defendant OPM and its newly appointed Acting

16  Director, Defendant Charles Ezell, ordered federal agencies across the country to terminate tens of

17  thousands of federal employees by sending them standardized notices of termination, drafted by

18  OPM, that falsely state that the terminations are for performance reasons.  OPM followed up this

19  instruction on February 14, 2025 with a directive in writing to the Chief Human Capital Officers

20  Council ("CHCO") for federal agencies, in which OPM reiterated the order to fire all probationary

21  workers across the government other than those OPM permitted the agencies to retain as "mission

22  critical," and to do so, falsely, for performance.

23       2.     Probationary employees are employees of the competitive service in their first year of

24  employment in a particular position, and employees of the excepted service in their first two years of

25  employment in a particular position (hereafter collectively "probationary employees").  Probationary

26  employees may include experienced federal employees who have recently become employed in a

27  new position or a new agency.

28

SECOND AMENDED COMPLAINT, No. 3:25-cv-01780-WHA          1

3.      OPM's directive that federal agencies terminate these employees en masse, on pretextual grounds, seeks to further the newly elected Presidential Administration's policy goals of dramatically curtailing the size and spending of the federal government.  But Congress, not OPM, controls and authorizes federal employment and related spending by the federal administrative agencies, and Congress has determined that each agency is responsible for managing its own employees.  OPM lacks the constitutional, statutory, or regulatory authority to order federal agencies to terminate employees in this fashion that Congress has authorized those agencies to hire and manage, and certainly has no authority to require agencies to perpetrate a massive fraud on the federal workforce by lying about federal workers' "performance," to detriment of those workers, their families, and all those in the public and private sectors who rely upon those workers for important services.

4.      OPM is an agency with no statutory authority to make termination decisions for federal employees (other than for OPM's own employees).  Notwithstanding this lack of legal authority, OPM ordered federal agencies throughout the nation, including in this District, to wipe out their ranks of probationary employees without any regard to applicable statutes, including the Administrative Procedure Act ("APA") and statutes governing federal employment and the respective roles of OPM and the agencies.

5.      OPM also ordered the agencies to use a template e-mail to terminate these workers, provided by OPM, that falsely inform employees that their terminations are for performance reasons rather than as part of a government-wide policy to reduce headcount that was authorized by no law.

6.      The federal agencies that followed OPM's directive did not otherwise have plans to terminate the entirety of their probationary workforce, who were employed in authorized positions to perform services that in each agency's judgment were needed to perform their statutorily mandated role.  In fact, some agencies have confirmed to their employees that they did not want to terminate their probationary employees but were directed to do so by OPM.  And they have confirmed that the notices of termination mandated by OPM were false, because the agencies were *not* firing the workers for performance reasons.

SECOND AMENDED COMPLAINT, No. 3:25-cv-01780-WHA                                          2

7.      As of the filing of this Second Amended Complaint, tens of thousands of probationary employees across dozens of federal agencies have already been terminated in the summary, assembly-line fashion directed by OPM.  Each day, more such employees receive notice of the termination of their federal employment.  The terminations have been conducted summarily, without any advance notice to the affected employees, throwing their lives, their families' lives, and the entire federal government into chaos.

8.      OPM, the federal agency charged with implementing this nation's employment laws, in one fell swoop has perpetrated one of the most massive employment frauds in the history of this country, telling tens of thousands of workers that they are being fired for performance reasons, when they most certainly were not.

9.      OPM's program is an unlawful *ultra vires* action outside the scope of any statutory or Constitutional authority.  OPM's program also violates the APA's prohibitions of unlawful, arbitrary and capricious, and procedurally improper agency action (including because this government-wide action was taken without notice and comment rule-making).  Where, as here, a federal agency has engaged in unlawful action contrary to the APA, the courts "shall …hold unlawful and set aside" that action.  5 U.S.C. § 702(2).

10.     The APA, was designed to "serve as the fundamental charter of the administrative state." *Kisor v. Wilkie*, 588 U.S. 558, 580 (2019) (plurality opinion) (internal quotation marks omitted).  As the Supreme Court recently explained, "Congress in 1946 enacted the APA 'as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices.'"  *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 391 (2024) (quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 644 (1950)).  OPM's actions disrupt the constitutional balance of power and violate numerous federal statutes, running roughshod over fundamental protections against unlawful and arbitrary federal action.

11.     The Court should immediately enjoin OPM and all those Defendant Federal Agencies that have implemented or that intend to implement OPM's unlawful directive to terminate their

employees in an unlawful manner, to cease implementation of this mass pretextual terminations of probationary federal employees, and to rescind the unlawful terminations that already have occurred.

## JURISDICTION AND VENUE

12.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

13.    Venue is appropriate in this district under 28 U.S.C. § 1391(e).  Plaintiffs AFGE and AFGE Local 1216 represent probationary and trial-period federal employees whose place of employment is within the Northern District of California, and who have been terminated, or are subject to termination, because of OPM's illegal program.

14.    Intradistrict assignment is appropriate in the San Francisco/Oakland division of this Court.

## PARTIES

15.    Plaintiff AFGE, AFL-CIO, is a labor organization and unincorporated association headquartered at 80 F Street N.W., Washington, D.C. 20001.  AFGE, the largest union of federal employees, represents approximately 800,000 federal civilian employees through its affiliated councils and locals in every state in the United States, including employees of numerous agencies of the federal government, including the Department of Veterans Affairs ("VA"), Department of Education, National Institutes of Health, Small Business Administration, and others.  AFGE represents employees of the VA who are employed in San Francisco, Oakland, San Bruno, Eureka, Ukiah, Clearlake, and Martinez, California.

16.    Plaintiff AFSCME, AFL-CIO, is a labor organization and unincorporated association headquartered at 1625 L Street, N.W., Washington, D.C. 20036.  AFSCME is the largest trade union of public employees in the United States, with 1.4 million members organized into approximately 3,400 local unions, 58 councils and affiliates in 46 states, the District of Columbia and Puerto Rico. AFSCME unions represent federal civilian employees in numerous agencies and departments across the federal government, including the Federal Aviation Administration, the Department of Agriculture, the Peace Corps, Americorps, and the Veterans Administration.  Approximately 10,000

of Plaintiff AFSCME's members are federal employees; over 1.1 million are state and local government employees, with the remainder retirees and private sector.

17.    Plaintiff AFGE Local 1216 is a labor organization and unincorporated association headquartered at 4150 Clement Street, San Francisco, California 94121.  AFGE Local 1216 represents hundreds of VA employees who are employed in San Francisco, California.

18.    Plaintiff United Nurses Association of California/United Health Care Professionals, AFSCME, AFL-CIO ("UNAC"), is a labor organization and an unincorporated association headquartered at 955 Overland Ct., Suite 150, San Dimas, California 91773.  UNAC represents employees of the VA who are employed at Pettis Memorial Hospital in Loma Linda, California.

19.    Plaintiff AFGE Local 2110 is a labor organization and unincorporated association headquartered in Palo Alto, California.  AFGE Local 2110 represents approximately 4,000 employees of the VA at the VA Palo Alto Health Care System, including its Menlo Park and Livermore Divisions, and at several Community-Based Outpatient Clinics in Fremont, San Jose, Monterey, and Capitola.  Those employees work in all non-supervisory classifications, including doctors, nurses, emergency medical services personnel, food service workers, custodial staff, and administrative staff.

20.    Plaintiff Main Street Alliance ("MSA") is a national network of small businesses, with approximately 30,000 members throughout the United States.  MSA helps small business owners realize their full potential as leaders for a just future that prioritizes good jobs, equity, and community through organizing, research, and policy advocacy.  MSA also seeks to amplify the voices of its small business membership by sharing their experiences with the aim of creating an economy where all small business owners have an equal opportunity to succeed.  MSA is nonpartisan and is a §501(c)(3) organization.  MSA has approximately 1,410 small business members in California, including more than 70 small businesses in Alameda, Santa Clara, San Francisco, Sonoma, and Contra Costa Counties.

21.    Plaintiff Coalition to Protect America's National Parks ("Coalition") is a non-profit organization made up of over 3,400 members, all of whom are current, former, and retired employees and volunteers of the National Park Service. Together, they have accumulated over 50,000 years of

SECOND AMENDED COMPLAINT, No. 3:25-cv-01780-WHA                                      5

1   experience caring for America's most valuable natural and cultural resources.  The Coalition's goal is

2   to support the preservation and protection of the National Park System and the mission-related

3   programs of the National Park Service ("NPS") to ensure the survival of the park system for

4   generations to come.  The Coalition's members are regular and avid users of the National Park

5   System and NPS programs, as well as the national forests and other public lands, for recreation and

6   conservation activities.

7          22.     Plaintiff Western Watersheds Project ("WWP") is a non-profit environmental

8   conservation group that works to influence and improve public lands management throughout the

9   western United States to protect native species and conserve and restore the habitats they depend

10  on.  WWP's primary focus is on the negative impacts of livestock grazing, including harm to

11  ecological, biological, cultural, historic, archeological, scenic resources, wilderness values, roadless

12  areas, Wilderness Study Areas and designated Wilderness.  WWP was founded in 1993 and has more

13  than 14,000 members and supporters and field offices in Idaho, Montana, Wyoming, Arizona,

14  Nevada, and Oregon.  WWP covers over 250 million acres of public land spanning all of the western

15  states.

16         23.     Plaintiff Vote Vets Action Fund Inc. ("VoteVets") is a non-partisan, non-profit

17  organization incorporated under the laws of the District of Columbia. Its purpose is to lift up the

18  voices of veterans on matters of national security, veterans' care, and everyday issues that affect the

19  lives of those who served as well as their families including foreign policy, veterans' unemployment,

20  robust investment in care for veterans, energy security, protecting the rights of those who serve, and

21  upholding the Constitution and democracy that every military member swore to uphold and protect.

22  VoteVets has nearly two million supporters across the country, in all fifty states, with whom it

23  regularly communicates about issues affecting veterans, including the operations, programs, and

24  services available through the VA.  Approximately 417,000 of VoteVets' supporters live in California,

25  including 131,000 in Northern California.

26         24.     Plaintiff Common Defense Civic Engagement ("Common Defense") is a grassroots

27  membership organization of progressive veterans, military families, and civilian supporters standing

28

SECOND AMENDED COMPLAINT, No. 3:25-cv-01780-WHA                                    6

up for our communities against the rising tide of racism, hate, and violence. Common Defense invests in the leadership of its members through training and deployment in campaigns that connect directly to their history of service, including voting rights, climate justice, and anti-militarism. Approximately 33,187 of Common Defense's members live in California, including approximately 2,000 veterans.

25. Plaintiff the American Public Health Association ("APHA") is a non-partisan, non-profit organization that champions the health of all people and all communities; strengthens the profession of public health; shares the latest research and information; promotes best practices; and advocates for public health issues and policies grounded in scientific research. APHA represents more than 23,000 individual members who reside in all 50 states, including 2,100 individual members in California, and also has 52 state and regional affiliates. APHA is the only organization that combines a 150-year perspective, a broad-based member community, and the ability to influence federal policy to improve the public's health. APHA's membership additionally includes more than 250 California students in university public health schools or related programs, and over 50 California agency or organizational members, including the California Department of Public Health, Contra Costa County Public Health, Marin County Public Health, and the Los Angeles Trust for Children's Health.

26. Plaintiff Association of Flight Attendants-CWA, AFL-CIO ("AFA") is a labor union organized under the Railway Labor Act, 45 U.S.C. § 151, *et seq*. and serves as the leading voice for a safe, healthy and secure aircraft cabin for passengers and crew alike. AFA represents over 55,000 flight attendants at twenty airlines, including flight attendants employed by Alaska Airlines, Hawaiian Airlines, United Airlines, and Avelo Airlines who are based in San Diego, Los Angeles, Burbank, and San Francisco.

27. Plaintiff American Geophysical Union ("AGU") is a 501(c)(3) membership association for Earth and space scientists. The organization, founded in 1919, pursues a mission "to support and inspire a global community of individuals and organizations interested in advancing discovery in Earth and space sciences and its benefit for humanity and the environment." AGU has

SECOND AMENDED COMPLAINT, No. 3:25-cv-01780-WHA                                    7

1    more than 42,000 members worldwide, with 29,000 residing in the U.S.; approximately 8,400 of

2    those members work in the federal government, 28,000 are university researchers, and 2,000 are

3    scientists at nonprofit organizations.  In addition to traditional career support provided by an

4    association, AGU publishes a portfolio of 24 high-impact scholarly journals and convenes regular

5    scientific meetings, including its Annual Meeting, which had more than 30,000 attendees in 2024.

6        28.    Plaintiff Climate Resilient Communities ("CRC") is a small community-based non-

7    profit organization that has grown rapidly through its grassroots work in environmental justice.  CRC

8    works predominantly in southern San Mateo County in East Palo Alto, the Belle Haven neighborhood

9    of Menlo Park, and the unincorporated community of North Fair Oaks.  CRC's work addresses the

10   immediate needs of residents living in heavily polluted neighborhoods and suffering the

11   consequences of decades of disinvestment and overt segregation, by, among other things, distributing

12   air purifiers for children and elders with medical conditions, enrolling low-income families in utility

13   payment assistance programs, making vital home safety repairs for low-income residents, and

14   providing education and resources to help communities weather escalating climate disasters like the

15   January 2025 Los Angeles wildfires.

16       29.    Plaintiff Point Blue Conservation Science ("Point Blue") is a nonprofit organization

17   founded in 1965 and headquartered in Petaluma, California.  Its mission is to conserve birds, other

18   wildlife, and ecosystems through science, partnership, and outreach.  Over six decades in

19   conservation, Point Blue has curated long term ecological data sets, honed analytical methods, and

20   built a deeply rooted culture of collaboration to address the significant challenges of our time.  Point

21   Blue's 160 scientists are leaders in climate-smart conservation science and are spearheading nature-

22   based solutions to threats to wildlife and our communities.  Point Blue's staff are experts in ecology,

23   data management, restoration, evaluating and building solutions to environmental challenges, and

24   more.  Point Blue records observations of the natural world using rigorous, standardized protocols

25   and use analyses of these observations to deepen our community's understanding of nature to

26   improve conservation outcomes, partnering with local, state, and federal agencies to implement

27   conservation solutions, including the US Department of Defense, the USDA Natural Resources

28

SECOND AMENDED COMPLAINT, No. 3:25-cv-01780-WHA                                    8

1    Conservation Service, NOAA, the National Science Foundation, and the US Fish and Wildlife

2    Service.

3        30.    Plaintiff State of Washington, represented by and through its Attorney General, is a

4    sovereign state of the United States of America. The Attorney General is Washington's chief law

5    enforcement officer and is authorized under Washington Revenue Code § 43.10.030 to pursue this

6    action.

7        31.    Plaintiffs bring the claims in this complaint on their own behalf and on behalf of their

8    members.

9        32.    Defendant Office of Personnel Management ("OPM") is a federal agency

10    headquartered in Washington, D.C.  OPM is a federal agency within the meaning of the

11    Administrative Procedure Act ("APA"), 5 U.S.C. § 551(1).

12        33.    Defendant Charles Ezell has been the Acting Director of OPM since January 20, 2025.

13    He is sued in his official capacity.

14                        **Defendants Named for Relief Purposes Only**

15        34.    Defendant United States Department of Agriculture ("USDA" or "Agriculture") is a

16    federal agency headquartered in Washington, D.C.  USDA is a federal agency within the meaning of

17    the Administrative Procedure Act ("APA"), 5 U.S.C. § 551(1).  USDA's component sub-agencies

18    include the Forest Service, the Natural Resources Conservation Service, the Agricultural Marketing

19    Service, and the Food and Nutrition Service, among others.  USDA is one of the Federal Agency

20    Defendants that was ordered by OPM to terminate probationary employees, including by receiving

21    the February 14, 2025 OPM email.   Defendant USDA is named solely for purposes of obtaining

22    complete relief.

23        35.    Defendant Brooke Rollins is the Secretary of Agriculture and is sued in her official

24    capacity.  Defendant Rollins is named solely for purposes of obtaining complete relief.

25        36.    Defendant United States Department of Commerce ("Commerce") is a federal agency

26    headquartered in Washington, D.C.  Commerce is a federal agency within the meaning of the

27    Administrative Procedure Act ("APA"), 5 U.S.C. § 551(1).  Commerce's component sub-agencies

28

SECOND AMENDED COMPLAINT, No. 3:25-cv-01780-WHA                    9

include the National Oceanic and Atmospheric Administration ("NOAA"), the National Weather Service, and the National Marine Fisheries Service ("NMFS"). Commerce is one of the Federal Agency Defendants that was ordered by OPM to terminate probationary employees, including by receiving the February 14, 2025 OPM email. Defendant Commerce is named solely for purposes of obtaining complete relief.

37. Defendant Howard Lutnick is the Secretary of Commerce and is sued in his official capacity. Defendant Lutnick is named solely for purposes of obtaining complete relief.

38. Defendant United States Department of Defense ("DoD" or "Defense") is a federal agency headquartered in Washington, D.C. USDA is a federal agency within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. § 551(1). DoD is one of the Federal Agency Defendants that was ordered by OPM to terminate probationary employees, including by receiving the February 14, 2025 OPM email. Defendant DoD is named solely for purposes of obtaining complete relief.

39. Defendant Pete Hegseth is the Secretary of Defense and is sued in his official capacity. Defendant Hegseth is named solely for purposes of obtaining complete relief.

40. Defendant United States Department of Education ("Education") is a federal agency headquartered in Washington, D.C. Education is a federal agency within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. § 551(1). Education is one of the Federal Agency Defendants that was ordered by OPM to terminate probationary employees, including by receiving the February 14, 2025 OPM email. Defendant Education is named solely for purposes of obtaining complete relief.

41. Defendant Linda McMahon is the Secretary of Education and is sued in her official capacity. Defendant McMahon is named solely for purposes of obtaining complete relief.

42. Defendant United States Department of Energy ("Energy") is a federal agency headquartered in Washington, D.C. Energy is a federal agency within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. § 551(1). Energy is one of the Federal Agency Defendants that was ordered by OPM to terminate probationary employees, including by receiving

the February 14, 2025 OPM email.  Defendant Energy is named solely for purposes of obtaining complete relief.

43.     Defendant Chris Wright is the Secretary of Energy and is sued in his official capacity. Defendant Wright is named solely for purposes of obtaining complete relief.

44.     Defendant United States Department of Health and Human Services ("HHS") is a federal agency headquartered in Washington, D.C.  HHS is a federal agency within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. § 551(1).  HHS's component sub-agencies include the Centers for Disease Control and Prevention (CDC), the Food and Drug Administration (FDA), the National Institutes of Health (NIH), and the Health Resources and Services Administration (HRSA).   HHS is one of the Federal Agency Defendants that was ordered by OPM to terminate probationary employees, including by receiving the February 14, 2025 OPM email. Defendant HHS is named solely for purposes of obtaining complete relief.

45.     Defendant Robert F. Kennedy Jr. is the Secretary of HHS and is sued in his official capacity.  Defendant Kennedy is named solely for purposes of obtaining complete relief.

46.     Defendant United States Department of Homeland Security ("DHS") is a federal agency headquartered in Washington, D.C.  DHS is a federal agency within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. § 551(1).  DHS is one of the Federal Agency Defendants that was ordered by OPM to terminate probationary employees, including by receiving the February 14, 2025 OPM email.  Defendant DHS is named solely for purposes of obtaining complete relief.

47.     Defendant Kristi Noem is the Secretary of DHS and is sued in her official capacity. Defendant Noem is named solely for purposes of obtaining complete relief.

48.     Defendant United States Department of Housing and Urban Development ("HUD") is a federal agency headquartered in Washington, D.C.  HUD is a federal agency within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. § 551(1).  HUD is one of the Federal Agency Defendants that was ordered by OPM to terminate probationary employees, including by receiving

the February 14, 2025 OPM email.  Defendant HUD is named solely for purposes of obtaining complete relief.

49.    Defendant Scott Turner is the Secretary of HUD and is sued in his official capacity. Defendant Turner is named solely for purposes of obtaining complete relief.

50.    Defendant United States Department of Justice ("DOJ") is a federal agency headquartered in Washington, D.C.  DOJ is a federal agency within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. § 551(1).  DOJ is one of the Federal Agency Defendants that was ordered by OPM to terminate probationary employees, including by receiving the February 14, 2025 OPM email.  Defendant DOJ is named solely for purposes of obtaining complete relief.

51.    Defendant Pam Bondi is the Attorney General and is sued in her official capacity. Defendant Bondi is named solely for purposes of obtaining complete relief.

52.    Defendant United States Department of the Interior ("DoI" or "Interior") is a federal agency headquartered in Washington, D.C.  Interior is a federal agency within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. § 551(1).  Interior's component sub-agencies include the U.S. Fish and Wildlife Service ("FWS"), the U.S. National Park Service ("NPS") and the Bureau of Land Management ("BLM").  Interior is one of the Federal Agency Defendants that was ordered by OPM to terminate probationary employees, including by receiving the February 14, 2025 OPM email.  Defendant DoI is named solely for purposes of obtaining complete relief.

53.    Defendant Doug Burgum is the Secretary of the Interior and is sued in his official capacity.  Defendant Burgum is named solely for purposes of obtaining complete relief.

54.    Defendant United States Department of Labor ("DOL") is a federal agency headquartered in Washington, D.C.  DOL is a federal agency within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. § 551(1).  DOL is one of the Federal Agency Defendants that was ordered by OPM to terminate probationary employees, including by receiving the February 14, 2025 OPM email.  Defendant DOL is named solely for purposes of obtaining complete relief.

55.     Defendant Vince Micone is the Acting Secretary of Labor and is sued in his official capacity.  Defendant Micone is named solely for purposes of obtaining complete relief.

56.     Defendant United States Department of State ("State") is a federal agency headquartered in Washington, D.C.  State is a federal agency within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. § 551(1).  State is one of the Federal Agency Defendants that was ordered by OPM to terminate probationary employees, including by receiving the February 14, 2025 OPM email.  Defendant State is named solely for purposes of obtaining complete relief.

57.     Defendant Marco Rubio is the Secretary of State and is sued in his official capacity. Defendant Rubio is named solely for purposes of obtaining complete relief.

58.     Defendant United States Department of Treasury ("Treasury") is a federal agency headquartered in Washington, D.C.  Treasury is a federal agency within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. § 551(1).  Treasury's component sub-agencies including the Internal Revenue Service ("IRS").  Treasury is one of the Federal Agency Defendants that was ordered by OPM to terminate probationary employees, including by receiving the February 14, 2025 OPM email.  Defendant Treasury is named solely for purposes of obtaining complete relief.

59.     Defendant Scott Bessent is the Secretary of Treasury and is sued in his official capacity.  Defendant Bessent is named solely for purposes of obtaining complete relief.

60.     Defendant United States Department of Transportation ("DOT") is a federal agency headquartered in Washington, D.C.  DOT is a federal agency within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. § 551(1).  DOT's component subagencies include the Federal Aviation Administration ("FAA").  DOT is one of the Federal Agency Defendants that was ordered by OPM to terminate probationary employees, including by receiving the February 14, 2025 OPM email.  Defendant DOT is named solely for purposes of obtaining complete relief.

61.     Defendant Sean Duffy is the Secretary of Transportation and is sued in his official capacity.  Defendant Duffy is named solely for purposes of obtaining complete relief.

1      62.      Defendant United States Veterans' Administration ("the VA") is a federal agency

2  headquartered in Washington, D.C.  The VA is a federal agency within the meaning of the

3  Administrative Procedure Act ("APA"), 5 U.S.C. § 551(1).  The VA is one of the Federal Agency

4  Defendants that was ordered by OPM to terminate probationary employees, including by receiving

5  the February 14, 2025 OPM email.  Defendant the VA is named solely for purposes of obtaining

6  complete relief.

7      63.      Defendant Doug Collins is the Secretary of the VA and is sued in his official capacity.

8  Defendant Collins is named solely for purposes of obtaining complete relief.

9      64.      Defendant United States Environmental Protection Agency ("EPA") is a federal

10  agency headquartered in Washington, D.C.  EPA is a federal agency within the meaning of the

11  Administrative Procedure Act ("APA"), 5 U.S.C. § 551(1).  EPA is one of the Federal Agency

12  Defendants that was ordered by OPM to terminate probationary employees, including by receiving

13  the February 14, 2025 OPM email.  Defendant EPA is named solely for purposes of obtaining

14  complete relief.

15      65.      Defendant Lee Zeldin is the EPA Administrator and is sued in his official capacity.

16  Defendant Zeldin is named solely for purposes of obtaining complete relief.

17      66.      Defendant United States General Services Administration ("GSA") is a federal agency

18  headquartered in Washington, D.C.  GSA is a federal agency within the meaning of the

19  Administrative Procedure Act ("APA"), 5 U.S.C. § 551(1).  GSA is one of the Federal Agency

20  Defendants that was ordered by OPM to terminate probationary employees, including by receiving

21  the February 14, 2025 OPM email.  Defendant GSA is named solely for purposes of obtaining

22  complete relief.

23      67.      Defendant Robin Carnahan is the GSA Administrator and is sued in her official

24  capacity.  Defendant Carnahan is named solely for purposes of obtaining complete relief.

25      68.      Defendant United States National Aeronautics and Space Administration ("NASA") is

26  a federal agency headquartered in Washington, D.C.  NASA is a federal agency within the meaning

27  of the Administrative Procedure Act ("APA"), 5 U.S.C. § 551(1).  NASA is one of the Federal

28

SECOND AMENDED COMPLAINT, No. 3:25-cv-01780-WHA          14

1  Agency Defendants that was ordered by OPM to terminate probationary employees, including by

2  receiving the February 14, 2025 OPM email.  Defendant NASA is named solely for purposes of

3  obtaining complete relief.

4       69.    Defendant Janet Petro is the NASA Acting Administrator and is sued in her official

5  capacity.  Defendant Petro is named solely for purposes of obtaining complete relief.

6       70.    Defendant National Science Foundation ("NSF") is a federal agency headquartered in

7  Alexandria, Virginia.  NSF is a federal agency within the meaning of the Administrative Procedure

8  Act ("APA"), 5 U.S.C. § 551(1).  EPA is one of the Federal Agency Defendants that was ordered by

9  OPM to terminate probationary employees, including by receiving the February 14, 2025 OPM

10  email.  Defendant NSF is named solely for purposes of obtaining complete relief.

11       71.    Defendant Sethuraman Panchanathan is the Director of the NSF and is sued in his

12  official capacity.  Defendant Panchanathan is named solely for purposes of obtaining complete relief.

13       72.    Defendant United States Office of Management and Budget ("OMB") is a federal

14  agency headquartered in Washington, D.C.  OMB is a federal agency within the meaning of the

15  Administrative Procedure Act ("APA"), 5 U.S.C. § 551(1).  OMB is one of the Federal Agency

16  Defendants that was ordered by OPM to terminate probationary employees, including by receiving

17  the February 14, 2025 OPM email.  Defendant OMB is named solely for purposes of obtaining

18  complete relief.

19       73.    Defendant Russell Vought is the Director of OMB and is sued in his official capacity.

20  Defendant Vought is named solely for purposes of obtaining complete relief.

21       74.    Defendant United States Small Business Administration ("SBA") is a federal agency

22  headquartered in Washington, D.C.  SBA is a federal agency within the meaning of the

23  Administrative Procedure Act ("APA"), 5 U.S.C. § 551(1).  SBA is one of the Federal Agency

24  Defendants that was ordered by OPM to terminate probationary employees, including by receiving

25  the February 14, 2025 OPM email.  Defendant SBA is named solely for purposes of obtaining

26  complete relief.

27

28

SECOND AMENDED COMPLAINT, No. 3:25-cv-01780-WHA         15

1    75.    Defendant Kelly Loeffler is the Administrator of the SBA and is sued in her official

2    capacity.  Defendant Loeffler is named solely for purposes of obtaining complete relief.

3    76.    Defendant United States Social Security Administration ("SSA") is a federal agency

4    headquartered in Baltimore, Maryland.  SSA is a federal agency within the meaning of the

5    Administrative Procedure Act ("APA"), 5 U.S.C. § 551(1).  SSA is one of the Federal Agency

6    Defendants that was ordered by OPM to terminate probationary employees, including by receiving

7    the February 14, 2025 OPM email.  Defendant SSA is named solely for purposes of obtaining

8    complete relief.

9    77.    Defendant Leland Doudek is the Acting Commissioner of the SSA and is sued in his

10   official capacity.  Defendant Doudek is named solely for purposes of obtaining complete relief.

11   78.    The "Federal Agency Defendants" include all those federal agencies and their agency

12   heads that were ordered by OPM to terminate probationary employees, as identified in the preceding

13   paragraphs ¶¶34-76.

14   79.    The Federal Agency Defendants are each named solely pursuant to Rule 19(a)(1)(A)

15   for purposes of effectuating complete relief as to Claims One through Four against Defendants OPM

16   and Ezell.

## FACTUAL ALLEGATIONS

### I.    Statutes and Regulations Governing Termination of Federal Employment

#### A.    Congressional Authorization to Federal Agencies and OPM

20   80.    Congress created the federal agencies that employ federal workers through an exercise

21   of its Article I legislative power.  The executive agencies of the federal government are identified in

22   various statutes, including 5 U.S.C. § 101 (listing agencies).

23   81.    Each agency has its own authorizing statutes that govern its administration, including

24   statutory provisions that authorize one or more individuals to act as the head of the agency.  *See e.g.*,

25   10 U.S.C. §§ 111, 113 (Defense); 12 U.S.C. § 5491 (CFPB); 16 U.S.C. § 551 (Agriculture/Forest

26   Service); 26 U.S.C. §§ 7801, 7803 (IRS); 38 U.S.C. §§ 301, 303 (VA); 42 U.S.C. §§ 202, 203 (HHS);

42 U.S.C §§ 281, 282 (NIH); 42 U.S.C. §§3411, 3412 (Education); 42 U.S.C. § 7131 (Energy); 51 U.S.C. § 20111 (NASA).

82.     Congress has also authorized, in these agency-specific establishing statutes, each agency head to exercise powers of management over that agency and its employees, including the hiring and firing of employees, consistent with any generally applicable laws.  For example:

- 26 U.S.C. §§ 7803, 7804 (IRS: "the Commissioner of Internal Revenue is authorized to employ such number of persons as the Commissioner deems proper for the administration and enforcement of the internal revenue laws, and the Commissioner shall issue all necessary directions, instructions, orders, and rules applicable to such persons.");

- 42 U.S.C. §§ 7231, 7253 (Energy: "In the performance of his functions the Secretary is authorized to appoint and fix the compensation of such officers and employees, including attorneys, as may be necessary to carry out such functions. Except as otherwise provided in this section, such officers and employees shall be appointed in accordance with the civil service laws …"; "the Secretary is authorized to establish, alter, consolidate or discontinue such organizational units or components within the Department as he may deem to be necessary or appropriate.");

- 20 U.S.C. § 3461 (Education: "The Secretary is authorized to appoint and fix the compensation of such officers and employees, including attorneys, as may be necessary to carry out the functions of the Secretary and the Department.  Except as otherwise provided by law, such officers and employees shall be appointed in accordance with the civil service laws …");

- 42 U.S.C. § 203 (HHS: "The Secretary is authorized … to establish within them such divisions, sections, and other units as he may find necessary; and from time to time abolish, transfer, and consolidate divisions, sections, and other units and assign their functions and personnel in such manner as he may find necessary for efficient operation of the Service.");

- 12 U.S.C. § 5492 (CFPB: "The Bureau is authorized to establish the general policies of the Bureau with respect to all executive and administrative functions, including—…(7) the appointment and supervision of personnel employed by the Bureau; (8) the distribution of business among personnel appointed and supervised by the Director and among administrative units of the Bureau");

- *See also, e.g.,* 16 U.S.C. §§ 551, 554a, e (Agriculture; management and employment in Forest Service); 38 U.S.C. §§ 303, 510 (VA: Secretary; "control, direction, and management of the Department"; "authority to reorganize offices"); 10 U.S. C. § 113 (DoD: Secretary; "authority, direction, and control over the Department of Defense"); 42 U.S.C. § 282 (NIH:  Director,

1    management authority); 51 U.S.C. §§ 20111, 20113 (NASA: Administrator "shall have

2    authority and control over all personnel and activities thereof.").

3    83.    In addition to the specific authority granted to each agency head by these authorizing

4    statutes, Congress also enacted a "General authority to employ" that applies to all federal agencies:

5    Each Executive agency, military department, and the government of the District of Columbia
     may employ such number of employees of the various classes recognized by chapter 51 of
6    this title as Congress may appropriate for from year to year.

7    5 U.S.C. § 3101.

8    84.    Besides this specific authority regarding employment decisions, Congress also

9    delegated general authority to each federal agency head to adopt regulations "for the government of

10   his department, the conduct of its employees, the distribution and performance of its business…" 5

11   U.S.C. § 301; *see also* 5 U.S.C. § 302 (authorizing agency heads to delegate their authority to

12   subordinate employees).

13   85.    Congress also enacted the Civil Service Reform Act of 1978 ("CSRA") to establish

14   uniform standards for agencies and civil service employment across the federal government. 5

15   U.S.C. § 2101 (defining "civil service"); § 2015 (defining "employee"). The provisions of the CSRA

16   include statutes governing agency termination of employees for cause based on performance (5

17   U.S.C. § 4303(a); 5 U.S.C. § 7513(a)), and agency layoffs ("reductions in force, or "RIFs") (5 U.S.C.

18   § 3502).

19   86.    Congress also established the OPM by statute. 5 U.S.C. § 1101. Congress did *not*

20   authorize the OPM to hire or fire any federal employees employed by any agency other than OPM

21   itself. 5 U.S.C. §§ 1102, 1103. Rather, OPM's role, as established by Congress, is to act as the

22   human resources agency for the federal government, including by creating and publishing

23   government-wide rules in compliance with the APA. 5 U.S.C. §§ 1103, 1105. OPM's authority with

24   respect to the termination of employees of other agencies and departments is limited to providing

25   technical assistance and writing regulations. 5 U.S.C. §§ 4304, 4305, 7514.

26   87.    As the Acting Solicitor General recently confirmed in a petition to the U.S. Supreme

27   Court on behalf of the President and other federal officials, "*[a]gency heads control hiring and firing*

28   SECOND AMENDED COMPLAINT, No. 3:25-cv-01780-WHA                          18

*decisions for subordinates*—here, an agency of over 100 people who perform important investigative and enforcement functions affecting the entire federal workforce." Thus, in support of its request to vacate a district court temporary restraining order reinstating the head of the Office of Special Counsel, the federal government argued that the President's inability to remove the head of the agency deprived him of the power to control agency's employees—because *only the agency head* is authorized to hire and fire an agency's employees.[1]

## B. Probationary and Trial-Period Employees in Federal Service

88.     Approximately 200,000 probationary employees are employed in agencies throughout the federal government nationwide.[2]  Of these, at least 15,000 are employed in California, providing services that range from fire prevention to veterans' care.

89.     OPM's mass termination program has swept up two categories of federal employees, whose employment is governed by statute and regulation: probationary employees in the "competitive" service, and employees within their first two years of employment in a position in the "excepted" service.  Plaintiffs refer herein to all such employees as "probationary employees."

90.     Probationary employees in the competitive service are, with some exceptions, those who have been employed in their current position for less than one year.  5 U.S.C. § 7511(a)(1)(A)(ii); 5 C.F.R. § 315.801.  Employees are appointed as "career" or "career-conditional employees" subject to completing the probationary period.  5 C.F.R. § 315.201(a).

91.     The probationary period provides the opportunity for the federal agency to assess the individual performance of the employee.  Under governing OPM regulations, an agency "shall utilize the probationary period as fully as possible to determine the fitness of the employee and shall terminate his or her services during this period if the employee fails to demonstrate fully his or her qualifications for continued employment."  5 C.F.R. § 315.803(a).

---

[1] Application to Vacate the Order Issued by the U.S. District Court for the District of Columbia and Request for an Immediate Administrative Stay, *Bessent v. Dellinger*, No. 24A790, https://www.documentcloud.org/documents/25536868-dellinger-scotus-emergency-filing/?mode=document at 27 (filed U.S. Supreme Court Feb. 16, 2025).

[2] https://www.businessinsider.com/trump-administration-fired-probationary-federal-workers-veterans-affairs-agencies-2025-2

SECOND AMENDED COMPLAINT, No. 3:25-cv-01780-WHA                    19

92.     Most employees in the excepted service are also subject to a statutory trial period of two years, which, like the probationary period in the competitive service, is intended to permit the agency to evaluate the employee's performance and fitness for long-term employment in that position.  5 U.S.C. § 7511(a)(1)(C)(ii).

93.     Probationary employees throughout the federal government often have many years (or even decades) of federal service, and can include those who have transferred to a new agency or who are newly promoted to supervisory or management positions.

### C.     Regulations Governing the Termination of Probationary Employees

94.     Federal agencies may lawfully terminate probationary employees based on the agency's assessment of the employee's performance during the probationary period, pursuant to 5 C.F.R. § 315.804(a), which is entitled: "Termination of probationers for unsatisfactory performance or conduct."

95.     Under that regulation, "when an agency decides to terminate an employee serving a probationary or trial period because his work performance or conduct during this period fails to demonstrate his fitness or his qualifications for continued employment, it shall terminate his services by notifying him in writing as to why he is being separated and the effective date of the action."  5 C.F.R. § 315.804(a).  "The information in the notice as to why the employee is being terminated shall, as a minimum, consist of the agency's conclusions as to the inadequacies of his performance or conduct."  *Id.*  Trial-period employees in the excepted service have the same notice rights when removed from their positions for performance reasons.  5 C.F.R. § 316.304.

96.     Federal agencies may also lawfully terminate a probationary employee "for reasons based in whole or in part in conditions arising before his appointment."  5 C.F.R. § 515.805.

### D.     Statutes and Regulations Governing the Termination of Employees as Part of a RIF

97.     Federal agencies may also terminate probationary employees as part of an agency RIF. An agency may conduct a RIF "to reduce the size of its workforce."  *Tiltti v. Weise*, 155 F.3d 596, 601 (2d Cir. 1998).  "RIFs are not aimed at removing particular individuals; rather, they are directed solely at positions."  *Grier v. Dep't of Health & Hum. Servs.*, 750 F.2d 944, 945 (Fed. Cir. 1984).

SECOND AMENDED COMPLAINT, No. 3:25-cv-01780-WHA                                        20

1      98.     Agencies must follow specific statutory directives in conducting a RIF, including

2    detailed requirements for retention preferences, considerations for veterans, and the consideration of

3    tenure of employment and length of service.  5 U.S.C. § 3502(a)(1), (3).  Congress delegated to OPM

4    the authority to promulgate regulations that agencies must follow in implementing RIFs.  5 U.S.C. §

5    3502(a).

6      99.     Pursuant to that statutory authorization, and through notice-and-comment rulemaking,

7    OPM has issued detailed regulations setting forth the procedures by which RIFs must be conducted.

8    *See* 5 C.F.R. Part 351.  These RIF regulations apply whenever an agency determines that it is

9    necessary to release employees "because of lack of work; shortage of funds; insufficient personnel

10    ceiling; reorganization; the exercise of reemployment rights or restoration rights; or reclassification

11    of an employee's position due to erosion of duties … ."  5 C.F.R. § 351.201(a)(2).

12      100.    All agencies of the federal government are required to comply with the RIF

13    regulations whenever an agency "determines that a reduction force is necessary."  5 C.F.R. § 351.204;

14    *see also* 5 C.F.R. § 351.201(c) ("Each agency is responsible for assuring that the provisions in this

15    part are uniformly and consistently applied in any one reduction in force.").

16      101.    The RIF regulations apply to employees in the competitive and excepted services.  5

17    C.F.R. § 351.202(a), (b).  Probationary employees are expressly protected by the RIF regulations.  5

18    C.F.R. §§ 351.501(b)(2), 351.502(b)(2).  Probationary employees are included in "group II" of three

19    groups of employees, and may only be released, in order of retention, after the release of "group III"

20    employees, a group that includes employees under various temporary, term, and other provisional

21    appointments.  5 C.F.R. § 351.501(b).

22      102.    Before conducting a RIF, a federal agency must establish "competitive areas in which

23    employees compete for retention."  5 C.F.R. § 351.402.  Thus, RIFs are not conducted based on

24    agency-wide seniority.  Many probationary employees are veterans or would otherwise be entitled to

25    preference in the event of a RIF.

26

27

28

103.    The RIF regulations require that employees receive notice of at least 60 days before being released from employment, or at least 30 days from when the RIF is caused by circumstances that were not reasonably foreseeable.  5 C.F.R. § 351.801(a), (b).

104.    The governing statute and the RIF regulations also require that states and local governments be notified in advance of RIFs of 50 or more employees in an affected geographic area so they can be prepared to assist affected employees.  5 U.S.C. § 3502; 5 C.F.R. § 351.803.

## II.    OPM's Unlawful February 13, 2025 Order to Fire Probationary Employees Across the Nation

105.    Before the first day of the new Presidential Administration, OPM had never taken the position that it had the authority to direct other agencies to terminate employees.  As of early January 2025, the Acting OPM Director was Rob Shriver.  On January 16, 2025, he issued a press release, and gave an interview discussing OPM's work with agencies throughout the federal government on issues ranging from "skills-based federal hiring"; the ""retirement claims backlog"; a "new health insurance program for Postal workers"; and, significantly, "*how agencies recruit and retain early-career employees*." (Emphasis added).[3]  No mention was made of any federal government plan to terminate the employment of probationary employees at any agency, or across the nation.

106.    Before January 20, 2025, OPM had made no public statement regarding any program to terminate probationary employees.  Neither had any agency in the federal government made any public statement regarding any desire to terminate probationary employees.  No union or group of federal employees had been provided any notice of any program or decision to terminate probationary employees.  On information and belief, before January 20, 2025, OPM had no plans to order federal agencies to terminate their probationary employees, and no agency had such a plan.

107.    Before January 20, 2025, no OPM Director had ever taken the position that OPM had the legal authority to direct agencies to terminate the employment of employees of other federal agencies.

---

[3]https://federalnewsnetwork.com/workforce/2025/01/after-years-of-work-opm-is-hitting-on-all-cylinders-acting-director-says/.

SECOND AMENDED COMPLAINT, No. 3:25-cv-01780-WHA                    22

108.    On January 20, 2025, the first day of the incoming Presidential Administration, President Donald J. Trump appointed Charles Ezell to serve as Acting OPM Director.

109.    The same day, Acting OPM Director Ezell distributed a memo to "Heads and Acting Heads of Departments and Agencies" regarding "Guidance on Probationary Periods, Administrative Leave and Details." In this memo, Acting Director Ezell directed department and agency heads to submit to OPM, no later than January 24, 2025, a report listing all "employees on probationary periods, who have served less than a year in a competitive service appointment, or who have served less than two years in an excepted service appointment."[4] The memorandum directed agencies to "promptly determine whether these employees should be retained at the agency."[5]

110.    OPM required agencies to adhere to a *200-character limit* in any explanation provided as to why any individual employee should be retained by the agency.[6]

111.    On February 11, 2025, President Trump issued Executive Order 14210, entitled "Implementing the President's 'Department of Government Efficiency' Workforce Optimization Initiative."[7] The Executive Order instructed that "Agency Heads shall promptly undertake preparations to initiate large-scale reductions in force (RIFs)."[8]

112.    OPM did not wait for agencies to plan for or initiate any RIF.

113.    On or about February 13, 2025, OPM officials met with agency leaders across the federal government and directed them to begin firing their probationary employees without following RIF procedures.[9]

---

[4] https://www.opm.gov/media/yh3bv2fs/guidance-on-probationary-periods-administrative-leave-and-details-1-20-2025-final.pdf

[5] *Id.*

[6] https://federalnewsnetwork.com/workforce/2025/02/opm-asks-agencies-to-justify-keeping-probationary-employees/

[7] https://www.whitehouse.gov/presidential-actions/2025/02/implementing-the-presidents-department-of-government-efficiency-workforce-optimization-initiative/

[8] *Id.*

[9] https://thehill.com/homenews/administration/5144113-federal-probationary-employees-fired/ (Feb. 13, 2025); https://www.washingtonpost.com/dc-md-va/2025/02/13/trump-administration-fires-probationary-federal-workers/ (Feb. 13, 2025); https://apnews.com/article/trump-federal-workers-layoffs-doge-406752da1614755b8fabe9c94e0c71a8 (Feb. 13, 2025).

SECOND AMENDED COMPLAINT, No. 3:25-cv-01780-WHA                    23

114.     CBS News has reported that: "**The decision on probationary workers**, who generally have less than a year on the job, **came from the Office of Personnel Management**, which serves as a human resources department for the federal government.  The notification was confirmed by a person familiar with the matter, who spoke on condition of anonymity because they weren't authorized to discuss it publicly."  (Boldface added.)[10]

115.     On information and belief, as of February 13, 2025, prior to the order from OPM, no federal agency intended to terminate its probationary employees en masse, and no agency intended to terminate probationary employees (other than on an individualized basis for actual performance or conduct reasons) without complying with RIF procedures.

116.     On February 14, 2025, OPM sent an email with the subject "Follow up: CHCO Council Special Session."[11]  The CHCO is the "Chief Human Capital Officers Council," an entity established by statute.[12]   The statutory purpose of the CHCO is publicly set forth:

> The CHCO Council is the principal interagency forum to advise and coordinate the activities of the agencies of its members on such matters as modernization of human resources systems, improved quality of human resources information and legislation affecting human resources operations and organization[13]

The CHCO statutory mandate does not include acting as a conduit for OPM orders to agencies regarding their employees, or receiving or effectuating instruction from OPM on terminating any employees.

117.     OPM sent the February 14 email to the "CHCOs and Deputy CHCOs."  OPM's public website identifies all of the following individuals as CHCOs and Deputy CHCOs of the agencies:

- Agriculture (CHCO Anita Adkins; Acting Deputy CHCO Michelle Long)

---

[10]https://www.cbsnews.com/news/federal-layoffs-probationary-workers-warnings-bigger-cuts-on-way/

[11] This email was revealed for the first time to the public on February 26, 2025 as an exhibit to the Ezell Declaration in support of Defendants' opposition to the TRO in this case, which was submitted after the filing of Plaintiffs' First Amended Complaint.  A copy of the document submitted by Defendants is attached hereto as **<u>Exhibit A.</u>**

[12] CHCO was created by the Chief Human Capital Officers Act of 2002 (Act), which was enacted as part of the Homeland Security Act, Public Law 107-296.

[13] https://beta.chcoc.gov/static/content/CHCOCouncilCharterFinal20211214.pdf

SECOND AMENDED COMPLAINT, No. 3:25-cv-01780-WHA        24

1         •  Commerce (CHCO Jessica Palatka; Deputy CHCO VACANT)

2         •  Defense (CHCO Zev Goldrich; Acting Deputy CHCO Daniel Hester)

3         •  Education (CHCO Jacqueline Clay; Deputy CHCO Bonnie Hochhalter])

4         •  Energy (CHCO Erin Moore; Deputy CHCO Todd Turner)

5         •  HHS (CHCO Jeffery Anoka, Deputy CHCO Jonathan Gardner)

6         •  Homeland Security (CHCO Roland Edwards, Deputy CHCO Roger Brown)

7         •  HUD (CHCO Lori Michalski, Deputy CHCO Priscilla Clark)

8         •  Interior (CHCO Mark Green, Deputy CHCO Jennifer Ackerman)

9         •  Justice (CHCO Mike Williams, Deputy CHCO VACANT)

10       •  Labor (CHCO Sydney Rose, Deputy CHCO Carin Otero)

11       •  State (CHCO Marcia Bernicat, Deputy CHCO Jameela Akbari)

12       •  Treasury (CHCO Trevor Norris, Deputy CHCO VACANT)

13       •  Transportation (CHCO VACANT, Deputy CHCO Anne Audet)

14       •  VA (CHCO Tracey Therit, Deputy CHCO VACANT)

15       •  EPA (CHCO Helena Wooden-Aguilar, Deputy CHCO Mara Kamen)

16       •  GSA (CHCO Arron Helm, Deputy CHCO Jermey Taylor)

17       •  NASA (CHCO Kelly Elliot, Deputy CHCO Anne Roemer)

18       •  NSF (CHCO Wonzie Gardner, Deputy CHCO Eric Dilworth)

19       •  OMB (CHCO Sarah Spoone, Deputy CHCO VACANT)

20       •  OPM (CHCO Carmen Garcia< Deputy CHCO Joe Knouff)

21       •  Office of the Dir. Nat. Intelligence (CHCO Cynthia Snyder; Deputy CHCO VACANT)

22       •  SBA (CHCO Elias Hernandez, Deputy CHCO Julie Brill)

23       •  SSA (CHCO Florence Felix-Lawson, Deputy CHCO Kristen Medley-Proctor)

24       •  USAID (CHCO Cynthia Snyder, Deputy CHCO Sheila Wright)

25

26

27

28

SECOND AMENDED COMPLAINT, No. 3:25-cv-01780-WHA            25

1    • Small Agency Human Resources Council Chair Arrie Etheridge; Deputy Chair Star
2       Anderson)[14]

3    118.    The Small Agency Council is an "association of sub-Cabinet, independent Federal
4    agencies," that "represents about 80 small agencies." The Small Agency Council Human Resources
5    representatives "supports these employees by working with OPM and the CHCO Council on the
6    various Government-wide priorities."[15]

7    119.    The Merit Systems Protection Board ("MSPB") and Federal Labor Relations
8    Authority ("FLRA") are members of the Small Agency Council and are among the small independent
9    agencies instructed by the February 14 email to terminate probationary employees.[16]

10    120.    In the February 14 email, OPM instructed these CHCOs and Deputy CHCOs at each
11    federal agency as to the "immediate next steps for probationary employees." OPM stated: "We have
12    asked that you separate probationary employees that you have not identified as mission-critical no
13    later than end of day Monday, 2/17 [President's Day, a federal holiday]. We have attached a template
14    letter." The email further instructed agencies that "OPM believes 'qualifications for continued
15    employment' in the current context means that only the highest-performing probationers in mission-
16    critical areas should be retained."

17    121.    The February 14, 2025 email then instructed agencies that, "[a]fter *actioning*"
18    (emphasis added), they must update their previous probationary worker spreadsheets and submit
19    those lists to OPM, and continue to do so every day.

20    122.    OPM's template letter attached to the February 14 email stated:

21    MEMORANDUM FOR [EMPLOYEE], [TITLE], [ORGANIZATION]
      FROM: [NAME]
22    [TITLE]
      SUBJECT: Notification of Termination During Probationary Period
23    REFERENCES: 5 U.S.C. § 7511
      [5 U.S.C. § 3321(a)]
24    [5 C.F.R. §§ 315.803 and 804]
25

26    [14] https://beta.chcoc.gov/members
27    [15] https://www.chcoc.gov/content/small-agency-human-resources-council-sahrc
      [16] *E.g.*,https://www.chcoc.gov/content/small-agency-human-resources-council-sahrc and
28    https://www.sac.gov/about/members.htm

SECOND AMENDED COMPLAINT, No. 3:25-cv-01780-WHA                    26

[5 C.F.R. § 316.304]
[INSERT AGENCY POLICY]

This is to provide notification that the Agency is removing you from your position of [TITLE] and federal service during your probationary/trial period consistent with the above references.

On [INSERT DATE OF APPOINTMENT], the Agency appointed you to the position of [TITLE]. As documented on your appointment Standard Form 50 (SF-50), your appointment is subject to a probationary/trial period. [The agency also informed you of this requirement in the job opportunity announcement for the position.]

Guidance from the Office of Personnel Management ("OPM") states, "An appointment is not final until the probationary period is over," and the probationary period is part of "the hiring process for employees."[1] "A probationer is still an applicant for a finalized appointment to a particular position as well as to the Federal service." [2] "Until the probationary period has been completed," a probationer has "the burden to demonstrate why it is in the public interest for the Government to finalize an appointment to the civil service for this particular individual."[3] Furthermore, OPM has emphasized that individual employee performance measurement should be aligned with and support organizational goals and focus employee efforts on achieving organizational and group goals. In addition, OPM has instructed Agencies to consider whether an employee's performance is in the best interest of the government, in light of the President's directive to dramatically reduce the size of the federal workforce.

**Based on the OPM guidance referenced above**, **the Agency finds, based on your performance, that you have not demonstrated that your further employment at the Agency would be in the public interest**. For this reason, the Agency informs you that the Agency is removing you from your position of [TITLE] with the Agency and the federal civil service effective [insert date and time, if necessary].

You may have a right to file an appeal with the Merit Systems Protection Board (MSPB) on the limited grounds set forth in 5 C.F.R. § 315.806. Any such appeal must be filed within 30 days of the effective date of this notice or 30 days after the date of your receipt of this notice, whichever is later. You should review MSPB regulations at 5 C.F.R. §§ 1201.14 and 1201.24 for instructions on how to file an electronic appeal and content requirements of the appeal, respectively. For more information, please visit www.mspb.gov or contact your local MSPB regional or field office at: [INSERT MSPB REGIONAL OR FIELD OFFICE CONTACT INFORMATION].

We appreciate your service to the Agency and wish you the greatest of success in your future endeavors. If you have any questions, please contact [CONTACT].

[INSERT NAME OF AGENCY OFFICIAL]
[INSERT TITLE OF AGENCY OFFICIAL]

1    [emphasis added].[17]

2        123.    OPM later followed up with "FAQs" provided to agencies regarding this directive.

3    Those FAQs instructed agencies that "'qualifications for continued employment' means that only the

4    highest-performing probationers in mission critical areas should be retained" and "The notice **must**

5    include the agency's conclusions as to the inadequacies of the employee's performance or conduct."

6    OPM also instructed agencies to use the "codes" for "processing" terminations for "unacceptable or

7    unsatisfactory performance" and instructed the agencies (twice) that the "codes should be consistent

8    with the reasons the agency stated in the termination notices" that OPM gave them to use.  Finally,

9    OPM instructed agencies that they need not provide employee unions with notice or information

10   regarding the termination of probationary and trial employees.

11       124.    On information and belief, OPM has lists containing every probationary employee

12   terminated as a result of its orders throughout the federal government, because it ordered agencies to

13   submit those reports to OPM Chief of Staff on a daily basis.

14   **III.    Federal Agencies' Immediate and Ongoing Implementation of OPM's Unlawful
            Directive**

15

16       125.    Agencies across the federal government began acting on OPM's February 13, 2025

17   directive immediately through chaotic mass terminations of their probationary employees.[18]

18       126.    Tens of thousands of probationary employees have already been subjected to mass

19   terminations, with no advance notice, by agencies across the federal government, including

20   employees at the following agencies:

21       U.S. Forest Service[19]
         Department of Veterans Affairs[20]

22

23   _____

24       [17] A copy of OPM's template is attached hereto as **<u>Exhibit B</u>**.
         [18]https://www.washingtonpost.com/politics/2025/02/14/trump-firing-probation-workforce-

25   buyouts-doge/f816fbea-eb23-11ef-969b-cfbefacb1eb3_story.html

26       [19] https://www.reuters.com/world/us/mass-firings-federal-workers-begin-trump-musk-purge-us-
         government-2025-02-13/; https://www.sfgate.com/california-parks/article/joshua-tree-yosemite-

27   locals-protest-mass-layoffs-20174425; https://www.nytimes.com/2025/02/18/climate/trump-layoffs-
         park-and-forest-service-workers.html

28       [20] *Id.*; https://www.washingtonpost.com/nation/2025/02/17/trump-fires-federal-workers-
         performance/

Department of Education[21]
National Science Foundation[22]
General Services Administration[23]
Small Business Administration[24]
Consumer Financial Protection Bureau[25]
Department of Energy[26]
National Nuclear Security Administration[27]
Department of Housing and Urban Development[28]
Centers for Disease Control[29]
National Park Service[30]
National Institutes of Health[31]
Environmental Protection Agency[32]
Bureau of Reclamation[33]
Department of Interior[34]
Bonneville Power Administration[35]
US Department of Agriculture[36]
Bureau of Land Management[37]
US Fish and Wildlife Service[38]

---

[21] https://www.reuters.com/world/us/mass-firings-federal-workers-begin-trump-musk-purge-us-government-2025-02-13/

[22] https://www.wired.com/story/national-science-foundation-february-2025-firings/; https://www.nytimes.com/2025/02/18/us/politics/national-science-foundation-firings.html.

[23] https://www.reuters.com/world/us/mass-firings-federal-workers-begin-trump-musk-purge-us-government-2025-02-13/

[24] https://www.businessinsider.com/federal-workers-fired-not-fired-then-terminated-sba-2025-2

[25] https://www.reuters.com/world/us/mass-firings-federal-workers-begin-trump-musk-purge-us-government-2025-02-13/

[26] https://www.eenews.net/articles/doe-to-lay-off-probationary-staff-today/

[27] https://www.npr.org/2025/02/13/nx-s1-5296928/layoffs-trump-doge-education-energy

[28] https://www.nbcnews.com/politics/white-house/trump-administration-federal-agencies-fire-probationary-employees-rcna192149

[29] https://apnews.com/article/trump-firing-probation-workforce-buyouts-layoffs-doge-159a6de411622c2eb651016b1e99da37

[30] https://www.nytimes.com/2025/02/18/us/politics/national-science-foundation-firings.html (1000 NPS employees)

[31] https://www.nbcwashington.com/news/president-trump-politics/taking-away-years-of-experience-nih-probationary-employees-fired-friday/3845749/

[32] https://abcnews.go.com/US/agencies-federal-workers-fired/story?id=118901289

[33] https://www.nytimes.com/2025/02/18/us/politics/national-science-foundation-firings.html

[34] *Id.* (1300 Interior Dept employees fired over holiday weekend).

[35] https://www.opb.org/article/2025/02/19/bonneville-power-administration-reverses-30-job-cuts-continues-with-plans-to-eliminate-430-positions/

[36] https://www.npr.org/2025/02/18/nx-s1-5300150/among-the-federal-workers-fired-usda-workers-who-keep-food-safe-and-crops-growing

[37] https://www.nytimes.com/2025/02/18/us/politics/national-science-foundation-firings.html; https://www.cnn.com/2025/02/14/politics/probationary-federal-employees-agencies-firings-doge/index.html

[38] https://www.cnn.com/2025/02/14/politics/probationary-federal-employees-agencies-firings-doge/index.html

SECOND AMENDED COMPLAINT, No. 3:25-cv-01780-WHA                    29

Cybersecurity and Infrastructure Security Agency[39]
US Citizenship and Immigration Services[40]
Federal Emergency Management Agency[41]
Federal Aviation Administration[42]
Department of Transportation[43]
Food and Drug Administration[44]
National Highway Traffic Safety Administration[45]
Pipelines and Hazardous Materials Safety Administration[46]
Centers for Medicare & Medicaid Services[47]
Substance Abuse and Mental Health Services Administration[48]
Federal Deposit Insurance Corporation[49]

127.    While implementing OPM's orders, numerous federal agencies informed workers that OPM ordered the terminations.  For example, at the National Science Foundation meeting for probationary employees, employees were told the following:

You've been invited here today because you were either a probationary employee or you are an expert on intermittent appointment.

We've asked you here today to tell you face to face that we will be terminating your employment at the end of the day today.

*We've been directed by the administration to remove all term probationary employees.*

Today at 11 o'clock, each of you will receive a termination letter by email.

---

[39] https://thehill.com/homenews/5154340-dhs-fires-probationary-employees/

[40] *Id.*

[41] https://www.politico.com/news/2025/02/19/fema-email-firings-affect-majority-staff-00204779

[42] https://apnews.com/article/doge-faa-air-traffic-firings-safety-67981aec33b6ee72cbad8dcee31f3437

[43] https://www.nbcphiladelphia.com/news/national-international/transportation-department-workers-with-exceptional-reviews-told-theyre-fired-for-performance-issues/4111423/?os=iosdF&ref=app

[44] https://www.nytimes.com/2025/02/18/us/politics/fda-food-safety-jim-jones-resignation.html (terminated workers "included people with specialized skills in infant formula safety and food safety response"; FDA food safety chief resigns because "loss of critical employees overseeing the nation's food supply made his work impossible").

[45] https://www.politico.com/news/2025/02/18/layoffs-auto-pipeline-safety-00204715

[46] *Id.*

[47] https://www.fiercehealthcare.com/regulatory/mass-layoffs-hhs-cdc-cuts-1300-probationary-workers-reports-say

[48] *Id.*

[49] https://www.reuters.com/world/us/fdic-fires-new-employees-part-broader-government-layoffs-2025-02-18/

SECOND AMENDED COMPLAINT, No. 3:25-cv-01780-WHA                    30

At 1 p.m, you will lose access to the network[.]  And at the end of the day today, you'll be terminated.

You ready? You have one more thing.  You have the option to resign in lieu of termination.

That may be beneficial to you.  If you choose to resign, you will not be eligible for unemployment.

However, if asked when you apply for future positions, you will be able to say that you were not terminated.

So for those of you that have federal benefits.  Sorry.  Okay.  For those of you that have federal benefits, your health insurance will be terminated at the end of the pay period.

Your federal dental and vision insurance plan, they will terminate at the end of the pay period.  There is no extension for coverage under FedVIP.
…
This is in executing Government-wide guidance from the administration.  I'm sure you've read in the news that all agencies are terminating probationary employees.
…
So there was no limited discretion.  *This is not a decision the agency made.  This is a direction we received*, first of all.  Second of all, this is the first of many forthcoming workforce reductions.
…
*We are following orders*.  We are part of the executive branch.  We follow that.  I apologize for people that have made life-changing career moves.
…
We were directed last Friday by OPM to terminate all probationers except for a minimal number of mission critical probationers.
Mission critical determination, first of all, it is exceptionally small number that we're permitted to have.
…
There's no negotiation, first of all.  *And second of all, the administration has already announced its intention to significantly reduce the workforce*.

It is only a matter of time. It is not today is not the only workforce reduction that we will do.

(Emphasis added.)

128.     The NSF explained that the agency had previously been told that it would have discretion to retain workers, and had in fact made the decision to retain all of its probationary employees, only to have OPM issue a superseding order on February 13, 2025 requiring the agency to terminate everyone:

We did.  In the last two weeks.  Up until Friday.  Yes.  We were told by OPM it was the agency's discretion whether to remove probations or not.

SECOND AMENDED COMPLAINT, No. 3:25-cv-01780-WHA                                      31

*We chose to retain them all.*  Last Friday night.

They gave direction to there was some direction that was given to cabinet level agencies.  And so you saw those actions taking place at the end of last week.

But the directions we received were it was our discretion.  And late, late Friday night….

*They told us that they directed us to remove probationers.*

(Emphasis added.)

129.     Under oath at a congressional hearing on February 25, 2025, Tracey Therit, the Chief Human Capital Officer of the VA, responded to questioning:

RANKING MEMBER TAKANO: So nobody ordered you to carry out these terminations?·

You did it on your own?

MS. THERIT: There was direction from the Office of Personnel Management.

130.     Other agencies across the government have also told the public and their employees the same thing: that OPM *ordered* the terminations, including in the following documented instances:

- In an online town hall for IRS employees, the IRS CHCO told employees, "Regarding the removal of the probationary employees, again, that was something that was directed from OPM. And even the letters that your colleagues received yesterday were letters that were written by OPM, put forth through Treasury, and given to us."  The IRS CHCO was one of the recipients of the February 14 email.

- On February 26, 2025, Civilian Personnel Policy Council Members at the Department of Defense (DoD) received an email from Defense Civilian Personnel Advisory Service Director Daniel J. Hester stating: "In accordance with direction from OPM, beginning February 28, 2025, all DoD Components must terminate the employment of all individuals who are currently serving a probationary or trial period."  The termination letters were sent to DoD employees by the Dod CHCO.  The DoD CHCO was one of the recipients of the February 14 email.

- Termination letters to employees at the Bonneville Power Administration stated: "Per OPM instructions, DOE finds that your further employment would not be in the public interest. For this reason, you are being removed from your position with DOE and the federal civil service."

- USDA's Deputy CHCO told USDA employee: "Last night, agencies were notified by the Office of Personnel Management (OPM) that the Administration has decided probationary employees are not eligible for the Deferred Resignation program and also that these employees are to be terminated."  The USDA CHCO was one of the recipients of the February 14 email.

SECOND AMENDED COMPLAINT, No. 3:25-cv-01780-WHA                                    32

131.    OPM required agencies to use its template termination notices, which OPM created and provided to the agencies, to be sent to those agencies' probationary employees, citing performance as the basis for the termination.

132.    Reflecting that directive, many agencies have used identical or nearly identical text in letters notifying probationary employees of their termination.  For example:

    a.  Termination letters received by probationary employees in multiple agencies, including the Departments of Homeland Security, Health and Human Services, Agriculture, and Education, included identical introductory language stating as follows, with identical footnotes and footnote text:

> Guidance from the Office of Personnel Management ("OPM") states, "An appointment is not final until the probationary/trial period is over," and the probationary/trial period is part of "the hiring process for employees."[1]  "A probationer is still an applicant for a finalized appointment to a particular position as well as to the Federal service."[2]  "Until the probationary period has been completed," a probationer has "the burden to demonstrate why it is in the public interest for the Government to finalize an appointment to the civil service for this particular individual."[3]

    b.  Termination letters received by probationary employees in multiple agencies included the following boilerplate language describing the reasons for their termination: "The Agency finds, **based on your performance**, that you have not demonstrated that your further employment at the Agency would be in the public interest."  (Boldface added).

    c.  Similarly, termination letters received by probationary employees in multiple agencies included the following boilerplate language describing the reasons for their termination: "Unfortunately, the Agency finds that that you are not fit for continued employment because your ability, knowledge and skills do not fit the Agency's current

needs, and **your performance** has not been adequate to justify further employment at the Agency."  (Boldface added).[50]

133.    At the National Science Foundation meeting reference above, employees were told the language in the letters came from the "boilerplate" language from OPM:

> "The cause comes from boilerplate we received from OPM.  The cause says that the agency finds based on your performance that you have not demonstrated that your further employment at the agency would be in the public interest."

134.    The termination letters issued to probationary employees cite, as authority for the terminations, the regulations that govern terminations **for performance reasons**:  5 C.F.R. § 315.803 (directing agencies to terminate probationary employees "if the employee fails to demonstrate fully his or her qualifications for continued employment"); 5 C.F.R. § 315.804 (requiring notice of the reasons when an agency "decides to terminate an employee serving a probationary or trial period because his work performance or conduct during this period fails to demonstrate his fitness or his qualifications for continued employment," including a statement of the "agency's conclusions as to the inadequacies of [the employee's] performance or conduct"); and 5 C.F.R. § 316.304 (entitling trial period employees in the excepted service to the same notice rights upon termination for performance reasons as probationary employees in the competitive service).

135.    Despite the citation of these authorities in the template termination letters, the letters fail to provide any individualized reasons why the employees' performance warranted termination. Many termination letters appear to have been created by means of mail merges.  Some termination letters do not even specify the name of the employee being terminated.

136.    The reference to employee performance in the mass termination letters and the citation to the authority for the termination of probationary employees for performance reasons is a pretext.

---

[50] Recent reporting by the Washington Post revealed similar templates and instructions by OPM to agencies in January and February 2025 with respect to employees unlawfully targeted for termination and/or administrative leave because of perceived participation in work related to Diversity, Equity, and Inclusion programs.  Washington Post, Feb. 15, 2025, *Records show how DOGE planned Trump's DEI purge — and who gets fired next,* available at: https://wapo.st/4jVWqEd.

SECOND AMENDED COMPLAINT, No. 3:25-cv-01780-WHA                                        34

The real reason for the mass terminations, as expressed by the incoming Presidential Administration, is to reduce the size of the federal workforce.

137.    Many terminated probationary employees had received excellent performance reviews from their agencies.  Supervisors were not consulted as to the performance of individual probationary employees before they were terminated.  On information and belief, some probationary employees have subsequently been told by agency representatives that they were terminated solely because their agencies were being restructured, not based on any performance or conduct by the employee.

138.    USA Today recently reported that "Fired probationary employees interviewed by USA TODAY all said they were never told of any performance problems.  One hadn't been in the job long enough to have a performance review.  Another was fired just a month into her job after relocating from more than 1,700 miles away to take it.  And a third employee said his supervisor explicitly told him he wasn't being terminated for performance reasons.[51]

139.    NBC News reported that although Department of Transportation probationary employees received letters stating that they were being terminated for performance reasons, "most of those employees were rated as being 'exceptional' performers by their supervisors."[52]

140.    The Washington Post reported that: "One well-rated Veterans Affairs staffer texted her boss to complain after she was fired.  In text messages obtained by The Post, he replied, "It states it's due to your performance which is not true. … Your performance has nothing to do with this.'"[53]

141.    On information and belief, Defendants plan further waves of mass pretextual terminations of probationary employees.  The New York Times maintains a tracker of public information regarding probationary terminations, and states (as of March 4, 2025): "These figures are

---

[51]https://www.msn.com/en-us/news/us/its-a-lie-federal-workers-incensed-by-performance-language-in-termination-letters/ar-AA1zcrmN?ocid=BingNewsSerp

[52]https://www.nbcnews.com/politics/doge/federal-workers-exceptional-reviews-fired-performance-issues-rcna192347

[53] https://www.washingtonpost.com/nation/2025/02/17/trump-fires-federal-workers-performance/

SECOND AMENDED COMPLAINT, No. 3:25-cv-01780-WHA                    35

1    just a portion of the more than 200,000 probationary employees that the Trump administration aims

2    to cut, and more dismissals are expected."[54]

3        142.    Further proving that the NSF did not make the decision at the agency level to fire its

4    probationary workers, following the Temporary Restraining Order in this case, the Director of NSF

5    immediately ordered all terminated probationary workers reinstated.  On Monday, March 3, 2025, at

6    9:12 a.m. the NSF Office of the Director issued a Staff Memorandum that said:

7        A Federal court issued an opinion on Friday relative to the probationary employees.  NSF has
         immediately started the process of reinstating our other probationary employees.  All
8        impacted probationary employees will receive backpay and no break in service.
         This is welcome news to all of us.  We recognize that these actions have had a significant
9        impact on the terminated staff and all of you…

10       I want to thank all of you for your tireless efforts, even under great stress and uncertainty, to
11       do the hard work that is necessary to allow NSF to continue to advance incredible ideas and
         talent throughout our nation.

12   Another post on this subject from the Director stated further:  "NSF welcomes the return of our
13

14   probationary employees who will help ensure the United States remains the global leader in scientific

15   discovery and innovation."

16       143.    To Plaintiffs' knowledge, as of the date of this filing, the Department of Defense

17   delayed terminations of probationary employees that were set to occur on February 28, 2025 but

18   since that date has terminated some probationary employees, in at least some cases using the OPM

19   template.

20       144.    Other agencies have reinstated limited numbers of workers, demonstrating the

21   government's interest in employing these individuals and lack of difficulty in reinstatement.  Scores

22   of federal workers want their jobs to be reinstated, and on information and belief, those

23   reinstatements can occur as easily as the NSF's reinstatement on March 3, 2025.  These employees

24   were fired by email en masse and can be reinstated en masse.

25   **IV.    Impact on Plaintiffs, the Federal Government, and the Public**

26

27   ────────────────────

28   [54]https://www.nytimes.com/interactive/2025/02/11/us/politics/trump-musk-doge-federal-workers.html

SECOND AMENDED COMPLAINT, No. 3:25-cv-01780-WHA                    36

145.    Plaintiffs AFSCME, AFGE, AFGE Local 1216, AFGE Local 2110, and UNAC (hereafter "Union Plaintiffs") each represent probationary employees who have been summarily fired, and falsely informed that their termination was based on performance, as a result of OPM's orders to federal agencies, or who are at risk of summary termination as a result of OPM's orders.

146.    Each Union Plaintiff has the core function of representing employees in federal bargaining units in collective bargaining and providing counseling, advice, and representation to represented employees in the event of adverse employment actions.

147.    Each Union Plaintiff has been prevented, by the surprise mass terminations, from exercising those core functions as employee representative, including because by providing sham reasons for probationary employees' terminations, OPM has undermined the Plaintiffs' ability to effectively assist represented employees in vindicating their rights and seeking appropriate remedies.

148.    Each Union Plaintiff has expended substantial time and resources in the days following the surprise mass terminations addressing member concerns and attempting to provide employees with effective representation. As a result of the surprise mass terminations, each Plaintiff has been forced to divert resources that would be devoted to representing employees who have experienced adverse employment action for legitimate resources.

149.    Each Union Plaintiff has been harmed in multiple other ways by the termination of its members, including by the loss of dues income and bargaining power.

150.    Each Union Plaintiff has organizational standing to sue in its own right and has associational standing to sue on behalf of its members.

151.    Plaintiff Main Street Alliance's members face imminent harm as a result of the anticipated reductions and delays in services provided by the Small Business Administration, on which its members rely for critical services. Those services include but are not limited to: loan guarantees to enable small businesses to obtain financing to start up or grow; and emergency disaster relief, such as in response to the January 2024 Los Angeles wildfires and Hurricane Helene in Western North Carolina. Plaintiff Main Street Alliance's members also face imminent harm as a result of the anticipated reductions and delays in services provided by the USDA, on which many

SECOND AMENDED COMPLAINT, No. 3:25-cv-01780-WHA                    37

1    MSA members rely.  For example, MSA members have utilized grant funding through various

2    programs administered by the Agricultural Marketing Service to grow their businesses.  The

3    terminations of USDA employees are likely to lead to reductions and delays in the operation of those

4    programs, harming MSA members.

5        152.    Plaintiff Coalition to Protect America's National Parks' members face imminent harm

6    as a result of the anticipated reductions and delays in services provided by the National Park Service.

7    The Coalition's members are regular and avid users of America's national parks, national forests,

8    wildlife refuges operated by the Fish & Wildlife Service, marine sanctuaries operated by NOAA, and

9    other public lands, both for recreation and conservation purposes, and would be adversely affected by

10    any degradation of the parks and the programs of the NPS, the Forest Service, the Fish & Wildlife

11    Service, the NOAA Office of National Marine Sanctuaries, and the Bureau of Land Management

12    ("BLM"), and the ability of those agencies to preserve and protect parks and public lands, and make

13    them available to visitors.  Such degradation in safety and services provided to the public in the

14    National Parks and other public lands, marine sanctuaries, and wildlife refuges is already happening,

15    and further degradation is inevitable based on the Coalition's experience in prior government

16    shutdowns and with reductions in services to the public in those circumstances.

17        153.    Plaintiff Western Watersheds Project ("WWP") faces imminent harm to its mission to

18    protect and restore wildlife and public lands.  The mass termination is likely to cause further

19    degradation of public lands and wildlife.  WWP's members are regular and avid users of the public

20    lands in the Western United States.  They use the National Parks, public lands and wilderness areas

21    controlled by the BLM and Forest Service, and other federal lands for recreation, conservation, and

22    study activities.  WWP's members would be adversely affected by the degradation of public lands

23    and the worsening threats to species that are likely to result from the reductions of staffing in the

24    National Park Service, BLM, and the Fish & Wildlife Service and other federal agencies that will

25    delay Endangered Species Act listing decisions.

26        154.    Additionally, in performing its own conservation work, WWP engages with numerous

27    federal agencies and relies on those agencies being fully staffed to enable WWP to achieve its

28

SECOND AMENDED COMPLAINT, No. 3:25-cv-01780-WHA                    38

mission.  This includes coordinating and communicating with the Fish & Wildlife Service and the National Marine Fisheries Service (which is a component agency of NOAA, which is itself a component agency of the Department of Commerce) in conservation activities to protect various species.  WWP also relies on data provided by NOAA through its component agency the National Weather Service in identifying and analyzing conservation issues, such as using NOAA's drought data to inform WWP's work with respect to overgrazing on public lands.  The loss of probationary employees in these agencies is likely to lead to reductions and delays in providing these public services and maintaining the data that WWP relies on for its conservation work.

155.    Plaintiff VoteVets faces imminent harm to its supporters who are veterans and who rely on the VA medical system and other critical federal services provided to veterans. The VA has dismissed over 1,000 probationary employees across various roles, including those in mental health research, cancer treatment, addiction recovery, prosthetics, and burn pit exposure studies. The mass termination has also hindered the recruitment of essential support staff for the Veterans Crisis Line, which provides critical emergency mental health care (including suicide prevention) and support for military veterans, service members, their families, and caregivers positions such as trainers and quality assurance personnel.  The mass termination of probationary employees is likely to impair the quality of these essential services.  In addition, many of VoteVets' supporters are themselves employed by the federal government, including many probationary employees who lost their jobs pursuant to this mass termination.

156.    The mass termination has also directly harmed VoteVets as an organization.  The time of VoteVets' staff and consultants has been diverted from VoteVets' regular activities to field and respond to inquiries from veterans and their families and to connect them with case workers in congressional offices.

157.    Plaintiff Common Defense also faces imminent harm to itself and its members.  Its veteran members also rely on services provided by the VA medical system and other critical mental health services available to veterans.  Military families and veterans experience food insecurity at higher rates than the general population, and many members of Common Defense rely on the

SECOND AMENDED COMPLAINT, No. 3:25-cv-01780-WHA                    39

Supplemental Nutrition Assistance Program (SNAP) provided through the USDA.  Members of

Common Defense also rely on federal educational assistance offered to veterans, including through

student loans and loan deferral, cancellation, and forgiveness programs administered by the

Department of Education.  The mass terminations at all these agencies risk severe disruption to those

services.  Further, Common Defense has had to devote considerable resources to responding to

requests from its members and providing guidance about the mass probationary terminations,

diverting resources that Common Defense ordinarily devotes to its other core priorities.

158.    Plaintiff APHA also faces imminent harm to itself and its members.  APHA's

membership includes individual public health care workers, student members in schools or programs

in public health or related fields, and agency members such as local health departments and public

and private health organizations.  The termination of probationary employees at HHS restricts these

members' ability to do their jobs in numerous ways.  Members who are students and academics rely

on NIH staff to manage grants and proposals for ongoing public health research.  Local health

department members and public health worker members across the country depend on the work,

expertise, and information provided by the CDC to track and respond to public health threats,

including rapidly spreading diseases.  CDC employees, including probationary employees, work to

track disease spread; conduct and validate lab analysis of public health data nationwide; screen

travelers for dangerous pathogens at airports and border crossings; and provide on-the-ground

support to local health departments when needed.  Disruptions to this key public health testing,

prevention, and response work place additional burdens on APHA members to respond to public

health threats, such as the ongoing spread of bird flu and measles throughout the country, and the

possible entry into the US of diseases surging around the world, such as mpox, Ebola, or polio.

159.    In addition, APHA's organizational mission includes providing public information

about outbreaks and public health risks, for which APHA relies on data and information provided by

the CDC and other components of HHS.  The terminations of probationary employees are likely to

lead to delays and reductions in the information gathered by the agency and the information available

to APHA for its public education work.  These mass terminations have also required APHA to take on

1  additional work responding to member questions and will require APHA to devote more resources to

2  public education about outbreaks and public health risks to compensate for the reductions in agency

3  workforce and capacity.

4      160.    Plaintiff AFA also faces imminent harm to itself and its members.  Aviation safety is

5  fundamental to the flight attendant profession.  Recent terminations of FAA employees introduce

6  unnecessary risk and stress that distracts from the mission of safe flight for civil and military

7  operations.  Chaotic workplaces harm recruitment, training and retention of critical personnel.  FAA

8  specialists are responsible for repairing air traffic control facilities and updating digital maps for

9  pilots.  Meteorologists provide critical reports that help navigate safe flights and avoid the dangers of

10  turbulence that range in harm from air sickness and coffee burns to serious injury and even death.  If

11  FAA specialists cannot do their jobs, flight attendants cannot do theirs.  In the wake of the events of

12  the past few weeks, some flight attendants have decided to leave the profession altogether while

13  others are getting pressure from their families to get another job.  Flight attendants rely upon a robust

14  federal workforce to ensure our skies are safe and secure.  AFA is already observing the adverse

15  effects of a diminished workforce on the federal aviation system.

16      161.    Plaintiff American Geophysical Union also faces imminent harm to itself and its

17  members.  Not only do AGU members work in agencies across the federal government, AGU's

18  scientific community outside the federal government significantly relies on federal grants to support

19  research, including awards from the National Science Foundation, Department of Energy, U.S. Forest

20  Service, Environmental Protection Agency, Department of Interior, U.S. Fish and Wildlife Service,

21  Bureau of Land Management, and National Oceanic and Atmospheric Administration, to name only a

22  few.  Further, observations and data collected and curated by these agencies are the backbone of

23  global science, are particularly critical for protecting health and human safety, and are relied on by

24  AGU members both inside and outside of the government to support their own work.  The scientific

25  work supported by these federal agencies and resources protects communities by improving advance

26  warning of flooding, refining forecasts of hurricane paths, and anticipating wildfire risk.  Federal

27  science also bolsters the economy.  Farmers use scientific drought outlooks to inform seasonal

28

SECOND AMENDED COMPLAINT, No. 3:25-cv-01780-WHA          41

1   investments, and the insurance industry relies on geoscience to assess risks to infrastructure for

2   natural hazards including earthquakes, volcanoes, floods and sea level rise.  Federal science is

3   necessary to design solutions to the climate crisis by driving innovations in energy production and the

4   sustainable extraction of critical minerals for low carbon transportation.  The loss of staff in these

5   federal agencies will reduce the availability of this data, and delay and undermine the administration

6   of federal grants, impairing the ability of AGU members to perform their research.

7        162.    Plaintiff Climate Resilient Communities also faces imminent harm.  CRC was recently

8   approved for an Environmental Justice Collaborative Problem Solving Grant from the EPA to

9   distribute air purifiers to residents of East Palo Alto, which suffers from poor air quality that is the

10  result of the decades of results of environmental injustice.  CRC's grant officer at the EPA was a

11  probationary employee who was terminated in February 2025.  CRC had relied on its grant officer to

12  navigate the complex compliance requirements associated with this grant.  With the loss of its grant

13  officer, and a blackout on agency communications to the public, CRC fears that its grant funding now

14  may be discontinued.  CRC had already increased staffing to support the work funded by this EPA

15  grant, and has been compelled to reassign those employees to other projects, thereby diverting

16  resources that were intended to support those other projects.

17       163.    Plaintiff Point Blue faces actual and imminent harm to its conservation activities.

18  Fourteen of Point Blue's employees are designated as "partner biologists" who have been partially

19  funded through the Natural Resources Conservation Service ("NRCS"), which is a component agency

20  of the USDA.  This program helps private landowners obtain grants to support various conservation

21  practices on their land, including wildlife friendly agriculture and healthy forests and wildfire

22  resilience practices.  The Point Blue partner biologists work with landowners to develop their

23  conservation plans and obtain multiple certifications required by NRCS.  Point Blue has recently

24  learned that multiple employees of NRCS were terminated in February, including soil conservation

25  specialists, range conservation specialists, engineers, and administrative staff.  The loss of these

26  NRCS staff members prevents conservation plans from being certified.  Point Blue has had to

27  reassign its partner biologists to other projects, diverting resources that were intended for other work.

28

SECOND AMENDED COMPLAINT, No. 3:25-cv-01780-WHA                                42

In addition, the loss of federal employees at other agencies from which Point Blue receives grant funding or partners with, including NOAA, DoD, the National Science Foundation, the Forest Service, and the Fish & Wildlife Service is likely to impair grant activities and administration, thereby impairing Point Blue's ability to pursue its conservation work.

164.    Plaintiff State of Washington relies every day on the services of agencies across the federal government, including the work of individuals located in the State of Washington but also individuals who work in other states and the District of Columbia.  The agencies whose work and services directly impact the State include Cabinet-level Departments (including at least the USDA, Commerce, Education, Energy, HHS, DHS, HUD, Interior, Labor, Treasury, Transportation, and VA) and many independent agencies (including EPA, SSA, FTC, CFPB and others).  The State also works, daily, alongside the enforcement arms of many federal agencies to protect Washingtonians from unlawful acts ranging from environmental harm to labor abuses. The State contains numerous federal offices and extensive federal lands, including three National Parks (Olympic, North Cascades and Mount Rainier), eight National Forests, extensive lands administered by the Bureau of Land Management, six military bases (which employ significant numbers of civilian staff), and significant dams on the Columbia and Snake Rivers run by the Bureau of Reclamation and Army Corps of Engineers.  The State relies heavily on data created by many offices within the federal government, ranging from weather data produced by NOAA to education-statistics created by the Department of Education.

165.    The State is also impacted in multiple ways when residents of Washington lose their jobs.  While the federal government is not revealing the numbers of federal employees who have been terminated, the State believes it to be at least 1,000 individuals in Washington thus far and growing every day.  Local governments within the State also rely on and interact with the federal government every day: from FEMA in the event of a disaster, to NOAA weather data for emergency preparedness planning, to the CDC for expertise and data on broad public health issues that affect the State.

166. Reduced staffing at any of the federal agencies on which the State relies and interacts with every day will directly impact the State, far beyond the immediate harm to federal employees based in Washington who have lost their livelihood and benefits. The State faces imminent harm as the result of the reductions and delays in services provided by numerous federal agencies that stem from the termination of probationary employees. Reductions to the VA medical system cause uncertainty and confusion, disrupting the availability and quality of crucial medical and mental health services for veterans.[55] Workforce reductions to the National Park Service, national forests, and other public lands threaten wildlife, workers, and visitors. The State relies on partnerships with the federal government to fight wildfires, contain outbreaks of communicable diseases, keep its waters clean, and respond to natural disasters. Without sufficient federal staffing, the State's workload and costs will increase, forest fires within the State will be harder to fight, diseases will be harder to control, and emergency response times will drop.[56] In yet another example, the State's Department of Fish and Wildlife ("WDFW"), Oregon, PNW Tribes, and the Federal Government negotiate annual salmon harvests each year in what is called the "North of Falcon" process. Those planning talks are underway now for the 2025 season, with final agreement expected in April, after which WDFW would update their fishing rules, and NOAA would be expected to promptly review and issue a 2025 Biological Opinion and Endangered Species Act coverage for the North of Falcon fisheries. Any NOAA delay would wreak havoc on the fishing communities, both commercial and recreational.

167. Terminated employees and their families now face an immediate loss of income and benefits (including health benefits); economic insecurity; the immediate need to search for alternative employment; and the future adverse impact of an employment termination falsely predicated on performance.

168. OPM's actions have already had impacts in California beyond terminated employees, their families, and their representatives. For example, "the Trump administration has already made

---

[55] https://www.king5.com/article/news/local/washington-veteran-family-says-nationwide-va-layoffs-already-hurt-quality-of-care/281-fd7a2530-4631-42eb-8a56-9edf215c6dee

[56] https://www.murray.senate.gov/wp-content/uploads/2025/02/WA-Impacts-of-Trump_Musk-Mass-Layoffs-1.pdf

the United States more exposed to catastrophic wildfires in ways that will be difficult to reverse,
current and former federal employees say….The job cuts, which amount to roughly 10 percent of the
agency's work force, could hobble the Forest Service, which was already struggling to remove
vegetation across its vast land holdings at a pace that matches the growing threat from fires,
according to current and former federal employees, as well as private companies and nonprofit
organizations that work on thinning forested lands." [57]  The effects have been immediate:

> In California, the Forest Service's efforts to remove underbrush are on pause, according to a
> person who manages an organization that runs wildfire prevention projects in the state and
> who spoke on the condition of anonymity out of concern of reprisals. [58]

## V.    OPM's February 22, 2025 New Reporting Program for All Federal Workers

169.    On February 22, 2025, OPM began to implement a new mandatory reporting program
for all federal employees throughout the federal government.  OPM has ordered all federal employees
to submit e-mail reports justifying their work.

170.    Prior to February 22, 2025, federal employees were not required to submit any reports
regarding their work to OPM.  On information and belief, no OPM rule, regulation, policy, or
program has ever, in United States history, purported to require all federal workers to submit reports
to OPM.

171.    On February 22, 2025, employees throughout the federal government, employed at
many different agencies, received the same email, from the address: hr@opm.gov.

172.    Prior to January 20, 2025, no such email address existed for use by OPM or within the
federal government.

173.    On information and belief, this e-mail is being sent under the purported authority of
OPM.

174.    On information and belief, this e-mail was sent to over 2 million federal employees.

175.    The message was sent with "High Importance."

---

[57] https://www.nytimes.com/2025/02/15/climate/us-forest-service-layoffs-wildfires.html
[58] https://www.nytimes.com/2025/02/15/climate/us-forest-service-layoffs-wildfires.html

SECOND AMENDED COMPLAINT, No. 3:25-cv-01780-WHA                                    45

176.    The message was not signed by any government official, nor did it identify the head of agency on whose behalf it was sent, the authority or program under which it was sent.

177.    The title of the email was:  "What did you do last week?"

178.    The body of the email stated:

**Please reply to this email with approx. 5 bullets of what you accomplished last week and cc your manager.**

**Please do not send any classified information, links, or attachments.**

**Deadline is this Monday at 11:59 EST.**

179.    On February 22, 2025 a social media account purporting to belong to an individual named Elon Musk (@elonmusk), who has been identified by the President as the head of the federal agency known as Department of Government Efficiency ("DOGE"), posted the following message:

**Consistent with President @realDonaldTrump's instructions, all federal employees will shortly receive an email requesting to understand what they got done last week.**

**Failure to respond will be taken as a resignation.**

180.    After the OPM email notification on February 22, 2025, at least some federal agencies, including the Federal Bureau of Investigation, began telling their employees not to respond to this OPM surprise request.

181.    Public outcry ensued from the initial e-mail, public social media postings of individuals who claim to be involved in this new program, and agencies' inconsistent reactions.

182.    On Monday, February 24, OPM issued a "Guidance on Government-wide email What did you do last week?" to "Heads and Acting Heads of Departments and Agencies," transmitted through the CHCO Council.[59]  That Memorandum purports to require all federal agencies to do the following:

Responses to this email should be directed to agency leadership, with a copy to OPM at hr@opm.gov. Agencies should review responses and evaluate nonresponses, considering such factors as whether the employee was on excused leave on Monday, February 24, 2025 or had access to email on that date. Employees on approved leave on February 24, or who lacked access to email, are not expected to respond by the deadline. Agency heads  may exclude

---

[59] https://www.chcoc.gov/content/guidance-government-wide-email-what-did-you-do-last-week

SECOND AMENDED COMPLAINT, No. 3:25-cv-01780-WHA                                46

personnel from this expectation at their discretion and should inform OPM of the categories of the employees excluded and reasons for exclusion.

Agencies should consider whether the expectation for employees to submit activity  and/or accomplishment bullets should be integrated into the agency's Weekly Activity Report or future required organizational activity reporting in order provide an enterprise-wide view of workforce achievements and organizational trends. Furthermore, agencies should consider any appropriate actions regarding employees who fail to respond to activity/accomplishment requests. It is agency leadership's decision as to what actions are taken.

182.    Late on Friday, February 28, 2025, federal employees began receiving another government-wide OPM email.[60]  That email instructed federal employees to submit five bullet points summarizing their accomplishments and copy their manager.  The email stated that weekly submissions would be required by every Monday at 11:59 p.m. Eastern Time.

183.    On Saturday, March 1, 2025, the social media account purporting to belong to Elon Musk posted the following: ""The President has made it clear that this is mandatory for the executive branch. Anyone working on classified or other sensitive matters is still required to respond if they receive the email, but can simply reply that their work is sensitive."

184.    OPM has not posted any further "Guidance" to agencies subsequent to the new Friday, February 28, 2025 government-wide emails.

185.    Prior to January 2025, OPM did not maintain or use any government-wide email system for communicating with federal employees.

186.    On February 5, 2025, OPM posted Privacy Impact Assessment for Government-Wide Email System" stating that responding to any OPM mass email was "explicitly voluntary."

187.    On February 28, 2025, OPM edited the Privacy Impact Assessment for Government-Wide Email System to state:

Individual federal government employees can decline to provide information by not responding to the email. *The consequences for failure to provide the requested information will vary depending on the particular email at issue.*

---

[60] https://www.npr.org/2025/03/01/g-s1-51490/federal-workers-new-email-accomplishments

188.   Prior to February 22, 2025 and through the date of this complaint, no notice was published, in the Federal Register or anywhere else, regarding any OPM program, rule, policy, or regulation requiring all federal employees to provide a report regarding their work to OPM.  Prior to February 22, 2025 and through the date of this complaint, no notice was published, in the Federal Register or anywhere else, regarding any program, rule, policy, or regulation under which employees who failed to respond to an email from hr@opm.gov requesting such a report would be considered to have submitted a "resignation" of federal employment.

189.   OPM has not complied with any procedural requirements in the APA, 5 U.S.C. §553, with respect to this new program

## CLAIMS FOR RELIEF

### Claim I:

#### Separation of Powers/*Ultra Vires*
#### Against Defendants OPM and Acting OPM Director Ezell

#### OPM's Order to Federal Agencies to Terminate Probationary Employees Unlawfully Conflicts with and Overrides Legislative Power

190.   Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

191.   Plaintiffs have a non-statutory right of action to enjoin and declare unlawful official action that is ultra vires.

192.   The Constitution vests the legislative power in Congress.  U.S. Const., art. I.  Federal legislation must be passed by both chambers of Congress before it may be presented to the President, and, if signed, become law.  U.S. Const., art. I.; *I.N.S. v. Chadha*, 462 U.S. 919, 951 (1983).

193.   The Constitution vests executive power in the President.  U.S. Const., art. II, and imposes on the President a duty to "take Care that the Laws be faithfully executed."  U.S. Const. art. II, § 3.

194.   The President and Executive Branch have no constitutional power to unilaterally enact, amend, or repeal parts of duly enacted statutes.  *Clinton v. City of New York*, 524 U.S. 417, 438–39 (1998).  The declared purpose of separating and dividing the powers of government was to "diffus[e] power the better to secure liberty."  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579,

635 (1952) (Jackson, J., concurring); *see also Bowsher v. Synar*, 478 U.S. 714, 721–22 (1986) ("Justice Jackson's words echo the famous warning of Montesquieu, quoted by James Madison in The Federalist No. 47, that 'there can be no liberty where the legislative and executive powers are united in the same person, or body of magistrates'...."  The Federalist No. 47, p. 325 (J. Cooke ed. 1961).").

195.    Congress exercised its Article I legislative authority to create the agencies of the federal government.  *See generally* United States Code, Title 5 (Government Organization and Employees).  To the agency heads, Congress has also expressly delegated the power to manage the functions of the agencies, including the right to employ and discharge subordinate employees of the agencies and to spend appropriated funds on those positions.

196.    In addition to specific authorizing statutes, Congress has also generally authorized the heads of administrative agencies to make employment decisions (5 U.S.C. § 3101), manage the employees of that agency (5 U.S.C. § 301), or delegate to subordinate officers the management decisions, including the hiring and firing of employees (5 U.S.C. § 302).

197.    Congress also made the federal administrative agencies subject to the requirements of the CSRA, which sets forth uniform rules pertaining to employment for the civil service across federal agencies.  The agencies, led by their agency heads, are obligated by Congress to comply with the CSRA with respect to their employees.

198.    The OPM Program requiring federal agencies to remove probationary employees throughout the federal government unlawfully usurps the legislative authority of Congress and is therefore ultra vires, by overriding the direct Congressional authorization of agency heads to manage the affairs and employees of their respective agencies, including by overriding each of the following statutes:

   a.    The authorization to all agencies to employ: 5 U.S.C. § 3101;

   b.    The authorization to all agencies to manage agency affairs via rules, including rules for employment: 5 U.S.C. §§ 301, 302;

   c.    The specific authorizing statutes for each federal agency, which create the office of agency head to administer the agencies, and enumerate the duties of the agency heads

including with respect to employment: *e.g.*, 26 U.S.C. §§ 7803, 7804 (IRS); 42 U.S.C. §§ 7231, 7253 (DOE); 20 U.S.C. § 3461 (Dept. of Ed.); 42 U.S.C. § 203 (HHS); 12 U.S.C. § 5492 (CFPB); 16 U.S.C. §§ 551, 554a, e (Agr.; Forest Service); 38 U.S.C. § 303, 510 (VA): 10 U.S.C. § 113 (DoD):  42 U.S.C. § 282  (NIH); 51 U.S.C. §§ 20111, 20113  (NASA).

d.     The CSRA authorization to agencies that govern employee removal: 5 U.S.C. §§ 7512, 7513;

e.     The CSRA provisions that apply to agency RIFs, which authorize OPM to create regulations by which agencies may conduct RIFs of their employees: 5 U.S.C. § 3502; *see also* 5 C.F.R. § 351.204 Responsibility of agency ("Each agency covered by this part is responsible for following and applying the regulations in this part when the agency determines that a reduction force is necessary."); *id.* § 351.205 Authority of OPM ("The Office of Personnel Management may establish further guidance and instructions for the planning, preparation, conduct, and review of reductions in force.").

199.     OPM's actions also exceed any statutory authority granted to it by Congress.  In creating OPM and delegating duties to its Director, Congress did not authorize OPM or its Director to order the termination of employees at any other federal agency.  *See* 5 U.S.C. § 1103 (authorizing Director of OPM to "appoint[] individuals to be employed *by the Office*" and "direct[] and supervis[e] employees *of the Office*, distribut[e] business among employees and organizational units of the Office, and direct[e] the internal management *of the Office*") (emphases added).

200.     OPM's actions were not authorized by any Article II Executive power, because no Article II constitutional power authorizes OPM to order federal agencies created by Congress to discharge subordinate agency employees, or either to order OPM to direct agencies, or order agencies themselves, to rely on false statements regarding employee performance to effectuate the discharged ordered by OPM.

201.     Therefore, OPM's order to the federal agencies to terminate probationary employees was issued without legal authority and is ultra vires.

## Claim II:

### Administrative Procedures Act Section 706(2)(A) and (C)
### Against Defendants OPM and Acting OPM Director Ezell
### (Action Inconsistent with Law and Exceeding Statutory Authority)

**The OPM Order to Terminate Probationary Employees Government-Wide Violates Statutes Governing Agency Powers and the CSRA**

202.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

203.    Federal probationary employees, including Plaintiff Unions' members, are subject to the requirements of the OPM order that all federal agencies terminate probationary employees, and the acts of the Federal Agency Defendants implementing that order. Plaintiffs and their members and supporters are persons who have suffered legal wrong as a result of, and have been adversely affected or aggrieved by, OPM and Acting OPM Director's actions for purposes of 5 U.S.C. § 702.

204.    OPM is an agency that Congress has made subject to the APA. 5 U.S.C. § 701. OPM's mass termination program and order to federal agencies constitutes a final agency action under the APA. 5 U.S.C. § 704.

205.    Under the APA, a court shall "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" (5 U.S.C. § 706(2)(A)), or that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" (5 U.S.C. § 706(2)(C)).

206.    The actions of OPM and its Acting Director, including but not limited to the OPM program requiring federal agencies to terminate probationary employees, violate the Administrative Procedure Act because they are inconsistent with law in violation of 5 U.S.C. § 706(2)(A), and exceed statutory authority, in violation of 5 U.S.C. § 706(2)(C), and are for those reasons also arbitrary and capricious in violation of 5 U.S.C. § 706(2)(A).

207.    The actions of OPM and its Acting Director overriding the direct Congressional authorization of agency heads to manage the affairs and employees of their respective agencies, including by overriding each and every one of the following statutes:

a.    The authorization to employ: 5 U.S.C. § 3101;

b.    The authorization to manage agency affairs via rules, including rules for employment: 5 U.S.C. §§ 301, 302;

c.    The specific authorizing statutes for each federal agency, which create the office of agency head to administer the agencies, and enumerate the duties of the agency heads including with respect to employment: *e.g.*, 26 U.S.C. §§ 7803, 7804 (IRS); 42 U.S.C.

§§ 7231, 7253 (DOE); 20 U.S.C. § 3461 (Dept. of Ed.); 42 U.S.C. § 203 (HHS); 12 U.S.C. § 5492 (CFPB); 16 U.S.C. § 551, 554a, e (Agr.; Forest Service); 38 U.S.C. §§ 303, 510 (VA): 10 U.S.C. § 113 (DoD): 42 U.S.C. § 282 (NIH); 51 U.S.C. §§ 20111, 20113 (NASA).

d. The CSRA authorization to agencies that govern employee removal: 5 U.S.C. §§ 7512, 7513;

e. The CSRA provisions that apply to agency RIFs, which authorize OPM to promulgate regulations by which agencies may conduct RIFs of their employees: 5 U.S.C. § 3502; *see also* 5 C.F.R. § 351.204 Responsibility of agency ("Each agency covered by this part is responsible for following and applying the regulations in this part when the agency determines that a reduction force is necessary."); *id.*, § 351.205 Authority of OPM ("The Office of Personnel Management may establish further guidance and instructions for the planning, preparation, conduct, and review of reductions in force.").

208. OPM's actions also exceed any statutory power or duties granted by Congress to OPM. In creating OPM and delegating duties to its Director, Congress did not authorize OPM or its Director to order the removal of employees employed by any other federal agency. See 5 U.S.C. § 1103 (authorizing Director of OPM to "appoint[] individuals to be employed *by the Office*" and "direct[] and supervis[e] employees *of the Office*, distribut[e] business among employees and organizational units *of the Office*, and direct[e] the internal management *of the Office*") (emphases added).

## Claim III:

## Administrative Procedures Act Section 706(2)(A) (Arbitrary and Capricious) Against Defendants OPM and Acting OPM Director Ezell

### The OPM Order to Terminate Probationary Employees Government-Wide by Falsely Invoking Performance is Arbitrary and Capricious

209. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

210. Federal probationary employees, including Plaintiff Unions' members, are subject to the requirements of the OPM order to federal agencies to terminate probationary employees and the acts of the Federal Agency Defendants implementing that order. Plaintiffs and their members and supporters are persons who have suffered legal wrong as a result of, and have been adversely affected or aggrieved by, OPM and Acting OPM Director's actions for purposes of 5 U.S.C. § 702.

SECOND AMENDED COMPLAINT, No. 3:25-cv-01780-WHA                                        52

211.    OPM is an agency that Congress has made subject to the APA.  5 U.S.C. § 701. OPM's order to federal agencies constitutes final agency action under the APA.  5 U.S.C. § 704.

212.    The actions implementing OPM's mass termination program also constitute final agency actions under the APA.

213.    The actions of OPM and its Acting Director, including but not limited to the OPM program requiring federal agencies to terminate probationary employees, violate the APA because they are arbitrary and capricious, in violation of 5 U.S.C. § 706(2)(A), for reasons that include the following:  OPM's actions are based on the fiction that the employees are being terminated for performance reasons; OPM's actions are intended to deprive terminated employees of an administrative remedy; OPM's actions required agencies to terminate employees immediately, often with only a few hours notice; OPM's actions required agencies to violate commitments made to employees and the agency's own plans for those employees; and OPM's actions had no relationship to agencies' staffing needs or statutory mandates.

## Claim IV:

### Administrative Procedures Act Section 706(2)(D)
### Against Defendants OPM and Acting OPM Director Ezell
### (Notice and Comment Rulemaking; Mass Termination)

**The OPM Order to Terminate Probationary Employees Government-wide is Void for Failure to Comply with Required Notice and Comment Rulemaking**

214.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

215.    Federal probationary employees, including members of Plaintiff Unions, are subject to the requirements of the OPM Program requiring federal agencies to terminate probationary employees. Plaintiffs and their members and supporters are persons who have suffered legal wrong as a result of, and have been adversely affected or aggrieved by, OPM and Acting OPM Director's actions for purposes of 5 U.S.C. § 702.  Had OPM followed notice-and-comment procedures required by the APA, Plaintiffs would have provided comments about the OPM Program.

216.    OPM is an agency that Congress has made subject to the APA.  5 U.S.C. § 701. OPM's order to federal agencies constitutes final agency action under the APA.  5 U.S.C. § 704.

SECOND AMENDED COMPLAINT, No. 3:25-cv-01780-WHA                    53

217.     Under the APA, a court shall "hold unlawful and set aside agency action …found to be …. without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

218.     The OPM Order directing agencies to terminate probationary employees is a "rule" for purposes of the APA.  5 U.S.C. § 551(4).

219.     Congress assigned to the Director of OPM the duty of "executing, administering, and enforcing—(A) the civil service rules and regulations of the President and the Office and the laws governing the civil service."  5 U.S.C. § 1103(a)(5)(1).  Congress also required that "in the exercise of the functions assigned under this chapter, the Director shall be subject to subsections (b), (c), and (d) of section 553 of this title."  5 U.S.C. § 1105.  Congress expressly made the requirements of section 553 apply to OPM actions "notwithstanding subsection (a) of such section 553," which otherwise exempts "matter[s] relating to agency management or personnel or to public property, loans, grants, benefits, or contracts."  5 U.S.C. § 553(a).

220.     Notwithstanding the OPM Director's express obligations pursuant to 5 U.S.C. §§ 1103 and 1105 to comply with notice and comment rule-making pursuant to the APA, neither OPM nor its Acting Director complied with the rule-making provisions set forth in 5 U.S.C. § 553 before issuing the OPM order directing agencies to terminate probationary employees.

221.     OPM's order directing agencies to terminate probationary employees therefore also violates 5 U.S.C. § 706(2)(D) by failing to observe procedures required by law.

### Claim V:

**Administrative Procedures Act Section 706(2)(D)**
**Against Defendants OPM and Acting OPM Director Ezell**
**(Notice and Comment Rulemaking; Email Reporting Program)**

**The OPM Program Requiring Federal Employees to Submit Reports by Email is Void for Failure to Comply with Required Notice and Comment Rulemaking**

222.     Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

223.     Federal probationary employees, including Plaintiff Unions' members, are subject to the requirements of the OPM Program requiring federal employees submit e-mail reports to opm.gov reporting on "what you accomplished last week." Plaintiffs and their members and supporters are

SECOND AMENDED COMPLAINT, No. 3:25-cv-01780-WHA                              54

persons who have suffered legal wrong as a result of, and have been adversely affected or aggrieved by, OPM and Acting OPM Director's actions for purposes of 5 U.S.C. § 702.  Had OPM followed notice-and-comment procedures required by the APA, Plaintiffs would have provided comments about the OPM Program.

224.    OPM is an agency that Congress has made subject to the APA.  5 U.S.C. § 701.  OPM's new program for federal employee reporting constitutes final agency action under the APA.  5 U.S.C. § 704.

225.    Under the APA, a court shall "hold unlawful and set aside agency action …found to be …. without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

226.    The OPM's new program for federal employee reporting is a "rule" for purposes of the APA.  5 U.S.C. § 551(4).

227.    Congress assigned to the Director of OPM the duty of "executing, administering, and enforcing—(A) the civil service rules and regulations of the President and the Office and the laws governing the civil service."  5 U.S.C. § 1103(a)(5)(1).  Congress also required that "in the exercise of the functions assigned under this chapter, the Director shall be subject to subsections (b), (c), and (d) of section 553 of this title."  5 U.S.C. § 1105.  Congress expressly made the requirements of section 553 apply to OPM actions "notwithstanding subsection (a) of such section 553," which otherwise exempts "matter[s] relating to agency management or personnel or to public property, loans, grants, benefits, or contracts."  5 U.S.C. § 553(a).

228.    Notwithstanding the OPM Director's express obligations pursuant to 5 U.S.C. §§ 1103 and 1105 to comply with notice and comment rule-making pursuant to the APA, neither OPM nor its Acting Director complied with the rule-making provisions set forth in 5 U.S.C. § 553 before commencing OPM's new program for federal employee reporting government-wide.

229.    OPM's new program for federal employee reporting therefore violates 5 U.S.C. § 706(2)(D) by failing to observe procedures required by law.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray that this Court:

SECOND AMENDED COMPLAINT, No. 3:25-cv-01780-WHA                    55

1.      Declare that OPM's new programs 1) requiring federal agencies to terminate probationary employees and 2) requiring federal employees to report to OPM are unlawful;

2.      Enter preliminary or permanent injunctive relief setting aside OPM's order as unlawful; requiring OPM and Federal Agency Defendants to cease terminations of probationary employees pursuant to OPM's program and order; and requiring OPM and Federal Agency Defendants to rescind the prior unlawful terminations of probationary employees pursuant to OPM's Order.

3.      Enter preliminary or permanent injunctive relief setting aside OPM's order as unlawful; requiring OPM and Federal Agency Defendant, to cease requiring federal employees to report to OPM, and take no action against any employee who fails to respond to OPM's instructions to report;

4.      Award Plaintiffs their costs, reasonable attorneys' fees, and other disbursements as appropriate;

5.      Grant such other and further relief as the Court deems just and proper.

DATED:  March 11, 2025

                               Scott A. Kronland
                               Stacey M. Leyton
                               Eileen B. Goldsmith
                               Danielle E. Leonard
                               Robin S. Tholin
                               James Baltzer
                               ALTSHULER BERZON LLP
                               177 Post St., Suite 300
                               San Francisco, CA 94108
                               Tel: (415) 421-7151

               By: */s/ Danielle E. Leonard*

                    *Attorneys for Plaintiff Organizations*

                    Norman L. Eisen (*pro hac vice forthcoming*)
                    Pooja Chaudhuri (SBN 314847)
                    STATE DEMOCRACY DEFENDERS
                    FUND

SECOND AMENDED COMPLAINT, No. 3:25-cv-01780-WHA          56

600 Pennsylvania Avenue SE #15180
Washington, DC 20003
Tel: (202) 594-9958
Norman@statedemocracydefenders.org
Pooja@statedemocracydefenders.org

By: */s/ Norman L. Eisen*

*Attorneys for Plaintiff Organizations*

Rushab Sanghvi (SBN 302809)
AMERICAN FEDERATION OF GOVERNMENT
EMPLOYEES
80 F Street, NW
Washington, DC 20001
Tel: (202) 639-6426
Sanghr@afge.org

By: */s/ Rushab Sanghvi*

*Attorneys for Plaintiff American Federation of
Government Employees (AFGE)*

Teague Paterson (SBN 226659)
Matthew Blumin  (*pro hac vice forthcoming*)
AMERICAN FEDERATION OF STATE, COUNTY,
AND MUNICIPAL EMPLOYEES
1625 L Street, N.W.
Washington, D.C.  20036
Tel: (202) 775-5900
TPaterson@afscme.org
MBlumin@afscme.org

By: */s/Teague Paterson*

*Attorneys for Plaintiff American Federation of State
County and Municipal Employees (AFSCME)*

Tera M. Heintz (SBN 241414)
Cristina Sepe (SBN 308023)
Cynthia Alexander, WA Bar No. 46019 (*pro hac vice
forthcoming*)
Deputy Solicitors General
OFFICE OF THE WASHINGTON STATE
ATTORNEY GENERAL

SECOND AMENDED COMPLAINT, No. 3:25-cv-01780-WHA                    57

1
2
3
4

800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744
tera.heintz@atg.wa.gov
cristina.sepe@atg.wa.gov
cynthia.alexander@atg.wa.gov

5

By: */s/ Tera M. Heintz*

6

*Attorneys for Plaintiff State of Washington*

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

SECOND AMENDED COMPLAINT, No. 3:25-cv-01780-WHA                    58

# Exhibit A

Att. B

**From:** CHCO Council
**Sent:** Friday, February 14, 2025 12:48 PM
**Subject:** Follow up: CHCO Council Special Session

CHCOs and Deputy CHCOs,

Thank you for your time today.

This message clarifies immediate next steps for probationary employees.

Over the past several days, agencies have worked to review, clean up, and finalize their lists of probationary employees they wish to keep, and wish to terminate, and begin taking action.

We have asked that you separate probationary employees that you have not identified as mission-critical no later than end of the day Monday, 2/17. We have attached a template letter.  The separation date should be as soon as possible that is consistent with applicable agency policies (including those in CBAs).

Guidance from the Office of Personnel Management ("OPM") states, "An appointment is not final until the probationary period is over," and the probationary period is part of "the hiring process for employees."  A probationer is still an applicant for a finalized appointment to a particular position as well as to the Federal service.   "Until the probationary period has been completed," a probationer has "the burden to demonstrate why it is in the public interest for the Government to finalize an appointment to the  civil service for this particular individual." Thus, the probationary period is part of the federal hiring process; there is currently a hiring freeze; and a probationer has no right to continued employment in the federal government.

An employee's performance must be measured in light of the existing needs and interests of government. OPM has emphasized that individual employee performance measurement should be "aligned with and support organizational goals" and "focus[] employee efforts on achieving organizational and group goals." An employee's performance must be viewed through the current needs and best interest of the government, in light of the President's directive to dramatically reduce the size of the federal workforce.

Through the exemptions process, agencies have identified the highest-performing probationers in mission critical areas. Regulations on probationary periods state: "The agency shall utilize the

2-ER-322

probationary period as fully as possible to determine the fitness of the employee and shall terminate his or her services during this period if the employee fails to demonstrate fully his or her qualifications for continued employment." 5 CFR 315.803.  OPM believes "qualifications for continued employment" in the current context means that only the highest-performing probationers in mission-critical areas should be retained.

After actioning, please update the previous probationary employee spreadsheet you've sent us to include the information below. **Please resend the updated version to tracking@opm.gov with Amanda Scales and Jamie Sullivan on cc by 8:00pm EST Monday**. This tracker should include:

- Which probationary employees have been terminated and which you plan to keep. For those you plan to keep, provide an explanation of why.
- For each probationary employee, indicate if they have opted into the deferred resignation program or not. This can be done by cross-checking the latest submissions sent to you via tracking@opm.gov. Please also indicate whether you have signed a written deferred resignation agreement with them or not.
- Probation end date.

**Please continue providing these reports daily through at least the end of next week.**

We have also attached a template Probationary tracker for your reports today.

Thank you,
OPM

# Exhibit B

[DATE], 2025

MEMORANDUM FOR [EMPLOYEE], [TITLE], [ORGANIZATION]

FROM:              [NAME]
                      [TITLE]

SUBJECT:       Notification of Termination During Probationary Period

REFERENCES:    5 U.S.C. § 7511
                    [5 U.S.C. § 3321(a)]
                    [5 C.F.R. §§ 315.803 and 804]
                    [5 C.F.R. § 316.304]
                    [INSERT AGENCY POLICY]

This is to provide notification that the Agency is removing you from your position of [TITLE] and federal service during your probationary/trial period consistent with the above references.

On [INSERT DATE OF APPOINTMENT], the Agency appointed you to the position of [TITLE]. As documented on your appointment Standard Form 50 (SF-50), your appointment is subject to a probationary/trial period. [The agency also informed you of this requirement in the job opportunity announcement for the position.]

Guidance from the Office of Personnel Management ("OPM") states, "An appointment is not final until the probationary period is over," and the probationary period is part of "the hiring process for employees."[1] "A probationer is still an applicant for a finalized appointment to a particular position as well as to the Federal service."[2] "Until the probationary period has been completed," a probationer has "the burden to demonstrate why it is in the public interest for the Government to finalize an appointment to the civil service for this particular individual."[3] Furthermore, OPM has emphasized that individual employee performance measurement should be aligned with and support organizational goals and focus employee efforts on achieving organizational and group goals. In addition, OPM has instructed Agencies to consider whether an employee's performance is in the best interest of the government, in light of the President's directive to dramatically reduce the size of the federal workforce.

Based on the OPM guidance referenced above, the Agency finds, based on your performance, that you have not demonstrated that your further employment at the Agency would be in the public interest. For this reason, the Agency informs you that the Agency is removing you from your position of [TITLE] with the Agency and the federal civil service effective [insert date and time, if necessary].

---

[1] OPM, *Practical Tips for Supervisors of Probationers*.

[2] *See* U.S. Merit Systems Protection Board Report to the President and Congress, *The Probationary Period: A Critical Assessment Opportunity* (August 2005)

[3] *Id.*

You may have a right to file an appeal with the Merit Systems Protection Board (MSPB) on the limited grounds set forth in 5 C.F.R. § 315.806. Any such appeal must be filed within 30 days of the effective date of this notice or 30 days after the date of your receipt of this notice, whichever is later. You should review MSPB regulations at 5 C.F.R. §§ 1201.14 and 1201.24 for instructions on how to file an electronic appeal and content requirements of the appeal, respectively. For more information, please visit www.mspb.gov or contact your local MSPB regional or field office at: [INSERT MSPB REGIONAL OR FIELD OFFICE CONTACT INFORMATION].

We appreciate your service to the Agency and wish you the greatest of success in your future endeavors.  If you have any questions, please contact [CONTACT].

[INSERT NAME OF AGENCY OFFICIAL]
[INSERT TITLE OF AGENCY OFFICIAL]

PATRICK D. ROBBINS (CABN 152288)
Acting United States Attorney
PAMELA T. JOHANN (CABN 145558)
Chief, Civil Division
KELSEY J. HELLAND (CABN 298888)
Assistant United States Attorney
U.S. ATTORNEY'S OFFICE
450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495

ERIC HAMILTON
Deputy Assistant Attorney General
DIANE KELLEHER
Branch Director
CHRISTOPHER HALL
Assistant Branch Director
JAMES D. TODD, JR.
Senior Trial Counsel
YURI S. FUCHS
Trial Attorney
U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, DC 20044

*Counsel for Defendants*

## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, *et al.*<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OFFICE OF PERSONNEL MANAGEMENT, *et al.*,<br><br>Defendants. | Case No. 3:25-cv-1780-WHA<br><br>**DEFENDANTS' *EX PARTE* MOTION TO VACATE MARCH 13, 2025, EVIDENTIARY HEARING; PRECLUDE TESTIMONY OF ACTING DIRECTOR CHARLES EZELL; QUASH SUBPOENAS COMMANDING TESTIMONY AT THE EVIDENTIARY HEARING; AND FOR A PROTECTIVE ORDER PROVIDING IMMEDIATE RELIEF FROM MARCH 11, 2025, DEPOSITIONS; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>The Hon. William H. Alsup |

## <u>TABLE OF CONTENTS</u>

BACKGROUND ...................................................................................................... 2

ARGUMENT ........................................................................................................... 6

    I.    The March 13 Evidentiary Hearing and Any Depositions Are Unnecessary
    in Light of OPM's Compliance with the TRO and Defendants'
    Willingness To Convert the Court's TRO into a Preliminary Injunction. ............. 6

    II.    Compelling the Testimony of the Head of an Executive Branch Agency
    Would Inappropriately Intrude on the Workings of a Coordinate Branch
    of Government and Pose Avoidable and Unnecessary Separation-of-
    Powers Concerns. ................................................................................................... 7

    III.    Plaintiffs' Attempt to Broaden the Scope of any Evidentiary Hearing to
    Include Witnesses from Non-Party Agencies Further Warrants Vacating
    the Hearing. ............................................................................................................ 9

    IV.    Plaintiffs' Deposition Notices Fail to Comply with Rules 30 and 45 of the
    Federal Rules of Civil Procedure ......................................................................... 11

    V.    The Court Should Order the Parties to Meet and Confer about Genuinely
    Disputed Material Facts Before Holding an Evidentiary Hearing or
    Ordering Any Additional Testimony or Discovery. ............................................. 13

CONCLUSION ...................................................................................................... 14

## TABLE OF AUTHORITIES

### CASES

*Am. Historical Ass'n v. Nat'l Archives & Records Admin.*,
    402 F. Supp. 2d 171 (D.D.C. 2005) .................................................................. 7

*Ashton Woods Holdings L.L.C. v. USG Corp.*,
    No. 15-cv-1247, 2021 WL 8084334 (N.D. Cal. Apr. 5, 2021) ............................ 11

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ........................................................................................ 9

*Cheney v. U.S. Dist. Court for Dist. of Columbia*,
    542 U.S. 367 (2004) ........................................................................................ 7

*Flores v. Jaddou*,
    No. 1:23-cv-02004, 2023 WL 7282897 (D. Md. Nov. 3, 2023) .......................... 9

*Garlough v. Trader Joe's Co.*,
    No. 15-cv-1278, 2015 WL 4638340 (N.D. Cal. Aug. 4, 2015) .......................... 10

*Guttenberg v. Emery*,
    26 F. Supp. 3d 88 (D.D.C. 2014) ...................................................................... 9

*In re Cheney*,
    544 F.3d 311 (D.C. Cir. 2008) .......................................................................... 7

*In re Kirkland*,
    75 F.4th 1030 (9th Cir. 2023) .......................................................................... 11

*In re U.S. Dep't of Educ.*,
    25 F.4th 692 (9th Cir. 2022) ............................................................................ 7

*In re USA*,
    624 F.3d 1368 (11th Cir. 2010) ........................................................................ 7

*Int'l Molders' & Allied Workers' Loc. Union No. 164 v. Nelson*,
    799 F.2d 547 (9th Cir. 1986) .......................................................................... 10

*Kenneally v. Lungren*,
    967 F.2d 329 (9th Cir. 1992) .......................................................................... 10

*Public Power Council v. Johnson*,
    674 F.2d 791 (9th Cir. 1982) ............................................................................ 8

*Sibley v. U.S. Supreme Ct.*,
   786 F. Supp. 2d 338 (D.D.C. 2011) ........................................................... 9

*Simplex Time Recorder Co. v. Secretary of Labor*,
   766 F.2d 575 (D.C. Cir. 1985) ................................................................... 7

*Stanley v. Univ. of S. Cal.*,
   13 F.3d 1313 (9th Cir. 1994) ................................................................ 8, 10

*Steel Co. v. Citizens for a Better Env't*,
   523 U.S. 83 (1998) ..................................................................................... 9

*United States v. Morgan*,
   313 U.S. 409 (1941) ................................................................................... 7

## **RULES**

Fed. R. Civ. P. 4 ............................................................................................ 11

Fed. R. Civ. P. 26 ................................................................................... *passim*

Fed. R. Civ. P. 30 .................................................................... 1, 5, 12, 13

Fed. R. Civ. P. 45 .................................................................. 1, 10, 12, 13

Pursuant to Fed. R. Civ. P. 26, 30, and 45, Local Rule 7-10, and this Court's statements at the March 6, 2025, Status Conference, Defendants respectfully move for an order: (1) vacating the evidentiary hearing set for March 13, 2025; (2) vacating the Court's directive that the Acting Director of the U.S. Office of Personnel Management ("OPM"), Charles Ezell, testify at any evidentiary hearing; (3) quashing subpoenas served by Plaintiffs seeking to compel the attendance of twelve current or former federal government employees as witnesses at any evidentiary hearing; and (4) immediately relieving Defendants from the obligation to produce those same twelve current or former employees at depositions noticed for March 11, 2025. Defendants stipulate that, in consideration for granting that requested relief, they would consent to an order converting the Court's February 27, 2025, temporary restraining order ("TRO") into a preliminary injunction. That would allow for a more orderly resolution of the claims and defenses presented in this litigation.

Good cause supports this request: OPM has already substantially complied with the Court's TRO by promptly updating its guidance to agencies, thus obviating the necessity (or at minimum reducing the value) of any evidentiary hearing, and thereby also eliminating the need for the discovery Plaintiffs seek in connection with that hearing. At the same time, Defendants' willingness to stipulate to conversion of the TRO into a preliminary injunction further eliminates any need for or benefit from such a hearing—and, at minimum, eliminates any need to proceed on a highly expedited timetable.

On the other side of the ledger, the Court's order that OPM produce its Acting Director for in-person testimony at a hearing scheduled for a date barely more than two weeks after its oral TRO raises fundamental constitutional concerns—especially at this early litigation stage, where evidentiary proceedings are disfavored under Ninth Circuit precedent. And Plaintiffs' expressed intent to expand the scope of any hearing to as many as twelve government witnesses (through either in-person testimony or the introduction of recorded or transcribed evidentiary depositions they seek to schedule and conduct in a single day in advance of the hearing) would render any proceedings fundamentally unmanageable. The same is true for Plaintiffs' latest efforts to vastly broaden their claims through the addition of 20-plus federal agencies as

defendants, which threatens to expand the scope of any hearing just as substantially.

At bottom, the interests of justice, party resources, and judicial economy do not warrant the creation of an inter-branch constitutional controversy by compelling the acting head of an executive agency to testify in this posture; nor do they warrant a full-blown evidentiary hearing on the existing record. The Court should instead vacate the evidentiary hearing, rescind any order requiring the Acting Director of OPM to testify, protect the government from overbroad and unduly burdensome deposition practice, and convert its TRO into a preliminary injunction to allow the parties to move in orderly, expedited fashion to the next stage of this litigation.

Alternatively, Defendants would ask the Court to continue any hearing date until such time as evidentiary hearings become necessary—at a minimum, after the resolution of Plaintiffs' motion for leave to amend their complaint for a second time, and after Defendants have had a meaningful opportunity to submit dispositive-motion briefing on the merits of Plaintiffs' claims. Defendants' willingness to stipulate to conversion of the TRO to a preliminary injunction should eliminate any reasonable concerns with that modest alternative relief. Defendants would further request that, if the Court determines that an evidentiary hearing is necessary after the completion of dispositive-motion briefing, Defendants be permitted to identify appropriate declarants or other persons with relevant knowledge and produce them for limited, orderly depositions on a reasonable schedule—with enough time to seek appellate intervention, if appropriate—rather than at an expedited in-person hearing.

**BACKGROUND**

On February 19, 2025, Plaintiffs sued OPM and its Acting Director, Charles Ezell. Plaintiffs then filed an amended complaint while moving *ex parte* for a TRO and order to show cause on February 23, 2025. *See* Compl., ECF No. 1; Am. Compl., ECF No. 17; Pls.' TRO Mot., ECF No. 18. Plaintiffs' claims rest on allegations that OPM had "ordered" federal agencies to terminate probationary employees and that this was an *ultra vires* act that exceeded the scope of OPM's statutory authority and otherwise violated the Administrative Procedure Act. *See* Am. Compl. ¶¶ 104–42; Pls.' TRO Mot. at 15–22. On February 24, 2025, this Court ordered Defendants to respond to Plaintiffs' TRO motion by February 26, 10:00am PST, and set a

hearing on Plaintiffs' motion for February 27, 1:30pm PST. *See* Order Setting Hearing, ECF No. 21.

At the conclusion of the February 27 hearing, this Court issued an oral TRO, which it later reduced to writing. As amended, the Court held that "OPM's January 20 memo, February 14 email, and all other efforts by OPM to direct the termination of employees . . . are unlawful, invalid, and must be stopped and rescinded." Mem. Op. & Order Amending TRO at 24, ECF No. 45. The Court ordered OPM to provide written notice of its order to the Bureau of Land Management ("BLM"), Department of Defense ("DOD"), Fish and Wildlife Service ("FWS"), National Park Service ("NPS"), Small Business Administration ("SBA"), and Veterans Administration ("VA"). *See id*.

Given the factual dispute over whether OPM had actually directed any terminations, this Court determined that further evidentiary proceedings were necessary. The Court thus directed Acting Director Ezell to appear before the Court to testify regarding Plaintiffs' allegations at an evidentiary hearing on March 13, 2025. *See* Tr. of Feb. 27, 2025, Hrg. at 69:8-18, ECF No. 44; Mem. Op. & Order Amending TRO at 24. As relevant to the instant motion, Mr. Ezell is the Acting Director of an Executive Branch Agency. *See* Decl. of Charles Ezell ¶ 1, ECF No. 34. He does not reside, is not employed, and does not regularly transact business in person in California. *See* Decl. of Yuri Fuchs ¶ 8, attached as Ex. 1. And, as relevant to Plaintiffs' allegations, Mr. Ezell was not on the February 13 call conducted by OPM regarding its guidance to agencies and was not present for most of the February 14 call. *See* Decl. of Noah Peters ¶¶ 7-8, attached as Ex. 2.

In accord with the TRO, the government provided notice of this Court's order to DOD on February 27, 2025; OPM provided notice of this Court's order to BLM, NPS, SBA, and the VA on February 28, 2025, and provided notice to DOD and the FWS on March 3, 2025. *See* Fuchs Decl. ¶ 4. Also on March 3, 2025, OPM issued revised guidance clarifying that "OPM is not directing agencies to take any specific performance-based actions regarding probationary employees[,]" and further clarifying that "[a]gencies have ultimate decision-making authority over, and responsibility for, such personnel actions." Mem. from Charles Ezell, Acting Director,

OPM, to Heads and Acting Heads of Departments and Agencies (Revised March 4, 2025),
attached as Ex 3.

On March 4, 2025, Plaintiffs moved for leave to file a Second Amended Complaint
("SAC"), proposing to add some 43 additional defendants, including other federal agencies and
agency heads that Plaintiffs allege were ordered by OPM to terminate probationary employees.
*See* Pl.'s Redline of SAC ¶¶ 34–76, ECF No. 49-1. The newly named agencies and their agency
heads are located in Washington, D.C., Alexandria, Virginia, and Baltimore, Maryland—all
outside the State of California. *See id.* The agency employees from whom Plaintiffs seek to elicit
testimony do not reside, are not employed, and do not regularly transact business in person in the
State of California. *See* Fuchs Decl. ¶ 8.

On March 5, 2025, Plaintiffs informed Defendants that they intended to call a total of five
government employees as witnesses at the March 13, 2025, evidentiary hearing, including
Acting Director Ezell and OPM employee Amanda Scales, as well as one employee from three
non-defendant government agencies. *See id.* ¶ 5.

While Defendants were taking necessary steps to comply with the TRO and actively
meeting and conferring with Plaintiffs' counsel regarding multiple issues between Monday,
March 3, and Wednesday, March 5, Plaintiffs abruptly shifted gears late in the day on March 5
and filed an "urgent" request for a status conference, asserting prematurely that Defendants
intended not to comply with the Court's Order. *See* Not. of Pls.' Urgent Request for Status Conf.
at 2, ECF No. 55. This Court set a status conference for March 6, 2025. *See* Order Setting Status
Conf., ECF No. 57. At the conference, the Court ordered Defendants to file no later than March
10, 2025, 12:00pm PDT, either: (1) a statement that they intended to produce Mr. Ezell as well
as four other individuals from whom Plaintiffs sought testimony at the March 13, 2025, hearing;
or (2) a motion for relief from the Court's Order to produce Mr. Ezell and other witnesses at the
hearing. *See* Tr. of March 6, 2025, Status Conf. at 10:14-21, ECF No. 65.

Also on March 6, 2025, after 8:00pm PST, Plaintiffs served Defendants with twelve
deposition notices, for two OPM employees and ten employees of non-defendant agencies to
appear in Washington, D.C., to give deposition testimony on March 11, 2025, and twelve

subpoenas to those same employees to appear at the March 13, 2025, evidentiary hearing in San Francisco. *See* Nots. of Depo., Subpoenas, attached as Exs. to Fuchs Decl. Plaintiffs' deposition notices were not accompanied by subpoenas for the non-defendant agency employees. *See id*. Plaintiffs noticed six of the depositions to commence after the close of business on March 11, 2025. *See id*. (commanding witnesses to appear for depositions commencing between 5:00pm EDT and 9:00pm EDT). Plaintiffs' notices incorrectly stated that Defendants agreed to the date and time of the depositions. *Compare id*. *with* Fuchs Decl. ¶ 8.

On March 7, 2025, Defendants acknowledge receipt of the deposition notices and subpoenas and agreed to accept service on behalf of the employees of the non-defendant agencies. *See* Fuchs Decl. ¶ 8. Defendants informed Plaintiffs that the deposition notices did not comply with the requirements of Rule 30 of the Federal Rules of Civil Procedures and, for the employees of non-defendant agencies, the requirements of Rule 45, and each agency's Touhy regulations, because: (i) two business days to locate and prepare the witnesses to appear the next day was not reasonable; (ii) Plaintiffs had not issued subpoenas to the employees of non-defendant agencies; and (iii) Plaintiffs had not complied with each agency's Touhy regulations. *See id*. Defendants also informed Plaintiffs that the subpoenas to appear at the evidentiary hearing in San Francisco did not comply with Rule 45 because none of the employees reside, is employed, or regularly transacts business in person in California. *See id*.

On March 9, 2025, Defendants asked Plaintiffs to accept a declaration and deposition testimony from another OPM employee in lieu of producing Mr. Ezell. *See id*. ¶ 9. Defendants asked Plaintiffs to reschedule all of the depositions (especially for those noticed to commence and/or continue after regular business hours) so that they could proceed at a more reasonable pace in accord with Rule 30, and to withdraw their subpoenas for these witnesses to appear at an evidentiary hearing in San Francisco. *See id*. Additionally, Defendants informed Plaintiffs that two of the non-defendant agency employees no longer work for the government such that, unless and until Defendants reached those former employees and secured their consent, Defendants could not accept service of subpoenas or deposition notices on their behalf. *See id* ¶.

On March 10, 2025, Plaintiffs responded to Defendants and withdrew the deposition

notices and subpoenas for the two former employees. *Id.* ¶ 10. Plaintiffs also indicated that they were open to "any reasonable proposal regarding the total number of witnesses," but insisted that any remaining witnesses be made available for depositions either on March 11 or 12 or appear remotely at the Court' hearing on March 13, 2025. *Id.*

## ARGUMENT

### I. The March 13 Evidentiary Hearing and Any Depositions Are Unnecessary in Light of OPM's Compliance with the TRO and Defendants' Willingness To Convert the Court's TRO into a Preliminary Injunction.

The purpose of the evidentiary hearing was to adjudicate factual disputes over whether OPM had directed agencies to terminate their probationary employees. But that factual dispute is no longer of any practical consequence. OPM promptly complied with this Court's TRO after its issuance. It contacted each agency the Court ordered it to contact (as well as DOD, which the Court made clear did not fall within the scope of its oral TRO ruling) to advise them of the Court's ruling. Simultaneously, OPM amended its guidance to all agencies regarding agency removals of probationary employees to "clarify[] and confirm[] that OPM has not directed, and is not directing, your agency to take specific performance-based actions against probationary employees. Agencies have and continue to have ultimate decision-making authority over such personnel actions." Mem. from Charles Ezell, Acting Director, OPM, to Heads and Acting Heads of Departments and Agencies (Revised March 4, 2025). OPM's prompt compliance has substantially lessened, if not obviated altogether, the necessity and value of any evidentiary hearing or any kind of testimony that Plaintiffs may seek to obtain.[1] Thus, requiring a hearing to go forward on March 13, with in-person testimony from OPM's Acting Director and/or rushed deposition testimony from others, would not serve the interests of justice.

This testimony and any evidentiary hearing are also unnecessary because Defendants are willing to stipulate to the TRO becoming a Preliminary Injunction until any further briefing on Plaintiffs' pleadings. Given that stipulation, no factual disputes need to be adjudicated now.

---

[1] Indeed, Plaintiffs' allegations in the proposed revised second amended complaint ("SAC") show that agencies are, in fact, reinstating previously terminated probationary employees. *See, e.g.,* Pls.' Proposed SAC ¶ 141 (noting the reinstatement of previously terminated employees by the National Science Foundation), ECF No. 49-2.

Defendants thus respectfully request that the Court vacate the hearing, deny Plaintiffs' requests for testimony, and order the parties to meet and confer about a proposed schedule for further briefing on Plaintiffs' pleadings after it rules on Plaintiffs' motion for leave to file a Second Amended Complaint.

## II. Compelling the Testimony of the Head of an Executive Branch Agency Would Inappropriately Intrude on the Workings of a Coordinate Branch of Government and Pose Avoidable and Unnecessary Separation-of-Powers Concerns.

This Court should vacate its order directing Acting Director Ezell to appear at an evidentiary hearing for another, independent reason: compelling the testimony of an acting agency head would pose major separation-of-powers concerns, especially at this early stage of litigation. There are far less intrusive ways to obtain any information needed for resolution of Plaintiffs' request for preliminary relief (even if any such information were needed, which it is not). Thus, this Court should reconsider its order issued at the hearing on Plaintiffs' TRO motion for the Acting Director to appear at an evidentiary hearing before this Court, especially since the Court did not have an opportunity to consider the relevant law concerning compelling testimony from the heard of an agency. *See generally* Defs.' Opp'n to Pls.' TRO Mot.; Tr. of Feb. 27, 2025, Hrg.

The Ninth Circuit has rejected attempts to compel the testimony of an agency head on the basis that courts "cannot intrude into the workings of the executive branch and the time of that branch's leaders if there is another way to obtain the necessary information." *In re U.S. Dep't of Educ.*, 25 F.4th 692, 704 (9th Cir. 2022). Indeed, it is well-settled that "top executive department officials should not, absent extraordinary circumstances, be called to testify regarding their reasons for taking official actions." *Simplex Time Recorder Co. v. Secretary of Labor*, 766 F.2d 575, 586 (D.C. Cir. 1985); *see also United States v. Morgan*, 313 U.S. 409, 422 (1941) (holding that it was improper for a district court to compel the Secretary of Agriculture testify at trial). Other courts have likewise rejected the premise that "that a federal district court should ever compel a member of the President's cabinet or another high-ranking official to appear in a judicial proceeding to testify." *In re USA*, 624 F.3d 1368, 1376 (11th Cir. 2010). This is because the "duties of high-ranking executive officers should not be interrupted by judicial demands for

information that could be obtained elsewhere." *In re Cheney*, 544 F.3d 311, 314 (D.C. Cir. 2008); *Cheney v. U.S. Dist. Court for Dist. of Columbia*, 542 U.S. 367, 383 (2004); *see also*, *e.g.*, *Am. Historical Ass'n v. Nat'l Archives & Records Admin.*, 402 F. Supp. 2d 171, 182 (D.D.C. 2005).

These fundamental concerns are only magnified at this early stage of the case, where evidentiary proceedings, including discovery, are discouraged. *See, e.g.*, *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1326 (9th Cir. 1994) ("In this circuit, the refusal to hear oral testimony at a preliminary injunction hearing is not an abuse of discretion if the parties have a full opportunity to submit written testimony and to argue the matter."). Plaintiffs filed their complaint and their request for an emergency motion just two weeks ago. This Court should reject Plaintiffs' motion to expedite briefing and adjudication of their motion for expedited discovery because Plaintiffs have not established any urgency, particularly after OPM's compliance with the Court's TRO.

Acting Director Ezell's submission of a declaration in support of Defendants' opposition to Plaintiffs' TRO motion does not change these considerations. Agency officials, including heads of agencies, routinely submit declarations in litigation brought against the government. *See, e.g.*, *Public Power Council v. Johnson*, 674 F.2d 791, 794 (9th Cir. 1982). Like Acting Director's Ezell's declaration, such declarations are based on information obtained by the official in course of performing his or her official duties and provide background information and summarize agency decision making reflected in other, sometimes lengthy or complex official documents. *See id*. In such circumstances, cross examination to challenge those statements is unnecessary. That is the case here: the testimony of the Acting OPM Director would have scant evidentiary value to begin with as Mr. Ezell did not join on any February 13 phone calls regarding OPM guidance issued to agencies and only joined the beginning of the February 14 phone call discussing the same. *See* Peters Decl. ¶¶ 7-8. Especially where, as here, the agency head lacks specific knowledge of disputed issues of fact, the interests of justice do not favor seeking further testimony from such an official.[2]

---

[2] This Court suggested that, if Mr. Ezell does not give testimony, it would strike his declaration from the record. *See* Tr. of Status Conf. at 6:10-12, 22:20-21. Since Defendants have

Pre-answer discovery is likewise disfavored, and this Court should thus reject Plaintiffs' request to take discovery before this Court has an opportunity to evaluate whether Plaintiffs have adequately pled legally valid claims or whether this Court even has jurisdiction as to all Defendants and as to all claims. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (courts have duty to first assure themselves of jurisdiction). Plaintiffs' efforts should be denied because they seek to leapfrog the ordinary Federal Rules of Civil Procedure; Defendants have not yet had the opportunity to raise threshold defenses to Plaintiffs' claims, which they intend to do. While the Court concluded at least some Plaintiffs had standing, that was on a preliminary motion, and Defendants intend to assert these arguments in more fulsome fashion in forthcoming motion practice. Because there are substantial doubts as to standing, this Court should not order discovery until it has assured itself of jurisdiction. *See Guttenberg v. Emery*, 26 F. Supp. 3d 88, 99 (D.D.C. 2014); *Sibley v. U.S. Supreme Ct.*, 786 F. Supp. 2d 338, 346 (D.D.C. 2011) ("It is well settled that discovery is generally considered inappropriate while a motion that would be thoroughly dispositive of the claims in the Complaint is pending."); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007) ("So, when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should be exposed at the point of minimum expenditure of time and money by the parties and the court.") (cleaned up); *Flores v. Jaddou*, No. 1:23-cv-02004, 2023 WL 7282897, at *2 (D. Md. Nov. 3, 2023) (rejecting proposal to "permit this case to proceed, direct the parties to engage in discovery, and expend resources adjudicating potential discovery disputes and/or dispositive motions just for the Fourth Circuit to conclude that this Court had no subject matter jurisdiction to decide the merits of the case in the first place."). These proceedings should instead unfold on an ordinary timeline.

### III.  Plaintiffs' Attempt to Broaden the Scope of any Evidentiary Hearing to Include Witnesses from Non-Party Agencies Further Warrants Vacating the Hearing.

All this aside, the Court should reject Plaintiffs' attempt to broaden the scope of the evidentiary hearing by demanding in-person testimony from ten witnesses from other (non-defendant) agencies. Requiring multiple witnesses from agencies who are not yet parties to this

already substantially complied with the TRO and are willing to stipulate to convert the TRO into a preliminary injunction, that course of action is not objectionable.

case to travel cross country for an evidentiary hearing on less than one week's notice would not serve the interests of justice; even if the logistics of getting those witnesses to a hearing could be managed, the hearing itself would be unmanageable in scope. Nor can Acting Director Ezell or the other witnesses be compelled to attend under Rule 45 of the Federal Rules of Civil Procedure, as none reside, is employed, or regularly transacts business in person in California.

As noted above, the Ninth Circuit expressly disfavors evidentiary hearings where such a hearing would be burdensome. *See, e.g.*, *Kenneally v. Lungren*, 967 F.2d 329, 334-35 (9th Cir. 1992) ("If the facts are simple and little time would be taken, a court may be required to hold an evidentiary hearing on a motion for an injunction. However, we have rejected any presumption in favor of evidentiary hearings, especially if the facts are complicated." (modifications omitted)); *Int'l Molders' & Allied Workers' Loc. Union No. 164 v. Nelson*, 799 F.2d 547, 555 (9th Cir. 1986) ("[A]n evidentiary hearing should not be held when the magnitude of the inquiry would make it impractical."). As a result, the Ninth Circuit has consistently held that parties are not automatically entitled to present witness testimony at preliminary-injunction hearings. *See, e.g.*, *Stanley*, 13 F.3d at 1326. Here, a hearing with a dozen government witnesses spanning a wide range of federal agencies would be unmanageable and impractical (in addition to being unnecessary at this juncture for the reasons explained above).

Separately, Rule 45, which governs the issuance of subpoenas for testimony of a person at a trial, hearing, or deposition, provides that a subpoena may only compel a person to attend a hearing, trial, or deposition within 100 miles of where the person resides, is employed, or regularly transact business in person, or "if the person is a party or a party's officer" within the state where the party resides, is employed, or regularly transact business in person. *See* Fed. R. Civ. P. 45(c)(1). As the Committee Notes on the 2013 Amendment to the Rules explain, the Rule clarifies that a "court's authority to compel a party or party officer to travel long distances to testify at trial . . . may now only be required as specified in Rule 45(c)." Advisory Cmte. Notes on Rules—2013 Amendment.

Rule 45(c) thus precludes either this Court or Plaintiffs from compelling the appearance of agency employees who do not reside, are not employed, and do not regularly transact business

in person within the State of California. *See Garlough v. Trader Joe's Co.*, No. 15-cv-1278, 2015 WL 4638340, at *5 (N.D. Cal. Aug. 4, 2015) ("Rule 45(c)(1)(B) allows a court to command a *party* to attend a trial, deposition, or hearing anywhere in the state where they reside, are employed, or regularly transact business in person."). Moreover, Rule 45's geographic limits also apply in the event that a party seeks to obtain testimony of an out-of-state witness remotely by video. *See In re Kirkland*, 75 F.4th 1030, 1042–47 (9th Cir. 2023) (noting that even advances in remote testimony capabilities were immaterial as "the rules defining the federal subpoena power have not materially changed"); *Ashton Woods Holdings L.L.C. v. USG Corp.*, No. 15-cv-1247, 2021 WL 8084334, at *1 (N.D. Cal. Apr. 5, 2021) ("Rule 45 contains no exception that would permit the Court to decree that out-of-state witnesses are within 100 miles of a trial in Oakland, California because streaming facilities exist in their states . . . .").

In this case, Plaintiffs served subpoenas on two OPM employees and ten employees of non-defendant agencies to appear for testimony at the March 13, 2025, evidentiary hearing in before this Court. *See* Pls.' Subpoenas, *supra*. None of the employees reside, work, or regularly transact business in person in the State of California. *See* Fuchs Decl. ¶ 8. As a result, both this Court and Plaintiffs lack the power to compel the appearance of any of these employees, even remotely by video, at an evidentiary hearing in San Francisco. This Court should thus excuse these employees from appearing to give testimony at the March 13, 2025, evidentiary hearing or any other hearing before this Court.

## IV. Plaintiffs' Deposition Notices Fail to Comply with Rules 30 and 45 of the Federal Rules of Civil Procedure

This Court should also grant a protective order excusing OPM employees and employees of non-defendant government agencies from appearing for deposition testimony on March 11, 2025, in Washington, DC, because Plaintiffs' notices fail to comply with the requirements of Rule 26, 30 and 45 of the Federal Rules of Civil Procedure.

Rule 26 precludes a party from seeking discovery from any source before the parties have conferred as required by Rule 26(f) or when authorized by stipulation or court order. *See* Fed. R. Civ. P. 26(d)(1). The Rule only allows early discovery to commence "[m]ore than 21 days after the summons and complaint are served on a party." *Id*. 26(d)(2)(A).

In this case, Plaintiffs filed this action on February 21, 2025, *see* Compl., ECF No. 1, and effected service on Defendants on February 24, 2025. *See* Fed. R. Civ. P. 4(i)(1)(A)(i); Fuchs Decl. ¶ 2. Thus, it has not been 21 days since Plaintiffs served Defendants with their summons and complaint, and Defendants have not stipulated to discovery commencing before their Rule 26 conference, *see* Fuchs Decl. ¶ 7. Nor has this Court entered an order after the benefit of briefing on the issue expressly altering the limits on discovery set by Rule 26, *see* Fed. R. Civ. P. 26(b)(2), or expressly authorizing discovery to commence in this case, especially discovery against agencies that are not parties to this litigation.[3] Plaintiffs' deposition notices are thus defective because their attempts to take discovery this early in the litigation do not comply with Rule 26.

Even if this Court had altered Rule 26's limits on discovery, Plaintiffs' notices do not comply with Rule 30 and 45. Rule 30 allows a party to depose any person, including a party, subject to the requirements of Rule 30(a) *and* Rule 45. *See* Fed. R. Civ. P. 30(a). Moreover, Rule 30 requires a party who wants to depose a person to "give reasonable written notice." *Id.* 30(b)(1).

Rule 45 governs the command of non-party witnesses to appear to give deposition testimony. *See* Fed. R. Civ. P. 45(a)(1)(A)(iii), (B). The Rule requires a party or attorney issuing a subpoena to take reasonable steps to avoid imposing undue burden on a person subject to a subpoena and requires that the command to appear "allow a reasonable time to comply." *Id.* (d)(1), (3)(A)(i). It authorizes a court to quash a subpoena for failure to comply with the Rule. *See id.* (d)(3).

In this case, Plaintiffs served twelve deposition notices on Defendants seeking testimony from two OPM employees and ten employees of non-defendant agencies less than three business days before the depositions are set to commence. *See* Pls.' Depo. Nots., *supra*. Plaintiffs did not

---

[3] At most, the Court stated at the March 6, 2025, status conference that, "if the problem is that [Acting Director Ezell doesn't – he's busy and doesn't want to take the time to come in person, then I suggest that the plaintiffs could come to Washington and take his deposition; two hours should be sufficient" Tr. of Status Conf. at 5:12-16; *see also id.* at 25:6-10 (responding to Plaintiffs' suggestion that "[w]ith respect to the other four individuals, the plaintiffs would be willing to go to D.C. and take their depositions early next week," by stating "[t]hat would be very much appreciated.").

issue subpoenas to employees of non-defendant agencies. *See* Fuchs Decl. ¶ 8. Plaintiffs' notices are defective because they seek more than ten depositions in violation of Rule 30. They do not provide reasonable written notice or allow a reasonable time to comply. Moreover, at least six notices provide for the depositions to commence, or at least continue, after regular business hours in the Eastern time zone, which imposes an undue burden on those employees. This Court should thus issue a protective order relieving all twelve employees from appearing on March 11, and should instead order Plaintiffs to meet and confer with Defendants to work out a reasonable schedule to the extent that any depositions are needed at this time (which again, as explained above, they are not).[4]

## V.  The Court Should Order the Parties to Meet and Confer about Genuinely Disputed Material Facts Before Holding an Evidentiary Hearing or Ordering Any Additional Testimony or Discovery.

To the extent that any testimony is necessary at this stage of the litigation—which it is not, given Defendants' willingness to convert the TRO to a preliminary injunction—Defendants submit that, rather than hold an evidentiary hearing on March 13, 2025, the Court should direct the parties to meet and confer about what material facts, if any, are in dispute. Defendants are prepared to produce the contemporaneous records of the February 13 and 14 phone calls. Defendants are also prepared to demonstrate that politically accountable leadership at the agencies cited in the TRO are making their own, independent decisions about retaining or terminating (and in some cases, reinstating) probationary employees. And Defendants may be willing to stipulate to various facts that are no longer material as a practical matter given the TRO and OPM's compliance with its terms.

Once Defendants have provided this proffer to Plaintiffs, the parties can meet and confer about any remaining material factual disputes; and if there are such disputes, how to proceed. Typically, at this stage of a case, such disputes are addressed not via court appearances but

---

[4] Because Plaintiffs did not previously confer with Defendants regarding the timing of these depositions, these depositions are also improper under the Local Rules of this Court. *See* N.D. Cal. L. R. 30-1 (noting that "before noticing a deposition of a party or witness affiliated with a party, the noticing party must confer about the scheduling of the deposition with opposing counsel").

through written answers and depositions, subject to the limits and requirements of Rule 26, 30, and 45 of the Federal Rule of Civil Procedure. *See* Fed. R. Civ. P. 26, 30, 45. Following the conclusion of any further fact finding, the parties could submit dispositive motions to the Court. Such a course would allow for a robust factual presentation to the Court without requiring the testimony of an acting agency head or the testimony of non-party federal agency employees. Indeed, the current pace of the litigation—including Plaintiffs' abrupt and immediate request for depositions—interferes with a fulsome presentation of the issues to the Court while straining the resources of Defendants. And again, Defendants are willing to convert the TRO into a preliminary injunction.[5]

## CONCLUSION

For good cause shown herein, this Court should grant Defendants' motion and vacate the March 13, 2025, evidentiary hearing; quash the subpoenas seeking testimony of current and former government employees at that hearing; issue a protective order granting immediate relief from Plaintiffs' notices to appear for deposition testimony on March 11, 2025; and order the parties to meet and confer and submit a Joint Status Report to the Court by March 24, 2025.

---

[5] In the alternative, if this Court does not grant Defendants' request for a protective order entirely relieving Defendants of their obligations to produce witnesses for deposition testimony, in the interests of comity, Defendants believe it might be possible to work with Plaintiffs to try to schedule, at a time and place that is convenient to the agency employees, up to four depositions of up to two hours in length each during the weeks of March 10 and 17, 2025, consistent with the Court's guidance to the parties. *See* Fuchs Decl. ¶ 11.

Dated: March 10, 2025                     Respectfully submitted,

                                          PATRICK D. ROBBINS (CABN 152288)
                                          Acting United States Attorney
                                          PAMELA T. JOHANN (CABN 145558)
                                          Chief, Civil Division
                                          KELSEY J. HELLAND (CABN 298888)
                                          Assistant United States Attorney
                                          U.S. ATTORNEY'S OFFICE
                                          450 Golden Gate Avenue, Box 36055
                                          San Francisco, California 94102-3495

                                          ERIC HAMILTON
                                          Deputy Assistant Attorney General

                                          DIANE KELLEHER
                                          Branch Director
                                          CHRISTOPHER HALL
                                          Assistant Branch Director

                                          JAMES D. TODD, JR.
                                          Senior Trial Counsel

                                          s/ Yuri S. Fuchs
                                          YURI S. FUCHS
                                          Trial Attorney
                                          U.S. DEPARTMENT OF JUSTICE
                                          Civil Division, Federal Programs Branch
                                          P.O. Box 883
                                          Washington, DC 20044

                                          *Counsel for Defendants*

(244 of 275), Page 244 of 275
Case: 25-1677, 05/22/2025, DktEntry: 45.3, Page 244 of 275
Case 3:25-cv-01780-WHA    Document 70    Filed 03/07/25    Page 1 of 4

Scott A. Kronland (SBN 171693)
Stacey M. Leyton (SBN 203827)
Eileen B. Goldsmith (SBN 218029)
Danielle E. Leonard (SBN 218201)
Robin S. Tholin (SBN 344845)
James Baltzer  (SBN 332232)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Tel. (415) 421-7151
Fax (415) 362-8064
skronland@altber.com
sleyton@altber.com
egoldsmith@altber.com
dleonard@altber.com
rtholin@altber.com
jbaltzer@altber.com

*Attorneys for Plaintiffs*

[Additional Counsel not listed]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO; AMERICAN FEDERATION OF STATE COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO, et al., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES OFFICE OF PERSONNEL MANAGEMENT, et al., <br><br> Defendants. | Case No. 3:25-cv-01780-WHA <br><br> **PLAINTIFFS' SUPPLEMENTAL EVIDENCE IN ADVANCE OF MARCH 13, 2025 HEARING** |

Plaintiffs' Supplemental Evidence in Advance of March 13, 2025 Hearing, No. 3:25-cv-01780-WHA

**PLAINTIFFS' SUPPLEMENTAL EVIDENCE IN ADVANCE OF
MARCH 13, 2025 HEARING**

Plaintiffs submit the following evidence in advance of the scheduled evidentiary hearing on March 13, 2025:

| |
|---|
| Declaration of Leandra Bailey |
| Declaration of Heather Bartlett |
| Declaration of Dr. Georges C. Benjamin, M.D. |
| Declaration of Cade Cannedy |
| Declaration of Kelly Cunningham |
| Declaration of Dwight Dively |
| Declaration of Shane Esquibel |
| Declaration of Cami Feek |
| Declaration of Krista Finlay |
| Declaration of Michael Garl |
| Declaration of Jennifer Hennessey |
| Declaration of Caroline Mellor |
| Declaration of Sara Nelson |
| Declaration of Ashley Nindl |
| Declaration of Melissa Pitkin |
| Declaration of Alexandra Shultz |
| Supplemental Declaration of Oscar Arbulu |
| Supplemental Declaration of Erik Molvar |
| Supplemental Declaration of Don Neubacher |
| Supplemental Declaration of Shawn Phetteplace |

Plaintiffs' Supp. Evidence in Advance of March 13, 2025 Hearing, No. 3:25-cv-01780-WHA                    1

DATED:  March 7, 2025

Respectfully submitted,

Scott A. Kronland
Stacey M. Leyton
Eileen B. Goldsmith
Danielle E. Leonard
Robin S. Tholin
James Baltzer
ALTSHULER BERZON LLP
177 Post St., Suite 300
San Francisco, CA 94108
Tel: (415) 421-7151

By: */s/ Danielle E. Leonard*
        Danielle E. Leonard

*Attorneys for Plaintiff Organizations*


Norman L. Eisen (*pro hac vice*)
Pooja Chadhuri (SBN 314847)
STATE DEMOCRACY DEFENDERS
FUND
600 Pennsylvania Avenue SE #15180
Washington, DC 20003
Tel: (202) 594-9958
Norman@statedemocracydefenders.org
Pooja@statedemocracydefenders.org


By: */s/ Norman L. Eisen*

*Attorneys for Plaintiff Organizations*


Rushab Sanghvi (SBN 302809)
AMERICAN FEDERATION OF GOVERNMENT
EMPLOYEES
80 F Street, NW
Washington, DC 20001
Tel: (202) 639-6426
Sanghr@afge.org

By: */s/ Rushab Sanghvi*

Plaintiffs' Supp. Evidence in Advance of March 13, 2025 Hearing, No. 3:25-cv-01780-WHA          2

*Attorneys for Plaintiff American Federation of Government Employees (AFGE)*

Teague Paterson (SBN 226659)
Matthew Blumin (*pro hac vice*)
AMERICAN FEDERATION OF STATE, COUNTY, AND MUNICIPAL EMPLOYEES
1625 L Street, N.W.
Washington, D.C.  20036
Tel: (202) 775-5900
Tpaterson@afscme.org
MBlumin@afscme.org

By: */s/Teague Paterson*

*Attorneys for Plaintiff American Federation of State County and Municipal Employees (AFSCME)*

Tera M. Heintz (SBN 241414)
Cristina Sepe (SBN 308023)
Cynthia Alexander, WA Bar No. 46019 (*pro hac vice forthcoming*)
Deputy Solicitors General
OFFICE OF THE WASHINGTON STATE ATTORNEY GENERAL
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744
tera.heintz@atg.wa.gov
cristina.sepe@atg.wa.gov
cynthia.alexander@atg.wa.gov

By: */s/ Tera M. Heintz*

*Attorneys for Plaintiff State of Washington*

Plaintiffs' Supp. Evidence in Advance of March 13, 2025 Hearing, No. 3:25-cv-01780-WHA          3

1  NICHOLAS W. BROWN
   Attorney General of Washington
2  TERA M. HEINTZ, SBN #241414
   Deputy Solicitor General
3  Solicitor   eneral's Office
   1125 Washington Street SE, PO Box 40100
4  Olympia, WA  98504-0100
   (360) 753-6200
5  Tera.Heintz@atg.wa.gov
   Attorneys for Plaintiff State of Washington

6

7              **UNITED STATES DISTRICT COURT**
            **NORT   ERN DISTRICT OF CALIFORNIA**
8                 **AT SAN FRANCISCO**

9  AMERICAN FEDERATION OF              NO. 3:25-cv-01780-WHA
   GOVERNMENT EMPLOYEES, AFL-CIO,
10 et al.,                            DECLARATION OF CAMI FEEK

11              Plaintiffs,

12      v.

13 UNITED STATES OFFICE OF
   PERSONNEL MANAGEMENT, et al.,

14
                Defendants.
15

16

17

18

19

20

21

22

23

DECLARATION OF CAMI FEEK                    ATTORNEY GENERAL OF WASHINGTON
NO. 3:25-cv-01780-WHA                           Complex Litigation Division
                                                800 Fifth Avenue, Suite 2000
                                                Seattle, WA  98104-3188
                                                (206) 464-7744

I, Cami Feek, declare as follows:

1. I am over the age of 18, competent to testify as to the matters herein, and make this declaration based on my personal knowledge.

2. I am the Commissioner for the Washington State Employment Security Department (ESD), a position I have held since February 2021. ESD is responsible for administering the state's Unemployment Insurance (UI) program. I have served at ESD since 2017, previously as Deputy Commissioner.

3. The purpose of the UI program is to provide temporary wage replacement to individuals who are unemployed through no fault of their own, and to reduce involuntary unemployment and the harms it causes to the people of Washington State.

4. As Commissioner of ESD, I am responsible for administering the UI benefits program, as well as ensuring compliance with federal laws and regulations.

5. As Commissioner of ESD, I have access to reports and data regarding unemployment statistics in Washington State, including the current and former rates of unemployment benefits applications, the status of applications, the methods and costs to ESD of processing and adjudicating these applications, and handling any appeals from ESD's adjudications. Additionally, my role includes overseeing the implementation and compliance of federally funded programs within the agency, ensuring all expenditures align with federal guidelines and regulations.

6. The Trump Administration's mass termination of probationary federal workers irreparably harms Washington State. As described further below, it is more onerous for ESD to process the unemployment benefits claims of federal employees than other non-federal

DECLARATION OF CAMI FEEK
NO. 3:25-cv-01780-WHA

1

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

employees. ESD has experienced a higher volume of federal employees' unemployment benefits claims during the current Trump Administration than is typical. Processing and adjudicating all federal employees' claims results in a cost to the State, because ESD's federal funding for UI administration covers only roughly 75 of the costs to operate the unemployment insurance program, even though the federal employees' benefit payments themselves must be reimbursed by the federal government. Moreover, processing and adjudicating federal employees' claims takes away from the resources that would otherwise be spent processing the UI benefits claims of other unemployed Washingtonians, delaying their receipt of UI benefits.

7. Data obtained by ESD as part of its federal state cooperative uarterly Census of Employment and Wages program shows that there were approximately 76,000 federal employees in Washington State as of the start of 2025. Since the Trump Administration took office and began its mass terminations of federal employees, the number of unemployment benefits applications from former federal employees has increased. Between January 20, 2025, and March 3, 2025, there were almost triple the number of unemployment benefits claims made in the same period in 2024. Focusing on the period February 13, 2025—which is when I understand, through information and belief, that federal Office of Personnel Management (OPM) officials met with federal agency officials and ordered termination of tens of thousands of the federal government's probationary employees—through March 3, 2025, ESD experienced a nearly 470 increase in unemployment benefits claims from federal employees than compared to this same period last year. Given the trends in federal employee mass terminations, this number will likely only increase.

DECLARATION OF CAMI FEEK
NO. 3:25-cv-01780-WHA

2

8.      These mass terminations include employees in a range of federal agencies in Washington State. Since January 20, 2025, ESD has received unemployment benefits claims from terminated employees at 50 unique federal agencies. Since February 13, 2025, ESD has received unemployment benefits claims from terminated employees at 39 unique federal agency employers. Of these agency employers, since January 20, 2025, five federal agencies have at least 50 terminated employees filing claims with ESD; and since February 13, 2025, four federal agencies have at least 50 terminated employees filing claims with ESD.

9.      Each step of the unemployment benefits process is more onerous for ESD for each of these terminated federal employees—a process that has become more onerous still due to the mass terminations conducted by OPM.

10.      Eligible employees of the federal government are entitled to receive Unemployment Compensation for Federal Employees. The eligibility requirements for these claims are the same as for regular UI claims and claimants file their claims in the state in which the former federal employee was previously employed. However, the federal government is not required to file quarterly reports of employee hours and wages to ESD. Therefore, when a claimant applies for unemployment benefits after losing their employment with a federal agency, substantially more work is required for ESD to issue a monetary determination, which establishes that a claimant meets the hourly claim qualification criteria and their benefit amounts.

11.      Because the federal government does not file quarterly tax and wage reports with ESD, the intake process is more cumbersome for federal employees than for other employees. ESD must gather information on the claimant's hours and wages by reaching out to both the claimant and their former employer so ESD can determine the claimant's base year wages, their

DECLARATION OF CAMI FEEK                    3
NO. 3:25-cv-01780-WHA

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1    weekly benefit amount, their maximum amount of benefits potentially payable, and their benefit

2    year.

3    12.    Because the intake process requires back-and-forth communications between

4    ESD and the claimant and their federal employer, it normally takes several days to complete.

5    ESD's Special Wages and Benefits unit, or "SWAB," within its wage and tax division,

6    communicates with federal agencies to obtain wage and hour information. This process requires

7    the use of more of ESD's resources than most non-federal-employee claimants, whose monetary

8    determinations are issued through a more streamlined process based on information already in

9    ESD's system from employers' quarterly reports.

10    13.    Overall, the intake process is far more time-consuming for federal employee

11    unemployment benefits claimants than for most claimants. More federal employees call ESD for

12    assistance in filing claims then is typical because their information is not in ESD's system, and

13    many are confused in navigating the claims process. The increased complexity of intake

14    processes for federal claims stems from a host of factors, including that some federal workers

15    are unsure of which specific sub-agency they worked for, and some federal employees may not

16    have access to records showing their hours or wages.

17    14.    ESD must also spend more time adjudicating these claims. However, the Trump

18    Administration's mass terminations have further complicated the adjudication, because, in many

19    cases, federal agencies have not made clear on the face of the document discharging the

20    employee the reason for their termination, as certain notices said, for example, that the employee

21    failed to meet management's performance expectations, had test failures in their qualification

22    program that is required for their position, and or are not suitable for continued employment with

23

DECLARATION OF CAMI FEEK          4          ATTORNEY GENERAL OF WASHINGTON
NO. 3:25-cv-01780-WHA                             Complex Litigation Division
                                                   800 Fifth Avenue, Suite 2000
                                                    Seattle, WA 98104-3188
                                                       (206) 464-7744

the Federal service. ESD must therefore investigate whether someone's termination was for misconduct, disqualifying them for benefits, or not. This involves back-and-forth communications between ESD and the claimant and federal employer concerning the nature of the separation. This investigation occurs on top of any other investigation and adjudication that would normally transpire to determine whether a claimant qualifies for benefits.

15.     Only three of ESD's 93 unemployment benefits adjudicators are experienced in adjudicating federal employees' claims. These adjudicators usually adjudicate all of the incoming federal employees' claims each week and still have time to adjudicate dozens of other UI claims each week, as well. However, with the uptick in federal employees' claims after January 20, 2025, they have worked exclusively on federal claims adjudication and have no time for adjudicating regular UI claims. This results in the delayed adjudication of the state claims that those experienced adjudicators would otherwise be able to work on, and delayed benefits payments to Washingtonians. If there continues to be a rise in federal government terminations, ESD will need to train more adjudicators on adjudicating federal employees' unemployment benefits claims, but without the resources to hire additional staff this will cause further delays in processing UI benefit claims for the broader pool of UI claimants in Washington State.

16.     Funding for the administration of the program comes, in part, from Washington State. Washington State, like all other states, relies on a federal UI Administration grant financed by employers' Federal Unemployment Tax Act (FUTA) tax to fund its UI program administration. This funding appropriated by Congress and provided by the United States Department of Labor (USDOL) to states is apportioned based on an outdated Resource Justification Model that states provide USDOL. As a result, in recent years, Washington

DECLARATION OF CAMI FEEK                          5                    ATTORNEY GENERAL OF WASHINGTON
NO. 3:25-cv-01780-WHA                                                          Complex Litigation Division
                                                                              800 Fifth Avenue, Suite 2000
                                                                              Seattle, WA 98104-3188
                                                                              (206) 464-7744

1    consistently receives less than 75 of the administrative funding it needs annually to operate the

2    UI program. To support the federal funding gap of the remaining 25 , ESD relies on funds from

3    the State's Administrative Contingency Account and the Employment Services Administrative

4    Account. The Administrative Contingency Account receives revenues from penalties and

5    interest from Washington employers for late or incorrect unemployment taxes and interest from

6    Washington unemployment insurance claimants who must repay benefits to which they were not

7    entitled. The Employment Services Administrative Account receives its revenues from a

8    socialized employer tax, assessed to Washington employers in addition to their experience-rated

9    UI tax based on their employees' UI benefits claims.

10    17. While the federal government is responsible to reimburse states for payments of

11    Unemployment Compensation for former federal employees, the payments are initially made

12    from ESD's state UI trust, called the "unemployment compensation fund." Wash. Rev. Code

13    50.16.010(1). It is generally funded by contributions collected from Washington State employers

14    and Washington employers' payments in lieu of contributions, and by other credits and

15    reimbursements, as provided in Wash. Rev. Code 50.16.010(2). The state UI trust is used to

16    pay UI benefits to Washington workers.

17    18. ESD has also needed to take other measures in order to make up for the federal

18    government's lack of notice of the mass terminations. For instance, because ESD has not been

19    able to deploy a local rapid response team to meet groups of workers to make them aware of

20    available benefits and services, as well as provide guidance on how to access them, it plans to

21    hold virtual informational sessions for recently-terminated federal workers, educating them on

22    claims processes and records needed. ESD has also had to update its online guidance for federal

23

DECLARATION OF CAMI FEEK            6            ATTORNEY GENERAL OF WASHINGTON
NO. 3:25-cv-01780-WHA                                Complex Litigation Division
                                                    800 Fifth Avenue, Suite 2000
                                                    Seattle, WA 98104-3188
                                                    (206) 464-7744

1  workers to include information related to the mass terminations, such as including information

2  about the federal deferred resignation offer and its impact on receipt of unemployment benefits.

3  ESD developed an online resource, available here: https://esd.wa.gov/get-financial-

4  help/unemployment-benefits/basic-eligibility-requirements/groups-special-rules.    The

5  development of this resource involved a cost to the State, as ESD's communications team

6  worked with adjudicative staff to prepare the guidance and links to helpful resources.

7       I declare under penalty of perjury under the laws of the State of California and the

8  United States of America that the foregoing is true and correct.

9       DATED and SIGNED this 5th day of March 2025 at Olympia, Washington.

10

11       CAMI FEEK

12

13

14

15

16

17

18

19

20

21

22

23

DECLARATION OF CAMI FEEK                    7          ATTORNEY GENERAL OF WASHINGTON
NO. 3:25-cv-01780-WHA                                        Complex Litigation Division
                                                              800 Fifth Avenue, Suite 2000
                                                              Seattle, WA  98104-3188
                                                                  (206) 464-7744

1   Scott A. Kronland (SBN 171693)
    Stacey M. Leyton (SBN 203827)
2   Eileen B. Goldsmith (SBN 218029)
    Danielle E. Leonard (SBN 218201)
3   Robin S. Tholin (SBN 344845)
    James Baltzer  (SBN 332232)
4   ALTSHULER BERZON LLP
    177 Post Street, Suite 300
5   San Francisco, CA 94108
    Tel. (415) 421-7151
6   Fax (415) 362-8064
    skronland@altber.com
7   sleyton@altber.com
    egoldsmith@altber.com
8   dleonard@altber.com
    rtholin@altber.com
9   jbaltzer@altber.com
10
11  *Attorneys for Plaintiffs*
12  [Additional Counsel not listed]
13
14              UNITED STATES DISTRICT COURT
15          FOR THE NORTHERN DISTRICT OF CALIFORNIA
16                  SAN FRANCISCO DIVISION

17  AMERICAN FEDERATION OF              Case No. 3:25-cv-01780-WHA
    GOVERNMENT EMPLOYEES, AFL-CIO;
18  AMERICAN FEDERATION OF STATE
    COUNTY AND MUNICIPAL EMPLOYEES,
19  AFL-CIO;  et al.,
20
            Plaintiffs,
21
22      v.
23  UNITED STATES OFFICE OF PERSONNEL
    MANAGEMENT, et al.,
24
            Defendants.
25
26
27
28

    Declaration of Melissa Pitkin, No. 3:25-cv-01780-WHA

1    I, Melissa Pitkin, declare the following under penalties of perjury:

2        1.    I am over 18 years of age and competent to give this declaration. This declaration is

3    based on my personal knowledge, information, and belief.

4        2.    I am the Acting Chief Executive Officer of Point Blue Conservation Science ("Point

5    Blue"), a nonprofit organization founded in 1965 and headquartered in Petaluma, California.

6        3.    Point Blue's mission is to conserve birds, other wildlife, and ecosystems through

7    science, partnership, and outreach. Over six decades in conservation, Point Blue has curated long term

8    ecological data sets, honed analytical methods, and built a deeply rooted culture of collaboration to

9    address the significant challenges of our time. Point Blue's 160 scientists are leaders in climate-smart

10   conservation science and are spearheading nature-based solutions to threats to wildlife and our

11   communities. Point Blue's staff are experts in ecology, data management, restoration, evaluating and

12   building solutions to environmental challenges, and more. Point Blue records observations of the

13   natural world using rigorous, standardized protocols and use analyses of these observations to deepen

14   our community's understanding of nature to improve conservation outcomes, partnering with local,

15   state, and federal agencies to implement conservation solutions, including the US Department of

16   Defense, the USDA Natural Resources Conservation Service, NOAA, the National Science

17   Foundation, and the US Fish and Wildlife Service.

18       4.    Fourteen of Point Blue's employees are designated as "partner biologists" who have

19   been partially funded through the Natural Resources Conservation Service ("NRCS"), which is a

20   component agency of the United States Department of Agriculture. This program helps private

21   landowners obtain grants to support various conservation practices on their land, including wildlife

22   friendly agriculture and healthy forests and wildfire resilience practices. The Point Blue partner

23   biologists work with landowners to develop their conservation plans and obtain multiple certifications

24   required by NRCS.

25       5.    Point Blue has recently learned that multiple employees of NRCS were terminated in

26   February, including soil conservation specialists, range conservation specialists, engineers,

27   archeologists, and administrative staff. The loss of these NRCS staff members directly impacts Point

28   Blue's ability to participate in conservation planning because the lack of staffing causes significant

Declaration of Melissa Pitkin, No. 3:25-cv-01780-WHA        1

1    delays on the clearing and implementation of these plans and prevents conservation plans from being

2    certified.

3          6.    Point Blue has not been paid for work completed in 2024 and the first quarter of 2025

4    under two valid NRCS agreements. Upon information and belief, the delays in Point Blue's receipt of

5    payment are likely attributable to the staffing cuts at NRCS in their administrative office.

6          7.    In addition, the loss of federal employees at other agencies from which Point Blue

7    receives grant funding or partners with, including the National Oceanic and Atmospheric

8    Administration, the Department of Defense, the National Science Foundation, the Forest Service, and

9    the Fish     Wildlife Service is likely to impair grant activities and administration, thereby impairing

10   Point Blue's ability to pursue its conservation work.

11

12         I declare under penalty of perjury under the laws of the United States that the foregoing is true

13   and correct. Executed this  6th  day of March in   Petaluma,           California.

14

15

16

17   _____

18   Melissa Pitkin

19

20

21

22

23

24

25

26

27

28

Declaration of Melissa Pitkin, No. 3:25-cv-01780-WHA          2

1  Scott A. Kronland (SBN 171693)
   Stacey M. Leyton (SBN 203827)
2  Eileen B. Goldsmith (SBN 218029)
   Danielle E. Leonard (SBN 218201)
3  Robin S. Tholin (SBN 344845)
   James Baltzer  (SBN 332232)
4  ALTSHULER BERZON LLP
5  177 Post Street, Suite 300
   San Francisco, CA 94108
6  Tel. (415) 421-7151
   Fax (415) 362-8064
7  skronland@altber.com
8  sleyton@altber.com
   egoldsmith@altber.com
9  dleonard@altber.com
   rtholin@altber.com
10 jbaltzer@altber.com

11 *Attorneys for Plaintiffs*

12 [Additional Counsel not listed]

13

14            UNITED STATES DISTRICT COURT

15        FOR THE NORTHERN DISTRICT OF CALIFORNIA

16              SAN FRANCISCO DIVISION

17 AMERICAN FEDERATION OF              Case No. 3:25-cv-01780-WHA
   GOVERNMENT EMPLOYEES, AFL-CIO;
18 AMERICAN FEDERATION OF STATE
   COUNTY AND MUNICIPAL EMPLOYEES,
19 AFL-CIO, et al.,

20            Plaintiffs,

21
        v.
22
23 UNITED STATES OFFICE OF PERSONNEL
   MANAGEMENT, et al.,
24
            Defendants.
25

26

27

28

   Declaration of Alexandra Shultz, No. 3:25-cv-01780-WHA

I, Alexandra Shultz, hereby declare as follows:

1.      I am the Vice President of Science Policy and Government Relations for the American Geophysical Union ( AGU ), a position I have held since 2014. I make this statement based on personal knowledge and if called as a witness could and would testify competently thereto.

2.      AGU is a 501(c)(3) membership association for Earth and space scientists. Founded in 1919, AGU s mission is  to support and inspire a global community of individuals and organizations interested in advancing discovery in Earth and space sciences and its benefit for humanity and the environment.  In furtherance of this mission, AGU publishes a portfolio of 24 high-impact scholarly journals and regularly convenes meetings of scientists interested in working together on discovery and solution-based science; our 2024 annual meeting had more than 30,000 attendees. AGU is also deeply committed to inspiring and supporting the next generation of scientists to advance this mission.

3.      AGU s members are individual scientists who work in academia, government agencies, and the private sector. Many of our members are students and early-career scientists, including probationary employees in the federal government. Today, AGU has more than 42,000 dues-paying members worldwide, including 29,000 members residing in the U.S., of whom 4,380 are in California. AGU s members in the U.S. include approximately 3,800 working in the federal government, 17,200 university researchers, and 1,040 scientists at nonprofit organizations.

4.      The mass termination of probationary federal employees has already harmed AGU and its members and threatens imminent continued harm to both AGU and its members that will be severe and irreversible.

5.      First, many of AGU s members work in federal agencies across the federal government, including but not limited to the National Science Foundation (NSF), National Oceanic and Atmospheric Administration (NOAA), Department of Energy (DOE), Environmental Protection Agency (EPA), U.S. Geological Survey (USGS), U.S. Forest Service (USFS), National Aeronautics and Space Administration (NASA), Bureau of Reclamation, and Department of Agriculture (USDA). AGU members at the NSF, NOAA, DOE, EPA, USGS, and USFS have already been terminated as

Declaration of Alexandra Shultz, No. 3:25-cv-01780-WHA        1

1  part of the mass termination program challenged in this lawsuit, and many others face imminent job

2  loss if the mass termination program is allowed to proceed.

3       6.    Second, AGU s members in the scientific community outside the federal government

4  rely significantly on federal funding to support their scientific research, including grants from the

5  NSF, DOE, USFS, EPA, NOAA, Department of Interior, U.S. Fish and Wildlife Service (FWS), and

6  Bureau of Land Management (BLM), to name a few. The loss of federal employees at these agencies

7  is likely to impair grant activities and administration, which will impair the work of these scientists

8  and undermine AGU s mission to support and further this scientific research.

9       7.    Third, AGU s members both inside and outside of the federal government rely

10  significantly on the work of federal employees to support and further their own work and scientific

11  research. AGU members work closely, and often in direct collaboration, with federal agencies,

12  including but not limited to the NSF, NOAA, DOE, EPA, USGS, USFS, NASA, Bureau of

13  Reclamation, USDA, the National Institute of Environmental Health Sciences (NIEHS) (a division of

14  the National Institutes of Health (NIH)), as well as BLM, FWS, and the Centers for Disease Control

15  and Prevention (CDC).

16       8.    AGU members rely on the observations and data collected and curated by these and

17  other federal agencies, which are the backbone of global science and are particularly critical for

18  protecting health and human safety. The scientific work supported by these federal agencies and

19  resources protects communities by providing critical air quality and water monitoring and data,

20  improving advance warning of flooding and tsunamis, refining forecasts of tornado and hurricane

21  paths and seismic activity, anticipating wildfire risk, and so much more. The work of these federal

22  agencies is also essential in providing the essential information for communities and the nation to be

23  prepared for and respond to climate change as well as designing solutions to the climate crisis by

24  driving innovations in energy production and the sustainable extraction of critical minerals for low

25  carbon transportation. In addition, these agencies collect data that is used to assess risks to

26  infrastructure from natural hazards, including but not limited to floods, earthquakes, avalanches,

27  volcanoes, floods, wildfires, and sea level rise. The loss of staff in these federal agencies will likely

28  reduce the availability of this data, delay and undermine the administration of federal grants,

Declaration of Alexandra Shultz, No. 3:25-cv-01780-WHA       2

1   impairing the ability of AGU members to conduct their research, and prevent the collaborations and

2   consultations imperative for the application of science to the public and private sector.

3          9.      The termination of probationary employees at these federal agencies will have

4   significant and far-reaching harmful impacts on AGU, its members, and communities across the

5   country that depend on their work. The termination of probationary employees in the past few weeks

6   has already disrupted critical activities. For example, AGU is aware that terminations at the EPA have

7   resulted in halting work studying forest density and snowpack, the results of which are essential for

8   managing western forest water availability. AGU has also learned that terminations at NOAA last

9   week reduced the number of staff working on the agency s tsunami program, a program that requires

10  24 7 monitoring and that was already understaffed. Reduced staffing levels at already-overtaxed

11  warning centers and support offices will make tsunamis more dangerous.

12         10.     NOAA also terminated the only air quality forecaster in the Environmental Modeling

13  Center of the National Weather Service, which may cause the agency to suspend or terminate its early

14  warning system. Another AGU member terminated from NOAA was set to begin work processing a

15  backlog of over 300 applications for permits in the Florida Keys National Marine Sanctuary.

16  Termination of another AGU member, a communications specialist at NOAA Fisheries based in the

17  Monterey Bay Duty Station in California, has broken a key link in the chain of information sharing

18  between the agency and the public. And the termination of two other AGU members from the

19  USDA   both highly experienced scientists and program managers for the Data Science for Food and

20  Agricultural Systems   has created a gap in leadership and expertise within the USDA that will likely

21  slow down or halt important projects related to soil health, climate change adaptation, and sustainable

22  agricultural practices. This disruption may have far-reaching consequences for farmers, researchers,

23  and rural communities who rely on USDA-supported programs and data for decision-making and

24  innovation in the agricultural sector.

25         11.     AGU s mission is to ensure that Earth and space science is robust and able to serve

26  humanity and the environment. AGU s mission is impaired by the termination of probationary

27  employees because many if not all of those employees work at the interface of science and society,

28

Declaration of Alexandra Shultz, No. 3:25-cv-01780-WHA                          3

1    and academic scientists who rely on federal agencies for funding or data will likewise lose critical

2    resources and collaborations that would be in service of AGU's mission.

3        12.    The termination of federal employees will result in lost member dues and lost revenue

4    from scientists who may not be able to publish in AGU journals or attend AGU meetings. AGU has

5    also been forced to divert substantial resources away from the central work of its organization in

6    order to address the impacts to its members and scientific community as a result of these mass

7    terminations. Addressing these urgent needs has required AGU leadership and staff to abandon

8    previously planned projects and instead work around the clock to help respond to the current crisis.

9

10    I declare under penalty of perjury under the laws of the United States that the foregoing is true

11    and correct. Executed this 7th day of March, 2025 in Washington, D.C.

12

13

14                    Alexandra Shultz

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Declaration of Alexandra Shultz, No. 3:25-cv-01780-WHA                 4

Scott A. Kronland (SBN 171693)
Stacey M. Leyton (SBN 203827)
Eileen B. Goldsmith (SBN 218029)
Danielle E. Leonard (SBN 218201)
Robin S. Tholin (SBN 344845)
James Baltzer  (SBN 332232)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Tel. (415) 421-7151
Fax (415) 362-8064
skronland@altber.com
sleyton@altber.com
egoldsmith@altber.com
dleonard@altber.com
rtholin@altber.com
jbaltzer@altber.com

*Attorneys for Plaintiffs*

[Additional Counsel not listed]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO; AMERICAN FEDERATION OF STATE COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO, et al., <br><br>　　　　Plaintiffs, <br><br>　　v. <br><br>UNITED STATES OFFICE OF PERSONNEL MANAGEMENT, et al., <br><br>　　　　Defendants. | Case No. 3:25-cv-01780-WHA |

SUPPLEMENTAL DECLARATION OF ERIK MOLVAR, No. 3:25-cv-01780-WHA

I, Erik Molvar, declare as follows:

1.     I am the Executive Director of the Western Watersheds Project (WWP), which is a Plaintiff in this action.  This declaration supplements my previous declarations (Dkt. 18-13, 39-2).

Since I submitted my Supplemental Declaration dated February 26, 2025, WWP has identified further harms to its conservation work that are already occurring or are highly likely to occur as a result of the mass termination of probationary employees at several federal agencies that WWP regularly interfaces with in support of our conservation work.

WWP relies on drought data collected and curated by the National Weather Service, which is a part of National Oceanic and Atmospheric Administration ("NOAA"), to support our work in connection with livestock grazing on federal lands.  In particular, WWP has long advocated for federal agencies to reduce livestock levels in response to drought, recommending the use of the Drought Monitor, an asset maintained by NOAA.  We regularly use this comprehensive public information source to inform our analysis of areas that are now affected, or are predicted to be affected by drought, and use that analysis to support our lobbying efforts with Congress and federal agencies to promote environmentally protective policies around grazing.  The agency's Drought Index and related tools are essential to our work, and there is no comparable public source of nationwide drought information.  We are concerned that job losses within NOAA will interrupt the availability of the Drought Monitor data and thereby impair our efforts to persuade agencies to respond effectively to drought to prevent deterioration of federal public lands.

Similarly, NOAA also produces a number of reports on climate change, an issue that WWP raises frequently to highlight the cumulative effects of livestock grazing, oil and gas development, and other permitted uses on federal lands.  For example, climate change is at the heart of WWP's legal challenge to the 2015 West-wide sage grouse plans.  WWP was a plaintiff in litigation regarding these sage grouse plans, in which the plaintiffs argued that the Bureau of Land Management ("BLM") had failed to complete an adequate cumulative impacts analysis, including the cumulative impacts of climate change on sage grouse and their habitats.  WWP, together with other plaintiffs, won a preliminary injunction blocking the first Trump administration's gutting of sage

SUPPLEMENTAL DECLARATION OF ERIK MOLVAR, No. 3:25-cv-01780-WHA          1

1    grouse protections in 2019. *See generally Western Watersheds Project et al. v. Bernhardt*, D. Idaho

2    Case No. 1:16-cv-00083-BLW (Winmill, J.). We rely regularly on NOAA's climate information to

3    perform the analysis necessary for cases like that one.

4         5.    WWP also regularly relies on the National Marine Fisheries Service ("NMFS"),

5    another component agency of NOAA, on conservation of anadromous fishes. NMFS oversees the

6    listing and recovery of marine species under the Endangered Species Act, including salmon runs on

7    the Columbia and Snake Rivers and coho and chinook salmon runs in Point Reyes National Seashore.

8    WWP has advocated strongly for dam removal on the Snake and Columbia in the context of the U.S.

9    Army Corps of Engineers' dam operations plan, and lobbied Rep. Mike Simpson (R-Idaho) to seek

10   removal of these dams (which he did seek to do), to promote the recovery of those salmon runs. We

11   also advocated for removal of livestock from Point Reyes National Seashore, which is managed by

12   the National Park Service ("NPS"), in part to restore spawning habitats for ESA-listed salmon and

13   steelhead, and litigated the NPS plan for Point Reyes, which resulted in a settlement ending several

14   cattle operations in the area. The loss of so many employees from NOAA will impair the agency's

15   ability to list and recover anadromous salmon and steelhead populations, undermining our successful

16   conservation work with these species.

17        It has been widely reported that hundreds of probationary employees have been

18   terminated in recent weeks, out of a total NOAA workforce of about 13,000, as part of the mass

19   termination of probationary workers challenged in this case. *See, e.g.*,

20   https://www.nytimes.com/2025/02/27/climate/noaa-layoffs-trump.html. The loss of such a large

21   percentage of NOAA's workforce will inevitably impair NOAA's ability to provide the public data

22   that WWP relies on. Further, those staffing reductions will impair our ability to work with NMFS on

23   the recovery of marine species (anadromous fishes in particular), to the detriment of WWP's mission

24   to protect and restore them.

25        7.    WWP holds a state grazing lease on Champion Creek, which is embedded within the

26   Sawtooth Valley National Recreation Area ("SNRA") near Stanley, Idaho. The SNRA is

27   administered by the U.S. Forest Service. WWP acquired this grazing lease as part of our mission to

28   preserve and restore land from overgrazing that had badly damaged riparian habitats. Even over the

SUPPLEMENTAL DECLARATION OF ERIK MOLVAR, No. 3:25-cv-01780-WHA     2

1    short span of three growing seasons, our recovery efforts have substantially restored this riparian

2    habitat, providing high quality habitat for numerous species, including salmon and steelhead

3    spawning habitat.  This highly effective conservation work is threatened by the termination of Forest

4    Service employees in the SNRA, which is likely to result in a lack of Forest Service oversight of

5    cattle grazing on Forest Service lands upstream.

6          8.     Our Operations Director, who is based in Hailey, Idaho, has reported to me that due to

7    terminations of the Forest Service employees who run the SNRA in recent weeks, the SNRA's

8    Stanley office has been closed to the public, and the main office staff has dwindled to a single

9    employee.  The federal employee in charge of regulating development on lands where conservation

10    easements apply in the SNRA also was fired, so today there is no compliance check on the terms and

11    conditions of conservation easements in SNRA.  We are concerned that the mass termination of

12    probationary Forest Service staff will result in poorer oversight of livestock grazing on Forest Service

13    lands, impairing salmon and steelhead spawning habitats in Champion Creek that we are actively

14    leasing lands to protect, and undermining WWP's painstaking work of the past three decades. When

15    cattle graze excessively in riparian (streamside) habitats, where they tend to congregate under lax

16    management, they denude streamside vegetation and cause erosion and siltation from the

17    streambanks, which smothers salmon and steelhead spawning gravels, depriving the eggs of the

18    oxygen they require to hatch.

19          9.     Our conservation work in Canyons of the Ancients National Monument ("Canyons"),

20    operated by the BLM near Dolores, Colorado, is highly likely to suffer as a result of the summary

21    termination of the rangeland management specialist working at Canyons and in the BLM Tres Rios

22    field office.  The rangeland management specialist's job is to review, renew, and update grazing

23    permits on BLM lands in the area.  The job, when properly performed, includes incorporating the

24    most up-to-date science of rangeland ecology and restoration practices to facilitate ecologically sound

25    stewardship of rangeland resources.  This position in Tres Rios was exceptionally difficult to fill and

26    had gone vacant for more than a year after the retirement of the previous rangeland management

27    specialist connected to that office.  Because of that long vacancy, there is a substantial backlog of

28    permit renewals and land health evaluations to be processed.  The position was finally filled in

SUPPLEMENTAL DECLARATION OF ERIK MOLVAR, No. 3:25-cv-01780-WHA      3

1   December 2024, with a highly qualified individual.  But that employee was just fired on February 18,

2   2025, solely because he was in his probationary period.  As a result of this extended vacancy,

3   livestock grazing leases stand to be renewed without the customary environmental review and under

4   their original terms and conditions, per Section 402(c)(2) of the Federal Lands Planning and

5   Management Act, rather than receiving an environmental analysis with the possibility of adjustments

6   to the timing and numbers of livestock that are permitted.  This will extend harmful impacts of

7   problematic livestock grazing in Canyons, rather than correcting ecologically damaging problems

8   caused by inappropriate grazing.

9         The wildlife biologist at the Los Padres National Forest, which is administered by the

10   U.S. Forest Service, was fired as part of the mass termination of probationary employees.  The loss of

11   an employee in this position will result in reduced ability to manage several imperiled species,

12   including the California condor, spotted owl, arroyo toad, and California red-legged frog.  The

13   reduced ability of the Forest Service to manage those rare species and their habitats will directly

14   impair WWP's conservation efforts in Los Padres.  WWP specifically advocates on behalf of the red-

15   legged frog and spotted owl, and participates in the environmental review process, commenting on

16   National Environmental Policy Act (NEPA) documents on the Los Padres National Forest and filing

17   occasional appeals.  For example, WWP joined several other environmental groups in an appeal of

18   the Happy Canyon grazing allotment, which resulted in an improved decision benefitting the

19   California red-legged frog.  On Monday, March 3, an official at the Los Padres National Forest

20   informed me that the agency would be unable to undertake environmental assessments and process

21   NEPA reviews in the absence of a wildlife biologist on staff.

22        11.    In one pointed example of the effect of the summary terminations on WWP's work,

23   WWP's Arizona-New Mexico Director was scheduled to participate in a BLM-sponsored field trip on

24   February 19-21 together with BLM staff and other stakeholders to view Assessment, Inventory and

25   Monitoring ("AIM") plots and begin the Land Health Evaluation process.  AIM is a comprehensive

26   system of standards for assessing natural resource conditions and trends on public lands managed by

27   the BLM.  The BLM employee who was supposed to lead this trip was fired on February 14.  As a

28   result, the trip participants were only able to visit less than half of the grazing allotments/AIM sites

SUPPLEMENTAL DECLARATION OF ERIK MOLVAR, No. 3:25-cv-01780-WHA     4

originally planned. This means that WWP was unable to obtain the information it needs to conduct its ongoing conservation work in the area.

12.     WWP also relies heavily on scientific research performed by other federal agencies in its work. The quality and availability of that research is threatened by the mass termination of probationary employees.

13.     For example, a scientist from the U.S. Geological Survey has been working in Oregon on a study to document the role of fire on rangeland health and cheatgrass invasion in the context of drought. This scientist was at the beginning of what could have been a very productive career, but was fired in February 2025 because he was probationary. His study has now been abandoned. I recently authored a comprehensive synopsis of the scientific literature regarding cheatgrass invasion and its impact on ecosystems on behalf of WWP, based on scientific findings produced by USGS and other institutions. I can no longer rely on what would have been his valuable work on cheatgrass to advocate for improvements in federal land management.

14.     Similarly, WWP regularly uses research funded by the National Science Foundation to advocate for protection and restoration of wildlife and public lands. This includes: NSF-funded Mexican wolf genetics research, which WWP has repeatedly cited in our efforts to advance Mexican wolf recovery; NSF-funded research on the evolution of horses in North America, which WWP has used in our advocacy for ecologically sustainable management of wild horse populations; and NSF-funded research into the effectiveness of native carnivores in reducing Chronic Wasting Disease in deer and elk populations, which WWP has cited repeatedly in our advocacy in favor of restoration of native carnivores like wolves and mountain lions, to name a few. WWP relies heavily on science to advocate for protection and restoration of wildlife and native ecosystems, and each study is unique and irreplaceable. WWP cites scientific studies in our Endangered Species listing petitions (based entirely on science), in our comments on environmental reviews for federal land-use plans, industrial projects, and grazing permit assessments, in public advocacy presentations, and myriad other efforts. The termination of many program officers at NSF is likely to lead to the interruption or cancellation of scientific studies such as these, and will deprive WWP of the scientific knowledge needed to advocate for improved conservation efforts by federal and state agencies. While NSF announced on

SUPPLEMENTAL DECLARATION OF ERIK MOLVAR, No. 3:25-cv-01780-WHA          5

1    March 3 that it is rehiring probationary employees in response to this Court's February 28, 2025

2    order, we remain concerned that their jobs, and the scientific work they support, are in peril, and that

3    is likely to impair our own work.

4         I declare under penalty of perjury under the laws of the United States that the foregoing is true

5    and correct.  Executed this 6th day of March 2025 in San Rafael, California.

6

7

8

9                                                      Erik Molvar

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SUPPLEMENTAL DECLARATION OF ERIK MOLVAR, No. 3:25-cv-01780-WHA              6

PATRICK D. ROBBINS (CABN 152288)
Acting United States Attorney
PAMELA T. JOHANN (CABN 145558)
Chief, Civil Division
KELSEY J. HELLAND (CABN 298888)
Assistant United States Attorney
U.S. ATTORNEY'S OFFICE
450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495
(415) 436-7200
kelsey.helland@usdoj.gov

ERIC HAMILTON
Deputy Assistant Attorney General
DIANE KELLEHER
Branch Director
CHRISTOPHER HALL
Assistant Branch Director
JAMES D. TODD, JR.
Senior Trial Counsel
YURI S. FUCHS
Trial Attorney
U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, DC 20044
yuri.s.fuchs@usdoj.gov

*Counsel for Defendants*

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, *et al*.<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OFFICE OF PERSONEL MANAGEMENT, *et al.*,<br><br>Defendants. | Case No. 3:25-cv-1780-WHA<br><br>**DECLARATION OF YURI S. FUCHS IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT**<br><br>The Hon. William H. Alsup |

I, Yuri S. Fuchs, declare, pursuant to 28 U.S.C. § 1746 and Local Rule 7-3, as follows:

1.      I am a member in good standing of the State Bar of California and am admitted as a federal attorney in this Court. I represent all of the Defendants in this action.

2.      On February 27, 2025, the Court ordered OPM to provide written notice of its February 27, 2025 TRO to the Bureau of Land Management ("BLM"), Department of Defense ("DOD"), National Science Foundation ("NSF"), National Park Service ("NPS"), Small Business Administration ("SBA"), and Veterans Administration ("VA").  *See* ECF No. 45 at 24. On February 28, the Court amended the TRO to remove NSF and add the Fish and Wildlife Service ("FWS").  *Id.*

3.      The government provided notice of this Court's order to DOD on February 27, 2025. OPM provided notice of this Court's order to BLM, NSF, NPS, SBA, and the VA on February 28, 2025. OPM provided notice to FWS, and further notice to DOD, on March 3, 2025.

4.      On March 4, 2025, OPM issued revised guidance clarifying that "OPM is not directing agencies to take any specific performance-based actions regarding probationary employees[,]" and further clarifying that "[a]gencies have ultimate decision-making authority over, and responsibility for, such personnel actions." Mem. from Charles Ezell, Acting Director, OPM, to Heads and Acting Heads of Departments and Agencies (Revised March 4, 2025).  A true and correct copy of this revised guidance is attached hereto as Ex. 1.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 7, 2025

_____/s/ Yuri S. Fuchs_____
            YURI S. FUCHS



**UNITED STATES OFFICE OF PERSONNEL MANAGEMENT**
Washington, DC 20415

The Director

# MEMORANDUM

**TO:**          Heads and Acting Heads of Departments and Agencies

**FROM:**     Charles Ezell, Acting Director, U.S. Office of Personnel Management

**DATE**:      January 20, 2025
                   **Revised: March 4, 2025**

**RE**:          Guidance on Probationary Periods, Administrative Leave and Details

---

The U.S. Office of Personnel Management (OPM) is providing the following guidance to agencies regarding critical potential personnel actions.  Specifically, this memorandum deals with 1) probationary periods, and 2) administrative leave and details.

### I.     Probationary Periods

Probationary periods are an essential tool for agencies to assess employee performance and ensure that "a probationer's conduct and performance have established that the individual will be an asset to the Government."[1] Employees on probationary periods can be terminated during that period without triggering appeal rights to the Merit Systems Protection Board (MSPB).[2]

Generally, employees in the competitive service with less than one year of service, and in the excepted service with less than two years of service, can be terminated without triggering MSPB appeal rights.[3] This applies to temporary employees on appointments "not to exceed" a date certain.[4]

No later than January 24, 2025, agencies should identify all employees on probationary periods, who have served less than a year in a competitive service appointment, or who have served less than two years in an excepted service appointment, and send a report to OPM listing all such employees to employeeaccountability@opm.gov. In addition, agencies should promptly determine whether those employees should be retained at the agency.

---

[1] *See* U.S. Merit Systems Protection Board Report to the President and Congress, *The Probationary Period: A Critical Assessment Opportunity* (August 2005).

[2] *Starkey v. Dep't of Hous. and Urban Dev.*, 2024 MSPB 6, ¶ 16; *Marynowski v. Dep't of the Navy*, 2012 MSPB 82, ¶ 4 (2012).

[3] *Forest v. Merit Sys. Prot. Bd,* 47 F.3d 409, 412 (Fed. Cir. 1995); *Holmes v. Merit Sys. Prot. Bd*., 655 F. App'x 816, 818 (Fed. Cir. 2016); see also 5 U.S.C. §§ 7511(a)(1)(A), (C).

[4] *See Forest,* 47 F.3d at 410*; Holmes,* 655 F. App'x at 816.

---

(274 of 275), Page 274 of 275    Case: 25-1677, 05/22/2025, DktEntry: 45.3, Page 274 of 275
Case 3:25-cv-01780-WHA    Document 64-1    Filed 03/07/25    Page 2 of 3

Page 2

Please note that, by this memorandum, OPM is not directing agencies to take any specific performance-based actions regarding probationary employees. Agencies have ultimate decision-making authority over, and responsibility for, such personnel actions.

## II.    Administrative Leave and Details

"Federal agencies have the discretion to grant paid administrative leave to employees to help manage their workforces when it is in their best interest to do so."[5] The flexibility given to agencies in using paid administrative leave reflects the fact that "heads of Executive agencies have broad authority to manage their organizations, including the authority to grant administrative leave, unless prohibited by law."[6]

OPM regulations note four pertinent areas where paid administrative leave is appropriate: (1) "the absence is directly related to the agency's mission," (2) "the absence is officially sponsored or sanctioned by the agency," or (3) "the absence will clearly enhance the professional development or skills of the employee in the employee's current position," or (4) "the absence is in the interest of the agency or of the Government as a whole."[7] "An agency must retain the discretion to grant or not grant administrative leave in any circumstance based on agency judgments regarding mission needs."[8]

Placing an employee on paid administrative leave may be an appropriate action where the agency component in which the employee works is being eliminated or restructured, or where the agency weighs changes to the individual's role at the agency as part of a workforce realignment. It also may be appropriate when a new agency manager determines that the absence of the employee from the office "is in the interest of the agency or of the Government as a whole."[9] Agencies are encouraged to use flexibilities associated with paid administrative leave as they implement agency restructuring initiatives or determine the best ways to manage agency components going forward.

In addition, agency heads have broad discretion to detail employees "among the bureaus

---

[5] *Administrative Leave, Investigative Leave, and Notice Leave*, 89 Fed. Reg. 10,2256-01 (Dec. 17, 2024).

[6] U.S. Office of Personnel Management, *Fact Sheet: Administrative Leave*.

[7] 5 C.F.R. § 630.1403(a)(1).

[8] 5 C.F.R. § 630.1403(a)(4). OPM reiterates that while "[t]he effective date for these regulations addressing administrative leave (subpart N) and investigative and notice leave (subpart O) is 30 days after the date of publication," nonetheless "the compliance date is set as 270 days after the date of publication." 89 Fed. Reg. at 10,2257. That is, agencies must "revise and implement their internal policies consistent with the Act within 270 calendar days from the date OPM prescribes the regulations," and "[a]gencies are responsible for compliance with time limits provided for in the Act, these OPM regulations, and any related guidance." *Id.* OPM thus believes that agencies are not required to comply with the administrative leave rule and new regulations until September 13, 2025, the deadline for agencies to issue their own implementing regulations. **OPM requests that agencies not issue any agency-specific rules until such rules have been reviewed and approved by OPM.**

[9] 5 C.F.R. § 630.1403(a)(1).

Page 3

and offices of [their] department[s]" for up to 120 days by written order.[10] An agency may temporarily detail an employee to "unclassified duties."[11] Such details may provide additional flexibilities to agencies during the transition period and as agencies undertake reorganization efforts and close offices.

      Please do not hesitate to contact OPM if you have any questions regarding these matters at employeeaccountability@opm.gov.

cc: Chief Human Capital Officers (CHCOs), Deputy CHCOs, and Human Resources Directors.

---

[10] 5 U.S.C. § 3341.

[11] *Frankel v. Dep't of Educ.*, 17 M.S.P.R. 453, 455–56 (1983).