**Nos. 25-1677, 25-2637**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

————————————

AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, et al.,

Plaintiffs-Appellees,

v.

UNITED STATES OFFICE OF PERSONNEL MANAGEMENT, et al.,

Defendants-Appellants.

————————————

On Appeal from the United States District Court
for the Northern District of California

————————————

## BRIEF FOR APPELLANTS

————————————

YAAKOV M. ROTH
  *Acting Assistant Attorney General*

PATRICK D. ROBBINS
  *Acting United States Attorney*

MARK R. FREEMAN
COURTNEY L. DIXON
CASEN B. ROSS
JOSHUA M. KOPPEL
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7270*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-1923*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................... 1

STATEMENT OF JURISDICTION ........................................................... 3

STATEMENT OF THE ISSUE ................................................................. 3

STATEMENT OF THE CASE ................................................................... 3

      A.     Statutory Background ........................................................... 3

      B.     Factual Background .............................................................. 5

      C.     Prior Proceedings ................................................................ 8

SUMMARY OF ARGUMENT ................................................................. 14

STANDARD OF REVIEW ...................................................................... 17

ARGUMENT ........................................................................................... 17

I.      THE DISTRICT COURT LACKS JURISDICTION ............................. 17

      A.     Plaintiffs Failed To Demonstrate Article III Standing ............. 17

      B.     The District Court Lacks Subject-Matter Jurisdiction Over
              Challenges To Federal Personnel Actions ............................. 24

II.     THE DISTRICT COURT'S REINSTATEMENT ORDER IS UNTETHERED FROM
      PLAINTIFFS' CLAIMS AND UNLAWFUL, IN ANY EVENT ...................... 29

III.    PLAINTIFFS FAILED TO ESTABLISH THE OTHER PRELIMINARY-
      INJUNCTION FACTORS ................................................................. 35

CONCLUSION ....................................................................................... 39

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:**                                                                            <u>**Page(s)**</u>

*American Fed'n of Gov't Emps. v. Secretary of the Air Force*,
716 F.3d 633 (D.C. Cir. 2013) ........................................................................24

*American Fed'n of Gov't Emps. v. Trump*,
929 F.3d 748 (D.C. Cir. 2019) ................................................................... 5, 25

*Baker v. Carr*,
369 U.S. 186 (1962) ......................................................................................32

*Block v. Community Nutrition Inst.*,
467 U.S. 340 (1984) ...........................................................................26, 27, 28

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ...........................................................................1, 13, 19

*East Bay Sanctuary Covenant v. Biden*,
993 F.3d 640 (9th Cir. 2021) ........................................................................22

*Egbert v. Boule*,
596 U.S. 482 (2022) ......................................................................................33

*Elgin v. Department of the Treasury*,
567 U.S. 1 (2012) ................................................................... 9, 24, 29, 33

*FDA v. Alliance for Hippocratic Med.*,
602 U.S. 367 (2024) ...........................................................15, 18, 20, 21, 36

*Fraihat v. U.S. Immigration & Customs Enf't*,
16 F.4th 613 (9th Cir. 2021) ........................................................................31

*Friends of the Wild Swan v. Weber*,
767 F.3d 936 (9th Cir. 2014) ........................................................................35

*Graham v. Ashcroft*,
358 F.3d 931 (D.C. Cir. 2004) ........................................................................27

*Grosdidier v. Chairman, Broad. Bd. of Governors,*
    560 F.3d 495 (D.C. Cir. 2009) ...........................................................26

*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.,*
    527 U.S. 308 (1999) ................................................................... 32, 33

*Harkrader v. Wadley,*
    172 U.S. 148 (1898) ...........................................................................33

*Havens Realty Corp. v. Coleman,*
    455 U.S. 363 (1982) ...........................................................................18

*Herb Reed Enters., LLC v. Florida Entm't Mgmt., Inc.,*
    736 F.3d 1239 (9th Cir. 2013) .............................................................35

*Hollingsworth v. Perry,*
    558 U.S. 183 (2010) ...........................................................................37

*Hunt v. Washington State Apple Advert. Comm'n,*
    432 U.S. 333 (1977) ...........................................................................18

*Karnoski v. Trump,*
    926 F.3d 1180 (9th Cir. 2019) .............................................................17

*National Treasury Emps. Union v. FLRA,*
    737 F.3d 273 (4th Cir. 2013) ...............................................................25

*Nken v. Holder,*
    556 U.S. 418 (2009) ...........................................................................35

*Raines v. Byrd,*
    521 U.S. 811 (1997) ...........................................................................17

*Sampson v. Murray,*
    415 U.S. 61 (1974) ...............................................................32, 34, 37

*Saul v. United States,*
    928 F.2d 829 (9th Cir. 1991) ...............................................................28

*Sawyer, In re,*
    124 U.S. 200 (1888) ...........................................................................32

*Simon v. Eastern Ky. Welfare Rights Org.*,
    426 U.S. 26 (1976) ................................................................................23

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) ...............................................................................17

*United States v. Fausto*,
    484 U.S. 439 (1988) ............................................... 4, 15, 24, 25, 26, 27, 28

*Walton v. House of Representatives*,
    265 U.S. 487 (1924) ................................................................................33

*White v. Berry*,
    171 U.S. 366 (1898) ................................................................................33

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) .............................................................................. 17, 35

## Statutes:

Civil Service Reform Act of 1978,
    Pub. L. No. 95-454, 92 Stat. 1111 (1978) .................................................24

5 U.S.C. § 702(1) .............................................................................................32

5 U.S.C. § 1103 ................................................................................................29

5 U.S.C. § 1103(a)(7) ........................................................................................4

5 U.S.C. § 1204(a)(2) ................................................................................. 5, 33

5 U.S.C. § 1212 .......................................................................................... 5, 25

5 U.S.C. § 1214 .......................................................................................... 5, 25

5 U.S.C. § 1214(g) ...........................................................................................33

5 U.S.C. § 3301 ................................................................................................30

5 U.S.C. § 3321(a)(1) .........................................................................................4

5 U.S.C. § 3393(d) ............................................................................................... 4

5 U.S.C. §§ 7101–7135 ................................................................................... 5, 24

5 U.S.C. § 7105(a)(2) ...................................................................................... 5, 25

5 U.S.C. § 7123(a) ........................................................................................... 5, 25

5 U.S.C. § 7511 ..................................................................................................... 25

5 U.S.C. § 7511(a)(1) ....................................................................................... 4, 5

5 U.S.C. § 7511(a)(1)(B)–(C) ............................................................................. 4

5 U.S.C. § 7512 ............................................................................................... 5, 25

5 U.S.C. § 7513(d) .......................................................................................... 5, 25

5 U.S.C. § 7701 ...................................................................................................... 5

5 U.S.C. § 7701(b) ................................................................................................ 5

5 U.S.C. § 7701(g) .......................................................................................... 5, 33

5 U.S.C. § 7703 ................................................................................................... 25

5 U.S.C. § 7703(b)(1) ............................................................................... 5, 25, 33

7 U.S.C. § 608c .................................................................................................... 26

28 U.S.C. § 1292(a)(1) .......................................................................................... 3

28 U.S.C. § 1331 ................................................................................................... 3

42 U.S.C. § 2000e-5(g) ...................................................................................... 33

**Regulatory Materials:**

5 C.F.R. § 5.3 ...................................................................................................... 30

5 C.F.R. § 315.801 ................................................................................4

5 C.F.R. § 315.802 ................................................................................4

5 C.F.R. § 315.803(a) ...........................................................................4

5 C.F.R. § 315.806 ...........................................................................5, 25

5 C.F.R. pt. 731 ..................................................................................30

Exec. Order No. 14,210,
   90 Fed. Reg. 9669 (Feb. 14, 2025) ...........................................6, 31

**Rules:**

Fed. R. App. P. 4(a)(1)(B) ....................................................................3

Fed. R. App. P. 4(a)(2) .........................................................................3

Fed. R. Civ. P. 19(a)(1) .......................................................................29

## INTRODUCTION

The district court issued a far-reaching preliminary injunction that directs six federal departments and agencies (with more possibly to follow) to immediately return to duty thousands of probationary employees who were terminated in February 2025. The district court did so in a suit filed not by the employees themselves—whose claims Congress has channeled through special administrative procedures—but by a group of nonprofit organizations who allege that the terminations could cause a reduction in government services. And the court entered that sweeping relief on the theory that the U.S. Office of Personnel Management (OPM) unlawfully directed the agencies to terminate employees—even though OPM clarified otherwise in response to the court's temporary restraining order.

On April 8, the Supreme Court granted a stay of that injunction pending the resolution of this appeal. Order, *OPM v. American Fed'n of Gov't Emps.*, No. 24A904 (U.S. Apr. 8, 2025) (S. Ct. Stay Order). As the Supreme Court's order granting that extraordinary relief reflects, the district court's decision is fundamentally flawed and must be reversed. The nonprofit plaintiffs' theory of downstream harm rests on a highly attenuated chain of inferences that are "insufficient" to establish an Article III injury "under established law." *See id.* at 1 (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013)). That conclusion, dictated by the Supreme Court's order, suffices to vacate the injunction.

In addition, the district court's order is flawed in several additional respects that independently require reversal. Congress has channeled all federal employment disputes through the Civil Service Reform Act (CSRA) into an administrative process with judicial review in the U.S. Court of Appeals for the Federal Circuit. Allowing strangers to the federal-employment relationship to circumvent that process would upend that reticulated statutory scheme and contravene Supreme Court precedent. Were plaintiffs' theory correct, downstream users of government services could always go directly to court to raise challenges that Congress has required the employees themselves to first pursue administratively.

Beyond that, the district court's injunction does not follow from the legal problem the court identified. Plaintiffs argued, and the court found, that the termination decisions had been directed by OPM, without statutory authority. But the parties all agree that OPM lacks statutory authority to direct agencies to terminate probationary employees, and OPM issued a memorandum expressly clarifying that "OPM is not directing agencies to take any specific performance-based actions regarding probationary employees" and that "[a]gencies have ultimate decision-making authority." 2-ER-376. That should have solved the court's concern. Insofar as the agencies stood by their employment decisions, it is now clear they did so of their own volition. Yet the district court, without evidence, decried the clarifying memorandum as a "sham" and required agencies to offer to reinstate probationary employees. The district court's injunction therefore usurps the very agency power the

2

court was purporting to protect.  In light of these errors, and the lopsided balance of harms they have caused, this Court should vacate that injunction.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. § 1331.  2-ER-266, ¶ 12.  The district court issued a preliminary injunction from the bench on March 13, 2025, 3-ER-526–27 (minute entry); 1-ER-89–96, and entered a written order explaining its reasons for the injunction on March 14, 2025, 1-ER-29–42.  Defendants filed a timely notice of appeal on March 13, 2025, which became effective no later than when the district court entered the written order on March 14.  3-ER-485–86; *see* Fed. R. App. P. 4(a)(1)(B), (2).  This Court has jurisdiction pursuant to 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUE

Whether the district court erred in granting a preliminary injunction ordering the reinstatement of thousands of federal employees at the behest of third-party organizations who allege downstream harms from the federal government's personnel decisions.

## STATEMENT OF THE CASE

### A.    Statutory Background

**1.**  The Office of Personnel Management assists the President in overseeing the federal workforce.  Congress has instructed OPM to, among other things, "aid[] the President … in preparing such civil service rules as the President prescribes, and

3

otherwise advis[e] the President on actions which may be taken to promote an efficient civil service …, including recommending policies relating to the selection, … tenure, and separation of employees." 5 U.S.C. § 1103(a)(7).

Federal law provides that "[t]he President may … provide … for a period of probation" for federal employees "before an appointment in the competitive service becomes final." 5 U.S.C. § 3321(a)(1); *see id.* §§ 3393(d), 7511(a)(1). Pursuant to that authority, OPM has issued rules defining the probationary term for the competitive service and specifying that an agency "shall utilize the probationary period as fully as possible to determine the fitness of the employee and shall terminate his or her services during this period if the employee fails to demonstrate fully his or her qualifications for continued employment." 5 C.F.R. § 315.803(a); *see id.* §§ 315.801, 315.802. Employees in the excepted service are subject to a trial period of up to two years. 5 U.S.C. § 7511(a)(1)(B)–(C).

**2.** The Civil Service Reform Act "establishe[s] a comprehensive system for reviewing personnel action taken against federal employees." *United States v. Fausto*, 484 U.S. 439, 455 (1988). Through that statute, Congress created an "integrated scheme of administrative and judicial review, designed to balance the legitimate interests of the various categories of federal employees with the needs of sound and efficient administration." *Id.* at 445. Under the CSRA, most civilian employees of the federal government can appeal a significant personnel action—including a removal, suspension for more than 14 days, or furlough of 30 days or less—to the Merit

Systems Protection Board (MSPB).  5 U.S.C. §§ 7512, 7513(d), 7701.  The MSPB can

order relief to prevailing employees, including reinstatement.  *Id.* §§ 1204(a)(2),

7701(b), (g).  The Federal Circuit has exclusive jurisdiction to review most final

decisions of the MSPB.  *Id.* § 7703(b)(1).

Federal employees in their probationary period generally do not have a right to

appeal to the MSPB.  5 U.S.C. § 7511(a)(1); *see* 5 C.F.R. § 315.806 (permitting certain

probationary employees to appeal to the MSPB only on specific issues).  In certain

circumstances, probationary employees may file a complaint with the Office of Special

Counsel, which may in turn pursue administrative relief before the MSPB.  *See* 5

U.S.C. §§ 1212, 1214.

The CSRA includes the Federal Service Labor-Management Relations Statute,

which governs labor relations between the Executive Branch and its employees.  *See* 5

U.S.C. §§ 7101–7135; *American Fed'n of Gov't Emps. v. Trump*, 929 F.3d 748, 752 (D.C.

Cir. 2019).  The Federal Labor Relations Authority (FLRA) is charged with

adjudicating federal labor disputes.  5 U.S.C. § 7105(a)(2).  Congress has authorized

review of the FLRA's decisions in the courts of appeals.  *Id.* § 7123(a).

### B.    Factual Background

**1.**  On January 20, 2025, President Trump acted to optimize the size of the

federal workforce and limit hiring to mission-critical positions.  The President issued a

memorandum instituting a hiring freeze of federal civilian employees and ordering

agencies to identify ways to reduce the size of the federal government.  2-ER-248–49;

*see also* Exec. Order No. 14,210, 90 Fed. Reg. 9669 (Feb. 14, 2025) (clarifying terms of the hiring freeze).

The same day, OPM Acting Director Charles Ezell transmitted to Executive Branch agencies a memorandum "providing … guidance … regarding critical potential personnel actions." 2-ER-235. The memorandum explained that "[p]robationary periods are an essential tool for agencies to assess employee performance and manage staffing levels." 2-ER-235. It stated that agencies "should identify all employees on probationary periods" and "should promptly determine whether those employees should be retained at the agenc[ies]." 2-ER-235.

On February 12, OPM sent agency Chiefs of Staff an email titled "Probationary Employee Actions." 2-ER-246. The email instructed the agency Chiefs of Staff to "partner with your [agency Chief Human Capital Officer] to action those [employees] you know you wish to separate from … using the attached template letter." 2-ER-246 (emphasis omitted). The email requested that agencies provide OPM with a tracker reflecting "[w]hich probationary employees have been terminated and which [the agencies] plan to keep." 2-ER-246.

On February 14, OPM sent an email to an interagency forum providing additional guidance to agencies. 2-ER-238–39. OPM explained that "[a]n appointment is not final until the probationary period is over" and that "[u]ntil the probationary period has been completed, a probationer has the burden to

6

demonstrate why it is in the public interest for the Government to finalize [his] appointment to the civil service." 2-ER-238 (quotation marks omitted). OPM advised that "[a]n employee's performance must be measured in light of the existing needs and interests of government," and that probationers would have the requisite "qualifications for continued employment" only if they are "the highest-performing probationers in mission-critical areas." 2-ER-238–39 (quotation marks omitted).

On February 24, OPM again emailed the interagency forum, noting that it had received numerous questions "[a]s agencies continue to make decisions on whether to retain probationary employees." 2-ER-245. OPM provided a frequently-asked-questions document "[t]o assist agencies in carrying out their decisions." 2-ER-245. None of those communications directed agencies to terminate any particular probationary employees; rather, OPM instructed agencies to engage in a review of probationers based on how their performance was advancing the agencies' mission. *See, e.g.*, 2-ER-240 (asking "How should agencies evaluate the performance of an employee serving a probationary or trial period?" (emphasis omitted)).

**2.** Beginning on February 13, federal agencies terminated numerous federal employees serving in their probationary periods. The Department of Veterans Affairs, for example, dismissed "more than 1,000 employees," consistent with "a government-wide Trump Administration effort to make agencies more efficient, effective and responsive to the American People." 2-ER-251–52. The Department of Agriculture announced that it "is pursuing an aggressive plan to optimize its

workforce," including "by eliminating positions that are no longer necessary." 2-ER-258. And the Department of Defense announced that it "is re-evaluating [its] probationary workforce, consistent with the President's initiative to reform the Federal workforce to maximize efficiency and productivity"; the Department noted that it "believe[s] in the goals of the program" and touted Secretary Hegseth's view that "it is simply not in the public interest to retain individuals whose contributions are not mission-critical." 2-ER-260.

### C.    Prior Proceedings

**1.** Four labor unions filed this action on February 19, 2025. 3-ER-511. Four days later, plaintiffs filed an amended complaint adding as plaintiffs five additional organizations: Main Street Alliance, a network of small businesses; Coalition to Protect America's National Parks, a nonprofit organization comprising individuals associated with the National Park Service; Western Watersheds Project, an environmental conservation group; and Vote Vets Action Fund Inc. (VoteVets) and Common Defense Civic Engagement, organizations that work on behalf of veterans. 3-ER-453–55, ¶¶ 20–24. The action was brought against OPM and Acting OPM Director Ezell. 3-ER-451, ¶ 1; 3-ER-455, ¶¶ 26–27. Plaintiffs primarily alleged that OPM acted in excess of its statutory authority, and in contravention of agencies' own statutory authority to hire and manage their workers, by "order[ing] federal agencies" to terminate employees. 3-ER-450–51; 3-ER-461–65. Plaintiffs moved for a temporary restraining order. 3-ER-410–13.

**2.** On February 27, the district court issued a temporary restraining order from the bench. 3-ER-517. In a written order the next day, the court determined that it likely lacks jurisdiction to hear the union plaintiffs' claims because the claims in this case "'are the vehicle by which they seek to reverse the removal decisions, to return [members] to federal employment, and to [collect] the compensation they would have earned but for the adverse employment action,'" and that Congress has "channeled" such claims "to the FLRA and MSPB." 3-ER-390–91 (alterations in original) (quoting *Elgin v. Department of the Treasury*, 567 U.S. 1, 22 (2012)). But the court took a different view as to the organizational plaintiffs, whose members are end-users and beneficiaries of government services. The court reasoned that, as to those plaintiffs, it likely has subject-matter jurisdiction because the organizational plaintiffs' claims concerning alleged reductions in government services causing harms to their organizational missions are "ill-suited to adjudication by a *labor* board." 3-ER-391. The court acknowledged that the organizational plaintiffs alleged that those injuries occurred "*because*" of the "unlawful[]" termination of the probationary employees. 3-ER-391. It nonetheless determined that, because the organizational plaintiffs are not entitled to proceed before the FLRA and MSPB, they can bring their challenge to the legality of the terminations in district court. 3-ER-391.

The district court also reasoned that the organizational plaintiffs have standing. 3-ER-391–400. The court found standing based on the organizational plaintiffs'

assertions that their members may suffer delays or disruption in government services as a result of the terminations. 3-ER-293–97. With respect to two of the organizational plaintiffs, the court found standing based on the organizations' assertions that they would feel forced to divert resources to counteract the impacts of a potential reduction in government services caused by the terminations. 3-ER-398–99.

On the merits, the district court observed that OPM "concedes that it lacks the authority to direct firings outside of its own walls." 3-ER-386. But it rejected OPM's factual contention that it did not direct the firings, determining that the agencies likely terminated employees at the direction of OPM. 3-ER-386–87.

The district court also determined that the organizational plaintiffs are likely to suffer irreparable harm due to "loss of access to national recreational areas" and diminished government services, and because plaintiffs had diverted significant resources to responding to the hardships created by the terminations. 3-ER-400–01. The court's temporary restraining order deemed OPM's January 20 memorandum and February 14 email "unlawful" and "invalid" and directed that those communications and "all other efforts by OPM to direct the termination of employees" at the National Park Service, Bureau of Land Management, Department of Veterans Affairs, Department of Defense, Small Business Administration, and Fish and Wildlife Service "must be stopped and rescinded." 3-ER-402. The court further required OPM to provide written notice of the order to those six agencies. 3-ER-402.

10

**3.** OPM promptly complied with the court's temporary restraining order, notifying the specified agencies of the court's order.  2-ER-374.

Moreover, on March 4, OPM revised its guidance to clarify that "OPM is not directing agencies to take any specific performance-based actions regarding probationary employees."  2-ER-376.  OPM emphasized that "[a]gencies have ultimate decision-making authority over, and responsibility for, such personnel actions."  2-ER-376.

Plaintiffs subsequently filed a second amended complaint adding other nonprofit organizations and the State of Washington as additional plaintiffs, and naming 22 additional federal agencies and their heads as defendants "for [r]elief [p]urposes [o]nly."  2-ER-271.

**4.** On March 13, the district court held an evidentiary hearing, at the conclusion of which it issued a preliminary injunction—even though plaintiffs had never filed a motion for that relief and defendants never had an opportunity to respond to such a motion.  3-ER-524–25 (minute entry); 1-ER-89–96.

The district court ordered the Departments of Veterans Affairs, Agriculture, Defense, Energy, Interior, and Treasury to "immediately"—without waiting for a written order—"offer reinstatement to any and all probationary employees terminated on or about February 13th and 14th, 2025"; "cease any termination of probationary employees at the direction of … OPM"; cease using a template termination notice provided by OPM; and submit, within seven days, a list of all probationary employees

11

who were terminated, "with an explanation as to each of what has been done to comply with" the court's order. 1-ER-94–95. The court further stated that it may "extend[] the relief later in the future to other agencies." 1-ER-96. The court also opened discovery and ordered the deposition of an OPM official. 1-ER-96. The government filed a notice of appeal the same day.

The district court issued a written preliminary injunction ruling the following day. The court reiterated that it was ordering relief based solely on the claims made by the nonprofit organizational plaintiffs. 1-ER-36. It incorporated its prior standing analysis, citing additional declarations asserting that the organizational plaintiffs' members may face disruption in accessing government services because of the terminations. 1-ER-40. In a single conclusory sentence, the district court also found that two additional organizational plaintiffs—Point Blue Conservation Science and American Geophysical Union, each of which had been added in the second amended complaint, after the temporary restraining order was issued—had "shown likely harms at OPM's hand." 1-ER-40; *cf.* 2-ER-269–70, ¶¶ 25-26, 28 (adding plaintiffs American Public Health Association, Association of Flight Attendants-CWA, and Climate Resilient Communities, whose standing the district court never addressed). On the merits, the court again rejected the government's factual contention that OPM did not issue a directive ordering agencies to terminate probationary employees. 1-ER-38–39. And the court reiterated that the plaintiffs had established irreparable harm for the same reasons it had previously articulated. 1-ER-41.

The district court denied the government's request for a stay pending appeal. 2-ER-192–96. On March 14, the government sought a stay pending appeal and an immediate administrative stay in this Court. This Court denied an administrative stay on March 17, over the partial dissent of Judge Bade. 9th Cir. Dkt. 14.1. The Court denied a stay pending appeal on March 26, again over the dissent of Judge Bade. 9th Cir. Dkt. 27.1.

The government sought a stay from the Supreme Court. On April 8, the Supreme Court granted that motion, emphasizing that, "under established law," the "allegations of the nine non-profit-organization plaintiffs … are presently insufficient to support the organizations' standing." S. Ct. Stay Order 1 (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013)). The Supreme Court stayed the injunction pending resolution of this appeal and the disposition of any petition for certiorari. *Id.*[1]

**5.** Proceedings in district court have continued since the government's appeal of the preliminary injunction. Prior to the Supreme Court's stay decision, the district

---

[1] Five of the six agencies in this case are also the subject of a preliminary injunction issued by a district court in the District of Maryland requiring the reinstatement of probationary employees working or residing in 19 States and the District of Columbia. *Maryland v. U.S. Dep't of Agric.*, No. 1:25-cv-00748 (D. Md. Apr. 1, 2025), Dkt. 126. The Fourth Circuit recently stayed that injunction pending appeal, concluding that the government "is likely to succeed in showing the district court lacked jurisdiction" and that the government had established irreparable harm. *See* Order at 4-5, *Maryland v. U.S. Dep't of Agric.*, No. 25-1248 (4th Cir. Apr. 9, 2025).

The Department of Agriculture is separately subject to an order by the MSPB staying the termination of its probationary employees until April 18. *See* 2-ER-227, ¶¶ 4–5; Order on Stay Request, *Special Counsel ex rel. John Doe v. U.S. Dep't of Agric.*, No. CB-1208-25-0020-U-1 (M.S.P.B. Mar. 5, 2025).

court ordered the federal government to provide updates about the onboarding process for reinstated probationary employees, and it specified that "rehir[ing]" employees "but then plac[ing] them on administrative leave" is "not allowed by the preliminary injunction, for it would not restore the services the preliminary injunction intends to restore." 2-ER-191. In addition, the district court ordered the parties to address whether the court had previously erred in holding that it likely lacked jurisdiction over the union plaintiffs' claims, 1-ER-97–98, and, after ultimately reconsidering that prior ruling, ordered the parties to show cause why the preliminary injunction "extended to the organizational plaintiffs … should not be extended to the public-sector union plaintiffs," 1-ER-162. The court also invited the State of Washington to move for a preliminary injunction. 1-ER-162. The court held a hearing on those motions on April 9. 3-ER-539.

## SUMMARY OF ARGUMENT

This Court should reverse the district court's extraordinary injunction ordering the reinstatement of thousands of probationary employees. As the Supreme Court has already recognized, the district court lacked jurisdiction to enter the injunction at the behest of organizational plaintiffs who allege speculative downstream harms from a potential reduction in certain government services. Nor was the court's reinstatement order otherwise proper.

**I. A.** Plaintiffs' allegations are "insufficient" to demonstrate Article III standing under "established" Supreme Court precedent. *See* S. Ct. Stay Order 1.

14

Plaintiffs allege that their members might suffer from delays or disruptions in government services because of the termination of federal employees, but plaintiffs only speculate about the possible effects of reduced staffing at federal agencies. In the few instances where plaintiffs have identified specific examples of delays in government services, they are unable to concretely tie those delays to the termination of probationary employees. And with respect to two organizational plaintiffs, the district court relied solely on a diversion-of-resources theory that is squarely foreclosed by *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), which held that diverting organizational resources in response to a defendant's actions is not an Article III injury-in-fact. Plaintiffs likewise cannot establish that their alleged injuries are redressable, where there is no dispute that agencies have authority to terminate probationary employees, and the agencies have generally stood by their decisions to terminate employees independent of any direction from OPM.

**B.** Even if plaintiffs had standing to sue, the district court lacks subject-matter jurisdiction over their claims because Congress has established a comprehensive system for reviewing personnel actions taken against federal employees. The CSRA permits certain categories of employees to appeal certain personnel actions to the MSPB with subsequent judicial review in the U.S. Court of Appeals for the Federal Circuit. The Supreme Court has held that those who are not given appellate rights under the CSRA cannot bypass that administrative-review scheme and seek judicial review in district courts. *United States v. Fausto*, 484 U.S. 439, 445 (1988). Permitting

15

end-users of government services to challenge federal personnel actions in federal court, without any of the limitations that Congress placed on employees' own claims, would upend the comprehensive scheme Congress established.

**II.** The district court's reinstatement order is baseless, in any event. The district court's reinstatement remedy sweeps far broader than the supposed legal error the court identified—that OPM unlawfully directed agencies to terminate probationary employees. Even if plaintiffs were correct, a matter the government disputes, that would—at most—justify preliminary relief clarifying OPM's role and the agencies' independent authority. That has already happened here. The district court's choice to go much further and order agencies to reinstate terminated employees and return them to full-duty status extends far beyond what the court could properly order under its equitable authority and usurps the very agency power the court was purporting to vindicate.

**III.** Finally, the district court abused its discretion in ordering reinstatement because plaintiffs failed to demonstrate that they satisfied any of the equitable factors necessary for such sweeping relief. Plaintiffs' speculative assertions of harm do not suffice for Article III standing, let alone for establishing imminent irreparable injury. And the district court failed to correctly weigh the balance of harms in directing the sweeping reinstatement of thousands of employees across the federal government— relief that is maximally disruptive to the government but will provide at best minimal relief to plaintiffs.

## STANDARD OF REVIEW

To obtain a preliminary injunction, a plaintiff must show that it is likely to succeed on the merits, that it would suffer irreparable harm absent a preliminary injunction, and that the balance of the equities and the public interest favor an injunction. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). This Court reviews the grant of a preliminary injunction "for abuse of discretion, but review[s] any underlying issues of law de novo." *Karnoski v. Trump*, 926 F.3d 1180, 1198 (9th Cir. 2019) (per curiam).

## ARGUMENT

## I.    THE DISTRICT COURT LACKS JURISDICTION

### A.    Plaintiffs Failed To Demonstrate Article III Standing

Under Article III, federal courts "do not exercise general legal oversight of the Legislative and Executive Branches." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423–24 (2021). Instead, a plaintiff must establish an injury that is both "legally and judicially cognizable." *Raines v. Byrd*, 521 U.S. 811, 819 (1997). "This requires, among other things, that the plaintiff have suffered 'an invasion of a legally protected interest which is … concrete and particularized,' and that the dispute is 'traditionally thought to be capable of resolution through the judicial process[.]'" *Id.* (first alteration in original) (citation omitted).

In granting the preliminary injunction, the district court relied "solely on" the standing of nonprofit organizational plaintiffs whose members are end-users of

17

government services. S. Ct. Stay Order 1; *see* 1-ER-99; 1-ER-36. An organization may establish standing based on the standing of its members, *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977), or by identifying "injuries [the organizations themselves] have sustained," *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 393 (2024) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 n.19 (1982)). But in either event, an organization—like any other litigant—"must satisfy the usual standards for injury in fact, causation, and redressability." *Id.* at 393–94. As the Supreme Court recently confirmed in staying the district court's injunction, plaintiffs' allegations are "insufficient." *See* S. Ct. Stay Order 1.

1. The district court erred in concluding that the organizational plaintiffs established standing from alleged delays or disruptions in government services. *See* 3-ER-394–96. Plaintiffs only speculate that agencies' terminations of probationary employees will cause delays or disruptions of government services that plaintiffs or their members use. One plaintiff, for example, asserts that the termination of employees at the Small Business Administration "will make access to [certain] financial assistance slower and less reliable," which is "likely to have ripple effects" across the economy. 3-ER-442–43, ¶¶ 7–8. Another alleges that Yosemite National Park "will likely have to stop specific functions and close park areas" because "[w]hen there was a partial government shutdown in 2018, visitors trashed scenic viewpoints" and "trampled sensitive ecological areas." 3-ER-428, ¶ 5. Others fear that, given reduced available staff, the Bureau of Land Management may be unable to provide

timely "land health assessments," 3-ER-425, ¶ 8, or that the Fish and Wildlife Service may be unable to meet deadlines in separate litigation, 3-ER-404, ¶ 3; *see also* 2-ER-394–96.[2]

Such "[a]llegations of possible future injury" as an indirect result of the government's personnel decisions are not sufficient to establish an Article III injury. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (alteration in original) (emphasis and quotation marks omitted); *see* S. Ct. Stay Order 1 (citing *Clapper* in recognizing that plaintiffs' allegations fail under "established" precedent). Plaintiffs' forecasted injuries are particularly speculative given that agencies have stated they have taken personnel actions to "maximize efficiency and productivity" in government services. *E.g.*, 2-ER-260; *see also, e.g.*, 2-ER-252 (noting "safeguard[s] to ensure VA benefits and services are not impacted").

---

[2] As noted above, the district court found—without any discussion—that two organizational plaintiffs who were named in the second amended complaint likely have standing. *See supra* p. 12; 1-ER-40 (Point Blue Conservation Science and American Geophysical Union). Because those plaintiffs were named in this action only after the temporary restraining order was issued—and because plaintiffs never moved for a preliminary injunction—defendants did not have an opportunity to address those plaintiffs' standing. In any event, those plaintiffs' allegations fail for the same reasons as other organizational plaintiffs'. *See, e.g.*, 3-ER-359–60, ¶¶ 5, 7 (alleging that the termination of employees from the Natural Resources Conservation Service in the Department of Agriculture is "likely to impair grant activities and administration" and will "delay[]"the certification of conservation plans); 2-ER-363, ¶¶ 6, 8 (alleging that the "loss of federal employees" is "likely to impair grant activities" that plaintiff's members rely upon and "will likely reduce the availability of [scientific] data" supported by federal agencies).

19

Plaintiffs cite a mere handful of specific instances of alleged delays in government services. But plaintiffs only speculate that such delays are the result of the termination of probationary employees, as opposed to separate government policies or unrelated isolated circumstances. Plaintiffs allege, for example, that a bathroom facility in Joshua Tree National Park "remained closed well after its scheduled opening time" during one organizational member's visit, 3-ER-408, ¶ 4; and that a staff member at the Bureau of Land Management invoked unspecified "staffing issues" as the reason it was unable to respond to a plaintiff's Freedom of Information Act request, 2-ER-424–25, ¶ 7. Plaintiffs cannot satisfy the causation prong of standing with mere speculation.

The implications of plaintiffs' standing theory are staggering. On plaintiffs' view, end users of government services could use the courts to second-guess agencies' personnel decisions—whether that be hiring or firing, opening an office in a different location, or shifting employees between offices—on the theory that those decisions may result in government services being provided in a less-optimal manner than plaintiffs would prefer. That "sweeping" theory, which would permit federal courts to superintend the federal government's personnel policies at the behest of "virtually every citizen" who uses government services, is "flatly inconsistent with Article III." *Alliance for Hippocratic Med.*, 602 U.S. at 392; *see* S. Ct. Stay Order 1.

Furthermore, in concluding that two plaintiffs—VoteVets and Common Defense—established Article III standing, the district court appeared to rely on the

theory that those organizations have had to "divert" organizational resources to "counteract[]" the effects of the agencies' actions. 3-ER-398–99 (quotation marks omitted). That theory is likewise foreclosed by Supreme Court precedent. In *Alliance for Hippocratic Medicine*, 602 U.S. at 395, the Supreme Court made clear that "divert[ing] [organizational] resources in response to a defendant's actions" is not an Article III injury-in-fact. *Id.* The Court therefore rejected medical associations' arguments that they had standing to challenge FDA regulations that made it easier for pregnant women to obtain mifepristone because the regulations had caused the associations "to conduct their own studies on mifepristone so that [they could] better inform their members and the public about mifepristone's risks" and "'forced' the associations to 'expend considerable time, energy, and resources' drafting citizen petitions to FDA, as well as engaging in public advocacy and public education." *Id.* at 394. The Court emphasized that "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Id.*

Here, too, Common Defense and VoteVets cannot "manufacture [their] own standing," *Alliance for Hippocratic Med.*, 602 U.S. at 394, by devoting resources to "providing guidance" or "[r]esponding to members['] questions" about the federal government's potential actions, 3-ER-415–16, ¶ 6; *see also* 3-ER-420, ¶ 11 (alleging that "[t]he time of VoteVets' staff and consultants has been diverted from Vote Vets'

21

regular activities to field and respond to inquiries from veterans and their families and to connect them with case workers in congressional offices"). Nor have those plaintiffs shown that the organizations themselves "'would have suffered some other injury' had they 'not diverted resources'" to responding to members' inquiries. *East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 663 (9th Cir. 2021).

**2.** Plaintiffs' theory of standing is particularly untenable given the fundamental mismatch between their theory of illegality and the injuries that they assert. Plaintiffs' central claim in this case is that OPM unlawfully directed other agencies to fire probationary employees without statutory authority to do so. But, in response to the district court's temporary restraining order, OPM has already issued revised guidance to all agencies clarifying that "OPM is not directing agencies to take any specific performance-based actions regarding probationary employees" and that "[a]gencies have ultimate decision-making authority over, and responsibility for, such personnel actions." 2-ER-376. At least one agency did subsequently rescind some probationary employees' terminations, even before the district court ordered reinstatement. *See* 1-ER-56; *see also infra* pp. 30–31.

Any alleged harms experienced by plaintiffs from the downstream effects of the terminations of probationary employees are therefore not plausibly traceable to any extant directive by OPM; rather, they are traceable, at most, to each agency's independent decision to adhere to prior terminations. Indeed, the district court has

never questioned that "[e]ach agency" has "discretion to hire and fire its own employees." 1-ER-41 (emphasis omitted). For the same reason, those harms are not redressable by relief the district court could properly order on plaintiffs' claims: Deeming invalid the original OPM guidance that plaintiffs challenged will not restore the jobs and lead to the provision of services that plaintiffs seek to use, especially when that guidance has already been withdrawn.

The district court purported to "restore" government services for plaintiffs only by going far beyond any relief with respect to OPM's guidance and ordering that agencies reinstate terminated employees to full-duty status, *see, e.g.*, 2-ER-191—an impermissible remedy, as discussed further *infra* pp. 32–34. But even as to reinstatement, the district court ignored fundamental redressability concerns. Plaintiffs' assertions of injury from an alleged loss of government services depend on speculation that reinstating probationary employees might result in their resuming the same tasks in the same way and might then improve federal services that some of their members use. But as Judge Bade observed, "the various agencies" might well "reassign" these employees "to new positions, or assign them different tasks, or prioritize their mission and services in a manner that does not result in increased services to the organizational plaintiffs." 9th Cir. Dkt. 27-1, at 3 (Bade, J., dissenting); *see Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 43 (1976) (finding the plaintiffs lacked standing where it was "speculative whether the desired exercise of the court's

remedial powers … would result in the availability to" the plaintiffs of services they desired); *see also infra* p. 38.

### B. The District Court Lacks Subject-Matter Jurisdiction Over Challenges To Federal Personnel Actions

Even if plaintiffs could establish Article III standing, the district court lacked subject-matter jurisdiction to assess the legality of the Executive's personnel actions. Congress has "established a comprehensive system for reviewing personnel action[s] taken against federal employees" that provides the "exclusive means" for review. *Elgin v. Department of the Treasury*, 567 U.S. 1, 5, 8 (2012) (quotation marks omitted).

The Civil Service Reform Act of 1978, Pub. L. No. 95-454, 92 Stat. 1111 (1978), which includes the Federal Service Labor-Management Relations Statute for federal labor-management relations, 5 U.S.C. §§ 7101–7135, sets out an "integrated scheme of administrative and judicial review" for challenges to personnel actions taken against members of the civil service, *United States v. Fausto*, 484 U.S. 439, 445 (1988). Through that comprehensive scheme, "Congress intentionally provided—and intentionally chose not to provide—particular forums and procedures for particular kinds of claims." *American Fed'n of Gov't Emps. v. Secretary of the Air Force*, 716 F.3d 633, 636 (D.C. Cir. 2013) (alterations and quotation marks omitted). Congress allowed certain individual federal employees who are affected by agency personnel decisions to challenge those decisions "by litigating their claims through the statutory scheme in the context of [a] concrete" dispute, albeit limited to the claims and remedies

24

provided by Congress. *See American Fed'n of Gov't Emps. v. Trump*, 929 F.3d 748, 757 (D.C. Cir. 2019); *see also* 5 U.S.C. §§ 7703(b)(1), 7105(a)(2), 7123(a).

Chapter 75 of the CSRA "governs adverse action taken against employees for the 'efficiency of the service,'" and Subchapter II addresses, *inter alia*, removals from service. *Fausto*, 484 U.S. at 446–47; *see* 5 U.S.C. § 7512. Employees covered by Subchapter II may seek review of adverse actions in the MSPB, followed by judicial review in the Federal Circuit. 5 U.S.C. §§ 7513(d), 7703. But Congress did not permit all federal employees to challenge all employment actions. *See National Treasury Emps. Union v. FLRA*, 737 F.3d 273, 277 (4th Cir. 2013). The definition of "employee" in Subchapter II specifically excludes those who are serving a probationary or trial period. 5 U.S.C. § 7511. Probationary employees in the competitive service may therefore appeal to the MSPB only in limited circumstances, such as to seek review of "a termination not required by statute which [the employee] alleges was based on partisan political reasons or marital status" or that "was not effected in accordance" with specified procedural requirements. 5 C.F.R. § 315.806. Probationary employees can also lodge complaints with the Office of Special Counsel, which can investigate prohibited personnel practices. 5 U.S.C. §§ 1212, 1214.

The district court acknowledged this comprehensive scheme, 3-ER-387, but misunderstood the scope of Congress's choice to preclude district-court jurisdiction. Although the court did not question that individual employees would have to pursue their claims pursuant to the procedures and limitations provided by Congress, it

reasoned that nonprofit organizations may bring their claims outside that scheme because they allege that agency terminations will reduce government services that will affect their members and organizational missions. 3-ER-391. That gets it exactly backwards. The "exclusion" of end-users of government services "from the provisions establishing administrative and judicial review for personnel action" of the type challenged here "*prevents* [them] from seeking review" under other provisions. *See Fausto*, 484 U.S. at 455 (emphasis added); *Grosdidier v. Chairman, Broad. Bd. of Governors*, 560 F.3d 495, 497 (D.C. Cir. 2009) (Kavanaugh, J.) ("[T]he CSRA is the exclusive avenue for suit even if the plaintiff cannot prevail in a claim under the CSRA.").

Supreme Court precedent makes clear that when a comprehensive scheme of the sort at issue here permits review at the behest of some types of plaintiffs but not others, it implicitly precludes review by plaintiffs who are not authorized to bring claims. In *Block v. Community Nutrition Institute*, 467 U.S. 340, 347 (1984), the Supreme Court considered a statute that permitted dairy handlers to obtain review of certain "market orders" after exhausting administrative remedies, but did not authorize review by anyone else. *See id.* at 346 (citing 7 U.S.C. § 608c). When a group of dairy consumers sought review of a marketing order, the Supreme Court explained that the statute omits a "provision for participation by consumers in any proceeding," and that "[i]n a complex scheme of this type, the omission of such a provision is sufficient reason to believe that Congress intended to foreclose consumer participation in the regulatory process." *Id.* at 347. Accordingly, the Court explained, the "structure of

26

this Act indicates that Congress intended only producers and handlers, and not consumers, to ensure that the statutory objectives would be realized." *Id.* And the "restriction of the administrative remedy to handlers strongly suggests that Congress intended a similar restriction of judicial review of market orders." *Id.* Any other holding would facilitate circumvention of the comprehensive statutory scheme. *Id.* at 348.

Those principles apply with full force to the CSRA, as Supreme Court precedent likewise makes clear. *See Fausto*, 484 U.S. at 448 (applying *Block* to conclude that certain employees who lack CSRA appeal rights "should not be able to demand judicial review for the type of personnel action covered by that chapter"). It would turn the CSRA's comprehensive structure "upside down" if end-users of government services—who are, at most, indirectly affected by a termination—could obtain judicial review of termination decisions without any of the restrictions that would apply if the affected employees themselves were to bring such a claim. *Id.* at 449. The exclusion of nonprofit organizations such as plaintiffs from the CSRA's review scheme reflects Congress's considered judgment about the limitations of who should be permitted to challenge a personnel decision, rather than providing carte blanche for tangentially affected parties to sue without using the CSRA's comprehensive scheme. *See Graham v. Ashcroft*, 358 F.3d 931, 935 (D.C. Cir. 2004) (Roberts, J.) ("[I]t is the comprehensiveness of the statutory scheme involved, not the 'adequacy' of the specific remedies" that precludes jurisdiction).

That Congress intended to exclude end-users of government services from the class of people who can challenge federal personnel actions is unsurprising. The CSRA is "designed to balance the legitimate interests of the various categories of federal employees with the needs of sound and efficient administration," and to replace a "patchwork system with an integrated scheme of administrative and judicial review." *Fausto*, 484 U.S. at 445; *see also Saul v. United States*, 928 F.2d 829, 833 (9th Cir. 1991) ("The goal [of the CSRA] was 'a single unified personnel policy which takes into account the requirements of all the various laws and goals governing Federal personnel management.'" (alteration omitted)). Permitting end-users of government services to challenge the federal government's personnel decisions in federal district courts around the country would plainly impede those goals and "disrupt" the "complex and delicate" scheme that Congress established to challenge federal employment actions. *Block*, 467 U.S. at 348.

It is no answer to suggest, as the district court did in granting a temporary restraining order, that plaintiffs are bringing claims against OPM rather than individual employing agencies. *See* 3-ER-389. Plaintiffs' claims are squarely directed to agency termination decisions, *see, e.g.*, 2-ER-278–84, ¶¶ 80–104; and regardless, whatever may have been true of the nature of plaintiffs' claims at the time of the district court's temporary restraining order—when OPM was the only agency defendant—plaintiffs have now amended their complaint to bring claims directly against the employing agencies, *see* 2-ER-271–78, ¶¶ 34–79. Indeed, it was only

28

because of that amendment that the court (erroneously) thought it had authority to issue a broad injunction ordering employees to be reinstated at specific agencies.[3]

In short, Congress did not enact a carefully circumscribed, "integrated" scheme of review in the CSRA just to allow strangers to the employment relationship to pick and choose among legal theories, remedies, and forums outside that scheme. *See Elgin*, 567 U.S. at 14.

## II. THE DISTRICT COURT'S REINSTATEMENT ORDER IS UNTETHERED FROM PLAINTIFFS' CLAIMS AND UNLAWFUL, IN ANY EVENT

Even if the organizational plaintiffs have standing and were not required to channel their claims, the district court had no grounds to order reinstatement—on a mass scale—for the perceived legal violation it identified.

**A.** The district court's sweeping reinstatement order is badly out of step with plaintiffs' theory of illegality. As discussed above, plaintiffs' central claim in this case is that OPM lacks statutory authority to direct other agencies to terminate probationary employees. No one disputes that as a legal matter. OPM's role is to provide support, guidance, and coordination with respect to federal human-resources policy, consistent with its statutory and regulatory responsibilities. 5 U.S.C. § 1103. It

---

[3] Nor can plaintiffs avoid that conclusion by insisting that the defendants were added "for [r]elief [p]urposes [o]nly," 2-ER-271. The Federal Rules of Civil Procedure do not recognize a class of defendants that may be considered "only" for granting relief but that otherwise may be ignored. *See, e.g.*, Fed. R. Civ. P. 19(a)(1) (recognizing, for example, that a person in whose absence the court cannot afford complete relief should be joined only if their joinder "will not deprive the court of subject-matter jurisdiction").

does not—and cannot—make for other agencies the personnel decisions at issue here.[4]

The government disputes that OPM in fact directed any such firings. But this Court need not address that dispute at this preliminary stage. Even assuming plaintiffs' theory were correct, the only preliminary relief that might have been appropriate would have been limited to instructing OPM to clarify that it has no power to direct termination actions at the agencies in these circumstances, and to give agencies the opportunity to rescind terminations if they acted based on confusion about OPM's authority. That has already occurred. When the district court granted plaintiffs a temporary restraining order, it ordered that relief, directing OPM to rescind certain communications to agencies and notify agencies of the court's decisions. OPM complied with the court's order and, further, issued clarifying guidance. OPM has now made clear that "[a]gencies have ultimate decision-making authority over, and responsibility for," performance-based personnel actions against probationary employees. 2-ER-376.

Any confusion was therefore cleared up, and agencies were left to make their own politically accountable decisions. At least one agency did rescind some

---

[4] For many decades, OPM has conducted suitability investigations and made suitability determinations regarding federal employees, which has historically included instructing agencies not to employ, or to separate from, federal employees who do not meet the suitability and fitness requirements set forth in OPM regulations. *See* 5 U.S.C. § 3301, 5 C.F.R. § 5.3; 5 C.F.R. pt. 731. Those suitability authorities are not implicated in this case.

probationary employees' terminations after OPM's clarification. *See* 1-ER-57. Most did not. *See, e.g.*, 2-ER-218–19, ¶ 12. That result is to be expected—the President directed agencies to optimize the federal workforce, and agencies may and should make employment decisions against the backdrop of that policy choice. *See* Exec. Order No. 14,210, § 3, 90 Fed. Reg. at 9669–70.

For these reasons, the government was willing to consent to an order converting the district court's temporary restraining order into a preliminary injunction. 2-ER-331. Instead, the district court entered sweeping preliminary relief—without plaintiffs ever having filed a motion for such relief—directing terminated employees to be reinstated at specific agencies. That extraordinary remedy goes far "beyond the scope" of the legal problem the court identified, and it is not based on any record evidence showing that such staggering relief is necessary. *Fraihat v. U.S. Immigration & Customs Enf't*, 16 F.4th 613, 645 (9th Cir. 2021) (alteration and quotation marks omitted) ("A federal court must 'tailor a remedy commensurate with the specific violations' at issue in a case, and it errs where it 'imposes a systemwide remedy going beyond the scope' of those violations." (alterations omitted)). Plaintiffs have provided no evidence to doubt that OPM's clarifying memorandum resolved any confusion and left agencies to make their own choices. The district court simply decried OPM's clarification as a "sham" and granted plaintiffs the extraordinary remedy of directing reinstatement at specific agencies, remarking that "maybe" an

injunction is needed to "tell[] [agencies] to rehire [probationary employees]." 1-ER-57–58.

Consequentially, while the plaintiffs purported to vindicate agencies' right to make their own personnel choices, this case became a vehicle for the district court to usurp that authority by ordering agencies to broadly reinstate employees who had been intentionally let go.

**B.** Although that fundamental flaw is alone sufficient to conclude that the court's reinstatement remedy was improper, the court's remedy also exceeded the scope of its equitable powers. Reinstatement is not an available remedy on plaintiffs' claims, and even where the extraordinary remedy of reinstatement is available, it requires a heightened showing that plaintiffs have not come close to establishing here.

Plaintiffs bring suit under the Administrative Procedure Act. *See* 2-ER-310–15, ¶¶ 202–29. But the Administrative Procedure Act authorizes a court to grant injunctive relief subject to traditional equitable limitations. *See* 5 U.S.C. § 702(1). Absent express statutory authority, a federal court may grant only those equitable remedies that were "traditionally accorded by courts of equity." *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 319 (1999). Reinstatement is not a remedy that was traditionally available at equity. *See Sampson v. Murray*, 415 U.S. 61, 83 (1974). To the contrary, courts of equity lacked "the power … to restrain by injunction the removal of a [public] officer." *In re Sawyer*, 124 U.S. 200, 212 (1888); *see, e.g.*, *Baker v. Carr*, 369 U.S. 186, 231 (1962) (decisions that "held that federal equity

32

power could not be exercised to enjoin a state proceeding to remove a public officer" or that "withheld federal equity from staying removal of a *federal* officer" reflect "a traditional limit upon equity jurisdiction"); *Walton v. House of Representatives*, 265 U.S. 487, 490 (1924) ("A court of equity has no jurisdiction over the appointment and removal of public officers ...."); *Harkrader v. Wadley*, 172 U.S. 148, 165 (1898) ("[T]o sustain a bill in equity to restrain ... the removal of public officers, is to invade the domain of the courts of common law, or of the executive and administrative department of the Government."); *White v. Berry*, 171 U.S. 366, 377 (1898) ("[A] court of equity will not, by injunction, restrain an executive officer from making a wrongful removal of a subordinate appointee, nor restrain the appointment of another." (quotation marks omitted)).

The creation of new remedies is "a legislative endeavor," *Egbert v. Boule*, 596 U.S. 482, 491 (2022), and courts of equity lack "the power to create remedies previously unknown to equity jurisprudence," *Grupo Mexicano*, 527 U.S. at 332. Accordingly, where Congress departs from equitable tradition, it does so expressly. In the CSRA, Congress authorized the MSPB to award "reinstatement," as well as "backpay" to prevailing employees, and it has authorized review of the MSPB's decision in the Federal Circuit. *Elgin*, 567 U.S. at 6 (citing 5 U.S.C. §§ 1204(a)(2), 7701(g), 7703(b)(1)); 5 U.S.C. § 1214(g); *see also, e.g.*, 42 U.S.C. § 2000e-5(g) (empowering courts to grant "reinstatement" as well as "back pay" as remedies for employment discrimination). But plaintiffs are neither entitled to proceed under the

33

CSRA nor did they follow the required CSRA procedures. *See supra* pp. 24–29. And neither the district court nor plaintiffs have identified any statute that authorizes a court to reinstate public employees in order to restore government services to third parties—let alone a statute that allows a court to do so based on a purported illegality in the employees' termination, rather than based on a statutory entitlement by those third parties to the services sought.

Moreover, even where Congress has authorized reinstatement, the Supreme Court has recognized that a grant of preliminary injunctive relief in government personnel cases requires an elevated showing. *Sampson*, 415 U.S. at 84. The Court emphasized that courts of equity had historically denied any reinstatement power, noting "the traditional unwillingness of courts of equity to enforce contracts for personal service either at the behest of the employer or of the employee," instructing that a plaintiff in a "Government personnel case[]" must, "at the very least … make a showing of irreparable injury sufficient in kind and degree to override these factors cutting against the general availability of preliminary injunctions" in such cases. *Id.* at 83–84.

The district court gave no heed to those principles in ordering the government to reinstate thousands of employees to redress speculative potential harms to end users of government services. Even if those harms met the bare minimum required to establish standing under Article III, *but see* Part I.A, the attenuated disruptions in

end-users' preferred government services cannot be the basis for reinstating

thousands of government employees that executive agencies have chosen to dismiss.

## III. PLAINTIFFS FAILED TO ESTABLISH THE OTHER PRELIMINARY-INJUNCTION FACTORS

Plaintiffs additionally failed to establish that any of the equitable factors favor

injunctive relief. Plaintiffs failed to establish irreparable injury, and any such harm is

plainly outweighed in any event by the government's and the public's interest, which

"merge" here. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

At the outset, plaintiffs' failure to establish irreparable harm is alone sufficient

to vacate the injunction. *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 946 (9th Cir.

2014). The district court concluded that plaintiffs had established irreparable harm

from a "[l]oss of access" to government resources. 3-ER-399. But as discussed

above, plaintiffs' allegations of reduced access to certain government services as a

downstream effect of agencies' terminations of probationary employees do not suffice

for Article III standing. *Supra* pp. 18–20; *see* S. Ct. Stay Order 1. At a minimum,

those harms are insufficient to establish that plaintiffs face imminent irreparable harm

that is "*likely*" pending final judgment. *Herb Reed Enters., LLC v. Florida Entm't Mgmt.,*

*Inc.*, 736 F.3d 1239, 1249 (9th Cir. 2013) (quoting *Winter v. Natural Res. Def. Council,*

*Inc.*, 555 U.S. 7, 22 (2008)). That is particularly so given that plaintiffs' handful of

specific examples illustrate, at most, delays in government services that do not

constitute irreparable harm. *See, e.g.*, 3-ER-424–25, ¶ 7 (asserting lack of "timely"

35

response to Freedom of Information Act request); 3-ER-408, ¶ 4 (alleging bathroom facility at Joshua Tree National Park "remained closed well after its scheduled opening time"). The district court's further conclusion that plaintiffs have established irreparable harm from having to "divert[]" organizational resources, 3-ER-401, fails for the same reason discussed above with respect to plaintiffs' standing, *see supra* pp. 20–22; *see also Alliance for Hippocratic Med.*, 602 U.S. at 394, 396.

The district court's error is underscored by its emphasis that plaintiffs have established irreparable harm from the "degradation" of wildlife and national parks. *See* 3-ER-400. The record comes nowhere close to establishing that any such degradation is likely or imminent. *See, e.g.*, 3-ER-404–05, ¶ 4 (speculating that reduced U.S. Fish & Wildlife Service staff might not detect a nascent fungal threat to an endangered species population); 3-ER-405, ¶ 6 (asserting that organizations' members would be "adversely affected by the degradation of public lands" if "reductions of staffing" were to "delay" Endangered Species Act "listing decisions"); 2-ER-368–70, ¶¶ 7–8, 10 (opining that "a lack of [U.S.] Forest Service oversight of cattle grazing" could have adverse environmental effects on wildlife habitats); 3-ER-428, ¶ 5 (speculating that Yosemite National Park may have "to stop specific functions and close park areas").

At a minimum, plaintiffs' assertions of irreparable injury do not justify the district court's sweeping reinstatement of thousands of probationary employees across multiple federal agencies. To take one example, the district court's injunction has

36

required the reinstatement of more than 1,000 seasonal employees at the Forest Service who were not in pay status nor performing work at the time of their terminations due to the off-season. 2-ER-182. That relief does not plausibly redress any irreparable injury to plaintiffs. Similarly, the district court did not purport to draw any link between plaintiffs' asserted harms and the termination of probationary employees at the Department of Treasury but nonetheless directed reinstatement at that agency.

On the other side of the ledger, the district court's injunction irreparably harms the federal government, as the Supreme Court necessarily found in staying that injunction pending appeal. *See Hollingsworth v. Perry*, 558 U.S. 183, 190 (2010) ("To obtain a stay pending the filing and disposition of a petition for a writ of certiorari, an applicant must show … a likelihood that irreparable harm will result from the denial of a stay."). The injunction directly and significantly interferes with the government's ability to manage its workforce—an area in which "the Government has traditionally been granted the widest latitude." *Sampson*, 415 U.S. at 83, 91–92. As discussed above, OPM's clarifying memorandum removes any doubt that agencies may make their own personnel decisions with respect to the retention of probationary employees. It disserves both the government and the taxpayers to require the government to continue employing individuals whose services the government has determined it no longer requires. And the government will not be able to recover those salaries if it later wins this case. *See* Order Granting Stay 5, *Maryland v.*

*Department of Agric.*, No. 25-1248 (4th Cir. Apr. 9, 2025) (staying injunction directing the reinstatement of probationary employees because "[t]he Government is unlikely to recover the funds disbursed to reinstated probationary employees"). The court's order would seem to prevent, moreover, employees' termination based even on a newly arising ground such as poor performance occurring after reinstatement—at least absent further clarification or permission from the district court.

These burdens are exacerbated by the fact that the court's injunction goes even further than requiring that federal employees be reinstated, directing that they be returned to full-duty status, complete with work assignments, in its misguided effort to "restore" the specific government services that plaintiffs fear may be impeded. *See* 2-ER-191. As discussed above, however, it is speculative, at best, that the court's relief will in fact redress any harm to plaintiffs. *See supra* pp. 23–24. Restoration of any services that were in fact affected by terminations relies on the independent judgment of employees (who are not parties to this suit) to accept reinstatement to full-duty status, and on agencies' independent decisions about how to deploy reinstated employees in light of agency priorities and the continuing uncertainty about the employees' statuses given that the court's injunction could be reversed at any time. *See* 9th Cir. Dkt. 27-1, at 3 (Bade, J., dissenting). The court's relief is therefore maximally disruptive to government services, while providing minimal, if any, relief to plaintiffs' asserted downstream harms.

## CONCLUSION

For the foregoing reasons, the preliminary injunction should be vacated.

Respectfully submitted,

YAAKOV M. ROTH
  *Acting Assistant Attorney General*

PATRICK D. ROBBINS
  *United States Attorney*


MARK R. FREEMAN
COURTNEY L. DIXON

  *s/ Casen B. Ross*
CASEN B. ROSS
JOSHUA M. KOPPEL
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7270*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-1923*
  *casen.ross@usdoj.gov*

May 2025

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Circuit Rule 32-1(a) because it contains 9,376 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Casen B. Ross*
Casen B. Ross