Nos. 25-1677, 25-2637

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

American Federation of Government Employees, AFL-CIO, et al.
*Plaintiff-Appellees*,
v.
The Office of Personnel Management, et al.
*Defendants-Appellants*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
No. 3:25-cv-01780-WHA
The Honorable Judge William H. Alsup

_____

## ANSWERING BRIEF FOR PLAINTIFFS-APPELLEES

_____

Scott A. Kronland
Stacey M. Leyton
Eileen B. Goldsmith
Danielle E. Leonard
Robin S. Tholin
James Baltzer
ALTSHULER BERZON LLP
177 Post St., Suite 300
San Francisco, CA 94108
Tel.: (415) 421-7151
dleonard@altber.com

*Attorneys for Plaintiff-Appellee Organizations\**
*[additional counsel on following page]*

Norman L. Eisen
Pooja Chaudhuri
STATE DEMOCRACY DEFENDERS
FUND
600 Pennsylvania Avenue SE #15180
Washington, DC 20003
Tel: (202) 594-9958
Norman@statedemocracydefenders.org
Pooja@statedemocracydefenders.org

*Attorneys for Plaintiff Organizations\**

Teague Paterson
Matthew Blumin
AMERICAN FEDERATION OF
STATE, COUNTY, AND MUNICIPAL
EMPLOYEES
1625 L Street, N.W.
Washington, D.C.  20036
Tel: (202) 775-5900
TPaterson@afscme.org
MBlumin@afscme.org

*Attorneys for Plaintiff American
Federation of State County and
Municipal Employees (AFSCME)*

Rushab Sanghvi
AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES
80 F Street, NW
Washington, DC 20001
Tel: (202) 639-6426
Sanghr@afge.org

*Attorneys for Plaintiff American
Federation of Government Employees
(AFGE)*

Tera M. Heintz
Cristina Sepe
Cynthia Alexander
Deputy Solicitors General
OFFICE OF THE WASHINGTON
STATE ATTORNEY GENERAL
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744
tera.heintz@atg.wa.gov
cristina.sepe@atg.wa.gov
cynthia.alexander@atg.wa.gov

*Attorneys for Plaintiff State of
Washington*

*Plaintiff-Appellee Organizations are the American Federation of Government Employees, AFL-CIO, American Federation of State County and Municipal Employees, AFL-CIO, AFGE Local 2110, American Federation of Government Employees Local 1216, United Nurses Associations of California/Union of Health Care Professionals, AFSCME, AFL-CIO, American Public Health Association, Association of Flight Attendants-CWA, AFL-CIO, American Geophysical Union, Point Blue Conservation Science, Climate Resilient Communities, Main Street Alliance, Common Defense Civic Engagement, Coalition to Protect Americas National Parks, Western Watersheds Project, Vote Vets Action Fund Inc.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................... ii

INTRODUCTION AND SUMMARY OF ARGUMENT ............................... 1

STATEMENT OF JURISDICTION .............................................................. 5

STATEMENT OF THE ISSUE ..................................................................... 5

STATEMENT OF THE CASE ...................................................................... 6

    A.    Statutory and Factual Background ................................................. 6

        1.    The Authority of Federal Agencies and OPM with Respect to Probationary Employee Terminations ..................................... 6

        2.    OPM's Unlawful Directives to Other Federal Agencies to Terminate Probationary Employees *En Masse* ............................. 8

    B.    Procedural History ..................................................................... 14

        1.    The Union Plaintiffs ............................................................ 15

        2.    The Organizational Plaintiffs ............................................... 17

        3.    The State of Washington ...................................................... 20

        4.    The February 27 Temporary Restraining Order ................... 21

        5.    The March 13 Preliminary Injunction ................................. 23

        6.    The District Court Reconsiders Its Jurisdiction Over the Union Plaintiffs' Claims ..................................................... 26

        7.    The April 18 Preliminary Injunction ................................... 26

        8.    Further District Court Proceedings ....................................... 28

STANDARD OF REVIEW ......................................................................... 29

ARGUMENT ............................................................................................. 29

  I.    These Consolidated Appeals Should Be Dismissed or Held in Abeyance Because They Are or Soon Will Be Moot. ............................................ 29

    A.    The District Court's Impending Summary Judgment Ruling Will Moot These Appeals. ................................................................. 30

    B.    This Court Could Grant No Further Effective Relief as to Either Preliminary Injunction. ............................................................. 32

        1.    There is No Live Controversy as to the April 18 Injunction .............. 33

2.   There is No Live Controversy as to the March 13 Reinstatement Order ...........................................................35

II.   Congress Did Not Remove Jurisdiction over Plaintiffs' Claims Against OPM ..............................................................37

III.   OPM's Challenge to the Organizational Plaintiffs' Standing Fails............50

IV.   OPM's Remaining Challenges to March 13 Injunction Also Fail ............57

A.   OPM's Two-Sentence Revision to the January 20 Memorandum Did Not Obviate the Need for the March 13 Injunction.................................57

B.   The March 13 Injunction Did Not Exceed the District Court's Equitable Authority...........................................................59

C.   The District Court's Balancing of Equities Was Not Clear Error...........61

CONCLUSION ....................................................................63

CERTIFICATE OF COMPLIANCE ....................................................66

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*AFGE v. OPM*,
  Case No. 25-1677, 2025 WL 914823 (9th Cir. Mar. 26, 2025) ..................25, 39

*AFGE v. Sec'y of Air Force*,
  716 F.3d 633 (D.C. Cir. 2013)..............................................................44

*AFGE v. Trump*,
  __ F.4th __, 2025 WL 1541714 (9th Cir. May 30, 2025) ..........................*passim*

*AFGE v. Trump*,
  929 F.3d 748 (D.C. Cir. 2019)..............................................................44

*Am. Fed'n of Musicians v. Paramount Pictures Corp.*,
  903 F.3d 968 (9th Cir. 2018) .......................................................29, 51

*Anderson v. City of Bessemer City, N.C.*,
  470 U.S. 564 (1985)................................................................52, 59

*Arc of California v. Douglas*,
  757 F.3d 975 (9th Cir. 2014) .......................................................29, 57

*Axon Enter., Inc. v. Fed. Trade Comm'n*,
  598 U.S. 175 (2023)................................................................43, 45

*Baird v. Bonta*,
  81 F.4th 1036 (9th Cir. 2023) .............................................................62

*Bennett v. Isagenix LLC*,
  118 F.4th 1120 (9th Cir. 2024) ....................................................29, 51

*Block v. Community Nutrition Institute*,
  467 U.S. 340 (1984)..........................................................................49

*Bogaert v. Land*,
  543 F.3d 862 (6th Cir. 2008) .......................................................33, 34

*Bowers v. Mich. Acad. of Fam. Physicians*,
    476 U.S. 667 (1986) ............................................................48, 49

*Brock v. United States*,
    64 F.3d 1421 (9th Cir. 1995) ...............................................42

*Brown v. Plata*,
    563 U.S. 493 (2011) ..............................................................62

*Carr v. Saul*,
    593 U.S. 83 (2021) ................................................................45

*Chamber of Commerce v. United States Dep't of Energy*,
    627 F.2d 289 (D.C. Cir. 1980) ............................................31

*City & Cnty. of S.F. v. U.S. Citizenship & Immigr. Servs.*,
    944 F.3d 773 (9th Cir. 2019) ...............................................53

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ...............................................25, 51, 53

*Colorado River Water Conservation Dist. v. United States*,
    424 U.S. 800 (1976) ..............................................................37

*County of Los Angeles v. Davis*,
    440 U.S. 625 (1979) ..............................................................57

*Covington v. Jefferson County*,
    358 F.3d 626 (9th Cir. 2004) ...............................................55

*Dep't of Commerce v. New York*,
    588 U.S. 752 (2019) ..............................................................42

*Deutsche Bank Nat. Tr. Co. v. FDIC*,
    744 F.3d 1124 (9th Cir. 2014) .............................................31

*Doe v. Horne*,
    115 F.4th 1083 (9th Cir. 2024) ...........................................52

*Doe v. Trump*,
    284 F.Supp.3d 1182 (W.D. Wash. 2018) ...........................52

*Driftless Area Land Conservancy v. Valcq*,
    16 F.4th 508 (7th Cir. 2021) ...............................................................60

*E. Bay Sanctuary Covenant v. Biden*,
    993 F.3d 640 (9th Cir. 2021) .....................................................46, 56

*Elgin v. Dep't of the Treasury*,
    567 U.S. 1 (2012)............................................................37, 42, 44

*Epic Sys. Corp. v. Lewis*,
    584 U.S. 497 (2018)...........................................................................41

*Feds for Med. Freedom v. Biden*,
    63 F.4th 366 (5th Cir. 2023) (en banc) ...........................................43

*Fellowship of Christian Athletes v. San Jose Unified School Dist. Bd.*
    *of Ed.*,
    82 F.4th 664 (9th Cir. 2023) (en banc) ...........................................55

*Fikre v. Federal Bureau of Investigation*,
    904 F.3d 1033 (9th Cir. 2018) ...........................................33, 56, 57, 58

*Food & Drug Admin. v. Alliance for Hippocratic Medicine*,
    602 U.S. 367 (2024)..........................................................53, 55, 56

*Foster v. Carson*,
    347 F.3d 742 (9th Cir. 2003) ...........................................................36

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
    561 U.S. 477 (2010)...................................................................42, 45

*Friends of the Earth, Inc. v. Bergland*,
    576 F.2d 1377 (9th Cir. 1978) ........................................................33

*Grundman v. Trump*,
    Case No. 25-5165 (D.C. Cir. 2025) (per curiam) ...........................46

*Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*,
    527 U.S. 308 (1999)..............................................................5, 30, 59

*Harris v. Bd. of Supervisors*,
    366 F.3d 754 (9th Cir. 2004) ...............................................................55

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982)............................................................................55

*Hecht Co. v. Bowles*,
    321 U.S. 321 (1944)............................................................................60

*Hunt v. Imperial Merchant Servs., Inc.*,
    560 F.3d 1137 (9th Cir. 2009) .....................................................31, 32

*Jane Doe 1 v. Nielsen*,
    357 F.Supp.3d 972 (N.D. Cal. 2018).................................................60

*Karnoski v. Trump*,
    926 F.3d 1180 (9th Cir. 2019) ...........................................................28

*Lamb-Weston, Inc. v. McCain Foods, Ltd.*,
    941 F.2d 970 (9th Cir. 1991) .............................................................59

*Loper Bright Enter. v. Raimondo*,
    603 U.S. 369 (2024).....................................................................42, 49

*Lopez v. Griswold*,
    2023 WL 1960802 (10th Cir. 2023) ...................................................31

*M.R. v. Dreyfus*,
    697 F.3d 706 (9th Cir. 2012) .............................................................29

*Mariano v. United States*,
    529 F.3d 1243 (9th Cir. 2008) ...........................................................42

*Mims v. Arrow Fin. Servs., LLC*,
    565 U.S. 368 (2012)............................................................................37

*Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown*,
    567 F.3d 521 (9th Cir. 2009) ...............................................5, 50, 56

*NTEU and Dep't of Treasury, IRS*,
    60 F.L.R.A. 783 (2005).......................................................................41

*Nw. Env't Def. Ctr. v. Bonneville Power Admin.*,
   477 F.3d 668 (9th Cir. 2007) ......................................................60, 61

*OPM v. AFGE*,
   No. 24A904, 2025 WL 1035208 (U.S. Apr. 8, 2025) ....................25, 35, 51, 52

*Planned Parenthood Ariz. Inc. v. Betlach*,
   727 F.3d 960 (9th Cir. 2013) ..............................................30

*S. Utah Wilderness All. v. Smith*,
   110 F.3d 724 (10th Cir. 1997) ..............................................31

*Sackett v. EPA*,
   566 U.S. 120 (2012)..........................................................48, 49

*San Diego County Credit Union v. Citizens Equity-First Credit Union*,
   65 F.4th 1012 (9th Cir. 2023) ..............................................53

*Shell Offshore Inc. v. Greenpeace, Inc.*,
   815 F.3d 623 (9th Cir. 2016) ............................................32, 33, 36

*Sierra Club v. Trump*,
   963 F.3d 874 (9th Cir. 2020) ..............................................37, 52

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*,
   600 U.S. 181 (2023)..........................................................53

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014)..........................................................53

*Thunder Basin Coal Co. v. Reich*,
   510 U.S. 200 (1994)................................................*passim*

*Townley v. Miller*,
   722 F.3d 1128 (9th Cir. 2013) ..............................................50, 51

*Trump v. Wilcox*,
   145 S. Ct. 1415 (2025) ..............................................46

*U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*,
  578 U.S. 590 (2016)..................................................................42, 49

*U.S. Philips Corp. v. KBC Bank N.V.*,
  590 F.3d 1091 (9th Cir. 2011) .................................................30

*United States v. Fausto*,
  484 U.S. 439 (1988)...........................................................*passim*

*United States v. Oakland Cannabis Buyers' Coop.*,
  532 U.S. 483 (2001)..................................................................60

*Veit v. Heckler*,
  746 F.2d 508 (9th Cir. 1984) ...................................................42

*Warth v. Seldin*,
  422 U.S. 490 (1975)..................................................................53

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*,
  586 U.S. 9 (2018).....................................................................42

**Federal Statutes**

5 U.S.C.
  §§ 101-105 ...............................................................................15
  §§ 701-706 ...............................................................................41
  § 702 ...................................................................................36, 48
  §§ 1101-1105 ..............................................................................6
  § 1103 .............................................................................6, 41, 48
  § 1105 .............................................................................6, 41, 48
  § 2101 ........................................................................................6
  § 3101 ........................................................................................6
  § 3502 ........................................................................................8
  § 4304 ........................................................................................6
  § 4305 ........................................................................................6
  § 7103 ......................................................................................41
  § 7105 ......................................................................................39
  § 7117 ................................................................................39, 41
  § 7118 ................................................................................39, 41
  § 7123 ......................................................................................41

§ 7134 .................................................................................. 41
§ 7511 .................................................................................... 7
§ 7512 ..................................................................... 7, 39, 40
§ 7513 .......................................................................... 7, 39
§ 7514 .................................................................................... 6
§ 7701 .................................................................................. 40
§ 7703 .................................................................................. 40

26 U.S.C.
§ 7803 .................................................................................... 6
§ 7804 .................................................................................... 6

28 U.S.C.
§ 1292 .................................................................................... 5
§ 1331 ..................................................................... 5, 36, 37

42 U.S.C.
§ 7231 .................................................................................... 6

**Other Authorities**

5 C.F.R. Part 351 ................................................................... 8

5 C.F.R. § 315.803 ........................................................... 7, 11

5 C.F.R. § 315.804 ................................................................. 8

5 C.F.R. § 315.806 ............................................................... 10

5 C.F.R. § 316.304 ................................................................. 8

5 C.F.R. § 351.402 ................................................................. 8

5 C.F.R. § 351.501 ................................................................. 8

5 C.F.R. § 351.503 ................................................................. 8

5 C.F.R. § 351.801 ................................................................. 8

5 C.F.R. § 1201.27 ............................................................... 40

## INTRODUCTION AND SUMMARY OF ARGUMENT

A coalition of Plaintiff-Appellees, including labor unions, non-profit organizations, and the State of Washington, brought this case to challenge unprecedented conduct by Defendant-Appellants Office of Personnel Management and its Acting Director Charles Ezell (collectively "OPM"): In early February 2025, despite the absence of any statutory authority to do so, OPM directed other federal agencies to terminate their probationary employees *en masse* on the pretextual ground that those terminations were based on performance. Without notice or warning, OPM directed agencies to terminate these employees as a means to thin the ranks of the federal government workforce, by targeting those employees OPM believed had the weakest appeal rights. The abrupt termination of tens of thousands of probationary employees—which included anyone newly hired, promoted, or transferred—harmed services and functions throughout agencies and across the government. As the district court correctly concluded, a "mountain of … evidence" (1-ER-39) supports the conclusion that these terminations were made at OPM's direction, not independent actions of each agency, and as such, these actions exceeded OPM's statutory authority and violated the Administrative Procedure Act ("APA").

Based on these findings, the district court entered two preliminary injunctions: a March 13 order requiring the reinstatement of the unlawfully terminated employees at six federal agencies—the Departments of Agriculture, Defense, Energy, Interior, Treasury, and Veterans Affairs (1-ER-95)—for which the

-1-

Court found the strongest evidence of imminent harm caused by OPM's directive, and then, after that injunction was stayed by the Supreme Court, an April 18 injunction requiring the government to notify employees who had been terminated on the false pretext of performance that their terminations were not in fact based on deficient performance or fitness, thereby correcting the inaccurate documents that could otherwise impair employees' future employment prospects. The successive injunctions were granted to two different sets of Plaintiffs: the first to a group of veterans, conservation, science, labor, and small business organizations ("Organizational Plaintiffs") and the second to unions representing impacted federal employees ("Union Plaintiffs").

This consolidated appeal challenges both injunctions on narrow, primarily jurisdictional grounds. It bears emphasis at the outset just how many of the district court's rulings OPM has declined to challenge. OPM has never disputed, here or in the district court, that it lacks any authority to direct other agencies to terminate their probationary employees—much less to direct them to do so on the pretext of deficient performance. 3-ER-386; 2-SER-433–435. OPM also does not dispute the district court's factual findings, based on the record before it, that it in fact directed such terminations, exceeding its statutory authority in violation of both the constitutional separation of powers and the APA. Nor does OPM dispute that the Union Plaintiffs have Article III standing, nor that the April 18 injunction entered on their behalf requiring the correction of employees' false termination records was

-2-

based on an appropriate assessment of irreparable harm and the balance of the equities.  Supp. Brief at 12-22.

Instead, the only arguments raised by OPM are (1) that the district court lacked subject-matter jurisdiction to issue either preliminary injunction because any claim that touches on federal employment is precluded by the administrative schemes created by the Civil Service Reform Act of 1978 ("CSRA") and the Federal Service Labor-Management Relations Statute ("FSL-MRS"); (2) that the Organizational Plaintiffs lack standing; and (3) that the long-stayed reinstatement injunction exceeded the district court's equitable authority and otherwise failed to balance the equities appropriately.  Opening Brief at 17-37;[1] Supp. Brief at 12-22.

As an initial matter, there is every reason to believe that shortly after these appeals are argued and ready for resolution by this Court, these appeals will be mooted by a final district court ruling on the merits of the underlying claims. Therefore, to conserve this Court's resources and avoid entering a purely advisory decision, this Court should stay its hand or dismiss the appeal on prudential mootness grounds.  Even as OPM asks this Court to entertain its challenges to the district court's preliminary orders, the parties are pursuing cross-motions for summary judgment based on the administrative record on the underlying *ultra vires* and APA claims.  Those cross-motions are set for hearing on August 28, just nine days after this Court is scheduled to hear oral argument on these appeals.  Once the

---

[1] All citations to the "Opening Brief" are to the version filed on May 28 with citations to the consolidated Excerpts of Record.

district court rules on the cross-motions—and the district court had ruled swiftly throughout the litigation—these appeals will be moot. *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 314 (1999) (the grant or denial of a permanent injunction generally moots any appeal from a preliminary injunction).

Even aside from this impending summary judgment ruling, it is far from clear that this Court still has jurisdiction to decide either appeal. OPM acknowledges that the corrective notices required by the April 18 injunction have already been sent, an act that cannot be undone. As for the March 13 injunction requiring reinstatement, that injunction has been stayed for more than two months, and—however justified that injunction was on the record then before the district court—the district court has since made clear that it will not grant such relief again. 1-ER-24.

If this Court were nonetheless to reach the merits of these appeals, the district court should be affirmed. OPM's primary argument—that the district court lacked subject-matter jurisdiction because all of Plaintiffs' claims are "channeled" into the CSRA's statutory scheme—is foreclosed by this Court's recent published decision in *AFGE v. Trump*, __ F.4th __, 2025 WL 1541714 (9th Cir. May 30, 2025). As this Court just concluded, Congress did not impliedly remove federal court jurisdiction to hear claims challenging the legality of government-wide actions (including by OPM) that cannot be heard by the administrative agencies Congress created to adjudicate different claims. With that issue resolved, and

because OPM concedes the Union Plaintiffs have standing, there is no need for this Court to reach OPM's fallback arguments regarding the Organizational Plaintiffs' standing.  It is settled law that "in an injunctive case this court need not address standing of each plaintiff if it concludes that one plaintiff has standing." *Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown*, 567 F.3d 521, 523 (9th Cir. 2009).  Likewise, because OPM makes no argument as to whether the Union Plaintiffs are irreparably harmed or whether the balance of equities favors them, there is no need for this Court to evaluate whether the harms and equities associated with the Organizational Plaintiffs still support the long-stayed March 13 injunction.  Even so, if the Court were to reach those unnecessary issues, the record evidence—largely ignored in OPM's briefing—decisively supports affirmance on both standing and irreparable injury.

## STATEMENT OF JURISDICTION

As discussed further below, *see infra* at 34-50, the district court has jurisdiction over Plaintiffs' constitutional and APA claims pursuant to 28 U.S.C. §1331.  Plaintiffs agree with OPM that this Court has appellate jurisdiction pursuant to 28 U.S.C. §1292(a)(1).

## STATEMENT OF THE ISSUE

Whether OPM's appeals from the district court's preliminary injunctions should be dismissed as constitutionally or prudentially moot, and, if not, whether the district court abused its discretion in granting preliminary relief.

## STATEMENT OF THE CASE

**A.    Statutory and Factual Background**

1.    The Authority of Federal Agencies and OPM with Respect to Probationary Employee Terminations

Federal executive agencies are creatures of statute.  Pursuant to the agencies' authorizing statutes, agency heads exercise the exclusive power to manage the agencies and agency staff, including by hiring and firing employees consistent with applicable laws.  *See generally* 2-ER-278–280 and statutes cited.[2]

OPM, by contrast, merely provides human resources support and assistance to other federal agencies.[3]  Also created by statute, OPM's authority includes creating and publishing government-wide rules for the federal civil service, in compliance with the CSRA and APA.  2-ER-280 (citing 5 U.S.C. §§1103, 1105).  With respect to the hiring and firing of employees of other executive agencies, Congress has limited OPM's authority to providing technical assistance and writing regulations.  *Id.* (citing 5 U.S.C. §§4304, 4305, 7514).

The authority of federal agencies with respect to their employment practices is itself limited by the CSRA, which establishes uniform standards for agencies and civil service employment across the government.  2-ER-280 (citing 5 U.S.C. §2101 (defining "civil service"); §2015 (defining "employee")).  However, probationary

---

[2] *See* 5 U.S.C. §3101 ("General authority to employ"); *see also, e.g.*, 26 U.S.C. §§7803, 7804 (authority of Commissioner of Internal Revenue to employ and manage IRS workforce); 42 U.S.C. §7231 (authority of Secretary of Energy to appoint and fix compensation of Energy Department employees).

[3] *See* 5 U.S.C. §§1101-1105 (OPM creation and authorities).

employees—those in their first year of employment in the "competitive" service, and those serving a trial period of up to two years in the "excepted" service (which includes seasoned federal workers who have recently transferred or been promoted to a new position, *see* 1-ER-17)—have more limited rights with respect to their government employment than other employees in other civil service categories. Of particular importance here, probationary employees, unlike employees who have completed their probationary period, do not automatically have the right to appeal their terminations. *See* 5 U.S.C. §7511(a)(1) (excluding probationary employees from the definition of "employee" entitled to appeal adverse employment action to the Merit Systems Protection Board (MSPB)); §7512 (setting forth reviewable adverse actions); §7513 (limiting appeal rights to "employees").

To be sure, the OPM regulations in effect at the time of the mass termination of probationary employees directed agencies to "utilize the probationary period as fully as possible to determine the fitness of the employee and … terminate his or her services during this period if the employee fails to demonstrate fully his or her qualifications for continued employment." 5 C.F.R. §315.803(a). That authority, however, is constrained by other regulatory provisions. An agency may lawfully terminate a probationary employee based on its assessment of the employee's performance or conduct during the probationary period, but must give a written notice explaining the reasons for termination:

> [W]hen an agency decides to terminate an employee serving a probationary or trial period because his work performance or conduct during this period fails to demonstrate his fitness or his qualifications

-7-

for continued employment, it shall terminate his services by notifying him in writing as to why he is being separated and the effective date of the action. *The information in the notice as to why the employee is being terminated shall, as a minimum, consist of the agency's conclusions as to the inadequacies of his performance or conduct.*

5 C.F.R. §315.804(a) (emphasis added); *see also* 5 C.F.R. §316.304 (same notice rights for trial-period employees in the excepted service).[4]

    2.    <u>OPM's Unlawful Directives to Other Federal Agencies to Terminate Probationary Employees *En Masse*</u>[5]

Before January 20, 2025, OPM had never presumed to direct other agencies to terminate their employees. 2-ER-284. On the first day of the new presidential administration, however, OPM Acting Director Charles Ezell issued a memo to all

---

[4] Probationary employees may also be terminated as part of legitimate reductions-in-force ("RIFs"), actions by which agencies eliminate positions rather than terminate specific employees, when carried out in compliance with applicable statutes and regulations. *See* 2-ER-282–284; 5 U.S.C. §3502(a)(1), (3); 5 C.F.R. Part 351. Per OPM regulations regarding RIF procedures and retention preferences, RIFs are not conducted based on agency-wide seniority, and there is no provision that all probationary employees are terminated before all career employees. *See generally* 5 C.F.R. Part 351. Rather, in a RIF, the agency must determine "competitive areas" where employees compete for retention rights, determine the order of retention, and apply veterans' preferences. 5 C.F.R. §§351.402, 351.501. Further, all federal service, including service in previous positions, counts toward an employee's retention status. 5 C.F.R. §351.503. Finally, an agency must give affected employees at least 60 days' notice before termination, or at least 30 days' notice when the RIF is caused by circumstances that were not reasonably foreseeable. 5 C.F.R. §351.801(a), (b). OPM has never argued that the probationary employee terminations at issue in this case were conducted pursuant to a RIF.

[5] This account is drawn from the factual record before the district court on the TRO and PI motions. On May 9, after the court had issued the two preliminary injunctions challenged here, OPM filed an administrative record to facilitate review of the APA and *ultra vires* claims. 3-ER-545.

-8-

federal agency heads directing agencies to submit reports to OPM four days later, by January 24, identifying all of their probationary employees, and to "promptly determine whether these employees should be retained at the agency." 2-ER-285.

Shortly thereafter, OPM implemented its directive to other agencies to carry out the mass termination of their probationary employees. *See generally* 2-ER-285–290. In a February 12 email to agency heads, OPM directed agencies to "action those you know you wish to separate from by the end of the day tomorrow, 2/13/2025 [*sic*]," using an attached template termination notice, and, "[a]fter actioning," to report to OPM which probationary employees had been terminated and to "provide an explanation of why" the agency planned to keep any probationary employees. 2-ER-246. OPM also explained that "[e]mployees do not need to have received any particular performance rating previously to be separated," and advised agencies: "While you must provide notice of performance deficiencies in the notice [to the employee], … [u]ntil the probationary period has been completed, a probationer has the burden to demonstrate why it is in the public interest for the Government to finalize an appointment to the civil service for this particular individual." 2-ER-246–247.

The template termination notice that OPM supplied to the agencies stated uniformly that probationary employees were being fired for performance reasons:

> The Agency finds, based on your performance, that you have not demonstrated that your further employment at the Agency would be in the public interest. For this reason, the Agency informs you that the Agency is removing you from your position of [TITLE] with the

-9-

> Agency and the federal civil service effective [insert date and time, if
> necessary].

2-SER-460–461 (brackets in original). Misleadingly, the template notice further

stated that an employee "may have a right to file an appeal" with the MSPB "on

the limited grounds set forth in 5 C.F.R. §315.806." *Id.* That regulation, however,

allows probationary employees to appeal only when terminated for partisan

political reasons or based on marital status, or in limited situations when an

employee is fired based on conditions that predated the person's federal

employment, *see* 5 C.F.R. §315.806, *not* when an employee is terminated for

performance.

On February 14, OPM directed agency Chief Human Capital Officers

("CHCOs") to complete the "actioning" of probationary employees in their

agencies:

> We have asked that you separate probationary employees that you
> have not identified as mission-critical no later than end of the day
> Monday, 2/17. We have attached a template letter….

2-ER-238–239. OPM used the same template letter stating all terminations

were for performance. *Id.*; *see also* 2-SER-460–461. In that February 14

email, OPM also defined "performance" as follows:

> An employee's performance must be viewed through the current
> needs and best interests of government, in light of the President's
> directive to dramatically reduce the size of the federal workforce.

> Through the exemptions process, agencies have identified the highest-
> performing probationers in mission critical areas…

<center>-10-</center>

> OPM believes "qualifications for continued employment" [5 C.F.R. §315.803] in the current context *means that only the highest-performing probationers in mission critical areas should be retained*.

2-ER-238–239 (emphasis added). The CHCOs were then directed, "[a]fter actioning," to report back to OPM on a daily basis with updated lists of their terminated probationary employees. 2-ER-239.

OPM also created and enforced a process by which agencies could request and be granted exemptions to the requirement that they fire all probationary employees other than those deemed "mission critical." 1-ER-3. Thus, between January 20 and February 14, many agencies asked OPM if they could protect certain of their probationary employees from summary termination, and OPM decided whether to grant those "exemptions." 2-ER-238, 2-ER-246 (referencing "exemptions process"); 2-SER-254–258; 1-SER-68–69.

OPM largely defended below by claiming that it had provided only "guidance" to agencies. *See, e.g.*, 3-ER-386–87; 2-SER-434. Despite that claim, agency officials throughout the government told employees, the public, and even Congress that, in fact, OPM had directed the agencies summarily to terminate their probationary employees, using employee performance as a pretext. 2-ER-290–294.

For example, a U.S. Forest Service briefing paper dated February 13, 2025 and entitled "Probationary and Trial Period Off-Boarding Procedures" reported: "All federal agencies were notified by the Office of Personnel Management (OPM) to terminate all employees who have not completed their probationary or trial

-11-

period." 3-SER-481. Forest Service supervisors were advised to tell employees that "OPM directed agencies to separate Probationary employees starting 2/13/25." *Id.*; *see also* 2-ER-294. Termination letters sent to employees of other agencies similarly stated that OPM directed the firings. *See, e.g.*, 2-ER-294 (Defense Department; Bonneville Power Administration).

Several CHCOs in various agencies likewise admitted that probationary employees were terminated at OPM's direction. Despite the National Science Foundation ("NSF")'s request to OPM to retain all of its probationary employees, its CHCO told employees that the agency was "directed by the administration to remove all term probationary employees," and that "this is not a decision the agency made. This is a direction we received …." 2-ER-292–294; 4-SER-902, 909, 924–925, 928; *see also* 4-SER-884. The IRS CHCO similarly told employees that OPM "directed" the mass terminations and that "the letters that your colleagues received yesterday were letters that were written by OPM, put forth through Treasury, and given to us." 2-ER-294; 2-SER-441–444. In Congressional testimony, the VA CHCO admitted the agency terminated its probationary employees under "direction from [OPM]." 2-ER-294; 4-SER-726, 737.

As Plaintiffs thoroughly documented before the district court, probationers were notified that they were terminated for performance, with no statement of specific reasons (4-SR-856–859, 864–865 ("The Agency finds, based on your performance, that you have not demonstrated that your further employment at the Agency would be in the public interest"); 4-SER-903, 936–937 (same); 4-SER-

-12-

884, 897–898 (same); *see also, e.g.*, 4-SER-992; 4-SER-868–869; 4-SER-878–879; 4-SER-940–941, 945–946; 3-SER-542–543, and in many instances, in spite of those employees' outstanding work records and performance reviews. 2-ER-295–297; 4-SER-882–883, 888–894 (outstanding rating and performance review stating "Tom excelled in his first year"); 4-SER-901, 906 (described as "outstanding" in review)); 4-SER-872–873; 4-SER-942–943; 4-SER-958; 3-SER-542.

Neither OPM nor the federal agencies publicly announced these terminations. Nor did they warn or even inform employees' labor representatives. *See, e.g.*, 4-SER-856, 868–869, 940–941. Notwithstanding the speed with which the facts developed and lack of public information, Plaintiffs nonetheless marshalled a record replete with serious and detrimental effects upon government agencies and services that resulted from OPM's mass termination program.

Because probationary employees serve throughout the government at every level, their mass termination left arbitrary gaps in staffing that impaired all manner of government services. To take just a few examples, all of the Centers for Disease Control ("CDC") employees with a certain cybersecurity credential were fired, endangering data security. 4-SER-943. The mass termination hit many employees of the Federal Aviation Administration ("FAA") who are responsible for making and enforcing aviation safety regulations, creating "unnecessary risk and stress that detracts from the mission of safe flight for civil and military operations." 3-SER-571–572; 4-SER-991–997. And the loss of probationary employees at the VA immediately interfered with services including the Veterans Crisis Line's ability to

operate a hotline for emergency healthcare (including suicide prevention), "mental health research, cancer treatment, addiction recovery, prosthetics, and burn bit exposure studies," transportation services, and other administrative services that facilitate veterans' access to treatment.  4-SER-846–848; 876–879, 854–859, 1002–1004.

Likewise, the decimation of probationary employees at federal science agencies including National Oceanic and Atmospheric Administration ("NOAA"), the National Institutes of Health ("NIH"), and the CDC immediately threatened conservation work; fisheries, water, floodplain, and fire management; and local public health work.  3-SER-471, 485–491, 493–498, 500–502, 504–508, 540–543, 549–551, 553–560, 563–569, 590–591, 593–596, 601–606; 4-SER-794–796, 881– 886, 954–959.  Plaintiffs with long experience in environmental conservation documented the likely widespread damage to fragile ecosystems and species on national parks and other public lands that would result from the haphazard termination of probationary employees across agencies such as the Park Service and Fish & Wildlife Service.  3-SER-549–551, 590–591, 601–606, 608–609; 4- SER-794–796, 798–799, 948–952, 961–963, 969–970.

## B.    Procedural History

As soon as reports of these actions began to emerge via employees and the media, on February 19, 2025, AFGE, AFSCME, and several of their affiliates ("Union Plaintiffs") filed this action, alleging that OPM had acted *ultra vires* and violated the APA by directing other agencies to terminate their probationary

employees *en masse* for performance-based reasons that were pretextual. 3-ER-511–512. On February 23, Plaintiffs filed a First Amended Complaint, adding as plaintiffs five nonprofit organizations, and simultaneously moved for a temporary restraining order ("TRO") and preliminary injunction. 3-ER-449–482. Plaintiffs filed a Second Amended Complaint ("SAC") on March 11, adding four more nonprofits, one private-sector union, and the State of Washington as plaintiffs, and naming numerous federal departments and agencies as relief defendants under Fed. R. Civ. P. 19. 2-ER-262–326.[6]

1.    The Union Plaintiffs

Plaintiff AFGE represents about 800,000 federal civilian employees throughout the United States across federal agencies. 2-ER-266, 4-SER-955, 2-SER-398–399.[7] Plaintiffs AFGE Local 2110 and AFGE Local 1216 are AFGE affiliates representing VA employees in northern California. 2-ER-267. Plaintiff AFSCME represents federal employees in several agencies including the FAA, the Department of Agriculture, and the VA (along with many public state and local

---

[6] In their motion for leave to file the SAC, Plaintiffs also moved to join the new plaintiffs to the application for interim relief and file supplemental declarations. 3-SER-637–647. The district court granted leave to file the SAC and found no prejudice to OPM in joining the additional plaintiffs. 2-SER-459. OPM did not object to the filing of supplemental declarations. *See* 3-SER-625–635.

[7] Plaintiffs generally use "agencies" as defined in the U.S. Code to include both the Cabinet-level Departments and independent federal agencies. *See* 5 U.S.C. §§101-105. Plaintiffs use the more specific "Federal Agency Defendants" when referring to the specific agencies named as Rule 19 Defendants in Plaintiffs' SAC.

government employees, and employees in the private sector). 2-ER-266–267. Plaintiff United Nurses Association of California/United Health Care Professionals is an AFSCME affiliate representing VA employees in southern California. 2-ER-267.

Probationary employees who were members of the Union Plaintiffs were terminated in the February mass terminations. 4-SER-856, 868–869, 881–884, 900–903, 954–956, 992, 1002. Those employees faced not only immediate termination but also the loss of their health benefits, new job searches, moving expenses, and other hardships. 4-SER-858–862, 872–873, 885, 903, 941–943, 957–958, 994–996, 1002–1003; *see also* 4-SER-958 (noting sizable percentage of AFGE members who are veterans and will suffer from impairment of VA services). Further, those workers faced reputational harm that was likely to impair their ability to find other work because OPM's unlawful termination scheme saddled them with firings that were falsely predicated on their own performance. 4-SER-856–859, 942–943, 992–994; 1-ER-39–40, 51–52; *see also* 3-SER-715; 1-ER-91–92.

Take the example of an AFGE member and scientist who worked as a Program Director and group lead for the Division of Earth Sciences Instrumentation and Facilities Program at NSF. 4-SER-899–904. "In a February 13 performance review—*five days* before he was purportedly terminated '*based on [his] performance*'—[this individual's] supervisor reported in a performance review" that his work had been "outstanding." 1-ER-35 (citing 4-SER-932). The

-16-

same fate befell a Physical Science Information Specialist for the Forest Service whose most recent performance review gave her "the highest mark possible in every category" before she, too, received OPM's template termination letter. 1-ER-34 (citing 3-SER-470–471); *see also supra* at 12-13.

These were not isolated incidents. As one union official explained, many terminated probationary employees were "distressed that because the termination emails cite their performance as the reason for termination with no justification, their future job prospects will be diminished." 4-SER-942–943. Many of these probationary employees had moved across the country or declined more lucrative opportunities in the private sector to pursue federal service. *Id.*; *see also* 4-SER-995. The unlawful mass terminations left them not only without job security, but without the health insurance upon which they depended. 4-SER-942, 994. The Union Plaintiffs also suffered harm to their own core activities of providing representation services to federal employees in the bargaining units the unions represent. 4-SER-955–957, 994, 1002–1004; *see also* 4-SER-855–862, 868–873. The unlawful mass terminations overloaded union staff with queries and demands for representation, undermining the Union Plaintiffs' ability to effectively assist those and other members. 4-SER-856–858, 869–872, 954–957, 994, 1003.

## 2. The Organizational Plaintiffs

The Organizational Plaintiffs include small business, environmental, labor, and scientific and public health organizations. These plaintiffs documented actual and imminent harms they faced as a result of the mass termination of probationary

-17-

employees.  Based on the record assembled by Plaintiffs, the district court found that the "*en masse* termination of probationary employees … ha[d] sown significant chaos," compromising the core missions of and services provided by the Organizational Plaintiffs and causing injuries to their members who rely on the federal government for important services.  3-ER-383, 391-99.

For example, VoteVets and Common Defense, both membership organizations of veterans, faced imminent harm from the degradation of services provided through the VA, including the Veterans Crisis Line and other important research supporting veterans' mental and physical health.  *See supra* at 13-14; 2-ER-301–302; 4-SER-846–847, 877.  The Western Watersheds Project and the Coalition to Protect America's National Parks, membership organizations dedicated to public lands conservation activities, documented the harms they were already suffering, and likely to suffer, to their environmental conservation work and their members' use and enjoyment of national parks and other public lands, including by compromising law enforcement, structural and wildland fire fighting, search and rescue, and degrading habitats and services to the public.  *See supra* at 14; 2-ER-300–301; 3-SER-601–606, 608–609; 4-SER-798–799, 948–951, 961–962, 969–970.

The Main Street Alliance, a membership organization of small businesses, showed that its members would suffer from delays in access to services from the Small Business Administration, including disaster relief and loan guarantees, and

grants from the Department of Agriculture. 2-ER-299–300; 3-ER-623–624; 4-SER-982–984.

Point Blue Conservation Science, an environmental conservation organization, and Climate Resilient Communities, an environmental justice group, showed how the loss of probationary employees was already impairing their ongoing work as staff cuts in grant administration resulted in the failure to approve projects and to process payment for work performed, compromising these organizations' missions of improving forestry, agriculture, and wildlife management and mitigating the impacts of pollution on public health. 2-ER-304–05; 3-SER-500–502, 590–591. The American Geophysical Union and American Public Health Association, membership organizations in the sciences and public health, documented the harms their members were suffering to their ongoing work, which relies on robust partnerships with multiple federal science agencies. *See* 2-ER-302–304; 3-SER-494–498, 593–596.

The Association of Flight Attendants-CWA, AFL-CIO, a private sector labor union, showed how the mass termination of FAA employees threatened to impair critical aviation safety functions on which its members rely, such as "repairing air traffic control facilities" and "updating digital maps for pilots," introducing "unnecessary risk and stress that distracts from the mission of safe flight for civil and military operations." *Supra* at 13; 2-ER-303; 4-SER-993–996; *see also* 3-SER-571–572.

-19-

3.    <u>The State of Washington</u>

Washington supplemented this record with further evidence of the actual and imminent harms inflicted by OPM's mass termination of probationary employees. Those harms reached broadly into Washington's environmental and economic interests, because Washington relies heavily on its robust relationships with many federal agencies.  2-ER-305–06.

Washington's Department of Ecology, which depends on its federal partners to protect Washington citizens and infrastructure from flood risk, manage water resources throughout the state, protect state coastal resources, manage millions of acres of national forest, maintain and restore ecological forest health, protect wetlands, and address drought conditions, would be impaired by the loss of employees at agencies including NOAA, FEMA, the National Park Service, the Fish & Wildlife Service, the Bureau of Reclamation, and others.  *See* 3-SER-485–491, 504–508, 521–530, 532–538, 553–561, 563–569.

Cuts to NOAA staff, for example, were already disrupting the State's important environmental and economic interests.  Washington's Ocean Acidification Program ("OAP") conducts research, monitoring, coordination, and other activities designed to combat the crisis of ocean acidification.  As a result of the terminations of probationary employees at NOAA, OAP lost its Director and the Pacific Marine Environmental Laboratory lost researchers conducting critical field work.  3-SER-553–560.  Similarly, the Washington State Department of Fish and Wildlife's fisheries management activities had already been impaired because

-20-

probationary employee terminations at NOAA placed on hold projects aimed at releasing salmon from hatcheries and reintroducing salmon into the ocean and threatened important commercial fisheries.  3-SER-504–508.

The termination of probationary employees also directly caused economic damage to Washington as it confronted substantial increases in the number of unemployment benefits claims from federal employees, resulting in higher costs to the State's unemployment insurance program.  3-SER-532–538.

The district court found that the State of Washington had standing, but did not order relief on Washington's behalf because, in its view, Washington had not demonstrated irreparable harm.  1-ER-26–28; *see also* Opening Brief at 13 n.2.

>    4.    The February 27 Temporary Restraining Order

On February 23, the Union Plaintiffs and Organizational Plaintiffs named in the First Amended Complaint moved for a TRO and order to show cause why a preliminary injunction should not issue.  3-ER-411–412.  OPM opposed the motion, relying on a single declaration from Acting Director Ezell denying, as a factual matter, that OPM had directed the terminations.

On February 27, the district court held a hearing on the TRO application. The court subsequently entered a detailed written order granting a limited TRO enjoining further implementation of OPM orders to terminate probationary employees for two weeks.  Specifically, the district court ordered that "OPM's January 20 memo, February 14 email, and all other efforts by OPM to direct the termination of employees at NPS, BLM, VA, DOD, SBA, and FWS are unlawful,

invalid, and must be stopped and rescinded," and ordered OPM to give notice of the court's order to those agencies. 3-ER-402. The Court explained its choice of the six agencies as based on the strength of the initial evidence before it. 1-ER-95.

In reaching this decision, the district court ruled that the Organizational Plaintiffs had established their standing, likelihood of success on their *ultra vires* and APA claims, and imminent harm warranting a TRO. 3-ER-379–388, 391–401. Regarding likelihood of success, the district court observed that Plaintiffs had "mustered a mountain of evidence" (including "agency memos, termination letters, congressional testimony, meeting transcripts, emails, and more") that OPM had directed the mass termination of other agencies' probationary employees, rather than merely providing guidance that agencies could take or leave as they pleased. 3-ER-386; 1-ER-39. The district court therefore concluded that "[t]he weight of the evidence supports Plaintiffs' contention that OPM exceeded the bounds of its authority by unlawfully directing the mass termination of probationary employees across a wide range of federal agencies." 3-ER-386–387; *see also* 3-ER-379–383 (summarizing evidence). The court set a further preliminary injunction evidentiary hearing for March 13. 3-ER-402.

Based on an initial determination that the court likely lacked subject-matter jurisdiction over the Union Plaintiffs' claims under the channeling doctrine of *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), the district court did not grant a TRO to those plaintiffs. 3-ER-389–391. As a result, the court did not consider the Union Plaintiffs' standing or evidence of irreparable harm. 3-ER-391.

-22-

Although OPM asked the Court to preclude *all* of the plaintiffs' claims based on *Thunder Basin* doctrine, the district court found that it had jurisdiction over the claims of the Organizational Plaintiffs because their claims were so remote from "the scope of the statutory schemes created for the resolution of bargaining disputes and employee claims." 3-ER-391.

After the TRO was entered, OPM purported to comply by revising its prior January 20 Memorandum to all federal agencies—the memorandum by which Acting Director Ezell first instructed agencies to identify and submit to OPM their lists of all probationary employees within four days—to add a line stating that decisions with respect to probationary employees were for agencies to make. 2-ER-376. Notably, OPM did not rescind its re-definition of the term "performance" as used in the regulations to mean that agencies should retain only those probationers whom they deemed "mission critical." *Id.*; *see also* 2-ER-238–239. Nor did it direct federal agencies to rescind any terminations already undertaken based on OPM's prior direction to do so. *See* 2-ER-238–239.

5.      The March 13 Preliminary Injunction

Plaintiffs submitted further evidence of the scope of OPM and the agencies' actions, and further evidence of harm, in support of their request for a preliminary injunction.

In response to the evidence presented by Plaintiffs, OPM offered a smattering of internal emails and press releases, which it characterized as suggesting that the agencies had terminated their probationers of their own volition

-23-

rather than at OPM's direction, and OPM's March 4 revision to the January 20 memo it sent to other agencies.  2-ER-229–261.  Notably, OPM also withdrew its previously-filed declaration of Mr. Ezell on the stated ground that he lacked personal knowledge of its contents, and declined to produce him to testify at the hearing or for deposition.  2-SER-462–464; *see also* 2-ER-432–435.[8]  Indeed, in its written order granting the preliminary injunction, the district court observed that the evidentiary record had been created virtually exclusively by Plaintiffs, and OPM had "provided virtually no transparency."  1-ER-36.[9]

On March 13, the district court heard argument on whether to convert the TRO to a preliminary injunction, and ruled swiftly.  The Court granted a preliminary injunction to the Organizational Plaintiffs requiring terminated probationary employees in the six departments originally subject to the TRO— Agriculture, Defense, Energy, Interior, Treasury, and Veterans Affairs—to be reinstated.  1-ER-29–42.  As the district court explained, this remedy was

---

[8] OPM also attempted to vacate the preliminary injunction hearing, which the district court declined to do.  2-ER-327-345.   In support of that request, OPM provided a declaration from a different OPM official, Noah Peters, who also claimed that OPM did not direct agency action.  The district court ascribed "scant evidentiary value" to that declaration because Peters "did not claim personal knowledge as to *anything* in his declaration."  2-ER-194 (emphasis in original).

[9] *See also* 1-ER-38–39 (rejecting defendants' "press releases and a feeble start to a yet-to-come administrative record'" as "unpersuasive"); 1-ER-50 ("And the Government, I believe, has tried to frustrate the Judge's ability to get at the truth of what happened here and then set forth … a sham declaration—they withdrew it, then substitute[d] another.").

necessary "[t]o staunch the irreparable harms to [O]rganizational [P]laintiffs caused by OPM unlawfully slashing other agenc[ies'] staff." 1-ER-41.

Defendants timely appealed the March 13 preliminary injunction. 3-ER-485. Defendants sought an immediate administrative stay and stay pending of appeal from this Court, both of which were denied. *AFGE v. OPM*, Case No. 25-1677, 2025 WL 914823 (9th Cir. Mar. 26, 2025); *see also* 3-ER-527 (district court; also denying stay). In denying the stay, this Court concluded that OPM demonstrated "neither that they are sufficiently likely to succeed on the merits nor that they w[ould] suffer irreparable harm from complying with the preliminary injunction." *AFGE v. OPM*, Case No. 25-1677, 2025 WL 914823 (9th Cir. Mar. 26, 2025).

Even before this Court could rule, OPM sought a stay from the Supreme Court. On April 8, the Supreme Court stayed the injunction pending resolution of appeal and any subsequent certiorari. *See OPM v. AFGE*, No. 24A904, 2025 WL 1035208 (U.S. Apr. 8, 2025). In that order, the Court concluded: "The District Court's injunction was based solely on the allegations of the nine non-profit-organization plaintiffs in this case. But under established law, those allegations [are] presently insufficient to support the organizations' standing. *See, e.g.*, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013). This order does not address the claims of the other plaintiffs, which did not form the basis of the District Court's preliminary injunction." *Id*.

-25-

6.    The District Court Reconsiders Its Jurisdiction Over the Union
      Plaintiffs' Claims

At the March 13 preliminary injunction hearing, the district court invited

further briefing regarding the court's jurisdiction over the Union Plaintiffs' claims,

indicating that its earlier conclusion at the TRO stage that the court was likely to

hold that these claims must be channeled to the Federal Labor Relations Authority

("FLRA") and MSPB "might have been in error."  1-ER-96–97.  The district court

subsequently issued an order on March 24 reconsidering its earlier ruling and

confirming that it had jurisdiction over Union Plaintiffs' claims.  2-ER-164–174.

The court explained that all of the factors under the *Thunder Basin* channeling

analysis pointed toward allowing the Union Plaintiffs to pursue their *ultra vires*

and APA claims in federal court.  2-ER-174; *see generally* 2-ER-165–174.  The

court then issued an order to show cause why preliminary injunctive relief should

not also be granted to the Union Plaintiffs, and invited further briefing on whether

additional relief should be ordered.  2-ER-162–163.

7.    The April 18 Preliminary Injunction

The Union Plaintiffs and the State of Washington also moved for preliminary

injunctive relief.  3-ER-533.  On April 18, the district court granted a further

preliminary injunction in favor of the Union Plaintiffs.  1-ER-2–27.

The district court tailored the further relief it ordered based on developments

as of the time of its order.  The court found that its earlier order, although later

stayed by the Supreme Court, had done "much good" because after this Court's

-26-

earlier TRO (as well as a similar order issued by the District of Maryland in a different case brought by a coalition of states), many agencies had rehired their previously terminated probationary employees.  1-ER-24.  The status quo at the time of the Union Plaintiffs' injunction (April 18), according to the reports submitted by defendants, was therefore that most of the affected employees had returned to their federal employment.  Therefore, the court concluded that, "if any reinstated employees are now terminated (yet again), it will be because the agency has made the decision to do so, not because OPM has directed it.  The whole point of this lawsuit has been OPM's *ultra vires* act — not terminations made wholly by agencies themselves."  *Id.*  Plaintiffs disputed this conclusion at the time, but the court rejected Plaintiffs' arguments and declined to order any further reinstatements of probationary employees.  1-ER-24–25.

Instead, the district court found further irreparable harm flowing from the original OPM-directed terminations that still required correction.  Having found that the ostensibly performance-based terminations were a "sham," the district court recognized that unless corrected, those terminations would haunt those employees in their future careers:

> Termination under the false pretense of performance is an injury that will persist for the working life of each civil servant.  In pursuing future employment, each will have to concede that they have been terminated based on performance.  The stain created by OPM's pretense will follow each employee through their careers and will limit their professional opportunities.

1-ER-25-26.

-27-

The district court proceeded to grant further relief remedying this specific harm, ordering all of the relief Federal Agency Defendants to cease using the OPM template termination letter and to issue corrective letters to the probationary employees who had been terminated using the OPM template clarifying that their prior terminations were *not* for performance. 1-ER-27. OPM was further ordered to cease directing other agencies to terminate their employees, and the relief defendants were enjoined from following any such directives. *Id.*

Defendants did not move for a stay of the April 18 injunction from any court, instead proceeding to comply with it. *See* 2-ER-104–161. Defendants thus confirmed to the district court that by May 8 they had sent the corrective notices as required. *Id.* However, defendants also appealed the April 18 injunction. 3-ER-483.

8.    Further District Court Proceedings

While the preliminary injunctions have been pending on appeal, the district court litigation has continued. Defendants filed the administrative record on May 9. 3-ER-545. The parties agreed to, and the court approved, a briefing schedule on cross-motions for summary judgment based on the administrative record. 1-SER-57–59, 61–63. The cross-motions will be fully briefed by August 12, before this Court holds oral argument on these appeals. *Id.* The district court has set a hearing for August 28. 5-SER-1080.

-28-

## STANDARD OF REVIEW

This Court reviews the grant of a preliminary injunction for abuse of discretion. *Karnoski v. Trump*, 926 F.3d 1180, 1198 (9th Cir. 2019). "A district court abuses its discretion when its decision relies on an erroneous legal standard or clearly erroneous finding of fact." *Arc of California v. Douglas*, 757 F.3d 975, 983-84 (9th Cir. 2014). When the district court bases its decision on an erroneous legal standard, this Court reviews de novo the underlying issues of law. *Id.* But a district court's factual finding constitutes clear error only if it is "illogical, implausible, or without support in inferences that may be drawn from the facts in the record." *Id.* (quoting *M.R. v. Dreyfus*, 697 F.3d 706, 725 (9th Cir. 2012).

The Court may affirm a preliminary injunction on any ground supported by the record, *Bennett v. Isagenix LLC*, 118 F.4th 1120, 1125 (9th Cir. 2024), including grounds that the district did not consider or rejected, *Am. Fed'n of Musicians v. Paramount Pictures Corp.*, 903 F.3d 968, 981 (9th Cir. 2018).

## ARGUMENT

I. **These Consolidated Appeals Should Be Dismissed or Held in Abeyance Because They Are or Soon Will Be Moot.**

Any ruling by this Court on these appeals is likely to be overtaken by the District Court, which is set to hear arguments on August 28 on the parties' cross-motions for summary judgment on the administrative record. That summary judgment ruling will almost certainly render these appeals constitutionally moot. For that reason, this Court should either stay its hand until after the district court

-29-

issues its ruling or dismiss the appeals on prudential mootness grounds.  Even if that were not the case, moreover, factual developments have rendered it impossible for this Court to grant effective relief to the prevailing party, and the appeals should be dismissed as moot for that reason as well.

### A.    The District Court's Impending Summary Judgment Ruling Will Moot These Appeals.

The district court is poised to rule in the very near future on the parties' cross-motions for summary adjudication of the claims underlying these preliminary injunctions, and that ruling is virtually certain to render the present appeals constitutionally moot.  For that reason, this Court should either hold this appeal in abeyance to await the district court's ruling or should dismiss the appeals under the doctrine of prudential or anticipatory mootness.

Regardless of how the district court rules on these claims, its final adjudication will result in the dissolution or vacatur of the preliminary injunctions.  *See, e.g.*, *U.S. Philips Corp. v. KBC Bank N.V.*, 590 F.3d 1091, 1093 (9th Cir. 2011) (entry of final judgment immediately dissolves preliminary injunction).  If Plaintiffs prevail on summary judgment, so that these preliminary injunctions are replaced by a permanent injunction, these appeals will be moot.  *See Grupo Mexicano*, 527 U.S. at 314 ("Generally, an appeal from the grant of a preliminary injunction becomes moot when the trial court enters a permanent injunction, because the former merges into the latter."); *Planned Parenthood Ariz. Inc. v. Betlach*, 727 F.3d 960, 963 (9th Cir. 2013) ("The district court's entry of

-30-

final judgment and a permanent injunction moots Arizona's appeal of the preliminary injunction," requiring dismissal of the appeal). And if the district court rules for OPM on the merits, it will undoubtedly vacate the preliminary injunctions. In either circumstance, the preliminary injunctions would have no further force or effect.

This Court could either defer ruling on this appeal to await the district court's ruling or could dismiss the appeal on prudential or anticipatory mootness grounds. "The doctrine of prudential mootness permits a court to 'dismiss an appeal not technically moot if circumstances have changed since the beginning of litigation that forestall any occasion for meaningful relief.'" *Deutsche Bank Nat. Tr. Co. v. FDIC*, 744 F.3d 1124, 1135 (9th Cir. 2014) (quoting *Hunt v. Imperial Merchant Servs., Inc.*, 560 F.3d 1137, 1142 (9th Cir. 2009)); *see also id.* at 1138 (affirming dismissal of third-party unsecured bankruptcy claims on prudential mootness grounds, where there were insufficient funds to satisfy unsecured liabilities). "Prudential mootness addresses 'not the power to grant relief but the court's discretion in the exercise of that power.'" *S. Utah Wilderness All. v. Smith*, 110 F.3d 724, 727 (10th Cir. 1997) (quoting *Chamber of Commerce v. United States Dep't of Energy*, 627 F.2d 289, 291 (D.C. Cir. 1980)).

A case may be moot in this prudential sense, thus warranting dismissal of an appeal, when "an impending decision in the merits appeal might eliminate the controversy between the parties." *Hunt*, 560 F.3d 1137, 1142 (9th Cir. 2009). This principle applies equally to circumstances where the district court litigation has

proceeded toward a final merits ruling while a preliminary injunction is on appeal. *See, e.g.*, *Lopez v. Griswold*, 2023 WL 1960802 at *2 (10th Cir. 2023) (dismissing preliminary injunction appeal on prudential mootness grounds where the district court "plowed ahead" and was "likely to enter a final judgment" before the injunction could have any further effect).

While the Court is not *required* to dismiss an appeal that is likely to become moot in the near future, *Hunt*, 560 F.3d at 1142, this is a particularly apt case for applying the prudential mootness doctrine. The district court is poised to rule on the *ultra vires* and APA claims that underlie these preliminary injunction appeals, with a hearing set for August 28 on the parties' fully briefed cross-motions for summary adjudication on the administrative record. 1-SER-1–35; *supra* at 28. Thus, the district court is likely finally to adjudicate those claims on the merits nearly simultaneously with this Court's consideration of these appeals, and it would be a waste of judicial resources to prepare to issue a ruling on preliminary relief that will be constitutionally moot within a matter of days or weeks after oral argument.

### B.    This Court Could Grant No Further Effective Relief as to Either Preliminary Injunction.

Even if the district court's imminent action on the merits of the underlying claims were not sufficient reason for this Court to dismiss (or at the least, to refrain from deciding) these appeals, this Court's inability to grant OPM any effectual relief, even if OPM were to prevail, provides sufficient basis to dismiss the appeals

-32-

as moot. It is well established that "[w]hen events change such that the appellate court can no longer grant any effectual relief whatever to the prevailing party, any resulting opinion would be merely advisory." *Shell Offshore Inc. v. Greenpeace, Inc.*, 815 F.3d 623, 628 (9th Cir. 2016) (cleaned up). In such circumstances, the party appealing a preliminary injunction no longer has a "legally cognizable interest" in the injunction's validity and its appeal should be dismissed. *Id.*

### 1. There is No Live Controversy as to the April 18 Injunction

OPM complains that the April 18 injunction improperly "requir[ed] the federal government to notify terminated employees that their terminations were not 'performance' or fitness based." Supp. Brief at 1. Even if OPM were correct that such relief were improper (it was not, *see infra* at 57-61), that controversy is no longer live. According to OPM's own filings, the notices required by the April 18 injunction have already been sent. *See* 2-ER-104–61. No order of this Court could undo the sending of those notices. "Where … appellate courts cannot undo what has already been done, the action is moot." *Friends of the Earth, Inc. v. Bergland*, 576 F.2d 1377, 1379 (9th Cir. 1978); *see also Bogaert v. Land*, 543 F.3d 862, 863-64 (6th Cir. 2008) (dismissing an appeal as moot where defendants had already taken all "steps" required by the district court's injunction, and those actions could not be "undone.").[10]

---

[10] As addressed further below, OPM has previously argued that this case should have been mooted by its March 5 revision of the January 20 memorandum, which purported to clarify that OPM's directives were mere "guidance." *See infra*

To be sure, the April 18 injunction also ordered relief with ongoing effect; in particular, it enjoined OPM from "ordering, directing, or telling any other federal agency to terminate the employment of any federal employee or group of federal employees," and it enjoined all relief defendant agencies from complying with any such order from OPM. 1-ER-27. But OPM has consistently and explicitly disclaimed any objection to *that* relief. It has conceded, in the district court and this Court, that "OPM lacks statutory authority to direct agencies to terminate probationary employees." Opening Brief at 29; *see also id.* ("No one disputes that as a legal matter."); 3-ER-385–386. OPM cannot manufacture an active controversy as to those aspects of the April 18 order in light of the representations it has made to this Court and to the district court.

Because the only relief ordered by the April 18 injunction to which OPM objects cannot be "undone," *Bogaert*, 543 F.3d at 864, OPM's appeal from the April 18 injunction no longer presents an actual controversy and must therefore be dismissed.

---

at 57-59. Plaintiffs then argued, and the district court agreed, that OPM's revision did not moot the case, in part because that two-sentence addition to the January 20 memorandum—only one of many directives sent by OPM, *supra* at 8-14—had not "completely and irrevocably eradicate[d] the effects of the alleged violation." 2-SER-456–457 (quoting *Fikre v. Federal Bureau of Investigation*, 904 F.3d 1033, 1037 (9th Cir. 2018)). The issue here is not whether the case as a whole is moot—it is not, as Plaintiffs continue to seek permanent relief—but rather whether OPM's appeal from the preliminary order requiring the sending of specific notices became moot once those notices were sent.

### 2. There is No Live Controversy as to the March 13 Reinstatement Order

Nor is it possible for this Court to order any effectual relief with respect to the district court's original March 13 reinstatement order. The Supreme Court stayed that order more than two months ago. *OPM v. AFGE*, No. 24A904 (U.S. Apr. 8, 2025) (S. Ct. Stay Order). Even if that order were affirmed by this Court, the Supreme Court's stay would remain in effect pending final disposition on certiorari, *id.*, and, as noted above, the district court's imminent merits ruling would supersede the preliminary injunction long before the Supreme Court could entertain a petition for writ of certiorari in this appeal.

Moreover, in the meantime, the district court has concluded that the reinstatement remedy is no longer necessary. After the Supreme Court stayed the injunction with respect to the Organizational Plaintiffs, the Union Plaintiffs, and State of Washington moved for further injunctive relief that included reinstatement, including for the six agencies covered by the original injunction. When it issued its April 18 injunction, the district court denied a further reinstatement remedy, noting that although "much good" had been done by the March 14 injunction (as well as by "a separate preliminary injunction issued by a district court in Maryland"), "[t]here is much less need now for an order reinstating probationary employees than there was in March." 1-ER-24. In light of the passage of time and the effect of the injunctive relief, the district court concluded that, contrary to Plaintiffs' position, "if any reinstated employees are now terminated (yet again), it

-35-

will be because the agency has made the decision to do so, not because OPM has directed it." 1-ER-24. On that ground, it rejected Plaintiffs' requested reinstatement remedy.

The district court's factual finding that the relief it preliminarily ordered is no longer "need[ed]" extinguishes any actual controversy over the order's revival on appeal, because even if this Court were to affirm, and thereby permit the district court's reinstatement remedy, the district court has made clear it no longer views that remedy as appropriate. And if, on the other hand, this Court were to reverse, vacatur of the reinstatement order would not provide appellants with any "effectual relief." *Greenpeace*, 815 F.3d at 628.

Under the district court's fact-finding, the factual circumstances that supported the reinstatement remedy that it ordered (i.e., OPM's original unlawful termination directives) have "already come and gone," cannot be "undo[ne]," and are highly unlikely to recur in the same way that Plaintiffs challenged in this case. *Foster v. Carson*, 347 F.3d 742, 746 (9th Cir. 2003); *see also Greenpeace*, 815 F.3d at 628 (challenge to preliminary injunction moot on appeal because Shell's Arctic drilling operations ceased for foreseeable future).

Without an actual controversy, and given the unavailability of effective relief, any opinion addressing the propriety of the reinstatement order as of March 14 would be purely advisory.

-36-

## II.    Congress Did Not Remove Jurisdiction over Plaintiffs' Claims Against OPM

All Plaintiffs bring the same claims, challenging OPM's government-wide orders to federal agencies, under an express grant of federal jurisdiction, and an express cause of action under the APA.  28 U.S.C. §1331; 5 U.S.C. §702 ("[a] person … aggrieved by agency action … is entitled to judicial review thereof."). Plaintiffs' *ultra vires* claim invokes this court's Article III equitable power to review illegal governmental acts, which this Court has held survives the enactment of the APA and other statutes.  *See Sierra Club v. Trump*, 963 F.3d 874, 891 (9th Cir. 2020), *vacated as moot, Biden v. Sierra Club*, 142 S. Ct. 46 (2021).

Against 28 U.S.C. §1331's express grant of jurisdiction, OPM argues that the district court lacked subject matter jurisdiction to issue either of the preliminary injunctions on the ground that all Plaintiffs' claims are impliedly precluded from *any* judicial review because of the "comprehensive system for reviewing personnel action[s] taken against federal employees" established by the CSRA and the FSL-MRS.  Opening Brief at 24-29 (quoting *Elgin v. Dep't of the Treasury*, 567 U.S. 1, 5-8 (2012)); Supp. Brief at 12-22; *but see Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 383 (2012) ("[J]urisdiction conferred by 28 U.S.C. §1331 should hold firm against mere implication flowing from subsequent legislation"); *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976) (describing the "virtually unflagging obligation of the federal courts to exercise the jurisdiction given to them.").

-37-

OPM directs these arguments to both the Union Plaintiffs and the Organizational Plaintiffs, arguing that the claims of neither group of plaintiffs can be heard by the administrative agencies they invoke, so they cannot be heard by the district court either. Plaintiffs first address the reasons that these implied preclusion arguments are incorrect as to all Plaintiffs, consistent with this Court's recent decision in *AFGE v. Trump*, __ F.4th __, 2025 WL 1541714 (9th Cir. May 30, 2025), and then address any additional factors specific to each set of Plaintiffs—all of whom bring claims against OPM that Congress intended to be heard in federal court, not by administrative agencies without jurisdiction to hear these claims.

As explained further below, this Court's recent published decision in *AFGE v. Trump*, __ F.4th __, 2025 WL 1541714 (9th Cir. May 30, 2025), forecloses Defendants' argument that federal courts lack jurisdiction. That case involved a challenge to the Trump administration's government-wide efforts to "transform[] the Federal bureaucracy," including through directives issued by OPM, requiring agencies to reorganize and engage in large-scale reductions-in-force ("RIFs"), rather than through *en masse*, pretextual terminations of probationary employees at issue in this case. *Id.* at *1-2. "A collection of unions, non-profit organizations, and local governments" sued various government defendants, including OPM, alleging that this latest effort violated the constitutional separation of powers, exceeded statutory authority, and violated the APA. *Id.* at *1.

-38-

There, as here, the government argued that Congress impliedly removed jurisdiction over the challenge to these government-wide actions, either because claims were "channeled" in the first instances to the "the administrative system established by the CSRA," *id.* at *3, or precluded entirely because they could not be adjudicated through that system. Applying the test articulated in *Thunder Basin Coal Co. v. Reich*, 510 U.S. at 207, for determining whether the claims at issue "are of the type Congress intended to be reviewed" by an administrative system and *not* in the first instance by federal courts, this Court concluded that "the district court below correctly determined that Plaintiffs' claims [including those against OPM] were properly raised" in federal district court. *AFGE v. Trump*, 2025 WL 1541714 at *5 (quoting *Thunder Basin*, 510 U.S. at 212). That decision, like the prior stay decision in this case, *AFGE v. OPM*, 2025 WL 914823 at *1, rejected the argument that the non-profit plaintiffs' claims were impliedly precluded by Congress from *ever* being heard under *United States v. Fausto*, 484 U.S. 439, 454 (1988). *AFGE v. Trump*, 2025 WL 1541714 at *3-5.[11]

It is true, as Defendants claim, that the CSRA authorizes the MSPB to review claims brought by federal employees arising out of specific adverse actions taken against them by their employing federal agencies, 5 U.S.C. §§7512 (defining

---

[11] As discussed further below, this Court previously held, in denying the prior request to stay the March 13 preliminary injunction granted to the Organizational Plaintiffs pending appeal, that OPM had not "demonstrated—under existing authority—that they are likely to establish that Congress has channeled the organizational plaintiffs' claims to administrative agencies." *AFGE v. OPM*, 2025 WL 914823 at *1.

-39-

"[a]ctions covered"), 7513(d) (describing procedures for appeals of such actions to the MSPB), and that the FSL-MRS authorizes the FLRA to review unfair labor practice charges brought by unions representing federal employees against the employing agencies with whom they have collective bargaining agreements, 5 U.S.C. §§7105(a)(2), 7117, 7118.  But as this Court recently explained: "Neither body has the authority to address the type of constitutional and statutory claims raised by Plaintiffs" because these claims are not of the "type" that those administrative schemes were designed to handle.  *AFGE v. Trump*, 2025 WL 1541714 at *3.

More specifically, the text of the CSRA and FSL-MRS create no pathway by which Plaintiffs' claims against OPM challenging government-wide action can be heard by the MSPB, the FLRA, or the courts that review the resolution of employee-employer disputes by those agencies.  With respect to the MSPB, OPM cannot be sued as a defendant in an appeal before the MSPB, other than by its own employees, as their employing agency.  *See* 5 U.S.C. §7701 (MSPB: "An employee, or applicant for employment, may submit an appeal…" of agency action defined in §7512); *id*. §7703 (judicial review: "The Board shall be named respondent in any proceeding brought pursuant to this subsection, unless the employee or applicant for employment seeks review of a final order or decision on the merits on the underlying personnel action or on a request for attorney fees, in

-40-

which case the agency responsible for taking the personnel action shall be the respondent.").[12]

The FLRA likewise cannot hear challenges to government-wide rules. 5 U.S.C. §7117(a)(1) (duty to bargain, and therefore FLRA jurisdiction over bargaining disputes, extends to "matters which are the subject of any rule or regulation *only if the rule or regulation is not a Government-wide rule or regulation*") (emphasis added); *see also NTEU and Dep't of Treasury, IRS*, 60 F.L.R.A. 783, 783 (2005) (FLRA lacks jurisdiction to consider challenges to government-wide rules).  Nor is there any mechanism for a union to bring an unfair labor practice claim or other labor-management disputes before the FLRA *against OPM*, rather than the employing agency that is signatory to any collective bargaining agreement.  *See* §§7103(a)(1), 7118, 7123.

Nothing in the text of this statutory scheme supports an inference that Congress silently intended to send Plaintiffs' constitutional and APA claims to agencies that cannot hear them.  The Congress that created the MSPB, the FLRA, and OPM in 1978 was well aware of the APA's mechanisms for judicial review.

---

[12] Pursuant to 5 U.S.C. §7701(d), OPM can choose to intervene in an employee's appeal only when it wishes to weigh in on the application of a government-wide rule, but this one-way intervention does not permit an employee *to sue OPM*, or to name OPM as a defendant upon judicial review.  And although 5 C.F.R. §1201.27 contemplates "class appeals" to the MSPB, the class mechanism provides for relief only for classes of *employees* against their particular agency *employers*; nothing in the regulation authorizes class relief against a separate government agency that has taken government-wide action, as OPM has here.

When Congress created OPM, it expressly made OPM subject to the APA. 5 U.S.C. §§1103; 1105 (same), §7134 (same, for FLRA). Claims brought under those APA provisions are expressly made judicially reviewable. *See* 5 U.S.C. §§701-706. The Congress that created OPM and required it to comply with the APA surely could not have intended silently to exempt that agency's government-wide policymaking from APA review. *See Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) ("A party seeking to suggest that two statutes cannot be harmonized, and that one displaces the other, bears the heavy burden of showing a clearly expressed congressional intention that such a result should follow." (citation omitted)); *cf., e.g.*, *Loper Bright Enter. v. Raimondo,* 603 U.S. 369, 391-93 (2024) ("The text of the APA means what it says."). Indeed, the Supreme Court has held that the judicial review provisions of the APA are a "command," and warned against impliedly expanding exceptions. *E.g.*, *Dep't of Commerce v. New York*, 588 U.S. 752, 771-72 (2019); *see also U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 601-02 (2016) ("presumption" of judicial review in APA is strong; exceptions should be construed very narrowly); *accord Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 22-23 (2018).

Even before *AFGE v. Trump* was decided, controlling authority had consistently held that a federal employee who sues *his or her employing agency* over an adverse employment decision must first use the administrative channels created by Congress, but neither the Supreme Court nor this Circuit had ever extended those conclusions to government-wide rules or actions directed by OPM.

*See Elgin*, 567 U.S. at 10 (individual employee challenge to employer action); *Fausto*, 484 U.S. at 454 (same); *Veit v. Heckler*, 746 F.2d 508, 509 (9th Cir. 1984) (same); *Brock v. United States*, 64 F.3d 1421, 1424 (9th Cir. 1995) (same); *Mariano v. United States*, 529 F.3d 1243, 1246 (9th Cir. 2008) (same).

More recent cases applying the *Thunder Basin* doctrine to government-wide actions and programs have rejected the argument that such claims should be channeled.  *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 489 (2010) (Sarbanes-Oxley Act did not impliedly preclude jurisdiction over claims challenging the statute's creation of an oversight board); *Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 189 (2023) (constitutional claims were not channeled to SEC or FTC); *Feds for Med. Freedom v. Biden*, 63 F.4th 366, 375 (5th Cir. 2023) (en banc), *cert. granted, judgment vac'd on other grounds*, 144 S. Ct. 480 (2023) ("We hold plaintiffs are not challenging CSRA-covered personnel actions" when they challenge—"under the Constitution, the APA, and [other statutes]"—nationwide policymaking across executive branch agencies, as when a policy imposed by Executive Order compels federal employers to require employees to take COVID-19 vaccines).

OPM argues here, as the government defendants did in *AFGE v. Trump*, that the purpose of the "comprehensive" administrative adjudicatory system for employee claims against their employee agencies would be undermined by permitting claims against these government-wide actors to proceed.  Opening Brief at 24-29; Supp. Brief at 12-22; *see also AFGE v. Trump*, 2025 WL 1541714 at *3-

-43-

5. *AFGE v. Trump* has settled the issue in this Circuit, conclusively rejecting this argument. This Court answered this question by applying *Thunder Basin*'s three-factor test for determining whether a plaintiff's claims are "of the type Congress intended to be reviewed within [the CSRA's] statutory structure"—in particular, "(1) whether the claims are 'wholly collateral to a statute's review provisions,' (2) whether the issues are 'outside the agency's expertise,' and (3) whether 'a finding of preclusion could foreclose all meaningful judicial review.'" *AFGE v. Trump*, 2025 WL 1541714 at *3 (quoting *Thunder Basin*, 510 U.S. at 212-13).

As to the first *Thunder Basin* factor, this Court explained: "Plaintiffs are not challenging … employment decisions with respect to individual employees. Rather, they are challenging Defendants' constitutional and statutory authority to direct the federal agencies to take such actions in the first place." *Id.* at *3. The court further noted that "in nearly every case cited by Defendants in which a court channeled a constitutional or statutory claim through the CSRA, the plaintiff raised at least one claim properly within the unquestioned jurisdiction of the MSPB or FLRA." *Id.* at *4 (citing *Elgin*, 567 U.S. 1; *AFGE v. Sec'y of Air Force*, 716 F.3d 633 (D.C. Cir. 2013); *AFGE v. Trump*, 929 F.3d 748 (D.C. Cir. 2019)).[13] By contrast, *AFGE v. Trump*, like this case, did not include any individual employment claims within the MSPB or FLRA's unquestioned jurisdiction—but rather only constitutional and statutory challenges to a government-wide actions taking by

---

[13] OPM relies here on the same out-of-circuit authorities rejected by this Court in *AFGE v. Trump*. *See* Opening Brief at 5, 24-25; Supp. Brief at 4-5, 13-16.

government-wide actors, not employing agencies. *Id.* The plaintiffs' claims were therefore "*wholly* collateral to the CSRA's review provisions." *Id.* (quoting *Thunder Basin*, 510 U.S. at 212) (emphasis in original). This same analysis squarely applies to this case: here, too, Plaintiffs' claims do not include any employment claims within the MSPB or FLRA's unquestioned jurisdiction. Plaintiffs assert only constitutional and statutory challenges to government-wide directives made by actors who are not the employing agency.

As to the second factor—whether the issues are outside the agency's expertise—the Court held that "the MSPB and the FLRA lack the relevant expertise, as well as the jurisdiction," to decide the constitutional and APA claims brought by the *AFGE v. Trump* plaintiffs, because "agency adjudications are generally ill suited to address structural constitutional [and APA] challenges." *Id.* at *4 (citing *Carr v. Saul*, 593 U.S. 83, 92 (2021); *Free Enter. Fund*, 561 U.S. at 491). The MSPB and the FLRA have no more "expertise" to decide the constitutional and APA claims in this case than they did to decide the same claims in *AFGE v. Trump*. *Id.*

As to the third factor, the court held that "channeling Plaintiffs' claims would preclude meaningful judicial review" because "although some federal employees might be able to challenge their terminations in individual proceedings, that would not 'obviate the need to address their constitutional and statutory claims—which, again, allege injury not from this or that [employment action] but from subjection to [unlawful executive] authority." *Id.* at *4 (quoting *Axon*, 598

-45-

U.S. at 195) (alterations in original). In this case, OPM takes the argument even further than it did in *AFGE v. Trump* (where it admitted at least some employees could challenge some of the resulting agency action before the MSPB), arguing that probationary employees largely have no right to challenge their terminations. Supp. Brief. at 12-16. Meaningful review of these claims is plainly foreclosed where, for all the reasons previously explained, claims challenging these government-wide actions cannot be heard before these administrative agencies or in judicial review of agency decisions.[14]

This Court therefore held that claims challenging unlawful government-wide actions taken by OPM in excess of its statutory authority "were properly raised" in federal district court. *AFGE v. Trump*, 2025 WL 1541714 at *5. At least as to this jurisdictional analysis, this case cannot be meaningfully distinguished from *AFGE v. Trump*; all three factors point in the same direction, for the same reasons. As a published motions panel order addressing jurisdiction, *AFGE v. Trump* is "binding as precedent for other panels deciding the same issue." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 660 (9th Cir. 2021).

Against this backdrop, OPM's reliance on *Fausto* takes it no further here than in *AFGE v. Trump*. *Fausto* involved an employee's claim challenging an

---

[14] Indeed, meaningful review through the MSPB or FLRA is at present virtually impossible, given that other recent government actions have left both agencies without a quorum and therefore unable to decide cases at all. *See Trump v. Wilcox*, 145 S. Ct. 1415, 1415 (2025) (MSPB); *Grundman v. Trump*, Case No. 25-5165 (D.C. Cir. 2025) (per curiam) (filed June 18, 2025) (FLRA).

adverse employment decision that could not be heard on appeal to the MSPB, and
concluded that by enacting the comprehensive scheme in the CSRA, Congress
intended to preclude suits by employees for additional remedies under the Back
Pay Act. *Fausto*, 484 U.S. at 443, 448 ("It seems to us evident … that the absence
of provision for these employees to obtain judicial review is not an uninformative
consequence of the limited scope of this statute, but rather manifestation of a
considered congressional judgment."). *Fausto* does not address whether claims
challenging government-wide decisions by actors other than employing agencies
are justiciable (or stand for the proposition that they are not) and on this point,
*AFGE v. Trump* controls. *See* 2025 WL 1541714, at *3 ("Whether or not the
federal agencies' 'transformation[s]' and 'large-scale reductions in force' can be
characterized as an 'agglomeration' of 'individual employment actions,' Plaintiffs
are not challenging those employment decisions with respect to individual
employees. Rather, they are challenging Defendants' constitutional and statutory
authority to direct the federal agencies to take such actions in the first place.").
Under *AFGE v. Trump*, the CSRA does not displace judicial review of federal
claims challenging government-wide action even where federal employees could
be heard by the MSPB on individual claims, let alone where they cannot.[15]

---

[15] OPM has switched positions on appeal. It argued below that probationary
employees *could* be heard before the MSPB. 1-ER-60–62. Now, trying to come
within *Fausto*, it argues to this Court that probationary employees *cannot* appeal
their terminations (Supp. Brief at 14), but *Fausto* does not compel the result urged
by OPM for all the reasons discussed herein.

-47-

The foregoing demonstrates that Congress did not impliedly remove the long-recognized federal jurisdiction to hear constitutional and APA challenges to the illegality of government-wide actions. With respect to the Organizational Plaintiffs, OPM's additional arguments also fail. OPM takes the extreme position that those non-employee, non-union organizations are impliedly precluded from challenging, via long-standing constitutional and APA claims, unlawful government action. As this Court previously recognized in denying the stay in this case, governing law does not support OPM. *Supra* at 25. No authority supports the argument that such third parties—which Congress never contemplated would participate in such agency proceedings—are foreclosed from bringing APA and *ultra vires* claims over which the courts have express jurisdiction. As discussed above, the text favors Plaintiffs, not OPM: Congress has expressly made the OPM actions here at issue subject to the APA (5 U.S.C. §§1103(b), 1105), and so to judicial review (5 U.S.C.§702). "[T]he mere fact that some acts are made reviewable should not suffice to support an implication of exclusion as to others. The right to review is too important to be excluded on such slender and indeterminate evidence of legislative intent." *Bowers v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 674 (1986) (quotation omitted); *accord Sackett v. EPA*, 566 U.S. 120, 129 (2012).

OPM relies for this argument on *Fausto* again, but as discussed above, *Fausto* does not foreclose every third-party claim involving every government-wide action that has an impact on federal employment. 484 U.S. at 445. As this

-48-

Court held in rejecting this argument in *AFGE v. Trump*, "[w]e find it unlikely that Congress intended for the CSRA to preclude review for parties not even covered by that statute who allege claims outside the MSPB's and FLRA's jurisdiction." 2025 WL 1541714 at *5. Nothing in *Fausto* suggests Congress intended to foreclose claims by non-employee plaintiffs challenging government-wide actors, or that the analysis should be extended beyond reconciling the statutes addressed in that case.

Finally, OPM also relies on *Block v. Community Nutrition Institute*, 467 U.S. 340, 347 (1984), which precluded consumers from challenging regulatory milk pricing market orders under a particular statutory scheme. Opening Brief at 26-27. But the statute examined there explicitly allowed only milk handlers and producers to participate in the regulatory and adjudicatory process, prohibited injunctions, and allowed consumers to participate by notice-and-comment. *Block*, 467 U.S. at 348. The Court concluded that permitting consumers to bring an APA action under those circumstances—none of which obtain here—would "nullify" the procedures Congress had established in the milk marketing law. *Id.*; *but see Bowers*, 476 U.S. at 674. More recently, this Court has refused to deem APA review impliedly precluded, even when an agency adjudication scheme established by Congress provides a path to eventual judicial review: "[I]f the express provision of judicial review in one section of a long and complicated statute were alone enough to overcome the APA's presumption of reviewability for all final agency action, it would not be much of a presumption at all." *Sackett*, 566 U.S. at 129; *accord*

-49-

*Hawkes,* 578 U.S. at 601-02.  Implied doctrines cannot be so divorced from statutory text (which sets forth procedures the OPM admits these Plaintiffs cannot invoke, Opening Brief at 27-29).  *Cf. Loper Bright*, 603 U.S. at 391-92.  In any event, the Supreme Court's decades-old interpretation of an entirely separate regulatory scheme does not displace this Court's more recent interpretation of the CSRA and FSL-MRS.  *See AFGE v. Trump*, 2025 WL 1541714 at *3-5.

## III.    OPM's Challenge to the Organizational Plaintiffs' Standing Fails

OPM also challenges the district court's March 13 preliminary injunction on the ground that the Organizational Plaintiffs lack standing to pursue their claims. Opening Brief at 17-24.  But OPM concedes that the Union Plaintiffs *do* have standing; their only challenge to the April 18 order entered on behalf of those plaintiffs is based on the administrative channeling argument addressed above. Supp. Brief at 12-22; *supra* at 3.  That concession obviates any need for this Court to address OPM's standing arguments.

"As a general rule, in an injunctive case this court need not address standing of each plaintiff if it concludes that one plaintiff has standing."  *LensCrafters*, 567 F.3d at 523.  This Court therefore need only determine whether "at least one plaintiff has standing."  *Townley v. Miller*, 722 F.3d 1128, 1133 (9th Cir. 2013).

Here, as OPM points out, the district court initially found that it did not have subject-matter jurisdiction over the Union Plaintiffs' claims, because it mistakenly believed those claims were channeled to the FLRA or MSPB.  3-ER-389–390.  For that reason, the district court entered the March 13 preliminary injunction on behalf

-50-

of the Organizational Plaintiffs only.  1-ER-29.  At the time, the Union Plaintiffs and the Organizational Plaintiffs made the same legal arguments regarding the merits and balance of equities, and sought identical relief (with the Union Plaintiffs' showing of harm indisputably directly tied to the terminations of affected employees).  2-ER-317–318.  The district court subsequently reconsidered its initial holding as to the Union Plaintiffs' claims, and, on March 24, it concluded that it did have subject-matter jurisdiction over them, and OPM has since conceded that the Union Plaintiffs have standing.  2-ER-164–174; Supp. Brief at 12-22.  There was therefore undisputedly "at least one" plaintiff with standing to support the first preliminary injunction as of March 24.  *Townley*, 722 F.3d at 1133.  Thus, there is no need to reach Defendants' arguments as to the standing of the Organizational Plaintiffs, as this Court can affirm on the ground that *all* Plaintiffs, including the Union Plaintiffs, sought the first injunction on the same claims and the same legal grounds, and OPM does not dispute that the Union Plaintiffs have standing.  *Bennett*, 118 F.4th at 1125 (this Court may affirm preliminary injunction order on alternative grounds); *Paramount Pictures Corp.*, 903 F.3d at 981 (this Court may affirm on grounds not considered by district court).

Should this Court nonetheless reach the question whether the Organizational Plaintiffs established standing, it should affirm the district court's findings.  As an initial matter, OPM's arguments rely principally on an emergency order of the Supreme Court, which summarily stated that the Organizational Plaintiffs' "allegations" were "presently insufficient to support the organizations' standing."

-51-

*OPM v. AFGE*, No. 24A904 (U.S. Apr. 8, 2025) (S. Ct. Stay Order) (citing *Clapper*, 568 U.S. 398). OPM asserts that this language in the Supreme Court's emergency stay order "dictate[s]" the result in this case. Opening Brief at 1.

That is not the law. The Supreme Court's stay order does not purport to bind this Court's disposition of these appeals; indeed, the order expressly stays the preliminary injunction "pending" such disposition. *OPM v. AFGE*, No. 24A904 (U.S. Apr. 8, 2025) (S. Ct. Stay Order). This Circuit has previously responded to emergency orders of the Supreme Court by undertaking its own independent analysis of the issues, with the benefit of full briefing. *Sierra Club*, 963 F.3d at 887-93 (declining to follow an emergency stay order issued by the Supreme Court "suggest[ing]" that Sierra Club lacked a cause of action based on an independent review of the arguments and the record); *see also Doe v. Trump*, 284 F.Supp.3d 1182, 1185 (W.D. Wash. 2018) (declining to follow an emergency stay order issued by the Supreme Court because "this court is not at liberty to simply ignore binding Circuit precedent based on OPM's divination of what the Supreme Court was thinking when it issued the stay orders or what the Supreme Court's ultimate decision might have been had the appeals … not become moot.").

With the full record in view, it is clear that the district court's detailed conclusions as to the Organizational Plaintiffs' standing are supported by extensive evidence of concrete, actual or imminent harm. The factual underpinnings of those findings cannot be set aside absent clear error. *See, e.g., Anderson v. City of*

*Bessemer City, N.C.*, 470 U.S. 564, 573 (1985); *Doe v. Horne*, 115 F.4th 1083, 1100-01 (9th Cir. 2024).

To establish Article III standing, a plaintiff must show "(i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *Food & Drug Admin. v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 380 (2024). Organizations may satisfy the standing requirement in two ways: "Either the organization can claim that it suffered an injury in its own right or, alternatively, it can assert 'standing' solely as the representative of its members." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181, 199 (2023) (quoting *Warth v. Seldin*, 422 U.S. 490, 511 (1975)). Under either theory, the Organizational Plaintiffs "need only establish a *risk* or *threat* of injury to satisfy the actual injury requirement." *City & Cnty. of S.F. v. U.S. Citizenship & Immigr. Servs.*, 944 F.3d 773, 786-87 (9th Cir. 2019); *see also San Diego County Credit Union v. Citizens Equity-First Credit Union*, 65 F.4th 1012, 1023 (9th Cir. 2023) ("*Clapper* does not require plaintiffs, for purposes of establishing standing, to demonstrate that it is literally certain that the harms they identify will come about. Rather, *Clapper* recognized that standing may exist when there is a substantial risk that the harm will occur, and subsequent Supreme Court cases have followed suit.") (citing *Clapper*, 568 U.S. at 412 n.5); *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)) (cleaned up).

-53-

The Organizational Plaintiffs have established standing on behalf of their members and in their own right.  First, most Organizational Plaintiffs are membership organizations and have shown that their members face concrete injury or a "substantial risk" of future injury.  *Driehaus*, 573 U.S. at 158.  The district court's findings of harm that had already been or would be suffered by members of the Organizational Plaintiffs included impairment to veterans' medical and mental health services on which VoteVets and Common Defense members depend (3-ER-397–399; 1-ER-40–41; *supra* at 13-14, 18); the likely loss of SBA disaster relief, loan guarantees, and other SBA services that help small business members of Main Street Alliance to grow or stay afloat (3-ER-394; *supra* at 18-19); closure of National Park facilities and likely degradation of sensitive ecological areas and public services, harming members of plaintiff Coalition to Protect America's National Parks (3-ER-393–394; *supra* at 14, 18; *see also* 3-SER-489–490, 504–507, 518–519, 540–543, 549–551, 553–560, 564–569; 4-SER-949–951; impairment to Point Blue and Climate Resilient Communities' ongoing scientific and pollution mitigation work (1-ER-41; *supra* at 14, 19); threats to Western Watersheds Project's conservation work (1-ER-41, 3-ER-395–396; *supra* at 14, 18; *see also* 3-SER-601–606; 4-SER-794–796, 961–962); and harms to the ongoing scientific work of the American Geophysical Union's members (1-ER-41; *supra* at 14, 19).

OPM ignores nearly all of the evidence supporting the district court's findings, proceeding instead as if the only actual or potential harms identified by

-54-

the Organizational Plaintiffs concerned the availability of bathroom facilities in National Parks or whether the Bureau of Land Management was sufficiently staffed to respond to a single Freedom of Information Act request. Opening Brief at 20. But OPM's refusal to engage with the actual record or the court's factual findings does not reduce the Organizational Plaintiffs' allegations to "mere speculation." *Id.* As the district court explained: "Plaintiffs have each established a sufficient causal link between the mass termination of employees at the implicated agencies, and the imminent, foreseeable, and in some cases actual injuries that they face." 3-ER-399. That finding is entirely consistent with this Court's precedents. *See Harris v. Bd. of Supervisors*, 366 F.3d 754, 762 (9th Cir. 2004) (affirming preliminary injunction where it was "not speculative" that hospital cuts would "impede the County's ability to deliver medical treatment to plaintiffs in their times of need"); *Covington v. Jefferson County*, 358 F.3d 626, 651-52 (9th Cir. 2004) (the fact that an injury is widespread does not make it insufficiently concrete for Article III purposes).

The district court also correctly found standing based on the impact of the challenged actions on Plaintiffs' core organizational activities. 3-ER-391–399; 1-ER-40–41; *see also Alliance for Hippocratic Medicine*, 602 U.S. at 395; *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982); *Fellowship of Christian Athletes v. San Jose Unified School Dist. Bd. of Ed.*, 82 F.4th 664, 682-83 (9th Cir. 2023) (en banc) ("An organization has direct standing to sue where it establishes that the defendant's behavior has frustrated its mission and caused it to divert

-55-

resources in response to that frustration of purpose.") (cleaned up).  Plaintiffs documented the direct impact the terminations had on their ability to perform their own work, 3-SER-500–502, 590–591, 601–605; 4-SER-794–795, 961–962, as well as on other core activities and purposes, 3-SER-494–498, 571–572, 593–596, 598–599, 608–609; 4-SER-798, 846–847, 876–877, 969–970, 982–984.[16]

Finally, OPM argues that the Organizational Plaintiffs' standing is "particularly untenable given the fundamental mismatch between their theory of illegality and the injuries they assert."  Opening Brief at 22-24.  In OPM's view, the harms caused by an unlawful, pretextual mass termination program cannot possibly be redressed by the reversal of the actions taken pursuant to that program, because individual agencies "*might*" independently act in ways that continue to harm the Organizational Plaintiffs in the future.  Opening Brief at 3 (emphasis

---

[16] Because only one plaintiff need have standing to support the March 13 preliminary injunction, *Lenscrafters*, 567 F.3d at 523, and several Organizational Plaintiffs, as well as the Union Plaintiffs, plainly have standing to sue both in their own right and on behalf of their members, the Court need not reach OPM's argument that Common Defense and VoteVets failed to established their standing under *Alliance for Hippocratic Medicine*.  In any event, that decision expressly reaffirms that when a defendant's action interferes with an organization's "core" mission of providing services, the organization has standing to challenge that interference.  602 U.S. at 395; *see also E. Bay Sanctuary Covenant*, 993 F.3d at 663 (affirming that "an organization can sue on its own behalf when it suffered both a diversion of its resources and a frustration of its mission") (cleaned up). Common Defense and VoteVets demonstrated that OPM's mass terminations have frustrated their mission and core priorities by compelling them to devote resources to responding to overwhelming numbers of calls from their members, who both rely heavily on government services and are overrepresented in federal employment.  4-SER-846–847, 876–877.

-56-

added).  That proposition makes little sense.  When the government acts

unlawfully, federal courts retain jurisdiction to "completely and irrevocably

eradicate[] the effects of the alleged violation."  *Fikre v. Federal Bureau of

Investigation*, 904 F.3d 1033, 1037 (9th Cir. 2018) (quoting *County of Los Angeles

v. Davis*, 440 U.S. 625, 631 (1979)).  The speculative possibility that individual

government agencies "might" independently prevent the relief ordered by the court

from fully "eradicating" such effects does not eliminate the court's jurisdiction; if

anything, it serves only to support the district court's jurisdiction to order further

relief.  *Id.*; *see also* 2-SER-456–457.

## IV.    OPM's Remaining Challenges to March 13 Injunction Also Fail

OPM's remaining arguments all turn on whether the district court abused its

discretion when it entered the subsequently stayed March 13 injunction requiring

reinstatement.  Opening Brief at 29-38; *see also Arc of California*, 757 F.3d at 983-

84.  As explained above, there is no need for this Court to reach any of those

arguments, because the subsequent events have or will moot the appeal. *Supra* at

29-36.   Should the Court nonetheless reach these arguments, they are easily

rejected.

### A.    OPM's Two-Sentence Revision to the January 20 Memorandum Did Not Obviate the Need for the March 13 Injunction

OPM does not dispute in these appeals the district court's factual finding that

it unlawfully directed the mass termination of probationary employees.  Opening

Brief at 30.  Instead, OPM asserts that "the only preliminary relief that might have

-57-

been appropriate would have been limited to instructing OPM to clarify that it has no power to direct termination actions at agencies in these circumstances, and to give agencies the opportunity to rescind terminations if they acted based on confusion about OPM's authority." Opening Brief at 30. OPM thus contends that it complied with the only preliminary relief that would have been appropriate when, on March 5—over four weeks after it directed every agencies to terminate their probationary employees *en masse*, and those agencies followed and implemented that directive by terminating tens of thousands of employees—OPM revised its January 20 memorandum to add the following two sentences: "Please note that, by this memorandum, OPM is not directing agencies to take any specific performance-based actions regarding probationary employees. Agencies have ultimate decision-making authority over, and responsibility for, such personnel actions." 2-ER-376; Opening Brief at 30-31.

The district court correctly rejected this argument. It explained:

> For one thing, defendants' assumption that the addition of two sentences to the January 20 memo extinguished the parties' fact dispute regarding ongoing terminations is incorrect. OPM submits no evidence suggesting that federal agencies—some of which have continued to terminate probationers—are now acting at their own discretion. Nor has OPM submitted any evidence suggesting that it has rescinded or revised the other communications imparting its unlawful directive. Defendants' argument on this point simply asks that [the district court] accept OPM's factual contentions—supported only by counsel's say so—as true. That is not enough.

-58-

2-SER-456.  Based on this weighing of the evidence, the district court concluded that further relief was needed to "completely and irrevocably eradicate the effects of the alleged violation."  2-SER-457 (quoting *Fikre*, 904 F.3d at 1037).  "True, one agency reinstated nearly all probationers following [the district court's] TRO (further suggesting that the terminations were not the product of that agency's own discretion), but the record suggests that the majority remain terminated, and that plaintiffs will continue to suffer harms …"  *Id.*

As this Court just explained in *AFGE v. Trump*, "so long as the 'district court's account of the evidence is plausible in light of the record viewed in its entirety, [we] may not reverse it, even if 'had [we] been sitting as the trier of fact, [we] would have weighed the evidence differently.'"  2025 WL 1541714 at *9 (quoting *Anderson*, 470 U.S. at 574).  There, as here, "there [was] simply no evidence that would allow [this Court] to assess the district court's weighing of the evidence."  *Id.*  Under that standard, the district court's factual determination that further relief was necessary based on the record then before it was not clear error.  *See Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991) ("A district court has considerable discretion in fashioning suitable relief and defining the terms of an injunction.").

## B.     The March 13 Injunction Did Not Exceed the District Court's Equitable Authority

OPM further argues that, even if *some* relief were still appropriate after OPM's two-sentence revision, reinstatement was not.  Opening Brief at 32-33.  On

-59-

OPM's view, the district court's equitable power was limited to remedies "traditionally accorded by courts of equity," and reinstatement is categorically not one of those remedies. *Id.* (citing *Grupo Mexicano*, 527 U.S. at 319).

OPM's argument rests on a fundamental misunderstanding of the nature of equitable relief, especially in APA cases. As a general matter, "when district courts are properly acting as courts of equity, they have discretion unless a statute clearly provides otherwise." *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 496 (2001); *see also Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944) ("The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it.").

In the APA context, "this court, as a court of equity conducting judicial review under the APA, has broad powers to order mandatory affirmative relief, if such relief is necessary to accomplish complete justice." *Nw. Env't Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 680-81 (9th Cir. 2007) (internal quotation marks and citations omitted); *see also Driftless Area Land Conservancy v. Valcq*, 16 F.4th 508, 522 (7th Cir. 2021) ("Vacatur [of agency action] retroactively undoes or expunges a past [agency] action.... *[V]acatur unwinds the challenged agency action*.") (emphasis added); *Jane Doe 1 v. Nielsen*, 357 F.Supp.3d 972, 1003-04 (N.D. Cal. 2018) (exercising equitable authority under the APA to unwind unlawful denials of refugee status by setting aside the unlawful notices of ineligibility,

-60-

requiring that any future notices be corrected and re-issued, and reinstating the time within which potential refugees could seek review).

None of these authorities are compatible with OPM's unsupported view that reinstatement was categorically unavailable, even where "necessary to accomplish complete justice." *Bonneville Power Admin.*, 477 F.3d at 680-81. Based on the evidence then before it, the district court reasonably concluded that "the agencies were directed by OPM to fire all probationary employees, and they executed that directive," so "[t]o staunch the irreparable harms to organizational plaintiffs caused by OPM unlawfully slashing other agenc[ies'] staff required immediately reinstating those employees." 1-ER-41. There is nothing remarkable about ordering reinstatement as a means of protecting the status quo in those circumstances, especially where OPM had "wholly failed to argue there is any other way to avoid the irreparable injuries flowing from the unlawful terminations except to reinstate the employees." 2-ER-193.

## C.    The District Court's Balancing of Equities Was Not Clear Error

Finally, OPM argues that Plaintiffs failed to establish that their injuries were irreparable, and that, in any event, those harms were outweighed by the burdens the district court's reinstatement order imposed on the government.

As with OPM's challenges to the Organizational Plaintiffs' standing, this argument rests on OPM's persistent distortion of the record. As explained above, the Organizational Plaintiffs' showing of injury for both standing and irreparable harm purposes was substantial and well-supported. *See supra* at 13-14, 18-19, 52-

-61-

57.[17]  OPM entirely fails to show that the district court's weighing of this evidence was clearly erroneous.  *Cf. AFGE v. Trump*, 2025 WL 1541714 at *9.

On the other side of the ledger, OPM's discussion of the alleged burdens imposed on the government *does not cite any record evidence whatsoever*—only platitudes about the "government's" interest in being free from "interfer[ence] with [its] ability to manage its workforce."  Opening Brief at 37-38.  But this case is not about "the government's" ability to manage its workforce; it is about OPM's unconstitutional usurpation of other agencies' congressionally conferred authority to manage their own workforces.  Courts "may not allow constitutional violations to continue simply because a remedy would involve intrusion into" government operations.  *Baird v. Bonta*, 81 F.4th 1036, 1041 (9th Cir. 2023) (quoting *Brown v.*

---

[17] 4-SER-877–878 (VoteVets; loss of staffing in critical services for veterans, including Veterans' Crisis Line, "mental health research, cancer treatment, addiction recovery, prosthetics, [] burn pit exposure studies," and transportation services); 4-SER-847 (Common Defense; loss of access to VA services); 3-SER-571–572 (Association of Flight Attendants; staffing reductions at FAA undermine efficacy of agency with predictable impact on safety of flight crews); 3-SER-500–502 (Climate Resilient Communities; termination of probationary EPA program officer leaves CRC unable to navigate its grant requirements); 4-SER-983–894 (Main Street Alliance; likely impairment of access to SBA services including disaster relief); 4-SER-961–962 (Western Watersheds Project; reduced staffing has prevented Bureau of Land Management from responding to FOIA request); 3-SER-602–603 (imminent harm to riparian habitat managed by WWP because of probationary terminations at Bureau of Land Management); 4-SER-798 (Coalition to Protect America's National Parks; closed visitor center at Joshua Tree National Park); 3-SER-608 (CPANP; likely degradation to habitat in NOAA marine sanctuaries); 3-SER-498 (American Public Health Association; loss of members' access to their grant officers in federal science agencies, disrupting current and planned research); 3-SER-594 (American Geophysical Union; same).

*Plata*, 563 U.S. 493, 511 (2011)).  OPM's bare invocation of the government's interest in "manag[ing] its workforce" (Opening Brief at 37-38) cannot provide a basis for setting aside the district court's weighing of the evidence.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the consolidated appeals as moot on constitutional or prudential grounds.  If the Court does not dismiss these appeals as moot, it should affirm the district court's orders.

DATED: June 20, 2025               Respectfully submitted,

Scott A. Kronland
Stacey M. Leyton
Eileen B. Goldsmith
Danielle E. Leonard
Robin S. Tholin
James Baltzer
ALTSHULER BERZON LLP
177 Post St., Suite 300
San Francisco, CA 94108
Tel: (415) 421-7151

By: */s/ Stacey Leyton*

*Attorneys for Plaintiff Organizations*

Norman L. Eisen
Pooja Chaudhuri
STATE DEMOCRACY DEFENDERS
FUND
600 Pennsylvania Avenue SE #15180
Washington, DC 20003
Tel: (202) 594-9958

By: */s/ Norman L. Eisen*

*Attorneys for Plaintiff Organizations*

Rushab Sanghvi
AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES
80 F Street, NW
Washington, DC 20001
Tel: (202) 639-6426

By: */s/ Rushab Sanghvi*

-64-

*Attorneys for Plaintiff American Federation of Government Employees (AFGE)*

Teague Paterson
Matthew Blumin
AMERICAN FEDERATION OF STATE,
COUNTY, AND MUNICIPAL
EMPLOYEES
1625 L Street, N.W.
Washington, D.C.  20036
Tel: (202) 775-5900

By: */s/Teague Paterson*

*Attorneys for Plaintiff American Federation of State County and Municipal Employees (AFSCME)*

Tera M. Heintz
Cristina Sepe
Cynthia Alexander
Deputy Solicitors General
OFFICE OF THE WASHINGTON STATE
ATTORNEY GENERAL
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

By: */s/ Tera M. Heintz*

*Attorneys for Plaintiff State of Washington*

-65-

**CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure 32(g), I hereby certify that this motion complies with Federal Rule of Appellate Procedure 27(d)(1)(E) because it is proportionally spaced and has a typeface of 14 points.  It contains 15,854 words, in compliance with the type-volume limitations of Circuit Rules 27-1(1)(d), 32-3(2), and 32-2(b), as a joint brief submitted by the separately represented parties of Plaintiff Organizations and the State of Washington.


Dated: June 20, 2025

<div style="margin-left:40%">

*/s/ Stacey M. Leyton*
Stacey M. Leyton

</div>