Nos. 25-1677, 25-2637

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

American Federation of Government Employees (AFGE), et al.
*Plaintiff-Appellees*,
v.
The Office of Personnel Management, et al.
*Defendant-Appellants*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
No. 3:25-cv-01780-WHA
The Honorable Judge William Alsup

_____

## APPELLEES' MOTION TO DISMISS CONSOLIDATED APPEALS
## AS MOOT

_____

Scott A. Kronland
Stacey M. Leyton
Eileen B. Goldsmith
Danielle E. Leonard
Robin S. Tholin
James Baltzer
ALTSHULER BERZON LLP
177 Post St., Suite 300
San Francisco, CA 94108
Tel.: (415) 421-7151
dleonard@altber.com
*Attorneys for Plaintiff-Appellee Organizations\**
*[additional counsel on following page]*

Norman L. Eisen
Pooja Chaudhuri
STATE DEMOCRACY DEFENDERS
FUND
600 Pennsylvania Avenue SE #15180
Washington, DC 20003
Tel: (202) 594-9958
Norman@statedemocracydefenders.org
Pooja@statedemocracydefenders.org

*Attorneys for Plaintiff Organizations\**

Teague Paterson
Matthew Blumin
AMERICAN FEDERATION OF
STATE, COUNTY, AND MUNICIPAL
EMPLOYEES
1625 L Street, N.W.
Washington, D.C. 20036
Tel: (202) 775-5900
TPaterson@afscme.org
MBlumin@afscme.org

*Attorneys for Plaintiff American
Federation of State County and
Municipal Employees (AFSCME)*

Rushab Sanghvi
AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES
80 F Street, NW
Washington, DC 20001
Tel: (202) 639-6426
Sanghr@afge.org

*Attorneys for Plaintiff American
Federation of Government Employees
(AFGE)*

Tera M. Heintz
Cristina Sepe
Cynthia Alexander
Deputy Solicitors General
OFFICE OF THE WASHINGTON
STATE ATTORNEY GENERAL
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744
tera.heintz@atg.wa.gov
cristina.sepe@atg.wa.gov
cynthia.alexander@atg.wa.gov

*Attorneys for Plaintiff State of
Washington*

*Plaintiff-Appellee Organizations are the American Federation of Government Employees, AFL-CIO, American Federation of State County and Municipal Employees, AFL-CIO, AFGE Local 2110, American Federation of Government Employees Local 1216, United Nurses Associations of California/Union of Health Care Professionals, AFSCME, AFL-CIO, American Public Health Association, Association of Flight Attendants-CWA, AFL-CIO, American Geophysical Union, Point Blue Conservation Science, Climate Resilient Communities, Main Street Alliance, Common Defense Civic Engagement, Coalition to Protect Americas National Parks, Western Watersheds Project, Vote Vets Action Fund Inc.

Pursuant to Federal Rule of Appellate Procedure 27, Plaintiffs-Appellees move to dismiss these consolidated appeals of the District Court's preliminary injunctions as moot in light of the entry of final judgment issued on all claims by that Court.

On September 12, 2025, the District Court granted summary judgment in favor of Plaintiffs, including ordering declaratory relief and a permanent injunction, and denied OPM's cross-motion for summary judgment. *See* Dkt. 261 at 36-38 (attached hereto as Exh. 1). The District Court then entered final judgment on September 13. Dkt. 262 (attached hereto as Exh. 2).

As the Supreme Court has explained, "an appeal from the grant of a preliminary injunction becomes moot when the trial court enters a permanent injunction, because the former merges into the latter." *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 314 (1999); *see also Planned Parenthood Ariz. Inc. v. Betlach*, 727 F.3d 960, 963 (9th Cir. 2013) ("The district court's entry of final judgment and a permanent injunction moots Arizona's appeal of the preliminary injunction," requiring dismissal of the appeal); *U.S. Philips Corp. v. KBC Bank N.V.*, 590 F.3d 1091, 1093 (9th Cir. 2010) ("A preliminary injunction … dissolves *ipso facto* when a final judgment is entered in the cause.").

The preliminary injunctions that were before this Court have now merged into the District Court's permanent injunction and final judgment, and are no longer in effect. This Court therefore lacks jurisdiction to decide the appeals currently before it, which must be dismissed. Appellees therefore respectfully request this Court grant this motion and dismiss the pending appeals as moot.

DATED: September 15, 2025         Respectfully submitted,

Scott A. Kronland
Stacey M. Leyton
Eileen B. Goldsmith
Danielle E. Leonard
Robin S. Tholin
James Baltzer
ALTSHULER BERZON LLP
177 Post St., Suite 300
San Francisco, CA 94108
Tel: (415) 421-7151

By: */s/ Stacey Leyton*

*Attorneys for Plaintiff Organizations*

Norman L. Eisen
Pooja Chaudhuri
STATE DEMOCRACY DEFENDERS
FUND
600 Pennsylvania Avenue SE #15180
Washington, DC 20003
Tel: (202) 594-9958

By: */s/ Norman L. Eisen*

*Attorneys for Plaintiff Organizations*

Rushab Sanghvi

AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES
80 F Street, NW
Washington, DC 20001
Tel: (202) 639-6426

By: */s/ Rushab Sanghvi*

*Attorneys for Plaintiff American Federation
of Government Employees (AFGE)*

Teague Paterson
Matthew Blumin
AMERICAN FEDERATION OF STATE,
COUNTY, AND MUNICIPAL
EMPLOYEES
1625 L Street, N.W.
Washington, D.C. 20036
Tel: (202) 775-5900

By: */s/Teague Paterson*

*Attorneys for Plaintiff American Federation
of State County and Municipal Employees
(AFSCME)*

Tera M. Heintz
Cristina Sepe
Cynthia Alexander
Deputy Solicitors General
OFFICE OF THE WASHINGTON STATE
ATTORNEY GENERAL
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

By: */s/ Tera M. Heintz*

*Attorneys for Plaintiff State of Washington*

-3-

EXHIBIT 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES, AFL-CIO,
et al.,

           Plaintiffs,

      v.

UNITED STATES OFFICE OF
PERSONNEL MANAGEMENT, et al.,

          Defendants.

No. C 25-01780 WHA

**ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

**INTRODUCTION**

In early 2025, the Office of Personnel Management directed agencies across the federal government to terminate their probationary employees *en masse*, apart from the highest performers in "mission critical" roles and those within the scope of an OPM-approved exemption. That directive was unlawful. The means used to enforce terminations were also unlawful. Three groups of plaintiffs — private organizations, public-sector labor unions, and the State of Washington — challenged OPM's unlawful usurpation of other federal agencies' authority. The district court granted provisional relief, including an order requiring reinstatement of employees at six federal agencies. That reinstatement order, however, was stayed by the Supreme Court. After that stay, the district court found that it had jurisdiction over labor union plaintiffs' claims, then issued separate, more limited provisional relief as to those plaintiffs. The parties now cross-move for summary judgment. For the reasons stated below, plaintiffs' motion is **GRANTED IN PART,** and the government's cross-motion is **DENIED**. Permanent relief is granted to the extent stated below.

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

**STATEMENT**

At the outset of the new administration, the Office of Personnel Management issued and enforced a government-wide directive to fire probationary employees not deemed "mission critical."

**1.    OPM DECIDED WHO TO FIRE.**

On January 20, 2025, Charles Ezell, then the acting director of OPM, directed agencies to "identify all employees on probationary periods . . . and send a report to OPM [by January 24, 2025] listing all such employees to employeeaccountability@OPM.gov, with a copy to Amanda Scales at amanda.scales@opm.gov.  In addition, agencies should promptly determine whether those employees should be retained at the agency" (Dkt. No. 218-3 at 335).  OPM required agencies to submit updated lists as often as once a day.  Those lists had to be updated "after actioning" to reflect "[w]hich probationary employees have been terminated and which you plan to keep" (*id*. at 375; *see also id*. at 384) and eventually became a "daily tracker" of terminations (*id*. at 382).  Where an agency wished to keep an employee, they were directed to "provide [OPM] an explanation of why" (*id*. at 375; *see also id*. at 384).

OPM administered an "exemptions process" through which "agencies [ ] identified the highest-performing probationers in mission critical areas" (*id*. at 375).  That process evidences OPM's ultimate discretion over the retention and termination of other agencies' probationers.  The "administrative record" includes examples of exemptions granted to the Department of Justice and the National Transportation Safety Board.

OPM granted DOJ a series of exemptions.

*First*, OPM granted DOJ an exemption for certain practice groups on February 11:

> OPM has granted Civil Appellate, Federal Programs Branch,
> Office of Immigration Litigation, and Office of the Solicitor
> General exemptions from the hiring freeze and from any guidance
> to terminate probationary employees.

(*id*. at 359; *see also id*. at 382).  OPM directed DOJ to otherwise "use the attached letter to separate from probationary employees, with the exception of high-performing employees in mission critical roles" (*id*. at 382).

2

*Second*, OPM exempted DOJ's probationary attorneys at some unknown time:

> 1,273 [DOJ probationers] are Attorney's [*sic*] (of which 27 requested the [Deferred Resignation Program]) and 162 paralegals (2 requested DRP), *who OPM has reported to the Justice Department are exempt*.  The DOJ and White House rely on their expertise in the law to implement the executive orders as well as defend the government against challenges of its recent executive order implementation.

 (*id.* at 387 (emphasis added)).  The "administrative record" contains no information about why or when OPM "reported" that exemption to the DOJ.

*Third*, DOJ Assistant Attorney General for Administration Jolene Lauria made a request for a blanket DOJ exemption on February 18.  DOJ's request opened with a lengthy description of the "mission critical" roles occupied by DOJ's 10,468 probationers and ended with the following plea:  "**The Department of Justice must be exempt from firing its probationary employees given the criticality of the missions we support**" (*id.* at 388 (emphasis in original)).

OPM understood DOJ's February 18 email to be a "suggest[ion]" that OPM exercise *OPM*'s discretion to grant an exemption, not a determination by DOJ to grant itself one. Amanda Scales, the email's recipient, forwarded the request to OPM Special Advisor Noah Peters alongside the following note:

> Please see message below from Jolene with DOJ — at the bottom, she *suggests* DOJ be broadly exempted from probationary actions (with the caveat that DOJ is actively working on a broader downsizing / consolidation plan).
>
> Know [*sic*] DOJ is exempted for Civil Appellate, Federal Programs, Office of Immigration Litigation, and Office of the Solicitor General right now and nothing more right now.  *Let me know what you think here about going broader*.  Happy to set something up with her to discuss live if we need.

(*id.* at 386 (emphasis added)).

United States District Court
Northern District of California

Separately, as to the National Transportation Safety Board, a January 24 email from NTSB Chair Jennifer Homendy (to redacted recipients) stated:

> In accordance with OPM Guidance on Probationary Periods, Administrative Leave and Details, the NTSB is submitting the attached chart of probationary employees. . . .  As stated in the attached chart, all 20 employees are critical to our mission of public safety.  *The NTSB has therefore determined that all 20 employees should be retained by the agency.*

(*id*. at 339 (emphasis added)).

The NTSB Chair's own "determin[ation] that all 20 employees should be retained by the agency" was not enough (*ibid*.).  On February 5, Chair Homendy sent the following to Amanda Scales:

> I want to reiterate that our probationary employees are critical to public safety.  Currently, of the 20 employees previously provided who are on probationary periods:  13 employees are assigned to the DCA collision, 4 employees are assigned to the Philadelphia crash, and 2 employees are assigned to the ongoing Francis Scott Key Bridge collapse in Baltimore.  As you are aware, the NTSB's workforce is small — 435 employees — and all hands are on deck as we address these catastrophes while continuing our other modal work . . . .

(*id*. at 338).  Note, unlike the NTSB chair's *first* email, her *second* email to OPM made no mention of any NTSB "determine[ation] that all 20 employees should be retained by the agency" (*id*. at 339).  Scales forwarded the February 5 email to Peters, who deemed it "[f]ine to exempt them" (*id*. at 338).

Separate from the agency-specific exemptions granted to DOJ and the NTSB, OPM "indicated [in a call with agencies] that disabled veterans and PMF/interns would be excluded from the probationary exercise" but, when pressed by the Department of Housing and Urban Development for written guidance, decided against "send[ing] out anything more formal" and ceded discretion to each agency as to those groups:  "It's up to each agency.  They should consider excluding them but are not required" (*id*. at 357).

4

### 2.    OPM DECIDED WHEN TO FIRE.

In an email titled "[Action Due 2/13] Probationary Employee Actions," OPM "clarifie[d] immediate next steps for probationary employees," directing agencies to complete terminations "by the end of the day tomorrow, 2/13/2025" (*id*. at 383).

OPM extended that deadline the day after it passed: "We have asked that you separate probationary employees that you have not identified as mission-critical no later than end of the day Monday, 2/17" (*id*. at 375). Also on February 14, Carrie Sharp, Treasury's Acting Deputy Chief Human Capital Officer (CHCO), asked OPM the following:

> Treasury is hearing that other agencies are giving probationary employees 4 weeks of admin leave before they officially terminate. Has there been specific guidance that allows for an orderly transition? I'm under the impression that employees should be terminated immediately. Please confirm your understanding of how agencies should execute.

(*id*. at 374).

Veronica Hinton, an OPM employee, forwarded Sharp's question to Peters, noting that she "assume[s] it is agency discretion" (*ibid*.). Peters cabined agency discretion to four weeks only: "OPM advised to separate immediately, but anywhere from 0–4 weeks of admin leave is fine to ensure an orderly transition" (*ibid*.).

### 3.    OPM DIRECTED AGENCIES TO FIRE UNDER FALSE PRETENSE.

OPM circulated a "draft letter[ ] for terminating a probationary period employee" on February 12 and 14 (*id*. at 369–72, 375–78; *see also id*. at 382 ("Agencies should use the attached letter to separate from probationary employees")). The template letter identified fields for employee names, agency names, dates of appointment, and so on, to be filled in by each agency. It provided a single, specific reason for termination, irrespective of the letter's ultimate recipient:

> The Agency finds, *based on your performance*, that you have not demonstrated that your further employment at the Agency would be in the public interest. For this reason, the Agency informs you that the Agency is removing you from your position of [TITLE] with the agency and the federal civil service effective [insert date and time, if necessary].

5

1    (*id*. at 371 (emphasis added) (brackets in original); *see also id*. at 377).  OPM stressed,

2    repeatedly, that "agencies must identify performance or conduct deficiencies in the notice

3    terminating a probationer" (*id*. at 369).

4        Internally, meanwhile, OPM made clear that probationary termination (and retention)

5    depended on the "criticality" of any one role, *not* on any individualized review of the

6    performance of the probationer occupying that role:  "We have asked that you separate

7    probationary employees that you have *not identified as mission-critical* no later than end of the

8    day Monday, 2/17" (*id*. at 375 (emphasis added)).  OPM explained that "[w]hile agencies must

9    identify performance or conduct deficiencies in the notice terminating a probationer, such

10   performance or conduct deficiencies do not have to be identified in a previous performance

11   evaluation" (*id*. at 369; *see also id*. at 384 ("Employees do not need to have received any

12   particular performance rating previously to be separated.")).

13       The DOJ and NTSB exemption requests did not cite any one employee's performance.

14   DOJ "suggest[ed]" instead that "[t]he Department of Justice must be exempt from firing its

15   probationary employees given the criticality of the missions [they] support" (*id*. at 386–88).

16   Some DOJ probationers were employed in positions "critical to fighting the war on

17   drugs/Fentanyl," others were needed to "ameliorate the severe understaffing problem in

18   prison," and still others "provide[d] critical support to the implementation of executive orders"

19   (*ibid*.).  DOJ closed its request by emphasizing that while it sought exemption in one area, it

20   was acting elsewhere to meet the overall goal of reducing headcount:

21           Please note, however, we are actively pursuing several
             restructuring and downsizing proposals that will streamline the
22           Department's missions.  The planned restructuring and downsizing
             proposals will include RIFs and reorganizations in strategic
23           areas . . . that will ultimately reduce the overall number of staff in
             the Department of Justice.
24

25   (*id*. at 388).

26       The NTSB likewise "reiterate[d] that [ ] probationary employees are critical to public

27   safety" and received an exemption on that basis (*id*. at 338).  Neither agency cited probationer

28   performance whatsoever.

Federal agencies terminated a total of 25,406 probationers in less than a month's time. (Dkt. No. 250 at 61:14–17).

*      *      *

Plaintiffs filed suit on February 19, arguing that OPM's termination directive exceeded its statutory and constitutional authority in violation of the APA, among other things.

A temporary restraining order held that OPM's directive was likely unlawful. A preliminary injunction held similarly. Both pertained only to claims brought by the non-union plaintiffs. Our court of appeals denied the government's motion to stay that injunction pending appeal. The Supreme Court then paused the injunction.

On March 4, 2025, OPM, compelled by the undersigned's TRO, issued a revision of the January 20 memorandum. The revised memo was the same as the original, except that it added the following disclaimer:

> Please note that, by this memorandum, OPM is not directing agencies to take any specific performance-based actions regarding probationary employees. Agencies have ultimate decision-making authority over, and responsibility for, such personnel actions.

(Dkt. No. 218-3 at 401).

The undersigned then issued a second preliminary injunction, this time pertaining to the union plaintiffs. That injunction remains in place.

The government submitted an "administrative record" on May 9, and the parties now cross-move for summary judgment based on that record. This order follows full briefing and oral argument.

## ANALYSIS

### 1. THE "ADMINISTRATIVE RECORD."

The APA's waiver of sovereign immunity gives federal courts jurisdiction over claims against the United States that allege "legal wrong because of [a final] agency action" and "seek[ ] relief other than money damages," 5 U.S.C. § 702, so long as that action has not been "committed to agency discretion by law" or made unreviewable by Congress, *id*. § 701(a). Agency actions can be formal or informal. Formal actions require hearings and

are subject to stringent procedural requirements that produce lengthy "closed" records. Informal actions, meanwhile, are not, and do not generate a contemporaneous closed record. *See id*. §§ 553–57.

The APA's "whole record" provision requires that judicial review be conducted on the basis of "the whole record or those parts of it cited by a party." *Id*. § 706. Pinning down "the whole record" is simple enough for formal actions, where the APA's presumption that there *is* a "whole record" holds true. Formal adjudications, for example, involve a trial-type hearing before an administrative law judge, where evidence is received, witnesses testify, cross-examination is done, and a familiar trial-type record is generated. *Id*. §§ 554, 556–7. As far as "the whole record" is concerned, judicial review proceeds in the familiar appellate mode, on the basis of the closed, trial-type record made before the ALJ. Formal rulemakings, another example of closed-record proceedings, also require an on-the-record hearing where evidence supporting the agency action is presented. *Id*. §§ 553(c), 556–7.

Informal agency actions, meanwhile, are definitionally "off the record," undercutting the APA's presumption that there *is* a "whole record" for review. Because there is no hearing, the agency is not required to compile and submit a closed "record," as in formal adjudications and rulemakings. What, then, is the basis for judicial review? The APA itself is silent.

At the time of the APA's passage, informal actions were thought to concern generalized public interests "in which the agency was seen as an appropriate sole representative of the public interest," and thus unlikely to invite litigation due to stringent standing requirements. Gordon G. Young, *Judicial Review of Informal Agency Action on the Fiftieth Anniversary of the APA: The Alleged Demise and Actual Status of Overton Park's Requirement of Judicial Review 'On the Record'*, 10 ADMIN. L.J. AM. U. 179, 203 (1996); *see also id*. at 199–204. Formal actions were the backbone of administrative action through the 1960s and were expected to remain the primary mode of agency operation.

The Report of the Committee on the Judiciary of the House of Representatives recommending the APA's passage, cited throughout the Supreme Court's landmark *Overton Park* decision (discussed below), said that informal administrative action should be reviewed *de novo* on a record of the reviewing court's making:

> In short, where a rule or order is not required by statute to be made after opportunity for agency hearing and to be reviewed solely upon the record thereof, *the facts pertinent to any relevant question of law must be tried and determined de novo by the reviewing court* respecting either the validity or application of such rule or order — because facts necessary to the determination of any relevant question of law must be determined of record somewhere and, if Congress has not provided that an agency shall do so, then the record must be made in court.

H.R. REP. NO. 79-1980, at 45–46 (1946) (emphasis added).

The concomitant Senate Report, an "authoritative source[ ]" in interpreting the APA, *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 & n.31 (1979), said the same:

> Where for example an affected party claims in a judicial proceeding that a rule issued without an administrative hearing (and not required to be issued after such hearing) is invalid, *he may show the facts upon which he predicates such invalidity*.
>
> The requirement of review upon "the whole record" means that courts may not look only to the case presented by one party, since other evidence may weaken or even indisputably destroy that case.

S. REP. NO. 79-752, at 28 (1945) (emphasis added).

Changes to standing doctrine, prominently in *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150 (1970), widened the courtroom door to challenges to informal agency actions.  And, informal actions came to the fore of agency practice through the 1970s (and predominate today).  *See* William F. Pederson, Jr., *Formal Records and Informal Rulemaking*, 85 YALE L.J. 38 (1975).

The issue of what record controls in judicial review of an informal agency action reached the Supreme Court in 1971.  In *Overton Park*, Memphis residents challenged the Secretary of Transportation's authorization for funding of a highway through a public park, arguing that the Secretary had eschewed various procedural requirements imposed by the Department of

Transportation Act of 1966 and Federal-Aid Highway Act of 1968. *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 404–06 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). The "administrative record" submitted by the government consisted only of retrospective affidavits prepared for litigation. *Id*. at 409. Plaintiffs submitted their own affidavits and sought to depose the federal highway administrator. *Ibid*. *Overton Park*, breaking with the House and Senate Reports excerpted above, held that review of an off-the-record agency action, *see id*. at 414–15, must be confined to "the whole record" — that is, "the full administrative record that was before the [decision maker] at the time he made his decision," *id*. at 419–20. The Supreme Court reiterated the same two years later: "[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court . . . ." *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam).

Overton Park recognized two narrow exceptions justifying *de novo* review: *First*, "when the action is adjudicatory in nature and the agency factfinding procedures are inadequate," and, *second*, "when issues that were not before the agency are raised in a proceeding to enforce nonadjudicatory agency action." 401 U.S. at 415; *accord Camp*, 411 U.S. at 141–42. Subsequent decisions reaffirmed *Overton Park*'s "on the record" rule and reeled back its apparent exceptions: "The task of the reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court." *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985).

> If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation. The reviewing court is not generally empowered to conduct a *de novo* inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry.

*Id*. at 744.

United States District Court
Northern District of California

10

In *Vermont Yankee Power Corp. v. Natural Resources Defense Council, Inc.*, the Supreme Court rebuffed attempts to impose procedural requirements on agency actions beyond those set out by statute, explaining that, when delegated broad procedural authority by statute, "agencies 'should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties.'" 435 U.S. 519, 543 (1978) (quoting *FCC v. Schreiber*, 381 U.S. 279, 290 (1965)); *see id*. at 525–26.  As applied to informal agency actions, this means that courts cannot impose hearing or record-making requirements where the APA (or some other statute) does not.  *Id*. at 345.

The result:  *Overton Park* and its progeny "formalized" the *review* of informal agency action, bringing it within the "whole record" provision of the APA, while *Vermont Yankee* allowed the actions themselves to remain "informal" (*i.e.*, off the record).  Put differently, the so-called "record rule" limits judicial review of informal agency action to the "closed" and "contemporaneous" record before an agency at decision time, even though the "whole record," *composed* of documents contemporaneous to the challenged action, will be *compiled* retrospectively, from some larger corpus of evidence and during some specific litigation.

The Supreme Court has not provided guidance on the outer bounds of "the whole record," requiring only that the constituent parts of the record must be contemporaneous to the agency action, and that the record be robust enough to provide *some* basis for judicial review of the agency decision.  *See*, *e.g.*, *Overton Park*, 401 U.S. at 419–20 ("post hoc" affidavits alone not enough).  The outer bounds of the informal administrative record have otherwise been left for the lower courts to chart.  *E.g.*, *Thompson v. U.S. Dep't of Lab.*, 885 F.2d 551, 555–56 (9th Cir. 1989).

An APA plaintiff, meanwhile, faces an uphill battle should it choose to litigate the propriety of the government's record.

*First*, an APA plaintiff may seek to "complete" the record by showing that materials considered by the agency were omitted from the government's proffered record.  To do so, plaintiffs must overcome the presumption of regularity through "clear evidence."  *Blue Mountains Biodiversity Project v. Jeffries*, 99 F.4th 438, 445 (9th Cir. 2024).  In one instance,

the district court asked plaintiff to (1) identify the specific documents they believe to be omitted, (2) "identify reasonable, non-speculative grounds for its belief that the documents were considered by the agency and not included in the record," and (3) "describe when the documents were presented to the agency, to whom, and under what context." *Pac. Shores Subdivision, California Water Dist. v. U.S. Army Corps of Eng'rs*, 448 F. Supp. 2d 1, 6–7 (D.D.C. 2006) (Judge John Facciola); *see also Oceana, Inc. v. Ross*, 920 F.3d 855, 865 (D.C. Cir. 2019) (affirming denial of motion to compel where plaintiff had failed "a substantial showing . . . that the record was incomplete") (cleaned up)). The off-the-record nature of informal agency actions will often render that showing nigh impossible.

*Second*, a plaintiff may seek to supplement the administrative record with evidence outside the bounds of even a "complete" administrative record. For example, the "narrow" bad faith exception allows for extra-record discovery into the mental processes of agency decisionmakers "on a strong showing of bad faith or improper behavior" of the agency. *Dep't of Com. v. New York*, 588 U.S. 752, 781 (2019) (quoting *Overton Park*, 401 U.S. at 420).

In practice, where an "administrative record" meets *Overton Park*'s bare minimum, plaintiffs seldom succeed in completing or supplementing it.

The uncertain bounds of the "administrative record," its retrospective preparation (often after tooth-and-nail litigation of the merits on preliminary relief), the government's exclusive access to the broader corpus of evidence from which it must winnow "the whole record," and the uphill battle faced by plaintiffs wishing to challenge that record's propriety all come together to create opportunities to rig the deck before the cut.

The present case is illustrative. The "administrative record" submitted by the government is a sham. It does not facilitate judicial review: It frustrates it.

*First*, the government's record excludes OPM's denials of exemptions. The preliminary record compiled by plaintiffs evidenced OPM's denial of exemptions. For example, in a February 18 meeting informing its probationers of their *en masse* termination, the National Science Foundation stated: "We were directed last Friday [February 14] by OPM to terminate all probationers except for a minimal number of mission critical probationers" (Dkt. No. 18-9

at 27).  When confronted by the terminated probationers, the officials continued: "Up until Friday [February 14].  Yes.  We were told by OPM it was the agency's discretion whether to remove probations or not. *We chose to retain them all*" (*id.* at 26).  But "late Friday night," "[t]hey told us that they directed us to remove probationers."  "[*T*]*here was no limited discretion. This is not a decision the agency made.*  This is a direction we received" (*id.* at 21 (emphasis added)).  Asked if NSF had at least attempted to negotiate with OPM to minimize the number of terminations, NSF responded:  "There's no negotiation" (*id.* at 34).  The administrative record contains *no* record of *any* contact between OPM and NSF.

NSF chose to rehire its probationers days after the undersigned's TRO held that OPM's directive was likely unlawful.

Separately, in a March 6 sworn affidavit filed in the District of Maryland, IRS Chief Human Capital Officer Traci DiMartini stated:

> I attended several virtual meetings with Trevor Norris and other Human Capital Officers at Treasury agencies (which include the Office of the Comptroller of the Currency, the Bureau of Engraving and Printing, and the U.S. Mint) during which we discussed the directive to conduct mass terminations of probationary employees.
>
> . . . .
>
> Mr. Norris informed us that Charles Ezell, the Acting Director of OPM, Amanda Scales, Mr. Ezell's Chief of Staff, and Noah Peters, were the individuals spearheading the termination of probationary employees at OPM.
>
> . . . .
>
> *Mr. Norris specifically instructed me and the other Human Capital Officers at Treasury that OPM would not allow us to exempt military veterans from the probationary terminations.*

(Dkt. No. 94-1 at 6–7 (emphasis added)).

The government's administrative record does not include any communications with Treasury regarding exemptions for veterans.  It instead includes communications between HUD and OPM concerning *disabled* veterans, wherein Peters ceded discretion regarding that group to each individual agency (Dkt. No. 218-3 at 357).

13

Having excised all exemption denials from its "administrative record," the government now proclaims: "*Crucially*, the record does not show that OPM *ever* denied exemptions or ordered agencies to fire employees that the agencies wished to retain" (Defs.' Br. 5 n.2 (emphasis added)).

*Second*, the government's record contains documents that post-date the relevant agency action. As government counsel explained at oral argument, "post hoc statements" characterizing an agency action do not belong in the administrative record. *See Camp*, 411 U.S. at 143 (validity of action shall "stand or fall on the propriety of that finding," that is, the "contemporaneous explanation of the agency decision"); *cf. Blue Mountains*, 99 F. 4th at 457–58 (agency's explanations part of record only if themselves at issue). The government's record nevertheless contains a February 24 email — five days after the filing of the present litigation and just two days before the government's opposition to the TRO was filed — that serves to characterize the OPM directive in terms conducive to the government's litigation position:

> On Monday, January 20, 2025, the OPM Memorandum . . . *reminded* agencies that probationary periods are an essential step in evaluating employee performance.
>
> . . . .
>
> As agencies continue to make decisions on whether to retain probationary employees, OPM has received numerous questions. To assist agencies in carrying out *their* decisions, OPM offers, attached, the following frequently asked questions for agencies.

(Dkt. No. 218-3 at 389). It is beyond cavil that this email (and the attached "Q&A") were not "before the [decision maker] at the time of the decision." *Thompson*, 885 F.2d at 556.

*Third*, the government's record includes OPM's approval of *some* exemptions but omits others. The present record includes a series of emails in which OPM Special Advisor Noah Peters issued exemptions to the DOJ (*id*. at 359–63, 386–88) and the NTSB (*id*. at 338). At his deposition, meanwhile, Peters explained that he personally reviewed and granted exemption requests from the Equal Employment Opportunity Commission and "some sort of nuclear inspection agency," that OPM granted an exemption to "FAA air traffic controllers," and that there were others still that he was not personally aware of (Dkt. No. 188 at 87–88). The

government provides no explanation for its exclusion of records pertaining to those exemptions.

   *Finally*, even where the government's administrative record acknowledges an exemption request or grant, it does not contain any "documents and materials directly or indirectly considered by agency decisionmakers" in granting that exemption — only an email to an agency confirming or otherwise referencing the grant of an exemption. *Thompson*, 885 F.2d at 555 (cleaned up). With regards to the first exemption granted to DOJ, for example, the only document provided by the government is an email from OPM to DOJ stating:

> Want to confirm a couple items from our call: OPM has granted
> Civil Appellate, Federal Programs Branch, Office of Immigration
> Litigation, and Office of the Solicitor General exemptions from the
> hiring freeze and from any guidance to terminate probationary
> employees.

(Dkt. No. 218-3 at 359). On what basis? The record does not say. When was that call, and what other "items" were discussed? Again, silence.

   The government instead provides pages of back and forth wherein OPM and DOJ try to figure out whether they should meet at 2 o'clock, or 3 o'clock, or maybe 2:30, and otherwise troubleshoot their calendar invites (*id*. at 359–63). The government likewise provides pages of irrelevant documents concerning the "Return to Office" and "Deferred Resignation" programs, neither of which are at issue here (*see*, *e.g.*, *id*. at 341–45, 364–66, 395–99).

   Separately, a February 11 email from HUD's CHCO to OPM states: "In *one* of our last calls you had mentioned that OPM would be sending guidance on Disabled veterans and PMFs/Interns for the probationary employee exercise. Will there be guidance forthcoming?" (*id*. at 358 (emphasis added)). Peters decided that OPM "should not send out anything more formal" (*id*. at 357). In a later email, Peters stated that OPM "suggested possible categories of exemptions but are not requiring it" (*ibid*.). What categories of exemptions, and how many? We don't know, beyond disabled veterans and "PMFs/Interns." What documents did OPM rely upon in crafting these categories of unknown nature and number? The record is silent. And what about that call? Again, nothing. How many calls *were* there, anyway? Not a clue.

15

The record is scattered with innumerable references to calls, discussions, documents, and decisions that underpin, but have been excluded from, the government's narrow record.

The "administrative record" leaves the reader with the feeling that he is being led, blindfolded, along a carefully plotted path through a dense, unseen wood. Here and there, he may hear a rustle in the trees, feel the dark silhouette of a towering form, or intuit some other hint at the forest beyond, but never is he afforded an unfettered view of the landscape through which he passes.

*          *          *

Plaintiffs "move for summary judgment on the record defendants have presented, without conceding that defendants properly compiled a complete and accurate record of this matter" "in the interest of avoiding presenting unnecessary disputes to this Court" (Pls.' Br. 2 n.3). Because plaintiffs have waived the issue, this order assumes (without holding) that the present "administrative record" is sufficient. This order relies on that record.

### 2.    STANDING.

"As a general rule, in an injunctive case this court need not address standing of each plaintiff if it concludes that one plaintiff has standing." *Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown*, 567 F.3d 521, 523 (9th Cir. 2009).

A prior order explained that union plaintiffs have both direct and representational standing (Dkt. No. 202 at 14–19). That analysis is incorporated by reference here, with one alteration noted below. In sum, union plaintiffs stand in the shoes of their members, some of whom have been injured due to termination under false pretext, and stand on their own, in light of the harm to their operational funding and frustration of their core functions.

The government's counters are no more persuasive than before.

*First*, the government asserts that "union [p]laintiffs — despite this Court's request that they substantiate their allegations of harm to members — have failed to identify terminated probationers from *each* of the relief [d]efendant agencies they have named that are union members" (Defs.' Br. 9). Plaintiffs counter that they have identified "at least one member in each relief defendant agency" and point to a prior filing listing those members (Pls.' Reply 8).

United States District Court
Northern District of California

1    "[P]laintiff-organizations [are required] to make specific allegations establishing that *at

2    least one identified member* had suffered or would suffer harm." *Summers v. Earth Island

3    Inst.*, 555 U.S. 488, 498 (2009) (emphasis added). "Because Article III's standing requirement

4    does not apply to agency proceedings, [agencies have] no reason to include facts sufficient to

5    establish standing as a part of the administrative record." *Nw. Env't Def. Ctr. v. Bonneville

6    Power Admin.*, 117 F.3d 1520, 1527–28 (9th Cir. 1997). The reviewing court may therefore

7    consider extra-record evidence when determining whether plaintiffs can establish standing. *Id.*

8    at 1528.

9        Plaintiffs' list shows that at least one dues-paying member was terminated from each

10   relief defendant agency, with the exceptions of the Department of State, National Aeronautics

11   and Space Administration, and Office of Management and Budget (Dkt. Nos. 199-1). This

12   order will therefore tailor relief to exclude those three agencies.

13       *Second*, the government argues that union plaintiffs lack direct standing because they

14   "fail to establish an injury to their organizational mission" (Defs.' Br. 9). The undersigned's

15   prior determination that union plaintiffs suffered a reduction in union dues cannot be true, the

16   argument goes, because AFGE "has boasted that it stands at 321,000 dues-paying members, its

17   highest level ever, and is on track to reach 325,000 dues-paying members" (*ibid.* (cleaned up)).

18   But AFGE's ranks could be greater still absent the harm done by the OPM directive.

19       *Third*, the government asserts that plaintiffs' injuries are not fairly traceable to OPM's

20   actions (Defs.' Reply 4). This argument rests on the broader assertion that OPM's directive

21   was in fact mere guidance, which is taken up in full below.

22       In sum, the union plaintiffs have standing against OPM and all relief defendants except

23   for State, NASA, and OMB. The State of Washington's proofs do not move the needle as to

24   those three agencies.

United States District Court
Northern District of California

### 3.    JURISDICTION.

The district court has jurisdiction to hear these claims.  28 U.S.C. § 1331.  No statutory scheme channels them into an administrative body.  *AFGE v. Trump*, 139 F.4th 1020, 1031 (9th Cir. 2025) (citing *AFGE v. OPM*, 771 F. Supp. 3d 1127 (N.D. Cal. Mar. 24, 2025)).

The government repeats previous arguments to the contrary.  But "the government's channeling argument" was already rejected by this Court and by two separate panels of our court of appeals (in this case and in a "very similar" case).  *Ibid.* (similar case); *see AFGE v. OPM*, No. 25-1677, 2025 WL 914823, at *1 (9th Cir. Mar. 26, 2025) (this case).

*First*, the Court's jurisdictional analysis as to the private organizational plaintiffs was put at issue before our court of appeals in a motion seeking to stay the preliminary injunction in this case.  Our appeals court concluded that the government was not "likely to establish that Congress has channeled the organizational plaintiffs' claims to administrative agencies." *OPM*, 2025 WL 914823, at *1.  At the Supreme Court, the government argued that jurisdiction was improper even as to the organizational plaintiffs.  The preliminary injunction was stayed by the Supreme Court.  The Supreme Court did not give any jurisdictional reason for its stay. 145 S. Ct. 1914 (Apr. 8, 2025).  Now, the government ignores altogether our appellate court's initial assessment that jurisdiction would be proper here.

*Second*, the jurisdictional analysis as to all plaintiffs, set out in a separate order, was squarely considered by our court of appeals in a motion to stay pending appeal of preliminary injunction issued by Judge Susan Illston.  That case concerned whether OPM and others had exceeded statutory bounds when ordering agencies to terminate their (non-probationary) employees *en masse*.  Judge Illston expressly cited and followed the undersigned's jurisdictional order.  *AFGE v. Trump*, 782 F. Supp. 3d 793, 815–16 (N.D. Cal. 2025) (temporary restraining order); *AFGE v. Trump*, ___ F. Supp. 3d ___, 2025 WL 1482511, at *13 (N.D. Cal. May 22, 2025) (preliminary injunction).  Writing for the panel declining to stay that injunction, Judge William Fletcher expressly cited the undersigned's order as already having "rejected the government's channeling argument" in a case "very similar" to the one before them.  139 F.4th at 1031.  Ultimately, in that matter, the Supreme Court stayed the

United States District Court
Northern District of California

preliminary injunction. The Supreme Court, however, addressed the merits of the dispute in its decision without addressing jurisdiction. 145 S. Ct. 2635 (2025).

The government argues that the case before Judge Fletcher was centered on an order for agencies to terminate their employees, not on the terminations themselves (Defs.' Reply 6–7 (citing *Trump*, 139 F.4th at 1031)). So is this one. In the very passage the government cites, Judge Fletcher described the instant case as "very similar" to the one there in this very regard. Both cases are about whether one actor "exceed[ed] its authority when it directed *all* federal agencies to terminate their probationers *en masse*"; neither is about "one agency's decision [to terminate] one employee or *its own* workforce." 771 F. Supp. 3d at 1133 (emphases added); *accord Trump*, 139 F.4th at 1031. The government's briefing on summary judgment belies that this case concerns anything else. For instance, the government cites evidence for and against the central claim that "OPM ever denied exemptions or ordered [other] agencies to fire employees that the agencies wished to retain" (Defs.' Br. 5 n.2). Of course, the government does not cite evidence for and against each of the thousands of individual terminations, none of which is directly at issue here. The government also concedes that some relief would be beyond what the administrative channels could provide but contends that this implies Congress's intent to preclude such relief. The undersigned's jurisdictional order and our court of appeals have rejected such arguments already. 771 F. Supp. 3d at 1134; *Trump*, 139 F.4th at 1032–33.[1]

The government next contends that Judge Fletcher's express holding in *Trump* was pushed aside by the Supreme Court's subsequent stay. After recitation of procedure and result, the Supreme Court's stay stated, in full:

> [Judge Illston]'s injunction was based on [the] view that Executive Order No. 14210, 90 Fed. Reg. 9669 (2025), and a joint

---

[1]    At oral argument, counsel said he "think[s]" that "all of the collective bargaining agreements at issue" permit relief (Tr. 34–35). The government does not substantiate that thought by citation to any agreement at issue, nor its terms. *See* 5 U.S.C. § 7121(a)(2) ("Any collective bargaining agreement may exclude any matter from the application of the grievance procedures which are provided for in the agreement."); *see AFGE*, 2025 WL 914823, at *1 (9th Cir. Mar. 26, 2025) ("[A]ppellants [have not] demonstrated [that] Congress has channeled the organizational plaintiffs' claims to administrative agencies.").

memorandum from the Office of Management and Budget and Office of Personnel Management implementing that Executive Order are unlawful.  Because the Government is likely to succeed *on its argument that the Executive Order and Memorandum are lawful — and because the other factors bearing on whether to grant a stay are satisfied —* we grant the application.  We express no view on the legality of any Agency RIF and Reorganization Plan produced or approved pursuant to the Executive Order and Memorandum.  The District Court enjoined further implementation or approval of the plans based on its view about the illegality of the Executive Order and Memorandum, not on any assessment of the plans themselves.  *Those plans are not before this Court*.

145 S. Ct. 2635 (2025) (emphasis added).  For more than a century, the Supreme Court has

instructed that "'[w]ithout jurisdiction the court cannot proceed *at all in any cause*'; [indeed,] it

may not assume jurisdiction for the purpose of deciding the merits of the case." *Sinochem*

*Int'l v. Malaysia Int'l Shipping*, 549 U.S. 422, 431 (2007) (emphasis added) (quoting opinion

quoting *Ex Parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1869)).  The threshold jurisdictional

question was fully briefed in *Trump*:  The government expressly challenged Judges Illston and

Fletcher's jurisdictional analyses, and *even cited the undersigned's jurisdictional decision*,

arguing that all three were wrong.  *See* Br. for Applicants, *AFGE v. Trump*, 145 S. Ct. 2635

(2025) (No. 24A1174), 2025 WL 1569930, at *18.  Nevertheless, the Supreme Court looked

past the jurisdictional threshold to address the ultimate merits.  Absent "clearly irreconcilable"

Supreme Court authority, this order cannot ignore the analysis of two express decisions from

our court of appeals.  *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc).

  *Third*, other federal district courts and one other court of appeals have followed the

undersigned's order on jurisdiction.  *See AFGE v. Noem*, No. C25-451 MJP, 2025 WL

2337222, at *5 (W.D. Wash. Aug. 13, 2025) (Judge Marsha Pechman) (finding jurisdiction);

*New York v. McMahon*, ___ F. Supp. 3d ___, No. CV 25-10601-MJJ, 2025 WL 1463009, at

*20 (D. Mass. May 22, 2025) (Judge Myong Joun) (finding jurisdiction), *administrative stay*

*denied*, No. 25-1495, 2025 WL 1503501, at *1 (1st Cir. May 27, 2025), *stay denied sub nom.*

*Somerville Pub. Schs. v. McMahon*, 139 F.4th 63, 71 (1st Cir. 2025) (affirming jurisdictional

reasoning), *stay granted*, 145 S. Ct. 2643 (2025) (without reasoning); *New York v. Kennedy*,

No. 25-CV-196-MRD-PAS, 2025 WL 1803260, at *9 (D.R.I. July 1, 2025) (Judge Melissa

DuBose) (finding jurisdiction), *revised in other respects*, 2025 WL 2336446 (D.R.I. Aug. 12, 2025), *appeal docketed*, No. 25-1780 (1st Cir. Aug. 13, 2025); *Maryland v. USDA*, 777 F. Supp. 3d 432, 463, 471 (D. Md. 2025) (Judge James Bredar) (finding jurisdiction).  *But see Maryland v. USDA*, No. 25-1248, 2025 WL 1073657, at *1 (4th Cir. Apr. 9, 2025) (doubting jurisdiction).  The government does not grapple with these decisions, either.

*          *          *

*Finally*, recall that the undersigned's jurisdictional order found the *Thunder Basin* analysis to be "dispositive," and declined "to reach the further question whether any impairment by the president of the [Office of Special Counsel], [Merit Systems Protection Board], or [Federal Labor Relations Authority] — or argument by the government attacking the constitutionality of the OSC, MSPB, and FLRA in its other pending cases — provide[d] a further basis for subject-matter jurisdiction."  771 F. Supp. 3d at 1137.

The substantive analysis reincorporated here, as reinforced by our appeals court, remains dispositive.  But, to complete the record of these proceedings, this order pauses to address these further points.

*The Office of Special Counsel* is empowered to investigate prohibited personnel practices and to petition the MSPB for relief from such practices.  5 U.S.C. § 1214(a)–(c).  On February 7, 2025, the president terminated Special Counsel Hampton Dellinger.  The latter won a temporary restraining order reinstating him to his post.  The Supreme Court ordered that any application to stay the TRO be held in abeyance until the TRO expired.  *Dellinger v. Bessent*, 766 F. Supp. 3d 57 (D.D.C. 2025) (Judge Amy Berman Jackson).  Special Counsel Dellinger then won a permanent injunction reinstating him.  But that injunction was stayed pending appeal, and he resigned.  *See* 768 F. Supp. 3d 33, 75 (D.D.C. 2025), *vacated as moot*, No. 25-5052, 2025 WL 935211, at *1 (D.C. Cir. Mar. 27, 2025) (mem.).  On March 5, 2025, the president appointed Secretary of Veterans Affairs Doug Collins to serve as acting special counsel; he retained both posts, both as the head of an agency and as the special counsel charged with investigating agency actions.  On April 1, 2025, following the jurisdictional order in this case, the president appointed United States Trade Representative and Acting Director of

1    the U.S. Office of Government Ethics Jamieson Greer to serve as acting special counsel, to

2    retain all three posts. Ambassador Greer's appointments to the latter two have not been

3    confirmed by the Senate.

4         The OSC pathway to relief is functionally impaired. The appointments of first one and

5    then another government employer to investigate allegations against government employers

6    creates obvious conflicts of interest. Congressmembers have inquired into Acting Special

7    Counsel Greer's competing demands on time and loyalties, and have said that his acceptance

8    of several structurally conflicted roles was "misguided and a disservice to the public."[2]

9         Whereas under Senate-confirmed Special Counsel Dellinger the "OSC [had] made

10   certain claims" that terminating probationers in droves was contrary to law, his replacement

11   has "repudiated [those claims] in full," and even put them on their head. Now, per the current

12   OSC, agencies that *have* terminated probationers *en masse* have complied with the

13   "appropriate" policies of OPM, and "have [not] effectuated a constructive RIF." Rather, it is

14   the agencies that *have not* terminated probationers in droves that "have failed to abide by the

15   regulatory mandate to use the probationary period as a tool to screen out inadequate or

16   unsuitable probationers." *See* Br. of OSC as Amicus Curiae at 2, 25, *Interested Terminated*

17   *Probationary Emp. – Com. v. OPM*, No. CB-1205-25-0021-U-1 (M.S.P.B. May 14, 2025).

18        Perhaps worse, the OSC is — *according to the government* — constitutionally defective.

19   The government so argued in a separate litigation, asserting that Congress's scheme "raised

20   serious constitutional concerns," and any impairment of that scheme caused by the termination

21   of an independent special counsel and appointment of another was therefore justified. Defs.'

22   Br. ISO MSJ at 10, Civ. Action No. 25-0385 (ABJ), Dkt. No. 22 (D.D.C. Feb. 21, 2025).

23        The government nevertheless now argues that the OSC *could* provide relief (despite

24   being functionally impaired and, in its impaired state, advocating positions diametrically

25

26   _____

[2]   Letter from Congressmembers Ayanna Pressley, Linda T. Sánchez, Gerald E. Connolly, and

27   Donald S. Beyer, Jr., to Ambassador Jamieson Greer, Acting Director Jamieson Greer, and Acting
     Special Counsel Jamieson Greer (Apr. 9, 2025), https://pressley.house.gov/wp-

28   content/uploads/2025/04/Pressley-Letter-to-USTR-Greer-on-OSC.pdf [https://perma.cc/FBE9-
     263P].

opposed to those taken by plaintiffs in these proceedings).  The government argues that the OSC *should* provide relief (despite the government elsewhere challenging the scheme as constitutionally defective) (*see* TRO Opp. 17 (cited by Defs.' Br. 13); Defs.' Channeling Br. 4, 6–7, 10–11).

*The Merit Systems Protection Board* reviews complaints from terminated employees but not from probationers, unless brought on their behalf by the OSC.  *Compare* 5 U.S.C. §§ 4303(e)–(f), 7511(a)(1), 7512, 7513(d), *with id.* § 1214(b)(1)–(2).  Three days after terminating Special Counsel Dellinger, the president fired MSPB Chair Cathy Harris, reducing the number of MSPB board members to one — below the quorum required to render final decisions.  She won a permanent injunction reinstating her.  *Harris v. Bessent*, 775 F. Supp. 3d 164, (D.D.C. 2025) (Judge Rudolph Contreras).  An appeals panel stayed that injunction pending appeal, the appeals court sitting *en banc* vacated the panel's stay, and the Supreme Court subsequently re-imposed stay.  *See* No. 25-5037, 2025 WL 1021435, at *1 (D.C. Cir. Apr. 7, 2025) (mem.) (en banc); *Trump v. Wilcox*, 145 S. Ct. 1415, 1415 (2025).  The appeal pends.

As a result, the MSPB lacks quorum and cannot act.  This is the second such occasion in recent memory.  By the MSPB's account, "[b]etween January 7, 2017, and March 3, 2022, the Board did not have a quorum of members and therefore could not vote on any petitions for review."  A backlog of 3,800 cases built up.  Nearly all those cases were resolved between 2022 and Chair Harris's removal.  *See* MSPB, Frequently Asked Questions About the Lack of Quorum Period and Restoration of the Full Board (Mar. 7, 2025), https://www.mspb.gov/FAQs_Absence_of_Board_Quorum_3-7-25.pdf [https://perma.cc/NMF2-SDUM].  Since Chair Harris's removal, no work of any kind has proceeded on the MSPB's public dockets.  We have no idea how many cases have become backlogged.  As with the OSC, the government has argued elsewhere that the MSPB is "constitutionally intolerable" absent amendment.  Br. for Appellants, *Harris*, No. 25-5037, Dkt. No. 2108070, at 3.

The government nevertheless argues *here* that the MSPB *could* and *should* provide relief, even absent amendment. These arguments are disingenuous (*see* TRO Opp. 17 (cited by Defs.' Br. 13); Defs.' Channeling Br. 4–5, 7, 10–12).

*The Federal Labor Relations Authority*, finally, has authority to review unfair labor practices, such as exclusion from collective bargaining. 5 U.S.C. § 7105(a)(2). On February 10, 2025, the same day MSPB Chair Harris was terminated, FLRA Chair Susan Tsui Grundmann was terminated. She won a permanent injunction reinstating her to the FLRA. That injunction was stayed pending appeal. *Grundmann v. Trump*, 770 F. Supp. 3d 166, 190 (D.D.C. 2025) (Judge Sparkle Sooknanan), *stayed by* No. 25-5165, 2025 WL 1840641, at *1 (D.C. Cir. July 3, 2025). The appellant's opening brief in that proceeding was filed this month.

The FLRA is functionally impaired as a pathway to relief. Yes, it does have two of three members, which suffices for quorum to decide matters. But where the two disagree, two is no better than one or none. For example, in 2024, the FLRA decided *six* matters in July; in 2025, the FLRA decided just *one* matter in July. *Compare* 73 FLRA (May 12, 2022, through August 14, 2024) *with* 74 FLRA (August 15, 2025, through present). Moreover, the FLRA is — *according to the government* — a constitutionally defective pathway to relief. Were the FLRA composed of members chosen and retained according to Congress's scheme, those decisions would be "called into question and potentially voidable," they say. Br. for Appellants, *Grundmann v. Trump*, No. 25-5165, Dkt. No. 2133295, at 32.

In our proceedings, defendants nevertheless argue that the FLRA *could* provide relief and that the FLRA *should* provide relief even absent amendment (*see* TRO Opp. 17 (cited by Defs.' Br. 13); Defs.' Channeling Br. 5–6, 7–8, 10, 12).

In sum, the administrative schemes have stopped doing as much work as before (FLRA), have stopped doing any work at all (MSPB), or have started working for the other side (OSC).

*        *        *

"The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. "Not *may* have jurisdiction, but *shall*." *Axon Enter. v. FTC*, 598 U.S. 175, 205 (2023) (Gorsuch, J.,

United States District Court
Northern District of California

1    concurring).  No exception to Congress's command applies in this instance.  *OPM*, No. 25-

2    1677, 2025 WL 914823, at *1; *Trump*, 139 F.4th at 1031.

3        **4.    APA CLAIMS.**

4        The APA provides that "the reviewing court shall":

5            hold unlawful and set aside agency action, findings, and
            conclusions found to be —

6

7                **(A)** arbitrary, capricious, an abuse of discretion, or
                otherwise not in accordance with law;

8            . . . .

9                **(C)** in excess of statutory jurisdiction, authority, or
                limitations, or short of statutory right;

10

11               **(D)** without observance of procedure required by law . . . .

12   5 U.S.C. § 706(2).

13       Plaintiffs argue that "OPM's actions violated the APA in three different ways:  they are

14   contrary to law, arbitrary and capricious, and constitute rulemaking that should have been

15   conducted pursuant to APA procedures" (Pls. Br. 13).  This order turns first to finality, the sole

16   threshold question in dispute, then to plaintiffs' arguments.

17           *A.    FINALITY.*

18       The APA limits judicial review to "[a]gency action made reviewable by statute and final

19   agency action for which there is no other adequate remedy in a court."  5 U.S.C. § 704.

20   Finality is the only threshold matter at issue here.  To be final, "the action must (1) 'mark the

21   consummation of the agency's decisionmaking process' and (2) 'be one by which rights or

22   obligations have been determined, or from which legal consequences will flow.'"  *Oregon Nat.*

23   *Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006) (quoting *Bennett v. Spear*,

24   520 U.S. 154, 178 (1997)).  The "pragmatic and flexible" finality determination must "focus on

25   the practical and legal effects of the agency action."  *Ibid* (cleaned up).  Did the action

26   constitute a "definitive statement of the agency's position," did it have a "direct and immediate

27   effect on the day-to-day operations of the subject party," and was "immediate compliance with

28   the terms [ ] expected"?  *Ibid* (cleaned up).

United States District Court
Northern District of California

25

1    OPM's termination directive constituted a final agency action. OPM directed agencies to

2    terminate their probationers, except the "highest-performing probationers in mission critical

3    areas" (Dkt. No. 218-3 at 375) and those subject to an OPM authored or approved exemption.

4    "[I]mmediate compliance with the terms [was] expected." *Oregon*, 465 F.3d at 982 (cleaned

5    up). OPM held agencies to strict deadlines, first requiring that terminations happen by

6    February 13 (*id*. at 382–83), then by February 17 (*id*. at 375), and in any event "as soon as

7    possible that is consistent with applicable agency policies (including those in CBAs)" (*id*. at

8    375). OPM's directive had a "direct and immediate effect on the day-to-day operations of the

9    subject part[ies]." *Oregon*, 465 F.3d at 982 (cleaned up). Federal agencies terminated 25,406

10   probationers in less than a months' time (Dkt. No. 250 at 61:14–17).

### B.    IN EXCESS OF STATUTORY AUTHORITY; CONTRARY TO LAW.

12   "Section 706(2) of the APA states that if a reviewing court finds that an agency action is

13   'in excess of statutory jurisdiction, authority, or limitations, or short of statutory right' then the

14   court '*shall* . . . hold unlawful and set aside' that agency action." *Kaweah Delta Health Care

15   Dist. v. Becerra*, 123 F.4th 939, 953 (9th Cir. 2024) (alteration in original).

16   "Administrative agencies are creatures of statute. They accordingly possess only the

17   authority that Congress has provided." *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*, 595 U.S.

18   109, 117 (2022) (per curiam). Congress's statutory scheme grants to each agency head the

19   authority to manage its own affairs, including the hiring and firing of employees.

20   5 U.S.C. § 3101 ("Each Executive agency, military department, and the government of the

21   District of Columbia may employ such number of employees of the various classes recognized

22   by chapter 51 of this title as Congress may appropriate for from year to year."); *id*. § 301 ("The

23   head of an Executive department or military department may prescribe regulations for the

24   government of his department, the conduct of its employees . . . ."); *see also, e.g.*, 10 U.S.C.

25   § 113(b), (d) (Defense); 38 U.S.C. §§ 303, 510 (VA); 42 U.S.C. §§ 7131, 7231, 7253

26   (Energy).

27   The same is true of OPM. Congress vested OPM's director with the authority to

28   "secur[e] accuracy, uniformity, and justice in the functions of the Office," "appoint[ ]

United States District Court
Northern District of California

1    individuals to be employed by the Office," and "direct[ ] and supervis[e] employees of the

2    Office." 5 U.S.C. § 1103(a)(1)–(3).  Congress cabined that authority.  *Id*. § 1104(b)(3) (must

3    "compl[y] with the civil service laws, rules, and regulations").  At most, it can "recommend[ ]

4    policies relating to the . . . separation of employees" government-wide according to "the merit

5    system principles."  *Id*. § 1103(a)(7).

6         The government has identified a single instance in which Congress's statutory scheme

7    authorizes OPM to direct terminations beyond its own walls:  OPM's director "is authorized"

8    to "instruct[ ] an agency to separate or take other action against an employee serving an

9    appointment subject to investigation when the Director finds that the employee is disqualified

10   or unsuitable for Federal employment."  5 C.F.R. § 5.3(a)(1); *see* 5 C.F.R. pt. 731.  All agree

11   that that narrow circumstance is inapplicable:  No suitability determinations were made here.

12        The government cites no statute authorizing OPM to direct *en masse* terminations at other

13   agencies.  In that connection, our court of appeals recently held in a "very similar" case that

14   "OPM [has] only supervisory authority over the other federal agencies."  *Trump*, 139 F.4th at

15   1037; *Trump*, 782 F. Supp. at 823 ("Congress vested the Director of OPM with a number of

16   functions, none of which include the termination of employees from, or the restructuring of,

17   other federal agencies outside of OPM.").

18        OPM subverted Congress's statutory scheme when it directed other agencies to terminate

19   their probationers "with the exception of high-performing employees in mission critical roles"

20   (Dkt. No. 218-3 at 382).  OPM required relief defendant agencies to effectuate those

21   terminations by a specific deadline (*id*. at 375).  OPM required relief defendant agencies to

22   provide OPM with lists of their probationers (*id*. at 335).  OPM required daily updates to those

23   lists reflecting whether each probationer had been terminated (*id*. at 375).  Where a relief

24   defendant agency wished to retain an employee, OPM required it to "provide an explanation of

25   why" (*ibid*.; *see also id*. at 384).  OPM set up an "exemption process" through which agencies,

26   including at least DOJ and the NTSB, requested and received exemptions from the termination

27   directive.  On February 11, "OPM [ ] granted Civil Appellate, Federal Programs Branch,

28   Office of Immigration Litigation, and Office of the Solicitor General exemptions from the

27

United States District Court
Northern District of California

1   hiring freeze and from any guidance to terminate probationary employees" (*id*. at 359; *see also*

2   *id*. at 382). Separately, "OPM [ ] reported to the Justice Department" that its 1,273

3   probationary attorneys "are exempt" "from firing" (*id*. at 387–88). Finally, on February 18,

4   DOJ "suggest[ed]" (*id*. at 386) to OPM that DOJ as a whole "must be exempt from firing its

5   probationary employees given the criticality of the missions [they] support" (*id*. at 388). The

6   NTSB was exempted from the OPM directive by OPM Special Advisor Peters on February 5

7   (*id*. at 338 ("Fine to exempt them.")). OPM supplied relief defendant agencies with template

8   termination letters informing recipients that their termination was "based on your

9   performance" (*id*. at 371; *see also id*. at 377) and told relief defendant agencies that they "must

10  provide notice of performance deficiencies in the [termination] notice" (*id*. at 384). Internally,

11  both OPM and relief defendant agencies understood that terminations were to be determined

12  according to the "criticality" of specific roles, not individual performance (*see*, *e.g.*, *id*. at 388;

13  *id*. at 369 ("While agencies must identify performance or conduct deficiencies in the notice

14  terminating a probationer, such performance or conduct deficiencies do not have to be

15  identified in a previous performance evaluation.")).

16      In sum, OPM's directive unlawfully exceeded its own powers and usurped and exercised

17  powers reserved by Congress to each individual relief defendant agency.

18      The government disagrees but does not persuade. It contends that OPM did not direct

19  other agencies employment decisions: "[A]ll it did was give agencies guidance" (Defs. Br.

20  16). And, in response to that guidance, each agency exercised its independent judgment, the

21  argument goes (*ibid*.).

22      *First*, the government argues that OPM's directive was no different than guidance issued

23  by the agency in prior administrations (Dkt. No. 250 at 39:22–24). At oral argument,

24  government counsel pointed to a December 2023 OPM memo titled "Maximizing Effective

25  Use of Probationary Periods" (*id*. at 40:1). That memo advised the following (among other

26  things):

27          OPM advises agencies to periodically remind supervisors and
            managers about the value of the probationary period, particularly
28          as they hire new talent. This notice to supervisors could occur 4

months prior to expiration of the probationary period, and then
again 1 month prior to expiration of the probationary period, or any
other time intervals the agency determines appropriate.  When
doing so, agencies should also advise a supervisor to make an
affirmative decision regarding the probationer's fitness for
continued employment or otherwise take appropriate action.

(Dkt. No. 218-3 at 324).  Further  "practical tips" advised, "[i]f you conclude that the person is

not a good fit for the job, end the probationary period by ending the employment" (*id*. at 327).

The 2023 guidance did not (1) demand lists of every probationer at each agency, to be

updated daily, (2) demand that agencies provide "an explanation of why" they wish to keep

any one probationer, (3) demand that terminations be carried out by a date certain, (4) invite

requests to be "exempt[ed] from firing" (*id*. at 386–88), (5) "grant[ ] . . . exemptions . . . from

any guidance to terminate probationary employees" (*id*. at 359), or (6) instruct agencies to

employ an OPM-made template termination letter containing a pre-determined, pretextual

cause for termination.

The government argues throughout its briefing that the OPM directive was nevertheless

akin to these guidances because OPM used words like "guidance" (as in the quote immediately

above) and "please" when describing and effectuating its termination directive.  That argument

ignores the glaring realities laid out above in favor of cherrypicked verbiage.

*Second*, the government asserts that "the exemptions are properly understood as agencies

exempting their employees from OPM's initial guidance about identifying probationary

workers" (Dkt. No. 250 at 41:13–16).

As an initial matter, the exemption process cannot be "understood as *agencies* exempting

*their* employees" from anything.  OPM's own communications show that agencies directed

exemption *requests* to OPM, and OPM communicated *its* decision to those agencies (*see, e.g.*,

Dkt. No. 218-3 at 382 ("Please note that for DOJ, *OPM has granted* . . . exemptions from the

hiring freeze and from any guidance to terminate probationary employees" (emphasis added));

*id*. at 387 ("1,273 [DOJ probationers] are Attorneys . . . who *OPM has reported to the Justice*

*Department* are exempt" (emphasis added)).

As to *what* OPM exempted agencies *from*, OPM Special Advisor Peters's February 11 exemption of certain DOJ components speaks for itself:

> [Assistant AG] Lauria,
>
> Want to confirm a couple items from our call.
>
> OPM has granted Civil Appellate, Federal Programs Branch, Office of Immigration Litigation, and Office of the Solicitor General exemptions from the hiring freeze and *from any guidance to terminate probationary employees*.

(*id*. at 359).

The DOJ's request for a subsequent blanket exemption corroborates:

> At present, there are approximately 10,468 employees in probationary status. Of those employees, 92 percent of the employees are in critical immigration, law enforcement, national security, and other critical support categories.
>
> . . . .
>
> **The Department of Justice must be exempt *from firing its probationary employees* given the criticality of the missions we support**.

(*id*. at 386–88 (bold in original) (italics added)).

And while the government now says that agencies merely wished to be exempted from providing lists of probationers to OPM, DOJ's February 18 email suggest[ing] an "exempt[ion] from firing" actually had that very list attached to it (*id*. at 386–88 ("NOTE: This message contains the attached Department of Justice's updated probationary employees report.")).

OPM's own response to the DOJ request further betrays the government's characterization of the exemption process. OPM employee Scales forwarded the February 18 DOJ request to Peters, stating: "[S]he [Assistant AG Lauria] *suggests* DOJ be broadly exempted from probationary *actions*" (*id*. at 386 (emphasis added)). Treating DOJ's insistence that it "must be" exempt from firing its probationers as a "suggest[ion]" made sense only if she believed that OPM ultimately had to decide. "Action," meanwhile, was OPM's preferred euphemism for termination (*see, e.g*., *id*. at 383 ("Please partner with your CHCO to action those you know you wish to separate from by the end of the day tomorrow, 2/13/2025")).

1    *Third*, the government argues that "DOJ['s] decision declining to terminate *any* of its

2    probationary employees" evidences agency autonomy (Defs.' Reply 12; Defs.' Br. 20 ("[T]he

3    fact that certain agencies chose *not* to terminate probationary employees . . . further belies the

4    argument that OPM directed a back-end reduction-in-force.")).  Yes, it's true that DOJ saved

5    all of its probationers from the OPM ax.  But DOJ had to comply with OPM's exemption

6    process.  OPM's dispensations were "granted" (Dkt. No. 218-3 at 359, 382) and "reported" (*id.*

7    at 387) to DOJ.  That OPM *allowed* the DOJ exemptions doesn't mean that there was no OPM

8    approval required to spare probationers.  There certainly was, as laid out above.

9    The NTSB exemption is more of the same.  NTSB Chair Homendy "determined that all

10   20 employees should be retained by the agency" on January 24 (Dkt. No. 218-3 at 339).  Had

11   the NTSB been making its own determinations, that would have been the end of it.  Chair

12   Homendy instead sent an email to OPM days later "reiterat[ing] that [their] probationary

13   employees are critical to public safety" (*id.* at 338).  Peters allowed the NTSB to retain them

14   (*ibid.* ("Fine to exempt them.")).  These agencies did not "choose" to retain their employees.

15   They went hat in hand to OPM to plead for exemptions.

16   *Fourth*, the government advances yet another variation on the theme:  "[T]he

17   'exemptions' discussed are better understood as agencies seeking to exempt certain employees

18   from the broader Executive Branch priority to reduce the federal workforce and not from any

19   decision by OPM" (Defs.' Br. 5 n.2).  Here, too, the government's record shows otherwise.

20   Assistant AG Lauria's "suggest[ion]" to OPM that DOJ be exempted stated:  "The Department

21   of Justice must be exempt *from firing its probationary employees* given the criticality of the

22   missions we support" (Dkt. No. 218-3 at 388 (emphasis added)).

23   Assistant AG Lauria expressly disclaimed any intent to circumvent "the broader

24   Executive Branch priority to reduce the federal workforce" in the very next breath:

>        Please note, however, we are actively pursuing several
>        restructuring and downsizing proposals that will streamline the
>        Department's missions.  The planned restructuring and downsizing
>        proposals will include RIFs and reorganizations in strategic areas
>        that will ultimately reduce the overall number of staff in the
>        Department of Justice.

1    (*ibid.*).

2          OPM's Amanda Scales, forwarded Assistant AG Lauria's request

3    to Peters and reiterated:

4                Please see message below from Jolene with DOJ – at the bottom,
                she suggests DOJ be broadly exempted from probationary actions
5                (*with the caveat that DOJ is actively working on a broader
                downsizing / consolidation plan*).
6

7    (*id.* at 386 (emphasis added)).  So, it's quite clear that DOJ intended to address agency

8    downsizing in ways different from firing all probationary employees.

9          *Fifth*, the government argues that OPM's template termination letter matters not, because

10   "[p]laintiffs point to no evidence in the record that OPM actually required agencies to use these

11   drafts" (Defs.' Br. 19).  But the record shows that OPM repeatedly told agencies that they

12   should "us[e] the attached template letter" (Dkt. No. 218-3 at 384; *see also id.* at 369 ("Draft

13   letter[ ] for terminating a probationary period employee . . . [is] attached"); *id.* at 382

14   ("Agencies should use the attached letter to separate from probationary employees.")).  OPM

15   *repeatedly* told agencies that the publicly stated reason for termination *had to be* probationer

16   performance.  On February 12, OPM told agencies that "you *must* provide notice of

17   performance deficiencies in the [termination] notice" (*id.* at 384 (emphasis added)).  In a

18   second February 12 email, OPM again stated that "agencies *must* identify performance or

19   conduct deficiencies in the notice terminating a probationer, such performance or conduct

20   deficiencies do not have to be identified in a previous performance evaluation" (*id.* at 369

21   (emphasis added)).

22         *Sixth*, the government argues that OPM merely executed its "statutory authority under the

23   CSRA to provide guidance to clarify how agencies should carry out" the President's "hiring

24   freeze" executive order (Defs.' Br. 15; *see also* Dkt. No. 250 at 42:1–16 ("They wanted to be

25   on board with that agenda, so they were seeking confirmation from OPM.")).

26         The hiring freeze executive order is no refuge for OPM.   Our court of appeals recently

27   explained:  "'There is no provision in the Constitution that authorizes the President to enact, to

28   amend, or to repeal statutes.'  Instead, the President is tasked with 'tak[ing] Care that the Laws

United States District Court
Northern District of California

be faithfully executed.'" *Trump*, 139 F.4th at 1033 (9th Cir. 2025) (alteration in original) (first quoting *Clinton v. City of New York*, 524 U.S. 417, 438 (1998), then quoting U.S. Const. art. II, § 3). Whether OPM directed agencies of its own accord or did so at the behest of the executive (or by its order) is beside the point.[3]

*Seventh*, the government argues that OPM's directive cannot have been contrary to law because the government recently repealed Sections 315.803 and 315.804 of Title 5 of the Code of Federal Regulations, which had governed termination of probationers for performance (Defs.' Reply 12 (citations omitted)). "Thus, even if [p]laintiffs might have had a viable claim for injunctive relief before, they are no longer entitled to injunctive relief now" (*ibid*.). As an initial matter, those regulations were in full force when these terminations took place, and their (purported) *ex post facto* repeal does not figure. More importantly, the OPM directive was not contrary to law simply because it ran afoul of this or that regulation — it subverted the statutory scheme by which Congress reserved specific powers to each individual agency.

*Finally*, the government asserts:

> OPM repeatedly clarified that "[a]gencies are responsible for exempting whomever they want [from] . . . the President's directive to dramatically reduce the size of the federal workforce."

(Defs.' Reply 12 (ostensibly quoting a February 11 email from Special Advisor Peters)).

The "quote" proffered by government counsel James D. Todd Jr. is a fabrication. Government counsel pruned a portion of Peters's actual email ("agencies are responsible for exempting whomever they want") from its narrow context (an OPM provided list of categories for exemption) and grafted it onto a new, fabricated context found nowhere in the relevant email chain ("the President's directive to dramatically reduce the size of the federal workforce"). The result: A statement concerning OPM authored and approved exemption

---

[3] To the extent that the government is arguing, though it does not explicitly state, that even if OPM's actions were in fact a directive, they were lawful pursuant to an executive delegation of power, that argument fails, not just for the reasons stated above, but because the new rules employed to effectuate that directive would have had to go through notice and comment.

categories becomes, by brackets, ellipses, and government counsel's chicanery, a shot through the heart of plaintiffs' case. Counsel's ersatz evidence fails to persuade.

To explain the fabrication further, recall that during the "exemptions process," OPM "suggested possible categories of exemptions" to agencies (Dkt. No. 218-3 at 357). That happened on a call sometime before February 11 (*id*. at 358). The "administrative record" does not contain any direct evidence of when that call occurred or what was said. Then, on February 11, HUD CHCO Lori Michalski, a participant in that call, emailed Veronica Hinton (of OPM) a follow-up:

> In one of our last calls you had mentioned that OPM would be sending guidance on Disabled veterans and PMFs/Interns for the probationary employee exercise.. will there be guidance forthcoming?

(*ibid*. (all nits original)). Hinton forwarded Michalski's inquiry to Peters, who responded to Hinton and CHCO Council executive director Colleen Heller-Stein:

> Agencies are responsible for exempting whomever they want — they are not required to exclude people. *We have suggested possible categories of exemptions but are not requiring it*. It might not make sense for each agency.

(*id*. at 357 (emphasis added)). At no point in the internal email exchange did the words "the President's directive to dramatically reduce the size of the federal workforce" appear. That latter part of counsel's "quotation" is imaginary.

The February 11 email chain, in fact, evidences that OPM drafted a menu of sanctioned "categories" for exemption (disabled veterans and "PMFs/Interns" being two), communicated that menu to agencies by phone, refused to provide further information about those exemption categories in writing (*ibid.*), and later allowed agencies to pick-and-choose from that list of OPM exemptions. Yes, OPM delegated some measure of discretion it had unlawfully usurped back to the agencies by allowing them to take or leave any one category on the OPM menu. But OPM remained in charge: *OPM* authored and communicated the list of approved exemption categories to the other agencies, and the broader record shows *OPM* retained ultimate decision-making power over exemptions beyond those categories.

34

### C.    ARBITRARY AND CAPRICIOUS.

"Agency action is arbitrary and capricious when the agency 'relies on factors which Congress has not intended it to consider, entirely fails to consider an important aspect of the problem, or offers an explanation for its decision that runs counter to the evidence before the agency.'" *Ctr. for Biological Diversity v. U.S. Fish and Wildlife Serv.*, 67 F.4th 1027, 1035 (9th Cir. 2023) (alterations omitted) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). "The scope of review under the arbitrary and capricious standard is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs.*, 463 U.S. at 43.

Section 315.803(a) of Title 5 of the Code of Federal Regulations provided (until its purported repeal by executive order) that agencies "shall terminate [probationers'] services during [the probationary] period if the employee fails to demonstrate fully his or her qualifications for continued employment." Section 315.804(a) provided, in turn, that:

> [S]ubject to § 315.803(b), when an agency decides to terminate an employee serving a probationary or trial period because his work performance or conduct during this period fails to demonstrate his fitness or his qualifications for continued employment, it shall terminate his services by notifying him in writing as to why he is being separated and the effective date of the action. The information in the notice as to why the employee is being terminated shall, as a minimum, consist of the agency's conclusions as to the inadequacies of his performance or conduct.

The OPM directive was arbitrary and capricious: It directed the termination of over 25,000 probationers across the federal government "based on [their] performance" pursuant to Sections 315.803 and 315.804 without *any* consideration of actual performance or conduct, or any "rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (1983) (quoting *Burlington Trade Lines v. United States*, 371 U.S. 156, 168 (1962)). The record contains repeated, unequivocal direction to agencies that "agencies *must* identify performance or conduct deficiencies in the notice terminating a probationer" (Dkt. No. 218-3 at 369 (emphasis added); *see also*, *e.g.*, *id.* at 384 (agencies "must provide notice of

performance deficiencies in the [termination] notice")).  The record does not contain a single

mention of any performance deficiency on the part of any probationer terminated pursuant to

OPM's directive.

Even where OPM *granted* agencies' pleas for exemptions, it provided "no explanation at

all" for doing so (*see*, *e.g.*, *id.* at 359) (granting unreasoned exemptions to DOJ's civil

appellate, federal programs, immigration, and solicitor general branches).

### 5.    ULTRA VIRES.

The parties have also cross-moved for summary judgment of plaintiffs' *ultra vires* claim

for relief.  Plaintiffs concede that, because the record, analysis, and relief of the *ultra vires*

claim overlap with that of their APA claims, the Court need not reach both.  This order accepts

plaintiffs' concession and declines to reach the *ultra vires* claim.

### CONCLUSION

In the ordinary course, this order would, as required by the APA, set aside OPM's

unlawful directive and unwind its consequences, returning the parties to the *ex ante* status quo,

and as a consequence, probationers to their posts.  But the Supreme Court has made clear

enough by way of its emergency docket that it will overrule judicially granted relief respecting

hirings and firings within the executive, not just in this case but in others.  And, too much

water has now passed under the bridge since the Supreme Court stayed this Court's

preliminary injunction reinstating probationary employees.  The terminated probationary

employees have moved on with their lives and found new jobs.  Many would no longer be

willing or able to return to their posts.  The agencies in question have also transformed in the

intervening months by new executive priorities and sweeping reorganization.  Many

probationers would have no post to return to.

Probationers nevertheless continue to be harmed by OPM's pretextual termination "for

performance," and that harm can be redressed without reinstatement.

To that end, this order grants the following relief (all references to "relief defendant

agencies" or "agencies" in this section refer to all named relief defendants *except* the

Department of State, NASA, OMB, and OPM):

1. Declaratory judgment that OPM lacked the authority to direct other agencies to terminate their probationary employees and violated the APA when it did so. Terminations *pursuant to* that directive violated the APA.

2. The Court's preliminary injunction (Dkt. No. 202 at 26) is made permanent, modified as follows:

   a. Defendant OPM, its director, its Special Advisors, and all other OPM employees are enjoined from ordering, directing, or telling any other federal agency to terminate the employment of any federal employee or group of federal employees, except as allowed by 5 C.F.R. § 5.3 (*see supra*, at 27).

   b. All relief defendant agencies are enjoined from following any OPM order or direction to fire any agency employee, again excepting circumstances that fall within 5 C.F.R. § 5.3.

   c. All relief defendant agencies are enjoined from any further use of the OPM template termination letter provided by OPM — including any altered or modified versions.

3. Each relief defendant agency shall update each terminated probationary employee's personnel files, including their SF-50s, to reflect that their termination was not performance or conduct based. This shall be done by **NOVEMBER 14, 2025**. Each relief defendant agency shall submit a sworn declaration acknowledging compliance by **NOVEMBER 21, 2025**.

4. Where an employee was terminated by a relief defendant agency, rehired pursuant to Court order, then terminated *again* upon a stay of that order, the *second* termination cannot be made retroactive to the date of the first. It must stand on its own. Relief defendant agencies shall update all personnel files to comply with the order by **NOVEMBER 14, 2025**. Each relief defendant agency shall submit a sworn declaration acknowledging compliance by **NOVEMBER 21, 2025**.

5. Each relief defendant agency shall issue corrective notices to terminated probationers stating that "You were not terminated on the basis of your personal performance." Those letters shall be individually addressed to each probationer, meaning that the letter itself shall state on its face the name, address, and any other appropriate identifying information of that probationer (as well as that of the agency). Defendants, relief and otherwise, are of course free to disagree with this Court's ruling and to challenge this Court's ruling. They may yet prevail in the court of appeals or the Supreme Court. The corrective

letters, however, are not an appropriate medium for the litigation of those disagreements. To do so would undercut their fundamental purpose, as it did the first time around. To that end, corrective notices shall not contain further statements from each agency concerning the validity of this Court's ruling or the agency's opinions on this Court's ruling. There is no need to lard the letters with such distractions. Those notices shall be mailed by **NOVEMBER 14, 2025**. Each relief defendant agency shall submit a sworn declaration acknowledging compliance by **NOVEMBER 21, 2025**. Each relief defendant agency shall attach to that declaration an exemplar of the corrective notices sent.

6. Relief defendant agencies shall not make representations to third parties that probationers were terminated for cause or performance. Upon inquiry from third parties, agencies shall provide those parties the corrective notice ordered herein.

7. Each Chief Human Capital Officer (or equivalent) at the relief defendant agencies shall file a declaration with the Court acknowledging, in writing, that they have received and read this order by **OCTOBER 31, 2025**.

8. If a particular termination was in fact carried out after an individualized evaluation of that employee's performance or fitness, the Chief Human Capital Officer (or equivalent) of that agency may, in lieu of the above actions, submit, by **NOVEMBER 21, 2025**, a declaration, under oath and seal, stating so and providing the individualized reasoning and documentation underpinning that termination (*see* Dkt. No. 217).

9. Nothing in this order prohibits any federal agency from terminating any employee so long as the agency makes that decision on its own, does not use the OPM template termination notice, and is otherwise in compliance with applicable law.

**IT IS SO ORDERED.**

Dated: September 12, 2025.

_____
WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

EXHIBIT 2

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES, AFL-CIO
("AFGE"); AMERICAN FEDERATION
OF STATE COUNTY AND MUNICIPAL
EMPLOYEES, AFL-CIO ("AFSCME");
AFGE LOCAL 1216; UNITED NURSES
ASSOCIATIONS OF CALIFORNIA/
UNION OF HEALTH CARE
PROFESSIONALS, AFSCME, AFL-CIO;
AFGE LOCAL 2110; MAIN STREET
ALLIANCE; COALITION TO PROTECT
AMERICA'S NATIONAL PARKS;
WESTERN WATERSHEDS PROJECT;
VOTE VETS ACTION FUND INC.;
COMMON DEFENSE CIVIC
ENGAGEMENT; AMERICAN PUBLIC
HEALTH ASSOCIATION;
ASSOCIATION OF FLIGHT
ATTENDANTS-CWA, AFL-CIO;
AMERICAN GEOPHYSICAL UNION;
CLIMATE RESILIENT COMMUNITIES;
POINT BLUE CONSERVATION
SCIENCE; and, STATE OF
WASHINGTON,

                    Plaintiffs,

        v.

UNITED STATES OFFICE OF
PERSONNEL MANAGEMENT; and,
ACTING DIRECTOR CHARLES EZELL,
in his official capacity,

                    Defendants, and,

UNITED STATES ("U.S.")
DEPARTMENT OF AGRICULTURE;
SECRETARY ("SEC.") BROOKE
ROLLINS, in her official capacity;
U.S. DEPARTMENT OF COMMERCE;
SEC. HOWARD LUTNICK, in his official
capacity; U.S. DEPARTMENT OF
DEFENSE; SEC. PETE HEGSETH, in his
official capacity; U.S. DEPARTMENT OF

No.  C 25-01780 WHA

**FINAL JUDGMENT**

United States District Court
Northern District of California

1   EDUCATION; SEC. LINDA McMAHON,
    in her official capacity;

2   U.S. DEPARTMENT OF ENERGY;
    SEC. CHRIS WRIGHT, in his official

3   capacity; U.S. DEPARTMENT OF
    HEALTH AND HUMAN SERVICES;

4   SEC. ROBERT F. KENNEDY JR., in his
    official capacity; U.S. DEPARTMENT OF

5   HOMELAND SECURITY; SEC. KRISTI
    NOEM, in her official capacity;

6   U.S. DEPARTMENT OF HOUSING AND
    URBAN DEVELOPMENT; SEC. SCOTT

7   TURNER, in his official capacity;
    U.S. DEPARTMENT OF JUSTICE;

8   ATTORNEY GENERAL PAM BONDI, in
    her official capacity; U.S. DEPARTMENT

9   OF THE INTERIOR; SEC. DOUG
    BURGUM, in his official capacity;

10  U.S. DEPARTMENT OF LABOR;
    SEC. LORI CHAVEZ-DeREMER, in her

11  official capacity; U.S. DEPARTMENT OF
    STATE; SEC. MARCO RUBIO, in his

12  official capacity; U.S. DEPARTMENT OF
    TREASURY; SEC. SCOTT BESSENT, in

13  his official capacity; U.S. DEPARTMENT
    OF TRANSPORTATION; SEC. SEAN

14  DUFFY, in his official capacity;
    U.S. VETERANS' ADMINISTRATION;

15  SEC. DOUG COLLINS, in his official
    capacity; U.S. ENVIRONMENTAL

16  PROTECTION AGENCY;
    ADMINISTRATOR ("ADMSTR.") LEE

17  ZELDIN, in his official capacity;
    U.S. GENERAL SERVICES

18  ADMINISTRATION; ADMSTR. ROBIN
    CARNAHAN, in her official capacity;

19  U.S. NATIONAL AERONAUTICS AND
    SPACE ADMINISTRATION; ACTING

20  ADMSTR. SEAN DUFFY, in his official
    capacity; NATIONAL SCIENCE

21  FOUNDATION; DE FACTO DIRECTOR
    BRIAN STONE, in his official capacity;

22  U.S. OFFICE OF MANAGEMENT AND
    BUDGET; DIRECTOR RUSSELL

23  VOUGHT, in his official capacity;
    U.S. SMALL BUSINESS

24  ADMINISTRATION; ADMSTR. KELLY
    LOEFFLER, in her official capacity;

25  U.S. SOCIAL SECURITY
    ADMINISTRATION; and,

26  COMMISSIONER FRANK BISIGNANO,
    in his official capacity,

27
                Relief Defendants.
28
    _____

                        2

United States District Court
Northern District of California

1    Final judgment is hereby entered against Defendants and in favor of Plaintiffs to the

2    extent stated in the summary judgment order (but otherwise denied).

3    Final injunctive relief was ordered against all Relief Defendants except, as set out in the

4    summary judgment order, the Department of State, the National Aeronautics and Space

5    Administration, the Office of Management and Budget, and these three agencies' respective

6    agency heads in their official capacities.

7    The Court retains jurisdiction to enforce the final injunction and to award ancillary relief.

8    The Clerk shall close the file.

9

10    **IT IS SO ORDERED.**

11

12    Dated:  September 13, 2025.

13

14

15    WILLIAM ALSUP
     UNITED STATES DISTRICT JUDGE

16

17

18

19

20

21

22

23

24

25

26

27

28

3